1        UNITED STATES BANKRUPTCY COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3          (SAN FRANCISCO DIVISION)

4

5   In re:

6   DEMAS WAI YAN aka DENNIS YAN,        Case No. 04-33526

7                                        Chapter 11

8                                        San Francisco,California
                                         July 27, 2005
9                                        3:45 p.m.
            Debtor.
10  _____/

11  STELLA CHEN,

12          Plaintiff,

13      v.                               A.P. No. 05-03236

14  DEMAS WAI YAN aka DENNIS YAN,

15          Defendant.
    _____/

16

17        PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS
              TESTIMONY OF DEMAS YAN ONLY

18

19        BEFORE THE HONORABLE THOMAS CARLSON
             UNITED STATES BANKRUPTCY JUDGE

20

21

    APPEARANCES:

22

    For the Debtor:          LAW OFFICES OF MARK J. ROMEO
23                           BY: MARK J. ROMEO, ESQ.
                             130 Sutter Street, 7th Floor
24                           San Francisco, California 94104

25

1  APPEARANCES (CONTINUED):

2

3  For Stella Chen:           LAW OFFICES OF WILLIAM WEBB FARRER
                              BY: WILLIAM WEBB FARRER, ESQ.
4                             300 Montgomery Street, Suite 600
                              San Francisco, California 94104
5

6

7

8
   Court Recorder:            JANE GALVANI
9                             UNITED STATES BANKRUPTCY COURT
                              235 Pine Street
10                            San Francisco, California 94104

11

12
   Transcription Service:     Jo McCall
13                            Electronic Court
                              Recording/Transcribing
14                            3946 Pyle Avenue
                              Santa Rosa, California 95407
15                            Telephone: (707) 545-1838

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

July 27, 2005                           3:45 p.m.

---oOo---

THE CLERK: Raise your right hand, please.  Do you solemnly swear that the testimony you are about to give in this court is the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

THE CLERK: Please be seated.  State your full name and address for the record.

THE WITNESS: Okay.  My name is Demas Yan.  And my address is 1433 Seventh Avenue, San Francisco, California 94122.

DIRECT EXAMINATION

BY MR. ROMEO:

Q    Mr. Yan, can you very briefly tell the Court where you went to school after high school?

A    I went to school here.  I went to City College for two years.  This was around 1982.  And then I transferred to San Jose State University, and I graduated in 1987 with a BSEE degree, bachelor of science in electrical engineering. And then subsequently I took evening classes for my MBA.  I took classes in different locations.  I took some classes at Santa Clara University.  And also I took some classes at Golden Gate University.

1   Q    And did you get an advanced degree from Golden Gate

2  University?

3   A    No, I didn't.

4   Q    Is that where you met Tony Fu.

5   A    Yes.

6   Q    And you immigrated to this country from China?

7   A    From Hong Kong.

8   Q    From Hong Kong. And what year did you --

9   A    In 1973.

10   Q    And you've lived in San Francisco since that time?

11   A    Not continuously. I still reside in San Francisco

12  now. This is where most of my family members are. But

13  during my college years, I was away and for some period of

14  time, around '94 to '98, I was working in Asia.

15   Q    Okay. And when you were working in Asia, did you live

16  there much of the time?

17   A    I was working for U.S. companies. I was based there

18  as a sales manager, and from '94 to '96, I was based in

19  Hong Kong, and in '97, I was based in Singapore. And then

20  I went to work for another company, and at that time, I was

21  based in Hong Kong.

22   Q    And you have a residence in Hong Kong; is that true?

23   A    Correct.

24   Q    Now, after -- so you were employed from your narrative

25  in high tech or electronics businesses.

1  A     Yes.

2  Q     And when was the last time that you had any full-time

3  employment in that business?

4  A     In '98.

5  Q     Let me ask you about -- do you have any professional

6  licenses?

7  A     Yes.  I currently have an active license in

8  California, a broker's license, and also a California

9  contractor's license.

10 Q     Okay.  When did you get the real estate broker's

11 license?

12 A     This is in early 2001.

13 Q     And how long have you had a contractor's license?

14 A     I believe since early 2002.

15        THE COURT: The broker's license is from 2001?

16        THE WITNESS: Yes.

17        THE COURT: Okay.

18 BY MR. ROMEO:

19 Q     And in fact you've been the listing agent for the four

20 units on Chenery Street that have been sold during the

21 course of your case here.

22 A     Correct.

23 Q     Now are you single or married?

24 A     I'm currently married.

25 Q     How long ago did you get married?

1  A    I got married around September of last year.

2  Q    And where is your fiancee from?

3  A    She's from China.

4  Q    And where does she live now?

5  A    Here with me.

6  Q    And how long has she lived here in the United States?

7  A    Since September of last year.

8  Q    And before September of last year, where did she live

9 in China?

10  A    She lived in --

11       MR. FARRER: Objection, relevance.  I mean we're

12 trying to move along.

13       THE COURT: I assume he'll move through this

14 quickly.

15       THE WITNESS: She was living in Shenzhen in China.

16 BY MR. ROMEO:

17  Q    Okay.  Shenzhen is close to Hong Kong?

18  A    It's just across the border from Hong Kong.

19  Q    All right.  That's what the relevance is.

20       Were you in Hong Kong in February of 2002 at any

21 point?

22  A    Yes.

23  Q    For how long were you there?

24  A    I believe I went there in early February, and I didn't

25 come back to the U.S. until late May.

1  Q    Do you know a gentleman named Lueng Hing Lau?

2  A    No.

3  Q    You've heard the testimony regarding a meeting at a

4  restaurant in Hong Kong in February of 2002.  Do you ever

5  recall having such a meeting?

6  A    Well, my answer to your question is no, because the

7  meeting never happened, and the other part of your question

8  is that the first time I heard this story about a meeting

9  in a restaurant is yesterday in Fu's testimony.

10 Q    When was the first time you heard that you had taken a

11 loan in 3.6 million dollars in Hong Kong, from Lueng Hing

12 Lau?

13 A    Well, no one told me about -- told me the name of this

14 supposed uncle, and the only -- the only -- the first

15 knowledge I had of this story about a loan is in the

16 opposition paper to the preliminary motions that we were

17 trying to file, and this was around March of 2004 I think,

18 soon after I filed suit against Tony.  But at that time,

19 the declarations didn't mention whose uncle it was.  It

20 just said the loan was made by an uncle.

21 Q    Okay.  So that's the first time that you heard that

22 you took such a loan in Hong Hong in February 2002.

23 A    Yes.

24 Q    But you were in Hong Kong for part of February 2002;

25 is that correct?

1    A    Correct.

2    Q    And before you left for Hong Kong, and you said it was

3    in early February 2002, did you tell Tony Fu -- communicate

4    that fact to Tony Fu that you would travel to Hong Kong?

5    A    I'm not sure if I made a specific purpose to tell him

6    about that, but -- because at the time he was working on

7    the Chenery Street office, and we were in close contact.

8    And because I made frequent travels anyways, I'm sure that

9    I probably mentioned to him I would be away for a while.

10   But even when I'm away, he had ways of getting in touch

11   with me, and normally he gets in touch with me by fax or --

12   actually by fax, and by fax gets translated into e-mail

13   automatically.  So I check my e-mail every day.  So I

14   respond whether I'm here or away.

15   Q    When you were overseas in February 2002, was Tony --

16   did you tell Tony that you were going to be away -- that

17   you were going to be overseas?

