UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE THOMAS E. CARLSON, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 04-33526 |
| | ) Chapter 11 |
| DEMAS WAI YAN aka DENNIS YAN, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| STELLA CHEN, | ) Adv. No. 05-3236 |
| | ) |
| Plaintiff, | ) <u>TRIAL, VOLUME III</u> |
| | ) <u>TESTIMONY of</u> |
| v. | ) <u>WITNESS YAN only</u> |
| | ) |
| DEMAS WAI YAN aka DENNIS YAN, | ) Pages 3-1 to 3-239 |
| | ) |
| Defendant. | ) Thursday, September 15, 2005 |
| | ) San Francisco, California |

<u>Appearances</u>:

For the Plaintiff:    Law Offices of William Webb Farrer
    By:  William Webb Farrer, Esq.
    300 Montgomery Street, Suite 600
    San Francisco, California  94111

For the Defendant:    Law Offices of Mark J. Romeo
    By:  Mark J. Romeo, Esq.
    130 Sutter Street, Seventh Floor
    San Francisco, California  94104

For Wei Suen:    Corporate Counsel Law Group
    By:  John Chu, Esq.
    505 Sansome Street, Suite 475
    San Francisco, California  94111

Electronic Court    United States Bankruptcy Court
Recorder:    Clerk of the Court
    Jane L. Galvani
    235 Pine Street, 23rd Floor (94104)
    Post Office Box 7341
    San Francisco, California  94120-7341
    (415) 268-2366

Certified Electronic    Palmer Reporting Services
Transcriber:    P. O. Box 30727
    Stockton, California  95213-0727

Proceedings recorded by digital recording;
transcript produced by federally-approved transcription service.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 1 of 240

<u>I N D E X</u>

Witnesses:

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

Demas Yan
By Mr. Romeo:          4
By Mr. Farrer:                    25
By the Court:        137
By Mr. Farrer:                   138

Exhibits:                              Received in Evidence

Plaintiff's  67:                         page 128

Plaintiff's  70:                         page  99

Plaintiff's  94:                         page 165

Plaintiff's 101:                         page 210

Plaintiff's 103:                         page  51

Plaintiff's 105:                         page  52

Plaintiff's 113 and 114:                 page 151

Plaintiff's 116 and 117:                 page 183

Defendant's FF:                          page  64

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 2 of 240

1   Thursday, September 15, 2005                    9:35 o'clock a.m.

2                    P R O C E E D I N G S

3          THE CLERK:  All rise.

4          THE COURT:  Please be seated.  Good morning.

5          [COUNSEL]:  Good morning, Your Honor.

6          THE COURT:  Be seated, please.

7          Tell me how we're going to proceed today.

8          MR. ROMEO:  Where we left off, Your Honor, was that I

9   was still examining Mr. Yan on direct examination.  And I'd like

10  to proceed with that and finish off.  And then Mr. — I believe

11  then that Mr. Farrer is going to cross-examine Mr. Chu — Mr.

12  Yan.

13         MR. FARRER:  Yan.  You said Mr. Chu.

14         MR. ROMEO:  Oh, I'm sorry.

15         THE COURT:  Mr. Yan.  Okay?  Okay.  Go ahead, please.

16         MR. ROMEO:  If you'll recall, Your Honor, —

17         THE COURT:  Go on.  Now we were in the middle of the

18  examination, right?

19         MR. ROMEO:  We were, and —

20         THE COURT:  You're still under oath.

21         THE WITNESS:  Yeah.

22         THE COURT:  Okay.  Yes, go ahead.

23         MR. ROMEO:  Okay.  So the line of questioning that I

24  was on when we broke last was where I was asking him about the

25  instructions in the Santiesteban escrow for the sale of one of

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 3 of
240

1  the units.

2           THE COURT:  Okay.

3      DEMAS WAI YAN, DEBTOR'S WITNESS, PREVIOUSLY SWORN

4                  DIRECT EXAMINATION (Continued)

5  BY MR. ROMEO:

6  Q.  Do you have the black binder in front of you, Mr. Yan?

7  A.  Yes.

8  Q.  And could you turn to Exhibit 25?

9  A.  (Witness complies.)  Okay.

10 Q.  Is that your signature on those instructions?

11 A.  That's my computerized signature.

12 Q.  Okay.  And then would you look at Exhibits 29 and 30,

13 please?

14 A.  (Witness complies.)  Okay.

15 Q.  And those are — can you tell the Court what those are?

16 A.  Those were escrow instructions, I believe, were prepared by

17 Tony.  And I first saw this when I went over to —

18 Q.  Just tell — you just have to answer —

19 A.  Oh.

20 Q.  — the question.

21         So those are instructions that you — did you sign

22 those instructions?

23 A.  Yes.

24 Q.  And at the time that you signed those instructions — if you

25 remember last time I was asking you about negotiations and — and

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 4 of
240

1   disputes of that were going on with Tony Fu?

2   A.  Yes.

3   Q.  Were you still negotiating with Tony Fu at the time that you

4   signed those instructions?

5   A.  Yes, I was.

6   Q.  What's the date that you signed the amended instructions?

7   A.  Both of this was signed on the 13th of January, '04 — 2004.

8   Q.  At the time that you signed those instructions had you — did

9   you have a lawyer?

10  A.  I don't think I officially retained one, but I was talking

11  to Richard Beckman at the time.

12  Q.  Okay.  If you take a look in the white binder at Exhibit Q?

13  A.  (Complies.)  Okay.

14  Q.  What's the date of the letter that Mr. Beckman sent?

15  A.  This letter is dated January 20th, 2004.

16          MR. FARRER:  Your Honor, I just want to register an

17  objection here.  When Mr. Romeo offered this letter into

18  evidence, we — on — when they put Mr. Beckman on the stand we

19  offered a letter from Siu Ma in response to the letter denying

20  the allegations.  And when I tried to get in another letter the

21  Court indicated that it didn't want to be — hear any evidence

22  about the disputes that the lawyers were exchanging with one

23  another on the issue.  And at that point the Court asked Mr.

24  Romeo what the point of the letter was.

25          Now Mr. Yan is not the author of this letter.  So I'd

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01.04.34   Page 5 of
240

1   object to any testimony about — from him attempting to

2   characterize it.  Mr. Romeo has already limited its use to

3   simply notice, not for the truth of the matter stated.  And just

4   in fairness to me — I think it was Exhibit 95 that I tried to

5   offer when Mr. David Zeff (phonetic) sent a letter back to Mr.

6   Beckman making a settlement proposal, explaining further

7   circumstances about the case.  And the Court decided not to

8   allow the admission of that document, because Mr. Romeo had

9   specifically stated that this particular letter was going to be

10  limited simply to notice only.

11           MR. ROMEO:  I was pretty much done with the Exhibit Q.

12  I just wanted to try and establish a timeline.  I wasn't going

13  to go into the contents of the letter with the witness.

14           THE COURT:  Okay.  Let me just see what the testimony

15  is.

16  BY MR. ROMEO:

17  Q.  In your negotiations with Mr. Fu, did he make any indication

18  as to what course of action might be taken if you didn't sign

19  the instructions that I've just asked you about?

20  A.  I — I recall that all throughout the months before this was

21  filed Tony made, I think more than once, made threats to me that

22  he'll foreclose on the deed of trust if I don't agree to his

23  demands.

24           MR. FARRER:  Objection, nonresponsive.  Move to

25  strike.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 6 of 240

1        THE COURT:   Overruled.

2   BY MR. ROMEO:

3   Q.   In the same timeframe, when the instructions were signed,

4   say in the first couple weeks of January 2004, did Tony Fu and

5   you ever discuss any sellers' instructions?

6   A.   The sellers' instruction?

7   Q.   Well, let me go back and ask you a different question, more

8   foundational.  Were there seller instructions that were prepared

9   for this escrow to sell this unit to Mr. Santiesteban?

10  A.   Yes.  I did prepare one myself.

11  Q.   Okay.  Did Mr. Fu and you ever discuss the sellers'

12  instructions?

13  A.   No.

14  Q.   After the — after you sued Mr. — Mr. Fu and Ms. Chin in

15  February 2004 did you continue to market the units?

16  A.   I believe I took it off the market pretty soon after the

17  lawsuit was filed, I believe after the lis pendens was filed, by

18  the opposing counsels.

19  Q.   Why did you take it off the market?

20  A.   Because once the lis pendens is filed I don't think I can

21  legally sell the units.  That's my understanding of what the lis

22  pendens is.

23  Q.   Can you give us an approximate date that the lis pendens was

24  filed?

25  A.   I think the lawsuit was filed close to the end of February

1   2004.  And it's probably, I think, around at that time.

2            MR. FARRER:  Objection, nonresponsive, no foundation.

3   Move to strike.

4            THE COURT:  Restate the question again and please

5   answer the question very — listen carefully to the question.

6   BY MR. ROMEO:

7   Q.  Do you know when the lis pendens was filed?

8   A.  I don't recall right now.

9   Q.  Did — did you ever place the — did you ever place the units

10  back on the market?

11  A.  The units were listed on the MLS.  And also — is also

12  advertised on my company website.  So —

13  Q.  Is the answer then yes, you did put them back on the market?

14  A.  I put them back on the market, I believe — well, like I

15  said, I — after the suit was filed I took it off the MLS, but it

16  remained on my company website.  And then when the bankruptcy

17  file was — the bankruptcy case was filed, then I put it back on

18  — on the market, on the MLS.

19  Q.  Can you give an approximate month that you put the

20  properties back on the market on the MLS?

21  A.  On the MLS?  That's, I believe, in December of 2004.

22  Q.  Did you ever discuss — prior to the lawsuit did you ever

23  discuss the marketing and how it was going with Mr. Fu?

24  A.  Yes.

25  Q.  What did Mr. — what did you tell Mr. Fu?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 8 of
240

1    A.  Well, when we first listed the units for sale, this was in

2    middle of 2000 and — middle of 2003.  I recall that I spoke to

3    Tony about what price to list them at.  And then as the months

4    drag on without any interest from buyers, Tony and — and I had

5    further discussions about what to do about the pricing and how

6    to market the property — units.

7    Q.  What were those discussions?

8    A.  Basically the market then was very different than it was

9    today.  And we didn't get very much interest from buyers.  So we

10   have to continuously lower the prices.  So the discussions with

11   Tony was to — what to do since we weren't able to sell the

12   units.

13   Q.  Did Mr. Fu express any concern about the lowering of the

14   prices?

15   A.  No.

16   Q.  Was Mr. Fu concerned about — did he express to you any

17   concern to you about what his possible return as a 25-percent

18   seller would be?

19   A.  I don't think he — I don't think we mentioned like, you

20   know, how much we can estimate the prices — the actual selling

21   prices would be.  I think at the time both Tony and myself were

22   — were pretty, I would say, concerned that the units weren't —

23   weren't selling.  And I think we were both willing to lower the

24   prices further just to have the units be sold.

25              MR. FARRER:  Objection.  Nonresponsive, move to

1    strike.

2              THE COURT:  Overruled.  Go ahead.

3    BY MR. ROMEO:

4    Q.  Mr. Yan, did you have any discussions with Mr. Fu as to how

5    he was going to get his 25-percent share out of the project

6    during the same time period, the last half of 2003?

7    A.  Well, before I found out about the deed of trust that were

8    recorded, my — my understanding with him was always that he'll

9    get his 25 percent according to the contract and —

10   Q.  Why did that — why did that understanding change after you

11   found out about the deed of trust?

12   A.  Well, after I find out about the deed of trust I don't think

13   the understanding change immediately, because Tony did not — did

14   not gave me a direct answer one way or the other, whether he

15   wants the — wants to get his profits by the — paying off the —

16   the Stella Chen note for $450,000, or whether he still wants his

17   25-percent cut of the sales proceeds.

18   Q.  Was that actually discussed between you and Mr. Fu?

19   A.  Yes, it was discussed many times during our negotiations

20   after I found out that the deed of trust were recorded.

21   Q.  Okay.  You knew about the existence of the deed of trust.

22   When you say you found out about the deed of trust, you're

23   saying that that's when you — that it was — you knew it was

24   recorded?

25   A.  That's correct.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 10 of 240

1    Q.  Okay.

2    A.  Yeah.

3        (Pause in the proceedings.)

4    BY MR. ROMEO:

5    Q.  Let me go back, Mr. Yan, and ask you some questions about

6    the plaintiff's allegations of the Singapore deal.  Do you

7    remember — recall the testimony from the last time we were here?

8    A.  Yes.

9    Q.  First of all, have you ever been in a high-tech equipment

10   business?

11   A.  Yes.

12   Q.  When were you in that business?

13   A.  I was in it for many years.  I would say I have been in the

14   high-tech business ever since I graduated in '87 until probably

15   '98.  So more than ten years.

16   Q.  Were you in the high-tech equipment business in Hong Kong?

17   A.  Yes, I was.

18   Q.  How many years were you doing that?

19   A.  I was actually living in Hong Kong and Singapore for about

20   six years, or from '93 to '98 — '90 — well, about five years,

21   '93 to '98.

22   Q.  Did you have a full-time residence there?

23   A.  Yes.

24   Q.  Were you familiar with how high-tech equipment was bought

25   and sold in international transactions in Hong Kong during that

Case: 05-03236   Doc#31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 11 of 240

1    time period?

2    A.  Yes.

3    Q.  As far as the method of payment, is the preferred method of

4    payment in high-tech — international high-tech equipment

5    business transactions in Hong Kong in cash or some other medium?

6              MR. FARRER:  Objection.  Leading.

7              THE COURT:  Overruled.

8              THE WITNESS:  Well, from my experience, I — I have

9    never had any transactions done in cash.  And my experience is

10   that usually for large amounts usually it's an LC unless the

11   buyer has a credit line with the suppliers.

12   BY MR. ROMEO:

13   Q.  What do you mean by an LC?

14   A.  Letter of credit, so that — well, when it comes to

15   international transactions it's — that's always the issue of

16   trust.  The seller doesn't want to ship until he gets the money.

17   And the buyer doesn't want to give the money until they get the

18   equipment.  So normally, unless the buyer has a credit line with

19   the supplier, then the supplier would demand a LC in place to

20   guarantee payment after the shipments of the products.

21   Q.  In 2002 were you in the high-tech equipment business?

22   A.  No, I wasn't.

23   Q.  In 2002 did you go to Singapore?

24   A.  No.

25   Q.  In 2002 did you have any contact with any companies in the

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:54    Page 12 of
240

1    high-tech equipment business in Singapore?

2    A.  No.

3    Q.  Did you have any contact with any companies in China in the

4    high-tech — high-tech business in 2002?

5    A.  No.

6    Q.  Are you familiar with the exchange rate that's — between

7    Hong Kong dollars and U.S. dollars in 2002?

8    A.  Yes.

9    Q.  Are you familiar with the exchange rate from living in Hong

10   Kong?

11   A.  Yes.

12   Q.  Have you done many — have you done many transactions or

13   international transactions in U.S. versus Hong Kong dollars

14   while you were in the high-tech business?

15   A.  Yes.

16   Q.  What's the exchange rate?

17          MR. FARRER:  Objection, vague.  What point in time?

18          THE COURT:  Sustained.

19   BY MR. ROMEO:

20   Q.  What was the exchange rate in 2002?

21   A.  I believe it's around 7 — 7.8.

22   Q.  Okay.  And do you know from living in Hong Kong what the

23   exchange rate was during the period you lived there?

24   A.  Yes.

25   Q.  And what was that?

Case: 05-03236   Doc#:31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 13 of
240

1  A.  It's always been around 7.8.

2  Q.  Since you've had legal disputes with Ms. Chen and Mr. Fu,

3  have you had your deposition taken?

4  A.  Yes.

5  Q.  How many times?

6  A.  I think three times.

7  Q.  Okay.  And —

8  A.  Three or four times.

9  Q.  Three to four times?

10  A.  Um-hum.

11  Q.  In any of those depositions have you ever been asked about

12  the Chinese language note that we heard Mr. Fu testify about?

13  A.  No.

14  Q.  In any of those depositions have you been asked if you had

15  any high-tech equipment business dealings in Singapore?

16  A.  No.

17  Q.  In any of those depositions have you been asked whether you

18  had used the proceeds of the loan to purchase real property in

19  Hong Kong?

20  A.  I believe — yes to this question.  Yes.

21  Q.  Do you remember the attorney that asked you if you used to

22  the money to buy real property in Hong Kong?

23  A.  That's Mr. William Farrer.

24  Q.  Did you buy real property in Hong Kong with any money

25  borrowed from — from somebody else?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 14 of 240

1   A.  The answer to that is no, but I did buy a property in Hong

2   Kong.

3   Q.  Did you borrow money to — to buy that property?

4   A.  Yes.

5   Q.  From a bank?

6   A.  From a bank.

7           THE COURT:  And when was that?

8           THE WITNESS:  That was in 2000, the year 2000.

9   BY MR. ROMEO:

10  Q.  Did you just —

11          THE COURT:  When?

12          MR. ROMEO:  I'm sorry.

13          THE COURT:  What — what month?

14          THE WITNESS:  I — I don't recall the month.

15  BY MR. ROMEO:

16  Q.  What's the value of that condominium?

17  A.  The value in U.S. dollars is around $120,000.

18  Q.  Is that disclosed in your schedules in this bankruptcy case?

19  A.  Yes, it is.

20  Q.  When was the first time that you heard about Mr. Leung in

21  Hong Kong and Fei Sing Fu making a loan to you of 3.6 million

22  Hong Kong dollars?

23  A.  Fei Sing Fu.  I — let's see.  Can you repeat the question

24  again?

25  Q.  Yeah.  When was the first time you ever heard it alleged

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 15 of 240

1   that you had borrowed money from Fei Sing Fu and Mr. Leung in

2   Hong Kong, in cash, in 2002?

3   A.  Okay.  Their — their first allegation was that I didn't

4   borrow the money from Fei Sing Fu.  I borrowed the money from

5   this deceased person, Tak Hing Leung, I think, it is — he name

6   is.

7   Q.  Mr. Leung?

8   A.  Yes, uh-huh.  So at first the allegation was that I borrowed

9   the money from this person, Mr. Leung.  And they didn't make

10  allegation that Fei Sing Fu, who loaned me the money, until I

11  believe — the first time I heard that was in Tony's deposition

12  just a few months ago.

13  Q.  In 2000 — in 2002 — in November 2002, when you were meeting

14  with Tony at Starbucks about the deed of trust that's at issue

15  in this case, was there any mention of any such loan?

16  A.  No.

17  Q.  In 2002 after you came back from Hong Kong was there any

18  discussion about a loan that you had taken there?

19  A.  No.

20  Q.  In 2002 when you were in Hong Kong, were you out of contact

21  with Tony Fu?

22  A.  No.

23  Q.  Were you able to receive communications from him regularly?

24  A.  Yes.

25  Q.  And when did you return from Hong Kong to the United States

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 16 of
240

1  in 2002?

2  A.  I returned around I think like in early May, or late May.

3  I'm not sure.  But it was May of 2002 when I returned from Hong

4  Kong to the U.S.

5  Q.  If you look at the — the white binder, Exhibit F, please?

6  A.  (Complies.)  Okay.

7  Q.  Can you tell the Court what that is?

8  A.  Yes.  This is a fax that I received from Tony.

9  Q.  Did you receive that fax while you were in Hong Kong?

10  A.  Yes.

11  Q.  At the top of the first page of the exhibit is a name and a

12  phone number.  The name is Global Connection.  The phone number

13  is 751-8506.

14  A.  Yes.  I — I believe those are —

15  Q.  Do you know whose — whose fax line that is?

16  A.  That's the — Tony's fax line.

17  Q.  Were you able to respond to this fax?

18  A.  Yes.

19          THE COURT:  Now this was — you received while you were

20  in Hong Kong?

21          THE WITNESS:  Yes, because I always tell him when I

22  leave how he can reach me.  And the way he reach me —

23          THE COURT:  Okay.  You just — I just want to make sure

24  I understood.  You don't need to explain any further.

25          THE WITNESS:  Okay.  Okay.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 17 of 240

1          MR. ROMEO:  Your Honor, I have an additional exhibit

2     that I'd like to mark.  And I believe that would be Exhibit FF.

3     It's not in the binder.

4          THE COURT:  Okay.  Show it to counsel.

5     BY MR. ROMEO:

6     Q.  Mr. Yan, I'm going to show you what we've marked as Exhibit

7     FF.

8     A.  Okay.

9     Q.  Can you tell the Court what Exhibit FF is?

10    A.  FF is a — a notarized cancellation — or a document for

11    cancellation of a recorded agreement and is notarized by me in

12    Thailand.  And this is in response to the fax I received from

13    Tony.

14    Q.  Where is it notarized — where does it show that it was

15    notarized in Thailand?

16    A.  In the bottom-left corner.

17    Q.  Is that what we sometimes call consularizing a signature?

18    A.  Yes.

19    Q.  So were you in Thailand at that time?

20    A.  Yes, I was.

21    Q.  Were you able to send this document to Tony Fu from Thailand

22    in response to Exhibit F?

23    A.  Yes.

24    Q.  Okay.  Has Tony Fu, to your knowledge, ever prepared a

25    document that purported to be a document that you prepared?

Case: 05-03236   Doc#: 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 18 of 240

1          MR. FARRER:  I'm sorry.  Would you state that over?

2    BY MR. ROMEO:

3    Q.  Has Tony Fu ever prepared a document for your — over your

4    signature that you did not prepare or had any knowledge of?

5    A.  I found out after the fact that he had — had put this

6    document in my name with — without my permission.

7    Q.  Okay.  If I could ask you to look at Plaintiff's Exhibit 96?

8    A.  96.  (Complies.)  Okay.

9    Q.  Did you prepare that letter to Mr. Hutchinson?

10   A.  This letter, I don't — let me see.  Well, this letter, I

11   don't recall exactly.  I believe I — this letter was prepared

12   with — with Tony and myself.  I think this letter, if I can

13   recall, was that Tony asked me to prepare this.  And then he,

14   you know, told me what to write.  And I put it down upon — on

15   this letter.

16   Q.  Okay.  Did he ever prepare a letter that he didn't tell you

17   about that purported to be from you?

18   A.  Yes.

19   Q.  What — what letter was that?

20   A.  I recall that was a letter or a fax that he sent to CSLB,

21   the California State Licensing Board for contractors.  And I

22   found out after fact that he claims that this fax was prepared

23   by me, but —

24   Q.  Oh, but —

25   A.  — it wasn't.

Case: 05-03236    Doc#:31    Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 19 of
240

1    Q.   — but that — 96 is not that letter?

2    A.   That's not that letter.

3    Q.   Oh, then I have — took the wrong exhibit out.

4            MR. ROMEO:  Can I have a minute, Your Honor?

5        (Pause in the proceedings.)

6            MR. ROMEO:  May I approach the witness with this, to

7    ask that question?

8            THE COURT:  Yes.

9    BY MR. ROMEO:

10   Q.   Is this a document you were referring —

11           THE COURT:  Did you show it to Mr. Farrer?

12           MR. ROMEO:  The witness has indicated this isn't the

13   document, so —

14           THE WITNESS:  I don't see any in his binders.  If I

15   can just flip it through.

16       (Pause in the proceedings.)

17   BY MR. ROMEO:

18   Q.   Well, let — maybe we can move on and come back to that

19   later.

20   A.   Okay.  That's your mark?  Can we just read that stuff?

21           MR. ROMEO:  I guess we'll have to mark this as GG.  I

22   only have one copy, Your Honor.  May I show it to the Court and

23   the counsel first —

24           MR. FARRER:  We — I'm having —

25           MR. ROMEO:  — so I can read the —

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:54    Page 20 of
240

1          MR. FARRER:  — a problem bringing in new — new

2    evidence here that wasn't on his list.

3          THE WITNESS:  I think this was entered into evidence

4    by Mr. Farrer last time.  I think we objected — objected to his

5    entering this.

6          MR. FARRER:  Well, if you objected to me entering it,

7    why are you now entering it?

8          THE COURT:  What is it?  And what number was it of Mr.

9    Farrer's?

10          MR. ROMEO:  That's what I'm — I'm — I thought I had

11    the right document.  I apologize, Your Honor, for taking undue

12    time here.  It was one of his later-marked exhibits, I believe,

13    that I — maybe we can just come back to this.

14          THE COURT:  Let me — let me make —

15          THE WITNESS:  This — this here —

16          THE COURT:  — see if I understand something correctly.

17    Let me see if there's a dispute about this.  Okay?

18          THE WITNESS:  Can I — it's Exhibit 95.

19          MR. ROMEO:  Exhibit 95.  I'm sorry.  I had 96.  It was

20    95.

21          THE COURT:  Okay.  Let me see if I understand —

22    remember what's in dispute here and what isn't.  At this — at

23    the point this property was sold record title was solely in Mr.

24    Yan's name; —

25          MR. ROMEO:  Correct.

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:34    Page 21 of
240

1           THE COURT:  — is that right?

2           THE WITNESS:  Yes.

3           THE COURT:  There were two agreements regarding the

4    development of this property.  The one involving the first one,

5    which included Winky Wong.

6           MR. ROMEO:  Correct.

7           THE COURT:  And then the later one between Mr. Yan and

8    Mr. Fu?

9           MR. ROMEO:  Correct.

10          THE COURT:  Was there — the one regarding — the one

11   including Winky Wong was recorded?

12          MR. ROMEO:  Correct.

13          THE WITNESS:  Correct.

14          THE CLERK:  The second one was not?

15          MR. ROMEO:  Correct.

16          THE WITNESS:  Correct.

17          THE COURT:  It's not, as I understand it, it's not the

18   position of — neither party is challenging the authenticity of

19   the second agreement, that there was such an agreement signed by

20   both parties?

21          MR. ROMEO:  That's true.

22          MR. FARRER:  That's true.

23          THE COURT:  And that there was, in fact, a

24   cancellation signed by all parties of the first recorded

25   agreement which happened well after the second agreement was

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 22 of
240

1  signed?

2           MR. ROMEO:  Correct.

3           THE COURT:  Okay.  Thank you.

4           MR. ROMEO:  So you found Exhibit 95 —

5           THE COURT:  Now, Mr. Farrer, you are nodding.  Is that

6  a yes?

7           MR. FARRER:  I answered affirmatively to all of the

8  Court's questions, Your Honor.

9           THE COURT:  Okay.  The record has to have an oral

10  response.

11           MR. FARRER:  I apologize.

12  BY MR. ROMEO:

13  Q.  Is Exhibit 95 the document you're referring to?

14  A.  Yes.

15           THE COURT:  Okay.  Let me get back to the — hold on

16  just the second, please.  These things are not in the book, and

17  they're just kind of loose here.  And give me just a second to

18  track this down.  Very well.  I have it now.

19  BY MR. ROMEO:

20  Q.  Did you write this document?

21  A.  No.

22  Q.  Do you know who wrote this?

23  A.  After the fact, Tony — Tony told me that he wrote this.

24  Q.  Did you authorize him to send this to the Contractors State

25  License Board?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 23 of
240

1   A.  No.

2           MR. ROMEO:  All right.  Your Honor, I have no further

3   questions of this witness.

4           THE COURT:  Okay.  I assume there will be some

5   cross-exam.

6           MR. FARRER:  Yes, Your Honor.

7           MR. ROMEO:  Exhibit FF, Your Honor, I'm going to leave

8   it up here on the witness stand.

9           THE COURT:  And that's the cancellation?

10          MR. ROMEO:  Oh, you have it?

11          Yes.

12          THE COURT:  But that is the cancellation, which —

13          MR. ROMEO:  Yes.

14          THE COURT:  — which is stipulated?

15          MR. ROMEO:  Yes, sir.

16          THE COURT:  The fact is stipulated.

17          MR. FARRER:  The admission of the document can be

18  admitted, yes.

19          THE COURT:  Yeah.  But also you — as I understand, you

20  stipulated to the fact that it was, in fact, canceled and — the

21  recorded document.

22          MR. FARRER:  Yes, I have.

23          MR. ROMEO:  Yes, sir.

24          THE COURT:  Okay.

25          MR. FARRER:  Okay.  Mr. Yan, before I begin, I want to

Case: 05-03236   Doc#31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 24 of
240

1  remove that stack of paper that's in front of you, because it's

2  not exhibits.

3       (Pause in the proceedings.)

4                    <u>CROSS-EXAMINATION</u>

5  BY MR. FARRER:

6  Q.  Mr. Yan, you understand that you're still under oath?

7  A.  Yes, I am.

8  Q.  And you recall when you took the stand on July 27, 2005 you

9  took an oath to tell the truth, the whole truth, and nothing but

10  the truth?

11  A.  Yes.

12  Q.  And you understand that obligation?

13  A.  Yes.

14  Q.  Now as I understand it, you have been self-employed since

15  1998; is that correct?

16  A.  Yes.

17  Q.  And that you have both a real estate broker's license since

18  early 2001 and a contractor's license since early 2002?

19  A.  Yes.

20  Q.  Okay.  But you haven't made any money with either of those

21  licenses, have you?

22  A.  I make some money with my contractor license, I believe,

23  last year.  But only for — only a small amount.

24  Q.  How much?

25  A.  I think it's less than a thousand dollars.

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:54    Page 25 of
240

1   Q.  And as I understand it from your prior testimony during — in

2   deposition you had no income whatsoever during the years 2001,

3   2002, or 2003?

4   A.  I didn't have any reported income; that's correct.

5   Q.  Okay.  And the only income that you testified that you had

6   in 2004 was approximately $61,000 in rents that you've collected

7   from the two properties you own, including the units located at

8   547 Twenty-Third Avenue and the three condos located at the

9   Chenery Street property, which is the subject of this

10  litigation?

11  A.  Correct.

12  Q.  So you didn't mention the $1,000 income you had from the

13  contractor's license, did you, in your deposition testimony?

14  A.  Let me see.  Last year, I think — I think I didn't — maybe I

15  didn't — that didn't come across my mind because it was a small

16  amount.

17  Q.  Well, did you list it in your bankruptcy schedules?

18  A.  In my bankruptcy schedule, I listed all my assets.

19  Q.  No.  Your bankruptcy schedules actually ask you to list all

20  of the income you made during 2004.  Did you include the

21  contractor income in that, or not?

22          THE COURT:  Do we have the schedules here by the — are

23  they part of the exhibits?

24          MR. FARRER:  Yes, we do, Your Honor.  They are marked

25  as, I believe, Exhibit 57.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 26 of
240

1          THE COURT:  Okay.  Thank you.

2          MR. FARRER:  Let me see if my memory is — yes, they

3   are.

4          THE COURT:  Now that's the Statement of Financial

5   Affairs, but that's really what we want.

6   BY MR. FARRER:

7   Q.  Why don't you turn to Exhibit 57, Mr. Yan?

8   A.  (Complies.)  Okay.

9   Q.  Do you have that in front of you?

10  A.  Yes.

11  Q.  Do you see Question 1 there on the first page about all

12  income from employment or operation of business?  And you list

13  $60,750 in rents?

14  A.  Yes.

15  Q.  Did you list the contractor income you had last year?

16  A.  Well, looking at this, no.

17  Q.  You've also attended law school; is that correct?

18  A.  Yes.

19  Q.  And you started renting three of the four the Chenery Street

20  condominiums in March of 2004, right after you filed your

21  lawsuit against Tony Fu and Stella Chen; isn't that correct?

22  A.  Oh, repeat the question again?

23  Q.  I said you started renting the three — three of the four

24  Chenery Street condominiums in March of 2004 right after you

25  filed your lawsuit against Tony Fu and Stella Chen?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 27 of
240

1  A.  I don't recall whether it was in March or — or not.  But I

2  do recall that list — I listed them for rent I think soon after

3  the lawsuit was filed.

4  Q.  Well, why don't you take a moment and turn to Exhibits 44,

5  45, and 46?

6  A.  Okay.  (Complies.)

7  Q.  And are those the true and correct copies of the leases that

8  you entered into for 665 and 663 Chenery and 70 Wilder Street?

9  A.  Yes.

10 Q.  And aren't all of those leases signed by you during March of

11 '04?

12 A.  Yes.

13 Q.  And so you started collecting the rents from those three

14 condominiums right after you filed the lawsuit, right?

15 A.  No, the lawsuit was filed in February.  And this is signed

16 in April.

17 Q.  In March.

18        MR. ROMEO:  Your Honor, I'd object to a compound

19 question.

20        THE WITNESS:  The rents supposed to begin in April.

21 BY MR. FARRER:

22 Q.  Okay.  But you signed leases — what's the date of the

23 Exhibit 45 that you signed that?

24 A.  Let me take a look.  In March.

25 Q.  March what?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 28 of
240

1  A.  March 9th.

2  Q.  Of what year?

3  A.  2004.

4  Q.  And if you look at Exhibit 45, what's the date you signed

5  that lease?

6  A.  March 18th, 2004.

7  Q.  And if you look at Exhibit 46 for 70 Wilder, what's the date

8  you signed that lease?

9  A.  March 19th, 2004.

10  Q.  Right.  So — and as a result of your entering those three

11  leases you started collecting about $5700 a month from the

12  Chenery Street condominiums, didn't you?

13  A.  I would say that's probably correct.

14  Q.  Okay.  And you didn't talk to Tony Fu about renting those

15  units, did you?

16  A.  No.

17  Q.  And you didn't get his permission to do that, did you?

18  A.  I didn't need to.

19  Q.  Didn't your agreement with Mr. Fu give him the right to

20  decide whether to rent or sell those units?

21  A.  I think that's the wording in the contract, yes.

22  Q.  And just to clear that up, why don't we look at Exhibit D?

23  It would be in the white binder.

24  A.  Okay.  (Complies.)

25  Q.  Now turning your attention — you signed this agreement,

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 29 of 240

1   right?  This is —

2   A.  That's correct.

3   Q.  This is — there's no dispute that you and Mr. Fu had this

4   agreement regarding the Chenery Street property, right?

5   A.  That's no dispute that we signed this contract back in 2000.

6   But there was a dispute when I filed a lawsuit against Tony

7   about the validity of this contract.

8   Q.  Oh, I understand that.  But does paragraph 3 give Mr. Tony

9   Fu the complete right to decide whether to sell or rent the

10  property?

11  A.  The — well, this — this document speaks for itself.

12  Q.  Did you understand when you signed this document that you'd

13  agreed that Mr. Fu would have the sole and exclusive right to

14  decide whether to rent or sell the condominiums built on

15  Chenery?

16  A.  Yes, assuming that the contract is still valid.

17  Q.  And you used the rental proceeds that you collected from the

18  Chenery Street property to pay your own personal obligations; is

19  that right?

20  A.  I didn't pay — I didn't — well, I didn't put it into a

21  separate account.  So it was lumped together with my own

22  personal funds.

23  Q.  Well, you didn't have any other income, did you?

24  A.  Not major income as I can recall.

25  Q.  Forget the word "major."  You didn't have any other income,

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 30 of
240

1   right?

2   A.  I would say yes — probably yes to your question.

3   Q.  Well, you certainly didn't report any in — in the Statement

4   of Financial Affairs you filed with this Court under penalty of

5   perjury, did you?

6   A.  Well, like I said, I probably don't recall that I had — I

7   had any other incomes.