18   A    I'm sure I probably mentioned it.

19   Q    All right.  Did you keep in contact with Tony about

20   the Chenery project while you were overseas between

21   February and May 2002?

22   A    I think unless there's some major problems, I don't

23   think I'd be in touch with him.  I may have called him once

24   in a while and ask how things are going.

25   Q    Do you have the white binder in front of you?

1  A    Yes.

2  Q    Can you open it up first of all to Exhibit A.

3  A    Okay.

4  Q    And this is -- what's this agreement?

5  A    This was the first agreement that we had with Wenchi

6  Wong (Phonetic) when he was the sole owner of the property

7  at Chenery Street, and I believe this was a recording made

8  of this, but the recording I think was a little bit after

9  the agreement was signed.

10 Q    In regard to paragraph -- or item 2 on the first page

11 of the agreement, the estimated market worth of new

12 structure, do you see that?

13 A    Yes.

14 Q    Do you recall what time period that estimated value

15 applied to?

16 A    That was in late '99.

17 Q    Okay.  That was when it was made?

18 A    Yes.

19 Q    And when was the projected value supposed to -- was

20 that a future value when the property was completed?

21 A    I think at the time -- well, because Wenchi was the

22 owner, so he was concerned about when the building can be

23 completed, and of course, Tony and myself at the time, we

24 were positioning ourselves as the developer and we were

25 telling him that probably we can get it done within a year

1   or so.  So I think -- I don't think that we made a specific
2   projection as to when this price would apply to, but I
3   think in our mind, it's like in 2000 or early 2001.

4   Q    All right.  Go to the fifth page of the document, the
5   page called "Additional Agreement."

6   A    Yes.

7   Q    This has an item 2 which says:

8           "Add to the agreement summary No. 2."

9   Do you see what I'm saying there?

10  A    Yes.

11  Q    And who is Humphrey Woo?

12  A    Humphrey Woo was a friend of Tony Fu and Humphrey Woo
13  is also a licensed broker and at the time -- I'm not -- I
14  don't really recall whether he knew Wenchi Wong or not, but
15  at the time when we were negotiating with Wenchi, he was
16  involved a bit, giving comments, and I think just to give
17  credence to this agreement to this price range, we just had
18  Humphrey Woo look at the numbers and agree on it as well.

19  Q    Okay.  Look at Exhibit B please.

20  A    Okay.

21  Q    Just briefly.  And this is -- can you tell me what
22  this is.

23  A    Yes.  Subsequent to the first agreement with Wenchi
24  Wong, I'm not sure whether I proposed first or Wenchi came
25  to me, but anyway, we agreed that I'll buy over Wenchi's

1  property, and also we agreed, because I'm buying over

2  Wenchi's property, that will cancel the original agreement

3  that we had with the original conditions.

4  Q    Look at Exhibit C please.

5  A    Yes.

6  Q    Can you tell the Court what this document is.

7  A    Actually I don't recall that we had this until this

8  was produced in deposition by Tony Fu I believe.  But

9  looking at it now, I do recall at the time, I think before

10  I -- I guess I legally took over as the owner, I had some

11  discussions with Tony about what's the arrangement between

12  Tony and myself.  And I would say that most of the

13  handwritings here are Tony's handwriting except for some

14  cross-outs and additions.

15  Q    Flip over to Exhibit D please.

16  A    Okay.

17  Q    And can you tell the Court what this is.

18  A    Yes.  This was an agreement between Tony and myself

19  pertaining to only this property at Chenery Street, and I

20  think I was the one who may have drafted this, but I think

21  Tony had a big part in the wording of this.

22  Q    How many -- was there an original of this agreement?

23  A    I don't recall there was any other version except this

24  one.

25  Q    Was there an original, something that you guys

1  considered an original?

2  A    Oh.  Yes.  I believe Tony had an original.

3  Q    Okay.  Did you have the original?

4  A    I think I had a copy, yes.

5  Q    Did you have a blue ink copy or just a copy?

6  A    The copy I had was also in black, but I think –- I'm

7  not sure whether mine is an original or not.  I think it

8  was original, but it was in black.

9  A    Did you see Plaintiff's 97 today in court?

10  A    Yes.

11  Q    And was that the original of the agreement that you

12  had, the October 18th, 2000 agreement?

13  A    Well, you know, I actually don't recall that this

14  document was notarized, but seeing they slipped it with

15  that notary page attached to it, I do recall that it was

16  done in a real estate office.  And the one I saw today, I

17  would assume that is an original.

18  Q    All right.  Are you aware of any other original other

19  than the one that you saw today that Mr. Chu brought to

20  court?

21  A    Well, when Tony and myself were at Starbucks at the

22  time when he asked me to sign the Stella Chen note, I do

23  recall that he handed me a copy of this copy, which I

24  assume was the original, and which he told me was the only

25  copy that he had.

1   Q    Well, who had -- did you ever have a copy of that

2   original that Mr. Chu brought to court?

3   A    No.  Not the one with -- not any copy with the

4   notary's page attached to it.

5   Q    In your meeting -- well, you heard testimony by a

6   number of witnesses today and yesterday about a meeting

7   that took place at Starbucks, correct?

8   A    Yes.

9   Q    Who suggested that meeting?

10   A    I recall clearly at the time I was working on 23rd

11   Avenue on my property at 547 - 23rd Avenue, and I recall

12   that I got a call from Tony.  He said meet me at Starbucks,

13   which was just a few blocks away, so I said okay, I'll just

14   walk over there.  I remember it was in the afternoon about

15   maybe 2:00 or 3:00, I don't recall, about that time frame.

16   Q    Did Mr. Fu in his phone call to you in arranging that

17   meeting at Starbucks tell you what the subject matter of

18   the meeting was?

19   A    When he called me, he didn't say anything specific.

20   He said -- I don't really recall what he said, but

21   basically he just wanted to meet me for a meeting.

22   Q    And you agreed to meet him?

23   A    Yes.

24   Q    And did you in fact go over to Starbucks on Geary and

25   meet him?

1  A     Yes.

2  Q     And was it just you two?

3  A     Yes.

4  Q     What took place at the meeting?

5  A     Well, I recall the meeting was not that long.

6  Basically he just handed me the deed of trust, and he told

7  me a story.  It seemed that he was in some financial

8  problems.  He couldn't pay his mortgage and also he

9  couldn't like make payments on his father and mother-in-

10 law's life insurance, things like that.  And he said that

11 he wanted to see if he can get some money, get some loan

12 from some relatives or some friends.  And he told me that

13 he wanted to -- wanted me to sign a deed of trust so he can

14 show it to people that he has some collateral.  And at the

15 time, I, you know -- at the time I had some -- a little bit

16 of hesitation, but I was thinking, you know, Tony and

17 myself, we have some, you know, some history before between

18 us.  And also I pretty much had done the same thing for him

19 before in respect to the Lei Ming Li note, meaning that he

20 asked me to sign a deed of trust and I signed it, with his

21 promise that he won't record it.

22 Q     Well, what kind of history did you have with Tony

23 before?

24 A     Well, as we have testified, we first met as

25 classmates, but not until 1998 did we start to go into

1  business together, I would say, you know, have some

2  business relationship.  But since '98 till I would say now,

3  we have worked on I think four properties, four or five

4  properties anyways, but Chenery was the last one.  And we

5  didn't have major problems with the previous projects, so

6  at the time I, you know -- even though at the time when he

7  called me to meet him at Starbucks, we were starting to

8  have sour feelings, but at the time, you know, I didn't

9  want to, you know, worsen our relationship.