8   Q.  And so you used the income from those properties to pay your

9   own personal obligations, didn't you?

10  A.  Well, yes.

11  Q.  In fact, you used the income from those properties to make

12  the payments to the creditors listed on Exhibit 57, Question 3.

13  Why don't you turn to Exhibit 57?

14  A.  (Complies.)  Okay.

15  Q.  Do you have that in front of you?

16  A.  Yes.

17  Q.  Why don't you turn to the second page?

18  A.  (Complies.)  Okay.

19  Q.  Now Question 3 asked you to identify creditors that you made

20  payments to within 90 days of the bankruptcy filing.  Did you

21  understand that when you provided this information?

22  A.  Yes.

23  Q.  Okay.  So the first payment of $18,733 to MBNA, that's a

24  personal credit card of yours, isn't it?

25  A.  Yes.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 31 of
240

1  Q.  Okay.  Then the $32,506 you paid to David Grassi, he had a

2  judgment against you, right?

3  A.  Correct.

4  Q.  And that was against you personally, correct?

5  A.  Yes.

6  Q.  And so you — you used to the rental income to pay that?

7  A.  I don't think so.  Actually I recall that for this amount I

8  borrow money from my parents to pay off.

9  Q.  Okay.  The Washington Mutual Consumer Lending, the 3200,

10  that's a personal obligation of yours on 547 Twenty-Third

11  Avenue?

12  A.  Yes.

13  Q.  Okay.  And the second Washington Mutual $5600, that's also a

14  personal obligation of yours, that's a deed or a mortgage, also

15  on 547 Twenty-Third Avenue?

16  A.  Yes.

17  Q.  And the Citibank MC is another personal credit card of

18  yours?

19  A.  Yes.

20  Q.  Okay.  And you didn't give any portion of the rents you

21  collected from the Chenery Street property to Tony Fu or Stella

22  Chen, did you?

23  A.  No.

24  Q.  And as I understand it subsequent to filing bankruptcy you

25  started to relist the property for sale on the MLS.  And as a

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 32 of
240

1   result of those listings and pursuant to applications filed with

2   this Court you were successful in selling all four units?

3   A.  Yes.

4   Q.  Okay.  And you sold all four units, subject to this order,

5   for approximately $2.4 million?

6   A.  That's probably correct.

7   Q.  I believe you also testified here on July 27th that you

8   first met Stella Chen at Tony Fu's house in early 1990s; do you

9   recall that testimony?

10  A.  Yes.

11  Q.  Okay.  Now isn't it also true that you attended Tony Fu's

12  wedding?

13  A.  Yes.

14  Q.  Okay.  And that you appear in a picture with — when was

15  that, that wedding?

16  A.  I don't recall.  It's in early '90s, we — probably '90 or

17  '91.

18  Q.  Okay.  But in that picture — it's Exhibit 86, if you'd care

19  to turn to it.

20  A.  Yes.  I see it now.

21  Q.  Okay.  You were in a picture with Stella Chen, too, right?

22  A.  Well, looking at it now, yes, uh-huh.

23  Q.  And that's — that's you on the far left of that picture,

24  correct?

25  A.  Well, actually — when you mention now that that's Stella,

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 33 of
240

1  well, I take your word for it.  But I've always assumed that

2  this is — I didn't look at this picture carefully.  I always

3  assumed that my picture was taken with Crystal.

4  Q.  Well, looking at this picture and looking at the lady

5  sitting back here in the pew, do you recognize that as Stella

6  Chen?

7  A.  I would say now, you know, now you mentioned it, yes.

8  Q.  Okay.  And you've met Lei Ming Li or Crystal Li a number of

9  times, haven't you?

10  A.  Oh, yes, many times.

11  Q.  And they look different, don't they?

12  A.  Yes.  But I don't recall that I met Stella at — at his

13  wedding, so —

14  Q.  You're in a picture with her.

15  A.  Yes.  But I'm saying I don't recall I met her at the

16  wedding.  Maybe I took a picture with her.

17  Q.  Now focusing on this picture and seeing exactly what Stella

18  looks like at the time of that picture how many times have you

19  seen or been in her presence?

20  A.  Well, not counting this picture, I — the only time I can

21  recall is seeing her once at Tony's house.

22  Q.  Okay.  So you didn't — didn't you have dinner over at Tony's

23  house on a — several times?

24  A.  No.  Actually I only had dinner — dinner once at his house.

25  It's — I don't recall if it's dinner or lunch.  I recall only

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 34 of
240

1  had a meal once at his house when he introduced Stella Chen to

2  me.

3  Q.  Okay.  So you met her in the early '90s at his house.  And

4  then you had a picture taken with her at his wedding?

5  A.  I don't recall whether the meeting at his house came before

6  or after this picture was taken.

7  Q.  And didn't you tell me at your deposition on September 3rd,

8  2004 that the first time you heard the name of Stella Chen was

9  when you saw the preliminary title report from Fidelity dated

10  September 3rd, 2003, or about 13 years after you told this Court

11  you first met her?

12  A.  When I saw the — the name Stella Chen on that preliminary

13  report I was at a loss as to who that person is.  And it was

14  afterward that I talked Tony that I realized that it was his

15  sister.

16  Q.  But you had met her before, right?

17  A.  Oh, yes, but, you know, I — I don't recall what her name

18  was.

19  Q.  Okay.  All right.  Let's turn to the white binder, Exhibit

20  A.

21  A.  (Complies.)  Yes.

22  Q.  Do you have that in front of you?  You probably want to have

23  it open.

24  A.  Yes.

25  Q.  All right.  Just to kind of go over the factual background

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 35 of
240

1   of this case, as I understand it, based on your prior testimony,

2   I understand that on or about October 25th, 1999 you, Tony Fu,

3   and Winky Wong entered into a written agreement to develop the

4   663 Chenery Street property; is that correct?

5   A.  Correct.

6   Q.  And under that agreement Winky Wong was identified as the

7   owner.  And you and Mr. Fu were identified as the developers?

8   A.  Correct.

9   Q.  And Exhibit A is a true and correct executed copy of that

10  agreement, right?

11  A.  Yes.

12  Q.  Okay.  And you signed that agreement on October 25th, 1999?

13  A.  Yes.

14  Q.  Okay.  And under that agreement Mr. Wong was to contribute

15  the Chenery Street property and to pay the existing mortgages,

16  property taxes, and insurance, while you and Mr. Fu developed

17  that property by subdividing and building four condominiums

18  there at your own expense; is that correct?

19  A.  I think so, yes.

20  Q.  Okay.  And in return for that agreement Mr. Wong agreed that

21  you and Mr. Fu would each receive a 25-percent ownership

22  interest in Chenery?

23  A.  I don't think our contract specify what's the division

24  between Tony and myself.  I think just divided the — the proceed

25  pretty close to Winky and pretty close to Tony and myself.  As

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 36 of
240

1  to my agreement between Tony and myself, I don't think that was
2  specified here.
3  Q.  So line — paragraph 13 says, "Upon the sale owner and
4  developer shall divide the net proceeds after a sale as follows:
5  Proceeds up to 1.5 million, they're to be divided 50/50."
6  A.  Yes.
7  Q.  Is there anything in here that says your and Mr. Fu's
8  division is anything other than to split it?
9  A.  Well, this agreement, many — was agreement between Winky and
10  Tony and myself as — as — as I will say, you know, codevelopers.
11  And this 50/50 we first took — 50 goes to Winky; 50 goes to Tony
12  and me.
13  Q.  Yeah, but didn't you understand that you and Tony were going
14  to split your 50 percent?
15  A.  I'm just saying that this agreement didn't specify the — the
16  — how — how — it was first put down.
17  Q.  I'm asking you what your understanding was.
18  A.  I — I think — well, I — I think probably we didn't really
19  have a fixed agreement between Tony and myself as to how to
20  divide that up.  I don't think so.  But I think basically we had
21  the understanding probably that, you know, somehow we'd share
22  the expenses and depending on who — how much we share the
23  expenses.  Then we'll — we'll divide up the profits that way.
24  Q.  Didn't you have an understanding you and Tony were going to
25  split the 50 percent?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 37 of
240

1   A.  I don't recall at this time, when signing this agreement,

2   that we had a — a definite understanding.

3   Q.  Now neither you nor Mr. Fu paid Mr. Wong anything for your

4   50 — your joint 50-percent interest in the Chenery Street

5   property, did you, at that time, the time of this document?

6   A.  Well, I would say no, this — this is really a construction

7   agreement.  And I don't think we had any claim to ownership of

8   property at this time.

9   Q.  Mr. Yan, —

10              MR. FARRER:  Your Honor, could you please ask the

11  witness to answer my questions?

12              THE WITNESS:  Can you please ask —

13              THE COURT:  This is cross-exam.  Ask it over.  Listen

14  very carefully.

15              THE WITNESS:  Yeah, okay.

16              THE COURT:  He gets to answer yes-or-no questions.

17  They're to be answered at precisely.

18  BY MR. FARRER:

19  Q.  Did either you or Mr. Fu pay any money to Mr. Wong to

20  acquire an interest in the Chenery Street property at the time

21  of Exhibit A?

22  A.  Well, we didn't pay any money.  And I don't think we

23  acquired any interest.

24              MR. FARRER:  Your Honor, I'm going to —

25              THE COURT:  I take that's a no.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 38 of 240

1          MR. FARRER:  Yeah.  You're going to have to answer my

2     questions yes or no, if they can be answered yes or no.  Your

3     counsel is here.  He can ask you further follow-up questions.

4     BY MR. FARRER:

5     Q.  So you didn't pay him any money, did you?  You didn't pay

6     Mr. Wong a penny, did you?

7     A.  No, I — not that I recall, no.

8     Q.  And — and at the time you entered into Exhibit A you

9     contemplated that the Chenery Street property would be developed

10    and placed on the market within one year or by approximately

11    October of 2000; isn't that also correct?

12    A.  I think that's our projection.  I don't think this is within

13    the agreement.

14    Q.  Well, paragraph — what does paragraph 4 say, on page 2?

15    A.  Okay.  I stand to be corrected.  It says there the time

16    limit for completion shall be one year.

17    Q.  Now at the time you entered into this agreement you, and Mr.

18    Wong, and Mr. Fu attempted to estimate the fair market value of

19    the Chenery Street property.  If it were developed in accordance

20    with your expectations and based on those expectations in

21    October of 1999 the three of you estimated that property would

22    be worth between 1.5 and $1.8 million if it had been developed

23    within that one-year timeframe, correct?

24    A.  Correct.

25    Q.  However, none of you was willing to limit or cap your

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 39 of
240

1  ownership interest and profit participation, which is why

2  Exhibit A contains an express formula detailing exactly how the

3  net sale proceeds will be divided if that property sells for 1.

4  — for more than $1.8 million; isn't that true?

5  A.  I'm not sure I get your question.

6  Q.  Why don't you turn to paragraph 13?

7  A.  (Complies.)  Okay.

8  Q.  Do you have that in front of you?

9  A.  Okay.

10  Q.  Doesn't paragraph 13, the third bullet point, detail or set

11  forth a formula about how the proceeds will be divided if the

12  property sells for more than a million eight?

13  A.  Yes.

14  Q.  So no one agreed to limit their percentage interest in

15  Chenery to a sum certain in October 1999, did they?

16  A.  No.  No.

17  Q.  Okay.  Let's turn to Exhibit 1, please?

18          THE COURT:  Exhibit 1?

19          MR. FARRER:  Yes, sir.

20  BY MR. FARRER:

21  Q.  Do you have Exhibit 1 in front of you, sir?

22  A.  Yes.

23  Q.  Is Exhibit 1 a true and correct copy of an engagement letter

24  you signed and sent to Seher & Associates on October 26, 1999?

25  A.  Yes.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 40 of 240

1  Q.  And is that your transmittal letter and signature thereon,

2  as well as the first page of the engagement letter?

3  A.  Yes.

4  Q.  So the very day — the very next day after signing Exhibit A,

5  which is the development agreement for Chenery Street, you hired

6  Seher & Associates to conduct surveying and engineering services

7  so you could subdivide and build condominiums at 663 Chenery

8  Street; is that correct?

9  A.  Yes.

10  Q.  And both Frederick Seher and his assistant, or associate,

11  David Smith, helped you with that project?

12  A.  I believe so.

13  Q.  And then about one year later October 9th, 2002 you entered

14  into a new contract to buy Winky Wong's interest — to buy out

15  Winky Wong's interest in 663 Chenery Street, right?

16  A.  I'm not sure the date is correct.

17  Q.  Okay.  Well, why don't we turned then to Exhibit B, as in

18  "boy," in the white binder?

19  A.  (Complies.)  Okay.

20  Q.  Do you have that in front of you?

21  A.  Yes.

22  Q.  And if you look down towards the bottom portion under Part

23  2, —

24  A.  Yes.

25  Q.  — it refers to a contract for the sale and purchase of real

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 41 of
240

1   property for 663 Chenery Street dated October 9th, 2000; do you

2   see that?

3   A.  Yes.

4   Q.  Now that's the agreement where you're buying Winky Wong's

5   interest in Chenery Street, correct?

6   A.  Correct.

7   Q.  Okay.  And you paid him about $800,000 for that interest?

8   A.  What — re- — repeat your question here?

9   Q.  Did — you paid Mr. Wong about $800,000 to purchase his

10  interest in Chenery Street?

11  A.  I think it's less than that, but it's around that ballpark.

12  Q.  Do you recall your deposition on September of '04 where you

13  told me that you paid him $800,000 for his interest in Chenery

14  Street?

15  A.  Not — not in particular.  But like I said it's around that

16  ballpark, around eight hundred.

17  Q.  Well, how close it?

18  A.  I think it's less than that.  I think it's like seven

19  something.

20  Q.  Seven what?

21  A.  I don't recall.  I think 760, or 750, something like that.

22  Q.  Seven hundred and fifty thousand?

23  A.  Yes.

24  Q.  And as a result of that — that purchase, you now had a

25  75-percent interest in Chenery Street and Mr. Fu had a

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 42 of
240

1  25-percent interest?

2  A.  No.  I — like I said — well, the agreement — the original

3  agreement didn't specify how Tony and myself would divide up our

4  share.  And I think even at this time we still haven't reached

5  an agreement between Tony and myself as how to proceed.

6  Q.  When you purchased Chenery Street from Mr. Winky Wong on

7  October 9th of 2000 there was already an existing mortgage on

8  that property, wasn't there?

9  A.  I believe so.

10  Q.  Payable to World Savings?

11  A.  I believe Winky had two mortgages.

12  Q.  There were two mortgages on the property?

13  A.  Yes, um-hum.

14  Q.  One at World Savings and one at Bank of America?

15  A.  Yes.

16  Q.  Okay.  After you purchased that property, whose serviced

17  those mortgages?

18  A.  After I purchased —

19         THE COURT:  You mean who paid, who made the payments?

20         MR. FARRER:  Yeah, that's Better.

21  BY MR. FARRER:

22  Q.  But who paid in those mortgages?

23  A.  After — after the — after I — I bought Winky's share?

24  Q.  After you bought Mr. Wong's share on Chenery Street who paid

25  in the mortgages on Chenery Street?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 43 of
240

1   A.  I don't really recall now.  I believe I did, but I think I

2   asked Winky to — to pay.  I don't recall.  I think — supposedly

3   I should be paying for it, but I — I'm not really quite clear.

4   I think Winky still continued to pay — pay it for some time.

5   I'm not quite sure.

6   Q.  Did you ask him to continue paying it so those lenders

7   wouldn't accelerate their loans because there had been a

8   transfer of ownership?

9   A.  No.  That's never a concern of mine's, because I know as

10  long as — as long as we keep the payment there won't be any

11  danger of acceleration.

12  Q.  Did you ever look at the World Savings and Loan deed of

13  trust?

14  A.  No, I — I don't think I'd ever seen the deed of trust.  I —

15  I may have seen some of the monthly statements.

16          MR. FARRER:  Your Honor, may I approach the witness?

17          THE COURT:  Yes.  You showed Mr. Romeo a copy of

18  whatever this is?

19          MR. FARRER:  Yes.  I've handed the witness and Mr.

20  Romeo and the Court Exhibit 102, which is a World Savings deed

21  of trust against the Chenery Street property.  It was produced

22  by Seher & Associates in response to a subpoena.

23  BY MR. FARRER:

24  Q.  Do you have that in front of you, Mr. —

25  A.  Yes.

Case: 05-03236   Doc#31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 44 of
240

1    Q.  — Mr. —

2              THE COURT:  This is the deed of trust only?

3              MR. FARRER:  Yes, it's only the deed of trust.

4    BY MR. FARRER:

5    Q.  Mr. Yan, if you can turn to — it's page 12, it's kind of

6    small type, of Exhibit 102.  It bears a Bates Stamp number SEHER

7    00206; do you see that?

8    A.  Yes.

9    Q.  Okay.  Paragraph 26.

10   A.  Okay.

11   Q.  What does the title of that section say?

12   A.  Well, the title says, "Agreements about lender's rights if

13   the property is sold or transferred."

14   Q.  So do you understand that the lender did have the right to

15   accelerate the World Savings mortgage?

16   A.  I've never seen this before — this document before.

17   Q.  You didn't give it to Rick Seher?

18   A.  No.

19   Q.  So when you bought the property from Mr. Wong you didn't

20   bother to look at the deeds of trust and the mortgages on the

21   property?

22   A.  No.

23   Q.  And, as you sit here today, you can't tell me after you

24   bought the property who paid that mortgage?

25   A.  Well, like I said I believe I should be paying it — paying

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 45 of
240

1   it.  But, well, I'm not really quite clear as to what did that —

2   did I give the money to Winky that — so he'll pay — make the

3   payments for me, or whether I just pay the banks directly.  I

4   don't recall.

5   Q.  Well, if you didn't have any income in 2000 how are you

6   going to service a mortgage?

7   A.  Well, to be honest with you I was distressed with cash

8   during the construction of this project.  And I had to borrow

9   money from my family.

10  Q.  And do you know the approximate amount of debt service that

11  was owed on the Chenery Street property after you acquired Mr.

12  Wong's interest in that property?

13  A.  I think the combined two loans, two bank loans were around —

14  I think around $400,000.

15  Q.  Now let's turn to Exhibit B, as in "boy."

16  A.  (Complies.)  Okay.

17          THE COURT:  B?

18          MR. FARRER:  B.

19          THE COURT:  B.

20  BY MR. FARRER:

21  Q.  Okay.  Is Exhibit B a true and correct copy of an agreement

22  between you, and Winky Wong, and Tony Fu?

23  A.  Yes.

24  Q.  And you signed that agreement on October 12th, 2000?

25  A.  You're talking about B?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 46 of
240

1  Q.  B, "b" as in "boy."

2  A.  I think you have the wrong document — okay, okay, this is

3  the same.  Now this — this document — let's see — yes, it says

4  it was — this document was entered into on October 12th, 2000.

5  Q.  That's right.

6  A.  Okay.

7  Q.  And that's your signature on that document?

8  A.  Yes.

9  Q.  So the effect — is it your understanding the effect of

10  Exhibit B was to cancel Exhibit A?

11  A.  Yes.

12  Q.  And that's because you decided to buy Mr. Wong's interest in

13  Chenery Street, right?

14  A.  Yes.

15  Q.  And did you discuss that with Mr. Tony Fu before you did it?

16  A.  No.  I think I — his — I didn't have to get his permission,

17  but I believe that he knew all along that that was going to

18  happen.

19  Q.  Well, you have to answer my questions.  Did you discuss it

20  with Tony Fu, yes or no?

21  A.  I think I probably discussed it with him, but not to get his

22  permission.

23  Q.  Do you recall discussing it with him?

24  A.  As I said, I believe I — I discussed it with him, but not to

25  get his permission.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 47 of
240

1  Q.  And turning to Exhibit D, as in "dog."

2  A.  (Complies.)  Okay.

3  Q.  That's an agreement dated October 18, 2002.

4  A.  Okay.

5  Q.  Is that a true and correct copy of your agreement between

6  you and Tony Fu?

7  A.  Yes.

8  Q.  And you signed that agreement on October 18th of 2000?

9  A.  Yes.

10  Q.  And that agreement remains in force and effect subject to

11  whatever defenses you believe you can assert to it?

12  A.  Yes.

13           MR. ROMEO:  And — well, —

14  BY MR. FARRER:

15  Q.  So on October 18th, 2000, six days after signing Exhibit B,

16  you and Mr. Fu entered into Exhibit D to memorialize your

17  agreement with regard to developing 663 Chenery Street; is that

18  correct?

19  A.  I want to make sure I understand the question.  Can you

20  repeat it?

21  Q.  On October 18th, 2000, six days after you signed Exhibit B,

22  you and Mr. Fu entered into Exhibit D, as in "dog," to

23  memorialize your agreement with regard to developing 663 Chenery

24  Street?

25  A.  Yes.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 48 of 240

1  Q.  And under that agreement you confirmed that Mr. Fu has a

2  25-percent interest in Chenery Street, don't you?

3           MR. ROMEO:  I'm going to object that the question

4  calls for a legal conclusion, Your Honor.  I mean, I think this

5  document speaks for itself.  It's for the Court to interpret the

6  contract.

7           THE COURT:  I think that's probably so.

8           MR. FARRER:  Well, let me ask it a different way.

9           THE COURT:  Okay.

10 BY MR. FARRER:

11 Q.  Turning your attention to paragraph 1 of Exhibit D.

12 A.  Okay.

13 Q.  Do you see that sentence?

14 A.  Yes.

15 Q.  Now under this agreement you were to have 75-percent

16 ownership and Mr. Fu was to have 25-percent ownership in 663

17 Chenery Street, right?

18 A.  Okay.

19 Q.  That's what it says?

20 A.  Well, to be honest with you, this was drafted by Tony and

21 myself.  And my — my understanding maybe was — maybe the wording

22 here says that Tony Fu will get immediate 25-percent ownership

23 of the property by signing this contract.  But my understanding

24 was that after Tony constructs the project, now assuming that he

25 — he constructs the project successfully, then and only then

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 49 of
240

1   would he get — get his 25-percent ownership.

2          So, anyway, I'm not trying to be — to avoid your

3   question, but this — this contract speaks for itself.  But my

4   understanding when I signed this agreement was that I'm — I'm —

5   I have 100-percent ownership of the property and Tony will put

6   in his labor.  And then after he put in his labor then he'll get

7   his 25-percent ownership.

8   Q.  So is it your understanding that when you signed this

9   document that if Mr. Fu doesn't deliver completed condominiums

10  he gets absolutely nothing for all of this time, energy, effort,

11  and materials?

12  A.  Well, if he —

13         MR. ROMEO:  I'm going to object to the question still

14  is calling for a legal conclusion.  This is asking the witness

15  to testify —

16         THE COURT:  Overruled.

17         THE WITNESS:  Well, I — it may sound silly, but that

18  question never crossed my mind, because I always assumed that

19  the project would be finished successfully.

20  BY MR. FARRER:

21  Q.  And it was, wasn't it?

22  A.  Well, it was, but there were a lot of unforeseen problems

23  and delays.

24  Q.  Now in 2000 — in 2000 you also asked — entered into an

25  agreement for Mr. Fu to do work on 540 Second — 547 Twenty-Third

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 50 of
240

1   Avenue, didn't you?

2   A.  Can you repeat the date again?

3   Q.  In September of 2000.

4   A.  September 2000, I — I believe so, yes.

5           MR. FARRER:  May I approach the witness, Your Honor?

6           THE COURT:  Yes.

7   BY MR. FARRER:

8   Q.  Mr. Yan, I've asked the court reporter to mark as Exhibit

9   103 a document entitled, "Agreement."  Is this a true and

10  correct copy of an agreement between you and Tony Fu for

11  performing work on 547 Twenty-Third Avenue?

12  A.  Yes.

13  Q.  And that's your signature?

14  A.  Yes.

15          MR. FARRER:  I move the admission of Exhibit 103.

16          MR. ROMEO:  No objection, Your Honor.

17          THE COURT:  103 has admitted.

18      (Plaintiff's Exhibit 103 received in evidence.)

19  BY MR. FARRER:

20  Q.  And did you terminate that agreement in 2002?

21  A.  Yes.

22  Q.  Okay.

23          MR. FARRER:  May I approach the witness, Your Honor?

24          THE COURT:  Yes.  Does Mr. Romeo have copies of these?

25          MR. FARRER:  Yes.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 51 of
240

1          THE COURT:  Very well.  Thank you.

2    BY MR. FARRER:

3    Q.  Mr. Yan, I've asked the court reporter to mark as Exhibit

4    105 a memo from you to Tony Fu dated September 3rd of 2002?

5    A.  Well, actually this memo wasn't prepared to by me; it was

6    prepared by Tony.

7    Q.  Is that your signature on this document?

8    A.  Yes, it is.

9    Q.  Okay.  And aside from who prepared this document, did you,

10   in fact, terminate Tony Fu's services on 547 Twenty-Third

11   Avenue?

12   A.  Yes.

13   Q.  Okay.  And did you do that because you had acquired your own

14   contractor's license?

15   A.  That was one of the reasons, but not the main reason.

16          MR. FARRER:  I move the admission of Exhibit 105.

17          MR. ROMEO:  I think it's already in evidence as

18   Plaintiff's Exhibit Y.

19          THE COURT:  Well, —

20          MR. ROMEO:  But I have no objection.

21          THE COURT:  Belt and suspenders are all right.  105 is

22   admitted.

23          MR. FARRER:  It's not Exhibit Y.  It may be another —

24   different exhibit, but it — if it's a duplicate, I apologize.

25          MR. ROMEO:  I stand corrected, Your Honor.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 52 of
240

1          THE COURT:  But there was no objection.

2          MR. ROMEO:  No.

3          THE COURT:  Okay.  105 is admitted.

4     (Plaintiff's Exhibit 105 received in evidence.)

5   BY MR. FARRER:

6   Q.  Mr. Yan, would you turn in your — the black binder to

7   Exhibit 99?

8   A.  99.  I don't think it's in the binder.  Maybe it's loose.

9          THE COURT:  It's one of the loose exhibits.

10          THE WITNESS:  Yeah.  It's not here.

11          MR. FARRER:  I don't know why it's not in the —

12          THE COURT:  It's been submitted here.  I have them,

13   but —

14          MR. FARRER:  Yeah.  Well, what I'm going to do —

15          THE COURT:  — I think there are a lot of things that

16   never got put in the folder that were submitted at the —

17          MR. FARRER:  Do you have a copy?

18          THE COURT:  — first day of trial.

19          MR. FARRER:  Do you have a copy?

20          MR. ROMEO:  No, but I'll take one.

21          MR. FARRER:  It is my only one.  I'm going to give it

22   to the witness.

23          MR. ROMEO:  Oh, that's right.

24          MR. FARRER:  Okay.

25          Sorry about that.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 53 of 240

1           THE WITNESS:  Okay.

2   BY MR. ROMEO:

3   Q.  Is Exhibit 99 a true and correct copy of a grant deed from

4   Winky Wong to you dated December 14th and recorded on December

5   15th of 2000?

6   A.  Yes.

7   Q.  And in this document Mr. Wong is grant deeding a 50-percent

8   interest in Chenery to you; is that correct?

9   A.  No.  The reason why it was granted from Winky Wong to Winky

10  Wong and myself was because the purchase agreement between me

11  and Winky was that — well, was that I'll get 100-percent of the

12  ownership, but because I — there was an installment payment.  I

13  still owe him some money, some down payment.  And — and until

14  the down payment is paid off, that's why his name is still on

15  the record on the deed of trust.

16  Q.  This is the payment of the 750 —

17  A.  That's correct.

18  Q.  — or 60,000?

19  A.  That's correct.  Because I — I ask — well, I took subject to

20  the loans, existing loans.  And then I believe I still had

21  outstanding down payment.  I owe him.  I don't recall the exact

22  number.  I think it's like a hundred thousand or $200,000.  And

23  then we had the installment payment over several months.

24  Q.  And did you notify the lenders with liens against the

25  property that you had acquired a hundred-percent interest in

Case: 05-03236   Doc#:31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 54 of 240

1  that property?

2  A.  No.

3  Q.  And do you have Exhibit 100 there in the binder?

4  A.  The binder only — the binder only goes to 66 in the loose

5  ones.  I don't see 100.

6          THE COURT:  It's the loose ones, the next one.

7          THE WITNESS:  Here is the loose ones.

8  BY MR. ROMEO:

9  Q.  Mr. Yan, do you have Exhibit 100 in front of you?

10  A.  Yes.

11  Q.  And is this a true and correct copy of a grant deed from

12  Winky Wong to you dated August 14th, 2001 and recorded on August

13  15th, 2001?

14  A.  Yes.

15  Q.  And so on August 15th, 2001, almost two years after you

16  bought the Chenery Street property from him, Mr. Wong finally

17  grant deeded his entire interest in that property to you?

18  A.  I — I don't think it's two years.  I think it's more like

19  one year.

20  Q.  Well, why don't you look at Exhibit B?

21  A.  Exhibit B, okay.  Okay.

22  Q.  Exhibit B references a purchase and sale agreement of

23  October 9th of 2000, right?

24  A.  Okay.

25  Q.  I'm sorry.  And you're right.  It's — it's a year.  I stand

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 55 of
240

1    corrected.  Okay.

2            THE COURT:  We've been going for an hour and a half.

3    I don't think we should go for two and a half hours before we

4    take a break.  Is this a good time to take a break?

5            MR. FARRER:  Yes, it is.  That's fine.

6            THE COURT:  We'll just go till about noon — and what —

7    Mr. Yan, you may step down.  We'll take a short break.

8            What's the schedule for today?  Who do we have to deal

9    with?

10           MR. FARRER:  I just have cross of Mr. Yan.  And it's

11   still the defense's case.

12           Are you going to call any more witnesses, Mr. Romeo?

13           MR. ROMEO:  No, I don't think that we'll have any more

14   witnesses other than Mr. I can't think, which is already —

15           THE COURT:  Okay.  Do you have any witnesses?

16           MR. CHU:  No, Your Honor.

17           MR. FARRER:  And I don't —

18           THE COURT:  Okay.

19           MR. FARRER:  So we're going to — this is the last live

20   witness.

21           THE COURT:  For the whole thing, except for the

22   accounting issue, should we get to that.  We're not dealing with

23   those today.

24           MR. FARRER:  We're not dealing with that.  That's

25   actually Mr. Chu's —

Case: 05-03236   Doc#:31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 56 of 240

1          MR. CHU:  That's phase two which will be discussed at

2     a status conference after phase one is over, Your Honor.

3          THE COURT:  Okay.  I think I get it.

4          MR. FARRER:  Hopefully we'll be able to finish with

5     this witness.

6          THE COURT:  We have — I mean, we are dealing primarily

7     at this point, as I understand it, with the enforceability and

8     validity of this deed of trust.

9          MR. CHU:  Yes, Your Honor.

10         MR. FARRER:  Yes.

11         THE COURT:  And then the second question — there's a

12    second question is, if the deed of trust is valid and

13    enforceable, is there something more owed from the proceeds via

14    Exhibit D, and is there any kind of — whether or not that's so,

15    is there any kind of damages or — regarding the contractor issue

16    and accounting issues between the parties?

17         MR. CHU:  Correct.  That's true.

18         THE COURT:  And that's phase two.

19         MR. CHU:  Correct, Your Honor.

20         MR. ROMEO:  That's true.

21         MR. CHU:  And I think there's also the legal question

22    as to whether the contract is enforceable even if it is a

23    contract separate and apart from the Chen deed of trust and

24    note.  I think the debtor had raised a California defense.  Mr.

25    Fu is not a general — not licensed, therefore he shouldn't get

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 57 of 240

1  paid, something to that effect.

2          THE COURT:  Yeah, I understand.  Okay.  All right.  So

3  let's break five minutes or so.  Is that enough for you?  I just

4  want to give you something of a break.  If you need a minute or

5  two more, then that's fine.  When do you want to come back?  Let

6  me ask you this, five after?

7          MR. FARRER:  My preference is to finish this case

8  today.

9          THE COURT:  Well, I think we will.

10          MR. FARRER:  But I — I've got a lot of cross-

11  examination and a lot of exhibits to talk to the witness about.

12          THE COURT:  Okay.  How much longer do you think you

13  will be?

14          MR. FARRER:  Hours, for sure.  I mean, Mr. Yan has

15  testified.  I — we have 50 pages of a transcript from the direct

16  and — easily several more hours.

17          THE COURT:  Well, it depends on how many "several"

18  will be as to whether we finish or not.

19          MR. FARRER:  Well, I understand.  It's certainly our

20  hope, goal, and desire to finish today if it all possible.

21          THE COURT:  Okay.  Well, let's go — let's start at

22  five after 11:00 and we'll go to about five after 12:00.  And we

23  can keep lunch to an hour.

24          MR. FARRER:  Okay.

25          THE COURT:  And we'll just see how we do.  Okay?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 58 of 240

1           MR. FARRER:  Thank you.

2           THE CLERK:  All rise.

3      (Morning recess taken from 10:56 a.m. to 11:06 a.m.)

4           THE CLERK:  All rise.

5           THE COURT:  Please just give me a minute to catch up

6   with some —

7      (Pause in the proceedings.)

8           MR. ROMEO:  Your Honor, I haven't been able to find

9   Mr. Chu.

10           THE COURT:  Okay.

11           MR. FARRER:  Oh, interesting.

12           THE COURT:  Well, let's just wait a minute or so.

13           MR. ROMEO:  Perhaps while we're waiting for Mr. Chu,

14   I'd like to confirm with Mr. Hom, if possible.  He has a sheet

15   as to what's in.  I know we stipulated to a sort of wholesale

16   admission of exhibits last time, but we seem to be a little

17   uncertain as to what's in evidence and what isn't.  Mr. Farrer

18   is looking me like the admission —

19           MR. FARRER:  Well, my question is does Mr. Hom

20   maintain such a log?

21           THE COURT:  Well, it's on the record there, but I

22   don't know —

23           MR. FARRER:  But he doesn't have a separate sheet of

24   paper listing —

25           THE COURT:  I don't think we have a separate sheet of

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 59 of
240

1   paper.

2           Do you have a separate — did you maintain a log of the

3   exhibits?

4           THE CLERK:  I made some notes while — during — when

5   I'm in court — when I'm on a court schedule.

6           THE COURT:  Okay.  So now you've taken some notes, but

7   they haven't been matured into a log at this point?

8           THE CLERK:  Right.

9           THE COURT:  Okay.

10          MR. FARRER:  All right.  Well, then, we'll just —

11          MR. ROMEO:  We'll do that after the lunch break or

12  something.

13          MR. FARRER:  Yeah.  I think what we'd be asking —

14  prior to the close is just to confirm what's been admitted.

15          THE COURT:  Well, we could probably check out over

16  lunch — well, I know what you stipulated to.  I can find easily

17  what you stipulated to.

18          MR. FARRER:  Because that was right in the beginning.

19          THE COURT:  Yes.

20          MR. FARRER:  It was almost all of the initial

21  exhibits.

22          THE COURT:  We could — right.  We can find that over

23  lunch.  I can't get it right now.