10 Q    All right.  Let me ask you about -- do you have the

11 black binder there?

12 A    Yes.

13 Q    Can you go to Exhibit 6 please.

14 A    Okay.  Yes.

15 Q    You said Tony had a deed of trust at Starbucks?

16 A    Yes.

17 Q    Was it filled out when you got there?

18 A    I recall clearly that -- let me see -- I think he just

19 handed me a blank copy and what I did was I just filled in

20 the address, 663 Chenery Street, San Francisco, California.

21 And that's the only -- that's the only thing I could

22 recognize as my handwriting on it.

23 Q    Do you recognize the other handwriting on it?

24 A    Those are not mine.  I believe those are Tony's.

25 Q    What about the legal description that's attached to

1 the deed of trust. Was that --

2 A    I don't recall that he attached any of this. I don't

3 recall he attached the full deed of trust. I think he just

4 gave me the blank copy or maybe the first two pages.

5 Q    When you say when he gave you the first two pages,

6 you're talking about the first two pages of this exhibit?

7 A    Yes.

8 Q    And that's what he gave you during the meeting at

9 Starbucks?

10 A    Yes.

11 Q    Do you remember --

12 A    Actually no. I really don't recall whether he gave me

13 the full thing or not, but I just recall that it was a

14 blank document.

15 Q    What about on the legal description, where it says

16 Attachment A. Do you recognize the handwriting there?

17 A    That's not mine.

18 Q    Do you know whose it is?

19 A    I would assume that's Tony's.

20 q    What about on the first page of the document where it

21 says "When recorded mail to," and there's an address

22 written in.

23 A    I would like to add that this page, you know,

24 subsequent to the filing of the lawsuit, I noticed that

25 this page, this description page, Attachment A, is exactly

1 | the same page that was attached to the Lei Ming Li deed of
2 | trust. And the attachment wording is actually the same, is
3 | a mirror copy. So this tells me that this was a copy from
4 | the Lei Ming Li note.
5 | Q    All right. With regard to the first page of the
6 | document, Exhibit 6, who filled in the handwritten portions
7 | on the first page?
8 | A    Actually I don't think any of the other parts, except
9 | for the address, was filled in when it was taken to the
10 | notary's office.
11 | Q    So it's your testimony that the name of the
12 | beneficiary and the trustor were not filled in?
13 |          MR. FARRER: Objection. Leading. Misstates his
14 | testimony.
15 |          THE WITNESS: I recall --
16 |          THE COURT: Wait a second. I'm confused.
17 |          MR. ROMEO: I'm trying to understand --
18 |          THE COURT: At what time?
19 | BY MR. ROMEO:
20 | Q    During the meeting at Starbucks, when you showed up,
21 | was this filled out or not?
22 | A    Yes.
23 | Q    Was any of it filled out?
24 | A    From the best of my recollection, it wasn't filled
25 | out.

1    MR. FARRER: Objection.  There's no foundation.  I

2  mean the witness has testified he doesn't recall whether

3  certain blanks were filled in or not.

4    THE WITNESS: Well, I testified that I only filled

5  in the address, and I testified that at the time I recall

6  that Tony just handed me a blank page, a blank deed of

7  trust form.

8    MR. FARRER: That's not the question.

9    THE COURT: When you signed this, what was filled

10  in?

11    THE WITNESS: When I signed this, I believe the

12  only thing that was filled in is just the address, 663

13  Chenery Street, San Francisco, California, which is in my

14  handwriting.

15  BY MR. ROMEO:

16  Q    When you signed this, are you saying then that there

17  was no date on the deed of trust?

18  A    I think -- sorry.  I think that the amount, $450,000

19  was filled in.  I think that's for sure.

20  Q    What about your name Demas Yan, was that filled in or

21  not?

22  A    I don't recall.  I don't think so.  And I definitely

23  recall that the name Stella Chen wasn't filled in when I

24  signed this?

25  Q    Did you know who Stella Chen was at the time?

1  A     No, because I don't recall that when I signed this

2  that there was the name Stella Chen on it.  And actually I,

3  you know, not until the lawsuit happened, not until I found

4  out that the deed of trust was recorded, did I find out

5  that Stella Chen was Tony's sister.

6  Q     Well, had you met Tony's sister before?

7  A     Yes, but that was a long time ago, I think in early

8  1990's.

9  Q     Did you know he had a sister named Stella?

10 A     I knew he had a sister, but I don't recall her name.

11 Q     Did you ever socialize with her or see her at any time

12 of occasions --

13 A     No, I think I only met her --

14 Q     Let me finish the question.

15 A     Yes.

16 Q     -- before this was signed?

17 A     No, I think I only met her once in Tony's house.

18 Q     Did you and Mr. Fu have any discussion about whether

19 the deed of trust here was going to be recorded or not?

20 A     Yes.  I recall clearly that -- I think either he told

21 me or I asked him, you know, you're not going to record

22 this, and I think he just nodded or gave me an indication

23 that he won't record it.

24 Q     What about Exhibit 5, the promissory note, was that

25 something that was at the meeting with you at Starbucks

1  between you and Tony Fu?

2  A     You know, I –- after the meeting at Starbucks and

3  after we went over to the notary's office, I just walk away

4  and I didn't get to the office, and I did not receive this

5  in the mail or subsequently, and at the time I don't recall

6  that I signed anything with all this handwriting on it, all

7  these other crossed-out things on it.  And when I brought a

8  lawsuit, I didn't know –- I didn't recall that there was

9  such a note and I then told Mr. Bateman (Phonetic), my

10 attorney at the time, that there was a deed of trust in

11 Stella Chen's name.

12 Q     I don't think you need to -- I will have to stop you

13 there.

14 A     Okay.  That's fine.

15 Q     I don't want you going into any further

16 communications.

17        Mr. Yan, it's a case that you don't remember

18 seeing the promissory note during the course of the meeting

19 at Starbucks?

20 A     I'm pretty sure that I didn't sign this at the time.

21 Whether or not that's her signature, I really cannot

22 dispute.

23 Q     Now with regard to the deed of trust though, you did

24 sign the deed of trust on that day?

25 A     That's correct.

1  Q    And you signed it in front of a notary?

2  A    Yes, that's right.

3  Q    And you signed it and you saw the notary, Mr. Brodie.

4  Did you happen to recognize him when he came to court?

5  A    No.

6  Q    Did you have the partnership agreement with you at the

7  meeting at Starbucks?

8  A    No.  Oh, excuse me.  I didn't bring a copy but after I

9  signed this, I believe -- or at about the same time, I

10 think Tony handed me a copy of that October 18th agreement

11 between us.

12 Q    When you say handed it to you, was it at the time that

13 you signed on the same day, or was it at another time?

14 A    Well, it was on the same day.  I think it happened in

15 Starbucks before we walked over to the notary.

16 Q    Did he made any statement as to why he was giving you

17 a copy of the partnership agreement?

18 A    You know, I didn't ask him for it, and I didn't expect

19 it.  The reason why I signed the deed of trust was just

20 really to help him out.  I mean looking back from now, it

21 was kind of silly, but at the time I didn't see any harm in

22 doing it, as long as he promised that he won't record it.

23 So when he gave it to me, I just took it, but, you know, my

24 expectation at that time was that he still wants to follow

25 the terms of the contract, that is, when the property is

1   done and sold, he would still get his 25 percent share of

2   any sales proceeds.