24          MR. FARRER:  No.  We're not asking for that now.

25          THE COURT:  But we could go back.  That was July 14th?

 1              MR. FARRER:  No.

 2              MR. ROMEO:  July 25th.

 3              MR. FARRER:  26th and 27th.

 4              THE COURT:  26th and 27th?

 5              MR. FARRER:  Correct.

 6              THE COURT:  That's right, July 26th.  Okay.  What

 7    would be the 26th?

 8              MR. FARRER:  That would be the first day of trial.

 9              THE COURT:  Yes.

10              MR. FARRER:  And then we went back to back for two

11    days, and then —

12              THE COURT:  Yeah.  The point is that would have been

13    the first day.  We will have that recorded at the beginning.

14    And I can find out over lunch.

15              MR. FARRER:  Well, I think we know what that is.  It's

16    after that.

17              THE COURT:  Yes, okay.

18              MR. FARRER:  And additional exhibits came in.  Because

19    we have a pretty good list.  It would just be nice to

20    doublecheck some things.  And then just a point in

21    clarification.  I want to make sure that it's — it's the Court —

22              THE COURT:  I think — well, I think the only thing it

23    was excluded is that a couple of exhibits were limited in use.

24    I don't know that anything was excluded that was offered.

25              MR. FARRER:  I don't think you allowed in the Beckman

Case: 05-03236   Doc#31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 61 of
240

1   settlement letter.

2            THE COURT:  Well, that — I wouldn't have done that.

3   That's right.  Then there was another letter that was — which

4   was limited — for limited use.

5            MR. FARRER:  There was a Sui Ma letter, because he had

6   testified — Mr. Beckman testified he never got any response.

7   And we actually came up with —

8            MR. ROMEO:  Exhibit 68.

9            MR. FARRER:  That's right, Exhibit 68.  And then I

10  think Exhibit 95 was — excuse me — what was it?  Was it 90- —

11  93, I tried to get in through Mr. Beckman.  And I think the

12  Court — Mr. Romeo successfully objected to that.  But he did

13  agree to limit the scope of that letter from Mr. Beckman,

14  Exhibit Q.

15           MR. ROMEO:  Correct.

16           MR. FARRER:  For notice only.

17           MR. ROMEO:  Correct.  Okay.  We're still waiting for

18  Mr. Chu.  Okay.

19           The other — the other question I have while we're

20  waiting for Mr. Chu is that we've now have become aware that the

21  witness binder isn't necessarily complete.  But what matters to

22  me is that the Court's —

23           THE COURT:  I think I have everything.

24           MR. ROMEO:  — exhibits are complete.

25           THE COURT:  I think I have a — I have a long — now you

Case: 05-03236   Doc#:31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 62 of
240

1    skipped — what's the latest one in the exhibit?

2           MR. FARRER:  Well, I think we just admitted 105.

3           MR. ROMEO:  But the binder only goes up at least —

4           THE COURT:  Are they all sequential?  That's the

5    question.

6           MR. FARRER:  There — there

7           THE COURT:  I have a lot of exhibits here.

8           MR. FARRER:  There are sequential-numbered documents

9    that have not been admitted and are —

10          THE COURT:  Well, let me tell you what I've got here.

11   I have 68, —

12          MR. FARRER:  All right.  Well, let's write this down.

13          THE COURT:  — 86, 95, 96.  Well, there's more here.

14   Hold on.  74, 75, 76 — go again, 60- — 68, 74, 75, 76, 83, 84,

15   85, 86 — I need to find 86, I think.  Then I have 88, 90, 91,

16   92, 93, 94, 95, 96, 99, 100, 102, 103, 105.

17          MR. FARRER:  That's right.

18          MS. SPEAKER:  That should do it.

19          THE COURT:  Okay.  Is there anything else that you've

20   offered?

21          MR. FARRER:  You have FF, which was today.

22          MR. ROMEO:  FF is today.

23          MR. FARRER:  And is that —

24          MR. ROMEO:  I believe that's on the witness stand.

25          THE COURT:  Do you have FF?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 63 of 240

1              THE CLERK:  That one —

2              MR. ROMEO:  I believe it's only on the witness stand,

3    Your Honor.

4              THE COURT:  I don't have it here.

5              MR. ROMEO:  I'd like to move that back into evidence

6    if —

7              MR. FARRER:  I have no — I have no objection.

8              THE COURT:  Okay.  Is it marked?

9              MR. ROMEO:  Well, in my own fashion.

10             THE COURT:  Okay.  I'll mark it.  I'll finish marking

11   it to the extent necessary.

12        (Defendant's Exhibit FF received in evidence.)

13             MR. FARRER:  Okay.  The point of reference is that it

14   — it's what the Court has up there that's important and not that

15   the witness binder is incomplete, correct?  I mean, we're —

16             THE COURT:  Well, I mean, the witness needs to see

17   what you're asking the witness about.

18             MR. FARRER:  Absolutely.

19             THE COURT:  But the witness binder is not what we use

20   for the —

21             MR. FARRER:  Perfect.

22             THE COURT:  — making decisions and for the record.

23             MR. FARRER:  Okay.  Are we ready?

24             THE WITNESS:  Okay.

25   BY MR. FARRER:

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 64 of 240

1  Q.  Mr. Yan, —

2          THE COURT:  So I take it from what I've heard and not

3  heard from you that there's nothing up here that you offered

4  that I'm missing?

5          MR. FARRER:  Not to my knowledge.

6          THE COURT:  Okay.

7          MR. FARRER:  Mr. Romeo?

8          MR. ROMEO:  No.  That's fine.

9          MR. FARRER:  Okay.

10          THE COURT:  Go ahead, please.

11          MR. FARRER:  Okay?

12          THE COURT:  Yes.

13  BY MR. FARRER:

14  Q.  Okay.  Mr. Yan, if you would, black binder, Exhibit 2?

15  A.  (Complies.)  Okay.

16  Q.  And white binder, Exhibit D, as in "dog."

17  A.  Okay.

18  Q.  Is Exhibit 2 a true and correct copy of a attorney

19  engagement letter that you signed and returned to the law firm

20  of Herzig and Berlese on November 15th of 2000?

21  A.  Yes.

22  Q.  Okay.  So you signed Exhibit 2 approximately one month after

23  entering into your agreement with Tony Fu, which is Exhibit D?

24  A.  Yes.

25  Q.  And did both Margaret Berlese and an associate there named

Case: 05-03236    Doc#31    Filed: 11/18/05    Entered: 11/18/05 01:04:54    Page 65 of
240

1    George Weeks at that firm help you with the legal services that

2    you had requested from that firm?

3    A.   Yes.

4    Q.   Now if in the black binder you'd turn to Exhibit 3?

5    A.   (Complies.)  Okay.

6    Q.   And I'd like you to compare it, if you could, with Exhibit

7    5.

8    A.   Okay.

9    Q.   Do you have both of those documents in front of you?

10   A.   Yes.

11   Q.   Exhibit 3 is the Lie Ming Li promissory note and Exhibit 5

12   is the Stella Chen promissory note, right?

13   A.   Yes.

14   Q.   Okay.  And it's the same preprinted form, isn't it?

15   A.   Appears to be.

16   Q.   And you previously testified you definitely signed Exhibit

17   3?

18   A.   Yes.

19   Q.   Okay.  And that it was made payable to Lei Ming Li and it

20   was for $110,440, right?

21   A.   Yes.

22   Q.   Okay.  Now I notice that the Lei Ming Li —

23   A.   I want to add also that this Lei Ming Li note, I believe it

24   was notarized, as well.  I don't see a notarized page here.

25   Q.   I've never seen it.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 66 of 240

1   A.  Okay.

2   Q.  But thank you.

3          The Lei Ming Li promissory note doesn't include a

4   provision for interest, does it?

5   A.  No.

6   Q.  And it doesn't include a maturity date, does it?

7   A.  No.

8   Q.  Now turning to Exhibit 5, the Stella Chen promissory note,

9   the language regarding interest has been deleted, correct?

10  A.  Yes.

11  Q.  And there is no maturity date listed in that note, either,

12  is there?

13  A.  That's correct.

14  Q.  So the terms with regard to a no-interest provision and a no

15  maturity date are identical between the two notes, aren't they,

16  except one is left blank and one has been crossed out?

17          MR. ROMEO:  Well, Your Honor, then I object.  The

18  question really mischaracterizes the documents.  It's not a

19  particularly worthwhile question because the documents speak for

20  themselves.  They aren't really —

21          THE COURT:  I think you — I think all you're getting

22  at is the terms are similar?

23          MR. FARRER:  Exactly.

24          THE COURT:  It's done in different ways, but the terms

25  are similar.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 67 of
240

1  BY MR. FARRER:

2  Q.  Is that correct, Mr. Yan?

3  A.  I — I assume so, yes.

4  Q.  Well,..  Now on November 13th, 2002 you met with Tony Fu at

5  Starbucks coffee shop on Geary Street, right?

6  A.  Yes.

7  Q.  And you met with him because he had called you up and asked

8  him [sic] to meet you there?

9  A.  Yes.

10 Q.  And at that meeting he handed you a deed of trust and a

11 promissory note?

12 A.  I don't recall that he handed me a promissory note.  But I

13 do recall for sure that he handed me a deed of trust.

14 Q.  Do you recognize your signature on Exhibit 5?

15 A.  Well, actually I think I testified before that this

16 signature doesn't appear to be my normal signature.  But at this

17 time I can — I can't really say for sure that it wasn't mine.

18 Q.  So, as you sit here today, you're not denying you signed the

19 document; you're just saying you don't recall signing it?

20 A.  That's correct.

21 Q.  And if you didn't sign it, you can't recall whether you

22 signed it at Starbucks or over at the notary office?

23 A.  I'm sure that I didn't sign anything over at the notary's

24 office, except for the notary's logbook.

25 Q.  Well, didn't you sign the deed of trust in front of the

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 68 of
240

1  notary before he notarized it?

2  A.  Oh, that may be correct, yes, um-hum.  Yes.

3  Q.  I mean, that's why you went to the notary's office, isn't

4  it?

5  A.  Yes, um-hum.

6  Q.  So that he could witness your actual signature on the deed

7  of trust, right?

8  A.  That's correct.  So the deed of trust was notarized.  But I

9  know that this Exhibit 5, this note wasn't notarized.

10  Q.  Now when you entered into Exhibit D, as in "dog," which is

11  your agreement with Mr. Fu, —

12  A.  Yes.

13  Q.  — on October of 2000, wasn't there at least an understanding

14  or implicit agreement between the two of you that the

15  condominiums would be sold or rented as soon as they were

16  completed?

17  A.  I think we always assumed that we can sell the property as

18  soon as it's completed.

19  Q.  Okay.  And when is — and once they were completed they would

20  then be sold in the two of you would divide your respective

21  interests per Exhibit D, correct?

22  A.  Correct.

23  Q.  Okay.  Turning to Exhibit 6, which is the — what we've

24  referred to as the Stella Chen deed of trust.

25  A.  Okay.

Case: 05-03236   Doc#31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 69 of 240

1  Q.  Is that a true and correct copy of the deed of trust that

2  you signed on November 12th of 2000 — 13th, 2000?

3  A.  Well, when I signed this I recall distinctly that the — a

4  lot of the wordings here weren't filled in.  For example, Stella

5  Chen, the name there wasn't fill in.  And the only thing that I

6  recall that was filled in was the — the number of the bottom of

7  $450,000.

8           And I — I, myself, wrote in my — in my handwriting the

9  address description, which is 663 Chenery Street, San Francisco,

10 Ca., California.  Now in front of this phrase there's a extra

11 word that you're seeing, trustor address colon, and then behind

12 this phrase, that's also another extra — extra verbiage.  It

13 says, "Also see attachment."  And those are not my signature —

14 or my handwriting.  And I'm pretty sure that those weren't

15 filled in when it was notarized.

16 Q.  Why did you put down the address 663 Chenery Street?

17 A.  Well, because Tony told me that he wanted to have the deed

18 of trust against this property.  So I just filled it in — put in

19 the address.

20 Q.  Well, you wanted to make sure that this deed of trust

21 applied just to the Chenery Street property, not other

22 properties you own, correct?

23 A.  Yes.  I guess so, yes.

24 Q.  Okay.  And you say the $450,000 amount was included at the

25 time you signed it?

Case: 05-03236   Doc#: 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 70 of 240

1    A.   Yes.

2    Q.   Okay.

3    A.   Because I recall that we — Tony and myself discussed this

4    particular figure.  So that's why I — I remember this was on

5    this deed of trust.

6    Q.   And, as you sit here today, the identification, Stella Chen,

7    and/or assignee language, you don't deny that it was included in

8    there; you can't recall if it was in there?

9    A.   No.  I'm sure definitely it wasn't filled in.

10        (Pause in the proceedings.)

11   BY MR. FARRER:

12   Q.   Now do you recall your testimony on July 27th, 2005 in this

13   case?

14   A.   I may or may not.

15   Q.   Okay.  I'm going to hand you —

16           MR. FARRER:  Your Honor, if I could approach the

17   witness and the bench?  We had a partial transcript made of Mr.

18   Yan's testimony.  I may be referring to it during my cross-

19   examination.  I'm going to —

20           THE COURT:  That's fine.

21           MR. FARRER:  — hand the Court a copy and the witness.

22           THE COURT:  And you made an extra for Mr. Romeo,

23   correct?

24           MR. FARRER:  Oh, yes.

25           THE COURT:  Thank you.

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:54    Page 71 of
240

1              THE WITNESS:  All right.  Thank you.

2   BY MR. FARRER:

3   Q.  Mr. Yan, this is the court reporter's transcript of your

4   testimony when you were the witness box on July 27th.  And Mr.

5   Romeo asked you on page 17 — and he's referring to Exhibit 6.

6   Do you see that up on line 5?

7   A.  Yes.

8   Q.  And then on line 11, he states:

9              "So it's your testimony that the name of the

10  beneficiary in the trustor were not filled in?"

11             And I objected.

12             And then the Court said, "Wait a second."

13             And then Mr. Romeo said, "I'm trying to understand."

14             And the Court said, "At what time?"

15             Mr. Romeo clarified at the meeting at Starbucks.

16             And you answered, "Yes.

17             "And was any of it filled in?

18             "From the best of my recollection, it wasn't filled

19  in."

20  A.  This is line 24 and 25?

21  Q.  Correct.

22  A.  Okay.

23  Q.  I'm not asking you to explain that.  That was your testimony

24  on July 27th, right?

25  A.  Yes.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 72 of 240

1   Q.  Okay.

2   A.  And if you also look at line 8 and 9, it was — answers the

3   same question.

4   Q.  But you have since testified today that amount was filled

5   in, right?

6   A.  Yes, but if you look at page 18 — line 18 — 18 and 19.

7           THE COURT:  On page 18?

8           THE WITNESS:  Yes.

9   BY MR. ROMEO:

10  Q.  But your testimony before was it was your recollection, your

11  best recollection, it wasn't included.  You're not denying that

12  it was included?

13  A.  Denying the name, —

14  Q.  Yes.

15  A.  — Stella Chen?  Well, —

16  Q.  Is it fair to say you don't recall?

17  A.  Well, I would say right now, you know, that I'm pretty sure

18  it wasn't there.  Because for a fact I was surprised when I

19  found out the name is Stella Chen, when I look at these

20  preliminary reports, when I found out the first time that was

21  recorded.

22  Q.  Now you understand that the reason that a deed of trust is

23  notarized is so that the beneficiary can record it?

24  A.  Well, —

25  Q.  You can answer that yes or no.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 73 of
240

1   A.  Well, I can't answer — well, — if you're not referring to

2   this particular deed of trust, then the answer would be yes.

3   Q.  Okay.

4   A.  But referring to this deed of trust, the answer is no.

5   Q.  And the reason it is recorded so that the lender can get a

6   lien on the property, right?

7   A.  Which deed of trust are you referring to?

8   Q.  Hypothetically.

9   A.  Well, normally, if you — I — if it's a *bona fide* lender, I

10  would say that's — that's definitely a yes answer.

11  Q.  Okay.  And the reason the lender wants to have a lien on the

12  property so that they can go after the property if there's a

13  default, right, you understand that?

14  A.  Again, I'm assuming that is a *bona fide* lender.

15  Q.  Do you have that understanding that they can foreclose their

16  lien?

17  A.  They, meaning Stella Chen?

18  Q.  The lender.  No, the lender, hypothetically.  I'm not

19  talking about Exhibit 6.

20  A.  Oh, yeah.  Like I say if it's a *bona fide* lender, yes.

21  Q.  Okay.  And do you recall during your deposition in this case

22  when I asked you why — well, strike that.

23          Do you recall your testimony during this trial where

24  you testified that you and Tony had discussed whether or not

25  this Exhibit 6 would be recorded?

Case: 05-03236   Doc#:31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 74 of 240

1  A.  Would you repeat that question again?

2  Q.  Do you recall your testimony during which — in the trial —

3  during which you testified that you and Tony had discussed

4  whether or not Exhibit 6 would be recorded?

5  A.  That's correct.

6  Q.  Okay.  And you have testified that he told you he wouldn't

7  record it, right?

8  A.  That's correct.

9  Q.  Okay.  Do you recall your deposition in this case where I

10  asked you why you didn't want the deed of trust recorded?

11  A.  I don't recall.

12  Q.  Okay.

13       (Pause in the proceedings.)

14  BY MR. FARRER:

15  Q.  And do you recall telling me during your deposition that you

16  didn't really care if it was recorded?

17  A.  I don't recall.

18  Q.  Okay.  Why didn't you want the deed of trust recorded?

19  A.  Well, because the deed of trust was given to Tony, because

20  Tony gave me his — his, you know, story about saying that he

21  needed to get a — that he was — he originally was in dire

22  financial straits.  And that he just wanted to borrow money from

23  — from someone.  And he just wanted to have something to show

24  that he has — he has collateral.

25            So, you know, this was really given to him just to

Case: 05-03236   Doc#: 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 75 of 240

1  help him out.  So it wasn't really something that, you know,

2  that I was — it wasn't something official.  It was just given to

3  Tony on his request, which turns out to be a false request or,

4  you know, a false statement, that he just wanted to have

5  something for collateral.

6  Q.  So it wasn't supposed to be official, but you and he walk

7  over to that notary's office and have it notarized?

8  A.  Yes.

9  Q.  Okay.  Why would you do that?

10  A.  I wouldn't — I wouldn't have done it for anyone except for

11  Tony, because of the time I still, you know, I still didn't

12  think that he would actually, you know, set out a trap for me.

13  Q.  Well, wait.  You had already terminated him on 547

14  Twenty-Third Avenue, hadn't you?

15  A.  Yes.  And I believe I had a legitimate reason to do that.

16  Q.  Well, you may have, but maybe he's not trusting your

17  intentions right now, right?

18  A.  Well, he — he may have a grudge against me, but I'm never

19  thought that he actually hold a grudge — grudge against me on

20  that one.

21  Q.  And did you sign this deed of trust because you wanted to

22  help him borrow money from somebody, or because you were trying

23  to secure the money you owed him under Exhibit D?

24  A.  No.  Because at the time, see, when this was signed, 2002,

25  the project wasn't — wasn't finished yet.  He was still working

Case: 05-03236   Doc#31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 76 of
240

1   on Chenery Street.  So even looking at the — the contract

2   between Tony and myself, he's not entitled to any, you know,

3   thing until after his — after the project's finished.

4   Q.  So you didn't sign Exhibit 6 because you wanted to secure

5   for him the moneys he was owed under Exhibit D; is that correct?

6   A.  That never came up.  Like I said — but I — I recall at the

7   time that I spoke of he did tell me that, you know, his share,

8   now assuming that the project would be sold, would be at least,

9   you know, $450,000 based on our original estimate of a maximum

10  of $1.8 million.

11          So — so he put this — put this amount on this deed of

12  trust.  But, like I said, this was signed in late 2002 and the

13  project wasn't finished until 2003.  So if this is really to —

14  to pay him for his work, it's way too early.  And, you know,

15  like — like I said, it may sound very silly and — I guess for me

16  to say now, but at the time, you know, because me and Tony, we —

17  I still had some — some, I would say, good feelings toward him

18  at that time based on our, you know, long — long working

19  relationship and our friendship that I thought, you know, if he

20  want to have something to show people that he has something for

21  collateral, then I'll just do it, provided that he promise that

22  he won't record it.  And I — you know, I took his promise at

23  face value.

24  Q.  Okay.  I'm going to ask you to read from your deposition

25  testimony taken on September 3rd, 2004, page 46.

Case: 05-03236   Doc#:31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 77 of
240

1        MR. FARRER:  And I believe the Court should have those

2   earlier transcripts we brought.

3        If I may approach the witness, Your Honor?

4        THE COURT:  This is September 3rd?

5        MR. FARRER:  Correct.

6        THE COURT:  Page 46.

7        MR. FARRER:  Yes, sir.  Lines 5 through 14.

8        THE COURT:  There are a lot of pages missing in here.

9        MR. FARRER:  You're kidding.

10       THE COURT:  No.

11       MR. FARRER:  In the original?

12       THE COURT:  Yes, a lot of pages missing.  It goes —

13   like every eighth page I have, is what I have here.

14       MR. FARRER:  And what's the cover of that say?

15       THE COURT:  It says, "Original deposition of Demas Y.

16   Yan, February" — says, "Friday, September 3rd, 2004."  It's

17   supposed to be 163 pages.  It's a fraction of that.

18       (Counsel confer off the record.)

19       MR. FARRER:  I did — do you suppose that we offered

20   the Court the condensed version?  I don't know what happened to

21   the original.

22       THE COURT:  Let's see what you got.

23       MR. CHU:  I don't think I have any markings in that

24   copy, Your Honor.

25       MR. ROMEO:  I'd like to see what the original looks

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 78 of 240

1   like now.

2            THE COURT:  The original is obviously incomplete.  Why

3   don't you look at this one?  You can look at this, but you're

4   only going to be — you're only going to scratch your head.  I

5   think what you most need to look at is the copy is being

6   offered.

7        (Counsel confer off the record.)

8            THE COURT:  See, this is just obviously incomplete.

9   And you'll see.

10           MR. FARRER:  It's the first day of his deposition.

11           MR. ROMEO:  Okay.

12           MR. FARRER:  Mr. Romeo has it with him.

13           THE COURT:  Okay.

14           MR. FARRER:  And we'll bring back —

15           THE COURT:  This is very interesting.

16           MR. FARRER:  Yeah.  I never had that happen before.

17           THE COURT:  It starts on page 23, 24, 30, 31, 32, 33,

18   34, 35, 36, 37, 38, 39, 45, 51, —

19           MR. FARRER:  I know a lot to take care of, but —

20           THE COURT:  — 59, 64, 65.  There's a lot of stuff

21   missing.

22           MR. FARRER:  All right.  Well, let's move on.  Again,

23   page 46 on the condensed —

24           THE COURT:  46 in this?

25           MR. FARRER:  Yeah, we're going to use a condensed,

Case: 05-03236   Doc#: 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 79 of 240

1    because that's all I have to offer the Court.  I'll bring the

2    full one —

3              THE COURT:  What lines?

4              MR. FARRER:  Starting at line 5.

5              THE WITNESS:  Do I get a copy?

6              MR. FARRER:  Yeah, we're going to —

7              MR. ROMEO:  Are you going to —

8              Excuse me, Your Honor.  Is he going to read it into

9    the record, or — which would probably be clearer than simply

10   having the witness read testimony —

11             MR. FARRER:  I'm certainly willing to do that.

12             MR. ROMEO:  — or is it —

13             THE COURT:  How long an exhibit is this?

14             MR. FARRER:  It's going to go down to line 2 on page

15   47.

16             THE COURT:  Oh, I think we should just let him read

17   it, then.  Yes.

18             MR. FARRER:  Let me read it?

19             THE COURT:  Yeah, just go ahead and read it.

20             MR. FARRER:  Okay.

21             THE COURT:  I think that would be —

22             MR. FARRER:  Okay.  This is Mr. Farrer:

23             "QUESTION:"  This is page 46, line 5.  "So explain to

24   me in your own words exactly what your understanding of this

25   informal arrangement was between you and Tony Fu with regard to

Case: 05-03236   Doc#: 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 80 of 240

1   not recording the deeds of trust you gave to Li and Chen?

2       "ANSWER:  The deed of trust to Li, to be honest, I

3   don't recall that I ever signed it over, but apparently I did.

4   Apparently it was to security repayment of building materials

5   that Tony Fu bought.  The other deed of trust was signed over to

6   secure Tony Fu's payment of his contract to do the construction

7   work.

8       "QUESTION:  I didn't ask you what the deeds of trust

9   were for.  I asked you to tell me what your understanding of

10  this informal arrangement was for not recording them.

11      "ANSWER:  When?

12      "QUESTION:  Tell me exactly what was said between you

13  and Mr. Fu regarding not recording these deeds of trust?

14      "ANSWER:  I don't know I can say exactly.  I recall

15  when Tony Fu gave me the deed of trust to sign that he told me

16  he wouldn't record it, or maybe I asked him not to record it,

17  and he said, 'Yes,' something to that nature.

18      "QUESTION:  Why would you ask him not to record it?

19      "ANSWER:  No particular reason."

20  BY MR. FARRER:

21  Q.  All right.  Mr. Yan, if you would turn to Exhibit 7?

22  A.  (Complies.)  Okay.

23  Q.  This is the Scot Brodie notary book —

24  A.  Okay.

25  Q.  — or a portion of it.  And if you could turn to page 2 of

Case: 05-03236   Doc#31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 81 of
240

1  that notary book.  Is that your handwriting, signature line, on

2  page 3?

3  A.  Yes.  But before that — I'm just wondering.  I — I do recall

4  that in — in the — at least one of your depositions I did

5  mention that the reason why I gave the deed of trust to Tony was

6  because he gave me this story about his needing a loan.

7  Q.  Mr. Yan, no one's asked you to explain your answer.

8  A.  Okay.  That's fine.

9  Q.  I read it in your deposition.

10  A.  Fine.

11          THE COURT:  Can I stop — I think I need to talk to

12  both of you for a while outside the presence of the witnesses.

13  Mr. Chu can stay here.

14          MR. FARRER:  Yeah, —

15          THE COURT:  I'm a little bit confused about the

16  contentions and what's really at stake.  And I would like to ask

17  you a couple of questions.

18          MR. FARRER:  Okay.

19          THE COURT:  I'd like it to be on the record.

20          MR. FARRER:  All right.  Shall we excuse the witness?

21          THE COURT:  So if we can excuse everybody, except

22  counsel, I would just like to ask you a few questions.  I'm

23  asking you this because I think it may streamline this matter.

24  I need to know what the parties are contending.  Let's let them

25  leave.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 82 of
240

1      (Witness temporarily excused and all persons, including the

2  witness, except the Court, Court staff, Messrs. Romeo, Farrer,

3  and Chu exit the courtroom.)

4      THE COURT:  Okay.  Let me just talk a couple of

5  minutes.  If at any point I'm wrong, correct me, —

6      MR. FARRER:  Okay.

7      THE COURT:  — in any particular.  As I understand the

8  testimony, Mr. Yan said he signed this deed of trust.  Okay?

9  And that when he signed the deed of trust, according to his

10 testimony, it wasn't filled out who it was payable to, and that

11 he understood there was a $450,000 obligation.  He understood

12 that when it was there.  And that he — his explanation of this

13 is that the — it was meant to sort of — the $450,000 obligation

14 in some way represented his interest under Exhibit D, the second

15 agreement.

16     MR. FARRER:  Well, he's got two explanations.  That's

17 one of them.

18     MR. CHU:  Mr. Fu's interest under Exhibit D.

19     THE COURT:  Mr. Fu's interest, yes.  Well, he was

20 asked to sign this by Mr. Fu.

21     MR. CHU:  Right.

22     THE COURT:  Okay.  Now if one believes that he

23 actually signed the note, okay, if he signs a promissory note my

24 understanding of the defense was that — hold on just a second.

25     All right.  This — I have listed here in the pretrial

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 83 of
240

1    statement that the — basically that Mr. Fu prepared the note and

2    missed — for $450,000 the note and deed of trust and Mr. Yan

3    signed them.  Okay?

4            MR. CHU:  Correct, Your Honor.

5            THE COURT:  As I understand it, the defense against

6    the note is that there's no consideration for the note.

7            MR. ROMEO:  The defense against the note —

8            THE COURT:  In the sense that it — based on the fact

9    that it was — the consideration was — or it was a legal

10   consideration, because Mr. Fu was not a licensed contractor and

11   the consideration for the note was services he would perform in

12   that role.

13           MR. ROMEO:  I would state it more simply than that.  I

14   would say because they had said there was this loan in Hong Kong

15   that they get to be repaid on that.  And then Mr. Fu says, "By

16   the way, I also own 25 percent of that project.  And what we're

17   — you know, Mr. Yan is saying is, "No, there's only one set of

18   obligations between me and Tony as there's no such thing as this

19   Hong Kong loan, so you can't get paid.  Mr. Leung's loan from

20   Hong Kong and the 25 percent of the project.  And I have

21   defenses to the 25 percent," so it's not — it's a big mess.

22           THE COURT:  Okay.  If there is a note — a promissory

23   note is, as I recall, an unconditional promise to pay.  So we

24   have the possibility here — we have a — we clearly have a

25   partnership agreement between these folks of some sort, some

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 84 of
240

1   sort of joint venture, partnership.  It looks to be, from what

2   I've seen in the documents, that the — that Mr. Yan is the legal

3   owner of this parcel at the relevant times, that Mr. Fu probably

4   has an equitable interest via some, you know, that — that Mr.

5   Yan is holding this for this joint venture, or partnership, or

6   whatever, tenancy, equitable tenancy in common, whatever you

7   call it.  Okay.

8            MR. CHU:  I think that's accurate, Your Honor.

9            THE COURT:  If that is the case — well, that looks to

10  be what the case is here.  It also looks to be that there is a

11  note that signed.

12           MR. ROMEO:  Correct.

13           THE COURT:  It seems to me the real question here is

14  whether the — there's a separate obligation for the payment of

15  $450,000 pursuant to this Hong Kong loan in addition to the

16  appropriate distribution of proceeds of the Chenery Street

17  property.

18           MR. FARRER:  Exactly.

19           MR. ROMEO:  Yes.

20           MR. CHU:  Yes, Your Honor.

21           THE COURT:  Okay.  The defendant is saying, "Yeah, I

22  signed the loan but, you know, when I signed the loan there was

23  no Hong Kong loan.  When I signed this loan it was in respect of

24  Exhibit D.

25           MR. FARRER:  Fair enough.

Case: 05-03236   Doc#31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 85 of 240

1          MR. CHU:  Correct, Your Honor.

2          THE COURT:  Mr. Fu's interest growing out of Exhibit

3   D.

4          Now the reaction I have to this is as follows:  That

5   the real question here is going to be at phase two of the trial

6   in a couple regards.  And I don't think there's much of a

7   question here.

8          If Exhibit D was executed by the parties, I think that

9   this — Mr. Fu is an equitable owner in the property.  This is

10  probably — I don't know what you call this thing.  You haven't

11  told me whether it's a partnership, or a joint venture, or a

12  whatever.  But my guess is, as an equitable owner in the

13  property pursuant to a written agreement, he's probably an owner

14  for purposes of these contracting laws.  And I don't think this

15  consideration is illegal on its face.

16         There is clearly — the defendant admits that there's

17  some consideration here for this in that he contends — they're

18  different actions — Mr. Yan — plaintiff/defendant don't really

19  work — Mr. Yan contends that, yeah, I signed this, and it was in

20  respect of — it's sort of an advance on, or an estimate of, or

21  on account of, the Exhibit — the rights under Exhibit D.

22         It seems to me that this note is enforceable and that

23  there is no setoff permitted at this point because the note is a

24  separate obligation from the rights under Exhibit D that is

25  supported by some consideration, at minimum.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 86 of
240

1    It may be a completely separate obligation, if I

2 believe Mr. Fu's story that there was a separate loan.  And if

3 there was a separate loan for $450,000 it's so unrelated to, and

4 there's consideration for it, and it is not affected by any

5 problem in the partnership.  Okay?

6    If that is so, I think the note is enforceable.  There

7 may be an action under the partnership agreement to square the

8 account.  And that this note is considered a payment in respect

9 of the rights under that agreement, which does not preclude some

10 action for overpayment for breach of the agreement.  But that's

11 a separate thing.

12    And the note, the note is enforceable.  And if Ms.

13 Chen enforces the note, the question then is with Mr. Fu is:

14 Did he perform under the partnership agreement?  And if not, you

15 know, is he liable for some overpayment?  And separately is —

16 was there a separate Hong Kong note — a separate Hong Kong loan,

17 so that this $450,000 is not, in fact, in respect of the payment

18 of Exhibit D, but needs to be paid.  And it will not be paid

19 ultimately on account of the rights under Exhibit D.

20    But it seems to me that the defendant's own story — or

21 Mr. Yan's own story is:  Yes, I signed this thing.  Yes, I knew

22 it was a $450,000 obligation.  And I was, by making this

23 promise, the performance of which would satisfy an obligation,

24 which I agreed to pay the exact amount of $450,000 to satisfy,

25 which is the estimate of the obligations I thought I had under

Case: 05-03236   Doc#31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 87 of
240

1   Exhibit D.

2          And if that's so, I think there's lawful consideration

3   here.  And I believe these people — what — the only question is

4   whether there as partners, where he's an equitable as opposed to

5   a legal owner, whether — where there's such — such services in

6   favor of the partnership by an unlicensed contractor/equitable

7   owner are legally and valid consideration.

8          MR. ROMEO:  And that's phase two.

9          THE COURT:  Well, it's not phase two, because it goes

10  — that's the only question left about, that I see from the

11  testimony I've heard to date, about whether this note is

12  enforceable.

13         MR. FARRER:  Well, the issue for rights —

14         THE COURT:  Only if the rights under Exhibit D were

15  completely worthless, because he — he could not lawfully be paid

16  for services as an unlicensed contractor in a property in which

17  he was a partner.  Only if that's the case is there no

18  consideration for this note.

19         Now am I missing anything?

20         MR. ROMEO:  Well, there's there's additional issues

21  between Mr. Fu and Mr. Yan about — about the partners, —

22         THE COURT:  Oh, there's a lot of other issues.

23         MR. ROMEO:  — accounting issues, —

24         THE COURT:  The question has to do — a note is an

25  independent obligation.  It's been assigned.  I mean, this —

Case: 05-03236   Doc#: 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 88 of
240

1   this — whether he knew it was going to Ms. Chen or not, he

2   signed the promissory note which can be assigned to someone

3   else.

4          MR. FARRER:  But the question is what was the

5   consideration?  Was it a loan, or was it Exhibit D?

6          THE COURT:  They say —

7          MR. FARRER:  And our position in phase one is we got a

8   loan here.  And he knew it was a loan.

9          THE COURT:  But I can't know whether it's a loan or

10  whether it's Exhibit D until I hear all the testimony about

11  that.

12         MR. FARRER:  Well, —

13         THE COURT:  And I don't think I've heard all the

14  testimony about that, have I?