3           MR. FARRER: Objection.  Move to strike.  The

4   answer is based entirely on speculation.  There's no

5   statement that Mr. Yan told him that.

6           THE COURT: It seems that that's the case.  You

7   can go on and establish it if you think you have it.

8   BY MR. ROMEO:

9   Q    Mr. Yan, as best as you can recall, can you tell the

10  Court exactly what Mr. Fu said was the reason that you were

11  signing a deed of trust on this date?

12  A    Why I was signing the deed of trust?

13  Q    Yes.

14  A    The reason why he asked me to sign it because he said

15  that he wanted some type of proof of collateral that he has

16  so that they can get a loan to tide them over.

17  Q    Okay.  Did you have a discussion about whether this

18  deed of trust related to his partnership interest?

19  A    Well, that's pretty obvious between Tony and myself,

20  so we didn't have a discussion about that.

21          MR. FARRER: Objection.  Move to strike.  Non-

22  responsive.

23          MR. ROMEO: The answer is -- you can answer the

24  question yes or no.

25          THE WITNESS: I think he mentioned that the

1   $450,000 on the deed of trust was what he said was related

2   to the estimate of value that we had for the original

3   project.  But as I said, at the time I just signed this

4   deed of trust as a favor to him.  I didn't really expect

5   that he would just, you know, give up his interest in the

6   property for $450,000.  In my mind, I was still expecting

7   that we'll follow the terms of the contract.

8   Q    Let me ask you this.  Can you turn to Exhibit 3,

9   please.

10  A    Okay.

11  Q    In the black binder.

12  A    Yes.

13  Q    First of all, did you sign this promissory note?

14  A    Yes, I did.

15  Q    And was this promissory note prepared by you or

16  prepared by somebody else?

17  A    It was prepared by I believe Tony, yes.  He was the

18  one who handed it to me.

19  Q    Okay.  Why was this promissory note signed?

20  A    This note was signed because at the time Tony went

21  over to Home Depot and bought a lot of material that was

22  scheduled for work at 547 - 23rd Avenue and 663 Chenery

23  Street.  At the time he wanted to -- I recall very clearly

24  because at the time I was with him in Home Depot, and he

25  was ordering the equipment, the material, and he wanted to

1  use up his credit cards.

2  Q    Well, let me ask you this.  With regard to this

3  particular note, what obligation did you owe to Lei Ming Li

4  that made you want to sign a promissory note for 110,440 --

5  A    Well, Tony said that the --

6  Q    Let me finish the question, please.

7  A    Sorry.

8  Q    What obligation did you owe to Lei Ming Li?

9  A    I didn't owe any obligation to Lei Ming Li.

10  Q    Did you owe an obligation of $110,440 to anybody at

11  this time?

12  A    I believe that was the amount that Tony spent at Home

13  Depot for those materials.

14  Q    Well, what about this -- you see the figure in the

15  upper left-hand corner, 110,440.

16  A    Yes.

17  Q    And then you see 547 and then the figure 47285, and

18  then beneath that, 663 and it says 63155.  Do you see

19  those?

20  A    Yes.

21  Q    Whose handwriting is that in?

22  A    It's not mine.  I believe it's Tony's.

23  Q    Was that there on the note when you signed it?

24  A    Yes.

25  Q    What do those two amount, if you know, signify?

1  A    I believe that is the amount that he spent at Home

2  Depot and he had lists of materials that were supposed to

3  be used at each one of those locations.  And I just believe

4  that that was the amount that he told he spent for the

5  separate projects.

6  Q       MR. FARRER: Objection.  Based on speculation.  As

7  the witness testified, that's -- he didn't write the

8  numbers, and unless Mr. Fu told him that, I think his

9  answer is based entirely on conjecture.

10          THE WITNESS: Well, my testimony --

11          THE COURT; Well, ask another question.

12  BY MR. ROMEO:

13  Q    Did Mr. Fu and you, were you both present when this

14  note was signed?

15  A    Yes.

16  Q    Were you present when it was prepared?

17  A    Not when it was prepared, no.

18  Q    When it was signed, did you have any discussion with

19  Mr. Fu about it?

20  A    Yes.  He just told me that this was for the Home

21  Depot --

22  Q    Well, the answer to the question is just yes or no.

23  Did you discuss it with him?

24  A    Yes.

25  Q    Okay.  And what did Mr. Fu say about, if anything,

1  about why the amount of the note was 110,440?

2  A    He said that was the amount that he spent buying the

3  materials.

4          THE COURT: "He" meaning Tony?

5          THE WITNESS: Tony, yes.  At Home Depot.

6  BY MR. ROMEO:

7  Q    And did you have a discussion with Mr. Fu about why he

8  wrote in 547 and 47285 and then 663, 63155.

9  A    I didn't question him as to exactly how he came to

10 those numbers, but he told me that part of that 110K was

11 for 547 and part of it for 663, and that's why he wrote

12 down the two separate entries there.

13 Q    Take a look at Plaintiff's Exhibit 4.

14 A    Okay.

15 Q    Was -- did you sign Plaintiff's Exhibit 4?

16 A    Yes.

17 Q    And did you prepare Exhibit 4?

18 A    No, I did not.

19 Q    And does Exhibit 4 relate to the promissory note that

20 we were just looking at, Exhibit 3?

21 A    Yes.

22 Q    What is the relationship?

23 A    I believe he gave this to me at the same time he

24 showed me the promissory note and both of these were

25 notarized.

1 Q    Was there any discussion between you and Mr. Fu at the

2 time that this was notarized as to whether it would be

3 recorded?

4 A    Yes.  He made a promise to me that he it wouldn't be

5 recorded.  I'm not sure whether I asked him to do that or

6 if he volunteered, but that was the understanding, that it

7 won't be recorded.

8 Q    Okay.  What's the recordation date of this?

9 A    September 17th, 2002.

10 Q    And you signed it when?

11 A    I think more than a year and half before.  Let's see,

12 I signed this on February 9th, 2001.

13 Q    Was there any discussion between you and Mr. Fu as to

14 why if it was his obligations he incurred at Home Depot

15 that the note and deed of trust were in the name of Lei

16 Ming Li?

17 A    Well, that's an open secret between Tony and myself,

18 and I think -- and at the time he just wanted to hide his

19 assets from his creditors.

20 Q    Well, did he tell you that?

21          MR. FARRER: Objection.  Speculation.  Conjecture.

22 Unless there was a statement by Mr. Yan to that effect.

23          THE COURT: Yeah.  Let's get into the basis for

24 that.

25 ///

BY MR. ROMEO:

Q    Did Tony Fu tell you why the note and deed of trust that you were signing on February 9th, 2001 was going to be paid to Lei Ming Li?

A    He didn't tell me at this time why he wrote down to Lei Ming Li, but even before this note was signed, he told me that he wanted to hide his assets from his creditors.

MR. FARRER: Objection, Your Honor.  I move to strike the prior answer that it was based upon this note.

THE COURT: He said it was based on an open understanding, and then you followed up.  You can ask him about that prior time if you want.

MR. ROMEO: That's what I was going to do.

BY MR. ROMEO:

Q    So it wasn't discussed at the time that you signed the note, but there was some prior time that Mr. Fu had discussed this with you?

A    Yes.

Q    And who was he trying -- did he ever tell you who he was trying to hide his assets from?

A    Well, he had this bitter lawsuit with Florence Fung, and from what I gather is that he worked on Florence Fung's house and she refused to pay him the last installment, and Tony sued Florence Fung but actually Florence Fung ultimately prevailed and got a judgment against him.