15         MR. CHU:  I think the Court has heard the testimony,

16  Your Honor.  The — as I understand the Court's analysis, the

17  note is enforceable whether it's consideration for the Hong Kong

18  money or —

19         THE COURT:  So I've —

20         MR. CHU:  — or Exhibit D.

21         THE COURT:  — I've got all the evidence I'm going to

22  get about that note — about the loan in Hong Kong?

23         MR. CHU:  Yes, Your Honor.  That's all the evidence

24  coming in on the Hong Kong loan.

25         MR. FARRER:  Yes, sir.

Case: 05-03236   Doc#:31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 89 of 240

1          MR. CHU:  But —

2          MR. FARRER:  Yes sir.  And the only thing that I have

3   to establish with him is I wanted to go through some of the

4   premarked exhibits, all of which have been admitted, where he,

5   for example, calls Stella Chen his private lender.  I mean

6   you've seen these documents.  They're — they're repeated again

7   and again in our status conference statements and things like

8   that.

9          But I wanted to get the testimony from this witness'

10  own mouth, because he attempted to try to explain some of them

11  on July 27th.  And his explanations just don't — don't jive with

12  either his prior testimony, or his — his own handwritten emails

13  and documents that he created — he admits he created them — that

14  we're going to move into here.

15         THE COURT:  So as I understand it, the further

16  questioning you have goes to this question of what was the

17  consideration?  The note —

18         MR. FARRER:  And —

19         THE COURT:  — the note is, —

20         MR. FARRER:  Yes.

21         THE COURT:  — as I see, the note is enforceable.  But

22  the question is whether — what is it — on what basis is it

23  enforceable?

24         MR. CHU:  Correct, Your Honor.

25         MR. FARRER:  Well, is it — is it for a loan, as it

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 90 of
240

1   says on its face, or is it to memorialize —

2             THE COURT:  Is it in respect of Exhibit D?

3             MR. FARRER:  Exactly.  Exactly.  And I'm not into

4   Exhibit D at all.  I mean I don't care about really Exhibit D

5   unless, you know, — I had no intention of getting into that —

6   those accounting issues.  That was all phase two.  I wasn't even

7   going to participate.  The Court —

8             THE COURT:  Are you going to participate in this

9   examination?

10            MR. CHU:  Yes.  Yes, Your Honor.  I think one of the —

11  well, I think the key — the key issue here is Mr. Yan's

12  credibility versus the credibility of the other witnesses as far

13  as whether there is actual cash that has exchanged hands in Hong

14  Kong.  We intend to prove that Mr. Yan is lying about the whole

15  thing.  And — and the cross-examination is critical to that

16  issue.

17            THE COURT:  Okay.  All right.  I understand then what

18  we're really — all right.  Now you've helped me a great deal.  I

19  need to know why were doing this, because as I see that — there

20  is no defense to the enforcement of the note.  The question is

21  on what basis?

22            MR. FARRER:  Well, I would think that in phase one the

23  Court would be making a determination whether or not the note

24  represents a loan of money separate and apart from the services

25  rendered to the Chenery Street property.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 91 of
240

1          MR. ROMEO:  And that would be my assumption, too.

2          THE COURT:  So you're only seeking to determine

3   whether there was a separate loan at this point?

4          MR. FARRER:  The validity of the deed of trust.

5          THE COURT:  And if there is no separate loan, we will

6   deal with, in phase two, with whether the loan is — whether the

7   interest — the rights under Exhibit D were a lawful

8   consideration for the note —

9          MR. FARRER:  Exactly.

10          THE COURT:  — and what the other accounting issues

11   are.

12          MR. CHU:  Yes, Your Honor.

13          THE COURT:  I get it.

14          MR. CHU:  Of course, now that we're talking about it,

15   you know, I can see we can shortcut phase one and go straight to

16   phase two, if the Court — you know, based on the evidence

17   deduced so far — if the — if the Court finds that the note is

18   enforceable and the deed of trust is enforceable, then we just

19   go straight into phase two as to — to decide how much more or

20   less Mr. Yan has to pay on Exhibit D.

21          THE COURT:  Has anybody looked at — I know this is —

22   relates — and as I see the question there, from the point of

23   view of your client, is simply whether the — whether this

24   equitable sort of owner can — is an illegal contractor?  You can

25   work on your own property.  Can you work on a property in which

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:54    Page 92 of
240

1  you are not entitled, but have an equitable interest?

2      MR. FARRER:  Well, again, I don't — I don't think the

3  contractor issues are —

4      MR. CHU:  I don't think that's the case.

5      MR. FARRER:  — relevant to my note — my note

6  enforcement action, because I'm trying to enforce a loan.

7      THE COURT:  Well, what I'm saying here is the — the

8  sense I have is that we could stop phase one right now, because

9  the note is — I could do research over lunch.  And I'm quite

10  sure it's enforceable.

11      But what we're really doing is we're not determining

12  solely whether the note is enforceable, whether — we're

13  determining whether it's enforceable as the — as being in

14  respect of the Hong Kong loan alone.

15      MR. FARRER:  Exactly.

16      MR. ROMEO:  That is the dispute.

17      THE COURT:  Okay.  That's fine.  Okay.  And the reason

18  I asked you the question —

19      MR. FARRER:  That's what I need you to find.

20      THE COURT:  — the reason I ask you this question, as

21  I'm sitting here, this — you know, this note is enforceable.  I

22  don't know what basis it's enforceable on yet, but I know it's

23  enforceable, or it's so likely that it's — so that why are we

24  doing this?  But if we're skipping ahead, if we're trying to

25  determine that very important issue of whether there was a —

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 93 of
240

1   whether it's in respect of the Hong Kong loan or only in respect

2   of Exhibit D, that's something that clearly has to be decided.

3              MR. CHU:  Then the credibility of the witness comes

4   into play a hundred percent, Your Honor.  That — that's why

5   the —

6              THE COURT:  Understood, understood.

7              Now if you have a lot of questions about this and if

8   you have a lot of cross-examination, I don't know if we are

9   going to finish today.

10             MR. CHU:  I don't — I won't have much, Your Honor.  I

11  will be supplementing what Mr. Farrer does.  And I'm — I'm —

12             THE COURT:  All right.

13             MR. CHU:  — I'm fine.

14             THE COURT:  Let's eat.

15             MR. FARRER:  Fine.

16             THE COURT:  How soon do you want to start?

17             MR. FARRER:  What's the Court's preference?

18             THE COURT:  I can start almost as early as you want.

19  I mean I can get start at a quarter to, if you want to do that.

20  There are a lot of quick lunch places.  It's just up to you

21  folks.

22             MR. ROMEO:  That's fine with me.

23             MR. FARRER:  It's fine with us.

24             THE COURT:  All right.  I want to help you as much as

25  possible, and I just took a few minutes away from you.  So let's

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 94 of
240

1   start at a quarter to.  And thank you for your guidance.  This

2   helps a great deal.

3              MR. FARRER:  Okay.  How late will we be going today?

4   I mean if we get close I suppose I could go a little bit longer,

5   but if it doesn't look like it's going to finish, the Court's

6   preference would be to finish at 5:00, 4:30?

7              THE COURT:  Well, that's a very practical question,

8   well, for all of us.  I have to call my wife.  Somebody has to

9   get my daughter at 5:15 and get her to soccer practice at

10  Dominican.  That's the only thing that's going on.

11             MR. FARRER:  All right.

12             THE COURT:  And whether she can find another way,

13  whether my wife can pick her up, whether she can get a ride from

14  John, the coach, I don't know.

15             MR. FARRER:  All right.

16             THE COURT:  I will make some calls over lunch and let

17  you know.

18             I would like to finish this if we can.

19             MR. FARRER:  We all would.

20             THE COURT:  And I would like to — if I can arrange

21  this, I would like to go till — can you folks stay till 6:00 if

22  we need to?

23             Okay.  I'd like to go as late as 6:00.

24             MR. FARRER:  That's fine.

25             THE COURT:  I don't want to keep them any longer.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 95 of
240

1          MR. FARRER:  No.

2          THE COURT:  I could go longer than that, but I think

3    everybody will — it's not fair to them.  Well, let me see what I

4    can do about my soccer team.

5          MR. FARRER:  Okay.  Well, we could probably —

6          THE COURT:  I'll let you know right after — I can call

7    now, and I'll get this worked out.

8          MR. FARRER:  Oh, see how we are at the break in the

9    afternoon.  I mean, I'm going to go back and do some cutting.  I

10   mean, I don't — I've still probably got a couple of hours, and I

11   don't know what kind of —

12         MR. ROMEO:  You can cut all you want.

13         THE COURT:  Well, I really do think this 15 minutes or

14   whatever, was helpful, because I need to understand where you're

15   going.  And I think you need to understand how I'm looking at

16   this.  And to me the $64 question is was there a Hong Kong loan,

17   not whether this note is enforceable.

18         MR. ROMEO:  True.

19         THE COURT:  Okay.

20         [COUNSEL]:  Thank you, Your Honor.

21         THE CLERK:  All rise.

22       (Luncheon recess taken from 12:00 p.m. to 12:50 p.m.)

23         THE CLERK:  All rise.

24         THE COURT:  Okay.  Mr. Farrer, please go ahead.

25         MR. FARRER:  Thank you, Your Honor.

Case: 05-03236   Doc#:31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 96 of 240

1   BY MR. FARRER:

2   Q.  So, Mr. Yan, back to Exhibit 7.  We're looking at page 2 of

3   Exhibit 7.  Is that your signature on line 3 on the — the

4   column, "Signature of signer"?

5   A.  Yes.

6   Q.  And you signed that in Mr. Brodie's office in Mr. Fu's and

7   Mr. Brodie's presence?

8   A.  Yes.

9   Q.  And you did so after providing him with a copy of your

10  California driver's license?

11  A.  Yes.

12  Q.  And after you signed the deed of trust that Mr. Brodie

13  notarized did you then give it to Mr. Fu?

14  A.  Yes.

15  Q.  The original?  Okay.

16          And you understood that by notarizing that deed of

17  trust it could be recorded?

18  A.  If I assume that Tony's promise is true, that it won't be

19  recorded.

20  Q.  But having notarized the deed of trust you knew and realized

21  that it was now in a form that it could be recorded?

22  A.  What — that's always a danger.

23      (Pause in the proceedings.)

24          MR. FARRER:  May I approach the witness?

25          THE COURT:  Yes.

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:54    Page 97 of
240

1          MR. FARRER:  Exhibit —

2    BY MR. FARRER:

3    Q.  Mr. Yan, I've handed you now Exhibit 20 — 70, excuse me.

4    A.  Yes.

5    Q.  Is Exhibit 70 a true and correct copy of a lawsuit that you

6    filed against Tony Fu and Stella Chen on or about February 20th

7    of 2004?

8    A.  Yes.

9    Q.  Okay.  And did you read this document before it was filed?

10   A.  Yes.

11   Q.  And you authorized its filing?

12   A.  Yes.

13   Q.  And the document was — was accurate and true and correct —

14   A.  Yes.

15   Q.  — as of the date you signed it — or as of the date it was

16   filed?

17   A.  Correct.

18   Q.  Would you turn to page 3?

19   A.  (Complies.)

20          THE COURT:  Page?

21          MR. FARRER:  Page 3.

22          THE COURT:  3.

23   BY MR. FARRER:

24   Q.  Would you read paragraph 9, please?

25   A.  "In order to secure Yan's performance under the contract,

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 98 of 240

1    Yan is to execute a deed of trust and assignable rents (he's not

2    to refer to as the deed of trust) in the amount of $450,000 in

3    favor of Fu's sister, defendant Stella Chen.  A true and correct

4    copy of the deed of trust is attached hereto and incorporated

5    herein by reference as Exhibit B."

6    Q.  Would you turn to Exhibit B?

7    A.  (Complies.)  Yes.

8    Q.  Is Exhibit B an identical copy as Exhibit 6, Trial Exhibit

9    6?

10   A.  Yes.

11   Q.  So you admit that Exhibit B is a true and correct copy of

12   the deed of trust that you signed?

13   A.  Yes.

14          MR. FARRER:  Move the admission of Exhibit 70.

15          MR. ROMEO:  No objection.

16          THE COURT:  70 is admitted.

17      (Plaintiff's Exhibit 70 received in evidence.)

18   BY MR. FARRER:

19   Q.  Mr. Yan, would you turn to Defendant's Exhibit H, as in

20   "Harry"?

21   A.  (Complies.)  Okay.

22   Q.  Do you have that in front of you?

23   A.  Yes.

24   Q.  Okay.  Now I believe that when you talked about Exhibit H

25   during your direct testimony on July 27th you testified that you

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 99 of
240

1  asked Mr. Seher to prepare this plat map without any lender's

2  signatures on it; do you recall that?

3  A.  That's correct.

4  Q.  Okay.  And you asked him to do that because you intended to

5  pay them off, right?

6  A.  I intended to pay off the —

7          THE COURT:  I'm sorry.  What are we on here, I —

8          MR. FARRER:  — Exhibit H.

9          THE COURT:  H, okay.  Thank you.

10          THE WITNESS:  I intended to pay off the bank loans.

11  BY MR. FARRER:

12  Q.  Right.

13  A.  Yes, right.

14  Q.  Quite right.  And you signed — I'm curious how you signed

15  Exhibit H on June 9th, 2000 — well, strike that.

16          Did you sign Exhibit H on June 9th of 2003?

17  A.  Yes, I believe so.

18  Q.  That's your signature?

19  A.  Yes.

20  Q.  Even though it bears a — a preparation date of August 2003

21  on the right side?

22  A.  I don't — I cannot answer that.

23  Q.  And —

24          THE COURT:  Where?  I'm a little confused.  This is H?

25          MR. FARRER:  H, yes sir.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 100 of
240

1        THE COURT:  Okay.  It's a one-page document?

2        MR. FARRER:  It is a one-page document.  The Court

3   might have a — this is defendant's exhibit, not mine.  But it

4   looks like you may have a reduced copy.

5        MR. ROMEO:  I have an enlarged copy, Your Honor, if

6   you care to look at that?

7        THE COURT:  I just have this funny thing here.  Okay.

8        MR. ROMEO:  This —

9        THE COURT:  Yes.  So there's — somewhere else there's

10  another date?

11       MR. FARRER:  Yes, Your Honor, if you look on the — on

12  the right, right-bottom corner, just above the signature, or the

13  Frederick T. Seher & Associates' office address.

14       THE COURT:  August 2003, right.

15       MR. FARRER:  Right.

16       THE COURT:  Okay, I see that.

17  BY MR. FARRER:

18  Q.  And that question was:  How could he signed his on June 3rd,

19  it wasn't prepared until August 2003?

20  A.  Oh, I think it's obvious.

21       MR. ROMEO:  There's things that — excuse me, Your

22  Honor, the question — assumes a fact not in evidence that, in

23  fact, it was prepared in August 2003 and that that's a

24  preparation date.

25       THE COURT:  Okay.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 101 of
240

1          MR. ROMEO:   Okay.

2     BY MR. FARRER:

3     Q.   Mr. Yan, now when you asked Mr. Seher to prepare a plat map

4     without any signature blocks for the lenders whose signatures

5     you knew were required if they still had liens on the property,

6     right?

7     A.   Yes.

8     Q.   Okay.  Those lenders still had liens on the property, didn't

9     they?

10    A.   Yes.

11    Q.   Okay.  So you knew you couldn't use Exhibit H because you

12    hadn't paid off the institutional lenders, right?

13    A.   Not at the time when I signed this.  But my intention was to

14    pay them off.

15    Q.   All right.  Let's turn to Exhibit 21, please?

16    A.   (Complies.)

17    Q.   Is Exhibit 21 a true and correct copy of a preliminary title

18    report that you ordered from Fidelity National Title Company?

19    A.   It's a true report, but I did not order this from Fidelity.

20    It was given to me for free.

21    Q.   Okay.  Fidelity give you a copy of this?

22    A.   Yes.

23    Q.   And it's addressed to America Asia Investments LLC, which is

24    your business, isn't it?

25    A.   Yes.  They gave it to me because they want to entice me to

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 102 of
240

1   get — to give them the business of opening —

2   Q.  I didn't ask why they gave it to you.

3   A.  Okay.

4   Q.  I don't frankly care.  The question is:  Did you for did you

5   get a copy of this?  And did you receive a copy of it on or

6   about September 3rd of 2003?

7   A.  September 3rd?  I — I don't — I don't recall I got it on

8   that date.  I may not, because this is addressed to an address

9   in San Mateo.  And this is actually just a mailing address I

10  use.  So I may have gotten this maybe several days or, you know,

11  some days there.

12  Q.  And when you got it did you look at it?

13  A.  Yes.

14  Q.  Okay.  And when you read it you were aware there were four

15  deeds of trust recorded against the Chenery property, and

16  they're identified as items 4, 5, 7, and 8, on page 3 and 4 of

17  the title report?

18  A.  Yes.

19  Q.  And the first two of those deeds are listed in items 4 and

20  5, right?

21  A.  Yes.

22  Q.  And those are the two secured institutional loans that you

23  assumed from Winky Wong when you bought out his interest in the

24  Chenery property?

25  A.  Correct.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 103 of 240

1  Q.  And so at the time you — you assumed two institutional

2  loans, one in the principal amount of $382,400 in favor of World

3  Savings and a second one in the principal amount of $99,000 in

4  favor of Bank of America?

5  A.  Yes.

6  Q.  And when you reviewed this report and saw items 7 and 8 on

7  the Fidelity title report regarding the Ming Li and Stella Chen

8  deeds of trust, you didn't mention to anyone that you disputed

9  those deeds, did you?

10 A.  That's incorrect.  I immediately asked Tony what they were.

11 Q.  Okay.  Did you talk to anybody else about those deeds?

12 A.  No.

13 Q.  Okay.  So you didn't — you didn't call Fidelity and say:

14 Look, I don't know why those deeds are on my property, I dispute

15 them?

16 A.  Well, I know this, too, relates to Tony.  So that's why I —

17 I contacted Tony directly.

18 Q.  My question is did you call Fidelity and say you disputed

19 them?

20 A.  Why — no.  Why, why should I do that?

21 Q.  Okay.  Now why don't we turn to Exhibit 14, if you would,

22 please?

23 A.  (Complies.)  Okay.

24 Q.  Is Exhibit 14 a true and correct copy of a letter you

25 received from Frederick Seher on or about October 3rd of 2003?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 104 of
240

1    A.  Yes.

2    Q.  Okay.  And in that letter Mr. Seher tells you that he

3    received a call from your attorneys, Herzig and Berlese,

4    informing them that you have one or more additional loans on the

5    Chenery Street property, correct?

6    A.  Yes.

7    Q.  Okay.  And he tells you that that's going to require some

8    additional services on his part and he wants you want to

9    authorize and pay for those services, correct?

10   A.  Correct.

11   Q.  When you received this letter from Mr. Seher did you call

12   him and tell him that you didn't know what he was talking about?

13   A.  I — well, I — can you rephrase your question?

14   Q.  Did — when you received Exhibit 14 from Mr. Seher, did you

15   call him and tell him you didn't know what he was referring to

16   when he mentions these one or more additional loans?

17   A.  Well, I knew what he was referring to.

18   Q.  You did?

19   A.  Yes.

20   Q.  And that was the Stella Chen and the Ming Li deeds of trust,

21   wasn't it?

22   A.  Yes, correct.

23   Q.  And did you ever tell Mr. Seher that you disputed those

24   deeds of trust?

25   A.  No.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 105 of
240

1   Q.   Okay.  And if you will turn to Exhibit 15?

2   A.   (Complies.)  Okay.

3   Q.   Is that a true and correct copy of an email that you sent to

4   David Smith —

5   A.   That's correct.

6   Q.   — on October 4th of 2003?

7   A.   Yes.

8   Q.   And David Smith worked with Rick Seher?

9   A.   Yes.

10  Q.   Okay.  And so you sent to this email to Mr. Smith the day

11  after you received Exhibit 14, right?

12  A.   It appears to be, yes.

13  Q.   And you direct Mr. Smith not to take any action, that "We

14  are clearing the title and we will let you know if we need your

15  assistance," right?

16  A.   Yes.

17  Q.   And who is the "We," you're referring to in the sentence,

18  "We are clearing the title"?

19  A.   Well, I — looking back I don't recall why I put "We" there.

20  I wasn't really thinking too hard as to what to put down there.

21  The reason why I wrote this sentence is to — because after I

22  find out they want to charge me extra for preparing the map

23  again, I didn't think that was a, you know, a expense I want to

24  incur, if I can solve this problem with Tony Fu.

25  Q.   Well, again, in order to clear title to record the map you

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 106 of
240

1   still hadn't paid off institutional lenders as of the date of

2   Exhibit 15, had you?

3   A.  No, because the loan was still pending.  My refinancing loan

4   was still pending.

5   Q.  Would you turn now to Exhibit 18?

6   A.  (Complies.)  Okay.

7   Q.  Is Exhibit 18 a true and correct copy of a email and

8   attachment that you sent to David Smith at Seher & Associates on

9   November 19th, 2003?

10  A.  Yes, correct.

11  Q.  Okay.  So Exhibit 18, you are — you have now signed and

12  enclosed the Exhibit 14 —

13  A.  Yes.

14  Q.  — authorizing him to perform those additional services to

15  clear title?

16  A.  Yes.

17  Q.  And in that email you say to him, "Please confirm with me as

18  to the name of the lenders before updating the map"?

19  A.  Correct.

20  Q.  Right?

21  A.  Yes.

22  Q.  And who are the lenders that you're referring to in your

23  email?

24  A.  I was referring to the private lenders.

25  Q.  Okay.  And it would — Lei Ming Li and Stella Chen?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 107 of
240

1   A.  Yes.

2   Q.  And you go on to say, "I am now paying off the institutional

3   lenders."  Who were you referring to as the "institutional

4   lenders"?

5   A.  The existing bank loans, World Savings and BofA.

6   Q.  And that is your computerized signature on page 2 of Exhibit

7   18?

8   A.  Yes.

9   Q.  And by signing that letter you acknowledged there were two

10  more loans recorded against the Chenery Street property, right?

11          MR. ROMEO:  Excuse me, Your Honor.  I'm going to

12  object to the question as it's mischaracterizing the document.

13  It's — what he signed was a services agreement, not an

14  acknowledgment to two more loans on the property.

15          MR. FARRER:  Well, let me — I'll rephrase it.

16  BY MR. FARRER:

17  Q.  You understood when you were signing this agreement that the

18  reason you were being asked to sign this agreement, is because

19  there were two more loans appearing on the property, right?

20  A.  Well, there were two more — I don't know how — what's the

21  legal term for it.  It's encumbrance, I guess, two more

22  encumbrances.

23  Q.  And when you returned Exhibit 18, an enclosure to David

24  Smith, you didn't tell him you didn't know who Stella Chen was,

25  did you?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 108 of
240

1    A.   Repeat the question again?

2    Q.   When you returned Exhibit — when you sent Exhibit 18 —

3    A.   Okay.

4    Q.   — to David Smith, —

5    A.   Okay.

6    Q.   — you didn't tell him you didn't know who Stella Smith —

7    Stella Chen was, did you?

8    A.   Well, at that point I knew who Stella Chen was.  But to

9    answer your question, I have no reason to tell them.

10   Q.   And the institutional loans that you refer to in Exhibit 18

11   were, of course, you mentioned World Savings and Bank of

12   America, and you'd been making the debt service on those loans

13   since you acquired Winky Wong's interest in the property in

14   October of 2000?

15   A.   Yes, I believe so.

16   Q.   Okay.  Now turning to Exhibit 19.

17   A.   (Complies.)  Okay.

18   Q.   So one week after you sent Exhibit 18 to David Smith, you

19   send a second email to him on November 26, 2003, right?

20   A.   Yes.

21   Q.   And Exhibit 19 is your true and correct copy of an email you

22   sent to him, right?

23   A.   Yes.

24   Q.   And in that email you identified the names of the private

25   lenders as Lei Ming Li and Stella Chen, right?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 109 of
240

1  A.  Yes.

2  Q.  And you don't tell him you have any dispute with those

3  private lenders, do you?

4  A.  No.

5  Q.  Now during your direct testimony in — on July 27th, you

6  tried to explain this email when you testified that you used the

7  term "lenders" in that email, because that was the same term

8  that Seher's office had used in their communications.  Do you

9  recall that testimony?

10  A.  Yes.

11  Q.  Okay.  Can you show me where Seher used that term "lenders"

12  in their communications with you?

13  A.  I would need to refer back to some of the communications

14  they sent to me.

15  Q.  Well, I've showed you what I believe to be all that we have

16  here on the communications that were exchanged with you and the

17  Seher firm?

18  A.  I — let's see.  I believe there's more communications that I

19  received from them that had the term "lenders" on it.  I'm sure

20  about that.

21  Q.  Really.  Can you show me — have you produced any such

22  exhibit?

23  A.  I don't know.

24  Q.  So you can't put your fingers on any — any communication,

25  written communication, from the Frederick T. Seher & Associates

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 110 of
240

1  firm where they used the word "lenders," can you?

2  A.  Not — not in the exhibits that you — you just referred me

3  to.

4  Q.  Well, in any of the exhibits that have been marked, in any

5  of the exhibits that you have had marked?

6  A.  I'm sure that we filled the — the documents that I have.

7  There was a couple — actually quite a few from them, that they

8  referred to — to the name "lender."

9  Q.  Really?

10 A.  Yes.

11 Q.  Well, I think you'll have to direct me to them, because we

12 subpoenaed and received a complete copy of Seher & Associates'

13 file and didn't find any such documents.

14        Do you have a distinct recollection of such documents

15 existing?

16 A.  Yes.

17 Q.  Really?  Do you have the dates of those documents?

18 A.  I'm sure I can find for you later on during the break.

19 Q.  Okay.  And you'll agree to do that?

20 A.  Yes.

21 Q.  Was it you who first made the distinction between private

22 lenders and institutional lenders, as you did in Exhibit 18?

23 A.  Exhibit 18?  You mean Exhibit 19?

24 Q.  No, Exhibit 18.

25 A.  Okay.  And what was your point, again?  What was your

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 111 of
240

1  question, again?

2  Q.  I said:  Was it you who first made the distinction between

3  institutional lenders and private lenders?

4  A.  I guess in my mind I was trying to make a distinction to

5  them that the extra ones were not paying — paying the lenders.

6  That's the main point.

7  Q.  And in Exhibit 19 you identify your private lenders as Lei

8  Ming Li and Stella Chen, right?

9  A.  Yes.

10  Q.  Well, if you didn't owe Stella any money, why didn't you

11  identify Tony Fu as the person who was entitled to enforce that

12  deed of trust?

13  A.  Well, the only objective in communicating with David Smith

14  is to make sure that the — the condo map is correct.  And the

15  condo map has to have the names of the — well, "lenders'," name

16  on it.  So doesn't mean — that is not — it's not relevant that —

17  that the deed of trusts were actually held by Tony Fu for the

18  purpose of making sure that the condo map is correct, is

19  accurate.

20  Q.  And at no time did you tell David Smith that you didn't —

21  the deed of trust with Stella Chen wasn't *bona fide* and valid,

22  did you?

23  A.  Well, if you pardon my language I don't think they give a

24  damn whether it's true or not.

25  Q.  Please answer my question.  At no time did you ever tell

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 112 of
240

1   David Smith that your deed of trust to Stella Chen was not valid

2   and enforceable?

3   A.  No, I didn't tell them that.

4   Q.  And turning to Exhibit 20.

5   A.  (Complies.)  Okay.

6   Q.  Is Exhibit 28 a true and correct copy of a email you sent to

7   David Smith on December 4th of 2003?

8   A.  Yes.

9   Q.  And you're asking him for an estimate on when the map is

10  ready for pick up?

11  A.  Yes.

12  Q.  And is this the map that you've asked them to prepare

13  identifying Stella Chen and Lei Ming Li as lenders —

14  A.  Yes.

15  Q.  — whose consent is required so you can get your condominium

16  approval on Chenery Street?

17  A.  Yes.

18  Q.  And on the same day that you sent Exhibit 20, did you also

19  fax a copy of Exhibit 21 to David Smith?

20  A.  I'm not sure if it's the same day I've faxed it over.  But I

21  did fax it over.

22  Q.  Okay.  Can you tell from your fax number at the top the

23  date?  That's your fax header, isn't it?

24  A.  Yes.

25  Q.  And does it say December 4th of '03?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 113 of
240

1  A.  Yes.

2  Q.  At 3:48 in the afternoon?

3  A.  Yes.

4  Q.  So the same day you sent your email, Exhibit 20, you faxed

5  over your copy of the Fidelity preliminary report to David

6  Smith, right?

7  A.  Yes.

8  Q.  And that's your handwriting at the top?

9  A.  That's correct.

10 Q.  And that's also your handwriting on 12 pages?

11 A.  Yes.

12 Q.  Okay.  And if you would turn now to pages numbered 3 and 4

13 at the bottom of this report?

14 A.  (Complies.)  Yes.

15 Q.  Is that your handwriting to the left of items number 4 and

16 5?

17 A.  Yes.

18 Q.  And what does that say?

19 A.  "Paid off as of December 1st, '03.

20 Q.  Okay.  And what is the significance of those statements?

21 A.  Because I want to assure them that the condo map, without

22 the bank's essential block on them, is still correct, because

23 even though I paid off on December 1st, I don't think the record

24 shows that it's paid off yet.

25 Q.  So you're letting Mr. — your intention was to let Mr. Smith

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 114 of 240

1  know that when they updated the plat map so it could be executed
2  and thereafter recorded the only signatures you now needed were
3  those of Lei Ming Li and Stella Chen?
4  A.  Yes.
5  Q.  Okay.  Because they are listed as having recorded mortgages
6  against Chenery Street in items 7 and 8, right?
7  A.  Yes.
8  Q.  And later that afternoon, also on December 4th, 2003, did
9  you go by Frederick Seher & Associates and obtain the updated
10 plat map?
11 A.  I believe so.
12 Q.  And is Exhibit 22 a true and correct copy of the document
13 that you obtained from Mr. Seher's office on December 4th?
14 A.  Yes, I believe so.
15 Q.  Okay.  And what did you do with that document, the
16 enclosure, —
17 A.  I —
18 Q.  — the unexecuted plat map?
19 A.  I took the whole thing to Tony so that he can get the — get
20 them signed up.
21 Q.  Now I noticed that — this document over in the right, can
22 you tell when it bears a preparation date?
23 A.  Which page?
24 Q.  The first page of the plat map.
25 A.  Once — what's — repeat your question.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 115 of 240

1  Q.  Right above the Frederick Seher & Associates address, on the

2  right-hand — bottom right-hand corner?  Can you tell me the date

3  that appears right above that?

4  A.  I'm not sure what you're referring to.

5  Q.  Down in the bottom right-hand corner, above the Seher's

6  address.  Page 2.

7            THE COURT:  It's the same one we are looking at here?

8            MR. FARRER:  Yes.  Page 2 of Exhibit —

9            MR. ROMEO:  22.

10            THE WITNESS:  Oh, page 2.  Okay.  Yeah.

11            THE COURT:  This is Exhibit H, right?

12            MR. FARRER:  No.

13            MR. ROMEO:  No, Exhibit 22.

14            THE COURT:  22, okay.

15            THE WITNESS:  Okay.  It says August 2003.

16            THE COURT:  Okay.  Page 2.

17            MR. FARRER:  You have the second page right there,

18  Your Honor.  Just page 2 of the exhibit, which is the unexecuted

19  plat map.

20            THE COURT:  I'm still not finding the date.

21            MR. FARRER:  Right above the address block on the

22  bottom right-hand corner.  It's kind of hard to read, but —

23            THE COURT:  Yes, I do see it.

24            MR. FARRER:  Okay.

25            THE COURT:  It is hard to read.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 116 of
240

1          MR. FARRER:  Yeah.

2     BY MR. FARRER:

3     Q.  And you picked Exhibit 22 up from Mr. Seher's office, right?

4     A.  Yes.

5     Q.  And you gave it to Mr. Fu?

6     A.  Yes.

7     Q.  And you ask him to get Lei Ming Li and Stella Chen's

8     signatures, right?

9     A.  Yes.

10    Q.  Because they were lenders with liens against the property?

11    A.  Well, because their names were on the deed of trust, not on

12    the — well, I don't know.  I don't know how to answer your

13    question.

14    Q.  Well, why did you ask — why did you ask Tony to get — Mr. Fu

15    to get Lei Ming Li and Stella Chen's signatures on —

16    A.  Well, I —

17    Q.  — Exhibit 22?

18    A.  — at the time I was still negotiating with Tony as to what

19    to do about this deed of trust with the buyer pending.  And I

20    don't think we have reached an agreement yet.  But both Tony and

21    myself, it was in our interest to get the condo map done as soon

22    as possible.  So — so, you know, my — basically he has to get

23    the signatures in order for the contract to be signed.  And

24    that's in — in Tony Fu's interest, as well.

25    Q.  But you knew as of early September that there were four

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 117 of
240

1   liens on the property, right?

2   A.  Okay, yes.

3   Q.  And yet you went ahead and entered into a contract to sell

4   the unit to Mr. Santiesteban in September, right?

5   A.  That's correct.

6   Q.  And you knew you hadn't paid off the institutional liens,

7   right?

8   A.  Correct.

9   Q.  And you couldn't get condo map approval unless they sign the

10  map or you paid them off, right?

11  A.  Correct.

12  Q.  Okay.  So you entered into a contract with a innocent third

13  party knowing you couldn't deliver title because you hadn't paid

14  off the institutional lenders either, right?

15  A.  Well, when I entered into the sales contract with the buyer,

16  Tony knew about it and Tony gave his approval.  So I never

17  thought that he would stand in the way of the sale.

18  Q.  I'm not saying Mr. Yan was — you — Fu was in the way.  I'm

19  saying in the institutional lenders were in your way because you

20  hadn't paid them off.

21  A.  Oh, no.  That's a sure thing, because I — I — I'm sure I can

22  refinance my other property and pay them off.

23  Q.  But you didn't do it until December 1st?

24  A.  No.  I did it way ahead of that.  But, like I said, it took

25  some time for it get to — for it to be approved.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 118 of
240

1  Q.  Well, your own handwriting on the title report, Exhibit 21,

2  says they've been paid off as of December 1, '03, right?

3  A.  Sure.  But I don't recall when I applied for the refinancing

4  loan, but it's way before that.

5  Q.  Well, if you paid them off way before December 1st of '03,

6  why didn't you tell Seher & Associates that?

7  A.  I think you're misquoting me.  I said I probably apply —

8  well, I asked to Seher to prepare the map without the bank

9  signature blocks on them in June 2003.  And I got the

10 refinancing loan — well, no, no.

11            I pay them off in December.  But I believe my loan was

12 approved in October 2003.  The reason why it was approved in

13 October 2003, and there was a delay until I paid them off in

14 December, was at the time I was in Hong Kong.  And it took me a

15 while to get the wire transfer instructions through.

16 Q.  How much did you have to borrow to pay off those liens?

17 A.  Well, I refinanced my other property.  I took out a — a

18 first mortgage of $750,000.  Yes, that's correct.  And also with

19 the same — same lender, Washington Mutual, I took out a equity

20 line of $250,000.  So total I had a million dollars of what —

21 loan, loan from the Washington Mutual.