1  Q    Is that what you learned from Tony?

2  A    Yes.

3  Q    And was that why Tony was concerned about putting

4  things in his name?

5  A    Yes.  And I recall pretty clearly that soon after he

6  got that first judgment in this case, he came to me and

7  asked me, you know, about how to file bankruptcy, things

8  like that.

9  Q    When was the first time that you learned that the Lei

10 Ming Li note and deed of trust were recorded against the

11 Chenery property?

12      After this was made in 2001, I just put this out of my

13 mind, and I really don't recall about this note until it

14 showed up in the title report in late 2003.

15 Q    And do you remember a month in 2003?

16 A    Around September 2003.

17 Q    When was the first time that you learned that the

18 Stella Chen deed of trust had been recorded.

19 A    The same time, from the same title report.

20 Q    And were you surprised to see them in the title report

21 when you got it?

22 A    I saw the Lei Ming Li name.  I knew that was Crystal

23 because we had frequent contacts, so I wasn't surprised

24 about the Lei Ming Li note.  I saw the name Stella Chen.  I

25 was surprised.  I didn't know who that was, but when I

1  looked at the figure $450,000, I knew that was the note

2  that I signed at Home Depot that I gave to Tony.

3  Q    The note that you signed at Home Depot?

4  A    Yes.

5  Q    Or the note that you signed at Starbucks?

6  A    The deed of trust.  The deed of trust.

7  Q    You said Home Depot.  You didn't sign the note at Home

8  Depot; did you?

9  A    At Starbucks, I'm sorry.

10 Q    Okay.  So you recognized the $450,000 figure?

11 A    Yes.  I recognized it as related to the agreement

12 between Tony and myself.

13 A    Prior to getting that title report, had you involved

14 yourself in the development at the property at 663 Chenery

15 Street?

16 A    I wasn't -- I wasn't in charge of the actual

17 construction, but since I'm, you know, I'm the owner,

18 I helped out in terms of the applications, and, you know,

19 getting the permits moving along.

20 Q    Did you hire anybody, any professionals, to assist you

21 in developing that property?

22 A    No.  Tony was the one who was solely in charge of

23 that.

24 Q    Did you hire any professionals such as attorneys or

25 surveyors to help you in the development of the property?

1  A     Yes, I did.  I hired Rick Seher.

2  Q     Rick Seher?

3  A     Yes.

4  Q     Anyone else?

5  A     I hired Margaret Berlese as the attorney to work on

6  the condo subdivision.

7  Q     Okay.  Did you have some kind of fee basis for both of

8  those firms?

9  A     Yes.  I think initially both parties were on a flat

10  fee.

11  Q     What was Mr. Seher going to do?

12  A     He was the surveyor, and I think his only job was to

13  get the maps done to assist Berlese in getting the

14  subdivision done.

15  Q     Did you have maps prepared by Mr. Seher?

16  A     Yes.

17  Q     When was the first time you had a map prepared by him?

18  A     I recall that -- I retained Seher I think pretty early

19  in this project, and I think the first time I saw a map or

20  I was asked to sign a map was around 2001, I believe, in

21  the middle of 2001.

22  Q     Can you take a look at Exhibit G please.

23  A     Okay.

24  Q     Is this a map that you had prepared by Mr. Seher's

25  firm?

1   A    Yes.

2   Q    When was it prepared to your knowledge?

3   A    The date on this one is June 6, 2002.

4   Q    Okay.  Is there signatures on that map for approval by

5   the lenders?

6   A    Yes.

7   Q    What lenders are referenced in the map?

8   A    This is for World Savings and B of A.

9   Q    Prior to having this map prepared, did you give any

10  information regarding the title of the property to Mr.

11  Seher?

12  A    No, I didn't have to do that.  I think either Margaret

13  Berlese ordered the title reports directly from the title

14  company or I think she asked us to get them from the title

15  company.

16  Q    Do you know if a title report was given to Mr. Seher?

17  A    I did not give him any copies at this time when this

18  was made and I don't know how he -- I don't know how he --

19  I don't know whether he based this on a title report.

20  Q    Would you take a look at Exhibit H please.

21  A    H?

22  Q    Yes.  The next exhibit over.

23  A    Okay.

24  Q    Is that your signature on Exhibit H?

25  A    Yes, it is.

1  Q    Did you sign this document or this map on June 9th,

2  2003?

3  A    Yes.

4  Q    Did Mr. Seher explain to you who had to sign the

5  subdivision map before it was approved and filed?

6  A    Yes.  He said that all lienholders have to sign it.

7  In his words, he said all lenders have to sign it.

8  Q    Okay.  Are there any lender's signatures on this map?

9  A    No.

10 Q    Why do -- do you have any understanding as to why it

11 was prepared without lender's signatures?

12 A    Yes.  Because when we tried to get the banks to sign

13 off on the map, both World Savings and B of A did not come

14 forward with the signatures.  So around this time in June

15 2003, I told them that -- let's not bother with them, that

16 I'll just pay off the loans.   And since the only two liens

17 that I knew of was World Savings and B of A, I just told

18 them to prepare the map again without the lender's portion

19 in it.

20 Q    Okay.  And did they prepare the map again after June

21 2003?

22 A    Yes.

23 Q    And did they prepare -- let me ask you this.  Every

24 time that they had to revise the map, did it cost you

25 additional money?

1  A    I think for this one in June 2003, at this time, they

2  still haven't asked me to pay extra, but subsequent to this

3  one, when I found out that those Lei Ming Li note and the

4  Stella Chen note was recorded, I think at that time that's

5  when Seher was I think frustrated and asked me to pay

6  extra.

7  Q    Okay.  Take a look at Exhibit K please.

8  A    Okay.

9  Q    By the way, you said that you grew frustrated because

10 you couldn't get World Savings and Bank of America to sign

11 off on the subdivision map, correct?

12 A    Yes.

13 Q    And did you -- were you personally involved in trying

14 to get their approval from the banks?

15 A    No.  Margaret Berlese was in contact with them, and

16 she related that to me.  Well, I called her quite often to

17 ask about the progress because we were all eager to have

18 them sign and have the map done, and I just get it from her

19 that they refused to sign.

20 Q    Okay.  So --

21        MR. FARRER: Your Honor, I just want to note

22 Margaret Berlese was his lawyer so they've opened the door

23 for attorney-client privilege discussions when we go on

24 cross.  I mean I cannot sit here and have him testify about

25 what Margaret Berlese and he discussed about maps and

conversations with the lenders and then not be permitted to
go into the same topic on cross.

    MR. ROMEO: Well, I think he answered the question
that Margaret Berlese is the one who involved herself in
trying to get the lender's approval.

    MR. FARRER: And he also just testified about what
she told him about those discussions because he wasn't
involved.

    MR. ROMEO: All right.  Well, he can -- he's made
the statement to explain his own behavior or his own
actions.

    THE COURT: Okay.

By MR. ROMEO:

Q Mr. Yan, what did you do when you could not get the
lenders -- or could not get the lender's approval on the
maps?

A I knew for a fact that we need to get the map done,
otherwise we can't get the project finished.  So the only
way that we can get the map done was to pay them off, and
have a new map drawn up without any lender's requirement.

Q Well, let me ask you, what did you do then?  Did you
pay them off?

A Yes, I did.

Q What was the balance on the two loans that were on the
property at the time that you paid them off?

1  A    I believe both added together was I think around -- a

2  little over $400,000.