22 Q.  And how much in rental income were you getting from that

23 property at the time you refinanced it?

24 A.  At that time it was vacant, I believe.

25 Q.  How does one borrow $1 million on real estate that isn't

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 119 of
240

1   generating any income and the borrower doesn't have any

2   employment or income history?

3           MR. ROMEO:  Objection, Your Honor.  I think it's an

4   argumentative question.  He either refinanced the property or he

5   didn't.

6           THE COURT:  I'll allow the question.

7           THE WITNESS:  Well, for one thing the property lot was

8   appraised at $1.5 million.  And second thing is that my credit

9   history has — has always been stellar, has been — always been

10  very good.  So — well, I think that answers your question.

11  BY MR. FARRER:

12  Q.  But you had no income in '03, right?

13  A.  No.

14  Q.  And so how were you going to make the monthly payments on

15  that loan?

16  A.  Well, for the last few years I've been borrowing money from

17  my family.

18  Q.  So did you tell the bank that you were going to — didn't

19  they ask you:  Well, how you're going to pay this loan?

20  A.  No, they didn't ask me how I was going to pay the loan.

21          THE COURT:  Who made the loan?

22          THE WITNESS:  Washington Mutual.

23          THE COURT:  That's the new — that's the replacement

24  loan?

25          THE WITNESS:  On another property that I own.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 120 of 240

1          THE COURT:  Oh, I see.

2          THE WITNESS:  Yes.

3   BY MR. FARRER:

4   Q.  Now when you gave Exhibit 22 to Mr. Fu to get Lei Ming Li

5   and Stella Chen's signatures, did you sign it?

6   A.  Yes.

7   Q.  Did you sign it after December 4th of '03?

8   A.  I don't recall whether I signed it after — they signed it

9   first or vice versa.

10  Q.  Wasn't it true that the final plat map that was recorded as

11  your June 9th, '03 signature, six months before this one?

12  A.  I don't know.  I don't know whether that's true or not.

13      (Pause in the proceedings.)

14  BY MR. ROMEO:

15  Q.  Did Tony Fu obtain Stella Chen's and Lei Ming Li's

16  signatures on the plat map as you had requested?

17  A.  Yes.

18  Q.  And did he return it to you?

19  A.  Yes.

20  Q.  And did you return it to Rick Seher?

21  A.  I don't recall whether I gave it to Seher or to Berlese, my

22  attorney.

23  Q.  Okay.  But you gave it back to somebody so it could be

24  recorded?

25  A.  Yes.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 121 of
240

1  Q.  And it was recorded, right?

2  A.  Yes.

3  Q.  And the condominium approvals were obtained?

4  A.  Yes.

5  Q.  And is Exhibit 23, pages 2 and 3, true and correct copies of

6  the executed signature pages by Stella Chen and Lei Ming Li that

7  Tony Fu obtained on the plat map at your request?

8  A.  Yes, appears to be.

9  Q.  Okay.  And then I note that on December 12 Fred Seher is

10  sending this document — or indicates in his — his message that

11  this is the document being submitted to Street Use and Mapping

12  for recordation; do you see that?

13  A.  What page?

14  Q.  On the first page of Exhibit 23.

15  A.  23?

16  Q.  Yes.

17  A.  Okay.  Yes.

18  Q.  And if you turn to page 2, the document he's sending to

19  Street Use and Mapping is the one you signed on June 9th of '03,

20  right?

21  A.  Now looking at this I'm not quite sure whether you — you

22  have this from the same map or not.  This is a cover page.  You

23  may have copied this from a — I mean, look — look into what —

24  what I have here is just the cover page, not the complete map.

25  Q.  I understand that.  I understand that.  But this is a

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 122 of
240

1   four-page fax from Rick Seher to Robert — Fidelity National

2   Title.  And in the body, in the message, he says this is what

3   he's submitting to Street Use and Mapping for recordation.

4   A.  Okay.  Well, I — I guess maybe what he did was he just used

5   the one I signed on the June 9th, and then just added the

6   essential blocks for these other two persons to sign.

7   Q.  And Exhibit 23 identifies you as the owner of the property?

8   A.  Yes.

9   Q.  And it identifies Stella Chen as a beneficiary under a

10  recorded deed of trust?

11  A.  Yes.

12  Q.  All right.  Now do you have Exhibit 25 in front of you?

13  A.  Yes.

14  Q.  Who prepared that document?

15  A.  This one I recall that I prepared this one.

16  Q.  You did prepare that, all —

17  A.  Yes

18  Q.  — all of your own accord?  You drafted it and everything,

19  right?

20  A.  Yes.

21  Q.  And in that document you agree to pay Stella Chen $450,000

22  if she agrees to reconvey Exhibit 6, right?

23  A.  That's what this escrow instruction says.

24  Q.  And you faxed those escrow instructions to Tony Fu on

25  January 8th, 2004, right?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 123 of
240

1   A.  Yes.

2   Q.  Okay.  Do you have anything in writing between you and Mr.

3   Fu disputing the moneys owed to Stella Chen that are secured by

4   the deed of trust mentioned in Exhibit 25?

5           MR. ROMEO:  Objection.  Vague as to time.  There's —

6           MR. FARRER:  Anything, —

7           MR. ROMEO:  — pleadings.

8           MR. FARRER:  — ever.

9   BY MR. FARRER:

10   Q.  Correspondence, any written correspondence with Mr. Fu?

11   A.  I recall that when I got that Fidelity preliminary report

12   the first thing I did was I faxed over the page that had those

13   two liens on it.  I faxed over to Tony and I asked him for an

14   explanation.  Now he introduced that in the deposition.  And I

15   don't have a copy of that anymore.

16   Q.  But three months after you did that you prepare Exhibit 25?

17   A.  Yes.

18   Q.  Okay.  And you did that with the intention that Stella Chen

19   would sign it and give it to the escrow company, right?

20   A.  Well, when I sent this escrow instruction over, I also sent

21   over at the same time another one for Lei Ming Li.  And both

22   were sent over to Tony.

23   Q.  No, you've got to listen.

24   A.  And — and the thing is that I never got — got the signed

25   copy back from them.  And to be honest with you, I'm not sure

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 124 of
240

1   whether Stella Chen signed this on January 8, or not.  She may —

2   may have backdated — backdated it.

3   Q.  You signed it on January 8th, though, didn't you?

4   A.  Yes.  It's a fax signature.

5   Q.  That's your signature, isn't it?

6   A.  Yes.  This is my computer signature.

7   Q.  Okay.  Let's —

8   A.  And I want to add that this wasn't returned to me signed.

9   And it wasn't used at the escrow company.

10  Q.  Was it your intention in preparing and sending this Exhibit

11  25 to Tony Fu that he would get Stella Chen's signature on it,

12  and then it would be submitted to the escrow company and that

13  she would be paid $450,000?

14  A.  Well, my — to be honest, my main intention of sending this

15  over because Tony was making threats to me that he'll foreclose

16  on both of the Stella Chen note and the Lei Ming Li note if I,

17  you know, don't submit to his demand.

18          And the only reason why I agreed to put in an escrow

19  instruction for Stella Chen was — was because I was really

20  anxious for them to release the Lei Ming Li — the Lei Ming Li

21  note.

22  Q.  Okay.  Now you don't have any written threats from Tony Fu,

23  do you?

24  A.  What?

25  Q.  You don't have any written threats from Tony Fu, do you?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 125 of
240

1  A.  No.

2  Q.  Why don't you turn to Exhibit 67, if you would, please?

3          THE COURT:  67.

4          THE WITNESS:  I don't think I have —

5          MR. FARRER:  I don't think the Court has that.

6          THE COURT:  I don't believe I do.  Now I do.

7          MR. FARRER:  And I'm not sure that Mr. —

8  BY MR. FARRER:

9  Q.  Mr. Yan, do you have Exhibit 67 in front of you?

10  A.  Yes.

11  Q.  Is this a true and correct copy of a facsimile coversheet

12  that you prepared and sent to Tony Fu on January 8, 2004 with

13  Exhibit 25?

14  A.  Well, it appears to be genuine, but I haven't seen this in

15  all the depositions.  And I don't recall I — I had this.  But it

16  appears to be a coversheet for the escrow instructions.

17  Q.  That's right.  And at the upper right, it says page of 1 of

18  3, doesn't it?

19  A.  Excuse me?

20  Q.  The upper right, it says page 1 of 3?

21  A.  Yes.

22  Q.  Okay.  And look at Exhibit 25.  What does it say?

23  A.  Okay.  203.

24          THE COURT:  What page was this?

25  BY MR. FARRER:

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 126 of 240

1  Q.  Page — it says what?

2  A.  It says 2-0-3.  I'm saying that, you know, I'm — it appears

3  to be genuine.  I'm just saying that I — I don't have — before

4  you show me this, I didn't have recollection — a recollection.

5  I have the cover — the cover page.

6  Q.  Well, you don't have any doubt that you faxed over Exhibit

7  25 to Mr. Fu to get Stella Chen's signature, do you?

8  A.  Well, I'm — I'm sure I faxed over to Tony.  But like I said

9  he never — we termed them Santiesteban.  So I thought that he

10 didn't agree to the — the way it's written.

11 Q.  Right.  Well, —

12 A.  And he did submit this to the escrow company to be signed.

13 Q.  Let's stop speculating about what Mr. Fu did or didn't do,

14 because he never told you that, did he?

15 A.  Well, I'm not speculating to the fact that I didn't — I

16 never received it back signed.

17 Q.  And I didn't ask you that, did I?

18 A.  Okay.

19         THE COURT:  I need to be brought up to date on

20 something again.  This is at the beginning of '04.

21         MR. FARRER:  Correct.

22         THE COURT:  Is this in conjunction with a sale?

23         MR. FARRER:  It was in conjunction with the sale to

24 Mr. Santiesteban, —

25         THE COURT:  Okay.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 127 of 240

1          MR. FARRER:  — Unit 661 Chenery Street that Mr. Yan

2    had entered into, Your Honor.  I believe it's Exhibit —

3          THE COURT:  Okay.  I saw it in here.  I'm just trying

4    to —

5          MR. FARRER:  — 13.

6          THE COURT:  — make sure I understood the context

7    correctly.

8          MR. FARRER:  If you look at it Exhibit 13, which is

9    admitted on September 30th of '03, Mr. Yan faxes over a purchase

10   and sale agreement to Connie Ho to open the escrow for the sale

11   of that unit.  And four months later, because he doesn't have

12   condominium subdivision approval, he's now asking for escrow

13   instruction from Stella Chen and Lei Ming Li.

14         THE COURT:  Well, how does this — was the — was the —

15   were these to be paid off of the escrow from this sale?

16         MR. FARRER:  Yes, sir.

17   BY MR. FARRER:

18   Q.  The — that's a good question.  I think we'll establish that.

19         The escrow instructions, Exhibit 25, that you sent to

20   Tony Fu, was related to the Santiesteban Escrow; was it not?

21   A.  Yes.

22         MR. FARRER:  And I'd like to move the admission of

23   Exhibit 67.

24         MR. ROMEO:  No objection, Your Honor.

25         THE COURT:  67 is admitted.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 128 of
240

1        (Plaintiff's Exhibit 67 received in evidence.)

2    BY MR. FARRER:

3    Q.  Would you turn to Exhibit 27, Mr. Yan?

4    A.  Okay.

5            THE COURT:  Now if I can just interrupt again?  The

6    signatures are needed both for the map and to close escrow?

7            MR. FARRER:  Well, the signature —

8            THE COURT:  The lender's signature is in different

9    guises.  The lender has to sign off on the map as well as

10   signing on escrow instruction —

11           MR. FARRER:  To get paid.

12           THE COURT:  — so it's feasible to close.

13           MR. FARRER:  Well, they couldn't — a condominium

14   subdivision map at — you must get all mortgage or lien

15   encumbrance approval or consent to the subdivision.

16           THE COURT:  Right.

17           MR. FARRER:  So that's one thing.  And they didn't

18   have that when Mr. Yan entered into the agreement with Mr.

19   Santiesteban in September of '03.  That's a —

20           THE COURT:  But they also need to give him title.

21   They'd have to get signatures on the —

22           MR. FARRER:  The —

23           THE COURT:  — the escrow.

24           MR. FARRER:  That's exactly right, and —

25           THE COURT:  To get a reconveyance of his interest in

1    that property.

2              MR. FARRER:  That's right.  So Mr. Yan prepared

3    Exhibit 25 and sent it to Tony Fu to get the two private

4    lenders' escrow instructions.

5              THE COURT:  And that has to do with the sale?

6              MR. FARRER:  That has to do with the sale.

7              THE COURT:  The map he just signed, there's no escrow

8    instruction?

9              MR. FARRER:  No, no.

10             THE COURT:  Meaning correct?

11             MR. FARRER:  Now once the lender signed that document

12   it gets filed.  And that's what Exhibit 27 is, which I'm getting

13   to.

14             THE COURT:  Yes, okay.

15   BY MR. FARRER:

16   Q.  Mr. Yan, Exhibit 27, is that a true and correct certified

17   copy of the recorded parcel map for the Chenery property?

18   A.  Yes, appears to be.

19   Q.  Okay.  And that bears Stella Chen, Lei Ming Li, and your

20   signatures?

21   A.  Yes.

22   Q.  And your signature was done on June 9th of '03, right?

23   A.  Yes.

24   Q.  And theirs was done on December 9th of '03, right, six

25   months later?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 130 of
240

1  A.  Yes.

2  Q.  And I believe that document is going to be very hard to

3  read, but I think the condominium approval — or plat map was

4  finally recorded in San Francisco County on — it looks like

5  January 10th or 13th of '04?

6  A.  On the last page?

7  Q.  Actually it's on the very first page, right in the middle,

8  below the Stella Chen's signature area, in the notary block.

9  A.  I can't read it.

10 Q.  Do you recall that the plat map was recorded in early

11 January of '04?

12 A.  I believe so.

13      (Comments off the record and Mr. Chu approaches Mr.

14 Farrer.)

15 BY MR. FARRER:

16 Q.  Mr. Yan, let me show you a more legible copy of Exhibit 27.

17          MR. ROMEO:  May I see it, too, please?

18          THE WITNESS:  Yes, it's recorded on January 13th,

19 2004.

20      (Pause in the proceedings.)

21 BY MR. FARRER:

22 Q.  So is it fair to say that — turning back to Exhibit 25 —

23 that at least as of January 8th, 2004 you had no problem paying

24 Stella Chen the principal amount of $450,000 under her deed of

25 trust?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 131 of
240

1   A.  No, that's not — that's not correct, because even though I

2   signed this as my instruction my intention was still to

3   negotiate with Tony.

4   Q.  Did you tell anybody that?

5   A.  I — well, I didn't tell Tony — did I tell Tony?  Actually

6   Tony knows I'm still negotiating with him.

7   Q.  Oh, he knows that?

8   A.  Yes.

9   Q.  But as far as you know, Stella Chen could have taken the

10  signed escrow instructions that you prepared and signed and sent

11  to her on January 8th over to the escrow company.  And as far as

12  the escrow company, the buyer, and everybody else would have

13  known you had authorized the escrow company to pay Stella Chen

14  $450,000, right?

15  A.  Well, for a fact, like I said, this was never returned to me

16  signed.  And it was never forwarded to the escrow company by

17  Stella Chen.  So they never used it.

18  Q.  How do you know that?  Did somebody tell you that?

19  A.  It's not used at the escrow company.  A different

20  instruction was used at the company.

21  Q.  Did somebody tell you that?

22  A.  Tell me what?

23  Q.  That they hadn't forwarded Exhibit 25 to the escrow company.

24  A.  Well, I just assumed it's not forwarded there.

25  Q.  You don't know that, do you?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 132 of
240

1  A.  Because I didn't sign this escrow instruction at the escrow

2  company.  I was asked to sign another escrow instruction.

3  Q.  We'll get to that in a minute.

4  A.  Okay.

5  Q.  We'll get to that in a minute.  But you don't know that this

6  wasn't taken to the escrow company, do you?

7  A.  Okay.  I — I —

8  Q.  And it was your intention that it be given to the escrow

9  company, wasn't it?

10  A.  Yes.

11  Q.  Now during your testimony in this case on July 27th you

12  testified that the first time you saw the escrow instruction is

13  when you went to the title company, right?  Do you recall that?

14  A.  Yes.  I recall that, yes.

15  Q.  That's not a true statement, is it?

16  A.  That's because I complete- — completely forgot about this

17  escrow instruction that I prepared, because they never sent it

18  back to me.  And I just forgot that they existed.

19  Q.  Well, the first time you saw the escrow instructions

20  authorizing the payment of the entire amount due to Stella Chen

21  on her deed of trust was actually January 8, because that's the

22  date you prepared them, right?

23  A.  Like I said, when I gave you that testimony, at that time I

24  didn't recall I had prepared this.  Yes, I — I sent over to

25  Tony.  They never sent it back to me, and I didn't have a copy

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 133 of
240

1    of it in my file.

2    Q.  Okay.  So you were mistaken in your testimony in this trial

3    on July 27th when you told this Court that the first time you

4    saw the escrow instructions is when you signed them at the title

5    company, right?

6    A.  The — the ones they — they prepared, I never saw them before

7    until I went to the escrow company.

8    Q.  But you had an earlier version of escrow instructions with

9    Ms. Chen, didn't you?

10   A.  I think you're confusing the issue.  I'm —

11   Q.  Don't argue with me.  Yes or no?

12   A.  Yes or no on what?

13   Q.  That you — there was an earlier version of the escrow

14   instructions.  And you were aware of them before you showed up

15   at the title company, because you wrote them?

16   A.  I — I may have been aware of them when I went to the escrow

17   company to sign them.  But — but after the — the lawsuit

18   commenced, I completely forgot about this — this original

19   instructions.

20   Q.  I showed them to you at your deposition.

21   A.  Yes.  And I think that was the first time I saw this again.

22   I didn't have it in my file.

23   Q.  That was what?  September of last year, right?

24   A.  Yeah, I think so.

25   Q.  So actually the first time you saw the escrow instructions

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 134 of
240

1   is when you prepared Exhibit 25, right?

2   A.  Well, which escrow instruction?  I prepared this.

3   Q.  The first ones.

4   A.  Yes.  Well, I —

5   Q.  Well, you knew —

6   A.  I'm not denying that I prepared this.

7   Q.  And you knew as of January 8th of '04 that you were

8   authorizing the title company to pay Stella Chen $450,000,

9   correct?

10  A.  I wasn't — well, no, I wasn't — let's — let's put it this

11  way:  If not for Tony's threat that he'll foreclose on both deed

12  of trusts, I wouldn't have signed the escrow instructions.

13  Q.  Okay.  Now in your transmittal letter to Tony Fu, which is

14  Exhibit 67, do you make any mention that Tony has threatened you

15  and that's why you were forwarding those instructions?

16  A.  Repeat your question again?

17  Q.  In Exhibit 67 do you make any mention that Tony Fu has

18  threatened you and that's why you're sending those escrow

19  instructions, yes or no?

20  A.  67 is a fax to Tony.

21  Q.  That's right.  Did you mention that he's been threatening

22  you in that fax?

23  A.  Why would I tell him that he's threatening me when — when

24  he's the one who knows that he's threatening me?

25  Q.  Because you're saying the only reason you prepared these

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 135 of
240

1   documents is because he was threatening you, —

2   A.  Yes.

3   Q.  — right?

4   A.  That's correct.

5   Q.  Okay.  But you don't tell him that.  You don't say, 'I'm

6   only doing this because you're threatening me,' right, Mr. Yan?

7   You don't say that, do you?  In fact, you don't tell anybody

8   that, do you?  You don't tell Connie Ho that in the title

9   company.  You don't tell Rick Seher that.  You don't tell

10  Margaret Berlese that.

11  A.  If — now — I can answer the question, please.

12          MR. ROMEO:  I just want to want to make sure what

13  question he's answering —

14          THE WITNESS:  Okay.

15          MR. ROMEO:  — because there's two pending.

16          THE WITNESS:  Now to answer your question is, like I

17  said, the reason why I signed both escrow instructions was I was

18  very concerned that he wouldn't release the Lei Ming Li note

19  because, as — as you can tell, we agreed that I didn't owe the

20  face amount on the Lei Ming — Lei Ming Li note.

21          And Tony was making the threat that he'll foreclose

22  the Lei Ming Li note on its face value even though he knows that

23  I don't owe the face amount.  So if I tell him that I'm just

24  doing this because you're threatening me, then I don't think

25  he'll agree to release the Lei Ming Li note for less than the

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 136 of
240

1  face amount.  He'll use — still using that as a leverage against

2  me.

3  BY MR. FARRER:

4  Q.  There is no written communication between you and Mr. Fu

5  regarding threats to foreclose on the property, is there?

6  A.  Well, I'm not — I don't think Tony was that dumb to put it

7  in writing.  He — he's —

8  Q.  Yes or no?

9  A.  He said to me in my face that he will foreclose —

10 Q.  You could have confirmed it, right?  I mean, you're pretty

11 good about writing emails and letters whenever you feel like.

12 You never sent him a letter stating that he was threatening you,

13 did you?

14 A.  I think I sent him letters that we have a dispute on the Lei

15 Ming Li note and the Stella Chen note.

16             MR. FARRER:  Okay.

17             THE COURT:  Hold on a second.  What exhibit is the

18 note?

19             MR. FARRER:  The promissory note is Exhibit 5, the

20 Stella Chen promissory note.  The Lei Ming Li one is Exhibit 3.

21             THE COURT:  May I ask a question?

22             MR. FARRER:  Sure.

23                         EXAMINATION BY THE COURT

24 BY JUDGE CARLSON:

25 Q.  What default did Mr. Fu assert under the note?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 137 of 240

1  A.  I didn't get the question.

2  Q.  He can't foreclose unless there's a default under the note.

3      What default did he assert you had made?

4  A.  I don't think he ever gave me a reason as to, that I know.

5  I — there was a default.  He just came out — came out and said

6  that, "I'll foreclose."

7      THE COURT:  Okay.

8                    CROSS-EXAMINATION (Resumed)

9  BY MR. FARRER:

10 Q.  Now you testified on July 27th, that you signed the escrow

11 instructions authorizing the full payment of $450,000 under the

12 Stella Chen deed of trust because you needed to get Lei Ming Li

13 to release her deed of trust.  Do you recall that?

14 A.  Yes.

15 Q.  And you testified that you needed her to clear off her deed

16 of trust because you knew you didn't owe her the face amount of

17 that obligation, right?

18 A.  That's correct.

19 Q.  And how much did you owe her of the — the face amount of her

20 obligation — well, let's back up.

21      Her obligation is Exhibit 3, right?

22 A.  Yes.

23 Q.  And the face amount of that obligation is $110,440, right?

24 A.  Yes.

25 Q.  Okay.  And we all know from your prior testimony that you

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 138 of
240

1  agreed and did, in fact, pay her I think it was $17,285 in —

2  through the escrow company to obtain a release of her deed of

3  trust, right?

4  A.  Correct.

5  Q.  And in addition you had previously given her a check for

6  $30,000 on May 30th, 2001 right?  And that's Exhibit 89, or it's

7  your Exhibit DD?

8  A.  Yes.

9  Q.  So the total of those two numbers is the $47,285, right?

10 A.  Correct.

11 Q.  And that is the amount that is set forth on Exhibit 3 to the

12 right of the principal amount of the note with the numbers at

13 547 in front of it, right?

14 A.  Correct.

15 Q.  Okay.  So now we have this 63,155, right?

16 A.  Yes.

17 Q.  Okay.  Now on September 20th of 2003, a little over three

18 months before you ask Lei Ming Li to sign the escrow

19 instructions for 17,285, you assign a $50,000 promissory note

20 from Augustine Fallay to her, right?

21        MR. ROMEO:  Objection, Your Honor.  That

22 mischaracterizes the document that's being referred to.

23        THE COURT:  Which — what — I have Exhibit 3 here, I

24 see the note.  What other — where the — what else are you

25 referring to here?  Let me just follow you a little better.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 139 of
240

1        MR. FARRER:  Okay.  Let's — we'll back up.  If the

2   Court were to look at Exhibit 89, which Mr. Yan testified to in

3   his original...

4        MR. ROMEO:  Your Honor, I don't think there's an

5   Exhibit 89 marked yet.

6        THE COURT:  I don't have 89.

7        MR. FARRER:  All right.  Well, let's go to —

8        MR. ROMEO:  I think what he's referring to is Exhibits

9   90 through 92.

10       MR. FARRER:  No.

11       MR. ROMEO:  The Fallay note.

12       MR. FARRER:  No.  What I want to refer to it as

13  Exhibit DD.

14       MR. ROMEO:  Okay.

15       THE COURT:  DD.

16       MR. ROMEO:  The white binder.

17       THE COURT:  Yeah.  I —

18       MR. FARRER:  Here, I'm sorry.

19       THE COURT:  Well, I have some checks — a check.

20       MR. FARRER:  Now I've got a — I've got a more legible

21  copy for the Court and the witness and opposing counsel, of

22  course.

23  BY MR. FARRER:

24  Q.  Mr. Yan, is Exhibit 89 a true and correct copy of a check

25  that you gave to Lei Ming Li on or about May 30th, 2001 for

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 140 of
240

1  30,000 bucks?

2  A.  Correct.

3  Q.  Okay.  And that was a payment on account of her promissory

4  note, right?

5  A.  Yes.

6  Q.  Okay.  And then in addition in the escrow you wrote her a

7  check for 17,285?

8  A.  Correct.

9  Q.  So far you've paid her 47,285 bucks, right?

10  A.  Yes.

11  Q.  Okay.  Now —

12         THE COURT:  Okay.  That includes of the $30,000 check,

13  which is —

14         MR. FARRER:  Exhibit 89.

15         THE COURT:  — which is — okay.  Exhibit Number 89.

16  Okay.  And there was another 17,000, which is —

17         MR. FARRER:  Two eighty-five that was paid in escrow.

18  And that is represented —

19         THE COURT:  Okay.  I remember this generally.

20         MR. FARRER:  My Exhibit O, which has been admitted.

21  BY MR. FARRER:

22  Q.  Why don't you turn to Exhibit O, just for the record, if you

23  would, please?  That's in your white binder.

24  A.  Okay.

25  Q.  Is that a true and correct copy of escrow instructions you

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 141 of
240

1  gave to Old Republic authorizing the payment of 17,285 to Lei
2  Ming Li?
3  A.  Yes.
4  Q.  Okay.  And in return for that sum she reconveyed her deed of
5  trust against the Chenery property?
6  A.  Yes.
7  Q.  Okay.  So those are the first two payments.  Now, why don't
8  we —
9         THE COURT:  All right.  I have to ask just another
10 stupid question here.
11        MR. FARRER:  No, all questions are good.
12        THE COURT:  547 Twenty-Third Avenue, Home Depot.
13 These are, I take it, some reference to expenses?
14        MR. FARRER:  The witness has testified that the Lei
15 Ming Li note was given because of materials that Tony Fu had
16 bought, some on 547 Twenty-Third Avenue and some for Chenery
17 Street.
18        THE COURT:  Okay.  So the 47 — the note itself has —
19        MR. FARRER:  Two components.
20        THE COURT:  Well, yeah.  It has — it lists two
21 different numbers, one for 547, the other for 663.
22        MR. FARRER:  Correct.  And so far —
23        THE COURT:  Okay.  And that refers to Chenery?
24        MR. FARRER:  So far I've just established that the
25 47,285 has been paid.  That's Exhibits 89 and O.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 142 of
240

1          THE COURT:   Okay.

2    BY MR. FARRER:

3    Q.   Now why don't you turn to Exhibit 91, if you would, please?

4    A.   (Complies.)   Okay.

5    Q.   And is Exhibit 91 a true and correct copy of a promissory

6    note that you got from Augustine Fallay on or about May 5th of

7    2000?

8    A.   Yes.

9    Q.   Okay.   And it's for $50,000, right?

10   A.   Yes.

11   Q.   And it bears interest from and after May 8th of 2000 at the

12   rate of 6 percent per annum, correct?

13   A.   Yes.

14   Q.   Okay.   And you received that promissory note from Mr. Fallay

15   because — the consideration for this promissory note is a

16   $50,000 check that you gave to Mr. Fallay, right?

17   A.   Yes.

18   Q.   And you were the sole source of funds for that note, weren't

19   you?

20   A.   The money came from my checking account, but actually

21   $25,000 of that loan was credit — well, credit to me, from —

22   from Tony, from Crystal, from Lei Ming Li.

23   Q.   Who advanced the funds for the note?

24   A.   I advanced the funds, the $50,000.   But actually $25,000 of

25   that actually belongs to Tony.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 143 of
240

1  Q.  Oh, so Tony made a loan to Augustine Fallay with your money?

2  A.  With money that I owe him for something else.  So — so in

3  actuality half of the amount I gave to Augustine.  Half of those

4  actually belongs to Tony.

5  Q.  And has that always been true?

6  A.  Yes.

7  Q.  You've never owned more than 25,000 of this note?

8  A.  That's correct.

9  Q.  Never ever?

10 A.  No.  That's always — I never denied that I — I don't owe the

11 — Tony half of it.

12 Q.  Well, not that you owe Tony half, that Tony owns half of

13 this note.  You're not entitled to the 50,000.  You're only

14 entitled to 25; is that your testimony?

15 A.  Yes.

16 Q.  So — and your check out of your own account evidencing the

17 funding of Exhibit 91 — the promissory note is Exhibit 90, isn't

18 it?

19 A.  Correct.

20 Q.  Okay.

21 A.  And if you read the handwriting that explains why half of it

22 belongs to Tony.

23 Q.  That's your handwriting, though, isn't it?

24 A.  Yes.

25 Q.  Okay.  And it's after the fact, isn't it?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 144 of 240

1  A.  After the fact?

2  Q.  Yeah.  It's not on your check?

3  A.  No.  This was given to Tony to — to evidence that half of it

4  belongs to him.

5  Q.  Okay.  But it's not on the check you gave to Mr. Fallay, is

6  it?

7  A.  No.

8  Q.  And all of the money came out of your account?

9  A.  Yes.

10  Q.  All right.  And then on September 20th of 2003 you assigned

11  your interest in that note, the $50,000 note, to Crystal Li,

12  right?

13  A.  I was asked by Tony to sign this, but I was — to be honest

14  with you I was tricked into signing this by Tony.

15  Q.  Did you sign it?  Is that your signature?

16  A.  Yes, it's my signature.

17  Q.  And you're assigning all your right, title, and interest in

18  the $50,000 note to Crystal Li, right?

19  A.  Yes.

20  Q.  And Crystal Li is Lei Ming Li, isn't it?

21  A.  Correct.

22  Q.  Okay.  So — and that assignment was in partial satisfaction

23  of the moneys you owed to her under the Lei Ming Li $110,000

24  promissory note, right?

25  A.  No, that's completely untrue.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 145 of
240

1   Q.  Do you have any idea how much money was owed under that

2   $50,000 promissory note as of September 20th, 2003?

3   A.  You mean counting interest?

4   Q.  Yeah.

5   A.  I don't — I don't know, but it's not that much.

6           MR. FARRER:  Approach the witness, Your Honor?

7           THE COURT:  Yes.

8           THE WITNESS:  Okay.

9   BY MR. FARRER:

10  Q.  Mr. Yan, I ran a calculation of what was due on the — hold

11  on.

12      (Pause in the proceedings and comments off the record.)

13          MR. FARRER:  Back up here.  I'm sorry.

14  BY MR. FARRER:

15  Q.  Let's turn to Exhibit 113.  Mr. Yan, I took the time to

16  calculate how much money was due on that promissory note, the

17  full $50,000 for Mr. Fallay, as of September 20th, 2003, which

18  is date of your assignment of your interest in that note to

19  Crystal Li.  Do you see those calculations?

20  A.  Yes.

21  Q.  Are they accurate?

22  A.  Well, I think numerically they may be accurate.  But the

23  fact is that the reason why I was tricked by Tony into signing

24  this assignment —

25  Q.  Mr. — Mr. Yan, I didn't ask you why you were tricked by

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 146 of
240

1    Tony.  I'm asking you about my calculations.

2    A.  Well, — well, I think numerically it's correct.

3    Q.  You have an attorney here.  He can ask you those questions.

4    A.  Sure, okay.

5              THE COURT:  I think the question can be answered.

6              THE WITNESS:  Yes.

7    BY MR. FARRER:

8    Q.  Now on the day that Stella — I'm sorry — Lei Ming Li

9    released her deed of trust against the Chenery Street property,

10   which if we look at Exhibit O I believe was the January 13th of

11   '04, if you turn to Exhibit 14 —

12             MR. ROMEO:  114.

13             MR. FARRER:  114, excuse me.  Thank you, sir.

14             THE WITNESS:  Okay, yes.

15   BY MR. FARRER:

16   Q.  Do you have those calculations?

17   A.  Yes.

18   Q.  Are they accurate?

19             THE COURT:  114?  Do I have 114?

20             MR. FARRER:  Yeah, I just passed them, the two of them

21   to you.

22             THE COURT:  I see.  Okay.  Yeah, I saw 113.  But I

23   didn't see in further.

24             THE WITNESS:  I'll assume that you — you did the

25   correct calculation.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 147 of 240

1  BY MR. FARRER:

2  Q.  Okay.  Do you have a reason to dispute the $61,041 figure?

3  A.  Well, assuming that the note is actually collectable.

4  Q.  Well, let's not — no.  How much was due on the note?  Not

5  whether it's collectible or not.

6  A.  That's fine.  I — like I said, unless I punch the

7  calculation again I assume that your calculation is correct.

8  Q.  And the $61,000 number is very, very close to the $63,000

9  remaining balance on the Crystal Li note, wasn't it?

10  A.  That's not relevant, because like I said —

11  Q.  Yes or no?  The two numbers are relatively close.

12  A.  It's off by 2000.  Okay.

13  Q.  Well, you wanted a discount on the Crystal Li note, didn't

14  you?  You said you were negotiating with Tony Fu because you

15  didn't owe the face amount of the note.  And that was a true

16  statement, wasn't it?

17  A.  That's correct.

18  Q.  In fact, all you owed on that note was was the 17,285?

19  A.  That's correct.  So I was very eager to pay off immediately.

20  I didn't want Tony to have something to — to be able to use as a

21  leverage against me.

22  Q.  But you could prove the note had been paid down, as you did

23  on July 27th in this trial.  You testified you gave her a check

24  for $30,000, and you assigned your interest in the promissory

25  note to her, and you pay her 17,285.  So you didn't owe her any

1   more money, did you?

2   A.  Well, that's not the — the gist of the negotiation I did

3   with Tony.  We never brought up this — this assignment as to

4   apply to this note.  All along my argument with Tony was that I

5   — I didn't owe the amount for the Chenery project, because for

6   the material cost he, as the general contractor, was responsible

7   for.

8   Q.  Mr. Fu, I've asked the court reporter — I've asked you — or

9   marked and presented to you what's been marked as Exhibit 115,

10  showing the various payments made on the Fallay note.  The

11  principal amount of that note was $110,440, right?