3  Q    And when did you pay them off?

4  A    I paid them off in December of 2003?

5  Q    Where did you get the money?

6  A    I got the money because I refinanced my property at

7  547 - 23rd Avenue, a little bit before that in October of

8  2003.

9  Q    All right.  And who was the refinance lender on 547 -

10  23rd Avenue?

11  A    Washington Mutual.

12  Q    And how much -- did you take cash out of the

13  refinance?

14  A    Yes, I did.

15  Q    How much was that?

16  A    I think I took out over $500,000.

17  Q    And you used those funds to pay off Bank of America

18  and World Savings?

19  A    Correct.

20  Q    Take a look at Exhibit K please.

21  A    Okay.

22  Q    Do you remember getting this letter from Mr. Seher?

23  A    Yes.

24  Q    And when you got the letter and it said something

25  about one or more additional loans, did you understand in

1  receiving that letter what loans were being referred to?

2  A    Yes.

3  Q    What loans were being referred to, the additional

4  loans?

5  A    That's the deeds of trust under Lei Ming Li's name and

6  Stella Chen's name.

7  Q    So you knew by the time that you got this letter about

8  the Lei Ming Li and the Stella Chen deed of trust?

9  A    Yes.

10 Q    Because you had seen them where?

11 A    In a title report.

12 Q    And where did the title report come from?

13 A    The first time I saw them in the title report, it was

14 a report from Fidelity Title.

15 Q    And did you send that title report to Mr. Seher's

16 office?

17 A    No.  Actually I -- not at this time, no.

18 Q    At some later date?

19 A    At some later date.

20 Q    In December 2000 --

21 A    That's correct.

22 Q    2003?

23 A    Yes.

24 Q    Okay.  Take a look at Exhibit L.  What did you mean

25 when you told Mr. Smith, "David, please do not take any

1  action.  We are clearing the title"?

2  A    Because in his letter in October 3rd, he was asking me

3  to sign an additional agreement, fee agreement.  So the

4  next day, October 4th, I sent him an e-mail.  I said, hold

5  on, I don't want to -- the reason why I said this was

6  because I don't want him -- I don't want the need for me to

7  pay any extra costs for the map.

8  Q    By the way, in your agreement with Tony Fu for the

9  development of this property, you were supposed to put in

10  $300,000 into the construction costs, correct?

11  A    Correct.

12  Q    Were you required to pay any other additional costs

13  out of your own pocket that were not a credit towards the

14  300,000?

15  A    We mentioned in our agreement that anything not

16  related to construction, I will be responsible for.

17  Q    Would things like the expenses for Mr. Seher's office

18  and Margaret Berlese's office fall into that category?

19  A    Yes, correct.

20  Q    And that was agreed between you and Tony?

21  A    Yes.

22  Q    By the way, when the new title report in 2003 showed

23  the other deeds of trust on the property, did you incur

24  additional expense with Margaret Berlese's office because

25  of that?

1  A     Yes.  I think she charged me some extra fees.

2  Q     You saw in her deposition something about an hourly

3  rate?

4  A     Correct.

5  Q     And so you incurred additional expense because of

6  these newly discovered deeds of trust?

7  A     That's correct.

8  Q     By the way, when you were having problems getting the

9  lenders, World Savings and Bank of America, to approve the

10 subdivision map, did you ever discuss that problem with

11 Tony Fu?

12 A     I'm sure I did.  I'm sure that he knew that I was

13 having problems with that.

14 Q     Well, are you sure you discussed it with him or are

15 you just guessing?

16 A     No, I'm sure that we had some discussions.

17 Q     Did you tell Tony Fu your plan was to pay off those

18 loans?

19 A     I think I did, yes.

20 Q     When the new title report came in 2003, did you have

21 any discussion with Mr. Fu about the newly-discovered deeds

22 of trust?

23 A     The first time I saw those deeds of trust on the title

24 report, I immediately sent a fax to Tony, and I asked him

25 what those were.

1    THE COURT: You asked him what?

2    THE WITNESS: I asked him what those were.  Did he

3  know what those were, what those deeds of trust were.

4  BY MR. ROMEO:

5  Q    And did you get a response from Tony?

6  A    No.  And that was surprising because normally he

7  gets back to me quite quickly.

8  Q    Did you ever get a response from Tony, whether it was

9  tardy or quick?

10  A    Well, a few days later, I called him up, and I

11  mentioned to him, you know, why -- what those were, and

12  basically I knew at that time what they were, but I wanted

13  to hear it from him why, you know, what they were.  And

14  then we just -- we just had a quick -- a big heated

15  argument over that.

16  Q    Was that an argument that took place face to face in

17  person or was it on the phone?

18  A    It was on the phone.

19  Q    And were you both in San Francisco at the time?

20  A    Yes.

21  Q    And what happened in that big argument on the phone?

22  A    Well, it was a heated argument.  I don't recall the

23  specific wording.

24    THE COURT: Do you remember when this was, what

25  month?

1    THE WITNESS: This was in September -- actually

2 this was on I think the day or the day after I got the

3 Stantiesteban offer.  When I called him up, also I had the

4 talk with him about those deeds of trust.  So I don't have

5 the date of that contract, but it was around that time.

6 BY MR. ROMEO:

7 Q    Do you have the black binder in front of you?  Maybe

8 we can --

9 A    Okay.  Oh okay.  I see the -- this is Exhibit 12?

10 Q    You're faster than me.  Okay.

11 A    And this was prepared on September 25th, but I'm not

12 sure whether I got it on that date or not.  Let's see.  On

13 the top, the fax heading says August 19th.  I don't think

14 that's correct.

15    THE COURT: What document are we in now?

16    THE WITNESS: This is 12, Exhibit 12.

17    THE COURT: Oh, okay.

18    THE WITNESS: I believe that I got this around

19 September 25th, and I got this and I gave Tony a call

20 because I wanted to get his feedback on this offer.  Plus

21 at that time, I was asking him about, you know, why didn't

22 you get back to me about those deeds of trust when I asked

23 you to explain what they were.

24 BY MR. ROMEO:

25 Q    How did he respond?

1  A    I don't recall the exact words, but he didn't deny

2  that those didn't belong to him.

3  Q    Well --

4         MR. FARRER: Objection.  Speculation.  No

5  foundation.  I move to strike that answer because there's

6  no statement that Mr. Yan said anything -- that Mr. Fu --

7         THE COURT: What did he say?  You need to limit

8  yourself to what he said, not --

9         THE WITNESS: Okay.  I don't recall exactly what

10 he said.

11        THE COURT:  -- not your thoughts about what he

12 said.

13        THE WITNESS:  Yes.  I don't recall exactly what

14 he said, but I think he just said that's the amount that

15 you owe me on the property, the work I did for you.

16        MR. FARRER: Objection, no foundation.  Move to

17 strike.

18        THE COURT: Do you remember what he said?

19        THE WITNESS: I don't recall exactly the words,

20 but --

21        THE COURT: Do you remember generally what he

22 said?

23        THE WITNESS: Yes.  Generally what he said was,

24 that was the amount that you owe me.

25 ///

1   BY MR. ROMEO:

2   Q      Owe him?

3   A      Owe him, yes.

4   Q      After you found the deeds of trust from Stella Chen

5   and Lei Ming Li on the title of the property, did you have

6   revised maps prepared?

7   A      Yes.

8   Q      Did you communicate that title report to Mr. Seher's

9   office?  Did you send it to him?