12  A.  Yes.

13  Q.  That's correct.  And you testified that you made that

14  payment to Lei Ming Li of $30,000 on May 30th of '01, right?

15  A.  Correct.

16  Q.  And then we have the assignment of the $50,000 Fallay note,

17  which at the time of the assignment had a balance due of

18  $60,098.64, right?  And that's Exhibit 113.

19  A.  Well, I didn't know what's the interest that was due at the

20  time when I assigned that — I assigned the note.  I never did

21  the calculation.  And, like I said, this number — this

22  assignment doesn't — has nothing to do with this note with Lei

23  Ming Li.

24  Q.  And then so we have total payments or credits of

25  $107,383.64, right?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 149 of
240

1    MR. ROMEO:  No.  I'm going to object to the question.

2   It assumes facts not in evidence.  The witness has repeatedly

3   testified that the assignment of 50 percent of the August- — of

4   his 50 percent ownership Augustine Fallay note has not been a

5   credit against Lei Ming Li's note.  This exhibit is

6   objectionable and should not come in because it's not based on

7   any facts that are in this case.

8        It's completely inconsistent with his testimony and

9   it's inconsistent with his own exhibits which show that we have

10  a jointly-owned note.  Tony Fu and Dennis Y- — Demas Yan, and an

11  assignment, Plaintiff's Exhibit 92, which says that Mr. Yan is

12  assigning his interests in the note, not the entire note —

13       THE COURT:  So that — it would still leave — it would

14  leave the amount assigned at roughly $30,000, not 60,- —

15       MR. ROMEO:  If —

16       THE COURT:  — if it was only a one-half interest that

17  was assigned.

18       MR. ROMEO:  Assuming it was intended to be a credit

19  against the Lei Ming Li note at all —

20       THE COURT:  Well, obviously the value of it was about

21  $60,000 if he assigned his interest.

22       MR. ROMEO:  That's what the — that's what the

23  assignment, Plaintiff's Exhibit 92 indicates, is that an

24  assignment of his interest.

25       THE COURT:  92, let me see.  Okay.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 150 of
240

1    MR. ROMEO:  So I have to go back and object to Exhibit

2  115 because it's an argument, essentially.  It's not a piece of

3  evidence and it's nothing that the witness can testify to

4  because inconsistent with his testimony —

5    THE COURT:  Well, I think it's admissible.  The

6  question is it's relevance is dependent upon other things.

7    MR. ROMEO:  Thank you, Your Honor.

8    MR. FARRER:  I move the admission of 113 and 114.

9    THE COURT:  I assume we have the same objection, and

10  I'll rule the same way.  They have limited use.  The use is

11  dependent upon other things, but all they — all they purport to

12  be is a calculation of interest.

13    MR. ROMEO:  The witness testified the calculations at

14  least as a piece of arithmetic is correct, and I'll stipulate —

15    THE COURT:  Well, I don't think the witness even

16  testified to that.  He said he didn't have any reason not to

17  think it was correct —

18    MR. ROMEO:  Disagree.

19    MR. FARRER:  They're admitted?

20    THE COURT:  Unless he does this in his head.

21    THE WITNESS:  I can't even.

22    THE COURT:  They're admitted.

23    (Plaintiff's Exhibits 113 and 114 received in evidence.)

24    MR. ROMEO:  I don't care if 113 and 114 —

25    THE COURT:  They're admitted.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 151 of
240

1          MR. ROMEO:  Okay.

2          THE COURT:  Again, I understand the limitations on

3   their use, but as calculations...

4          MR. ROMEO:  They're helpful.

5          THE COURT:  Well, they're simply calculations of a

6   number that may or may not be — be of much value.

7          MR. FARRER:  And Exhibit 67 was admitted?  I just want

8   to double check.

9          MR. ROMEO:  Yes, I have no objection to that.

10          THE COURT:  67, yes.

11  BY MR. FARRER:

12  Q.  Now, Mr. Yan, on January 13th, 2004 you went down to Old

13  Republic Title Company, did you not?

14  A.  Yes.

15  Q.  And the purpose for your visit on that day was to sign

16  escrow instructions and other assorted documents so you could

17  close the sale of Mr. Santiesteban, right?

18  A.  My main purpose of signing those escrow instructions —

19  Q.  No.  My — my question direct- — was solely directed to why

20  did you go to Old Republic on January 13th of 2004?

21  A.  Well, I went down to — to sign the escrow instructions and

22  also to deposit the $17,285 into the escrow account.

23  Q.  For Ms. Li?

24  A.  That's correct.

25  Q.  And when you arrived at the title company you met with

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 152 of
240

1  Connie Ho?

2  A.  Yes.

3  Q.  The title officer assigned to the Santiesteban purchase and

4  sale?

5  A.  Yes.

6  Q.  And that was for Unit 661, Chenery Street, for $418,000,

7  right?

8  A.  Correct.

9  Q.  And five days — and you knew that was the purchase price,

10  right?  There was no surprise about that?  You were selling the

11  unit for $418,000, right?

12  A.  Yes.

13  Q.  And yet on January 8th you had signed escrow instructions,

14  you had prepared and signed and faxed escrow instructions

15  authorizing Old Republic to pay Stella Chen $450,000, right?

16  A.  I admit I signed the escrow instructions, —

17  Q.  Yeah, but —

18  A.  — but I've never put in money in to pay of Stella Chen.

19  Q.  But you knew when you signed — when you prepared, signed,

20  and faxed Tony Fu Exhibit 25 that there wasn't going to be

21  enough money in that sale to pay Stella Chen $450,000, didn't

22  you?

23  A.  Not from the sales proceed, but it doesn't — doesn't mean

24  that I don't have the money if I, you know, —

25  Q.  Oh, no, I'm not getting there.  But you knew that the money

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 153 of
240

1    that Mr. Santiesteban was paying wasn't going to be enough?

2    A.  Yes.

3    Q.  Okay.  So you knew you were going to have to contribute

4    funds into that escrow in order for it to close?

5    A.  Assuming that I couldn't — which a final agreement with

6    Tony.  Because at the time when I signed this escrow instruction

7    I was still talking to Tony.  And I was actually at the same

8    time talking to Mr. Beckman as a potential lawyer.

9    Q.  Okay.  But you prepared escrow instructions authorizing the

10   title company to pay out more than it was getting in, didn't

11   you?

12   A.  Yes.

13   Q.  Okay.  So you knew you were going to have to contribute for

14   those escrow instructions to be followed?

15   A.  I — at that time I didn't know that the — oh, actually that

16   to close the account — close the escrow or not, because, as I

17   said, I was still negotiating with Tony.  I didn't know what the

18   outcome of that negotiation would be.

19   Q.  And your negotiations with Tony were to clear off the Lei

20   Ming Li note, right, and deed of trust?

21   A.  With that also because, you know, for a fact we both agreed

22   that we — I don't owe the face amount.  But also I had disputes

23   about — about some offsets that I believe Tony owe me for the

24   extra — extra money I put into the contract, the construction.

25   Q.  You keep saying that you had a dispute that you didn't owe

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:54    Page 154 of
240

1    the face amount of the Lei Ming Li note, right?

2    A.  Yes.

3    Q.  Everybody knew you didn't owe the face amount of the Lei

4    Ming Li note because you had already paid her 30,000 bucks,

5    right?

6    A.  No.  Actually when I found out about this — the trust being

7    recorded back in September 2003, I started to immediately argue

8    with Tony that I don't owe the face amount.  And I told him,

9    "Show me how much I owe on this still trust, and I'll pay off."

10   But he never allow me to pay off because he was holding that

11   against me to — for his demand to pay off the Stella Chen note

12   as well.

13           I would happy — be happy to pay off back in September,

14   if —

15   Q.  Well, —

16   A.  — he — if he allowed me.

17   Q.  When you asked Lei Ming Li for a demand under her deed of

18   trust, didn't she tell you 17,285?

19   A.  She never told me anything.  I never discussed this with Lei

20   Ming Li.  It was only Tony —

21   Q.  Well, that was her demand into escrow, though, wasn't it,

22   17,285?

23   A.  Yes, after me and Tony agree on the — on the number.

24   Q.  Okay.  On the January 13th of '04 you went to Old Republic,

25   right?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 155 of
240

1  A.  Yes.

2  Q.  You met with Connie Ho?

3  A.  Yes.

4  Q.  And you signed some new escrow instructions, didn't you?

5  A.  Yes.

6  Q.  And new escrow instructions both for Lei Ming Li and Stella

7  Chen, right?

8  A.  Correct.

9  Q.  And would you turn to Exhibit 29?

10  A.  Yes.

11  Q.  Is Exhibit 29 a true and correct copy of the revised escrow

12  instructions that you signed in Old Republic's office on January

13  13th, 2004?

14  A.  Yes.

15  Q.  And in signing those escrow instructions you intended Old

16  Republic to rely on them, didn't you?

17  A.  I don't think that was — that ever crossed my mind.

18  Q.  Why would you sign and give it to them?

19  A.  Because if I didn't sign the Stella Chen escrow instruction

20  at the same time with the Lei Ming Li's instruction, I'm sure

21  that they won't release the Lei Ming Li note.

22  Q.  Well, you had a separate deal with Lei Ming Li and she did

23  in fact release her note without Stella Chen releasing hers,

24  didn't you?

25  A.  Well, on this same day I deposit the amount, 17,285, on

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 156 of
240

1  January 13th, when I signed this escrow instruction. And — and

2  Lei Ming Li refused to go and pick up the money for, I think,

3  quite a long time.

4  Q. In Exhibit 29 are you instructing Old Republic Title Company

5  to pay Stella Chen $450,000 in exchange for her release and

6  reconveyance of her deed of trust which is marked as Exhibit 6?

7  A. That wasn't — well, like I said, when I signed this —

8  Q. Yes or no.

9  A. I cannot answer yes or no because both — if I answer yes or

10  no both would be untrue.

11  Q. Really?

12  A. Yes.

13  Q. What does the first sentence say, that you signed? Why

14  don't you read that outloud?

15  A. Well, — okay. When I went to the escrow company to sign

16  this, it was the first time I saw this instructions.

17  Q. Did you read it before you signed it?

18  A. I read it before I signed it, but I really don't think I

19  have any leeway to negotiate with Tony again about what — what

20  contents to be in the escrow instructions. So I just signed it

21  and I put the money in to pay off the Lei Ming Li note.

22  Q. What is in Exhibit 29 that wasn't part of your agreement

23  under the Stella Chen deed of trust?

24  A. Well, all this verbiage about, you know, if the 661 one

25  doesn't close, then whatever, you know. All this conditions,

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 157 of 240

1  they were not put in by me.  And I just signed it — because at

2  the time I don't think I have any leeway, because Tony holds

3  both their trust, and I was really afraid that he will — you

4  know, he will follow through with his threat to foreclose,

5  especially on the Lei Ming Li note with the face value —

6  Q.  Well, you — you understood that Stella Chen's deed of trust

7  encumbered the entire property, right, not just one of the

8  units?

9  A.  Yes, that's correct.

10 Q.  Okay.  So that Stella Chen was entitled to be paid on her

11 deed of trust out of the first unit sold, whether it was 661,

12 663, or 665 Chenery, right?

13 A.  That's not correct because this — this Stella Chen note

14 belongs to Tony.  And Tony's agreement with me was that we'll

15 split the proceed 25 percent to him and 75 percent to me.

16 Q.  Well, why did you sign this?

17 A.  Like I said, I was under the threat from Tony.

18 Q.  Threat he was going to foreclose?

19 A.  Yes.

20 Q.  Something he hadn't initiated, he hadn't done, right?

21 A.  Well, when I signed this escrow instruction I was still

22 negotiating with Tony so, you know, I — I don't know what the

23 outcome of the negotiation would be.

24 Q.  But you're instructing the title company to pay Stella Chen

25 $450,000, aren't you?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 158 of
240

1   A.  I'm just signing the escrow instructions, I'm not

2   instructing anyone.  I'm not — you know, depending on the

3   negotiation — negotiation with Tony, I may or may not pay this

4   amount.

5   Q.  Who were the instructions directed to?

6   A.  Well, I —

7   Q.  Why don't you look at the document.

8   A.  I'm not arguing with the fact I signed this escrow

9   instruction.

10  Q.  Who are they directed to?

11  A.  It's obvious on this page.

12  Q.  Who are they directed to?

13  A.  It's Old Republic Title.

14  Q.  Okay.  And you signed this and give this to Connie Ho,

15  right?

16  A.  Yes.  Yes.

17  Q.  And when you signed it and gave it out Connie Ho you didn't

18  tell her that you didn't owe Stella Chen any money, did you?

19  A.  Actually I do recall I made — I made a passing comment, that

20  I said, "I'm disputing this, but I'll sign this anyway."

21  Because I know for a fact if I only signed the Lei Ming Li note

22  and not the Stella Chen note, they would never release the Lei

23  Ming Li note.

24  Q.  Really?

25  A.  Yes.

1  Q.  Well, you still hadn't signed any of the seller's

2  instructions, closing statement, grant deed, or anything.  You

3  had all the cards.  In fact because you held all the cards,

4  that's why this escrow didn't close; isn't that right?

5  A.  No.  This escrow didn't close because I couldn't reach

6  agreements with Tony.

7  Q.  You refused to sign the grant deed on this sale, didn't you?

8  A.  I think this was way after the escrow instructions were

9  signed.

10  Q.  You refused to sign the grant deed to Mr. Santiesteban,

11  didn't you?

12  A.  Yes.

13  Q.  Okay.  And you refused to sign seller's instructions, didn't

14  you?

15  A.  That may be true, I think, yes.

16  Q.  And you refused to contribute any money to the escrow so it

17  could close, right?

18  A.  No, that's incorrect.  Because I told Santiesteban through

19  his lawyer, Arthur...

20  Q.  Rugama.

21  A.  ...Rugama, just before I filed lawsuit against Tony, I told

22  Rugama that I'm willing to put up the $450,000 into a blocked

23  account so that Stella Chen can release the note, the sale can

24  go through, and we can, you know, litigate or settle our dispute

25  outside of the escrow.  And I believe Rugama actually tried to

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 160 of
240

1    communicate this offer to either Tony or Stella, and they

2    rejected it.  And I think I made the same offer again just

3    before I filed lawsuit against Tony or even after I filed the

4    lawsuit against Tony, to put the money into a blocked account so

5    I can still go through with the sale.

6    Q.  One second.  Would you turn to Exhibit 93, please?

7    A.  Yes.

8    Q.  Now you say you're willing to put $450,000 in a blocked

9    account, right?

10   A.  Yes.

11   Q.  That's what you told Mr. Rugama?

12   A.  Yes.

13   Q.  Wasn't that what David Zeff offered to do, and you didn't go

14   for it?

15   A.  I need to read this again.  I'm not quite sure whether I saw

16   this or not.

17   Q.  Well, Mr. Beckman was your lawyer on March 16th of 2004?

18   A.  Yes.  This is directed to Beckman —

19   Q.  In fact he already —

20   A.  Can you give me a moment to read this so I can answer your

21   questions?  (Perusing document.)

22        Well, this is completely different from my offer to

23   them.  According to this offer, if I pay for $450,000 into the

24   account I still owe Tony for the contract.  That would be double

25   payment.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 161 of 240

1   Q.  When you signed Exhibit 29, had Stella Chen's — Stella

2   Chen's signature on it?

3   A.  Repeat your question again.

4   Q.  When you signed Exhibit 29 was Stella Chen's signature on

5   it?

6   A.  Yes.

7   Q.  Did you ever tell Old Republic Title Company not to

8   implement your escrow instructions, which are marked as Exhibit

9   29?

10  A.  It was signed.  But, like I said, no money was in the escrow

11  account for this —

12  Q.  Did you ever tell them not to implement those escrow

13  instructions?

14  A.  I — I made a passing comment to Connie Ho that I was — I was

15  disputing this, but I was signing it anyway at the time.

16  Q.  Did — while you were meeting with coho on January 13th, 2004

17  did she tell you were going to have to contribute funds to the

18  escrow in order for it to close if you're going to pay Stella

19  Chen $450,000, as set forth in Exhibit 29?

20  A.  No, she never made that comment to me.

21  Q.  Did you know that at the time?

22  A.  Well, assuming that, like I said, I couldn't reach a

23  agreement with Tony, but we repeatedly said at this time I was

24  still negotiating with Tony.  And I have no idea what the final

25  outcome would be.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 162 of
240

1  Q.  Did you ever learn how much you were going to need to

2  contribute in order to close that sale?  If your escrow

3  instructions were —

4  A.  I guess I seen the figures in the estimates, the closing

5  estimates.

6        THE COURT:  Do we have an estimated closing statement

7  in here?

8        MR. FARRER:  Yes, we do, Your Honor.  And I'm going to

9  get to it right now.

10  BY MR. FARRER:

11  Q.  Exhibit 40.  Would you turn to Exhibit 40, please?

12  A.  Okay.

13  Q.  This was authenticated by the Old Republic custodian of

14  records who testified in the first — first day of trial, I

15  believe.  Now Exhibit 40, which comes from Old Republic's file,

16  indicates that you're going to need to contribute in excess of

17  $62,000 in order for this sale to close, correct?

18  A.  I think at the time I already put in the amount for the Lei

19  Ming Li note which is 17,285.

20  Q.  Right.  And that is referenced as a credit on the right-hand

21  column, the second number down, isn't it?

22  A.  Yes.

23  Q.  Okay.

24        THE COURT:  This just sort of puts them together?

25        MR. FARRER:  That's all it does.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 163 of
240

1      THE COURT:  And it takes — if one applies the sales

2  proceeds, the Lei Ming Li note, then when those — and that

3  payment comes from the sales proceeds, then needs one 62,- for

4  the other note.

5      MR. FARRER:  The seller would need to contribute

6  62,000 for —

7      THE COURT:  Yeah.  And if one paid — if the seller

8  paid Lei Ming Li — Lei Ming Li note out of other sources, then

9  that amount would go down.

10      MR. FARRER:  No, it wouldn't, because he's already

11  getting credit for it.  See, there's a debit and a credit, so

12  they cancel each other.  He still needs to put in 62,000,

13  because he actually wrote a check and delivered it to the title

14  company on January 13th of '04 for 17,285.

15  BY MR. FARRER:

16  Q.  Right, Mr. Yan?

17  A.  Yes.

18      MR. FARRER:  So they're already giving him credit for

19  the 17,285.  It's a debit and then it's a wash because he's

20  getting a full credit for it.

21      THE COURT:  Oh, yes, I see up top.

22      MR. FARRER:  Yes.  Oh, I'm sorry.  That's — that's

23  where —

24      THE COURT:  I didn't see it on the top.  Okay.

25      MR. FARRER:  Okay.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 164 of 240

1          THE COURT:  All right.

2   BY MR. FARRER:

3   Q.  Could you turn to Exhibit 94, please —

4          MR. FARRER:  Oh, I move the admission of Exhibit 90 if

5   I haven't already — I'm sorry — 40.  Property's already in.

6          THE WITNESS:  Okay.

7          MR. ROMEO:  It's in evidence, Your Honor.

8          MR. FARRER:  Thank you.

9   BY MR. FARRER:

10  Q.  You have Exhibit 94?

11  A.  Yes.

12  Q.  And is Exhibit 94 a true and correct copy of a fax that you

13  sent to Tony Fu on January 31st, 2004?

14  A.  Yes.

15  Q.  And you told him that you're offering to pay Stella Chen

16  $411,000, in which case you'll go forward with the escrow?

17  A.  No.  I'm offering to pay Tony this amount because Tony and I

18  know that he owes the Stella Chen note.

19          THE COURT:  I'm sorry.  I was making some notes here.

20  I didn't hear you say what exhibit that was.

21          MR. FARRER:  94.

22          THE COURT:  94.  Okay.

23          Go ahead, please.  Thank you.

24          MR. FARRER:  Okay.  I just move the admission of

25  Exhibit 94.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 165 of 240

1      MR. ROMEO:  No objection, Your Honor.

2      THE COURT:  Okay.  94 is admitted.

3      (Plaintiff's Exhibit 94 received in evidence.)

4  BY MR. FARRER:

5  Q.  How did you arrive at the number of $411,095?

6  A.  Because based on my — my records I paid more than $300,000

7  toward my contribution according to the contract.  And I — I did

8  a calculation and I offered to settle with Tony the extra amount

9  I pay in, and that amount was $450,000 minus, I think, $39,000

10  about, which I claim was amount that he owes me for my

11  over-contribution toward the construction.

12  Q.  So this is your rough ballpark of what you thought you'd owe

13  under the Stella Chen note —

14  A.  It was rough, but I think it was actually more lenient —

15  lenient on my part because I think my actual cost receipts was

16  actually way — a lot more than $340,000.  But I offered to him

17  that, you know, that he can — that I'll set in a offset of about

18  — around 39- — $39,000 for my over-contribution.

19  Q.  Did you take the Chenery Street units off the market in

20  approximately February of '04?

21  A.  I believe so, yes.

22  Q.  And you didn't put them back on the market until after you

23  filed bankruptcy?

24  A.  I think — well, I took them off MLS and I put them back on

25  the MLS after I filed bankruptcy.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 166 of 240

1  Q.  Okay.  And right after — shortly after your fax to Tony Fu

2  on January 31st of '04 you filed a lawsuit against him and

3  Stella Chen, didn't you?

4  A.  Yes.

5  Q.  And then you went right out and starting renting the

6  apartments and collecting all the rents for yourself, right?

7  A.  Yes.

8  Q.  Would you turn to 48 — 8, please?

9          THE COURT:  To what?

10         MR. FARRER:  48.

11         MR. ROMEO:  Oh.

12         THE COURT:  Oh, 48.

13         MR. FARRER:  I'm sorry.

14         THE WITNESS:  Yes.

15 BY MR. FARRER:

16 Q.  Is Exhibit 48 a true and correct copy of a letter you

17 received from me on or about August 5th, 2004?

18 A.  Yes.

19 Q.  Did you respond to that letter?

20 A.  I think I responded by sending you a letter saying that this

21 is — this is unwarranted.

22 Q.  And you didn't put the property back on the MLS as

23 requested, did you?

24 A.  No.  I think in my letter to you in response to this I was

25 telling you that, because you — there was all the lis pendens on

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 167 of 240

1  the property, I cannot legally sell the — the building anyway.

2  And I'm — I think I may have mentioned to you that at this time

3  the trial date was set for November 2004.  And this letter is in

4  August, so it's only like, what, three, four months away.  So I

5  think I also mentioned in my letter to you that doesn't make

6  sense, because the trial is just around the corner.

7  Q.  Well, you moved to continue that trial date, though, didn't

8  you?

9  A.  I went to move it because Tony assigned his contract to

10  someone else without telling me.  And then he had this other

11  person sue me later on, so I had to combine both trials.

12  Q.  And then on September — on or about September 1st of '04 you

13  received a notice of default under the Stella Chen deed of

14  trust?

15  A.  Yes.

16  Q.  And that's the first official foreclosure that Stella Chen

17  had initiated on her deed of trust since she received it in

18  November of '02?

19  A.  Are you asking me this?

20  Q.  Yes.

21  A.  I believe so, yes.

22          MR. FARRER:  Move the — is 48 in?  I'm sorry.

23          Yeah, okay.  It's already in.  I'm sorry.

24          MR. ROMEO:  I think —

25          THE COURT:  48 in.  49.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 168 of 240

1      MR. ROMEO:  I think all of these were in the big

2  step —

3      THE COURT:  I think everything was in except the new

4  stuff that you —

5      MR. FARRER:  Okay.

6      THE COURT:  — that you've been putting in as we go

7  along.

8      MR. FARRER:  Okay.  Thank you.

9  BY MR. FARRER:

10 Q.  Now you never cured the default, did you?

11 A.  No.  And I've always objected to the — to the demand, to the

12 default demand.

13 Q.  And you understand there were two demands.  One was

14 monetary, for the legal fees that have been incurred, and the

15 second was nonmonetary on account of your failure to market the

16 property as required by the Chen note and deed of trust, right?

17 A.  Well, I — I've always maintained my position, that the

18 notice of default was unwarranted.

19 Q.  And you took that position not once, not twice, but three

20 times in the state court and lost all three times, didn't you,

21 when you tried to get an injunction against the foreclosure?

22 A.  Yes.  That's because Stella Chen; Fei Sing Fu, Tony's

23 brother; and Tony, they all lied under oath on the declarations.

24      THE COURT:  Do we have those declarations?

25      MR. ROMEO:  Yes, Your Honor.  The declarations you

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 169 of 240

1  were referring to are Defendant's Exhibits R, S, T, U, X, and W.

2           THE COURT:  Okay.

3  BY MR. FARRER:

4  Q.  Who is Augustine Fallay?

5  A.  He's a close friend of Tony Fu.  He works at DBI.

6  Q.  What's DBI?

7  A.  Department of Building Inspections.

8  Q.  Okay.  Did he have any sort of responsibilities for

9  authority with regard to the Chenery Street project — project?

10  A.  As far as I know he was one of the person who had signed off

11  on some of the permits.

12  Q.  And you gave him a check for $50,000 on May 8th of 2000?

13  A.  Yes.

14  Q.  Okay.  And did you owe him any money at that time?

15  A.  No.

16  Q.  And did he ask for a loan?

17  A.  He asked for a loan through Tony.  It was Tony who asked me

18  to loan him the money.

19  Q.  Okay.  And so you made a loan to him for 50,000?

20  A.  Like I said, half the loan belongs to Tony.

21  Q.  You were the sole source of funds for that loan?

22  A.  Yes.

23           MR. ROMEO:  Asked and answered, Your Honor.

24  BY MR. FARRER:

25  Q.  And you asked him to sign a promissory note?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 170 of
240

1    A.  Yes.

2    Q.  And Exhibit 91's a copy of that promissory note, right?

3    A.  Yes.  And that promissory note states that the payment

4    should be made back to me and Tony.

5    Q.  Okay.  Did Tony Fu provide any portion of the $50,000 that

6    you provided to Mr. Fallay?

7            MR. ROMEO:  Your Honor, it's been asked and answered.

8            THE COURT:  I'm sorry?

9            MR. ROMEO:  That's been — excuse me.  Your Honor, I'm

10   objecting because it's been asked and answered.  We went over

11   this already, the source of funds of the Fallay loan in detail.

12           MR. FARRER:  I —

13           THE COURT:  It was in a certain account, I remember

14   that.

15           MR. ROMEO:  It was in —

16           MR. FARRER:  I had asked him if Tony Fu provided any

17   portion of the funds that Mr. Yan lent to Mr. Fallay.

18           MR. ROMEO:  And that's been asked and answered

19   already.

20           THE COURT:  Well, let me get the answer again just so

21   I make sure I understand.

22           THE WITNESS:  Yes.  Half —

23           THE COURT:  It was —

24           THE WITNESS:  Half of it belongs to Tony.

25   BY MR. FARRER:

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 171 of 240

1  Q.  I didn't ask you who it belongs to.  I said did Mr. Fu

2  provide any of the funds given to Mr. Fallay?

3  A.  Well, money's fungible.  I mean I owe — I owe Tony $25,000 —

4  Q.  Did Tony Fu put money —

5  A.  — and he allowed —

6  Q.  — into the account that you wrote the check on that you gave

7  to Mr. Fallay, —

8  A.  No.

9  Q.  — yes or no?

10  A.  No.

11  Q.  Why is it that you testified that Mr. Fu had a 50-percent

12  interest in the Fallay promissory note if you're the sole source

13  of funds for that note?

14      MR. ROMEO:  Your Honor, it's been asked and answered.

15  We've gone over this.

16      MR. FARRER:  I have not asked that question.

17      THE COURT:  I'm sorry.  Would you ask it again?

18      MR. FARRER:  Yes.

19  BY MR. FARRER:

20  Q.  Why is it that you're testifying that Tony Fu has a

21  50-percent interest in the Fallay promissory note if you are and

22  were the sole source of funds for that note?

23  A.  Can I ask you to refer to Exhibit 90 so I can explain it?

24  Q.  Sure.

25  A.  I'm sure you know the answer, but let me explain it.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 172 of 240

1          THE COURT:  Okay.  Hold on.  Let me get to 90, too,

2    please.

3    BY MR. FARRER:

4    Q.  Is it 90 or 92, Mr. Yan?

5    A.  90.

6          THE COURT:  No.  90.  90 also.

7          Okay, I have it now.

8          THE WITNESS:  90 is a copy of the check that I signed,

9    that I gave to Augustine for the loan for $50,000.  And this

10   copy, and also the handwriting, was given to Tony to indicate

11   that I acknowledge that 25 percent of this loan to Augustine

12   belongs to Tony.  In other words, when Augustine pay us back

13   supposedly half the money should go back to Tony.  And that's

14   why in the promissory note, which is Exhibit 91, if you look at

15   Exhibit 91 the signed promissory note by Augustine, on top at

16   third line it says paid — promise to pay the order of Demas Yan

17   and Tony Fu.

18          So even though the — even though the initial $50,000

19   came from my account, but actually I acknowledge that 25 percent

20   — $25,000 of that, when as we pay, should go back to Tony.

21   BY MR. FARRER:

22   Q.  Well, wait a second —

23   A.  And let me finish.  Exhibit 90, the handwriting says $25,000

24   to apply to downpayment on 547 Twenty-Third Avenue.  Now this

25   property was owned jointly by Tony and Crystal, his wife.  And

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 173 of
240

1 then Tony assigned this without consideration to his wife for

2 the simple purpose of trying to hide his assets from his

3 creditors —

4 Q. Mr. Yan, stick with the facts. Why does Mr. Yan have — you

5 — Fu have a 20- — a 50-percent interest in the Fallay note?

6 That's all I've asked you.

7 A. Let —

8 　　　　MR. ROMEO: Your Honor, —

9 　　　　THE WITNESS: I'm trying to explain.

10 　　　　MR. ROMEO: — this is has been asked and answered

11 multiple times today.

12 　　　　MR. FARRER: It hasn't.

13 　　　　MR. ROMEO: His name's on the note.

14 　　　　THE COURT: Okay.

15 　　　　MR. FARRER: That —

16 　　　　MR. ROMEO: Why is — why is — why — why is the wife

17 important —

18 　　　　THE COURT: I guess the question is why — why would —

19 why would you recognize that the $50,000 that — in your account,

20 the proceeds of that should belong half to Tony?

21 　　　　THE WITNESS: Because when I bought the property, 547

22 Twenty-Third Avenue, I bought this from Tony even though the

23 property was under Crystal's name, his wife's name. But in

24 actuality it was Tony who was selling it to me. The legal name

25 was in his wife's name.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 174 of 240

1          THE COURT:  So this was part of a downpayment?

2          THE WITNESS:  It was a downpayment that I still owed

3   on the installments.  At the time I still owe I think quite a

4   lot, a large — a large amount of money still on the downpayment,

5   I still haven't made yet.

6   BY MR. FARRER:

7   Q.  Okay.  So your story —

8          MR. ROMEO:  Excuse me.  Excuse me.  I just want to

9   point out for the record, we keep calling this his account, but

10  I see two names on the check.

11         THE COURT:  Yeah, I saw that, too.

12         MR. ROMEO:  And I don't often get to object to the

13  Court's question, but when you call it "your account," I have to

14  object —

15         THE COURT:  Now that is — Lei Ming Li is Mr. Fu's

16  wife, right?

17         THE WITNESS:  At this —

18         MR. FARRER:  Ex-wife.

19         THE WITNESS:  At this time —

20         THE COURT:  Ex-wife.

21         THE WITNESS:  — time — at this time it was his

22  ex-wife.

23         THE COURT:  Okay.  But you — it's your name and her

24  name on a check?

25         THE WITNESS:  Yes, because — now even though Lei Ming

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 175 of
240

1   Li is Tony's ex-wife, but in the — in truth they were still

2   living as husband and wife, and I know that and, you know,...

3           THE COURT:  The only question is this — let me get 90

4   again.  Hold on a second, please.

5           THE WITNESS:  I mean I'll be happy if — if Lei Ming Li

6   comes up and says that he — she —

7           THE COURT:  Why are you — these are printed checks,

8   and they have your two names on it.

9           THE WITNESS:  Yes.

10          THE COURT:  How did that happen?

11          THE WITNESS:  Oh, that's because Tony was also the

12  general contractor for this project at 547 Twenty-Third Avenue.

13  When I bought this from them, it came with a permit as already

14  preapproved for construction.  So my agreement with Tony was

15  that he was to work for me as the general contractor on this

16  project as well and — because —

17          THE COURT:  You set up an account?

18          THE WITNESS:  Yes.  And because I'm always away from —

19  from the city, I set up an account.  This is a subaccount under

20  my — my Citibank account, so I would transfer funds from my main

21  Citibank account into this account so that Lei Ming Li can write

22  checks for this project.

23          THE COURT:  So, in other words, you were basically the

24  owner of this account —

25          THE WITNESS:  Oh, yes, all the money belongs to me.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 176 of
240

1      THE COURT:  — and you authorized Lei Ming Li to write

2  checks on it?

3      THE WITNESS:  That's correct.

4      THE COURT:  For payment of — payment of supplies and —

5  having to do with the construction of the property?

6      THE WITNESS:  At this project, yes.

7  BY MR. FARRER:

8  Q.  And just to be — you just testified all the money in that

9  account was yours?

10  A.  Yes.

11  Q.  And what your testimony is, if I understand it, is that even

12  though you wrote a check for $50,000 to Mr. Fallay and you were

13  the sole source of those funds, half of that check represented

14  $25,000 you owed to Crystal Li in connection with your purchase

15  of 547, right?

16  A.  That's correct.

17  Q.  547 Twenty-Third?

18  A.  That's correct.

19  Q.  So in terms of the — your interested in the Fallay note, you

20  never owned more than 50 percent of that note; is that right?

21  A.  That's correct.

22  Q.  Okay.  So you only owned 25,000 of the $50,000 lent; that's

23  your testimony, isn't it?

24  A.  Yes.

25  Q.  Did you ever tell Mr. Fallay not to pay Crystal Li anything

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 177 of
240

1   on that note?

2   A.  I told Augustine after I signed this assignment, and after I

3   found out that I was tricked in to signing this, I called

4   Augustine, I told him, "Don't pay Crystal or Tony if they come

5   to you, because the assignment is fraudulent, was based on

6   fraud."

7   Q.  But you just testified Crystal Li owned half the note.

8   She's entitled to 25,000 bucks.  Why are you telling Fallay not

9   to pay her anything?

10  A.  Well, I mean it's up to Fallay.  But the thing is that I — I

11  owned half of the amount and I was tricked in to signing my

12  share of the loan to Crystal.

13  Q.  I'm not talking about your share.  I'm talking:  Why did you

14  tell Fallay not to pay Crystal Li anything, including the

15  $25,000 you say that she and Tony owned in that note?

16  A.  Well, because I don't want him to pay her anything.

17  Q.  So now did you —

18  A.  I mean, you know,...

19  Q.  Did you —

20  A.  Why should I ask him to pay Crystal?

21  Q.  Well, Crystal's making demand on him for payment and you're

22  telling him not to pay her anything, right?

23  A.  Sure.  I mean but whether he follows my instruction or not,

24  I have no control over that.

25  Q.  But you just have testified you only owned half of that

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:34    Page 178 of
240

1  note.