10  A      Did I send the title report to him?

11  Q      Did you send the new title report to him?

12  A      No, I never had to send him any title report.  If he

13  needs any title report, I think he just asked -- either

14  Berlese or asked the title company directly.

15  Q      Well, did you send it to David Smith by fax at some

16  point in 2003?

17  A      Correct.

18  Q      Okay.  So you did send it to David Smith?

19  A      But the one I sent him was the old copy, the one that

20  I got in September of 2003, and the reason why I sent it to

21  him is not to update him on the current status of the

22  title, but just to show him that, you know, just tell him

23  that I paid off those institutional loans.

24  Q      Okay.  So take a look at Plaintiff's Exhibit 9.

25  A      Okay.

1  Q    Mr. Farrer was asking about this exhibit among some of

2  the other witnesses yesterday.  Have you seen this before?

3  A    Yes.

4  Q    Is this your e-mail to David Smith?

5         MR. FARRER: I'm sorry, you said Exhibit 9?

6         MR. ROMEO: 19, I'm sorry.

7         THE COURT: 19, that makes more sense.

8         MR. ROMEO: I'm sorry, Your Honor.  It's getting

9  late in the day.

10         THE WITNESS: Yes, I've seen this.

11  BY MR. ROMEO:

12  Q    Was this in response to a communication from Mr.

13  Smith?

14  A    Yes.

15  Q    And if you look at Exhibit 18 --

16  A    Yes.

17  Q    So he was going to charge you additional -- you had to

18  sign an additional services contract?

19  A    Yes.

20  Q    Why did you use the term "lenders" in both of these e-

21  mails?

22  A    Because this is in response to their communication

23  with me, so I just used the same terms that they used in

24  their communication with me.  They just referred to

25  lienholders as the lenders.  And the reason why I sent this

1  was because I wanted to make sure that they got the names

2  correct -- spelled correctly in the new map so that they

3  won't charge me any more money for any more revisions.

4  Q    Now you got the Stantiesteban offer in September 2003?

5  A    Yes.

6  Q    And did you -- and you said you gave the copy of that

7  to Tony?

8  A    Yes.

9  Q    And you went into escrow with Mr. Stantiesteban?

10 A    Yes.

11 Q    During the course of that escrow, what title company

12 did you use?

13 A    Old Republic Title.

14 Q    During the course of that escrow, did you sign

15 instructions relating to the close of escrow?

16 A    Yes, I did.

17 Q    Did you have any contact with Mr. Fu during the escrow

18 regarding the form and content of the instructions?

19 A    With Tony Fu?

20 Q    Yes.

21 A    I recall that I went to the title company to sign the

22 escrow and that was the first time I seen those.

23        MR. FARRER: Objection.  Move to strike.  Non-

24 responsive.

25        THE COURT: I think the question had to do, what

1  did you talk -- did you talk to Mr. Fu.

2          THE WITNESS: I don't think I talked to him about

3  the contents of the escrow instructions.

4  BY MR. ROMEO:

5  Q    Did you have any discussions with Mr. Fu about how the

6  two notes, the Lei Ming Li note and the Stella Chen note,

7  were going to be satisfied during escrow?

8          MR. FARRER: Objection.  Vague.  What point in

9  time?

10          MR. ROMEO: During the escrow.

11          THE WITNESS: During the escrow.  Around that

12  time, we had some ongoing continuous negotiations back and

13  forth about, you know, what's the validity of those deeds

14  of trusts, and what's the actual amount that's owed behind

15  them.  And --

16  BY MR. ROMEO:

17  Q    Who did you have those negotiations with?

18  A    Only with Tony.

19  Q    Did you have any discussions with Stella Chen?

20  A    No because -- no, between Tony and myself, the notes

21  only behind the deed of trust, so he never asked me -- he

22  never told me that I need to talk to anyone else except

23  himself.

24  Q    Did you discuss the instructions or the escrow at any

25  time with Stella Chen?

1  A    No.

2  Q    Did you ever discuss the Lei Ming Li note with Lei

3  Ming Li?

4  A    No.

5  Q    Did you ever have a phone discussion with Tony that

6  included Lei Ming Li?

7  A    That was very close I think to the end of the

8  negotiations in that period between me and Tony, close to

9  just before filing the suit.  And I recall that we had I

10 think -- I remember that I was on the phone and Tony and

11 Crystal were on the same line, and I don't think we talked

12 specifically about the instructions, but we were just

13 having a discussion about, you know, why -- I guess each of

14 our positions as to why, you know, why they claimed all the

15 money and why I claim that I owe less on the deed of trust.

16 Q    So is that a subject matter that you had frequent

17 discussions with Mr. Fu about, and who was going to get how

18 much money out of the escrow?

19            MR. FARRER: Objection.  Vague and ambiguous.

20            THE WITNESS: Um, I --

21            THE COURT: Wait a second.

22            MR. ROMEO:  During this period of time -- let me

23 rephrase the question, Your Honor.

24            THE COURT: Yes.

25            MR. ROMEO: Just to save time.

BY MR. ROMEO:

Q    During the Stantiesteban escrow, did you have frequent

discussions with Tony Fu about what you just mentioned, how

much money each side was going to take out of the escrow?

          MR. FARRER: Objection.

          THE COURT: What does "each side" mean?

          MR. ROMEO:   Mr. Yan and Mr. Fu.

          THE COURT: Do you understand it now?

          THE WITNESS: Yes, I do.

          THE COURT: Okay.

          THE WITNESS: Yes.  We had frequent discussions.

BY MR. ROMEO:

Q    Okay.

A    I wouldn't say discussions.  It was more like

arguments.

Q    Okay.  So things were becoming acrimonious between

you?

A    Yes, definitely.

Q    Now, were you able to secure Lei Ming Li's agreement

as to her note?

A    Yes, through Tony.

Q    And you negotiated that with who?

A    Tony.

Q    Did you negotiate it with her at all?

A    No.

Q    What was the resolution of the Lei Ming Li note?

A    Well, I had proof that I paid $30,000 in satisfaction of that deed of trust, and the $30,000 I paid was specifically for reimbursement for the 547 - 23rd Avenue project.  And I guess I would need to look at that Lei Ming Li deed of trust to look at the numbers.  Actually the numbers on the --

Q    Well, actually just take a minute to look at Exhibit DD, when you talked about the proof of a $30,000 payment. Can you tell me if Exhibit DD was the proof that you gave at the time?

A    Yes.

Q    Okay.  You wanted to look at the board here.

A    Yes.

Q    First of all, what was -- was it a sum of money paid to Lei Ming Li for reconveyance of that deed of trust?

A    Correct.

Q    Were you able to get both deeds of trust reconveyed during this escrow?

A    No.  Only the Lei Ming Li note.

Q    This board here has the principal amount of the Lei Ming Li note, correct?

A    Correct.

Q    And the 17285 was what she was paid during escrow?

A    Correct.

Q    And that was paid actually by you putting in funds
into escrow to pay to her; is that correct?

A    Yes.

Q    You mentioned the 30,000, and that's Exhibit DD.

A    Yes.

Q    If my math is correct on that board, then that leaves
$63,155.

A    Correct.

Q    What is that figure?

A    Well, that's according to the deed of trust was the
portion that was designated for the project at 663 Chenery
Street.  In other words, that was the amount supposedly
owed for the materials purchased for 663 Chenery Street.

Q    Why didn't you simply pay Lei Ming LI another $63,155
for Chenery Street.