2  A.  That's true.

3  Q.  And you're telling Fallay not to pay any of it even though

4  you don't own the other half, right?

5  A.  Well, sure.

6  Q.  Did you ever make demand on Mr. Fallay to pay you the full

7  $50,000 on that Exhibit 91?

8  A.  No.

9  Q.  Never?

10  A.  No.

11  Q.  So when you signed Exhibit 92, as far as — your prior

12  testimony is as far as you're concerned you were assigning to

13  Crystal Li only your half or $25,000 principal of the Fallay

14  note, right?

15  A.  Correct.

16  Q.  Okay.  So as a result of that assignment Crystal Li now

17  owned a hundred percent of the Fallay note?  That's your

18  testimony, right, because half of it was hers from the start,

19  right?

20  A.  But soon after I signed that document —

21  Q.  Yes or no, at the time of the assignment she now owned a

22  hundred percent of that note because she already owned 25 per- —

23  50 percent and you were giving her your 50 percent, right?

24  A.  No.  The reason why, because I was told by Tony, the reason

25  why he asked me to sign this assignment but — was because at the

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 179 of
240

1  time I was — we were having difficulty in getting Augustine to

2  pay us back on the loan.  And Tony told me that by assign this —

3  assigning this to Crystal, it would be easier for her to get the

4  money from Augustine, but it was never a actual assignment in

5  terms of handing the money over to Crystal.  That's not the

6  reason why it was signed.  Okay.

7  Q.  I've asked the Court — I've marked as Exhibit 116 a copy of

8  a letter dated August 10th, 2005, addressed to Augustine Fallay

9  demanding full payment of the $50,000 note.  Did you send that

10 letter?

11 A.  Yes, I did.

12 Q.  And did you just testify you didn't demand payment of that

13 note?

14 A.  (No audible response.)

15 Q.  You just lied on the stand, didn't you, Mr. Yan?

16 A.  No, I did not.

17 Q.  Really?

18 A.  Yes, because if you — if you read the second paragraph it

19 says that I said that Crystal Li has a claim, that I made that

20 assignment to her.  But I deny the validity of that assignment

21 based on fraud and — of consideration.  Now I expect that

22 Crystal will come forward and claim her share of it and, you

23 know, if — if she does — she does step forward and claim — claim

24 her share of it, you know, and if a court of law will agree on

25 that, —

1       (Telephone rings.)

2              THE WITNESS:  — basically I'm still saying that

3   Crystal has — still has a claim, but unless she steps forward,

4   I'm saying that Augustine should pay me and then I'll indemnify

5   him should — should in fact it was at such debt I still owe

6   Crystal money on those note.

7   BY MR. FARRER:

8   Q.  Really?

9   A.  Yes.

10  Q.  Really.  Now you're demanding payment of the $50,000 note,

11  right?  You don't tell them you're only demanding half of the

12  note, you only want your 25,000 plus interest, do you?

13  A.  And also I set that out indemnify him, if it still turns out

14  that I don't deserve the full amount.

15  Q.  So you want him to pay you the full 50,- plus interest?

16  A.  Yes.

17  Q.  And did you get a response from Mr. Fallay?

18  A.  Yes, um-hum.

19  Q.  Okay.  Is Exhibit 117 a true and correct copy of the

20  response to your demand letter, which is marked Exhibit 116?

21  A.  Yes.

22  Q.  Have you had any further communications with Mr. Knox

23  regarding your demand for payment of the Fallay $50,000

24  promissory note since September 6th of 2005?

25  A.  We did have communications out of this, but I don't think it

1   was on the amount.

2   Q.  What were those communications?

3   A.  It's about me becoming a witness for the arraignment.

4   Q.  Oh, of Mr. Fallay?

5   A.  Yes.

6   Q.  Because they think your $50,000 payment's a bribe, don't

7   they?

8   A.  That's what Tony charges, yes.

9   Q.  Tony charges?

10  A.  Yes.

11  Q.  Oh, not the district attorney?  Mr. Fallay's been arrested,

12  hasn't he?

13          THE COURT:  Been arrested?

14          MR. FARRER:  Yeah.

15  BY MR. FARRER:

16  Q.  Hasn't he, Mr. Yan?

17  A.  Well, I — I only know from reading the news.

18  Q.  Well, you're quoted in the news, aren't you, on this whole

19  issue?

20  A.  I was quoted not on the arrest.  I don't know — I don't know

21  anything firsthand about the arrest —

22  Q.  You — you spoke to the *Chronicle* about it, didn't you?  You

23  appeared on the front page of the —

24          THE COURT:  What is this — is this relevant to the

25  current matter?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 182 of 240

1          MR. FARRER:  Well, it's only that — as to the

2   ownership of the Fallay note, yeah; and whether or not I'm

3   getting $60,000 credit.  I mean the man has testified all over

4   the map about who has an interest in this note and what

5   percentage it is.  And it seems to change every day.  And then

6   he just testified that he never made demand for payment, and of

7   course he did.

8          THE COURT:  But Mr. Fallay's being arrested doesn't

9   have anything to do with this.

10         MR. FARRER:  No.

11         THE COURT:  Because he acknowledges the debt and —

12         MR. FARRER:  Right.

13         THE COURT:  According to this letter, anyway.

14         MR. FARRER:  Yeah.  Of course that was after the

15   arrest.

16         I'd move the admission of Exhibits 116 and 117.

17         MR. ROMEO:  No objection.

18         THE COURT:  They are admitted.

19      (Plaintiff's Exhibits 116 and 117 received in evidence.)

20         MR. FARRER:  I'd also like to move the admission of

21   Exhibit 115.

22         MR. ROMEO:  I'm trying to think — which one was 115?

23         MR. FARRER:  That's the copy.

24         THE COURT:  This is another one of those calculations.

25         MR. FARRER:  Right.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 183 of
240

1    THE COURT:  Which I would accept only as being

2    calculations of numbers, not that the numbers represent — not

3    that the underlying facts about the value of the assignment are

4    correct.

5         MR. FARRER:  Okay.

6         THE COURT:  Okay.  If — you understand that?

7         MR. ROMEO:  Yes, I do, Your Honor.  Thank you.

8         MR. FARRER:  But if the Court were to find —

9         THE COURT:  If I were to find it was worth the —

10        MR. FARRER:  Fifty thousand.

11        THE COURT:  — that the whole —

12        MR. FARRER:  That he owned the whole thing.

13        THE COURT:  — that the assignment of the whole note —

14   or that the assignment in fact conveyed to...

15        MR. FARRER:  Crystal Li.

16        THE COURT:  — Crystal Li something which she didn't —

17   the full value of the note, none of which she previously had

18   before.

19        MR. FARRER:  Right.

20        THE COURT:  Then — then the face value of that note

21   would be that amount.

22   BY MR. FARRER:

23   Q.  Let's go back to Exhibit 57.

24        THE COURT:  Just out of curiosity, the sale never

25   closed?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 184 of
240

1          MR. FARRER:  Ultimately it did.

2          THE COURT:  It ultimately did close?

3          MR. FARRER:  The bankruptcy court order —

4          MR. ROMEO:  In 2005.

5          THE COURT:  Was the deed of trust reconveyed?

6          MR. FARRER:  No.

7          MR. ROMEO:  Yes.

8          THE COURT:  The Lei Ming Li deed of trust —

9          MR. FARRER:  Oh, it — no.  What would happen is we got

10  an order — they got an order selling free and clear with the

11  lien to attach to the proceeds.  So all the condos have been

12  sold.

13         THE COURT:  Yeah.

14         MR. FARRER:  All the proceeds, there's over $2

15  million —

16         THE COURT:  So this — this Lei Ming Li deed of trust

17  was never reconveyed —

18         MR. FARRER:  Oh, no, that has been paid —

19         THE COURT:  Or —

20         MR. ROMEO:  It was reconveyed —

21         THE COURT:  — that was reconveyed pursuant to those

22  instructions?

23         MR. FARRER:  Yes.

24         MR. ROMEO:  Yes.

25         MR. FARRER:  She was paid the 17,285.  She's out of

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:54    Page 185 of
240

1    the picture.

2            THE COURT:  Okay.  And she released completely?

3            MR. FARRER:  Yeah.

4            MR. ROMEO:  Yes.

5            MR. FARRER:  She got —

6            THE COURT:  Without reservation of rights?

7            MR. FARRER:  No.

8            THE COURT:  Okay.  Oke-doke.

9    BY MR. FARRER:

10   Q.  Mr. Yan, do you have Exhibit 57 in front of you?

11   A.  Yes.

12   Q.  Okay.  This is a document that you filed in connection with

13   your bankruptcy filing?

14   A.  Yes.

15   Q.  And you understood that you were signing under penalty of

16   perjury?

17   A.  Yes.

18   Q.  Okay.

19           THE COURT:  57?

20           MR. FARRER:  57, yeah.  It's a Statement of Financial

21   Affairs and Schedules of Assets and Liabilities.

22   BY MR. FARRER:

23   Q.  And your electronic signature appears, I think, it's on page

24   11 of Exhibit 57.  They're not numbered, but it's right before

25   the addresses of the creditors start.

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:34    Page 186 of
240

1   A.   Okay.

2   Q.   Now if you could turn towards the, I guess, the end — well,

3   halfway through.  If you get back to the schedules of your

4   Statement of Financial Affairs.  Schedule A starts with real

5   property.

6   A.   I don't know which page you're talking about.

7   Q.   I'll show you.

8            THE COURT:  What schedule are you on?

9            MR. FARRER:  A.

10            THE COURT:  Schedule A?

11            MR. FARRER:  Yes, sir.

12            THE WITNESS:  Okay.

13   BY MR. FARRER:

14   Q.   You reviewed the Statement of Financial Affairs before you

15   signed under penalty of perjury?

16   A.   Yes, I believe so.

17   Q.   And you were the source of the information that's contained

18   in the Statement of Financials Affairs and Schedules?

19   A.   Yes.

20   Q.   And you made an effort to make sure that it was true,

21   correct, and complete?

22   A.   I guess so, yes.

23   Q.   Yeah, okay.  If you turn to Schedule B, Personnel Property?

24   A.   Yes.

25   Q.   Okay.  This is where you're supposed to list, identify

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 187 of
240

1   personal property that you own as of the date you filed

2   bankruptcy on December 19th of 2004, okay?

3   A.  Yes.

4   Q.  And you've listed some checking accounts and then some

5   personal household items, a car, a watch, things like that.  You

6   see that?

7   A.  Yes.

8   Q.  Okay.  Now I don't see that you listed the Fallay promissory

9   note; why is that?

10  A.  No, because at the time I actually thought about it.  But

11  even though I dispute the assignment, there is an assignment and

12  I'm sure that they will claim that is a valid assignment.  And I

13  didn't think of it to bring this up with my lawyer.  So I just

14  didn't put it in.

15  Q.  So you — but you told Mr. Fallay not to pay Ms. — Ms.

16  Crystal Li any portion of that note before you filed bankruptcy,

17  right?

18  A.  Yes.

19  Q.  So you were taking a position the moneys owed in that note

20  were owed to you, weren't you?

21  A.  My — I'm taking the position that the assignment is

22  fraudulent.

23  Q.  Yeah, but —

24  A.  That's my — my position.

25  Q.  — even under your own version of events, you are owed

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 188 of
240

1   $25,000 under that note, right?

2   A.  That's correct.

3   Q.  Okay.  And you didn't list it on your schedules, did you?

4   A.  Because, as I said, it crossed my mind, but because there is

5   a disputed assignment, I just thought that it's not appropriate

6   for me to list it.  And I should have brought this up for my

7   attorney's comment, but I didn't.

8   Q.  And do you remember giving a 2004 examination in this case?

9   A.  I guess —

10  Q.  Which is a debtor's exam?

11  A.  Yes, I believe so.

12  Q.  And that 2004 examination was taken on February 1st of 2005?

13  A.  Yes.

14  Q.  And do you recall me bringing to your and your lawyer's

15  attention that you had not listed the Fallay note on your

16  schedules?

17  A.  Yes.

18  Q.  And you didn't do anything about that, did you?

19  A.  I recall I told you at that deposition, I told you that even

20  though I dispute the assignment of the — the assignment — the

21  assignment, that because there's an assignment, I wasn't sure I

22  should put it down or not.

23         MR. FARRER:  All right.  I'm going to turn to — I'd

24  like to read in a portion of his 2004 examination, page 91.

25         MR. ROMEO:  Give me a second.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 189 of 240

1          MR. FARRER:  And we brought the whole copies here

2   instead of the — it's in the —

3          MR. ROMEO:  The abbreviated version.

4          MR. FARRER:  Very abbreviated version.

5          THE COURT:  I'm on page 91.

6          MR. FARRER:  Okay.

7          MR. ROMEO:  Go ahead.

8          MR. FARRER:  "QUESTION: " — got it?

9          MR. ROMEO:  Go ahead.

10         MR. FARRER:  — "Why was a loan that was funded

11  exclusively to be repaid part of it to Tony Fu or his wife?

12         "ANSWER:  I believe that was part of the amount here

13  was supposed to be payment on the property at 547 Twenty-Third

14  Avenue.

15         "Well, which is it?  I mean you wanted it to be

16  partial payment when you bought that property from Mr. Fu's

17  ex-wife, but then you went to the obligor and told him it was in

18  dispute and not to pay it.  And then when you filed bankruptcy

19  you don't list it as an asset.  Why not?

20         "ANSWER:  Because, like I said, I mean I don't have a

21  claim to it anymore because there was an assignment on it.  But

22  I don't know whether that's still funded or not.

23         "QUESTION:  There's an assignment on it, yes, but then

24  you tell Mr. Fallay not to pay it.  Why?  If it's not yours, why

25  are you telling the guy who owes the money not to pay the person

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 190 of
240

1   who assigned — who you assigned it — the person you assigned it

2   to?

3           "ANSWER:  Because I didn't think the assignment was

4   funded."

5           THE WITNESS:  No, no.  I'm — I think there's probably

6   a missed trans- — missed transcription there.  I — I think —

7   BY MR. FARRER:

8   Q.  Did you get a copy of this transcript?  Did you get a letter

9   from the court reporter?

10  A.  Well, I'm — I'm sure I said I'm not sure whether this

11  assignment is valid, not funded.  It doesn't make sense to say

12  "funded."

13  Q.  You didn't make any changes to this transcript, did you?

14  A.  I don't recall — I think I got a copy, but I didn't make any

15  changes to it, that's true.  Maybe I didn't look at that —

16          THE COURT:  Well, Mr. Farrer's next answer [sic] says,

17  "This means in dispute about that assignment."

18          MR. FARRER:  That's right.  "Because I don't think

19  that assignment was funded.

20          "QUESTION:  Which means it was still your" —

21          THE WITNESS:  I think this is not "funded," it's

22  "valid."

23  BY MR. FARRER:

24  Q.  Don't interrupt.  I'm not asking —

25  A.  Okay.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 191 of 240

1  Q.  I'm reading your transcript.  I'm not asking you questions.

2  A.  Okay.

3        MR. FARRER:  "QUESTION:  Which means it was still your

4  money owed to you?

5        "ANSWER:  That means in dispute about the assignment.

6        "MR. FARRER:  I assume you don't know about this.

7        "MR. ROMEO:  I haven't seen it before."

8  BY MR. FARRER:

9  Q.  You haven't filed any amendments to your schedules in the

10  last six months, have you, listing the Fallay note?

11  A.  No.

12  Q.  As an asset?

13  A.  No.

14  Q.  You had Winky Wong come and testify at the trial, I think it

15  was on July 27th; do you recall that?

16  A.  Yes.

17  Q.  Did you pay him to testify?

18  A.  No.

19  Q.  Did you agree not to charge him a rent on the unit he was

20  renting at 540 Second — 547 Twenty-Third Avenue if he would

21  testify?

22  A.  That's completely BS.

23  Q.  Okay.  And so is there some reason that the rent you were

24  collecting from him doesn't appear on your operating statements

25  for the last few months?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 192 of
240

1  A.  Yes.  Because he is doing some remodeling of the project at

2  547 Twenty-Third Avenue from his expenses.  So I'm just giving

3  him credit for the work that he's doing on the project — on the

4  property.

5  Q.  So you had no discussion with him whatsoever about giving

6  him some sort of financial incentive to come here and testify;

7  is that your testimony?

8  A.  I'm — you know, I'm really amazed that you are trying to

9  include this to me.  And the answer is definitely not.

10  Q.  So if Mr. Humphrey — if Mr. Winky Wong said that he'd be

11  lying?

12  A.  Yes.

13        MR. FARRER:  Your Honor, could we just take a quick

14  break and let me collect my thoughts?  I might be finished.

15        THE COURT:  We can.  Okay.  Okay, and then you have

16  some, Mr. Chu, but in any event we want to have a short break

17  anyway.

18        MR. CHU:  Yes.

19        THE COURT:  Very well.  Let's take, when, five after

20  or ten after?

21        MR. FARRER:  Let's go ten.

22        MR. ROMEO:  Ten.

23        THE COURT:  Ten it is.

24        MR. ROMEO:  3:10?

25        THE CLERK:  All rise.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 193 of 240

1          (Recess taken from 2:58 p.m. to 3:13 p.m.)

2              THE COURT:  Please be seated.  Okay.

3    BY MR. FARRER:

4    Q.  Mr. Yan, you own a certain improved real property located at

5    547 Twenty-Third Avenue?

6    A.  Yes.

7    Q.  And that property includes two rental units?

8    A.  It has two units.

9    Q.  And one of which you're renting to Winky Wong for about

10   $1200 a month?

11   A.  Yes.

12   Q.  And did you transfer the — your entire interest in that

13   property to your parents in 2003?

14   A.  Yes.

15   Q.  And was it worth about a million — $1.5 million at the time

16   of that transfer?

17   A.  Yes.

18   Q.  And —

19              THE COURT:  Okay.  Hold on a second.

20              MR. FARRER:  Sorry.

21              THE COURT:  In 2003?

22              MR. FARRER:  Yes, sir.

23              THE COURT:  Okay.

24   BY MR. FARRER:

25   Q.  And it was worth 1.5 million at that time?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 194 of
240

1   A.  Yes.

2   Q.  Did you receive any money or other consideration from your

3   parents in exchange for that transfer?

4   A.  Not specifically — specifically for the transfer, but I do

5   owe them a lot of money, the — both of them.

6   Q.  Is Exhibit 42 a true and correct copy of your grant deed to

7   your parents on five forty-second [sic] Twenty-Third Avenue?

8   A.  Yes.

9   Q.  Okay.  And that's your signature that appears there?

10  A.  Yes.

11  Q.  And so on April 5th of 2004 that grant deed was recorded?

12  A.  Yes.

13  Q.  So as of that date you transferred your entire interest in

14  that property to your parents for which you received no

15  consideration?

16  A.  I transferred in name, but I've always been making payments

17  on this property.

18  Q.  Payments on the mortgages?

19  A.  Yes.

20  Q.  Okay.  Those would be two mortgages to Washington Mutual?

21  A.  Yes.

22          THE COURT:  Hold on a second.  The 40- — Exhibit 42?

23          MR. FARRER:  Yes, sir.

24          THE COURT:  So this transfer was in 2004?  I thought I

25  first heard —

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 195 of 240

1          MR. FARRER:  Oh, I said '03, didn't I?  I meant '04.

2          THE COURT:  But it's April 5th, '04?  Is that correct?

3          MR. FARRER:  That's what the document says, yes, sir.

4    So I have a typo.

5    BY MR. FARRER:

6    Q.  So as far as the public record is concerned, your parents

7    are the only record owners of that property?

8    A.  Yes.

9    Q.  And you have no record interest in that property?

10   A.  Yes.

11   Q.  And did you owe them any money at the time of that transfer?

12   A.  Yes.

13   Q.  How much did you owe them?

14   A.  I think I owe them at this time, let's see, April 2004.  I'm

15   not quite sure how much I owe them.  I think — the thing is that

16   they have a equity line against their — their home, which I use

17   when — if I'm short on cash.  So you can say that when — if use

18   — draw money from the equity line, I owe them money.

19   Q.  Okay.  Now if you turn to Exhibit 57, Schedule F?

20   A.  Yes.

21   Q.  Schedule F will be towards the end.

22   A.  Okay.

23   Q.  Entitled, "Creditors Holding Unsecured, Nonpriority Claims,"

24   do you see that?

25   A.  Yes.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 196 of
240

1    Q.  Do you see the creditor listed down there is last name Yan,

2    Chiuk, C-h-i-u-k, middle name Tin?

3    A.  Yes.

4    Q.  That's your father, isn't it?

5    A.  Yes.

6    Q.  And so as of the day you filed bankruptcy, December 19th of

7    2004, you owed him $38,000 on account of personal loans, right?

8    A.  Yes.

9    Q.  Did you owe him any more money?

10   A.  Not at this time, I don't think so.

11   Q.  And is that the money that you owed him when you transferred

12   547 Twenty-Third Avenue to him and your mother?

13   A.  I don't think so.  I think this amount I owed them was

14   because a large part of this amount was used to pay off the

15   judgment I had in the, what, in late 2004.

16   Q.  Okay.  On Exhibit 57 — bless you —

17          THE COURT:  Sorry.

18   BY MR. FARRER:

19   Q.  — page 5, which would be Question 10, entitled, "Other

20   Transfers."

21   A.  Page 5?

22   Q.  Yeah.  If you start at the beginning.  They're not numbered,

23   unfortunately.  But if you just count five pages back, the first

24   question at the top is Number 8, "Losses."  Do you see that?

25   A.  Okay.

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:34    Page 197 of 240

1  Q.  And down under Question 10, "Other Transfers."  Do you see

2  that?

3  A.  Okay.

4  Q.  And there is listed the transferee is your father and your

5  mother, —

6  A.  Yes.

7  Q.  — right?

8        And the date is April 5th of '04, right?

9  A.  Yes.

10  Q.  And it's referring to the transfer of 547 Twenty-Third

11  Avenue?

12  A.  Yes.

13  Q.  And it says, "Title only.  Change deed without

14  consideration"?

15  A.  Yes.

16  Q.  Right.  Now what does that mean?

17  A.  I just transfer it because it's a intrafamily transfer.

18  Q.  Why?

19  A.  Because at the time I believe that I was trying to sell the

20  property.  I think the house, if it's not under my name, if I

21  sell it as a broker instead of a homeowner.  And also I think in

22  terms of tax, I think it may be more tax advantageous for them

23  to hold it so that they can claim deductions on it versus

24  myself.

25  Q.  Well, but you really own it, right?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 198 of 240

1  A.  Yes, that's true.

2  Q.  Okay.  So you're committing some kind of tax fraud?

3  A.  I'm just — I'm assuming that if it's under the name, perhaps

4  there may be some tax advantage.  But I don't know what in

5  actuality what tax advantage that might be.

6  Q.  Well, do you think if they were to record the sale in their

7  own name they'd have to pay less taxes on the sale than you

8  might have to?

9  A.  No.  The thing is that at the time I was putting this on the

10  market for sale and my thinking is that if it doesn't sell, then

11  perhaps my parents can move in and live in as homeowners.  In

12  that case perhaps they can deduct some expenses from it.

13  Q.  Well, they already have a place to live that they own,

14  right?

15  A.  Yes, that's true.

16  Q.  I mean you live there with them, right?

17  A.  That's true.

18  Q.  Okay.  And what that — they own and live at 1433 Seventh

19  Avenue, right?

20  A.  Yes.

21  Q.  That's where you've lived with them for, what, like 20

22  years?

23  A.  Well, I've — I've always had a room there when I'm back

24  here, but I've been away for school and work.  But, as a matter

25  of fact, that house is a small house, an old house.  Of course

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 199 of
240

1  this new house will be much better and much bigger.

2  Q.  Well, did they tell you they wanted to move to a bigger

3  house?

4  A.  My — well, actually that's my intention is, you know, if —

5  if I come back with my wife, which I did, that we move to a

6  bigger place.

7  Q.  But you receive no consideration for that — that transfer to

8  them of the title of that property, right?

9  A.  That's correct.

10 Q.  And have you made any effort whatsoever to rescind that

11 transfer or have them grant-deed it back to you so the true

12 ownership of that property is reflected in the public record?

13 A.  No.  I don't think that's necessary.

14 Q.  Did you transfer it because you were trying to hide property

15 that you own in other people — in your parents' name?

16 A.  No.

17 Q.  Back to Exhibit 29.  You don't know who prepared those

18 escrow instructions, do you?

19 A.  29?

20 Q.  Yeah.

21 A.  I'm sure that's Tony is the one who instigated it.

22 Q.  Well, you're speculating, aren't you?  Tony didn't tell you

23 that, did he?

24 A.  No.  But I'm sure that that — he's the one who did it.

25 Q.  Well, what's the source of your — the information for that

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 200 of 240

1   belief?

2   A.  Because both — their trust is owned by Tony, so he's the one

3   who dictates the terms of the escrow instructions.

4   Q.  Well, he didn't prepare the first one, did he?

5   A.  And he didn't accept the first one as far as I know.

6   Q.  Well, you see it was signed by Stella, don't you?

7   A.  It was never given to me.

8   Q.  But it was signed by Stella, wasn't it?

9        Exhibit 25 is —

10  A.  I can't say for sure when she signed it.  She may have

11  signed it, back-dated it.  I don't know.

12  Q.  Tony Fu never told you he prepared Exhibit 29, did he?

13  A.  No.

14  Q.  And no one else ever told you that they learned Tony Fu

15  prepared Exhibit 29, did they?

16  A.  No.  But it's Tony who asked me to go there and sign it.

17  Q.  Now in response to your — Mr. Romeo's questions this

18  morning, you were testifying that you have some experience and

19  background in international transactions.  Do you recall that?

20  A.  Yes.

21  Q.  Exactly how many international transactions have you been

22  personally involved in?

23  A.  I would say too much — too much for me to count.

24  Q.  Too many for you to count.

25  A.  Yes.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 201 of 240

1   Q.  And — and is this — are we dealing with Hong Kong?

2   A.  When I was based in Asia I was based on in Hong Kong from

3   '93 to '96, and I was based in Singapore for '96 to '98.

4   Q.  And what were you doing?

5   A.  I was the Asia Pacific manager for a company — a U.S.

6   company based on here.

7   Q.  And what did you —

8   A.  We were suppliers.  We were manufacturers.

9   Q.  What did you manufacture?

10  A.  Of networking products, networking, telecommunications

11  products.

12  Q.  What was the first word?

13  A.  Telecommunications.

14  Q.  No, before that.  Never-king (phonetic)?

15  A.  Networking, yes.  Networking products.

16  Q.  Oh, networking.  I'm sorry.  I'm sorry.

17  A.  Yes.  Yes.

18  Q.  Networking products, okay.  And did you negotiate the sales

19  of those networking, telecommunication products with purchasers?

20  A.  Well, my territory is all of Asia Pacific, which includes

21  North Asia.  North Asia consists of Japan, Korea; and — and I'm

22  also in charge of the South Pacific, including Australia and New

23  Zealand; as well as Southeast Asia, including Thailand,

24  Singapore, —

25  Q.  Yeah.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 202 of
240

1   A.   — Indonesia —

2   Q.   I didn't ask you what your territory was.

3   A.   — and India.

4            THE COURT:  Can I stop a second?

5            How much redirect are you going to have?

6            MR. ROMEO:  Not very much, Your Honor.

7            THE COURT:  Okay.  And you don't have much?

8            MR. CHU:  Fifteen minutes.

9            THE COURT:  Okay.  I just want to make sure we finish.

10           MR. FARRER:  I think we will.

11           THE COURT:  Okay.

12           MR. ROMEO:  I think we're —

13           MR. FARRER:  I am almost there.

14           MR. ROMEO:  I think we're on track.

15           THE COURT:  Okay.

16           MR. FARRER:  Yeah.

17           THE COURT:  Okay.

18           THE WITNESS:  I'm answering your question.

19  BY MR. FARRER:

20  Q.   No.  My question was did you personally — were you

21  personally involved in the negotiation of the sale of the

22  networking telecommunications equipment to end-users?  Yes or

23  no.

24  A.   Sometimes I do, sometimes I don't.  The reason why is

25  because I sell through direct channels and also through — well,

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 203 of
240

1  I mean I sell direct and also through channels.

2  Q.  Okay.

3  A.  Direct meaning to end-users, and channels through

4  distributors.

5  Q.  Okay.  So you participated in sales?

6  A.  Yes.

7  Q.  And in those sales did you make sales to the United States?

8  A.  No.

9  Q.  Okay.  So how would you have any experience on what the

10  exchange rate between Hong Kong dollars in the United States

11  was, if you didn't ever have any sales to the U.S.?

12  A.  Well, because all my — well, all my expenses in Hong Kong, I

13  needed to convert back into U.S. dollars.

14  Q.  So that's your experience?  Your experience in the

15  conversion rate is used because your Hong Kong expenses were

16  paid to you in U.S. dollars?

17  A.  That's true, because my sales is always denominated in U.S.

18  dollars.  But, you know, everyone in Hong Kong knows what's the

19  exchange rate between U.S. dollars and Hong Kong dollars.

20  Q.  And that rate is 7.8 U.S. dollars — Hong Kong dollars for

21  every U.S. dollar?

22  A.  In 1984 the Hong Kong dollar was pegged to the U.S. dollars

23  and is always pegged around 7.8.

24  Q.  Seven point eight?

25  A.  Around.  It's always like 7.79 or 7.78.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 204 of
240

1   Q.  So other than payment of your personal expenses, you weren't

2   actually involved in any transactions involving use of the Hong

3   Kong dollar U.S. conversion rate for the sale of the networking

4   and telecommunications equipment, right?

5   A.  I don't recall whether I actually had sales in Hong Kong

6   dollars where I converted it back into U.S. dollars.  That may

7   have happened, I'm not sure.  But —

8   Q.  Now —

9   A.  Yeah.

10  Q.  — if one were to use a 8 Hong Kong dollar figure instead of

11  a 7.8 Hong Kong dollar figure for conversion, would you get paid

12  more or less?

13  A.  I think you need to rephrase your question again.

14  Q.  Well, the conversion rate was 8 instead of 7.8.

15  A.  Um-hum.

16  Q.  Would you be owed more U.S. dollars or less?

17  A.  When you convert back to U.S. dollars it's always more

18  advantageous for the — let's see.  I'll put it this way.  Well,

19  normally I convert U.S. dollars into Hong Kong dollars, and in

20  that case it's always advantageous to have higher exchange

21  rates, meaning 8.0 is much better than 7.8.  But I think the

22  reverse is true.  If you convert back from Hong Kong dollars to

23  U.S. dollars, then you would want to have a lower exchange rate,

24  because then you get more U.S. dollars.

25  Q.  So if the loan that has been alleged took place and a

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 205 of
240

1   conversion rate of 8 was used and 7.8 — a conversion rate of 8

2   Hong Kong dollars was used instead of 7.8 Hong Kong dollars, you

3   actually are being asked to pay less than was lent, right?

4   A.   That's correct.

5   Q.   With regard to that letter that you said Tony Fu wrote to

6   the contractor state license board, do you remember that

7   testimony this morning?

8   A.   Yes.  And that's 95.

9   Q.   95?  Thanks.

10          THE COURT:  95.

11  BY MR. FARRER:

12  Q.   Did you ever speak to a Ricardo Lopez?

13  A.   No.

14  Q.   Do you recall that I tried to subpoena the records from the

15  contractor state license board in the state court litigation?

16  A.   I think you may have, yes.

17  Q.   And do you recall that you filed a motion to quash that

18  subpoena?

19  A.   I may have, yes.

20  Q.   And do you know why — why would you want to do that if this

21  letter was forged?  Why were you afraid of what I might find out

22  from the contractor's state license board about you?

23  A.   Well, first of all, this letter I don't think came from — I

24  think — I think Tony Fu always had this in his possession, so I

25  wasn't trying to suppress this document.  I just — I think I

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 206 of
240

1   filed, what do you say, —

2   Q. Motion to quash.

3   A. — motion to quash, because basically I was just upset at

4   your tactics in trying to subpoena from all different sources.

5         THE CLERK: 8.

6         MR. FARRER: Huh?

7         THE CLERK: 8.

8   BY MR. FARRER:

9   Q. Would you turn to Exhibit 8, please?

10   A. Okay.

11   Q. Is Exhibit 8 a true and correct copy of a listing that you

12   prepared for the Chenery Street property in 2003?

13   A. I think this is one of many different versions. And I'm —

14   yes, it's something I prepared, but this is not the one and only

15   version.

16   Q. Okay. And is there any way to tell from this document when

17   the approximate date that you —

18   A. It's probably —

19   Q. — listed it —

20   A. It's probably in the beginning because the price is much

21   higher than what we were actually, you know, — what the actual

22   market can bear.

23   Q. Beginning of 2004?

24   A. I — let's see, I think the property was finished in middle

25   of 2003. I think soon after I put up the property on the

Case: 05-03236    Doc# 31    Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 207 of
240

1   market.  So this may be in 2003.

2   Q.  Okay.  And you prepared this document?

3   A.  Yes.

4   Q.  And did you put this on the MLS like this, in this —

5   A.  No.  This is a flyer to give out to buyers.

6   Q.  Okay.  And how did you distribute that flyer?

7   A.  Just at open houses.

8   Q.  Okay.  So this was available for anybody that came to the

9   premises?

10  A.  Yes.

11  Q.  Did you distribute it in any other fashion?

12  A.  No.

13          MR. FARRER:  May I approach the witness, Your Honor?

14          THE COURT:  Yes.

15  BY MR. FARRER:

16  Q.  Now, Mr. Yan, —

17          THE COURT:  Is this the new number?

18  BY MR. FARRER:

19  Q.  — I'd ask — I've marked as Exhibit 101 and pass to you

20  another advertisement for the Chenery Street property.  Do you

21  see that?

22  A.  Yes.

23  Q.  Did you prepare this?

24  A.  This is from my website, from my company website.

25  Q.  Did you prepare this?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 208 of
240

1   A.   Yes.

2   Q.   Okay.  And you set forth some listing prices for the — for

3   the units there down at the bottom?

4   A.   Yes.

5   Q.   And Chenery, 663 Chenery Street you have at $595,000?

6   A.   Yes.

7   Q.   665 Chenery Street you have at 525,000?

8   A.   Yes.

9   Q.   And 70 Wilder Street you have at 695,000?

10  A.   Yes.

11  Q.   And you didn't list 661 Chenery Street's value because you

12  were already in contract to sell that for 418,000, right?

13  A.   Correct.

14  Q.   Now ultimately you sold all four units for about $2.4

15  million, right?

16  A.   Yes.

17  Q.   So if Exhibit D is given force and effect, Tony Fu would be

18  entitled to 25 percent of that or roughly $600,000?

19  A.   Yes.

20  Q.   All right.  If my math is right on that.

21  A.   Yes.

22          MR. CHU:  A minor correction.  There's been an

23  assignment to Mr. Suen, so Mr. Suen gets the money, not Mr. Fu.