A    Because at the time my argument to Tony was that since
I have always fulfilled my portion of the agreement between
Tony and myself, in other words, that I was supposed to put
in a maximum of only $300,000 towards the construction
costs, and at the time I was negotiating with Tony to
reduce this deed of trust, I already put in more than
$300,000.  So my argument to him was that since I've always
fulfilled my agreement, anything that's related to the
construction costs that's above my, you know, my
contribution, under the contract, he should be liable for

1  that. And he agreed with my argument. So he agreed not

2  to -- to waive this in the deed of trust.

3  Q    Well, did he waive it or did he credit it against

4  something else?

5  A    No, it wasn't credited against anything.

6  Q    By the way, you were asked this morning about -- or

7  excuse me, you were here when Mr. Fu was shown Plaintiff's

8  Exhibits 91, 92 -- 90, 91 and 92. Are those still on the

9  witness stand. Do you have copies of them there?

10 A    Yes. Okay.

11 Q    Take a look at Exhibit 90 first.

12 A    Okay.

13 Q    What account was this written from?

14 A    This is from my Citibank account.

15 Q    And who was on that account?

16 A    The name is Demas Yan and Lei Ming Li. But this is an

17 account for my checking account.

18 Q    Okay. This account was set up for a particular

19 purpose?

20 A    Yes. At the time when this was set up, it was solely

21 only for expenses related to the project at 547 - 23rd

22 Avenue.

23 Q    Okay. So -- and this Mr. Augustine Farley (Phonetic)

24 received $50,000 from that account?

25 A    Yes, he did.

Q   And is that your handwriting underneath the photocopy
of the check?

A   Yes.

Q   And was this photocopy with your handwriting given to
Lei Ming Li?

A   It was given to Tony.

Q   It was given to Tony.  Did Tony arrange this
particular transaction?

A   I think he did, yes.  He was the one who asked me to
loan the money to this person

Q   If you'll take a look at Exhibit 91.  Who is the
holder of this note?

A   The name on the -- the holder on this is Demas Yan and
Tony Fu.

Q   What was your -- what was your interest in this note,
respectively?

A   The understanding was that when this note was --

Q   No, what was the percentage interest between Demas Yan
and Tony Fu in this note?

A   It is half and half.

Q   Okay.  Take a look at Exhibit 92.

A   Okay.

Q   What interest were you assigning in this --

A   This is my interest under that promissory note from
Augustine.

Q    Okay.  Were you assigning a $50,000 interest or a
$25,000 interest?

A    Only $25,000.

THE COURT: Okay.  Let me slow down here a little
bit.  The -- when was the Lei Ming Li -- have I pronounced
it right -- note retired by these various payments and
arguments?

THE WITNESS: That was retired when we agreed to
settle that deed of trust by my putting $17,285 --

THE COURT: And when did that close?

THE WITNESS: That was in --

THE COURT: That didn't close until the loan
closed -- or the sale closed finally, right?

THE WITNESS: No.

THE WITNESS: I put the money into that escrow
and -- but they took the money before the closing of the
escrow.  And this was in I think February of 2004, last
year.

THE COURT: And then that was reconveyed?

THE WITNESS: Yes, it was.

THE COURT: So that deed of trust was reconveyed.

THE WITNESS: Yes.

THE COURT: I guess what I'm not getting is, what
relationship does this assignment of this $25,000 note have
to that?

1    THE WITNESS: Nothing.

2    MR. ROMEO: It has none.

3    THE COURT: Okay.  Because the numbers didn't fit.

4    Okay.  Sorry.

5    MR. ROMEO: That was our point.

6    BY MR. ROMEO:

7    Q    Now the escrow, that the Stantiestebans purchased

8    eventually did close this year, correct?

9    A    Correct.

10   Q    It didn't close at the time before you filed suit

11   against Tony?

12   A    No.

13   Q    Why did you not close the escrow with Tony -- with

14   Stantiesteban?

15   A    Well, from the time I learned of the deed of trust

16   having been recorded in September of 2003, until February

17   of 2004, I was in continuous discussion with Tony, trying

18   to resolve this deal between us.  And finally when it seems

19   it was inevitable that we can't settle our dispute without

20   going through a suit -- you know, I really wanted to close

21   the escrow with Stantiesteban because I didn't want to get

22   into any problems -- any legal problems with them, but in

23   February of 2004, when Tony and myself couldn't resolve the

24   issue, I just bit the bullet and decided to file a suit

25   anyway against Tony.  And at the time, I explained to

1  Arthur Rugama, the attorney for this buyer, I told him that

2  I had a deed of trust with Tony Fu that I couldn't get him

3  to release, and I told him -- I told Arthur Rugama that I'm

4  willing to put $450,000 into a blocked escrow account so

5  that Tony can release the Stella Chen note so that I can

6  continue with the sale to closing with the buyer.

7  Q    Let me ask you something, were you concerned at the

8  time about having a lawsuit from the purchaser,

9  Stantiesteban?

10 A    Yes, I was.

11 Q    Did in fact Mr. Stantiestaben eventually file a claim

12 or a suit against you?

13 A    They filed a motion to -- I guess to have me go to

14 arbitration.

15 A    Okay.  Because the contract provided for arbitration?

16 A    Yes.  M-hm.

17 Q    So you did in fact have some legal fallout from Mr.

18 Stantiesteban?

19 A    Yes.  But I think he understood my position, and they

20 didn't really pursue that very seriously.

21         MR. FARRER: Objection.  Calls for speculation and

22 conjecture.  Move to strike the answer.

23         THE COURT: Sustained.

24         MR. FARRER: In fact, Your Honor, we're getting so

25 much of that from the witness, I would actually request the

1 Court direct the witness to simply answer the questions

2 based upon communications that actually took place than you

3 know his belief about what other people were thinking.

4         THE COURT: Listen to the questions carefully.

5         THE WITNESS: Okay, Your Honor.

6         THE COURT: Answer just what's being asked.

7 BY MR. ROMEO:

8 Q    Why did you sign the instructions directing the escrow

9 to pay off $450,000 to Stella Chen in return for

10 reconveyance?

11 A    Because all throughout the discussion period between

12 Tony and myself, I insisted that he reconvey the Lei Ming

13 Li note because I knew that I didn't owe the face amount of

14 that. But he insisted that he won't release it until I --

15 I guess I promised to pay off the Stella Chen note as well.

16 So that's why I agreed to sign the escrow instructions

17 because he refused to release the Lei Ming Li note, even

18 though that I knew -- both of us knew that I didn't owe the

19 face amount.

20         THE COURT: Okay.  We need to stop.

21         MR. ROMEO: Okay.

22         THE COURT: How much longer do you have?

23         MR. ROMEO: I have just a few more brief

24 questions.

25         THE COURT: How much time are you going to need?

1      MR. ROMEO: Five minutes.

2      THE COURT: Mr. Farrer?

3      MR. FARRER: Oh, the way he went after Tony Fu,

4  probably a couple of hours, at least.

5      THE COURT: Well, I'll see if I have any time.

6  You folks have just completely misrepresented how long this

7  was going to take, and I don't know when I'm going to be

8  able to get this in.

9      MR. CHU: I didn't make that representation.

10      THE COURT: We haven't take the time either.  Let

11  me see the calendar.

12      (Whereupon, the testimony of Mr. Yan is terminated at

13  5:01 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF TRANSCRIBER

        I certify that the foregoing is a correct transcript from the digital sound recording of the proceedings in the above-entitled matter.


DATED: August 13, 2005


                        By: /S/ Jo McCall

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25