24          MR. FARRER:  Well, under Exhibit D I said.

25          MR. CHU:  Oh, I see.

1          MR. FARRER:  I'd move the admission of 101.

2          MR. ROMEO:  That's fine, Your Honor.

3          THE COURT:  101 is admitted.

4      (Plaintiff's Exhibit 101 received in evidence.)

5          MR. FARRER:  No further questions, Your Honor.

6          THE COURT:  Okay.  Mr. Chu, do you have some

7  questions?

8          MR. CHU:  Yes.  Thank you, Your Honor.

9                  CROSS-EXAMINATION

10 BY MR. CHU:

11 Q.  Mr. Yan, earlier you testified about Exhibit FF.  This is a

12 cancellation agreement that —

13 A.  Yes.

14 Q.  You executed this in Thailand?

15 A.  Yes.  I don't have the copy in front of me anymore.

16 Q.  Let me show you mine.

17 A.  Okay.  Okay.

18 Q.  Did you draft that agreement?

19 A.  I — yes, I believe so.

20 Q.  You drafted in Thailand.  Had it signed and notarized?

21 A.  Yes.

22 Q.  And then you — I presume you must have FedExed it or DHLed

23 it back to Mr. Fu —

24 A.  That's correct.  Yes.

25 Q.  I'd like to direct your attention to Defendant's Exhibit B,

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 210 of 240

1  "b" like in "boy."

2  A.  Yes.  Okay.

3  Q.  This is also another cancellation agreement?

4  A.  Yes.

5  Q.  On the same agreement, is it not —

6          THE COURT:  Hold on a second.  Oh, this has the — who

7  first were a recording document, FF did, right?

8          MR. CHU:  FF, yes.  That's the one with the recorder's

9  stamp on it.

10         THE COURT:  So that was — hold on just a second,

11 please.  Let me just — I just want to see what document.  Is

12 that document referred to in here?  Do you have it?

13         MR. CHU:  FF, Your Honor?

14         THE COURT:  2000 G75, so that's A, right?  The

15 document that's referred to in FF is A?

16         MR. CHU:  Should be.  Yes.

17         Yes, Your Honor, the —

18         THE COURT:  Okay.

19         MR. CHU:  FF —

20 BY MR. CHU:

21 Q.  Mr. Yan, FF is a cancellation of the Winky Wong agreement,

22 is it not?

23 A.  That's correct.

24 Q.  Okay.  Exhibit B, like in "boy," that is also a cancellation

25 of the Winky Wong agreement?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 211 of
240

1    A.   Yes.

2    Q.   They're both cancellations?

3    A.   Yes.

4    Q.   You drafted B also, did you not?

5    A.   Yes.

6    Q.   And the only reason you needed to draft FF was because you

7    needed to have something recorded as well?

8    A.   Yes.  That's because the original agreement, Exhibit A, was

9    recorded.  And then when B was signed, it I was not recorded.

10   And then Tony was concerned that his creditors would find out

11   about Exhibit A.  So he asked me when I was in Thailand — I was

12   in Hong Kong.  He didn't know I was in Thailand, but when he

13   reach me I was in Thailand.  He told me that it's important to

14   record the cancellation.  That's why I had it notarized in

15   Thailand and then faxed it to him.

16   Q.   No.  That's all I had on —

17   A.   Okay.

18   Q.   — on B.

19         Now I'd like to redirect your attention to the first

20   day of trial.  Mr. Yan, do you recall Alina Laguna coming in to

21   testify?

22   A.   Yes.

23   Q.   And she was the broker for Mr. Santiesteban?

24   A.   Yes.

25   Q.   Do you recall that Ms. Laguna testified that you

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:34    Page 212 of
240

1  misrepresented the ownership of the property on the MLS?

2  A.  I don't recall that's what she said, but I think she made

3  the — I'm not sure whether she said it on the stand or in her

4  deposition.  Something to that effect, yes.

5  Q.  I think her testimony was to the effect that when a broker

6  is also the seller, that needs to be disclosed on the MLS, and

7  that that didn't occur in your case.

8  A.  I don't know whether that's a true fact or not.  I don't

9  know whether the regulation is in that regard.

10  Q.  Do you recall that she — so you're testifying that you don't

11  recall what you put on the MLS as far as the listing of the 663

12  Chenery property?

13  A.  I know that I didn't put myself down as the owner, but I'm

14  saying that I don't know whether it's a requirement for me to

15  put it down as owner.

16  Q.  Okay.  Well, do you — do you recall Ms. Laguna testifying

17  that she was talking to you and that she asked you to relay an

18  offer to the owner?  Do you recall that?

19  A.  Yes.  I — I don't know whether her recollection is the same

20  as mine's.  I recall that she had offered to me by phone and she

21  faxed it over to me.  And I told her that I would get back her.

22  I don't —

23  Q.  Do you —

24  A.  — I don't recall that I mentioned to him that I need, you

25  know, talk to the owner, or something else at that.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 213 of
240

1  Q.  Do you recall telling her — do you recall her testimony that
2  you told her the owner was out of town?
3  A.  I believe I read that in her deposition.  I'm not sure
4  whether she testified to that on the stand last time.  But
5  that's not my recollection, because the reason why I had to get
6  back to her and not give her an answer immediately was because I
7  need to talk to Tony, to get his permission.  And that's what I
8  did.
9  Q.  So if she testified that the owner — that you told her the
10  owner was out of town, then she would be lying, I suppose,
11  correct?  You wouldn't have lied to her, would you?
12  A.  I'm just saying that —
13          MR. ROMEO:  Well, I got to object.  He's asked two
14  questions right in a row.  Which one does he want answered.
15          THE COURT:  Pick a question.
16  BY MR. CHU:
17  Q.  If Ms. Laguna testified that you told her the owner was out
18  of town, she would be lying?  Yes or no.
19  A.  I don't know.  I don't know whether I said it or not, but
20  I'm sure that I didn't tell her that I'm not the owner.  I'm
21  sure of that.
22          MR. CHU:  Your Honor, move to strike.  Ask — I ask
23  that the witness answer the question.  I think that was a yes or
24  no question.
25          THE COURT:  I think you can answer it yes or no.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 214 of
240

1  BY MS. CHU:

2  Q.  Would Ms. Laguna have been lying on the stand under oath

3  here if she testified that you told her the owner was out of

4  town?

5  A.  I don't know.

6          THE COURT:  Well, there's a problem with that

7  question, that she may have been mistaken, not lying —

8          MR. CHU:  All right.

9          THE COURT:  — intentionally.

10          THE WITNESS:  Or she may be correct, but I just don't

11  recall, so I cannot say yes or no.

12  BY MR. CHU:

13  Q.  Mr. Yan, could I direct your attention to Plaintiff's — is

14  it plaintiff — your exhibit, your Exhibit H.  Can't get the

15  parties straight.  Everyone's something else.

16  A.  Okay.  Okay.

17  Q.  This is your photocopy of the parcel map that you signed for

18  Mr. Seher?

19  A.  Yes.

20  Q.  I think earlier you testified that you signed this parcel

21  map with no lenders on it and that Mr. Seher must have added the

22  signature box for Lei Ming Li and Stella Chen later on, before

23  the final map was recorded?

24  A.  I believe so.

25  Q.  You only signed this map once, correct?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 215 of
240

1   A.  Yes.

2            MR. CHU:  Let me borrow yours.

3        (Counsel confer off record regarding the parcel map.)

4            THE COURT:  Is this the same one I have here?

5            MR. CHU:  It's —

6            MR. FARRER:  It should have a stamp "74."

7            MR. CHU:  I think the "74" is the...

8            THE COURT:  This is Exhibit H.

9            MR. ROMEO:  Your Honor, may I look at the exhibits on

10  the exhibit statement.  We have an original on the counsel table

11  that...

12       (Counsel confer off record.)

13           THE COURT:  I think you gave me this one.  This is

14  Exhibit H.

15           MR. CHU:  H is the parcel map that Mr. Yan signed

16  without any lender signature blocks on it.

17           THE COURT:  There are no lender signature box.  That's

18  correct.

19           MR. CHU:  Does the Court have an original 74?

20           THE COURT:  I don't think so.  Maybe I do now.

21           MR. CHU:  This —

22           THE COURT:  Okay.

23  BY MR. CHU:

24  Q.  Mr. Yan,...Mr. Yan, that's the original parcel map that was

25  ultimately signed by everyone and recorded?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 216 of
240

1  A.  Yes.

2            THE COURT:  Okay.

3  BY MR. CHU:

4  Q.  Mr. Yan, I think your testimony earlier was that the first

5  time you learned of the Chen and Li deeds of trust was when you

6  received the September 2003 Fidelity National Prelim?

7  A.  The first time I knew that they were recorded, that's

8  correct.

9  Q.  Recorded.  So if it turns out that you signed a parcel map

10 with the signature blocks for Lei Ming Li and Stella Chen on it

11 already, that would contradict your testimony that you've given

12 that September would have been the first time that you learned

13 of the recordation of those deeds of trust, correct?

14           MR. ROMEO:  Objection, Your Honor.  I think that's an

15 argumentative question and mischaracterizes his testimony.

16           THE COURT:  Overruled.

17           THE WITNESS:  Well, I think you — you got it confused.

18 The first condo map that didn't have any lenders in it, Your

19 Honor, was prepared in June 2003.  And I signed that, and that's

20 the Exhibit H which didn't have any signature blocks on it.  And

21 — and in September I found out that the Lei Ming Li note and

22 Stella Chen note were recorded.  And then I had ongoing

23 discussions, argument with Tony about them.

24           And then I think the record show that my

25 communications with Seher, Seher the surveyor, happened I think

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 217 of
240

1   around December.  And that's because I just didn't have any

2   success in the negotiations with Tony to take those two — two

3   deeds out.

4           So in December I — well, I think the record will show

5   that Seher contacted me and said that they found out there were

6   two extra lenders on that and I — we drew the map again.  And I

7   need to sign the new service agreement.  This is in December

8   2004 — excuse me — December 2003.  So I signed that agreement.

9           And I think what happened was that because the condo

10  map was on special paper, on what's called Mylar paper, which is

11  kind of like a transparent plastic sheet, I think they just

12  instead of having me — or instead of preparing — preparing it

13  brand new, a Mylar sheet and having me notarize again, I think

14  they just totally — the sheet that didn't have any lender

15  signature on it, and just added the Lei Ming Li note on it —

16          THE COURT:  So this isn't the sheet you signed?  You

17  signed a clear plastic sheet?

18          THE WITNESS:  I — yeah, I signed a clear plastic

19  sheet.  Yes.  It's called Mylar.

20          THE COURT:  So this — this signature over here, this

21  is — this is a certified copy perhaps of some sort or some kind

22  of copy, but it is not the original that you signed?

23          THE WITNESS:  Well, exhibit — Exhibit H is the one

24  that was signed in June without any signature block.  And I'm

25  sure I signed that in June —

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 218 of
240

1          THE COURT:  Okay.  Hold on a second.  Hold on.  Let me

2   look at these.  Exhibit H.

3          THE WITNESS:  So Exhibit H is signed on June 9th

4   before a notary and it was signed without any signature block on

5   it.  I think the person to ask is Seher, but I think the

6   sequence of events is that in December of 2003, when I enter

7   into the new service agreement with Seher, to add the new

8   signature blocks to it.  I think he just used the old Mylar that

9   I signed in June.

10         MR. ROMEO:  Your Honor, I can clear this up.  If

11  you'll look at Exhibit N, for example, this says —

12         THE COURT:  Exhibit N?

13         MR. ROMEO:  From the engineer.  It says, "We're

14  preparing to send a Mylar to recordation.  Signature sheets have

15  been faxed to your attention.  Please find a pdf copy of the map

16  for your review."

17         What it is is they affix the signature sheets to the

18  big plastic Mylar map, which is a very large thing, and they use

19  Mylar because it provides a superior reproduction in recording

20  and reproducing the map, which is why the final map which is

21  recorded has Mr. Yan's signature dated June 9th, 2003 and it has

22  the signatures of Lei Ming Li and Stella Chen dated 12-9-2003,

23  because those sheets are separate from the map itself.

24         THE COURT:  I understand.  It's certainly what it

25  looks like.  I would just note, Mr. — Mr. Chu, that it looks as

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 219 of
240

1    if — well, no, let me see.

2              If you look at H and 74, the left-hand columns,

3    including that June 9th signature, look identical in all the

4    little details, the way every number is placed.

5    BY MR. CHU:

6    Q.  So — so you signed a Mylar copy of the parcel map, which I

7    presume was the original parcel map.  The Mylar is the original,

8    is it not?

9    A.  Yes.

10   Q.  And the Mylar is the one that has the notary's

11   acknowledgement on it?

12   A.  Yes.

13   Q.  So it can be recorded.

14   A.  Yes.

15   Q.  So there's only one original Mylar, correct?

16   A.  No.  There should be for — Exhibit H, that's another Mylar,

17   that list the bank's signature blocks.

18   Q.  The bank or the lenders signed the same sheet that you

19   signed, did they not?

20   A.  No.  The banks refused to sign it.  That's why I need to pay

21   them off and have a new Mylar prepared without their signature.

22   Q.  Correct.  But eventually Ms. Chen and Ms. Li signed the

23   Mylar map?

24   A.  Yes.

25   Q.  And the map that they signed was the same physical Mylar

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 220 of
240

1  that you had signed previously?

2  A.  I — from — from what I gather today, that's what happened,

3  yes.

4         MR. CHU:  I have only one copy of this, so I'm going

5  to describe it and show it to counsel.  This is a copy of a

6  document that was produced by Mr. Yan.  It's numbered Yan Number

7  79, 80, and 81.

8         THE COURT:  It's not previously admitted?

9         MR. CHU:  Not previously admitted, Your Honor.  And I

10 only have one copy.

11         THE COURT:  Okay.

12         MR. CHU:  I apologize.

13         MR. ROMEO:  How do we want to identify it for the

14 record?

15         MR. FARRER:  He can mark it as —

16         MR. CHU:  I —

17         MR. ROMEO:  One o —

18         MR. FARRER:  — Plaintiff's 17- —

19         MS. [SPEAKER]:  118?

20         MR. FARRER:  — 118.

21         MR. CHU:  118.

22 BY MR. CHU:

23 Q.  I'd like to show you Number 118.

24 A.  Okay.

25 Q.  A little difficult to read, but...

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 221 of
240

1   A.   Okay.

2   Q.   Is that not a — that's a blank signature page for the parcel

3   map?

4   A.   Yes.

5   Q.   It contains a signature block for you, a signature block for

6   Ms. Li and also Ms. Chen?

7   A.   Yes.

8   Q.   But none of those signature blocks have been signed or

9   filled in, correct?

10  A.   That's correct.

11  Q.   And that — that document came from the documents in your

12  possession, did it not?

13  A.   I don't know.

14  Q.   It bears the production numbers that you used on your

15  document production.

16  A.   Okay.

17  Q.   I see.  If it's from my production, I think there should be

18  some cover on this from Seher's office, because I — I wouldn't

19  have gotten it from any other source except from Seher's office.

20  There should be others.  Maybe the cover sheet will give an

21  explanation as to what it is.

22  Q.   Okay.  And apparently Mr. — well, Mr. Seher was the one who

23  produced the originals of all these documents, correct, for all

24  the parcel maps?

25  A.   Yes.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 222 of
240

1  Q.  You didn't produce them yourself?

2  A.  No.

3  Q.  So if you — if you had that document in your possession you

4  would have gotten it from Mr. Seher, right?

5  A.  Yes.

6  Q.  Now how is it that Mr. Seher would have been able to produce

7  a signature page with Ms. Li's signature block and Ms. Chen's

8  signature block on it without your original signature, if you

9  signed it before their blocks were added?

10  A.  I don't know.  I don't know whether this is — you know, if

11  you look at it and compare this with H, it's also different in

12  that Seher doesn't have the signature either.

13  Q.  That's — that's correct.  No one's signed that one yet.

14  A.  Yes.

15  Q.  So at one time there was a Mylar with their signature blocks

16  on it that no one had signed it?

17          MR. ROMEO:  Objection, Your Honor.  I think that calls

18  for speculation.  This could well be a pdf —

19          THE COURT:  What is the relevance of this?

20          MR. ROMEO:  The relevance, Your Honor, maybe it's

21  minor, but we — we would argue that Mr. Yan produced Exhibit H

22  and altered it by removing the references to the Lei Ming Li and

23  Stella Chen signature blocks because this document would show

24  that as of June of 2004 he already knew that the Chen and Li

25  signature blocks — Li and Chen deed of trust had been recorded,

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 223 of
240

1  which contradicts his prior deposition and trial testimony that

2  the first time he learned about the recordation was September

3  when he received the prelim.

4          MR. ROMEO:  Your Honor, I have to object to that line

5  of questioning because Mr. Seher already testified on the first

6  day of trial as to the sequence of these maps and that the map

7  marked as Exhibit H was in fact prepared in June and that the

8  later signatures, as is clear from the copious evidence in the

9  emails and letters amongst — per Li's office and the title

10  company and everything else is that the signature blocks of Chen

11  and Lei Ming Li were added later.  It's pretty obvious from his

12  testimony, the preparer, that that's what happened —

13          THE COURT:  I don't — I will sustain the objection.  I

14  don't think this is of sufficient relevance to be of benefit.

15          MR. CHU:  Very well, Your Honor.  I'll move on.

16  BY MR. CHU:

17  Q.  Let me focus your attention on the November 2002 Starbucks

18  meeting with Mr. Fu.

19  A.  Yes.

20  Q.  I think you testified very briefly earlier this morning that

21  the reason you signed the deed of trust was because Mr. Fu had

22  asked you to do it because he was trying to borrow money from

23  someone?

24  A.  That's what he told me.

25  Q.  So you testified previously, maybe at deposition, maybe at

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 224 of 240

1  trial, I'm not sure, but you testified that Mr. Fu was in dire

2  need of money and that he needed to have some evidence for

3  collateral purposes?

4  A.  That's the story that he told me.

5  Q.  So he told you that if you could give him a deed of trust so

6  he could show someone that you owe money and that he had the

7  security, he could use that as a control to — to borrow from

8  someone else, correct?

9  A.  That's what he told me.

10  Q.  The — the question then arises, why would having a note

11  payable to Stella Chen help him, because that doesn't show that

12  he's owed any money, correct?

13          MR. ROMEO:  Objection, Your Honor.  Calls for

14  speculation.  It's argumentative.

15          THE COURT:  I think the question is simply what did he

16  say.  I don't think — I don't think we can argue with — I think

17  this is argument on your part at the end of trial.

18          MR. CHU:  I can ask — I can ask it a different way,

19  Your Honor.

20          THE COURT:  I don't think this witness has any

21  personal knowledge that would — there's no reason to think he

22  has any personal knowledge of that.

23  BY MR. CHU:

24  Q.  Now Mr. Fu's statements to you wouldn't have made any sense

25  if he already had the deed of trust filled in to say "Stella

1    Chen," correct?

2              MR. ROMEO:  Your Honor, I think that's just an

3    argumentative question that calls for speculation.  Made sense

4    to him, for why?  I think he's testified what Mr. Fu's

5    statements were.  I think he can ask about those statements,

6    but —

7              THE COURT:  He —

8              MR. ROMEO:  — to ask in general does this make sense.

9              THE COURT:  Overruled.  You can have this question.

10             THE WITNESS:  Can you please repeat the question?

11   BY MR. CHU:

12   Q.  Let me think what it was.

13   A.  I think you asked me does it make sense.

14   Q.  Yeah.

15   A.  Yeah.

16   Q.  Pardon me.  What was your answer?

17   A.  I think you asked me it doesn't make sense.

18   Q.  Correct.  Would Mr. Fu's statements have made sense to you

19   if the deed of trust said "Stella Chen" on it instead of "Tony

20   Fu"?

21   A.  Well, I think — Tony didn't tell me this, but I'm sure that

22   if he borrows money, he needs to bow it from a very close friend

23   or relative.  Otherwise, you know, I don't think people will be

24   that trustful of him.  So assuming that he borrows it from a

25   relative or something, you know, and I'm — and I don't know at

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 226 of
240

1  the time that he probably won't put his name on it.  But as long

2  as he promise that it won't be recorded, that's fine.

3        Because the reason why I know that he probably won't

4  put his name on it is because I know for a fact, and he told me

5  at the time, that he was hiding his assets from his creditors.

6  And he transferred all his properties to his wife, ex-wife.

7  Q.  Now you testified that you're positive that deed of trust

8  was blank as far as who the beneficiary was?

9  A.  I'm positive, yes.

10 Q.  Were you in — you were in trial the first day when the

11 notary public came in to testify, James Brodie, were you not?

12 A.  That's true.

13 Q.  And Mr. Brodie testified that there's no way he would have

14 recorded an incomplete document, correct?

15 A.  I'm not trying —

16        MR. ROMEO:  You know, excuse me, Your Honor.  I have

17 to interrupt.  I think that that's not exactly what Mr. Brodie

18 said.  And I don't understand why the witness is repeatedly

19 being asked to — what someone else testified to in this trial.

20 I mean I can understand his foundational questions, but the

21 sense of all of his questions are:  Didn't so-and-so say in this

22 trial x, y, and z.  And I don't think that's fair to the witness

23 without giving him the transcript and asking a question in that

24 fashion.

25        But Mr. Brodie did say this.  He said that there were

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 227 of
240

1   some portions of deeds of trust or other documents that he

2   notarized that did have blanks in them.

3             THE COURT:  What is your question?

4             MR. CHU:  Your Honor, that —

5             THE COURT:  I don't think you've finished the

6   question.

7             MR. CHU:  I just asked if he recalled Mr. Brodie's

8   testimony, that he would never notarize an incomplete document,

9   and that he had turned away many documents in the past because

10  they were incomplete.

11  BY MR. CHU:

12  Q.  Do you recall him testifying to that effect?

13  A.  I don't think he used those words.  I never — I don't think

14  he ever made a comment that he turns away documents because they

15  were not filled out.

16  Q.  You don't recall that?

17  A.  Not the last part of your question.

18  Q.  The —

19            MR. ROMEO:  Your Honor, this is exactly what I'm

20  trying to avoid.  Now they're arguing over what Mr. Brodie

21  testified to or didn't testify to.  I object to this line of

22  questioning.

23            THE COURT:  It's not really very useful.

24            MR. CHU:  I wasn't arguing, Your Honor.  I was just

25  asking if the witness recalled.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 228 of 240

1          THE COURT:  Right, but you need to move on.

2    BY MR. CHU:

3    Q.  If Mr. Brodie did testify that the document was fully

4    completed when he notarized it, are you testifying that he was

5    mistaken right now?

6    A.  Yes.

7    Q.  You're not a notary public, are you?

8    A.  No.

9    Q.  And you're not aware of Government Code Section 8205?

10   A.  No.  But I do recall that when we were in front of this guy,

11   I didn't know his name at the time, —

12          MR. ROMEO:  Excuse me, Your Honor.  I'm going to have

13   to object and move to strike the answer as nonresponsive.

14          THE COURT:  Well, —

15          MR. ROMEO:  He — he answered it.

16          THE COURT:  — the question is whether you're familiar

17   with Government Code Section 8205, which I am not familiar with

18   by general memory.

19          MR. CHU:  I —

20          MR. ROMEO:  And I just think it calls for a yes or no

21   answer.

22          THE COURT:  Are you familiar with that code section?

23          THE WITNESS:  No, I'm not.

24   BY MR. CHU:

25   Q.  For your information, 8205 provides that a notary public may

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:54    Page 229 of
240

1  not notarize a document that is incomplete.  So if Mr. Brodie

2  had notarized an incomplete document, he would have been

3  breaking the law or —

4  A.  Well, that's — this is the first time I heard of this.

5  Q.  Now if it turns out that the document — no, I'll withdraw.

6          When you came into the trial was it your original

7  intention to testify that Mr. Fu gave you back the original of

8  the October 18th, 2000 agreement when you signed the deed of

9  trust for him?

10 A.  I don't know whether it was a original, but I do recall that

11 I think at Starbucks, after I signed the deed of trust and give

12 it to him, he gave me a copy of the contract between Tony and

13 myself.

14 Q.  Why would he give you a copy?

15          THE COURT:  What contract?

16          MR. CHU:  Oh, I'm sorry, Your Honor.  The —

17          MR. ROMEO:  Exhibit D.

18          MR. CHU:  We're talking about the partnership

19 agreement, Exhibit D.

20          THE COURT:  D.

21          THE WITNESS:  Yes.

22          MR. CHU:  D, as in "dog."

23          THE COURT:  Yeah, I remember it.

24 BY MR. CHU:

25 Q.  Okay.  Now originally you were going to come in and testify

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 230 of
240

1  that Mr. Fu gave you the original of that contract in exchange

2  for you executing the note and deed of trust, correct?

3  A.  Well, at the time he told me I think that it was the only

4  copy that he had.  So I assumed that was the — his original, and

5  he gave it to me.  I was surprised at the time when he give it

6  to me, but I just took it anyway when he give it to me.

7  Q.  Let's see.  If I can read from your trial brief I think the

8  offer of proof at the beginning of the trial was at the time Mr.

9  Fu surrendered the original of the October 18th, 2000 agreement,

10 which had been recorded and returned to him by the county

11 recorder to you at the meeting in which the note was signed.

12 Now you were in court when Mr. Fu produced the original that, I

13 guess, two weeks ago, or what.

14 A.  Well, I recall he gave me a one-page copy of it.  And, to be

15 honest with you, I don't recall that we notarize or recorded

16 this agreement between us.

17 Q.  Well, your —

18          THE COURT:  Was this agreement ever recorded?

19          MR. CHU:  No.  No, Your Honor, it was not.  The —

20          THE COURT:  D, D was not.

21          MR. CHU:  D was never recorded.  Exhibit 97 is the

22 actual original which — which has a notary acknowledgement

23 attached to it.  It could have been recorded, but it never was.

24          THE COURT:  97 is a grant deed — no, that's 99.  Do I

25 have 97?  I don't have 97.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 231 of 240

1    MR. ROMEO:  Your Honor, I think there was only one
2 because it was the original document.  And I think this was — I
3 think at the time Mr. Suen was going to — Mr. Chu was going to
4 retain custody of that?  I don't know what —

5    MR. CHU:  No.  Where the —

6    MR. FARRER:  Look in the exhibit book, John.  Witness
7 book.

8    MR. ROMEO:  Maybe it's up in the —

9    THE COURT:  It may be up there.  I do not have it
10 here.

11    MR. FARRER:  I don't have it either.

12    MR. CHU:  It is probably up here.  The — all the
13 originals were left with the Clerk, Your Honor.

14    THE COURT:  Okay.

15    THE WITNESS:  I don't see 97 here.

16    (Pause in the proceedings.)

17    THE COURT:  Do you have it?  Unless I have it out of
18 order somehow.

19    MR. CHU:  Oh, 97 is the grant deed, Your Honor,
20 according to this list.

21    THE COURT:  Well, there's a 99 here that's a grant
22 deed.  I don't know which is which, but I don't have a 97 in
23 front of me.

24    MR. CHU:  One of the exhibits is the original.  We'll
25 find it.  We'll find it before the close of trial, Your Honor.

Case: 05-03236    Doc# 31    Filed: 11/18/05    Entered: 11/18/05 01:04:34    Page 232 of
240

1  BY MR. CHU:

2  Q.  When you saw that the original had been entered into

3  evidence or introduced in court, you had to change your

4  testimony at that point, correct?

5  A.  No, I don't think so.

6  Q.  Did you not have a discussion with your lawyer in which you

7  discussed having to change your testimony?

8            MR. ROMEO:  Objection, Your Honor.  That calls for

9  privilege.  I mean, you know, you can't ask about discussions

10  with —

11            THE COURT:  The question is whether you changed your

12  testimony at the trial.

13            THE WITNESS:  I don't think I did.

14            MR. CHU:  As far as the discussion with counsel, Your

15  Honor, I believe it was loud enough to be heard from the other

16  side of the room, so —

17            THE COURT:  I don't remember.

18            MR. ROMEO:  I don't remember either.  I'm sorry.

19            MR. CHU:  All right.  I have nothing further, Your

20  Honor.

21            THE COURT:  Okay.  I have a question or two I want to

22  ask before we stop here a second.

23            Would you point again to the declarations in the state

24  court action?  That was R.  I guess I want to see — I want to

25  know what was stated by Mr. Yan in the state court action.  Are

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:54   Page 233 of
240

1    those in here?

2              MR. CHU:  No.

3              MR. ROMEO:  No.  There's no declarations of Mr. Yan.

4    But the only declaration in the state court that I used were R,

5    S, T, —

6              THE COURT:  Okay.

7              MR. ROMEO:  — U.

8              THE COURT:  Okay.  Let me —

9              MR. ROMEO:  V, W.

10             THE COURT:  I need just a moment to look at the trial

11   brief then.

12             Before I forget, by the way, I have your condensed

13   deposition.

14             MR. FARRER:  Oh, let me grab that.

15             MR. ROMEO:  Can I have my Exhibit H back, too?

16             MR. FARRER:  Exhibit?

17             MR. ROMEO:  I think he has my copy of Exhibit H.

18             THE COURT:  Yes.

19             You want your two parcel maps back?

20             MR. ROMEO:  I just want my Exhibit H —

21             THE COURT:  That's Exhibit H.

22             MR. ROMEO:  — 74.

23             THE COURT:  That is Exhibit H.

24             MR. ROMEO:  This is the only one that's been in my —

25             THE COURT:  I'm sorry.

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 234 of
240

1        MR. ROMEO:  — 74 I believe is the Court's copy.

2        MR. FARRER:  You might have two 74s, because you told

3 us earlier when we went through the ones you had you had

4 mentioned 74.  And then you took 74 out of the witness binder.

5        THE COURT:  Well, we have one here that's — that is

6 certainly sufficient.

7     (Counsel confer off record.)

8               <u>EXAMINATION BY JUDGE CARLSON</u>

9 BY THE COURT:

10 Q.  Okay.  I just have one question, one line of questions here.

11 It may break into more questions or not.

12        It's my understanding from your trial brief and from

13 what I've heard at the trial that Mr. Fu said that he wanted the

14 note to represent the value of his interest in the partnership

15 that's described in Exhibit D?

16 A.  Yes.

17 Q.  And that the amount of the note was essentially an estimate

18 of the value of his partnership interest?

19 A.  In our original agreement with Winky back in 1999 our

20 estimate price range of the finished project would be 1.5 to 1.8

21 million.  So taking the higher number of 1.8 under the contract

22 with Tony, supposedly it is a valid contract, then his share

23 would be 25 percent of 1.8, which is —

24 Q.  Right.  I understand.  I understand the math.

25        When you — if you were going — so my understanding is

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 235 of 240

1   that your position is that you do not owe both under the note

2   and under Exhibit D.  One replaces the other?

3   A.  That's correct.

4   Q.  Why wasn't there some notation at some point in a writing

5   which contains the obligation for the $450,000 that it replaces

6   exhibit — the rights under Exhibit B?

7   A.  When I signed the deed of trust to Tony, in my mind it

8   wasn't to replace his interest because all along he was still

9   thinking, you know, if I sell the properties and if the price

10  are good, that he will still get his claim of 25 percent.  And I

11  think that's what he did, because up until late 2003, when I was

12  still selling the property, he never made a demand that the deed

13  of trust would replace his interest.  And he only made that

14  demand when it turns out that the properties didn't sell.  This

15  was in late 2003.  And he just wanted to cash out with the deed

16  of trust.  And at that time I refused because I told him, "I'll

17  be happy to give your share" —

18  Q.  Well, I guess what I'm getting at is your position is that

19  whatever he was paid on the 450,000 — on this note —

20  A.  Yes.

21  Q.  — was at least a credit against what you would owe him under

22  the partnership agreement?

23  A.  That's correct.

24  Q.  Why was there no documentation that — of the nature of this

25  obligation, that it was — you know, in other words, that this

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 236 of
240

1  was payment in — in respect of — would satisfy —

2  A.  Well, first of all, —

3  Q.  — any payments in here would be a credit toward satisfying

4  Exhibit D?

5  A.  Yes.  Yes.  I understand your question but, first of all,

6  the relationship between Tony and myself has always been very

7  informal.  And, secondly, this deed of trust, when he asked me

8  to sign it, he didn't say outright that it replaces his

9  interest.  He just told me that he needed to borrow money and

10  that this is a way for him to show people that he has interest.

11      So when I signed this deed of trust in my mind he

12  still has, you know, a right to claim under his 25-percent share

13  under the contract.  And he promised me that he won't record it

14  — record it, so I assumed that, you know, this is something that

15  he won't bring up, that he would just claim his 25-percent

16  share.

17      But as the facts turn out, the property — the property

18  didn't sell well.  So I think he was just eager to get his money

19  back.  So he just demanded at the time for me to pay the 450,-

20  and — instead of claiming his 25 percent share of any sales

21  proceeds.

22      THE COURT:  All right.  Any further questions?  I know

23  you do, Mr. Romeo.  You had some redirect you said.

24      MR. ROMEO:  Nothing further, Your Honor.

25      THE COURT:  What?

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 237 of
240

 1          MR. ROMEO:  Nothing further, Your Honor.

 2          THE COURT:  Okay.  Do you have any further questions?

 3          MR. CHU:  No, Your Honor.

 4          We did locate the original of Exhibit D, though.  It

 5     turned out it was in one of our files, so.

 6          THE COURT:  Okay.

 7          MR. CHU:  We —

 8          THE COURT:  May I see it to see if it's any different?

 9     I'm not sure.  You've said it was notarized or something, and

10     the copy I have is not.

11          MR. CHU:  This document bears the plaintiff's original

12     exhibit stamp 97.  I'm not quite sure about the numbering

13     because the numbering is sort of —

14          MR. FARRER:  No, it's the right number.

15          MR. CHU:  It's the correct number?

16          MR. FARRER:  Yeah.

17          MR. ROMEO:  Are you sure?

18          MR. CHU:  (Hands the exhibit to the Clerk.)

19        (Counsel confer off record.)

20          THE COURT:  Okay.  Let me look at one more thing.  I

21     may have one more question.  That's all.

22          Now there was — somewhere in here there was a letter

23     from Mr. Yan's — one of your counsel.

24          MR. FARRER:  Yes.

25          THE COURT:  From Becker — Beckerman or —

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 238 of
240

1          MR. ROMEO:  Beckley.

2          MS. [SPEAKER]:  Beckman.

3          THE COURT:  Beckman.  What number was that?

4          MR. ROMEO:  Q.

5          THE COURT:  Q.

6          MR. ROMEO:  Exhibit Q.

7          THE COURT:  Okay.  No further questions?

8          MR. ROMEO:  No, Your Honor.

9          THE COURT:  Okay.  Thank you, Mr. Yan.  You may step

10    down.

11        (Witness excused.)

12        (Portion of the proceedings ordered ends at 4:22 p.m.)

13                          —o0o—

14

15

16

17

18

19

20

21

22

23

24

25

Case: 05-03236   Doc# 31   Filed: 11/18/05   Entered: 11/18/05 01:04:34   Page 239 of
240

```
State of California          )
                             )    SS.
County of San Joaquin        )
```

        I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

        I further certify that I am not a party to nor in any way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate No. 00124. Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

Susan Palmer
Palmer Reporting Services

Dated November 7, 2005