1      UNITED STATES BANKRUPTCY COURT

2      NORTHERN DISTRICT OF CALIFORNIA

3       (SAN FRANCISCO DIVISION)

4

5 In re:

6 DEMAS WAI YAN aka DENNIS YAN,   Case No. 04-33526

7             Chapter 11

8             San Francisco,California
              July 26, 2005

9             9:09 a.m.

      Debtor.

10 _____/

11 STELLA CHEN,

12     Plaintiff,

13   v.         A.P. No. 05-03236

14 DEMAS WAI YAN aka DENNIS YAN,

15     Defendant.

  _____/

16

17         **VOLUME I**

18     TRANSCRIPT OF TRIAL PROCEEDINGS

19

20    BEFORE THE HONORABLE THOMAS CARLSON
     UNITED STATES BANKRUPTCY JUDGE

21

22

  APPEARANCES:

23

  For the Debtor:    LAW OFFICES OF MARK J. ROMEO

24          BY: MARK J. ROMEO, ESQ.
          130 Sutter Street, 7th Floor

25         San Francisco, California 94104

1  APPEARANCES (CONTINUED):

2

3  For Stella Chen:          LAW OFFICES OF WILLIAM WEBB FARRER
                             BY: WILLIAM WEBB FARRER, ESQ.
4                            300 Montgomery Street, Suite 600
                             San Francisco, California 94104
5

6

7  For Wei Suen:             CORPORATE COUNSEL LAW GROUP
                             BY: JOHN CHU, ESQ.
8                            505 Sansome Street, Suite 475
                             San Francisco, California 94111
9

10

11  Cantonese Interpreter:   NORA YUEDA

12

13

14  Court Recorder:          JANE GALVANI
                             UNITED STATES BANKRUPTCY COURT
15                           235 Pine Street
                             San Francisco, California 94104
16

17

18  Transcription Service:   Jo McCall
                             Electronic Court
19                           Recording/Transcribing
                             2868 East Clifton Court
20                           Gilbert, Arizona 85297
                             Telephone: (480) 361-3790
21

22

23

24

25

I N D E X

| Plaintiff's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Fu, Fei Sing | | | | |
| By Mr. Farrer | 8 | | 60 | |
| By Mr. Romeo | | 21 | | |
| Seher, Frederick Thomas | | | | |
| By Mr. Farrer | 62 | | | |
| By Mr. Romeo | | 74 | | |
| Brodie, James Scot | | | | |
| By Mr. Farrer | 79 | | 88 | |
| By Mr. Romeo | | 84 | | |
| Chen, Stella | | | | |
| By Mr. Farrer | 96 | | 136 | |
| By Mr. Romeo | | 115 | | 139 |
| Kan, Harold | | | | |
| By Mr. Farrer | 142 | | | |
| Choy, William | | | | |
| By Mr. Farrer | 146 | | | |
| Leguna, Alina G. | | | | |
| By Mr. Farrer | 153 | | 166 | |
| By Mr. Romeo | | 162 | | |

| Plaintiff's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Fu, Tony | | | | |
|    By Mr. Farrer | 170 | | | |
|    By Mr. Chu | | 197 | | |
|    By Mr. Romeo | | 205 | | |

E X H I B I T S

| Plaintiff's Exhibits; | Ident. | Evid. |
|---|---|---|
| 1 through 66 (By stipulation) | | 6 |
| 74   Enlarged Subdivision Map | 78 | 78 |
| 76   MLS Listing | 168 | 168 |

| Defense Exhibits: | | |
|---|---|---|
| A through Q (By stipulation) | | 6 |

| Defense Impeachment Rebuttal Exhibits: | | |
|---|---|---|
| R through EE | 7 | |
| R and S - Declarations of Fei Sing Fu | | 62 |
| W and X - Two Declarations of Stella Chen | | 169 |

P R O C E E D I N G S

July 26, 2005                                  9:09 a.m.

---oOo---

THE CLERK: All rise.

THE COURT: Please be seated.  Good morning.

ALL COUNSEL: Good morning, Your Honor.

THE COURT: Could I have your appearances, please.

MR. FARRER: Good morning, Your Honor, William Farrer on behalf of plaintiff, Stella Chen.

MR. ROMEO: Good morning, Your Honor, Mark Romeo appearing for Demas Yan.  Demas Yan is also present.

MR. CHU: Good morning, Your Honor, John Chu for Wei Suen, the plaintiff in the consolidated complaint.

THE COURT: Mr. Chu, you're not –- you're more or less observing this phase, right

MR. CHU: Yes, Your Honor.

THE COURT: Okay.  I thought I understood what the issues were.  I didn't think we were getting into that yet.

MR. CHU: Well, we may get into some of it indirectly from the way I understand the evidence is going to come out.

THE COURT: Yes.  I understand.  Okay.  I've read your briefs, and I've read your pre-trial statement a week or so ago.  They're both very helpful.  If you want to make a brief pre-trial statement, you may.  I don't personally

1  believe I need it, but I'll leave it up to you.

2          MR. FARRER: The only administrative matter that

3  plaintiff would like to bring up is Mr. Romeo and I have

4  stipulated to the admission of all of plaintiff's exhibits.

5          THE COURT: Okay.

6          MR. FARRER: Exhibit Nos. 1 through 66.

7          MR. ROMEO: That's correct.

8          MR. FARRER: And all of defendant's exhibits which

9  I believe are Exhibits A through Q.

10          MR. ROMEO: A through Q.  I have given and put on

11  the stand and given to the Court binders with also

12  impeachment rebuttal exhibits which are marked R through

13  EE.  So --

14          THE COURT: Okay.  And those are just marked for

15  identification at this point.

16          MR. ROMEO: They're marked for identification at

17  this time.

18          THE COURT: Okay.  Very well.  Thank you.  Good

19  work.

20                              (Whereupon, plaintiff's Exhibits 1

21                              through 1 through 66 are admitted

22                              into evidence by stipulation.)

23                              (Whereupon, defense exhibits A

24                              through Q, are admitted into

25                              evidence by stipulation.)

1                    (Whereupon, Defense Impeachment

2                    Rebuttal Exhibits R through EE are

3                    marked for identification.)

4          MR. FARRER: Your Honor, our first witness is a

5   gentleman named Fei Sing Fu who does not speak any English

6   and we have a certified Cantonese Interpreter here --

7          THE COURT: Okay.

8          MR. FARRER:  -- named Nora Yueda, that's

9   Y-u-e-d-a, and --

10         THE COURT: Okay.  Well, we need to swear both the

11  interpreter and the witness.

12         MR. FARRER: Okay.

13      (The witness takes the stand.)

14         THE COURT: Would you -- is that a good place for

15  you to sit?

16         MS. YUEDA: That will be fine.

17         THE COURT: Okay.  We want to make you

18  comfortable.

19         NORA YUEDA, CANTONESE INTERPRETER, SWORN

20         THE CLERK: Do you solemnly swear that you will

21  correctly translate from Cantonese into English and English

22  into Cantonese?

23         MS. YUED: I do.

24          FEI SING FU, PLAINTIFF'S WITNESS SWORN

25                 (THROUGH THE INTERPRETER)

1          THE CLERK: Do you solemnly swear that the

2     testimony you are about to give in this Court will be the

3     truth, the whole truth, and nothing but the truth?

4          THE WITNESS: (Through the Interpreter) Yes.

5                    DIRECT EXAMINATION

6     BY MR. FARRER:

7     Q     Would you please state your name?

8     A     Fu Fei Sing.

9     Q     And where do you live?

10    A     Hong Kong.

11    Q     Have you ever been to the United States before?

12    A     No.

13    Q     Did you fly all the way here so you could testify at

14    this trial so you can recover the money owed to you by

15    Demas Yan?

16    A     Yes.

17    Q     Are you related to Stella Chen?

18    A     Yes.

19    Q     Is she your younger sister?

20    A     Yes.

21    Q     Are you related to Tony Fu?

22    A     Yes.

23    Q     Is he your younger brother?

24    A     Yes.

25    Q     Do you know Demas Yan?

1  A    Yes.

2  Q    Where did you meet him?

3  A    In Hong Kong.

4  Q    When did you first meet Demas Yan?

5  A    In 1994.

6  Q    How many times have you met with Demas Yan since 1994?

7  A    Seven, eight times.

8  Q    Was Demas Yan a family friend?

9  A    Yes.

10 Q    Did all of your meetings with Demas Yan take place in

11 Hong Kong?

12 A    Yes.

13 Q    Did Demas Yan ever contact you to borrow money?

14 A    Yes.

15 Q    When?

16        THE COURT: Okay.  What was the answer?

17        THE INTERPRETER: Yes.

18        THE COURT: Thank you.

19 BY MR. FARRER:

20 Q    And the question was when?

21 A    February of 2002.

22 Q    What happened?

23 A    My younger brother is the one who telephoned me and

24 said that he was trying to do some business, some computer

25 business, and whether I can raise some money for him and he

1  stated the amount that was 3.6 million Hong Kong currency.

2           MR. ROMEO: Your Honor, excuse me.  I thought the

3  answer was ambiguous as to who the "he" was.  Could I ask

4  Mr. Farrer to clarify.

5           THE WITNESS: Yan Wai Jung (Phonetic).

6  BY MR. FARRER:

7  Q    Who called him?

8  A    It was my younger brother who initially called me.

9  And eventually he called me in Hong Kong.

10          THE COURT: Who's "he"?

11 BY MR. FARRER:

12 Q    Who's "he," the "he" in the second --

13 A    Yan.

14 Q    Demas Yan call him?

15 A    Yes.

16 Q    Did Demas Yan call you in Hong Kong to discuss a loan?

17 A    Yes.

18 Q    Did he tell you how much he needed to borrow?

19 A    3.6 million.

20 Q    Hong Kong dollars?

21 A    Hong Kong currency.

22 Q    And did he tell you why he needed the money?

23 A    He said he wanted to be in the computer business and

24 to do business in China.

25 Q    Did Mr. Yan tell you that he needed to borrow the

1  money so he could buy some computer equipment?

2  A    Software preparation type components to export to

3  mainland China.

4  Q    And did Mr. Yan tell the witness how he was going --

5  when and how he was going to repay that loan?

6  A    First of all, when he telephoned me in Hong Kong, he

7  insisted on cash.  He insisted on cash and gave me three

8  days to come up with the money.  He gave me three days to

9  come up with the money.  I came up with the cash during

10 that time, and he insisted that it has to be in the form of

11 cash.

12 Q    Did Mr. Yan tell the witness how he was going to repay

13 that loan?

14 A    At the time he told me that I would be entitled to 20

15 percent profit, and that he would repay me within one

16 month.

17 Q    Okay.  After Demas Yan called you to request a loan,

18 what did you do?

19 A    At the time, I telephoned my younger brother and said,

20 is this person trustworthy.

21 Q    And what did the brother say?

22 A    My brother said, yes, he is trustworthy.  The two of

23 them were partners.

24 Q    Did the brother he spoke to, is that Dong Fu?

25 A    Fu Dong Sing.

1  Q    Also known as Tony Fu?

2  A    Yes.

3  Q    Were you able to raise the money that Mr. Yan wanted

4  to borrow?

5  A    Yes.

6  Q    Where did you get the money?

7  A    At the time, I did not have that kind of cash on me

8  and I approached my wife's uncle.

9  Q    And what is his name?

10  A    Leung Hing Lau.

11  Q    And did Mr. Lau say he was willing to participate in

12  that loan?

13  A    At the time I borrowed three million from him.  And I

14  put up the other sixty thousand.

15  Q    Sixty or --

16  A    Six hundred thousand.

17  Q    And this is all in Hong Kong dollars?

18  A    Yes.

19  Q    And what is the equivalent of 3.6 million Hong Kong

20  dollars into U.S. dollars?

21  A    Four hundred and fifty thousand U.S. dollars.

22  Q    Thank you.  Did Mr. Fei Fu then call Demas Yan and

23  tell him he could raise the money that Mr. Yan wanted to

24  borrow?

25  A    I telephoned him and said yes, that can be done.

1  Q    And what did Mr. Yan say?

2  A    And I reserved a room, a VIP room in Tung Yuen

3  Restaurant (Phonetic) in the Wanchai District, and along

4  with Leung Hing Lau, we gave him the money.

5  Q    Was there anyone else present at the restaurant when

6  the money was given to Mr. Yan?

7  A    No, just the three of us.

8  Q    And at that meeting, did Mr. Yan tell you that he

9  would repay that loan in one month's time?

10  A    Yes, he did, and in addition to that, there would be

11  20 percent profit.

12  Q    And what is the approximate date of this meeting in

13  the restaurant when the witness and Mr. Lau gave Mr. Yan

14  3.6 million Hong Kong dollars in cash?

15  A    February of 2002.

16  Q    Did Mr. Yan provide any written documentation to

17  confirm the loan?

18  A    Yes, and also a promissory note.

19  Q    So did Mr. Yan sign a promissory note?

20  A    Yes.

21  Q    What language was that promissory note in?

22  A    The promissory note was written in Chinese, but his

23  signature was in English, and I asked him that underneath

24  his English signature to also sign it in Chinese.

25  Q    Okay.  What did the Chinese promissory note say?

1  A    Borrowed from Mr. Leung Hing Lau, Hong Kong currency,
2  3.6 million.
3  Q    And did Mr. Yan give that original promissory note to
4  Mr. Lau?
5          THE INTERPRETER: Excuse me.  In Chinese, I
6  believe it's Mr. Leung.  The last name comes first.
7          MR. FARRER: Leung, excuse me.  You're right.
8          THE INTERPRETER: He did.
9  BY MR. FARRER:
10 Q    And did Mr. Yan give Mr. Fu or Mr. Leung a phone
11 number in China so that they could reach him if they wanted
12 to?
13 A    Just a Hong Kong telephone number that was given to
14 me.
15 Q    By Mr. Yan?
16 A    Yes.
17 Q    And did Mr. Yan call Mr. Fu after that meeting where
18 he and Mr. Leung gave Mr. Yan 3.6 million Hong Kong dollars
19 in cash?
20 A    A few days later, he telephoned me and said that he
21 was going to China.
22 Q    What happened -- well, strike that.  Did Mr. Fu hear
23 from Mr. Yan again?
24 A    He said he's going to China for about ten days and
25 after his return back to Hong Kong, he would look me up.

1 Q    Okay.  Did Mr. Yan look him up after he returned?

2 A    He did not.  And then after a whole month, I tried to

3 telephone him but I was not able to find him.

4 Q    So what did he do next?  What did Mr. Fu do next?

5 A    Then I telephoned my younger brother.  And I told him

6 that this person, he left, cannot find him, see if you can

7 find him in the United States.  And then eventually my

8 younger brother returned my call and said that he already

9 returned to the United States, and I asked my younger

10 brother to go after the money.

11 Q    Did Mr. Leung, was he upset about not getting repaid?

12 A    What he said to me was that people like that are just

13 totally not trustworthy, and I told him if I cannot locate

14 him, then this money I will pay you.

15 Q    Pay to Mr. Leung?

16 A    To Mr. Lau.

17 Q    Did Mr. Fu repay the three million Hong Kong dollars

18 that Mr. Leung had contributed to the 3.6 million dollar

19 loan to Mr. Yan?

20 A    I gave in June, and I also got the original promissory

21 note.

22 Q    June of what year?

23 A    2002.

24 Q    What did you do next?

25 A    Then I telephoned my younger brother; I said the money

1  I have repaid to him already.  In the meantime, I want you

2  to go after him to recover the money, and he said, no

3  problem.

4  Q    Okay.  Then did he -- thereafter did he hear from his

5  younger brother and learn what Mr. Yan wanted to do about

6  repaying the loan?

7  A    He just keeps dragging on and on.

8  Q    Did Mr. Fu learn that Mr. Yan was willing to sign a

9  new promissory note if Mr. Fu returned the original Chinese

10 promissory note that was given to Leung at the restaurant?

11         MR. ROMEO: I would object.  That's calling for

12 double hearsay.  He's asking what Yan's state of mind was

13 from conversations --

14         THE COURT: It's a lot of hearsay.

15         MR. FARRER: Let me rephrase it.

16         THE COURT: Okay.

17 BY MR. FARRER:

18 Q    At some point in time, did you return the original

19 Chinese promissory note that Mr. Yan had given to Mr. Leung

20 in the restaurant in February of 2002?

21         THE INTERPRETER: What did he do with the

22 promissory note --

23         MR. FARRER: Did he return it to the United

24 States?

25         THE INTERPRETER: The promissory note?

1           MR. FARRER: Yes.

2           THE WITNESS: (Through the Interpreter) First of

3  all, in September, my younger brother called me.  He said

4  Mr. Yan insisted on getting the old promissory note because

5  he wanted to replace it with a new promissory note.

6  BY MR. FARRER:

7  Q    Okay.  And when Mr. Fu heard that, what did he tell

8  his younger brother, Tony Fu, he wanted to do?

9  A    I said fine, I'll see if anybody would be making a

10 trip to the United States.

11 Q    And did he find someone --

12 A    And in October, my father has a friend who was coming

13 to the United States.

14 Q    And did he give that friend the original Chinese

15 promissory note to return to Mr. Yan when he signed a new

16 promissory note?

17 A    And on my behalf, I had him carry a package with kids'

18 clothing and in this package was the promissory note.

19 Q    And to whom was the package delivered?

20          MR. ROMEO: Objection, Objection.  This is

21 incompetent.  If he knew it wasn't in the United States, he

22 couldn't have known who it was delivered to.

23          MR. FARRER: Strike that.

24 BY MR. FARRER:

25 Q    Did you learn that the package had been received?

1  A     My younger brother did telephone me and said that he

2  has received the package, and so I told him I would like

3  him to write out a new promissory note with real estate as

4  collateral.

5  Q     Did Mr. Fei Fu tell Tony Fu who he wanted the

6  promissory note made out to?

7  A     I told my younger brother the promissory note had to

8  be written out to my younger sister.

9  Q     Stella Chen?

10 A     Yes.

11 Q     Why?

12 A     Because the two of them were in business together.

13 I just did not want the money to get all mixed up.

14 Q     When he says "the two of them were in business

15 together," is he talking about Tony Fu and Demas Yan?

16 A     Right.

17 Q     So Mr. Fu wanted the new promissory note made out to

18 his sister so it would not be confused with the business

19 dealings between Demas Yan and Tony Fu.

20 A     Precisely.  Exactly.  And I also further admonished my

21 younger brother, this person is not very trustworthy; you

22 should beware.

23 Q     Okay.  So he told his brother, Tony Fu, that he wanted

24 the promissory note made out to his sister so it would be

25 distinct and separate from Tony Fu's business dealings with

1  Demas Yan.

2        MR. ROMEO: Your Honor, I think it's been asked

3  and answered, and I've been pretty quiet about leading

4  questions, but he's been leading the witness an awful lot.

5        THE COURT: I think it's asked and answered

6  already.

7        MR. FARRER: Okay.

8  BY MR. FARRER:

9  Q    Have you, Mr. Fu, received any money on account of the

10  3.6 million dollars, Hong Kong dollars, that was lent to

11  Demas Yan in February of 2002?

12  A    None.

13  Q    Based upon your experience, is it quite common to make

14  loans to people in cash in Hong Kong?

15        MR. ROMEO: Objection.  Lacks foundation.

16        THE COURT: You can ask the foundation.

17  BY MR. FARRER:

18  Q    Have you made other loans to people in cash?

19  A    Yes.

20        MR. ROMEO: Your Honor, I'd let the translation

21  go, but I still object to the question, have you made loans

22  to other people in cash, I think is a wildly overbroad

23  question and, you know, I don't think it's relevant what

24  his personal custom and practice is.

25        THE COURT: Well, we'll see if he raises any

1   questions about it in cross, and then you can address it on

2   redirect if it's raised on cross.

3            MR. FARRER: Fine.

4   BY MR. FARRER:

5   Q   Is there anything unique or odd in your mind about the

6   way you and Mr. Leung handled the loan to Demas Yan?

7   A   The odd part was that he did not repay the money.

8   Q   At the time you made the loan to Demas Yan, did you

9   consider Mr. Yan to be a trusted family friend?

10   A   When I lent him the money, it was because I trusted my

11   younger brother.

12   Q   What happened to Mr. Leung?

13   A   Eventually, after I paid him back the money --

14   actually, does your question pertain to before or after I

15   paid him back?

16   Q   After.

17   A   I returned the money to him in June, and nothing

18   happened, and then he passed away October of 2003.

19   Q   Have you had any communications whatsoever with Demas

20   Yan since his phone call to you after the meeting in the

21   restaurant where he told you he was leaving for mainland

22   China?

23   A   None.

24   Q   What happened to the original Chinese promissory note

25   that Mr. Yan gave you and Mr. Leung at the restaurant?

1  A    That came to the United States so that he can prepare a

2  new promissory note secured by real estate.  He has real

3  estate in the United States and as soon as that is sold, we

4  would recover the money.

5  Q    Where is the original Chinese promissory note today?

6  A    The original one was with him.

7  Q    Who's the "him"?

8  A    Yung Wai Tung (Phonetic)

9  Q    Who's that?  Demas Yan?

10  A    Yes.

11  Q    And did Mr. Fu keep any copies of the Chinese

12  promissory note before he made arrangements to send it to

13  the United States?

14  A    No.

15  Q    Okay.  No further questions, Your Honor.

16         THE COURT: Okay.  Any cross-exam?

17         MR. ROMEO: Yes, Your Honor.

18         THE INTERPRETER: This chair?  I don't think it can

19  go any further.  Do you need to take it out?

20         THE CLERK: Just pull it close to the mike.

21         THE INTERPRETER: Oh, okay.

22                    CROSS-EXAMINATION

23  BY MR. ROMEO:

24  Q    Good morning, Mr. Fu.  My name is Mark Romeo and I am

25  Demas Yan's attorney.  I'm going to ask you some questions

1  about your testimony this morning.

2          You flew from Hong Kong to the United States to

3  testify in this trial?

4  A    Yes.

5  Q    And when did you arrive in the United States?

6  A    The 19th.

7  Q    The 19th of July?

8  A    July 19th.

9  Q    And have you met with Mr. Farrer?

10 A    Who is that?

11 Q    The attorney for Stella Chen.

12 A    Yes.

13 Q    And how many times did you meet with him?

14 A    One time.

15 Q    And was Tony Fu also present?

16 A    Yes.

17 Q    And did Tony Fu tell you what the testimony had been in

18 this case prior to your arrival in the United States?

19 A    No.

20 Q    Do you read or write English?

21 A    No.

22 Q    Did Tony Fu tell you about the deposition testimony in

23 this case?

24 A    No.

25 Q    And your occupation is a businessman in the trading

1 business in Hong Kong?

2 A    Yes.

3 Q    And you've been involved in business for more than 25

4 years?

5 A    Fifteen years.

6 Q    Okay.  And you're currently a director of the Yat Sen

7 Trade Development Company, Limited in Hong Kong?

8 A    Yes.

9 Q    And you have been a director of Far East Asia Limited

10 in Hong Kong?

11 A    Yes.

12 Q    And you've been a director of Promax Hong Kong

13 Development Company, Limited?

14 A    Which one is that?

15 Q    Promax Hong Kong Development Company, Limited.

16 A    Is that Kwok Tung (Phonetic) in Chinese?

17 Q    Yes.

18 A    Yes.

19 Q    And you've been a director of another company called

20 Far East Asia Shipping, Limited, correct?

21 A    Yes.

22 Q    And you consider yourself a very experienced

23 businessman, correct?

24 A    No, not really.

25 Q    You don't consider yourself an experienced businessman?

1  A    I know how to be in business.  Experience depends on

2  what level you're talking about.

3  Q    Well, you're experienced in international transactions;

4  aren't you?

5  A    Anything that's international, I usually refer those

6  to -- for my partner.  Usually I engage in business with

7  mainland China.

8  Q    And when you're engaged in business, you're aware of

9  the exchange rates between the various currencies, for

10  example, between Hong Kong and the U.S. dollar?

11  A    Yes.  Yes, of course, I know the difference between

12  U.S. currency and Hong Kong currency, but I'd like to know

13  what are you trying to find out with your question.

14  Q    Okay.  I'll -- let me ask another question.

15        The exchange rate between United States dollars

16  and Hong Kong dollars in 2002 was approximately 7.8 to 1,

17  correct?

18  A    No, no, no.  When you engage in business with China or

19  in Hong Kong, when it's in business, you use 8, the ratio of

20  8 to 1.

21  Q    Well, let me ask you this.  I didn't ask about what you

22  personally do.  I'm asking you if you're aware what the --

23  if you're aware that the exchange rate between Hong Kong

24  dollars and U.S. dollars in 2002 was 7.8?

25  A    Yes.

Q    And it's been 7.8 for quite a while; hasn't it, for several years?

A    Under normal circumstances in trading you use 8 to 1, not 7.8 to 1.

Q    I'm just asking you about whether he's aware of the official exchange rate --

A    That's how we conduct business with mainland China.

Q    I'm just asking you, Mr. Fu, if you're aware what the official exchange rate is in 2002?

A    But we base it on the ratio of 8 to 1.

Q    I'm going to move to strike as non-responsive, Your Honor.   I'm asking for what the official exchange rate is such as you get when you go into a bank and exchange Hong Kong dollars for U.S. Dollars.

          MR. FARRER: Well --

          THE COURT: I think you -- ask the question again and say that you're not -- explicitly say you're not interested in what rate he used, but in the official rate.

BY MR. ROMEO:

Q    Let me ask it this way, Mr. Fu.  The official rate if one goes into a bank with U.S. dollars to exchange them for Hong Kong dollars, in 2002 was 7.8, correct?

A    Well, the American dollars is variable, and it's approximately 7.8, but even the U.S. dollar is variable.

Q    But you agree that it's approximately 7.8 in 2002.

1  A     Yes.

2  Q     Now when Mr. Yan called you, you're saying he told you

3  that he wanted a specific or needed a specific amount of

4  money in order to transact his deal with China, correct?

5  A     Right.

6  Q     And you're telling us that the figure that he named in

7  that initial phone call was 3.6 million Hong Kong dollars,

8  correct?

9  A     Correct.

10 Q     And he did not say that he wanted to borrow the money

11 in sums of U.S. dollars, correct?

12 A     What do you mean?

13 Q     Did he request the amount in U.S. dollars or in Hong

14 Kong dollars?

15 A     Hong Kong currency.  He wanted Hong Kong currency.

16 Q     So when you talked about the amount of the loan with

17 Mr. Yan, in the phone call and in the restaurant, you talked

18 only in terms of Hong Kong dollars.

19 A     Yes.

20 Q     And it's your testimony that Mr. Yan insisted to you

21 that he wanted that loan to be made in currency, correct?

22 A     Right.

23 Q     And you weren't surprised that he asked for the loan to

24 be made in currency.

25 A     No, it's not.  In the business world, no.

1  Q    Did Mr. Yan tell you why he wanted the loan to be in

2  cash?

3  A    No.

4  Q    Did Mr. Yan explain to you what transaction he was

5  seeking to finance with the loan he was going to borrow from

6  you and Mr. Leung?

7  A    Computer software.

8  Q    Okay.  Did he say that it was a deal in which he was

9  going to act as a buyer or a seller of computer software?

10  A    He would sell the parts to mainland China.

11  Q    And did Mr. -- so Mr. Yan was going to acquire -- told

12  you he was going to acquire some kind of parts or equipment

13  or components and sell them to mainland China, correct?

14  A    He would buy the computer parts and sell it to China.

15  Q    Okay.  Now did Mr. Yan tell you where he was going to

16  buy the computer parts?

17  A    He said from Singapore.

18  Q    Did Mr. Yan mention whether he had had any meetings or

19  traveled to Singapore in connection with this transaction?

20  A    He said his client was already in Hong Kong, and that

21  was why he needed 3.6 million Hong Kong currency.

22  Q    He said his client, meaning who, the buyer or the

23  seller?

24  A    The client who sold him the parts.

25  Q    And that would be the person from Singapore, correct?

1  A    Yes.

2  Q    Now --

3  A    He told me that he was in Hong Kong.

4  Q    Now as I understand it, Tony Fu first called you from

5  the United States before Mr. Yan came to Hong Kong to

6  explain that Mr. Yan wanted a loan, correct?

7  A    My younger brother telephoned me and said that he would

8  go to Hong Kong to look me up.

9  Q    And the "he" being Mr. Yan would come to Hong Kong to

10 look you up.

11 A    Yes.

12 Q    And so the phone call with Tony was before you heard

13 from Mr. Yan when Mr. Yan was in Hong Kong, correct?

14 A    Right.  Right.

15 Q    And when Tony called you, Tony told you what the

16 purpose of the requested loan was, correct?

17 A    He just said that it was for business, computer

18 business.

19 Q    And then Mr. Yan told you the same thing when he

20 telephoned you on his arrival in Hong Kong.

21 A    Yes.

22 Q    And then when you heard the amount and you understood

23 that there was three days to get that amount, you approached

24 Mr. Leung to put together a package of 3.6 million Hong Kong

25 dollars, correct?

A    Yes, to help me raise this money.

Q    And is Mr. Leung a person whom you'd done business with before?

A    You're talking about Leung Hing Lau?

Q    Yes, I am.

A    No, not through business.  He's a relative of mine.

Q    So you had never done any business with Mr. Leung.

A    No business relationship.

Q    And what was Mr. Leung's profession or occupation at the time that you approached him?

A    He's the vice president of -- it's a very big real estate -- he's the vice president of a very big real estate company in Hong Kong called Cheung On Real Estate.

        MR. ROMEO: (To Interpreter) Is it possible to get the spelling of Cheung On?

        THE INTERPRETER: C-h-e-u-n-g, separate word, O-n. That's an approximation.

BY MR. ROMEO:

Q    And how old was Mr. Leung at the time that the loan was discussed with him?

A    At that time maybe seventy something years old, seventy something, eighty, around eighty, around eighty.

Q    How many times did you talk to Mr. Leung before the meeting at the restaurant to discuss this loan to Demas Yan?

A    One time, two times.

Q    Did you have any difficulty in convincing Mr. Leung to participate in the loan?

A    No, not at all.

Q    Where did you get the 600,000 Hong Kong dollars that you put into the loan?

A    From a bank.

Q    So you went to your bank -- what bank did you go to?

A    I went to several banks.  Some money I had at home.

Q    Why did you need to go to several banks?

A    Because that's how -- that's how I have my money.

Q    And so you went to each bank and you withdrew or cashed checks; is that how you got the currency?

A    Actually the smaller amount I withdrew from the bank. Most of that money was from home.  I had some money at home.

Q    What's the smaller amount?

A    Maybe fifty, sixty thousand.

Q    All right.  And what denominations was the currency that you put together for the loan in?

A    One thousand dollars.  I still have some on me.

Q    So the entire package of 600,000 Hong Kong dollars was comprised of 600 one thousand dollar Hong Kong notes, correct?

A    Six hundred each is one thousand dollars?

Q    I'm just asking, your amount, your piece of this loan was 600,000 Hong Kong dollars, which you funded using 600

1  one thousand dollar bills, correct?

2  A    One pile is a hundred -- it comes in tens.

3  Q    What comes in tens?

4  A    Each stack of one thousand Hong Kong dollars would be

5  in tens, and so I had ten of those stacks and I put them all

6  in a rubber band.

7  Q    So that would be one hundred thousand Hong Kong

8  dollars, correct?

9  A    Right.  One stack is a hundred thousand Hong Kong

10  dollars.

11  Q    Okay.  So you had ten stacks of ten thousand dollar

12  bills and then you put six of those together to make the

13  loan.

14  A    Six.  In any event, the 3.6 million Hong Kong dollars

15  was given over to him in one container.

16  Q    And how big of a container was it given?

17  A    It's just one of those leather type of containers or

18  bags.

19  Q    As big as this container?  I'm holding -- for the

20  record, I'm holding up a banker's box.

21  A    Taller than that.

22  Q    Bigger than this or smaller than this?

23  A    Narrower, taller, a little wider.  It's like a

24  briefcase.

25  Q    Was the loan or the money given to Mr. Yan in a

1  briefcase?

2  A    Yes.

3  Q    Whose briefcase was it put in?

4  A    That belonged to Mr. Leung.

5  Q    So Mr. Leung put in -- gave Mr. Yan his briefcase.

6  A    Yes.

7  Q    And do you know where Mr. Leung got three million Hong

8  Kong dollars in cash?

9  A    He's very wealthy.  He used to be a member of the

10 jockey club and he has his own private yacht and he would

11 need several hundred thousand dollars just to race one time.

12 Q    Well, my question was, do you know specifically where

13 he got these three million dollars in currency?

14 A    I would believe from his own home, but I'm not really

15 sure.

16 Q    Now when you met at the restaurant with Mr. Yan, I

17 believe it was the -- I can't find it in my notes.  What was

18 the name of the restaurant?

19 A    Tung Yuen Seafood Restaurant.

20 Q    Okay.

21       THE INTERPRETER:  That would be T-u-n-g and then

22 Y-u-e-n.  That's an approximation.

23       MR. ROMEO: T-u-n-g --

24       THE INTERPRETER: Y-u-e-n.

25       MR. ROMEO: Y-e-u-n.

1          THE INTERPRETER: Y-u-e-n.

2          MR. ROMEO: Y-u-e-n.

3    BY MR. ROMEO:

4    Q    When you met at the restaurant, was all the currency

5    there?

6    A    Yes.

7    Q    And so you brought your 600,000 and Mr. Leung brought

8    three million?

9    A    No, everything was put in one bag.

10   Q    Did you meet with Mr. Leung before you went to the

11   restaurant to put all the money in one bag?

12   A    Yes.  Yes, I went with him.

13   Q    And did you meet Mr. Leung at his home before you went

14   to the restaurant?

15   A    Yes.

16   Q    And then you met Mr. Yan at the restaurant?

17   A    Yes.

18   Q    Before you went to the restaurant, when you were

19   meeting with Mr. Leung, did you and Mr. Leung count out the

20   money before you put it in the briefcase?

21   A    Yes.

22   Q    When you met with Mr. Yan, was the money counted at any

23   time during that meeting?

24   A    He did.

25   Q    Mr. Yan counted out the cash?

1  A    Yes.

2  Q    And how long did it take Mr. Yan to count out the cash?

3  A    He just did it in a very cursive manner, how many

4  stacks, 36 times -- 36 stacks of -- yeah 36 stacks.

5  Q    So was Mr. Leung's money also in the same denominations

6  as yours, one thousand dollar bills?

7  A    Yes, one thousand dollars, everything in one thousand

8  dollars.

9  Q    And how long did the meeting take place at the

10  restaurant?

11  A    About two hours.

12  Q    You discussed or testified that there was a promissory

13  note that was written at the restaurant; is that correct?

14  A    Yes.

15  Q    Was there any other documentation other than the

16  promissory note?

17  A    None.

18  Q    Who wrote the promissory note out?

19  A    Mr. Yan.

20  Q    And what kind of paper was it written on?

21  A    White piece of paper.

22  Q    And to the best of your recollection, the promissory

23  note was a single sentence, correct?

24  A    No.  It's borrowed from Mr. Leung such and such an

25  amount -- such and such an amount, guaranteed payback, and

1 then signature.  He signed his name in English.  I asked him

2 to also write his name in Chinese.

3 Q    When it said "guaranteed payback," did it say

4 guaranteed payback by a particular date?

5 A    In one month was verbal only.

6 Q    Okay.  Did the promissory note have the date of the

7 meeting on it?

8 A    The date should be there, but right now I cannot

9 remember.

10 Q    Before Mr. Yan signed the note, did either you or Mr.

11 Leung review the note to see if you were satisfied with its

12 form?

13 A    We didn't think there was any problem.

14 Q    Did you read it before Mr. Yan signed it?

15 A    No.

16 Q    Whose idea was it to prepare a promissory note?

17 A    That's very customary.

18 Q    Okay.  So just as you say that it's customary to make

19 loans or do business transactions in cash in Hong Kong, it

20 is equally customary to evidence a loan by a promissory

21 note?

22 A    The promissory note is very customary.  That's usually

23 given.

24 Q    Okay.  So that goes to my question then, who raised the

25 custom in this instance?  Was it you, Mr. Leung or Mr. Yan?

1    A    Mr. Lau.

2    Q    Mr. Leung?

3    A    Mr. Lau.

4    Q    Okay.  At the conclusion of the meeting, who kept the

5    promissory note?

6    A    Mr. Leung.

7    Q    And then the promissory note had said that Mr. --

8    excuse me, let me start that over again.

9         The language of the promissory note said that Mr.

10   Yan received from Mr. Leung 3.6 million Hong Kong dollars.

11        THE INTERPRETER: Would you repeat your question?

12        MR. ROMEO: Sure.

13   BY MR. ROMEO:

14   Q    The note said that Mr. Yan agreed to repay 3.6 million

15   dollars, Hong Kong, to Mr. Leung?

16        MR. FARRER: Objection.  Mischaracterizes his prior

17   testimony.

18        MR. ROMEO: Let me ask another question.

19   BY MR. ROMEO:

20   Q    Did the promissory note say who specifically would

21   receive the repayment?

22   A    No.

23   Q    Now in addition to this promissory note, you said there

24   was a verbal agreement to pay the money to -- the money back

25   within a month; is that true?

A    Within one month.  That's oral, and also 20 percent profit.

Q    Was there any agreement to pay interest on the loan?

A    Interest was not discussed since there was also the promise to pay 20 percent profit.

Q    And did you discuss what the dollar amount of that 20 percent profit might be with Mr. Yan during that meeting?

A    It came from his mouth, 3.6 million dollars, 72,000 of that would be equal to 90,000 U.S. dollars.  I'm referring to 20 percent of 3.6 million.

Q    Okay.  So it wasn't 20 percent of his components deal with China; it was 20 percent on top of the amount of the note, correct?  Or the loan?

A    It is for conducting business.  It is profit on the business since he was using the 3.6 million to conduct business, and the 20 percent return would be $720,000 and that would be how much he would pay back.

Q    Just so I'm clear, the 20 percent of the profit was based on 20 percent of the loan amount, correct?

A    He borrowed 3.6 million to do business.  This part is oral.  He borrowed 3.6 million to do business.  When he repays, it would be that 3.6 million plus 20 percent profit.  That was oral.

Q    Just so I'm clear, the 20 percent is 20 percent of 3.6 million.

A     Right.   Twenty percent of 3.6.

Q     Now going back to the other question that I was asking him was, did Mr. Yan tell you what his potential profit was on buying these components from the person in Singapore and selling them in China?

A     He said it should be double.

Q     Did Mr. Yan tell you whether he had any of his own money in this transaction?

A     He did not mention.

Q     Did Mr. Yan promise to repay the loan in cash, in currency?

A     He did not mention.

Q     Did Mr. Yan tell you what he was going to do with the briefcase full of cash that he was taking away from the restaurant?

A     The only thing he said was that the money would be repaid in one month, within one month.

Q     My question, Mr. Fu, is this.  Did Mr. Yan tell you where he was going to take that briefcase full of cash and what he was going to do with it?

A     Whether he told me?  Whether or not he told me?

Q     Yes.

A     He did not.

Q     Did Mr. Yan say he was going to purchase the components for this transaction with cash as opposed to a check or a

1  letter of credit or some other medium?

2  A    Well, he was the one who insisted on cash.

3  Q    I'm just asking, Mr. Fu.  I'll ask the question again.

4  Did he tell you whether he was going to purchase the

5  components with the cash or he was going to purchase them

6  with a letter of credit or a check or some other medium of

7  payment?

8  A    He said cash.

9  Q    Mr. Yan said he would make the purchase with the cash.

10 A    He said he has to deal with his client in cash.

11 Q    Now, it's your testimony Mr. Yan was going to contact

12 you again about repayment of the loan while he was over in

13 Hong Kong, correct?

14 A    After his trip to mainland China, that he would contact

15 me after his trip from China back to Hong Kong.

16 Q    And why Mr. Yan tell you he was going to contact you

17 after his trip to China?

18 A    He didn't say for what purpose.  He just said after his

19 trip, he would just look me up.

20 Q    And then you never heard from Mr. Yan, correct?

21 A    Right.

22 Q    And then some period of time passed and you didn't get

23 the money, so you tried to call him at the number he'd given

24 you, correct?

25 A    He gave me his Hong Kong telephone number, and that was

1    the number that I tried, but I was not able to find him.

2    Q    Okay.  And then you called Mr. Fu to see if you could

3    contact Mr. Yan through Tony Fu, correct?

4    A    I telephoned my younger brother to see if he can locate

5    him.

6    Q    Okay.  And did you ask your younger brother to get Mr.

7    Yan's phone number in the United States so that you could

8    ask Mr. Yan directly about the loan transaction?

9    A    No.  I told my younger brother to go after him.

10   Q    So you had no intention yourself of directly contacting

11   Mr. Yan about the money that he had failed to repay to you

12   within a month.

13   A    Because my younger brother was the one who offered me

14   the guaranty saying that there's no problem lending him the

15   money.

16   Q    Okay.  And so far as your understanding with Mr. Yan

17   was, though, was that he was to repay that money within a

18   month from doing his deal between Singapore and China,

19   correct?

20   A    Right.  He needed that money to be in business.

21   Q    Okay.  And so -- but what your discussion with Mr. Yan

22   was, is that he was going to take the cash, buy some

23   components in Singapore, sell them in China, take the money

24   he got from the Chinese buyer and repay your loan out of

25   those proceeds.  Does that say it correctly?

1 A    That I wouldn't know.  I wouldn't know how he's going

2 to pay me the money.  I don't know how exactly he's going to

3 go about paying me, but he was just going to pay me.

4 Q    Well, did Mr. Yan tell you in so many words, I'm going

5 to do this deal; I'm going to make a lot of money on it; and

6 when I get that money, I'm going to pay you back and it's

7 all going to happen within a month?

8 A    He said when it's all done that he would repay me the

9 money.

10 Q    Okay.  Now, when you didn't get repaid the money, did

11 you hear from Mr. Leung about, where's the money.

12 A    Yes.  Mr. Leung asked me how did it go?  I said perhaps

13 there's some problems.  I said, but rest assured, I will pay

14 you.

15 Q    Well, did Mr. Leung call you several times to ask where

16 his three million Hong Kong dollars was?

17 A    No, I telephoned him.  He was also very angry.  He was

18 very angry.

19 Q    Okay.  So Mr. Leung and you discussed it several times

20 though, correct?

21 A    I talked to him about two times.

22 Q    And you felt embarrassment in front of Mr. Leung that

23 your brother's friend had not repaid this loan?

24 A    Not really embarrassed since I was going to pay him

25 back since he's my relative.

1  Q    So at some point, you yourself gave Mr. Leung 3.6

2  million dollars in repayment of the money that had been

3  loaned to Mr. Yan at the restaurant.

4  A    No, just three million.  I did that in June.

5  Q    Okay.  And did you give it back to him in cash?

6  A    No.

7  Q    Did you write him a check?

8  A    I paid him back in installments within a month in

9  several installments.

10  Q    How many installments.

11  A    The total was three million.  Right.  I repaid Mr.

12  Leung three million.

13  Q    And you paid him three million in several installments

14  during one month in June 2002.

15  A    Three installments.

16  Q    All right.  And were those installments made in checks

17  or were they made in currency or were they made in letters

18  of credit or what other medium -- or some other medium of

19  exchange?

20  A    Cash.

21  Q    Do you have any note or document or letter that

22  evidences your arrangement to pay Mr. Leung back the three

23  million dollars?

24  A    No.  I was moving from my office.  I didn't have those

25  with me.  He was the one who wrote a receipt.

1  Q    Mr. Leung wrote a receipt.

2  A    No, no, no.  Perhaps I misunderstood.

3  Q    Is there any type of document, an agreement, a letter,

4  a receipt that passed between you and Mr. Leung concerning

5  your repayment of the three million Hong Kong dollars?

6  A    None.  None.  No, I just used the promissory note of

7  Mr. Yan.

8  Q    Did Mr. Leung give you the promissory note?

9  A    Yes.  Otherwise how did I obtain it?

10  Q    And did he give you the promissory note after you had

11  paid him the three million dollars or somewhere between one

12  of the installments?

13  A    I only got that promissory note after I have paid him

14  in full.

15  Q    And did Mr. Leung hand you that promissory note in

16  person?

17  A    Yes.

18  Q    And you took the promissory note and took it where, to

19  your home or to your office?

20  A    First, my office.

21  Q    Did you keep it someplace safe?

22  A    Yes.

23  Q    When you had to make good on this money to Mr. Leung,

24  this three million dollars, did you communicate that to

25  either your brother or your sister?

1  A    I did tell that to my younger brother.

2  Q    Did you tell that to Stella Chen in a phone

3  conversation?

4  A    Not yet.

5  Q    But you did tell your brother in June 2002 that you

6  just had to pay three million dollars to Mr. Leung to make

7  good on Demas Yan's debt, correct?

8  A    I told him I already repaid in full.

9  Q    And did you tell your brother that you were angry or

10 upset about having to do that?

11 A    Of course I was angry.

12 Q    Was repayment of three million dollars a big obligation

13 for you?

14 A    What do you mean by whether that's a big obligation?

15 Q    Was it difficult to put together all of that money to

16 give to Mr. Leung?

17 A    No, no, no.

18 Q    So that was not a large debt or problem for you to

19 repay?

20 A    Not difficult.

21 Q    So you weren't upset about having to pay three million

22 dollars on Mr. Yan's account?

23 A    I don't quite understand.  He owe the money.  Of course

24 it's a big deal.  He was in the United States.  In November

25 when he wrote a promissory note, it had to be secured by

1  real estate.

2  MR. ROMEO:  I'm sorry.  Could I have the answer

3  read back?  I guess we can't without a court reporter.

4  THE COURT: We can't do that.

5  BY MR. ROMEO:

6  Q    He said it had -- you told Mr. Fu it had to be secured

7  by real estate?

8  A    Wanted him to write a promissory note that the amount

9  is secured by real estate.  And the promissory note had to

10  be written out to my younger sister.

11  Q    Those are instructions that you gave to Tony Fu?

12  A    Yes.

13  Q    And you gave him those instructions in about the middle

14  of 2002, correct?

15  A    Yes.

16  Q    Did you have some real estate in mind that it should be

17  secured on?

18  A    He said they have real estate and after that is sold,

19  it would be repaid first.

20  Q    Did you ever get to see the promissory note that was

21  written in the United States to secure this loan?

22  A    My younger sister told me about it.

23  Q    Okay.  Did you ever get to see it?

24  A    Only when I came here.

25  Q    Only when you came here on the 19th?

1  A    I didn't really even have to look at it.  They told me,
2  and I said, well, you people take care of it.
3  Q    Okay.  So you didn't --
4  A    I didn't really have to see it.  I just said you people
5  can take care of it.
6  Q    My question is, have you seen it?
7  A    The new promissory note?  No, I have not seen it, but
8  my younger sister made that clear to me.
9  Q    All right.  Now there was an old promissory note,
10 correct, Mr. Fu?
11 A    The old promissory note was replaced by this new
12 promissory note.
13 Q    The old promissory note -- if I call it -- can I call
14 it the Chinese note or the Hong Kong note -- why don't I
15 call it the Hong Kong note.  Okay.  The Hong Kong note was
16 sent by a friend of your father's on the airplane to the
17 United States in October 2002, correct?
18 A    Yes.
19 Q    And you gave it to your father's friend to carry to
20 Tony Fu, correct?
21 A    Yes.
22 Q    And where did you give it to your father's friend?
23 A    In Hong Kong.
24 Q    At a particular location in Hong Kong, at your house,
25 at your office?

1  A     In a restaurant in the Wanchai District.

2  Q     What's your father's friend's name?

3  A     Tsung, we all just call him Tsung. We

4  just call him brother Tsung.

5  Q     And before you went to --

6           THE INTERPRETER:  Probably T-s-u-n-g.

7  BY MR. ROMEO:

8  Q     Before you went to -- I assume you set up a meeting

9  with him at the restaurant; is that correct?

10  A     He came and telephoned me.  He said he lives at the

11  hotel.  And I said I will -- so we met at the hotel

12  restaurant.

13  Q     Tsung is a resident of China, correct?

14  A     Yes.

15  Q     So he was just staying or stopping in Hong Kong for a

16  brief time and then he was going on to the United States,

17  correct?

18  A     Yes.  In transit in Hong Kong on his way to the United

19  States.

20  Q     Okay.  Before you went to the restaurant, where did you

21  locate the note?  Was it at your home or in your office?

22  A     Home.

23  Q     Did you keep it in a safe?

24  A     In a drawer.

25  Q     Okay.  And the reason you wanted Mr. Tsung to hand

1  carry the original Chinese note, the Hong Kong note, to the
2  United States was to make sure that it got to your brother
3  safely, correct?

4  A    I did not tell him about that.  I just said this
5  package had children's clothing and two pieces of toys and I
6  asked him to carry that for me.

7  Q    Okay.  I'm not interested in what you told Mr. Tsung.
8  What I'm interested in is why did you use Mr. Tsung to hand
9  carry the note from Hong Kong to the United States?

10  A    It was just coincidental that it was the time that he
11  was coming to the United States for a visit, because he
12  mentioned something about, do you know anybody on his way to
13  the U.S.

14  Q    So you weren't concerned about the note being lost if
15  you sent it in the mail or some other -- DHL or something
16  like that?

17  A    Yes.

18  Q    You were concerned, and you wanted it hand carried so
19  it would arrive safely to Tony Fu, correct?

20  A    Yes.   No, because somebody was on his way to the
21  United States.   In October somebody was on his way to the
22  United States, a friend.   And to have somebody personally
23  bring that is better than mailing.

24  Q    Because it could get lost, because it's an important
25  document, correct?

1    THE COURT: Let me stop a second here. Two things.

2  We need to have a break, number one. Number two, your cross

3  is taking many, many, many times as long as the direct. And

4  I realize in this particular case it might take somewhat

5  longer. How long do you expect this trial to go? You two

6  told me it was a day, and I don't know if we're going to

7  have this with every witness, so --

8    MR. ROMEO: Well --

9    THE COURT: If you're almost done, we can finish

10  before the break, but we need to take a break at some point.

11  Everybody has been going almost two hours.

12    MR. ROMEO: Let me -- if I could have another ten

13  minutes, I'll wrap it up.

14    THE COURT: That's fine.

15    MR. ROMEO: Okay.

16    THE COURT: Go right ahead.

17  BY MR. ROMEO:

18  Q    And you didn't keep a copy of the Hong Kong note.

19  A    No.

20  Q    And so far as you know, Mr. Leung didn't keep a copy of

21  the Hong Kong note.

22  A    That I wouldn't know.

23  Q    And so far as you know, Tony Fu didn't keep a copy of

24  the Hong Kong note.

25  A    I don't think so. I wouldn't know actually.

1   Q   And the reason that you needed the Hong Kong note was

2 to give it to Mr. Yan so Mr. Yan would agree to sign a new

3 note, correct?

4   A   It was at his request. He was only going to prepare a

5 new promissory note upon receipt of the old one.

6   Q   "His" being Mr. Yan?

7   A   Yes.

8   Q   Okay. Mr. Fu, I opened a book in front of you, and I

9 have it open to Exhibit R.

10   A   I don't know what this is.

11   Q   Well, turn it to the second page.

12   A   This is my signature.

13   Q   Okay. But you don't know what this document says?

14   A   It's the content of this document I do know it is a

15 summary of the -- how it came about that he owed money.

16   Q   Before you signed this declaration, though, you had

17 someone -- I'm assuming you had someone translate it for

18 you?

19   A   In Hong Kong, yes.

20   Q   Who did the translating for you?

21   A   My friends.

22   Q   Okay. So when you signed this, this declaration,

23 though you were satisfied that what was -- what you were

24 signing was true?

25   A   Yes.

1  Q    Did Tony Fu ask you to sign this declaration?

2  A    No, my younger sister told me to.

3  Q    Stella Chen told you to sign this declaration.

4  A    And I also wanted to sign it.

5  Q    All right.  In your declaration, at paragraph 2, I'm

6  going to read from it, and ask the translator to translate

7  what I'm reading, and ask you a few questions about what you

8  said in this paper that you signed.

9         First of all, it says at paragraph 2:

10        "Demas Yan is a friend of our family who I have

11        known for ten years."

12 End quote.  Is that a true statement?

13 A    Correct.

14 Q    And I take it from that statement that you have known

15 Mr. Yan as a personal friend of yours for -- since

16 approximately 1994?

17        MR. FARRER: Objection, to the extent it

18 mischaracterizes the statement and is argumentative.

19        THE COURT: Would you state the question again?

20        MR. ROMEO: I'll restate the question.

21 BY MR. ROMEO:

22 Q    You're saying here that you've known Mr. Yan since

23 approximately 1994?

24 A    Yes.

25 Q    And you've seen him seven or eight times during that

1  period of time?

2  A    Yes.

3  Q    And the last time that you saw him before today's

4  trial, I take it, was at the restaurant when he received the

5  money, correct?

6  A    Yes.  Yes.

7  Q    And so the other seven or eight times occurred some

8  time before February of 2002.

9  A    Yes.

10  Q    And since you've never been to the United States except

11  for this trial, I take it that all of those personal

12  meetings or occasions where you saw Mr. Yan took place in

13  Hong Kong.

14  A    Right.

15  Q    And those were what type of occasions?

16        THE INTERPRETER: Excuse me.  I lost him.  I'm

17  going to ask him to repeat.

18        THE WITNESS: (Through the Interpreter) Usually

19  when he's in Hong Kong, he would call me and said my younger

20  brother has something for me, or if he's in Hong Kong, then

21  I would ask him to take something to the United States on my

22  behalf.

23  BY MR. ROMEO:

24  Q    In the ten plus years that you've known Mr. Yan, has

25  his appearance changed in any way?

1  A    He's not wearing glasses.

2  Q    Anything else?

3  A    I think he slimmed down somewhat.

4  Q    Does Mr. Yan have a residence in Hong Kong?

5  A    He said he did, but I do not personally know.

6  Q    All right.  Let's go back to your declaration here.  It

7  says in paragraph 2, quote:

8              "I was personally present at a meeting in February

9              of 2002 in Hong Kong when my wife's uncle agreed

10             to loan to Demas Yan Hong Kong dollars which had

11             an equivalent value of $450,000 U.S., and Yan

12             agreed to repay such funds to our family from the

13             proceeds of his real estate project."

14 Is that true?

15 A    The real estate refers to that latter note.  In that

16 one month that he promised to repay the money, he was not

17 able to.

18 Q    But you're saying here that the promise to secure in

19 real estate took place at the meeting in February of 2002.

20             MR. FARRER: Objection to the extent it

21 mischaracterizes that sentence or is argumentative.

22             THE COURT: He can have the question.

23 BY MR. ROMEO:

24 Q    Is it true Mr. Yan promised to repay the loan out of

25 the proceeds of a real estate project in February 2002?

1 A    That was not -- February, right?  In 2002, no that was

2 not what was said.

3 Q    All right.  Let's take a look at Exhibit S.  This also

4 has your signature on it; doesn't it, Mr. Fu?

5 A    Yes, it is.

6 Q    And this was signed on October 1st, 2004, about six

7 months after you signed the first declaration, correct?

8 A    Yes.

9 Q    Paragraph 2 on line 25, I'm going to read, quote:

10        "I was personally present at a meeting in February

11        2002 in Hong Kong when my wife's uncle agreed to

12        loan to Demas Yan Hong Kong dollars which had an

13        equivalent value of $450,000 U.S., and Yan agreed

14        to repay said funds to our family from the

15        proceeds of his real estate project in San

16        Francisco."

17 End quote.

18 A    Yes.

19 Q    Is that true?

20 A    You have to clarify the date.  Let me tell you --

21        MR. FARRER: Objection.  Asked and answered.

22        MR. ROMEO: It's a different declaration.

23        THE WITNESS:  -- In November, he wrote the

24 promissory note, and he asked to -- he asked to write a new

25 promissory note after he received the original one, and the

1  second one he would use real estate to secure the loan.

2  BY MR. ROMEO:

3  Q    But, Mr. Fu, what you said here isn't true; is it, Mr.

4  Yan never said in the February meeting in Hong Kong that he

5  was going to secure repayment on real estate in San

6  Francisco.

7        MR. FARRER: Objection to the extent it

8  mischaracterizes his declaration.

9        THE COURT: Overruled.

10        THE WITNESS: In 2002?  June of 2002?  I don't

11  understand, what month are you referring to in 2002?

12  BY MR. ROMEO:

13  Q    I don't want to waste time here, but I'd just like him

14  to read that sentence and tell me if it's true.

15        THE INTERPRETER: I will translate that sentence --

16        MR. ROMEO: If you would.

17        THE INTERPRETER: -- and then the question is

18  whether that's true.

19        THE WITNESS: February of 2002, no.  February,

20  right, are you referring to, February?  What my friend

21  translated to me was that this is a summary of the fact that

22  he owed me money.

23  BY MR. ROMEO:

24  Q    So your friend didn't translate this word for word; is

25  that your explanation?

1  A    Did not, no.

2  Q    And so you signed this under penalty of perjury to be

3  proffered in the United States Court without understanding

4  or reading what you signed?

5  A    Yes.  What I signed -- what I signed was to the

6  statement that he borrowed money from me.

7  Q    That it was very important; wasn't it, to prove that

8  there was a promise to repay this money at this meeting, and

9  you elaborated on that promise by saying that he even agreed

10 to secure it on real estate, correct?

11 A    Yes.

12 Q    And that Hong Kong note that you had hand carried to

13 the United States, that was a very important document to

14 you, correct?

15 A    Yes.

16 Q    And you didn't say anything about the Hong Kong note in

17 this declaration, or either of these declarations, Exhibits

18 R or S; did you?

19 A    Because he already wrote a promissory note to me --

20 because he already wrote a promissory note to my younger

21 sister, and I just let them take care of these matters for

22 me.

23 Q    Well, by November 5th, 2004 when Mr. Farrer prepared

24 this declaration, Exhibit S, you were aware from your

25 brother and sister that Mr. Yan was denying that he'd ever

1  had a meeting with you in Hong Kong and received that money,

2  correct?

3          MR. FARRER: Objection.

4          THE WITNESS: If that's what he said, then he's

5  lying.

6  BY MR. ROMEO:

7  Q    I'm asking you if Stella Chen or Tony Fu told you by

8  this date in November 2004 that Mr. Yan denied ever meeting

9  you at the restaurant and getting that money.

10 A    November 15th, 2004?

11 Q    By the date of this exhibit, Exhibit S.

12 A    Of course he denies that since he doesn't want to repay

13 the money.

14 Q    And you knew that by the time that you had signed this

15 declaration, Exhibit S.  You signed it on October 1st, 2004,

16 correct?

17 A    Yes.

18 Q    And when you knew that Mr. Yan --

19 A    Excuse me -- that I already knew what, would you please

20 clarify?

21 Q    You knew that Mr. Yan denied ever meeting you and

22 getting that $450,000 -- or excuse me, 3.6 million Hong Kong

23 dollars in February of 2002.

24 A    Yes.

25 Q    And you knew at that time that Mr. Yan was denying even

1  being at that restaurant and getting that 3.6 million

2  dollars in cash, that the fact that he'd signed that

3  promissory note would prove otherwise, correct?

4          THE INTERPRETER: The fact that Mr. Yan would

5  sign --

6          MR. ROMEO: Had signed that promissory note would

7  prove otherwise.

8          THE INTERPRETER: The new promissory note -- the

9  new promissory note would prove otherwise?

10          MR. ROMEO: Well, let me repeat the question.

11          THE INTERPRETER: Okay.  I'm sorry.

12  BY MR. ROMEO:

13  Q    Mr. Fu, I'm asking you, October 1st, 2004, you knew

14  that Mr. Yan had denied ever getting that money from you in

15  that restaurant with Mr. Leung in 2002.

16  A    In 2004?  October?

17          THE INTERPRETER: Let me repeat the translation.

18          THE WITNESS: October of last year, I only became

19  aware when there were litigations back and forth.

20  BY MR. ROMEO:

21  Q    Okay.  But you knew that that note, that Hong Kong

22  note, would prove that Mr. Yan was in fact at that

23  restaurant; didn't you?

24  A    The Hong Kong promissory note, I don't even need that

25  because in November of 2002, he took the original promissory

1 note to prepare the new one.  It took place during that

2 period of time.  Because he already established a new

3 promissory note, the old one was not needed.

4 Q    But wouldn't you agree that if Mr. Yan denied being at

5 that restaurant, that the existence of the Hong Kong note

6 would prove otherwise?

7         MR. FARRER: Objection, Argumentative.

8         MR. ROMEO: All right.  I'll withdraw the question.

9 BY MR. ROMEO:

10        THE COURT: The objection is overruled.  If you

11 want to withdraw the question, fine.

12 BY MR. ROMEO:

13 Q    In October 2004 when you signed this declaration, you

14 knew that the existence of that Hong Kong note would prove

15 that Mr. Yan was at that restaurant, yes or no.

16 A    But if I had the original promissory note, he would not

17 produce the new promissory note.

18 Q    I think the question said that he answer yes or no.

19        THE COURT: That is not a responsive answer, yes.

20 We need a break at some point.  This is just going on and

21 on.  The questions are good questions.  You just keep asking

22 the same ones over and over instead of moving forward.

23        MR. ROMEO:  I'm almost done, Your Honor, and I

24 apologize --

25        THE COURT: Okay.  Go ahead then.  Finish.

1    MR. ROMEO: No, we could take a break.

2    THE COURT: Well, how much longer do you have?

3    MR. FARRER: He said ten minutes twenty, fifteen

4 minutes ago.

5    MR. ROMEO: Okay.  Well, you know you can't trust

6 lawyers on time estimates.

7    (Laughter.)

8    MR. FARRER: Certainly.

9    MR. ROMEO: Okay.  So I have just one more

10 question, I swear.

11    THE COURT: Go ahead.

12    MR. ROMEO: No.  I think that's fine.  I have no

13 further questions.  Thank you, Your Honor.

14    THE COURT: Okay.  Do you want -- you have

15 redirect.

16    MR. FARRER: I have two short --

17    THE COURT: Okay.  Then let's do that.

18                REDIRECT EXAMINATION

19 BY MR. FARRER:

20 Q    Mr. Fu, was Mr. Leung your wife's uncle?

21 A    Yes.

22 Q    And what is the largest denomination that you can get

23 in Hong Kong dollars?

24 A    One thousand.

25 Q    Thank you.

1        MR. FARRER: No further questions.

2        THE COURT: Any further questions?

3        MR. ROMEO: No, Your Honor.  Thank you.

4        THE COURT: Okay.

5        MR. ROMEO: I appreciate the Court's patience.

6        THE COURT: Thank you, Mr. Fu, you may step down.

7   Let's take a short break.  Who's the next witness?

8        MR. FARRER: Mr. Seher.  He's right here.  He's

9   anxious to get going.  So as soon as we have the break --

10       THE COURT: Okay.  I think we need to let -- we

11  don't need to ask whether people need a break.  After two

12  hours, they need a short break.  Let's start at a quarter

13  after on that clock.  That's about six to seven minutes.

14  Okay.  You can pick up then.  Thank you.

15       THE CLERK: All rise.

16     (Whereupon, a recess is taken at 11:09 a.m. and the

17  court is reconvened at 11:20 a.m.)

18       MR. ROMEO: Your Honor, before we call the next

19  witness, I'd like to move Exhibits R and S into evidence.

20       THE COURT: R and S.

21       MR. ROMEO: The two declarations of Fei Sing Fu.

22       THE COURT: Oh, those two declarations.

23       MR. FARRER: No objection.

24       THE COURT: R and S are admitted.

25  ///

1          (Whereupon, Defense Exhibits R and

2               S, Declarations of Fei Sing Fu, are

3               admitted into evidence.)

4          MR. ROMEO: Thank you.

5          THE COURT: I'll enter them to my list, my now

6     growing list.

7          MR. FARRER: Your Honor, plaintiffs call the next

8     witness, Frederick Seher.

9      FREDERICK THOMAS SEHER, PLAINTIFFS' WITNESS, SWORN

10          THE CLERK: Raise your right hand, please.  Do you

11     solemnly swear that the testimony you are about to give in

12     this court is the truth, the whole truth, and nothing but

13     the truth?

14          THE WITNESS: I do.

15          THE CLERK: Please be seated.

16                    DIRECT EXAMINATION

17     BY MR. FARRER:

18     Q    Good morning, Mr. Seher.

19     A    Hi.  How are you?

20     Q    Would you please state your full name?

21     A    Frederick Thomas Seher.

22     Q    Thank you.

23          THE COURT: How do you spell your last name?

24          THE WITNESS: Frederick Thomas Seher, S-e-h-e-r.

25          THE COURT: S-e-h-e-r.  Thank you very much.

1    THE WITNESS: Sure.

2  BY MR. FARRER:

3  Q    Mr. Seher, do you own and operate Frederick T. Seher &

4  Associates?

5  A    Yes.

6  Q    And what type of business does Frederick T. Seher &

7  Associates do?

8  A    We're professional land surveyors.

9  Q    And you also specialize in the subdivision of land and

10 condominium conversions?

11 A    That's correct.

12 Q    Are you the custodian of records for Frederick Seher &

13 Associates?

14 A    Yes.

15 Q    Okay.  And do you know Demas Yan?

16 A    Yes.

17 Q    Did Mr. Yan engage your firm to assist with the

18 subdivision of 663 Chenery Street?

19 A    Yes.

20 Q    If you would take a moment, the black binder that's in

21 front of you is a bunch of exhibits that are separated by

22 tabs, and if you would turn to, under Tab 1, or Exhibit 1.

23 Right here.

24 A    Oh, this stuff.

25 Q    Do you have Exhibit 1 in front of you?

1  A    Yes.

2  Q    Is Exhibit 1 a true and correct copy of a letter that

3  you received from Demas Yan on or about October 26th, 1999

4  enclosing a signed engagement letter from him, which is

5  included with that letter?

6  A    Yes.

7  Q    And Mr. Yan was hiring your office to provide surveying

8  and engineering services for 663 Chenery Street?

9  A    Yes.

10 Q    Okay.  If you'd now turn to Tab 14.  Is Exhibit 14 a

11 true and correct copy of a letter that you e-mailed to Mr.

12 Yan on or about October 3rd, 2003 regarding a phone call you

13 received from his lawyers, Herzig and Berlese, advising you

14 that there were one or more additional loans on the 663

15 Chenery Street property?

16 A    Yes.

17 Q    And in that letter, you are asking Mr. Yan -- you're

18 explaining to Mr. Yan, this is beyond the scope of your

19 original engagement and asking him to agree to pay you for

20 the additional services?

21 A    That's correct.

22 Q    Did Mr. Yan sign and return that letter?

23 A    The one I'm looking at isn't signed, but I'm sure there

24 is a signed copy in the file.

25 Q    Who is David Smith?

1   A    David Smith is an employee of mine who no longer works

2   for me, but he was pretty much handling this project for us.

3   Q    So Mr. Smith was working on the 663 Chenery Street

4   project?

5   A    That's correct.

6   Q    Okay.  If you'd turn to Tab 15.  Is Exhibit 15 a true

7   and correct copy of an e-mail that your office received from

8   Demas Yan on or about October 4th, 2003 directing your

9   office not to take any further action until further notice?

10  A    Yes.

11  Q    If you'd turn to Tab 18 please.  Is what's been marked

12  as Exhibit 18 a true and correct copy of an e-mail and

13  enclosures that your office received from Demas Yan on or

14  about November 19th, 2003 enclosing the signed contract for

15  additional services and asking you to confirm the names of

16  the lenders on the Chenery Street project with him before

17  updating the map?

18  A    Yes.

19  Q    Is he also telling you in that e-mail that he is in the

20  process of paying off his institutional lenders?

21  A    Yes.

22  Q    And this document comes from your file?

23  A    Yes.

24  Q    And if you turn to page 2 of Exhibit 18, that's Mr.

25  Yan's signature on the contract that you sent to him on or

1   about October 3rd?

2   A    Yes.

3   Q    If you'd turn to Tab 19.  Is Exhibit 19 a true and

4   correct copy of an e-mail that your office received from

5   Demas Yan on or about November 26th, 2003 advising you that

6   the names of his private lenders are Lei Ming Li and Stella

7   Chen?

8   A    Yes.

9   Q    Does he also ask you to contact him if you need any

10  further information regarding those private lenders?

11  A    Yes.

12  Q    And does he also tell your office to contact him when

13  the updates are done so he can pick them up and get their

14  signatures?

15  A    Yes.

16  Q    Now based upon the scope of services you were providing

17  to Demas Yan on the Chenery Street project, what update is

18  he talking about?

19  A    He's talking about the owners of the -- all the owners

20  of the subdivision, all the owners of record of the

21  subdivision of the property being subdivided have to sign

22  the map, have to sign the parcel map.  It's the cover sheet

23  of the parcel map that has to be signed by all the owners of

24  the -- anyone with a record title interest.  So that's the

25  owners and any deeds of trust.

1    Q    Okay.

2    A    Or –- yeah, deeds of trust.

3    Q    And this e-mail came from your file?

4    A    That's correct.

5    Q    Is Exhibit 20 a true and correct copy of an e-mail your

6    office received from Demas Yan on December 4th, 2003

7    inquiring about the status of the updated map and when this

8    signatures for his private lenders would be ready for him to

9    pick up so he could get those signatures?

10   A    Yes.

11   Q    Is Exhibit 21 a true and correct copy of a preliminary

12   title report that Demas Yan –- a preliminary title report –-

13          MR. ROMEO: Your Honor, I have to object to the

14   leading form of the questions.  I know we're saving time on

15   some things, but this is starting to sound like

16   interrogatory responses or questions that I think –-

17          THE COURT: Fair enough.

18          MR. ROMEO: I think he needs to lead a little less,

19   especially with a third-party witness.

20          THE COURT: Not an adverse witness.

21          MR. ROMEO: No.

22   BY MR. FARRER:

23   Q    Mr. Seher, is Exhibit 21 a document that comes from

24   your file?

25   A    Yes.

1   Q    Can you tell me what it is?

2   A    It's a title report.

3   Q    And on what property?

4   A    On the 667 Chenery Street property.

5   Q    You mean 663?

6   A    663, excuse me.

7   Q    Did Demas Yan fax this title report to your office?

8   A    Yes.

9   Q    And what is the date of that title report?

10  A    The date of the title report is September 3rd, 2003.

11  Q    And can you tell for me by looking at Exhibit 21 when

12  it was sent to your office?

13  A    December 4th, 2003.

14  Q    Does this title report contain handwritten

15  signatures -- or handwritten notations?

16  A    On the top of the first page, it does.  And there's

17  some notations with respect to the deeds of trust in the

18  title report.

19  Q    Items 4 and 5?

20  A    Items 4 and 5 are marked off as "Paid."

21  Q    So in this fax to your office, is it your understanding

22  Mr. Yan was telling your office that he had paid off the

23  World Savings Bank loan identified in Item 4 and the Bank of

24  America loan identified in Item 5?

25  A    Yes.

1  Q    And do you see the Lei Ming Li and Stella Chen deeds of

2  trust identified in this report?

3  A    I see Winky Kei (Phonetic).  I don't see Stella Chen's

4  name on here.

5  Q    What about Item 8?

6  A    Item 8, yes, excuse me.  Yes.

7  Q    That's the Stella Chen deed of trust?

8  A    That's correct.  That's Item No. 8, yes.

9  Q    And Item 7 is the Lei Ming Li deed of trust?

10 A    That's correct.

11 Q    And again Mr. Yan sent this title report to your

12 office.

13 A    Yes.

14 Q    With the handwritten notes on it.

15 A    That's correct.

16 Q    If you'd turn to Tab 22.  Is Exhibit 22 a true and

17 correct copy of a letter and enclosures your office sent to

18 Demas Yan?

19 A    Yes.

20 Q    And you sent that on December 4th?

21 A    That's correct.

22 Q    And what are you sending to Mr. Yan?

23 A    We're sending one of three mylar sheets.  It's usually

24 the -- the first item that prints sheet 1 of 3 is the mylar

25 sheet that will be signed.  Then there's another set of

plans that we're sending which is all three sheets, and the
reason that we don't send all three mylar sheets is because
sometimes there's slight updates, technical updates, that
have to be performed on sheets 2 and 3 and until we've done
confirmation measurements and that, they may not be ready.
However, we like to try to get the signatures on sheet 1
because generally they take a while, sometimes there's three
or four lenders or owners, and they all have to take their
own individual time and sign the sheets, so we like to try
to get that done up front so it's not holding up the map in
the end.    That's why they only received 1 of 3 on the mylar
film.  And that will be an original.  And then on the next
item it was prints of the maps.  These are sheets 1 through
3 on white paper so that the lender or anyone signing the
map could see what the whole map looked like, at least at
that point.

Q    Did your office prepare the attachment to Exhibit 22,
in other words, the mylar --

A    Yes, yes.

Q    -- the plat map for signatures based upon the
information that Mr. Yan faxed to your office in the
Fidelity Title Report, Exhibit 21?

A    That's correct.  And we'll do that, but it will all be
subject to us receiving a final title report that will
ultimately be what will be the final form of the map when it

1  leaves our office.

2  Q    And the map -- the blank consent form that you sent to

3  Mr. Yan on December 4th, that is enclosed with Exhibit 22,

4  identifies Stella Chen and Lei Ming Li as beneficiaries

5  because they held deeds of trust against the property?

6  A    That's right.

7  Q    And you're asking Mr. Yan to get their signatures so

8  that the final condominium subdivision could be approved.

9  A    That's correct.

10 Q    Is -- if you turn to Tab 23, is Exhibit 23 a true and

11 correct copy of a fax that your office sent to Fidelity

12 National Title Insurance on December 12th, 2003?

13 A    Yes.

14 Q    And are you enclosing the signed mylar signatures?

15 A    We've copied them from the mylar map and faxed them to

16 the title company.

17 Q    And that includes the signature by Stella Chen as a

18 beneficiary?

19 A    That's correct.

20 Q    And who obtained those signatures?

21       MR. ROMEO: Objection.  Calls for speculation.

22 BY MR. FARRER:

23 Q    Strike that.  Who gave your office the signed consent

24 form that you're sending to Fidelity?

25 A    I'm sure -- you know, I'm sure it was the client.  I'm

1  sure it was whoever we gave the mylars to, to get signatures

2  from.

3  Q    And who is that?

4  A    And that was Demas Yan.

5  Q    Mr. Seher, I pass to you an enlargement of what I

6  believe is the enclosure with Exhibit 23, so it would be

7  more legible.  Is that the signed consent form that Mr. Yan

8  provided to your office which you then sent to Fidelity and

9  ultimately to the City for subdivision approval?

10 A    You know, to be honest with you, I'm not sure if this

11 is ultimately what got sent because I'd have to see a final

12 copy of this.  Well, it's my signature, so yes, yes, this is

13 what got sent to the City, caused the City -- I'm noticing

14 now that the City signed it and I signed it, so this is in

15 fact what got sent to the City.  That's absolutely correct.

16 Q    And does that have the signatures for Stella Chen as a

17 beneficiary?

18 A    Yes, it does.

19 Q    And does it also have the signature of Demas Yan as the

20 owner?

21 A    Yes.

22 Q    If you could turn to Tab 27.  Is Exhibit 27 a true and

23 correct copy of a final plat map for 663 Chenery Street that

24 was recorded on or about January 10th, 2004?

25 A    Yes.

1  Q    And again, that map contains your signature on the

2  first page?

3  A    Yes.

4  Q    And it contains Mr. Yan's signature as the owner and

5  Stella Chen's signature as the beneficiary.

6  A    Yes.

7  Q    Okay.  And persons or entities with deeds of trust

8  against it, these are property that the owner wants to

9  subdivide must sign off on the map before the City will

10 approve it.

11 A    Actually, it's more like all the deeds of trust that

12 are on the property have to be on the map or the title

13 company won't issue a parcel map guaranty and the City won't

14 accept the map without the title company issuing a parcel

15 map guaranty.  That's kind of more the way it is.

16 Q    Okay.  So the deed of trust holders must consent?

17 A    That's correct.

18 Q    So you worked for Mr. Yan from -- for over four years

19 from October '99 till at least January of 2004.

20 A    Correct.

21 Q    During that entire time, did Mr. Yan ever tell you that

22 he disputed the lien and deed of trust of Stella Chen?

23 A    Not that I'm aware of.

24 Q    During that time, did he ever tell you that he was not

25 aware that Stella Chen's deed of trust had been recorded

1  against the 663 Chenery Street property?

2  A    No.

3  Q    During that time that you represented him, did Demas

4  Yan ever tell you that he was under any pressure from Tony

5  Fu to concede the lien of Stella Chen or that the property

6  would be put into foreclosure?

7  A    Not that I'm aware of.

8           MR. FARRER: No further questions.

9           THE COURT: Okay.  Mr. Romeo?

10                      CROSS-EXAMINATION

11 BY MR. ROMEO:

12 Q    Good morning, Mr. Seher.

13 A    Hi.

14 Q    I'm Mark Romeo.  I'm representing Demas Yan.  We've

15 talked before.  I have just a few questions for you, and

16 we'll try and get you out of here because I understand it's

17 a busy week for you.

18          First of all, you testified that Mr. Yan retained

19 you in -- or your firm in 1999 for this project, correct?

20 A    Yes.

21 Q    And you initially prepared a subdivision map or -- the

22 first subdivision map that was prepared was in 2002?

23 A    Actually it evolves over time.  So I'm not sure when

24 the first draft of the map was created.

25 Q    Well, if you take a look at Exhibit -- this may be

easier for you out of the binder, and I'm showing you

Exhibit G.  I have an enlarged original if that's easier for

you to look at.

A    No, this is fine.  I can see this.  Uh-huh.

Q    Okay.  So as I understand it, this one was prepared in

June 2002?

A    Correct.

Q    And each time that the client has to make changes on

the subdivision map and go through all of this process, it

costs the client additional money?

A    Generally.  We anticipate a few changes earlier on as a

function of our initial contract, but when there's an

inordinate amount of changes -- if there's more than what we

deem as just the normal course of map preparation or in the

normal course of a project, then we'll try to get additional

services for that.  We anticipate a change or two, but when

it gets -- but if we have to start erasing the map and that,

then we'll go ahead and try to get additional services.

Q    And normally when a client comes in, you have some kind

of set fee for preparation of the map, but if it gets

into --

A    It's a good faith estimate, yeah.

Q    And then if it starts evolving and you get additional

lenders or things like that, then it starts to add up to

extra costs for Mr. Yan or a client like Mr. Yan.

1    A    That's correct.

2    Q    And in this case, Mr. Yan in fact in his October 3rd e-

3    mail when he was contacted about the additional lenders, he

4    asked you to hold off doing any more work, correct?

5    A    I think it was with respect to making any more changes

6    on the map.

7    Q    Okay.  And with respect to the terminology, you talk

8    about lenders.  It's the case that you have to have anybody

9    who's got a lien of record on the property has to sign off

10   on the subdivision map in order to get the parcel map

11   guaranteed, correct?

12   A    That's right.  It's record title -- people who have

13   record title interest, is kind of how we phrase it.

14   Q    And sometimes in dealing with a client such as Mr. Yan,

15   you refer to those people generically as lenders?

16   A    Yes.  Mr. Yan would be an owner or whoever is the owner

17   of record would be called an owner and a lender, yeah,

18   they're the two person or entities that would have to sign

19   the map, the owners and the lenders.

20   Q    Okay.  And the terminology that your firm used with Mr.

21   Yan, to refer to these other people that have the public

22   record interests is lenders --

23   A    Deeds of trust.

24   Q    -- the deeds of trust or other liens, you just refer to

25   them as lenders, correct?

1  A    That's correct.

2  Q    And the signatures on the map are commonly referred to

3  as just the lender's approval, correct?

4  A    That's correct.

5  Q    And it's not material or important to your work what

6  the underlying transaction with the particular deed of trust

7  is for, correct?

8  A    Absolutely correct.

9  Q    It's not important what the client thinks is owed or

10  not owed, correct?

11  A    That's right.

12  Q    And in fact the only thing you're concerned with

13  ultimately is what shows on the title report, and that's why

14  a title report is run before the map is recorded in a parcel

15  map escrow, correct?

16  A    That's correct.

17  Q    Okay.

18         MR. ROMEO: No further questions.  Thank you.

19         THE COURT: Any further questions?

20         MR. FARRER: No, Your Honor, I would just move the

21  admission of Exhibit 74.

22         MR. ROMEO: Sure.  No objection.

23         THE COURT: Exhibit 74.

24         MR. FARRER: Which is the enlarged --

25         THE COURT: Oh yes, okay.  No objection; it's

1  admitted.  Thank you, Mr. Seher, you're excused.

2          THE WITNESS: Leave this here?

3          MR. ROMEO: Yes, thank you.

4          THE COURT: Yes, please, just leave it there.

5                          (Whereupon, Plaintiff's Exhibit 74, an

6                          enlarged subdivision map, is marked for

7                          identification and admitted into

8                          evidence.)

9          THE COURT: Okay.  Who's next?  How do you want to

10 proceed vis-a-vis lunch?

11         MR. FARRER: I'm going to call Mr. Brodie, and

12 he'll take about five minutes.

13         THE COURT: Good.  A good pre-lunch witness.

14         MR. ROMEO: An appetizer.

15         THE COURT: Is everybody done with Mr. Seher?  Is

16 he excused?

17         MR. FARRER: Yes.  Is he released?

18         THE COURT: Yeah, that's what I'm asking.  Do

19 either you need Mr. Seher again?  May he go?

20         MR. ROMEO: No more, Your Honor, we're done with

21 him.  Thank you.

22         THE COURT: Okay.  Mr. Seher, you're excused.

23         THE WITNESS: All right.  Thank you.

24         THE COURT: Okay.  Now we have Mr. Brodie you want

25 to call?

1    MR. FARRER: Mr. Brodie?

2   JAMES SCOT BRODIE, PLAINTIFF'S WITNESS, SWORN

3    THE CLERK: Raise your right hand, please.  Do you

4 solemnly swear that the testimony you are about to give to

5 this Court will be the truth, the whole truth, and nothing

6 but the truth?

7    THE WITNESS: Yes.

8    THE CLERK: Please be seated.  State your full name

9 and address for the record.

10    THE WITNESS: James Scot Brodie, 5638 Geary

11 Boulevard, San Francisco 94121.

12      DIRECT EXAMINATION

13 BY MR. FARRER:

14 Q Good morning, Mr. Brodie.

15 A Good morning,

16 Q Are you a certified Notary Public?

17 A Yes.

18 Q And were you requested to notarize a deed of trust for

19 a Demas Yan on or about November 13, 2002?

20    MR. ROMEO: Objection, leading, Your Honor.

21 BY MR. FARRER:

22 Q Did you notarize a deed of trust for Demas Yan?

23    MR. ROMEO: I still object that it's leading.

24    MR. FARRER: I'm laying a foundation.

25    MR. ROMEO: He's asking if -- he's asking

1  specifically if there was some kind of a request.

2         THE COURT: Let's slow down.  That's all he's being

3  called for.  It's not a preliminary matter.  So don't lead

4  the witness.  Show him the exhibit.  Ask him what it is.

5         MR. FARRER: Okay.

6  BY MR. FARRER:

7  Q    Mr. Brodie, have you met Mr. Yan?

8  A    Yes.

9  Q    And what are the circumstances under which you met Mr.

10  Yan?

11  A    He –- I do my notaries through a store called "The

12  Gables," which is an office supplies store, and he came in

13  the store and requested that I notarize a short form deed.

14  Q    Okay.  And did you confirm his identity before you did

15  that?

16  A    Yes.

17  Q    And what did you ask him to provide to confirm his

18  identity?

19  A    A California driver's license.

20  Q    And do you typically record that information in your

21  notary book?

22  A    Yes.

23  Q    Okay.  Is Exhibit –- if you turn in the black binder,

24  to Tab 7.

25  A    Yes.

Q    By the way, do you have your original notary book with you?

A    Yes, I do.

Q    Would you pull out the page of your notary book where -- for the date that you notarized Mr. Yan's signature?

A    Yes.  This is it right here.  It was on November 13th, 2002.

Q    And would you compare your original notary book with what's been marked as Exhibit 7 and tell me if that's a true and correct copy of that page?

A    Yes.

Q    Okay.  Now did Mr. Yan sign your notary book in your presence?

A    Yes.

Q    And did you notarize a deed of trust at his request?

A    I don't have in my records a deed of trust.  It says a "short form deed," which, you know, without seeing the original document, it's just a note I make in my journal.

Q    Assuming you were asked to notarize a deed of trust, do you scan it to make sure it's complete before you notarize it?

A    Yes.

Q    And is that required by California law?

A    Yes.

Q    If you would turn to Tab 6.  Do you have that in front
of you?

A    Yes.

Q    If you would turn to page 2 of Exhibit 6.

A    M-hm.

Q    Is that a true and correct copy of your notary?

A    Yes, that is.

Q    And is this the deed of trust that you notarized for
Mr. Yan on November 13th, 2002?

        MR. ROMEO: Objection, leading.  The phrase for Mr.
Yan, I think, mischaracterizes -- it is leading the witness
to imply that there's some kind of request and consent, and
I don't --

BY MR. FARRER:

Q    Let me rephrase it.  Is this the document that Mr. Yan
asked you to notarize?

A    Yes, it is.

Q    Is this the document that Mr. Yan signed in your
presence?

A    Yes.

Q    And you notarized it after he signed it?

A    Right.  That's clearly my signature, so I wouldn't have
signed it without him in front of me.

Q    So Exhibit 6 is a true and correct copy of the deed of
trust Mr. Yan signed in your presence?

1  A    Yes.  And it says "short form deed of trust" on the

2  document which fits my records.

3  Q    To the best of your knowledge, were all of the blank

4  areas in this deed of trust completed before he signed it

5  and you notarized it?

6  A    Yes.  I've been a notary for over 12 years, and I've

7  turned away many documents that don't look complete.  And

8  even though I'm not responsible for what the document

9  states, you know, I follow the rules, so I wouldn't have

10  signed it had it looked blank in any way.

11  Q    What is your understanding of why people come to you to

12  have deeds of trust notarized?

13  A    The basic definition would be as a legal witness, to

14  check an ID and just record the information.  And all deeds

15  require a thumb print which I have in my journal.

16  Q    You're talking about Exhibit 7?

17  A    I guess, yeah.  I notice in Exhibit 7, it doesn't look

18  as clear as it does in my original journal.

19  Q    I apologize for that.

20  A    But yes, that is a thumb print.

21  Q    Is the first page of Exhibit 7 the front page of your

22  notary book?

23  A    Yes.

24  Q    Okay.

25           MR. FARRER: No further questions.

1    THE COURT: Any cross exam?

2    MR. ROMEO: Just a few questions, Your Honor.

3                    CROSS-EXAMINATION

4    BY MR. ROMEO:

5    Q    Good morning, Mr. Brodie.  My name is Mark Romeo.  I'm

6    representing Demas Yan here, and I have just a few questions

7    to follow up on what Mr. Farrer was asking you about.  You

8    said you've been a notary for 12 years, correct?

9    A    M-hm.

10   Q    Yes?

11   A    Yes.

12   Q    I'm sorry you have to answer out loud.

13   A    Right.

14   Q    On the date in question when you notarized the deed of

15   trust, plaintiff's Exhibit 6, did Mr. Yan come into your

16   store alone or was he accompanied by somebody?

17   A    That, I can't recall.

18   Q    How were you able to remember Mr. Yan when you came

19   here today?

20   A    I'm not saying I do remember Mr. Yan in any way.  I

21   recall him, as far as my records are concerned, he signed

22   the statement in front of me.  That's the only memory I have

23   of him.

24   Q    Okay.  So if I told you that this gentleman sitting

25   over here was Mr. Yan, would that be your exclusive source

1   of knowledge that he was Mr. Yan as opposed to some other

2   person?

3   A     Yes.

4   Q     Okay.  So you have no specific recollection of his

5   appearance.

6   A     No.

7   Q     And you have no specific recollection of whether he

8   came in alone or with somebody else?

9   A     Correct.

10  Q     And you, I take it, cannot recognize that gentleman

11  sitting in the third chair in the first row.

12  A     He looks vaguely familiar to me, but I've worked at the

13  store for 12 years, so if he lives in the neighborhood,

14  maybe he's come in.  We sell office supplies, cards, gifts.

15  So he does look familiar to me.  I would say he's probably a

16  customer at the store.

17  Q     Okay.  For the record, I pointed out Tony Fu.  You

18  mentioned that you notarized a deed of trust.  Did you --

19  were you asked to look at any other documents in connection

20  with this notary service?

21  A     No.

22  Q     If someone signs a promissory note that goes with a

23  deed of trust, you typically have to look at that?

24  A     Yes.  Yes, I do.  Well, it's not required.  Usually

25  people will lay out all the paperwork in front of me, and

1  I'll go through it and just double check to, you know, avoid

2  delays down the road, to just make everything -- what needs

3  to be notarized and what doesn't need to be notarized.

4  Q   Okay.  But sometimes people bring in just the deed of

5  trust, and there's a promissory note at a title company or

6  some other place that you never get to see, correct?

7  A   That's true, although sometimes if you have a deed of

8  trust and there's a power of attorney, I may notice that it

9  was notarized by someone else, but that I don't need to

10  notarize it.

11  Q   Okay.  Now with respect to plaintiff's Exhibit 6, when

12  you went to look at it to make sure that it was all

13  complete, what parts did you review?

14  A   Well, we sell legal forms at the store, so I pretty

15  much just look at the front of the page.

16  Q   What about this little box on the upper left-hand

17  corner which you see a lot in recorded documents --

18  A   M-hm.

19  Q   It says "Recording Requested by" in quotes, and then

20  sometimes as it does here, it says "When Recorded Mail to,"

21  and it has a space for the address.

22  A   Yes.

23  Q   Isn't it the case sometimes that that's left blank when

24  you notarize a document?

25  A   I would have to say usually the top left-hand corner is

1 filled in, but the top right-hand corner is always blank.

2 Q    The right-hand corner is where the recorder's stamp

3 goes, correct?

4 A    Yes.

5 Q    But sometimes the recorded return to box on the left-

6 hand corner isn't filled in, correct?

7            MR. FARRER: Objection, asked and answered.

8            THE WITNESS: I would have to say --

9            THE COURT: Overruled.  Go ahead.

10            THE WITNESS: -- looking at the document, I look at

11 the whole thing.  Below the lines, is the main thing.  I may

12 glance at the top left-hand corner and advise the client or

13 whoever that that needs to be filled out also.

14 BY MR. ROMEO:

15 Q    Okay.  But if they didn't fill it out right then and

16 there, you wouldn't refuse to notarize the document so long

17 as the actual instrument part below the title "Short Form

18 Deed of Trust" is filled out correctly.

19 A    Correct.

20 Q    Okay.

21 A    That's true.

22 Q    All right.

23            MR. ROMEO: No further questions.  Thank you, Mr.

24 Brodie.

25            THE COURT: Any further questions?

1    MR. FARRER: One quick point.

2                    REDIRECT EXAMINATION

3    BY MR. FARRER:

4    Q    Mr. Brodie, you don't have any questions in your own

5    mind that it was Mr. Yan who came in -- even though you

6    can't recall what he looks like, you did ask for identity

7    when he came in and asked you to do this.  You don't have

8    any question in your mind that it was Mr. Yan whose

9    signature -- who was present and asked you to notarize his

10   signature.

11   A    No question.  I mean, correct, I couldn't -- I wouldn't

12   recognize Mr. Yan if he was walking down the street and say,

13   oh, I did a notary for him three years ago, but as far as my

14   records are concerned, there's no way anybody else could

15   have signed my book or put, you know, his thumb print on it.

16   Q    When he came to your office, you actually asked to see

17   his driver's license to confirm his identity and compare the

18   picture on that driver's license with the man standing in

19   front of you and confirmed to your own satisfaction that

20   they were one and the same?

21   A    Yes.

22   Q    Okay.  Thank you.

23           MR. FARRER: No further questions.

24           THE COURT: Mr. Romeo?

25           MR. ROMEO: Nothing further, thank you, Your Honor.

1    Thank you, Mr. Brodie.

2             THE COURT: Okay.  Thank you, Mr. Brodie.  Is he

3    excused?  Are you done with him?

4             MR. ROMEO: Yes.

5             MR. FARRER: Yes, Your Honor.

6             THE COURT: You're excused, Mr. Brodie.

7             THE WITNESS: Thank you.

8             THE COURT: Okay.  What's your next -- who's your

9    next witness?

10            MR. FARRER: Well, they're all long.

11            THE COURT: They're all longer.  Well then why

12   don't we go to lunch.

13            MR. FARRER: I think that would be a good idea.

14            THE COURT: When do you want to start again, 1:00?

15   Will that work?

16            MR. FARRER: That would be fine.

17            MR. ROMEO: That's fine, 1:00 o'clock.

18            MR. FARRER:  How late are we going to go?

19            THE COURT: How long do you want to go?

20            MR. FARRER: Well, before -- this morning you

21   mentioned we told you it was going to be one day.  We might

22   have said that, but we have tomorrow set aside too.  You

23   said you had one matter coming in, in the morning.

24            THE COURT: Yes.

25            MR. FARRER:  I think it was a fee application, and

1   then both counsel are planning on going --

2           THE COURT: Yes.  Tell me what you -- we have a

3   couple more minutes before we go.  Who do you have left for

4   the plaintiff and for the defendant?

5           MR. FARRER: I have six witnesses left through live

6   testimony.

7           THE COURT: And how many of those are long?

8           MR. FARRER: I'm sorry?

9           THE COURT: How many of those are lengthy?

10          MR. FARRER: Well, it depends upon the cross.

11          THE COURT: Okay.

12          MR. FARRER: Because I'm sure I can get each one of

13  them on direct in 20 minutes or less, and there may be even

14  some things that Mr. Romeo and I can stipulate to.  We also

15  have a witness who the counsel stipulated her deposition

16  could be read in --

17          THE COURT: She's not available.

18          MR. FARRER: Well no, she is available, but she

19  didn't want -- actually, she's very busy and --

20          THE COURT: Okay.  So you agreed that --

21          MR. ROMEO: Actually, we could just submit the

22  transcript.

23          THE COURT: Well, you're not going to read it.

24  You can submit the transcript, but I'm not going to let you

25  read it.

1    MR. FARRER: Well then, okay.  That would be

2 Margaret -- well, why don't we deal with that -- that's

3 Margaret Belese, and I will get the original transcript to

4 the Court.  I have it here and give it to the Court, but we

5 have stipulated that her deposition transcript can be

6 admitted with the exhibits in its entirety.

7    MR. ROMEO: That's correct.

8    THE COURT: Okay.

9    MR. FARRER: And those exhibits, by the way, are

10 already listed on our exhibit list and admitted.  I'll just,

11 when we come back, identify for the Court --

12    THE COURT: Okay.  How many witnesses do you have,

13 Mr. Romeo?

14    MR. ROMEO: Mr. Fu, Ms. Chen, Mr. Yan -- although,

15 you know, if -- I don't know if we're going to go through

16 the -- he calls Mr. Yan as an adverse witness; I cross-

17 examine him, and then I call Mr. Yan again on direct.

18    THE COURT: You can do it any way you want.  You

19 can cross-examine him while it's his witness or you can call

20 him as your own.

21    MR. ROMEO: We could save a lot of time -- we could

22 save a lot of time by having everybody have one turn in the

23 chair for all purposes.

24    THE COURT: You can certainly do that.

25    MR. FARRER: That's acceptable.

1    THE COURT: That's fine with me.  Better for the

2    witnesses.

3    MR. FARRER: Okay.  Okay.  So, what, you have

4    three?  You mentioned Stella --

5    THE COURT: Well, I expect that we'll go till 5:00.

6    Does that make sense, roughly 5:00?

7    MR. FARRER: Yeah, I would think so.

8    THE COURT: So let's just kind of measure it

9    according to, you know, kind of where we finish with a

10   witness.

11   MR. FARRER: Of course.  I'm going to call the

12   harder one --

13   THE COURT: So we're not going to start right at --

14   we're not going to stop right at 5:00 in mid sentence.

15   MR. FARRER: No.

16   THE COURT:  If you have a witness that has a few

17   more minutes, we'll finish.  We're not going to start a new

18   witness at a quarter to 5:00.  Obviously we're going to use

19   sense here.  But roughly 5:00 o'clock, does that make sense?

20   MR. ROMEO: That's fine.

21   MR. FARRER: That's fine.

22   THE COURT: Okay.  I will see you at 1:00.

23   MR. FARRER: All right.  And we can leave all our

24   stuff here?

25   THE COURT: Oh yeah.

1     MR. FARRER: Thank you.

2     THE COURT: Now tomorrow morning, when we get to

3 this, by the way, I think we have a couple fee applications

4 at 9:30?

5     THE CLERK: Two.

6     THE COURT: Two.  They will probably take a total

7 of about two minutes.  I don't think they're -- as I recall,

8 there's no objections to them, so it's two minutes.  We can

9 even -- you could call them, Gordon, and as long as there's

10 no objections, and invite them to come by phone, and we'll

11 just appear by phone.  I don't -- let me look at them over

12 lunch.  I'll see if I have any questions, and we could get

13 rid of that fairly quickly.  That is not a problem.

14     MR. ROMEO: If we need to continue to tomorrow, can

15 we leave the boxes in the courtroom overnight?

16     THE COURT: Yes.

17     MR. ROMEO: Thank you.

18     MR. FARRER: Okay.

19     THE COURT: Okay.  See you at 1:00.

20     THE CLERK: All rise.

21     (Whereupon, the luncheon recess is taken at 12:00 noon,

22 and the court is reconvened at 1:07 p.m.)

23     THE CLERK: All rise.

24     THE CLERK: Please be seated.  Okay.  Let's

25 proceed.  Do you want to call your next witness?

1    MR. FARRER: Certainly.  Before I do, I am

2  handing –– I will hand the Court the original Margaret

3  Berlese deposition transcript taken on November 22nd, 2004,

4  that the parties have stipulated may be admitted in its

5  entirety.

6    THE COURT: Very well.

7    MR. FARRER: I also wanted to alert the Court that

8  some of the exhibits to Ms. Berlese's deposition have been

9  identified as trial exhibits here, which have already been

10  admitted, but they are Exhibits 2, 10, and 11.

11    THE COURT: Okay.

12    MR. FARRER: All right.  Plaintiff will call as her

13  next witness, Stella Chen.

14    THE COURT: Okay.

15    STELLA CHEN, PLAINTIFF, AND PLAINTIFF'S WITNESS, SWORN

16    THE CLERK: Please raise your right hand.  Do you

17  solemnly swear that the testimony you are about to give to

18  this Court is the truth, the whole truth, and nothing but

19  the truth?

20    THE WITNESS: I do.

21    THE CLERK: Please be seated.  State your full name

22  and address for the record.

23    THE WITNESS: Stella Chen and --

24    MR. FARRER: Your Honor, Ms. Chen is concerned

25  about her privacy, and would it be permissible with the

1 Court, there's been some stalking allegations, and she fears

2 for her kids' safety, to state her address here as my

3 office?

4 MR. ROMEO: Your Honor, I object to the stalking

5 allegations remark and to this --

6 THE COURT: Do you have an office address?

7 THE WITNESS: I don't.  I work at home.

8 THE COURT: Do you have any problem with the

9 address, not stating an address?

10 MR. ROMEO: It's on the exhibits already, on

11 recorded documents as it is, so -- but I do have to take

12 exception to the stalking allegations.  There's been no

13 testimony about that.

14 MR. FARRER: She has some concern.

15 THE COURT: Well, where is it in the exhibits?

16 MR. ROMEO: It's on her note and deed of trust,

17 4028 Coleman Circle, Richmond, California.

18 MR. FARRER: That's an old address.

19 THE COURT: Well, I always let people say their

20 work address, so unless there's particular need for the

21 address, I'll just let her state Mr. Farrer's address.

22 MR. ROMEO: I just had to take exception to the --

23 THE COURT: I'm not -- I don't think there's any

24 evidence of anything like that.  It's just people often

25 don't like to give out their address, and I'm reacting only

1  to that request.

2          MR. FARRER: Thank you, Your Honor.

3                    DIRECT EXAMINATION

4  BY MR. FARRER:

5  Q    Ms. Chen, would you please state your full name?

6  A    Stella Chen.

7  Q    And are you related to Tony and Fei Fu?

8  A    Yes.

9  Q    And are they your older brothers?

10 A    Yes.

11 Q    Do you know Demas Yan?

12 A    Yes.

13 Q    When did you first meet Mr. Yan?

14 A    Around '91, '92.

15 Q    And where did you meet him?

16 A    I met him at Tony's house.  Mr. Yan and Tony were

17 classmates at Golden Gate University at that time, so he

18 came over to Tony's house for dinner many times.

19 Q    And did you -- did Mr. Yan become what you would

20 consider a close family friend over the years?

21 A    I would say so, yes.

22 Q    Did Mr. Yan ever ask you to borrow money?

23 A    No.

24 Q    Did you ever learn that Mr. Yan had asked your family

25 to borrow money?

1  A    Yes.

2         THE COURT: To loan him money?

3         MR. FARRER: To loan him money.

4         THE WITNESS: Yes.  I think back in February 2002,

5  Tony mentioned to me that Demas is going to Hong Kong and

6  might borrow some money from my family in Hong Kong.  And

7  then in November, October or November '02, my eldest

8  brother, Fei Sing, called me and tell me that he wanted me

9  to be the beneficiary of the promissory note and the deed of

10 trust to collect the money that he loaned to Demas.  He

11 wanted my name there because he doesn't want the money

12 confused with Tony's and Demas' business dealings.  And

13 so -- but then he told me that Tony will let me know what to

14 do because Tony and Demas, they were partners at that time.

15 BY MR. FARRER:

16 Q    Okay.  And what happened next?

17 A    Next, I got the deed of trust by mail from the

18 Recorder's Office, and I called Tony and told him that I got

19 the deed, and he also gave me the promissory note of that

20 $450,000 promissory note.

21 Q    What did you do with the original deed of trust that

22 you got in the mail from the County Recorder's Office and

23 the original promissory note from Demas Yan?

24 A    I put it in a safe deposit box in my bank.

25 Q    If you would take a look at the exhibits, the black

1  binder and tell me if Exhibit 5 is a true and correct copy

2  of the promissory note payable to you that your brother gave

3  you?

4  A    Yes.

5  Q    And is Exhibit 6 a true and correct copy of the deed of

6  trust that you received in the mail?

7  A    Yes.

8  Q    Were you involved in the negotiation or drafting of

9  either of those documents?

10  A    No.

11  Q    Do you have the original of those documents?

12  A    Yes, I do.

13  Q    And you have them today?

14  A    Yes.

15  Q    And did you bring them with you?

16  A    Yes, I did.

17        MR. FARRER: If I may approach the witness?

18        THE COURT: Yes.

19  BY MR. FARRER:

20  Q    Ms. Chen, the documents that I've presented to you, is

21  that the original promissory note that your brother Tony

22  gave to you?

23  A    Yes.

24  Q    And is that also the original recorded deed of trust

25  that you received in the mail from the County Recorder's

1  Office?

2  A    Yes.

3  Q    After you received those documents from your brother

4  and in the mail, what happened next?

5  A    After I received those documents, I got a call from

6  Tony telling me that Demas has a condo parcel map for me to

7  sign, and I need to sign it in front of a public notary, so

8  I went over the next day to Tony's house and then we --

9  together we went to the local store on Geary Street and got

10 it notarized.  I signed it and then I left it with Tony.

11 Q    Is the attachment to Exhibit 23 the condo parcel map

12 that you signed?

13 A    23?

14 Q    The attachment.

15 A    Oh yes.

16 Q    Okay.  Now I also this morning, through Mr. Seher, had

17 him identify Exhibit 74 which is a blow-up, and I'm going to

18 hand that to you and ask you if this is the condo map that

19 your brother brought to you to sign?

20 A    Yes.

21 Q    And that's your signature on the document?

22 A    Yes.

23 Q    And after you signed it, what did you do?

24 A    I left it with Tony so he can give it back to Demas.

25 Q    What happened next?

1  A    I think back in September 2003, Tony called me and told

2  me that Demas accepted an offer to sell one of the condo

3  units, and because of my deed of trust and promissory note

4  says that I will get paid first, so he told me that he will

5  let me know when to go to the title company and all those --

6  Q    Did you ultimately receive a phone call about that

7  sale?

8  A    I receive a phone call from Tony, I think it's early

9  January 2004 that Demas want me to sign some escrow

10 instructions that he faxed to Tony for me to sign.  So I

11 went over to Tony's house the next day and signed those --

12 well, I think I went over that day and signed those escrow

13 instructions so the deal can go through so I can get paid.

14 Q    And were the escrow instructions that you were given to

15 sign, were they already signed by anybody else?

16 A    It was already signed by Demas, and then my name under

17 so he need me to sign my name there.

18 Q    And would you turn to Exhibit 25.  Do you have that in

19 front of you?

20 A    Yes.

21 Q    Is Exhibit 25 a true and correct copy of the escrow

22 instructions that your brother Tony brought to you and asked

23 you to sign?

24 A    Yes.

25 Q    Okay.  And were they already signed by Mr. Yan at the

1  time you signed them?

2  A    Yes.

3  Q    What did you do after you signed those escrow

4  instructions?

5  A    I left it with Tony because he will give back to Mr.

6  Yan.

7  Q    What happened next?

8  A    A couple days later, I got a call from Tony again and

9  saying that Mr. Yan wanted me to go to sign a revised escrow

10  instruction along with some documents in the title company,

11  and that he asked me if I can go the following day and I

12  say, yes.  And then he say that, don't forget to bring your

13  original deed of trust and promissory note.

14  Q    Okay.  So did you go to -- did you go to the title

15  company the following day?

16  A    Yes, I did.

17  Q    And what was the name of that title company?

18  A    I think it's called Old Republic Title Company on

19  Irving Street.

20  Q    On Irving Street.  And were you accompanied by your

21  brother Tony?

22  A    Yes.

23  Q    Okay.  And when you arrived there, who did you meet?

24  A    When I arrived there, I met a woman, her name is Connie

25  Ho, and she say that she is the title officer handling the

1 whole Chenery property escrow, and so she led us to a

2 conference room and asked us to wait there while she

3 gathered all the documents together and give me to sign.

4 And then she come back and give me the document and also the

5 revised escrow instruction, and I looked at it; I looked

6 through it and my last name spelled wrong so I told her.

7 And she say you can just cross it and spell your name the

8 right name and then initial there. So I did that, and I

9 signed it after I corrected it.

10 Q    Could you turn please to Tab 29. Is Exhibit 29 a true

11 and correct copy of the escrow instructions that were handed

12 to you by Connie Ho to sign on January 12th of 2004?

13 A    Yes.

14 Q    And that's your handwritten change by your name in the

15 second paragraph?

16 A    Yes, right.

17 Q    And that's your initial?

18 A    Yes.

19 Q    Now at the time you signed those revised escrow

20 instructions, had they been signed by Mr. Yan?

21 A    No, not yet.

22 Q    Okay. Did Ms. Ho ask you to sign any other documents

23 at the title company?

24 A    Yes.

25 Q    Do you recall what they were?

1    A    I don't recall.

2    Q    All right.  Let's turn to Tab 26.  Is that your

3    signature on Exhibit 26?

4    A    Yes.

5    Q    And is this one of the documents that Ms. Ho asked you

6    to sign?

7    A    Yes.

8    Q    Okay.  And she notarized that?

9    A    Yes, in front of me.

10   Q    And that had been prepared in advance by Old Republic?

11   A    I think so.

12   Q    And if you turn to Tab 28, Exhibit 28, does your

13   signature appear on that document?

14   A    Yes.

15   Q    And did you sign in Ms. Ho's presence on January 12th

16   of 2003?

17   A    Correct.

18   Q    And is this a document that she gave to you and asked

19   you to sign?

20   A    Yes.

21   Q    And she notarized it after you signed it?

22   A    Yes.

23   Q    Did you give Ms. Ho the original $450,000 promissory

24   note and recorded deed of trust that I showed you moments

25   ago?

A    Yes, I did.

Q    Did you have any questions for Ms. Ho about the escrow?

A    I did.  Actually at that time I asked Ms. Ho that when am I going to collect all this money, and she say as soon as the escrow close.  But then she mentioned one thing that Mr. Yan, Demas Yan will have to put up with another 60,000 in order to pay me in full because the selling price is lower than the deed that he owes me.  So that's what she say.

Q    Okay.  What happened next?

A    A few days later, I did not hear anything from Connie. I called the title company and try to look for Connie Ho, and she's very hard to reach, and every single time I call, she's not available so I talk to her assistant, Angie Wong, and she say she will let Connie call me back.  And finally, I get a hold of Connie, and I ask her what's going on; when is the sale going to be closed, and she say, there's some problem with the buyer -- a financing problem.  So it might take a while until that is done, so --

Q    During any of your conversations with Ms. Ho, did she ever tell you that Mr. Yan was disputing your promissory note or deed of trust?

          MR. ROMEO: Objection.  Calls for hearsay, Your Honor.

          THE WITNESS: No, she never say that.

          THE COURT: Hold on.  How is this not hearsay?

1      MR. FARRER: Well, let me ask it a different way.

2  BY MR. FARRER:

3  Q    Did you learn from any source, ever, that Mr. Yan was

4  disputing your note and deed of trust?

5      MR. ROMEO: Well, I'm going to object to that as a

6  very vague, open question.  She could have heard from her

7  own attorney unless he waives the privilege.

8      MR. FARRER: I'm not going to waive the privilege.

9  BY MR. FARRER:

10 Q    Any source other than your lawyer?

11 A    No.

12 Q    Did Demas Yan ever tell you that he disputed your note

13 and deed of trust?

14 A    Never.

15 Q    What happened next?

16 A    Next is -- let me think.  Oh, I got a call from Tony

17 that he received a letter from an attorney saying that he

18 represented Demas Yan and wanted me to -- want to pay me

19 for -- I think it's $408,000 instead of pay me in full,

20 otherwise he will file a lawsuit against me.

21 Q    Before that happened --

22      MR. ROMEO: I'm going to move to strike that as a

23 hearsay response.

24      MR. FARRER: It's an admission against interest.

25      THE COURT: Well, except that we don't know who

1 actually said it. It's only if it's really his lawyer.

2        MR. FARRER: Okay.

3        THE COURT: So we need a little bit more

4 information.

5 BY MR. FARRER:

6 Q   All right. Well, let's back up a little bit. Before

7 you got the phone call from your brother --

8        THE COURT: And it's an admission and it doesn't

9 have to be against interest. It's just a declaration

10 against interest. An admission will do, but only by a

11 person authorized to speak on behalf of the party opponent.

12        MR. FARRER: Understood.

13        THE COURT: And it's that authority that's just in

14 question.

15 BY MR. FARRER:

16 Q   Did you send Connie Ho a letter?

17 A   Yes, I did. I sent her a letter with my bank

18 information with it just in case that the sale goes through,

19 then she can wire the money -- deposit the money to my

20 account. And also tell her that if in case the sale does

21 not go through, I want the original deed of trust and the

22 promissory note back.

23 Q   Would you turn to Exhibit 34. Is this a true and

24 correct copy of a letter you sent to Connie Ho on February

25 18th of 2004?

1  A    Yes.

2  Q    And this is the information where you give her -- this

3  is the letter where you give her your account information

4  and tell her if the escrow doesn't close, you want the

5  original deed of trust returned?

6  A    Yes.

7  Q    Now before -- did you -- you mentioned that you had a

8  phone call from your brother indicating that he'd received a

9  letter.

10  A    Yes.

11  Q    From a lawyer for Mr. Yan.

12  A    Yes.

13  Q    Did you see that letter?

14  A    Yes.  My brother brought it over to me.

15  Q    And did you read it?

16  A    Yes, I read it.

17  Q    And was that letter from a lawyer who indicated in

18  that letter that he represented Demas Yan?

19  A    Yes.

20  Q    And what did that letter say to the best of your

21  recollection?

22        MR. ROMEO: Objection, Your Honor.  I think that

23  the letter should be produced, rather than talk about --

24        THE COURT: Do we have the letter?

25        MR. FARRER: It's one of his exhibits.

1    MR. ROMEO: Exhibit Q.

2    THE COURT: Well then let's talk about the letter.

3  Just ask if that's the letter.

4  BY MR. FARRER:

5  Q    Is, Ms. Chen, Exhibit -- Defendant's Exhibit Q a copy

6  of the letter that your brother gave you from a Richard

7  Beckman that was the attorney who said he represented Demas

8  Yan?

9  A    Yes.

10  Q    And after reading that letter, what did you say?

11  A    I say that's ridiculous.  He owe $450 (sic) and he want

12  to pay me less than that?

13  Q    You said $450.  Did you mean 450,000?

14  A    Well, $450,000.

15  Q    What happened next?

16  A    Next I contacted an attorney to write a response to

17  this letter just stating the facts to Beckman.

18  Q    And what was the name of that lawyer?

19  A    Siu Ma.

20  Q    And what happened next?

21  A    Let me see.  After that, next I got sued, and my

22  brother Tony called me and say that in his answering

23  machine, there's a message left by Beckman's office saying

24  that they're going to file an injunction, a motion for

25  injunction on a certain day.

1  Q    Were you foreclosing on your deed of trust at the time?

2  A    No, at that time, no.

3  Q    Did you go to court?

4  A    Yes, I went to court that day and I told the court that

5  I never get notified by the party who are intending to file

6  this motion.  I never get notified, and the court -- the

7  Clerk agreed to cancel the hearing that they set with Yan's

8  attorney, but they do warn me that they will -- they might

9  come back another time and they might, you know, file that

10 motion again.  You better find a lawyer.

11 Q    Did you find a lawyer?

12 A    I did.

13 Q    What was his name?

14 A    David Zeff (Phonetic).

15 Q    And was there a hearing on an injunction request by Mr.

16 Yan?

17 A    Yes.

18 Q    And did Mr. Yan prevail?

19       MR. ROMEO: Objection, relevancy, lack of

20 foundation.

21       MR. FARRER: This all goes to the merits of Mr.

22 Yan's claim and the evidence presented.

23       MR. ROMEO: And without the foundation as to what

24 the pleadings were and the fact that an injunction is denied

25 does not in itself have any res judicata or collateral

1  estoppel effect.

2  THE COURT: I think it's perfectly appropriate

3  background information.  The fact that it was denied is not

4  res judicata in any way in this action, but it is relevant

5  background information.  So the objection is overruled.

6  BY MR. FARRER:

7  Q    Was the injunction granted?

8  A    No.

9  Q    Is Exhibit 47 -- if you'd turn to Tab 47 -- a true and

10 correct copy of the order denying that injunction?

11 A    Yes.

12 Q    Did you -- and by the time -- Mr. Yan had sued you,

13 correct?

14 A    Yes.

15 Q    Okay.  And after you prevailed and the court denied Mr.

16 Yan's request for an injunction, that was to prevent a

17 foreclosure?

18 A    Would you say that again?

19 Q    Yeah.  Let me rephrase it.  After the hearing on the

20 injunction, did your lawyer recommend that you engage

21 different counsel?

22 A    My lawyer said that it's not -- we discussed -- I

23 discussed with my lawyer like what is the best way for me to

24 collect the money, and he suggested it will be foreclosure.

25 But he's not in that specialty, so he say, you know, I can

1  refer you to some lawyer or you might look around and find

2  somebody else.

3  Q    Did you find somebody else?

4  A    Yes, I did.

5  Q    And what was his name?

6  A    Brett Pedersen.

7  Q    And did that work out?

8  A    No, it did not work out because I felt like he was

9  overcharging me.

10  Q    And then did you find somebody to replace Mr. Brett

11  Pedersen?

12  A    Yes, I found Mr. Farrer.

13  Q    At some point, did you make demand on Mr. Yan to put

14  the Chenery Street property on the market or you would

15  initiate foreclosure proceedings?

16  A    Yes.

17  Q    Would you turn to Tab 48.  Is Exhibit 48 a copy of a

18  letter that you authorized demanding Mr. Yan put the Chenery

19  Street property on the market or you'd initiate foreclosure

20  proceedings?

21  A    Yes.

22  Q    Did Mr. Yan respond to that demand?

23  A    I don't think so.

24  Q    Did you start foreclosure proceedings against the

25  Chenery Street property?

1  A    Yes, we did.

2  Q    And is Exhibit 49 a true and correct copy of the Notice

3  of Default that you recorded?

4  A    Yes.

5  Q    And after you recorded that -- the motion for

6  preliminary injunction, did Mr. Yan make a second motion for

7  preliminary injunction in the State Court?

8  A    Yes.

9  Q    Did he prevail?

10 A    No.  Of course not.

11       MR. ROMEO: Move to strike the "of course not"

12 remark.

13       THE COURT: It's not responsive, and it is

14 stricken.

15 BY MR. FARRER:

16 Q    Is Exhibit 50 a true and correct copy of the order

17 denying Mr. Yan's second motion for a preliminary

18 injunction?

19 A    Yes.

20 Q    Did Mr. Yan make any effort, to your knowledge, to cure

21 the defaults listed in your Notice of Default?

22 A    No.

23 Q    So did you then go ahead in December of 2004 to file a

24 Notice of Trustee's Sale?

25 A    Yes.

1  Q    And is Exhibit 51 a true and correct copy of that

2  Notice of Trustee's Sale?

3  A    Yes.

4  Q    What happened next?

5  A    Next I know is that he -- I think he filed another

6  motion.

7  Q    Did he request a payoff figure?

8  A    Oh yes, he did.  I think he sent a letter to request

9  the itemized figure that how much he need to pay.

10 Q    And if you turn to Tab 52, Exhibit 52, is that a true

11 and correct copy of a letter from Demas Yan requesting a

12 written itemization of the default amount and payment

13 instructions?

14 A    Yes.

15 Q    Did you instruct your attorney to respond to that

16 letter?

17 A    Yes, we do.

18 Q    Is Exhibit 53 a true and correct copy of that response?

19 A    Yes.

20 Q    Did Mr. Yan respond to Exhibit 53?

21 A    I think he make another request.

22 Q    All right.  If you'd turn to Exhibit 54, have you seen

23 that before?

24 A    Yes.

25 Q    And is this a second payoff request from Mr. Yan?

1  A    Yes.

2  Q    And then did Mr. Yan ever remit any payment to you?

3  A    No.

4  Q    None whatsoever?

5  A    No.

6  Q    And instead did Mr. Yan file a second State Court

7  lawsuit against you?

8  A    Yes.

9  Q    Alleging essentially the same claims?

10 A    Yes.

11 Q    And then did he move for a third motion for preliminary

12 injunction in that second lawsuit?

13 A    Yes.

14 Q    And did he win that motion?

15 A    No.

16 Q    If you'd turn to Tab 55.  Have you seen that before,

17 Exhibit 55?

18 A    Yes.

19 Q    And is that a true and correct copy of a transmittal

20 letter and proposed order that was sent to Mr. Yan on

21 December 13th of 2004?

22 A    Yes.

23 Q    Do you know if Mr. -- did Mr. Yan ever respond to that

24 letter?

25 A    I don't recall he responds to that letter.

1  Q    Have you received any money on your $450,000 promissory

2  note?

3  A    No.

4  Q    Has Mr. Yan ever told you he disputes that promissory

5  note?

6  A    No.

7  Q    Has Mr. Yan ever told you that your $450,000 promissory

8  note is really to memorialize the money that he owes to your

9  brother for your brother's interest in the development of

10 the Chenery Street property?

11 A    Never.

12            MR. FARRER: No further questions.

13            THE COURT: Okay.  Cross-exam.

14            MR. ROMEO: Your Honor, I'm going to be using a

15 deposition transcript of Ms. Chen.

16            THE COURT: Okay.

17            MR. FARRER: What is the date of that?

18            MR. ROMEO: 9-17-04.

19                        CROSS-EXAMINATION

20 BY MR. ROMEO:

21 Q    Just to follow up on the last question while it's fresh

22 in our minds, you said Mr. Yan has never disputed this note

23 to you; is that correct?

24 A    Correct.

25 Q    Have you had any conversations with Mr. Yan directly

1 about the note since the filing of the lawsuit in

2 February –- his initial lawsuit against you in February of

3 2004?

4 A    No.

5 Q    So what you're really saying is that Mr. Yan has had no

6 conversations with you at all.

7 A    No.

8 Q    And just to follow up on –- do you still have your

9 binder in front of you?  Can you look at Exhibit 54?

10 A    You mean the black one?

11 Q    Yes, ma'am.

12 A    Okay.  54?

13 A    Yes, ma'am.

14 Q    And Mr. Farrer was just asking you about Mr. Yan's

15 response to his letter in response to Mr. Yan's request for

16 a payoff demand, correct?

17 A    I'm sorry, can you repeat that question?

18 Q    This is in response to Mr. Farrer's itemization of the

19 payoff, correct?  That was your testimony a few minutes ago.

20        MR. FARRER: Objection, to the extent it

21 mischaracterizes her testimony.

22        THE COURT: I'm sorry?

23        MR. FARRER: I said, objection to the extent it

24 mischaracterizes her testimony.  I'm not sure it's clear.

25 ///

BY MR. ROMEO:

Q    You just testified that this was given in response to Mr. Farrer's itemization.

A    I say that there's another itemized request, the second request to itemize.

Q    Okay.  And the reason you have personal knowledge of this is because you got it from Mr. Farrer's office, correct?

A    Correct.

Q    And when you got it from Mr. Farrer's office, you saw in the second sentence in the first paragraph the following statement:

        "Note that any amount that I pay will be under
        protest."

You saw that at the time, correct?

A    Yes.

Q    You were here this morning when Fei Sing Fu was testifying about this original loan in Hong Kong, correct?

A    Correct.

Q    In fact you attended all the depositions in this case; haven't you?

A    Not all of them.

Q    But you've attended all of the ones with Mr. Yan and Tony Fu; haven't you?

A    Yes.

1  Q    All right.  And you talk to Tony Fu pretty often; don't

2  you?

3             MR. FARRER: Objection.  Vague.

4  BY MR. ROMEO:

5  Q    You're in frequent contact with Mr. Fu; aren't you?

6  A    What do you mean by "frequent"?

7  Q    In regards to this case.  You talk to him often about

8  this case; don't you?

9  A    Not often about this case.

10  Q    Now, in the depositions and in the testimony this

11  morning, you heard about this loan that took place -- that

12  Fei Sing Fu said took place in Hong Kong, correct?

13  A    Yes.

14  Q    And in regard to that loan, you were told by Fei Sing

15  Fu that you were to collect that loan via the note and deed

16  of trust that you've just testified to this afternoon,

17  correct?

18  A    Correct.

19  Q    And you received phone calls from both Tony Fu and Fei

20  Sing Fu telling you that you were going to be the holder of

21  this note, correct?

22  A    Correct.

23  Q    Then you got the note and the deed of trust in the mail

24  in November 2002.

25  A    Yes, correct.

1  Q   And you weren't surprised because they told you that it

2  was going to be sent to you, correct?

3  A   Correct.

4  Q   And in fact on the deed of trust it has your then home

5  address of 4028 Coleman Circle on the address.

6  A   Correct.

7  Q   Okay.  And in these conversations with Tony Fu and Fei

8  Sing Fu, you've been told what you're going to do or what

9  you're supposed to do with the money when it's collected,

10 correct?

11 A   Correct.

12 Q   And it's your understanding, and you've testified that

13 the money is supposed to go back to Mr. Leung in Hong Kong,

14 correct?

15 A   I understand that when I collect the money, I am going

16 to give it back to my brother, Fei Sing Fu.

17 Q   Well, you've testified that the money goes back to Mr.

18 Leung; haven't you?

19 A   I am not sure if I testified to that, but I do remember

20 that I say I will give the money back to my brother and he's

21 going to do his part.  That's what I say.

22 Q   Okay.  So -- but you have testified that it's going

23 back to Mr. Leung and that's what Mr. Fei Sing Fu told you,

24 correct?

25 A   I cannot remember.

1  Q    Okay.  Can we show you your deposition?  Would that

2  refresh your recollection of what you said?

3  A    I think, yes.

4  Q    If I could have you take a look at your deposition at

5  page 39, line 2.  The testimony I'm referring to starts on

6  line 2, the question.  It says:

7         "Did your brother tell you that when he got the

8          money that he would then give it to Mr. Leung?"

9  And you said, Answer:

10         "They are -- well, that's their -- "

11 And Mr. Farrer interrupts and says:

12         "That's their arrangement"?

13         The witness" "Yeah."

14         "Mr. Farrer: Do you understand that's what's going

15          to happen though, that your brother was going to

16          give it to Leung Hing Lau?

17         "The witness: Yeah."

18 And then at line 17 -- excuse me, at page 40, line 3 to 5:

19         "Question from Mr. Yan: I thought you just said

20          the money goes eventually back to Leung Hing Lau?

21         "Answer: It does."

22 Does that refresh your recollection that the money goes to

23 Leung Hing Lau rather than Fei Sing Fu?

24 A    I guess at that time, yes.

25 Q    Well, you knew in -- you knew in 2002, didn't you, that

1 Fei Sing Fu had made good on the Leung loan; is that what

2 you're saying?

3 A    No, I don't know that he pay off Leung back in 2002.  I

4 don't know that.  He just told me that I'm going to collect

5 this money and the money he told me that the money was lent

6 to Demas Yan by Leung Hing Lau, but in February –- and he

7 asked me to collect the money for him and give it back to

8 him.  That's –- they have their own arrangement, I don't

9 know.

10 Q    But from what you understand and based on your

11 deposition testimony, your brother told you that he was

12 giving the money back to Mr. Leung; is that true?  Or is

13 your deposition testimony untruthful?

14 A    What I'm saying is that at that time when I have my

15 deposition, at that time, I don't –- I don't know –- I don't

16 know where the money goes to.  I mean I don't know that my

17 brother already pay off the note.  And I don't know their

18 arrangement.  All I know is that I collect the money and

19 give it back to my brother and he will do whatever his part.

20 Of course when he has to pay off Leung Hing Lau, eventually

21 he get the money --

22 Q    So are you testifying then that Fei Sing Fu never

23 mentioned to you once that he had paid three million dollars

24 Hong Kong to Mr. Leung?

25 A    Not until –- not until –- actually I never really asked

1  him all the details.

2  Q    Let's go to your deposition, page 54, line 7.  Mr. Yan

3  asked you a question commencing on line 7.

4              "So your older brother told you that Leung Hing

5              Lau made a loan to me, Demas Yan, and that a note

6              and deed of trust was made in your name; is that

7              correct?

8              "Answer: Yes, for me to collect the money for him.

9              "Question: The money belongs to Leung Hing Lau; is

10             that correct?

11             "Answer: Yes.

12             "Mr. Yan: Question: Your brother told you that you

13             were to collect the money, give it to your

14             brother, older brother, and your brother is going

15             to return the money to Leung Hing Lau; is that

16             correct?

17             "Answer: Correct."

18  Did you give that testimony?

19  A    Actually, I get lost here, sorry.  Line 7, the question

20  and then did you jump down or --

21  Q    I'm sorry.  I'm jumped down to page 55, line 2.

22  A    Yeah.  I cannot find it.

23  Q    I'm sorry, 2 to 18.  Did you give that -- if you'll

24  read that testimony.

25  A    Yes.

Q    Do you remember in your deposition Mr. Farrer telling

Mr. Yan that it is very clear that the uncle made the loan

and not Fei Sing Fu.

MR. FARRER: Objection.  No foundation.

THE COURT: I'm sorry?

MR. FARRER: I said objection, no foundation.

THE COURT: It was, did your brother ever say.

MR. FARRER: No, I thought he said did I tell --

MR. ROMEO: Yes.

THE COURT: Oh, okay.

BY MR. ROMEO:

Q    If you'll turn to your -- turn to the transcript to

page 23, lines 12 to 23.

THE COURT: Line 23 or page 23?

MR. ROMEO: Page 23.

THE WITNESS: Was that 23?

BY MR. ROMEO:

Q    Yes.  The question I'm asking is whether you recall in

your deposition Mr. Farrer making the following statement.

        "They don't claim her brother made the loan.  They

        claim his wife's uncle made the loan.  That's very

        clear."

Do you remember that statement?

A    Yes.

Q    Do you have the white binder in front of you?

1  A    Would you go to Exhibit X.  Have you found it?

2  A    Yes.

3  Q    Is that your declaration?

4  A    Yes.

5  Q    Did you sign that declaration on November -- excuse me,

6  November 4th, 2004?

7  A    Yes.

8  Q    Looking at paragraph 2, on the first page, the

9  following statement commencing on line 25:

10          "During February of 2002, Yan borrowed the sum of

11          $450,000 from my sister-in-law's uncle, who then

12          assigned that obligation to me for payment."

13  Now, that's not true either; is it?

14  A    Well, the money was borrowed, lent to Demas, originally

15  was from my sister's uncle, and that's a true statement.

16  Q    Well, let me ask you this.  Isn't it true that --

17          MR. FARRER: Excuse me, counsel.  Please don't

18  interrupt her answer.  She has to finish it.  You should let

19  her do so.

20          MR. ROMEO: Did you have something to add to your

21  answer?

22          THE WITNESS: Yeah, and then -- I mean that's where

23  it start is that the money was lent to Demas by my sister-

24  in-law's uncle, and then my brother called me and tell me

25  that they're going to let me collect the money for them.

BY MR. ROMEO:

Q    Okay.  Your brother, Fei Sing Fu called you; is that correct?

A    Yes.

Q    But you never dealt with Mr. Leung; is that correct?

A    Correct.

Q    And it's not true that Mr. Leung made an assignment to you of this note, correct?

A    Well –- well, because at that time, I don't really know the money belongs to who, so all my brother told me is that Leung lent the money and I am going to collect the money. So I think, you know, that's the assignment.

Q    Well, you understand –- you understood this when you signed this declaration; didn't you?

A    Yes.

Q    And you've understood all the legal documents that you've signed and put in evidence, correct?

A    Yes.

Q    You're no stranger to signing documents for legal purposes; are you?

A    No.

        MR. FARRER: Objection, no foundation. Argumentative.  Irrelevant.

        THE COURT: You can have the question –-

        MR. ROMEO: I'll withdraw the question.

1      THE COURT: What number is the note again?

2      MR. FARRER: 5.

3      THE COURT: 5.  Okay.  Thank you.

4  BY MR. ROMEO:

5  Q    Now, in the binder there, can you please go to Exhibit

6  W.  Do you remember signing this declaration in the State

7  Court lawsuit on March 11, 2004?

8  A    Yes.

9  Q    Now in relation to this Hong Kong loan, you learned

10  from your brother, both of your brothers, the facts and

11  circumstances of that loan, correct?

12  A    Correct.

13  Q    And that was important for you to understand because at

14  some point when Mr. Yan filed his lawsuit, he was denying or

15  not paying on the loan that you held, the $450,000 loan,

16  correct?

17  A    Correct.

18  Q    And they told you that Mr. Yan had actually received

19  the cash or currency in Hong Kong from Mr. Leung, correct?

20  A    Correct.

21  Q    And they told you that he'd signed a note in Chinese, a

22  promissory note when he received that money, correct?

23      MR. FARRER: Objection.  Vague as to the point in

24  time.

25      MR. ROMEO: When he received the money.

1      MR. FARRER: Did they tell her that in February of

2  '02; is that what you're asking?

3  BY MR. ROMEO:

4  Q    Your source of information about what happened in Hong

5  Kong was Fei Sing Fu, correct?

6  A    Yes.

7  Q    And Mr Fei Sing Fu told you about the Hong Kong note

8  that we were discussing this morning in his testimony,

9  correct?

10  A    Are you asking when or are you asking --

11  Q    I'm just asking you if he told you about that note.

12  A    He told me about that note, but not at that time.

13  Q    Okay.  When did he tell you about that note?

14  A    He told me that note -- I think some time this year,

15  not at the time he asked me to -- not at the time he

16  asked me to be the one collecting the money, because I think

17  because he think already he has a note, then, you know, he

18  did not mention to me.

19      MR. ROMEO: I'm going to move to strike the last

20  part of the response as non-responsive and incompetent.

21  She's speculating on Mr. Fei Sing Fu's state of mind.

22      MR. FARRER: Well --

23      THE COURT: The question I understand was

24  whether -- what she knew about the original note.

25      MR. ROMEO: Correct.

1    THE COURT: Phrase the question again.  Listen
2  carefully to the question.

3    THE WITNESS: Okay.

4  BY MR. ROMEO:

5  Q    Fei Sing Fu told you about the Chinese note, correct?

6  A    Correct.

7  Q    Can we agree we're not talking about the note -- you
8  were here for the testimony this morning.  A note written in
9  Chinese, I promise to pay 3.6 million Hong Kong.  Correct?

10  A    Correct.

11  Q    And Fei Sing Fu told you about that note?

12  A    Yes.

13  Q    And Tony Fu told you about that note?

14  A    Yes.

15  Q    And you knew about that note in 2004, correct?

16  A    No.

17  Q    You're denying you knew about that?

18  A    I don't know that note until this year.

19  Q    Okay.  So nobody mentioned that till 2005; is that your
20  testimony?

21  A    Yeah.  I --

22  Q    And was the first person you heard about that note from
23  Tony Fu?

24  A    No, from my brother, Fei Sing Fu.

25  Q    Looking at Exhibit W, paragraph 5 on page 2 of your

declaration, and it says:

"I am informed by both Dong Fu and Fei Sing Fu,
(paren Fei) [Fei] and believe that the
consideration for both -- "

THE COURT: Hold on a second. Where --

MR. ROMEO: I'm sorry, Exhibit W paragraph 2.

THE COURT: Is this paragraph 5?

MR. ROMEO: Yes, sir.

THE COURT: Okay.

MR. ROMEO: "... and believe that the consideration
for both the installment and deed of trust was a
loan made to Demas Yan by Fei's wife's uncle in
Hong Kong. Fei has told me, and he will submit a
declaration under penalty of perjury to confirm,
that he was present when the loan was made and Yan
agreed to secure the loan by said installment note
and deed of trust."

End quote. So is it true that Fei Sing Fu told you that Mr.
Yan had agreed to secure the note and deed of trust for the
Hong Kong loan in February 2002?

A    No. He told me that he agreed to secure the loan by
the property in October or November 2004.

Q    Did Fei Sing Fu say he was present when Mr. Yan
promised to secure the loan by a note and deed of trust on
real property?

1  A    He did not tell me that.

2  Q    He never told you that at any time?

3  A    He told me that Tony talked to Demas and they are going

4  to sign the deed of trust and the promissory note.

5  Q    Okay.  Well, your declaration says:

6           "Fei has told me, and he will submit a declaration

7           under penalty of perjury to confirm, that he was

8           present when the loan was made and Yan agreed to

9           secure the loan by said installment note and deed

10          of trust."

11 And that's referring to the one that you're suing in this

12 case, the one that's secured on Chenery Street.  So did Fei

13 Sing Fu make that statement to you or not?

14 A    Fei Sing Fu told me that he was present when the loan

15 was made.  And then later on, when Demas Yan did not return

16 the money, then after all these months tracing after him, he

17 finally agree to secure the loan by the property.  That's

18 what he told me.

19 Q    Okay.  So this statement here that you put in your

20 declaration is untrue because Fei Sing Fu never told you he

21 was present --

22          THE COURT: Is this a witness?  Is the woman in the

23 back a witness?  Are any of these people witnesses?

24          MR. FARRER: Yes, they all are.

25          THE COURT: They should probably go in the

1  conference room.

2     MR. ROMEO: I'll restart the question.

3  BY MR. ROMEO:

4  Q    So this statement is not true; is it, Ms. Chen?

5     MR. FARRER: Objection, argumentative.  Misstates

6  her testimony.

7     THE COURT: Which part of it are you getting at?

8  There's a lot of things in this statement.

9  BY MR. ROMEO:

10  Q    It's not a true statement, Ms. Chen, that Fei Sing Fu

11  told you he was present when Demas Yan agreed to secure the

12  repayment of the loan by the note and deed of trust.

13  A    When he told me is a summary; it's a summary that he

14  was present at the time the loan was made, and then the

15  summary of that, Yan agreed to secure the loan later.

16  Q    You've never been told a specific date that this loan

17  was made in Hong Kong; have you?

18  A    No.

19  Q    I want to talk to you about the instructions that you

20  were discussing with Mr. Farrer this morning -- or this

21  afternoon, the instructions that you signed at the title

22  company?  First of all, who prepared those instructions?

23  A    What instructions are you talking about?

24  Q    The instructions that have been marked as -- I believe

25  they're 25 and 26 in the black binder.

1     MR. FARRER: 25 and 29.

2     MR. ROMEO: 25 and 29, I stand corrected.

3     THE WITNESS: 25?  The 25 one I believe is Demas

4  faxed to Tony to ask me to sign.

5  BY MR. ROMEO:

6  Q    Okay.  You never -- and then you signed 29 on the 12th;

7  is that correct?

8  A    What 29 on the 12th?

9  Q    If you go to Tab 29, there's a revised instruction

10 where you fixed the spelling of your name.

11 A    Yes.

12 Q    Okay.  So you signed both of these instructions,

13 correct?

14 A    Correct.

15 Q    And you never had any direct contact with Mr. Yan about

16 these instructions; did you?

17 A    Correct.

18 Q    And you got these instructions strictly through Tony

19 Fu, correct?

20 A    I got the first one from Tony Fu.  The second one I got

21 it in the title company.

22 Q    Okay.  And Tony went with you to the title company,

23 correct?

24 A    Yes.

25 Q    And tony directed everything that was going on about

1  these instructions, correct?

2       MR. FARRER: Objection.  Vague and ambiguous, no

3  foundation.

4  BY MR. ROMEO:

5  Q    Insofar as he was dealing with you, you took all of

6  your orders and directions from Tony Fu; is that correct?

7       MR. FARRER: Objection.  Vague, ambiguous; there's

8  no foundation and argumentative.

9       THE COURT: Why don't you be more specific about --

10      MR. ROMEO: Okay.

11      THE COURT:  -- about, she signed these

12 instructions; that's what you're getting at, right?

13      MR. ROMEO: I'm not really getting at that.  I'm

14 really getting at whose direction she was acting at.  Was

15 Tony Fu the person who was directing her activities

16 or was she doing this on her own?

17      THE COURT: Okay.

18 BY MR. ROMEO:

19 Q    And that's my question to you.  Did you rely on Tony to

20 tell you what to do, whether these instructions were proper

21 to sign?

22 A    Well, Tony was the one contact with Demas, so when to

23 go and that's -- you know, I listen to him, but the things I

24 sign I don't do it and I look at it myself.

25 Q    Were you aware of Tony -- were you aware from Tony Fu

1  that he and Demas were having a lot of negotiations about

2  this particular escrow?

3  A    I don't -- all I know is that Demas try to squeeze some

4  money out from it.

5  Q    You're talking about the letter from Mr. Beckman,

6  Exhibit Q that you were shown earlier?

7  A    Yes.

8  Q    Were you shown that letter by Tony at the time?

9  A    I believe so because he only sent it to Tony.

10  Q    Okay.  And did you communicate directly with Mr.

11  Beckman about that loan?

12  A    No, I did not.

13  Q    Did you communicate with Tony about that letter?

14  A    I looked at the letter.  I say, that's ridiculous.

15  Q    Who did you say "that's ridiculous" to?

16  A    When Tony gave me, and I read the letter, and I say

17  that's ridiculous.

18  Q    Well, what did you tell Tony?  Why was it ridiculous?

19          THE COURT: Again, we're talking about Q?

20          MR. ROMEO: Yes.

21          THE WITNESS: Because he's trying to not -- to

22  squeeze, and you know, try to take advantage or whatever you

23  can say to not pay in full.

24  BY MR. ROMEO:

25  Q    Because it made you mad because Demas had borrowed

1  $450,000 and now was trying to pay back less, correct?

2  A    Definitely.

3  Q    And you told Tony Fu at that time, this is ridiculous.

4  He borrowed 450; he should pay back 450.

5  A    Yes.

6  Q    And you told Tony Fu that's what he should tell the

7  lawyer, Mr. Beckman in response to this ridiculous letter;

8  didn't you?

9  A    No, I did not.

10  Q    Did you suggest to Mr. Fu, to Tony Fu, that he should

11  tell the lawyer that Demas borrowed 450,000 and he should

12  pay back 450,000?

13  A    I did not suggest to Tony to tell the lawyer anything.

14  Q    And did Tony tell you what he was going to respond to

15  the lawyer?

16  A    He did not tell me.

17  Q    Did Tony agree that it was ridiculous, that Demas had

18  borrowed $450,000 and now he was trying to pay back less?

19  A    I think so.

20  Q    And that Dennis was trying to squeeze you when it was a

21  perfectly clear loan of 450,000; is that what Tony Fu said?

22  A    Yes.

23         MR. ROMEO: I have no further questions.   Thank

24  you, Your Honor.  Thank you, Ms. Chen.

25         THE COURT: Any redirect?

1        MR. FARRER: Sure.

2              REDIRECT EXAMINATION

3 BY MR. FARRER:

4 Q   Ms. Chen, just to recap.  You were not personally

5 involved or present with the original loan in Hong Kong.

6 A   No, I wasn't.

7 Q   Nor were you personally involved in any of the

8 negotiations or present during the drafting and

9 documentation of the replacement loan and deed of trust.

10 A   No, I wasn't.

11 Q   Okay.  If you would, in your exhibit binder, I just

12 want to clear up some administrative matters, if you would

13 turn to Exhibit 58.  Is that a true and correct copy of the

14 Proof of Claim you filed in this case?

15 A   Yes.

16 Q   And have any objections been filed to that claim?

17 A   No.

18 Q   And then Exhibits -- you understand that the Chenery

19 Street property -- do you know how many condominiums there

20 were built at the Chenery Street?

21 A   Four.

22 Q   And have they all been sold?

23 A   Right now, yes.

24 Q   And do you know how much net sale proceeds are

25 remaining?

A    I think it's 2.3 or 2.4 million.

Q    And where is that --

THE COURT: Net of the costs of sale?

MR. FARRER: Yes.

THE COURT: But not net of all the loans.

MR. FARRER: No, the net sale proceeds.

MR. ROMEO: That's the amount that's in the Bank of the West blocked account that Mr. Farrer and I agreed to.

MR. FARRER: In fact, I mean, maybe I've got a couple of documents that Mr. Romeo will stipulate to. They're Exhibit 59 and 60, 61, and 62, which are this Court's orders authorizing the sale of each of the four units.  And then, Your Honor --

THE COURT: So it may take care of senior liens, but it's not --

MR. FARRER: We are the first.  There are -- there were no other liens.

THE COURT: Oh, okay.  So then it's net sale proceeds means net of the closing costs.

MR. FARRER: Of the closing costs.

THE COURT: Yes.

MR. FARRER: Exactly.  And then Exhibit 64, these are already into evidence, is the most current statement I could get from Bank of the West showing the 2.3 million dollar sale proceeds in a blocked account.

1      THE COURT: Okay.

2  BY MR. FARRER:

3  Q    Ms. Chen, if you could turn to Exhibit 65.  Can you

4  tell me what Exhibit 65 is?

5  A    It's the statement of amount owed to me.

6  Q    Okay.  And there's two different calculations there.

7  What's the first one?

8  A    Is the -- as of March 1st, 2004.

9  Q    Through?

10 A    To June 30th, '05.

11 Q    Wait.  It has interest--

12 A    Oh yeah.  It has principal, interest and attorney's

13 fees and costs.

14 Q    Okay.

15 A    And trustee's fee.

16 Q    Now, the trustee's fee, if you turn to Exhibit 63, is

17 this a true and correct copy of an invoice you got from

18 Alliance Title for the trustee's fees in connection with the

19 non-judicial foreclosure on Chenery?

20 A    Yes.

21 Q    And have you paid all those fees?

22 A    Yes.

23 Q    Okay.  And then turning to Exhibit 66.  Have you seen

24 this before?

25 A    Yes.

Q    And is this a true and correct copy of a transmittal

letter to Mr. Romeo enclosing the title company invoices as

well as all of the legal fees that you had been billed in

this case?

A    Yes.

Q    And have you paid all of those fees?

A    Yes.

Q    Except for -- have you paid -- you haven't paid the

June 29th bill.

A    No, I haven't.

Q    Of this year.

A    But it's not due yet.

Q    Okay.  But aside from that, that's -- you have paid all

of these legal fees that were incurred in connection with

litigating with Mr. Yan in two State Court lawsuits and now

in the Bankruptcy Court.

A    Yes, right.

        MR. FARRER: No further questions.

        MR. ROMEO: Recross, Your Honor?

        THE COURT: Yes.

        MR. ROMEO: Just very brief.

                    RECROSS-EXAMINATION

BY MR. ROMEO:

Q    With regard to the legal fees, have you been the one

that's solely borne the cost of the litigation or have your

1  brothers also paid for the legal fees?

2  A   Right now, I am the one paying the legal fees.

3  Q   Now with regard to Exhibit 60 --

4        THE COURT: Okay.  Could you excuse me just a

5  second.

6        (Pause.)

7        THE COURT: Okay.  Please continue.

8  BY MR. ROMEO:

9  Q   With regard to Exhibit 65, Ms. Chen, I have a question,

10 and that is, you've got an item here for interest from

11 3-1-04 to 8-1-05, 63,750, and my question is, why does the

12 interest -- why is the interest running from 3-1-04 under

13 that scenario?

14 A   I think it's because at the time -- let me see -- he

15 take off the property on the market and then he filed the

16 lawsuit to sue us.  That's the time that -- according to the

17 deed, it's supposed to be on the market and he take it off.

18 Q   Okay.  Have you testified before that the -- you

19 believe that the note is due when the property is sold?

20 A   Yeah, if he agree the property should be sold back in

21 January '04 -- no, back in January '04, yeah.  And that will

22 be two months more.

23 Q   So I'm not sure I understand what your interpretation

24 of the note is.  Is the note due when the property is sold

25 or is the note due when he stops marketing it?

1   A    The note is due when it's sold.

2   Q    Okay.  All the property is sold?

3   A    My understanding is that, you know, whenever it's sold,

4   then I will get paid.  That's my understanding.

5   Q    Okay.  And for example, with Mr. Santiesteban's

6   property, he bought 661 Chenery, and there was a $418,000

7   purchase price in the escrow where you were asked to do the

8   instructions.

9   A    Yes.

10  Q    Sorry, that was kind of a long question.  In that case,

11  there wasn't enough actually to pay for the note, correct?

12  A    Correct.

13  Q    So the remainder of the note would not be due because

14  there wasn't enough money to pay it.

15  A    That's not what Connie Ho, the title company -- the

16  escrow officer told me.  She say that Demas has to put up

17  with the rest in order to pay me to get a clear title.

18  That's what she told me.

19  Q    Okay.  But so -- in any case, you're running the

20  interest in this scenario from March 1st instead of from

21  March 1st '02, correct?

22  A    Well, there's two categories here.

23  Q    But you told me that the interest runs because the note

24  is due when the property is sold, correct?

25  A    Correct.

Q    Okay.  Thank you.  No further questions.

THE COURT: Okay.  Any further questions?

MR. FARRER: No.

THE COURT: Okay.  Thank you, Ms. Chen, you're excused.  You may step down.

MR. FARRER: I have a couple of witnesses here from Old Republic.

THE COURT: Okay.

MR. FARRER: Neither one of which will take very long and we can take a break, if the Court decides.

THE COURT: Let's do it right now.

HAROLD KAN, PLAINTIFF'S WITNESS, SWORN

THE CLERK: Please raise your right hand.  Do you solemnly swear the testimony you are about to give to this court is the truth, the whole truth, and nothing but the truth?

THE WITNESS: I will.

THE CLERK: Please be seated.  Please state your full name and address for the record.

THE WITNESS: Yes.  Harold Kan, K-a-n, and work address, 475 Sansome Street, Suite 1700, San Francisco, California 94111.

DIRECT EXAMINATION

BY MR. FARRER:

Q    Good afternoon, Mr. Kan.

1  A    Good afternoon.

2  Q    Thank you for coming.  For whom do you work?

3  A    Old Republic Title Company.

4  Q    And how long have you worked there?

5  A    Twenty years.

6  Q    And what is your title?

7  A    Branch Manager.

8  Q    And can you give me a general description of your

9  duties and responsibilities as branch manager?

10  A    I run the special projects, commercial division, over

11  on Sansome Street.  We specialize in commercial

12  transactions, residential transactions, and my other duty is

13  a subdivision title officer.

14  Q    Okay.  Do you recall becoming involved in connection

15  with a condominium subdivision being done by a gentleman

16  named Demas Yan?

17  A    Vaguely.

18  Q    Do you recall being asked by a Connie Ho to get

19  involved with regard to that project?

20  A    I believe the answer is yes.

21  Q    Do you recall speaking with Mr. Demas Yan regarding the

22  reasons why a plat map on that subdivision had not yet been

23  recorded?

24  A    You know, it's hard to answer that question, because I

25  talk to a lot of people, and, you know, I would speculate if

1   I answered -- I mean I would say I probably did.

2   Q    Do you have any recollection of Mr. Yan ever

3   complaining to you about the liens against that project?

4   A    Again, you know, it's hard to answer that question.  I

5   guess the best way to answer is, I don't recall.

6   Q    Who is George Weeks?

7   A    George Weeks is -- was a paralegal over at Herzig and

8   Berlese.

9   Q    Okay.  And he's a friend of yours?

10  A    He became a friend of mine.

11  Q    Okay.  Do you recall communicating with Mr. Weeks about

12  the -- Mr. Yan's condominium subdivision?

13  A    I'm sure we have.

14  Q    If you would turn in the black binder in front of you

15  to Tab No. 10.  Is Tab No. 10 a true and correct copy of an

16  e-mail that you sent to George Weeks on September 22nd of

17  2003?

18  A    Yes.

19  Q    Why don't you take a moment to look at that e-mail and

20  the attachments to it and tell me if it refreshes your

21  recollection about why you sent that e-mail to Mr. Weeks.

22  A    Yes.  Based on this e-mail to George, is, typically my

23  relationship with the law firm, because my responsibility as

24  a subdivision title officer is when the condominium plans

25  are ready, just about ready to file, we need to make sure

that we revise our reports or revise our report or just get
verbal permission from the title operation as to what loans
are against the property because it is required that the
lenders consent to signing the map.

        And so I would say by reading this e-mail is that
we were led to believe that the loan was to be paid –- was
paid off and so George probably asked me, can you double
check on this, and it's my response, I'll check on it, and
the end result was we did not pick up any reconveyances.  So
therefore I cannot allow the map to record –- or file rather
is a better way to say it, unless those loans are taken care
of or have the lender's consent.

Q    And the liens that you found out or that you discovered
that caused you to write this e-mail are the deeds of trust
to Lei Ming Li and Stella Chen that are attached to your e-
mail?

A    Correct.  Correct.

Q    Just a minute.

     (Pause.)

        MR. FARRER: No further questions.

        THE COURT: Okay.  Any cross-exam?

        MR. ROMEO: No questions, Your Honor.  Thank you,
Mr. Kan.

        THE COURT: Okay.  Mr. Kan, you may step down.
Thank you.

1    THE WITNESS: Okay.

2        (Pause.)

3        WILLIAM CHOY, PLAINTIFF'S WITNESS, SWORN.

4    THE CLERK: Raise your right hand, please.  Do you

5 solemnly swear that the testimony you are about to give in

6 this court will be the truth, the whole truth, and nothing

7 but the truth?

8        THE WITNESS: I do.

9        THE CLERK: Please be seated.

10                    DIRECT EXAMINATION

11 BY MR. FARRER:

12 Q    Would you please state your full name.

13 A    William Choy, C-h-o-y,

14 Q    Good afternoon.

15 A    Good afternoon.

16 Q    Mr. Choy, you're a lawyer licensed to practice in the

17 State of California?

18 A    Yes.

19 Q    And you work for Old Republic?

20 A    Yes.

21 Q    And have you been designated by Old Republic as its

22 custodian of records with regard to its files regarding 661

23 Chenery Street?

24 A    Yes, I have.

25 Q    Who is Connie Ho?

1  A    Connie Ho I believe was an escrow officer with Old
2  Republic.
3  Q    Was she involved in the escrow for 661 Chenery Street?
4  A    Yes.
5  Q    And was she the escrow officer on that?
6  A    Yes.
7  Q    And did you bring Old Republic's original escrow files
8  with you today?
9  A    Yes, I have.
10 Q    Now I'm going to ask you to -- do you recall last year
11 that Old Republic received a subpoena from my office for the
12 originals of those files?
13 A    Yes.
14 Q    And that a complete copy of those files was made?
15 A    Yes.
16 Q    And then they were thereafter bates stamped with an
17 alpha that said ORTC, I believe.
18 A    That's correct.
19 Q    Okay.  I'm just going to ask you to take a look at a
20 number of exhibits and to confirm that they came from Old
21 Republic's files.  And why don't we start with Exhibit 5.
22 And if you could just confirm for me that that is a document
23 that was produced by Old Republic, and I'll direct your
24 attention to the bates stamp number down on the right-hand
25 corner.

1  A   Yes.  This document came from Old Republic's file.

2  Q   And the same with Exhibit 6?

3  A   Yes.

4  Q   Exhibit 13?

5  A   Yes.

6  Q   And do you recognize Exhibit 13?

7  A   Yes.

8  Q   And it's a true and correct, as far as you know,

9  complete copy of a fax that Demas Yan sent to Connie Ho on

10 September 30th of 2003?

11 A   Yes.

12 Q   Exhibit 16?

13 A   Yes.

14 Q   Exhibit 17?

15 A   Yes.

16 Q   Exhibit 26?

17 A   Yes.

18 Q   Now on Exhibit 26, is this a document that Old Republic

19 would prepare in connection with closing an escrow?

20 A   Yes.

21 Q   Exhibit 28?

22 A   Yes.

23 Q   Is that another document that Old Republic would

24 prepare in connection with closing an escrow?

25 A   Yes.

1  Q    Exhibit 29?

2  A    Yes.

3          MR. ROMEO: Is the question is it something that

4  ORTC would prepare or is it --

5          MR. FARRER: No, no.  The question in each case is,

6  are these documents that came from Old Republic's file and

7  are Old Republic's business records.

8          MR. ROMEO: Okay.  Thank you.

9          MR. FARRER: If I ask a follow-up question, I'll do

10 it just for that specific document.

11 BY MR. FARRER:

12 Q    So again, Exhibit 29 came from Old Republic's file?

13 A    Yes, it did.

14 Q    In connection with the escrow on the Chenery Street

15 property?

16 A    Yes, it did.

17 Q    Exhibit 31?

18 A    This document came from Old Republic's file.

19 Q    Exhibit 32?  Did that come from Old Republic's file?

20 A    Yes, it did.

21 Q    Exhibit 34?  Did that come from Old Republic's file?

22 A    Yes, it did.

23 Q    And is that letter from Ms. Chen correctly addressed to

24 Connie Ho at the time on Irving Street?

25 A    Yes.

1 Q    Exhibit 35, Buyer's Instructions, can you tell if that

2 was in Old Republic's file?

3 A    Yes, it was.

4 Q    And are these executed instructions from the buyer for

5 the unit at 661 Chenery Street?

6 A    Yes, his signature appears on the document.

7 Q    Who would typically prepare the buyer's instructions?

8 A    The escrow officer would.

9 Q    This would be Connie Ho at Old Republic?

10 A    That would be, yes.

11 Q    Okay.  Is Exhibit 36 from Old Republic's file?

12 A    Yes, it is.

13 Q    And would this be a document that Old Republic would

14 prepare?

15 A    Yes, it would be.

16 Q    Did Exhibit 37 come from Old Republic's file?

17 A    Yes, it did.

18 Q    And is this a document that Old Republic would have

19 prepared?

20 A    Yes, it would have.

21 Q    Exhibit 38, Estimated Buyer's Statement.  Is this a

22 document that came from Old Republic's file?

23 A    Yes, it did.

24 Q    And is this a document that Old Republic would prepare

25 in connection with closing an escrow?

1  A    Yes, it would have.

2  Q    Exhibit 39, Seller's Instructions.  Did that document

3  come from Old Republic's file?

4  A    Yes, it did.

5  Q    And is this a document that Old Republic would prepare

6  in connection with closing of a sale?

7  A    Yes, it would.

8  Q    Exhibit 40, did that document come from Old Republic's

9  file?

10  A    Yes, it did.

11  Q    And is this a document that Old Republic would have

12  prepared in connection with a closing?

13  A    Yes, it would have.

14  Q    And can you tell me from looking at that document how

15  much the seller had to contribute in order to close that

16  sale?

17  A    Approximately $62,431.40.

18  Q    Okay.  And Exhibit 41, does that document come from Old

19  Republic's files?

20  A    Yes, it did.

21  Q    Now, if -- assuming the seller came to Old Republic's

22  Office and signed the escrow instructions, would the title

23  officer at that time have made the remaining escrow closing

24  documents available to the seller to see?

25  A    I believe so, yes.

1  Q    So all of the exhibits I've just shown you are true and

2  correct copies of documents found in Old Republic's business

3  records for the sale of 661 Chenery Street.

4  A    Yes.

5  Q    Okay.

6        MR. FARRER: No further questions.

7        THE COURT: Any cross-exam?

8        MR. ROMEO: No, Your Honor.  Thank you, Mr. Choy.

9        THE COURT: Okay, Mr. Choy, thank you.  You're

10 excused.

11      (Pause, while another witness is summoned.)

12        THE COURT: Okay.

13      ALINA G. LEGUNA, PLAINTIFF'S WITNESS, SWORN

14        THE CLERK: Please raise your right hand.  Do you

15 solemnly swear that the testimony you are about to give to

16 this Court will be the truth, the whole truth, and nothing

17 but the truth?

18        THE WITNESS: I do.

19        THE CLERK: Please be seated.  Please state your

20 full name and address for the record.

21        THE WITNESS: Alina G. Leguna, L-e-g-u-n-a.  And my

22 address is 1000 Valencia Street, San Francisco, California

23 94110.

24 ///

25 ///

DIRECT EXAMINATION

BY MR. FARRER:

Q    Good afternoon, Ms. Leguna.

A    Good afternoon.

Q    What do you do for a living?

A    I am a real estate agent.

Q    And do you work for Zip Realty?

A    Yes, I do.

Q    And you're also a licensed California lawyer?

A    Yes, I am.

Q    And you've been licensed in California for
approximately 20 years?

A    Roughly, yes.

Q    Did you represent a gentleman named Felipe
Santiesteban in connection with an offer to purchase a
condominium unit at 661 Chenery Street?

A    Yes, I did.

Q    And that was a commercial unit?

A    A commercial condo.

Q    How did you find that property?

A    Through the MLS.  That's the Multiple Listing Service.

Q    Thank you.  Ms. Leguna, I'm going to show you what was
marked as Exhibit 1 to your deposition taken last year.  Is
that a true and correct copy of the Multiple Listing that
you located with regard to 661 Chenery Street?

1  A    Yes, it is.

2  Q    And do you recall who the listing agent was for that

3  property?

4  A    Yes, Demas Yan.

5  Q    Did you and your client, Mr. Santiesteban inspect that

6  property?

7  A    Yes, we did.

8  Q    And did you decide to make an offer on that property?

9  A    Yes, we did.

10  Q    And what was the listing price?

11  A    The listing price, it was 398,000.

12  Q    And how much did your client offer to purchase that

13  property?

14  A    I think we offered 398 and then we got a counter for

15  418 if I'm not mistaken.

16  Q    Your client's original offer, that was a full asking

17  price offer.

18  A    Right.

19  Q    And did you communicate that offer to the seller?

20  A    I do to the seller's agent.

21  Q    Okay.  Did you call Mr. Demas Yan to do that?

22  A    I did.

23  Q    And did you speak with him?

24  A    I did.

25  Q    And did you tell him you wanted to deliver your

1  client's offer to the seller personally?

2  A    Actually, my company usually wants us to do personal

3  presentations of offers.

4  Q    And did you tell Mr. Yan you wanted to do that?

5  A    Yes.

6  Q    And what did he say?

7  A    That the buyer was out of town.

8  Q    That the buyer or that the seller?

9  A    I'm sorry.  The seller.

10  Q    So Mr. Yan told you the seller of that property was out

11  of town.

12  A    Yes.

13  Q    And what did he tell you to do instead?

14  A    Then I asked him, I said, well, the company doesn't

15  really like us to fax these things.  He said, well, just fax

16  it to me.  And I said, well, how long is it going to take

17  for you to come back to us.  He told me I don't know exactly

18  but he says I'll get back to you in a couple of days.

19  Q    So Mr. Yan led you to believe in this conversation that

20  he wasn't the seller.

21  A    Yeah, we did not discuss that at all.

22  Q    Okay.  But he told you that the seller for 661 Chenery

23  Street was out of town.

24  A    Yes.  And actually the reason why I didn't -- why I

25  didn't believe he was the owner was because normally in the

1  MLS you're supposed to have some sort of disclosure if you

2  have any relation to either the seller or if you are part

3  owner of the property.

4  Q    Okay.  If you would turn to, in the black binder, Tab

5  No. 12.

6        MR. ROMEO: Excuse me, Your Honor, I didn't hear

7  what counsel said.

8        THE COURT: 12.

9        MR. ROMEO: 12.

10       MR. FARRER: 12.  I'm sorry.

11       MR. ROMEO: Thank you.

12 BY MR. FARRER:

13 Q    Ms. Leguna, do you recognize Exhibit 12?

14 A    Yes.

15 Q    And is that a true and correct copy of Mr.

16 Santiesteban's offer to purchase 661 Chenery?

17 A    That's it.

18 Q    And his offer was 398,000?

19 A    Yes, it was.

20 Q    And did you, pursuant to Mr. Yan's representation that

21 the seller was out of town, did you then fax this offer to

22 him?

23 A    I did.

24 Q    As requested?

25 A    I did.

1   Q    Did you later learn that Mr. Yan was the owner of the

2   property?

3   A    Yes.  I don't remember when, but it was when -- I think

4   when I saw one of the signatures in the counter offer,

5   that's when I became aware.

6   Q    Okay.  If you would please turn to Tab 13, which is

7   a -- the first page is a transmittal letter of a title

8   company, but if you look at the pages beyond that, is that

9   the counter offer on 661 Chenery?

10  A    That's the counter offer.

11  Q    And is that where you -- when you see it was signed by

12  Mr. Yan that you learned that he owned the property?

13  A    I believe this was the one.  It might have been

14  something subsequent to this.

15  Q    What did you do once you determined and learned that

16  Mr. Yan had lied to you when you called him initially to

17  present the offer?

18       MR. ROMEO: Objection.  Argumentative.  I think it

19  mischaracterizes the testimony and it's leading.  And he's

20  been leading this witness all along, not that it's on a lot

21  of controversial matters, but I do want to object that he's

22  been leading.

23       THE COURT: Would you ask it again?

24       MR. FARRER: Sure.

25       THE COURT: What is -- are we talking -- I was

1  trying to figure out -- I was trying to read No. 13, which

2  is kind of hard to read.  So if you'd just state it over,

3  I'd appreciate it.

4          MR. FARRER: Sure.

5  BY MR. FARRER:

6  Q    Ultimately you learned that Mr. Yan was the owner of

7  the property.

8  A    I did.

9  Q    And when you learned that, did you conclude that he had

10 misrepresented himself earlier in your phone conversation

11 with him when you called him and told him you wanted to

12 present Mr. Santiesteban's original offer to the seller

13 directly?

14         MR. ROMEO: Objection.  This is leading.

15         THE COURT: It is leading.

16 BY MR. ROMEO:

17 Q    Did you come to a conclusion that Mr. Yan lied to you?

18 A    I came to the conclusion that if he was the owner, he

19 should have said something in the MLS, because that's his

20 duty as a real estate agent, especially he's the broker,

21 so --

22 Q    Okay.  Exhibit 13 was Mr. Yan's counter offer, correct?

23 A    Yes.

24 Q    And did your client accept that?

25 A    He did.

1  Q     And was an escrow opened?

2  A     Escrow had already been opened I think with Old

3  Republic.

4  Q     Did your client require financing to purchase that

5  building?

6  A     Yes, and since this was a commercial building, he was

7  going through the Small Business Administration, and those

8  loans take a while.

9  Q     Did he obtain that financing?

10 A     Yes, we did.

11 Q     Did your client sign all of the papers that were

12 presented to him at the escrow company so the sale could

13 close?

14 A     Yes, we did.

15 Q     To your knowledge, did your client fulfill all of his

16 obligations under the purchase contract?

17 A     Yes, he did.

18 Q     And at any time during the purchase negotiations, did

19 Demas Yan tell you that he disputed any of the liens

20 recorded against the Chenery property?

21         MR. ROMEO: I'm going to object that this is

22 leading, and it lacks foundation as to if she knows anything

23 about these liens.

24         THE COURT: Absolutely.  Absolutely.  I mean you

25 can ask a general question about what if anything he heard

1  about why it didn't close.  I assume it didn't close.

2  BY MR. FARRER:

3  Q    Did that loan close, or did that sale close?

4  A    No, it didn't.

5  Q    Okay.  At any time -- when did you first learn that

6  the -- why didn't that sale close?

7  A    The sale didn't close because I understood that there

8  were problems regarding the ownership of the property.

9  Q    Did you ever -- did you speak to Mr. Yan about closing

10  the sale?

11  A    Oh, I did, quite a few times.

12  Q    Quite a few times.  And during any of those

13  conversations, did he tell you he disputed a deed of trust

14  in favor of Stella Chen?

15       MR. ROMEO: Objection, Your Honor.  This is

16  leading.  I mean he's suggesting what the answer is supposed

17  to be, and she's a third party, not an adverse witness.

18       THE COURT: Agreed.  Sustained.

19  BY MR. FARRER:

20  Q    Did Mr. Yan tell you, specify, why -- strike that.

21       Was Mr. Yan refusing to close the escrow?

22  A    As far as we were concerned, he was, because we did

23  everything we had to do in order to just have the matter

24  taken care of, be finalized.

25  Q    Did he tell you why he was refusing to close the

escrow?

A     Well, at some point, right before we were doing all the closing of the documents, he did say that he was challenging some claims that were being made against the property.

Q     Did you ask him why he hadn't told you about that before he made a counter offer to you?

A     At that point, all we wanted was to close escrow, and I figured that an answer to that wouldn't have closed escrow or wouldn't have helped anything.

Q     Would you turn to Tab 33?  Do you recognize Exhibit 33?

A     Yeah.

Q     Is that a document that you sent to Mr. Yan?

A     Yeah.  This is a notice for him to perform, and I did these once he -- I had spoken with the escrow company and they told me that he was not signing.

Q     And what did he -- did he respond to that notice?

A     He did not.

Q     So after Mr. Yan refused to close the sale, what did your client do?

A     My client, under my advice, went to get an attorney.

Q     And did he ultimately sue Mr. Yan?

A     I think he did, based on the contract he filed for arbitration.

Q     And did the sale of the 661 Chenery Street property ultimately close?

1  A    Last month.

2  Q    For the same sales price?

3  A    Oh yes.

4  Q    But about more than a year later.

5  A    Actually almost two years later.

6  Q    Okay.

7          MR. FARRER: No further questions.

8          THE COURT: Okay.  Cross-exam?

9          MR. ROMEO: Yes, Your Honor.

10                     CROSS-EXAMINATION

11  BY MR. ROMEO:

12  Q    Good afternoon, Ms. Leguna.

13  A    Good afternoon.

14  Q    My name is Mark Romeo.  I'm representing Demas Yan in

15  this case.  I have just a couple of questions to follow up

16  on your testimony.

17  A    Okay.

18  Q    With regard to this sale on 661 Chenery, did you ever

19  learn from Mr. Yan as to whether he was the sole owner or

20  there was a partner involved in the property?

21  A    Well, I learned about it, but to what extent?

22  Q    Did the name -- did the name Tony Fu come up?

23  A    Yes.

24  Q    And did you understand Mr. Fu as being somebody who was

25  also an owner of the property?

1  A    Yes.

2  Q    And you learned that from Mr. Yan?

3  A    I learned that from Mr. Fu.

4  Q    Okay.  Mr. Fu approached you some time in January of

5  2004?  I know that's stretching it, but --

6  A    I -- you know, I handle almost a hundred calls a day,

7  and if I was to remember that, I really would mark it in my

8  memory.  I don't think I can remember.  I remember that we

9  had several conversations.

10 Q    You had several conversations with Tony Fu.

11 A    Yes.

12 Q    And Tony Fu said that he was also an owner of the

13 property, correct?

14 A    He never did say that to me.  I figured that he was

15 because later on I was privy to some of the documents.

16 Q    And when Mr. Fu called you, you also called Mr. Yan to

17 tell him about conversations that you'd had with Tony Fu,

18 correct?

19 A    I did tell him once that somebody by the name of Fu had

20 called me.

21 Q    And he told you that Mr. Fu was somebody who had helped

22 him develop the property; is that correct?

23 A    He told me at that point -- and now I'm remembering --

24 at that point I think that's when Mr. Yan told me that he

25 had some claim against him regarding some of the

1  workmanship. That's what I remember.

2  Q    And did Mr. Yan tell you he had some issues with Mr. Fu

3  about Mr. Fu's lack of contractor's license?

4  A    I do remember that, yes.

5  Q    And did Mr. Yan also tell you when this escrow had

6  become a problem that he was -- that he didn't think he owed

7  one of the lien holders money because of the problems with

8  Mr. Fu?

9  A    He told me that he was trying to settle with them.

10 Q    Okay. But he was trying to -- he was trying to settle

11 with Mr. Fu and one of the lien holders?

12 A    I think trying to settle with Stella Chen, but I don't

13 remember specifics, whether he mentioned Mr. Fu. All I

14 remember about Mr. Fu was that he had told me about the

15 workmanship issue and the lack of license.

16 Q    In your deposition, do you recall being asked about a

17 discussion with Mr. Yan about why he was disputing the

18 amount owed Stella Chen?

19 A    I don't remember my deposition.

20 Q    If I showed you, would it refresh your recollection?

21 A    Of course.

22 Q    Okay. Thanks.

23        MR. ROMEO: Your Honor, if I could go to Ms.

24 Leguna's deposition at page 38, line 21, just this page and

25 the next page.

BY MR. ROMEO:

Q    The testimony that I want to refresh your recollection with is as follows, page 38, line 21:

      "Did Mr. Yan ever tell you that, give you any excuse or reason why he didn't think he owed Stella Chen any money?

      "Answer: That would be part of the excuse that Tony did not have a license and that he owed him for the construction."

A    Yeah, that's what I had told you earlier.  That's what I remember the conversation being.

Q    And then a little further down, on page 39, line 11 to 16:

      "Question: Did he ever tell you that the money he owed to Stella Chen was on account of the money he actually owed to Tony Fu?

      "Answer: That's what it seemed like to me, but I don't know if it's because he told me that or because that's what I gathered from what he had told me."

A    Right.

Q    So does that refresh your recollection about the discussions you had with Mr. Yan and the Stella Chen note?

A    It doesn't.  As you can see in my deposition, I wasn't really very clear about that, and that's why I said that I

1  must have, by the information that I was receiving from both

2  parties, that's what I assumed.

3  Q    Okay.

4        MR. ROMEO: I don't think I have any further

5  questions.  Thank you, Ms. Leguna.

6        THE COURT: Any redirect?

7                    REDIRECT EXAMINATION

8  BY MR. FARRER:

9  Q    Ms. Leguna, do you recall when you learned that Mr. Yan

10  had not disclosed that he was the owner of the property, me

11  asking you whether or not you confronted him about that, in

12  your deposition?

13  A    I don't remember.  I'm sorry.

14  Q    Okay.  If you would turn to page 21.  Ms. Leguna, I'm

15  going to ask you to read the question and answer from your

16  deposition taken on December 6th, 2004 in this case, on page

17  21, lines 3 through 7.  I need you to read it out loud.

18  A    It says:

19        "Question: Okay.  Did you confront him about that

20        and say why did you tell me the owner was out of

21        town if you were the seller?

22        "Answer: I did, but he was very evasive, and at

23        that point, I just knew that I had to really watch

24        out."

25  Q    Thank you.

1   MR. FARRER: That's all.

2   THE COURT: Any more cross?

3   MR. ROMEO: No recross.  Thank you, Your Honor.

4   Thank you, Ms. Leguna.

5   THE COURT: Okay.  Thank you.  Ms. Leguna, you're

6   excused.   Shall we take a break?

7   MR. FARRER: This would be a good time.

8   THE COURT: Okay.

9   THE CLERK: All rise.

10   MR. CHU: How long, Your Honor, how long a break?

11   THE COURT: Oh, let's start at ten after.

12   MR. CHU: Thank you.

13   (Whereupon, a recess is taken at 3:02 p.m., and the

14   court is reconvened at 3:16 p.m.)

15   THE CLERK: All rise.

16   THE COURT: Please be seated.

17   MR. FARRER: Your Honor, before we call our next

18   witness, an administrative matter or two.  The MLS listing

19   that I showed Ms. Leguna from her transcript has been marked

20   as Exhibit 76.  I believe Mr. Romeo has stipulated to its

21   admission.

22   MR. ROMEO: No objection.

23   MR. FARRER: I've given a copy to Mr. Hom which is

24   being passed to the Court.  We put an original in the

25   binder.

1    THE COURT: Did we have a 75?

2    MR. FARRER: We do, but we haven't introduced it.

3    THE COURT: Okay.  So I haven't missed anything.

4    MR. FARRER: No.

5    THE COURT:  All right.  Good.  All right.  76 is
6    admitted.

7                         (Whereupon, the MLS listing of the
8                         Chenery Street property is marked
9                         as Plaintiff's Exhibit 76 and
10                        admitted into evidence.)

11   MR. ROMEO: I wanted to also move for the admission
12   of Defendant's W and X, the two declarations of Stella Chen
13   that we used in her --

14   THE COURT: Oh yes.  Okay.  Those were your
15   rebuttal exhibits.

16   MR. ROMEO: Correct.

17   MR. FARRER: Your Honor, the only objection we have
18   is that they're incomplete because the declarations
19   themselves refer to a number of exhibits and I mentioned
20   this to Mr. Romeo during the break that if he would submit
21   and make copies --

22   THE COURT: You can supplement them if you wish.

23   MR. FARRER:  -- complete copies of those
24   declarations, I'd have no objection to them.

25   THE COURT: Well, I don't think the incompleteness

1  is an objection to the declarations.  If you want to attach

2  the exhibits, supplement them, complete them, you can.

3        MR. ROMEO: I have no objection to him doing so,

4  but I thought since the witness in both instances had

5  authenticated the declaration itself, that it should be

6  okay.

7        THE COURT: Right.  Okay.  W and X are admitted.

8                        (Whereupon, Defendant's Exhibits W

9                         and X, two declarations of Stella

10                        Chen, are admitted into evidence.)

11        MR. ROMEO: Thank you, Your Honor.

12        THE COURT: Okay.

13        MR. FARRER: Plaintiff calls as her next witness

14  Tony Fu

15        TONY FU, PLAINTIFF'S WITNESS, SWORN

16        THE CLERK: Please raise your right hand.  Do you

17  solemnly swear that the testimony you are about to give to

18  this Court is the truth, the whole truth, and nothing but

19  the truth?

20        THE WITNESS: I do.

21        THE CLERK: Please be seated.  Please state your

22  full name and address for the record.

23        THE WITNESS: My name is Dong Fu, also Tony Fu,

24  25813 Geary Boulevard, PMB 188, San Francisco, CA 94121.

25  ///

DIRECT EXAMINATION

1

BY MR. FARRER:

2

3  Q    Good afternoon, Mr. Fu.  You have to speak into the

4  microphone.  Thank you.  Are you related to Stella Chen?

5  A    Yes.

6  Q    And she's your younger sister?

7  A    Yes.

8  Q    And you're related to Fei Sing Fu?

9  A    Yes.

10 Q    And he's your older brother?

11 A    Yes.

12 Q    Do you know Demas Yan?

13 A    Yes.

14 Q    How do you know him?

15 A    We were classmates going to Golden Gate -- attended

16 classes at Golden Gate University in San Francisco here.

17 Q    And when did you first meet Mr. Yan?

18 A    In 1990.

19 Q    Okay.  Did you and Mr. Yan become friends?

20 A    Yes.

21 Q    And did you introduce Mr. Yan to your family?

22 A    Yes.

23 Q    Did he become a close family friend over the years?

24 A    Yes.

25 Q    Did he ever ask you to borrow money?

1  A    Yes.

2  Q    When?

3  A    In January 2002.

4  Q    Did he tell you why he needed money?

5  A    He was going to accomplish a deal in Hong Kong, buying

6  high tech equipment, that's computer network system or

7  something, and resell to China for a profit.

8  Q    Did he tell you how much money he needed to borrow for

9  that deal?

10  A    He told me it was $500,000.

11  Q    Okay.  Did he ask you for help in raising those funds?

12  A    Yes, he did.

13  Q    And were you able to help him?

14  A    Well, first I came up with my brother, Fei Sing Fu, and

15  I told him I try to talk to him and see if he had the funds

16  available for him.

17  Q    Did you tell Mr. Yan that you would talk to your

18  brother?

19  A    Yes, I did.

20  Q    To see if your brother had the funds available?

21  A    Uh-huh, yes.

22  Q    And did you call your brother?

23  A    I did.

24  Q    And what did he say?

25  A    He said if you're okay with him and have him call me

1  direct when he is in Hong Kong.

2  Q    Do you know if Mr. Yan did call your brother?

3  A    Yes, he did.

4  Q    Do you know if the loan was ever made?

5  A    Yeah, I knew the loan was made.

6  Q    And how do you know that?

7  A    One call was from my older brother, Fei Sing Fu, and

8  two calls is from Demas Yan, he call me, one in Hong Kong,

9  one in mainland China, thanking me for getting my brother to

10 come up with the funds for him.  And he also told me that he

11 met with my brother and Leung Hing Lau for the -- I mean

12 able to get 3.6 million Hong Kong dollars and accomplished

13 his deal.

14 Q    So Mr. Yan told you that.

15 A    Yes, he did.

16 Q    And he told you that in two separate phone

17 conversations.

18 A    Yes.

19 Q    When did he tell you that, about what time of year are

20 we talking?

21 A    It was February 2002.

22 Q    What happened next?

23 A    Some time in April, my brother called me and say, hey,

24 the deal was made and the money changing hands and he

25 promised to repay the money with 20 percent profit, but I

1  haven't seen him since, and I try to call him and I mean

2  nobody answer the number he gave me.  If you can find him,

3  see what's going on.

4  Q    So did you try to find Mr. Yan?

5  A    Yes, I did.

6  Q    Were you successful?

7  A    At first it was hard to reach him, and then eventually

8  I met him when he got back to San Francisco, and I believe

9  it was in late April.

10 Q    And what did Mr. Yan tell you about his deal to buy the

11 computer equipment?

12 A    He first was very disappointed with the deal and told

13 me, so sorry, but the deal was falling apart and like it

14 fell, and don't worry about the money, and you know me, I

15 have -- I mean I have the money to pay your brother back.

16 No problem with that.  But at that time, he said, let me

17 take care of David Grossie (Phonetic) first.  He was the guy

18 filing the lawsuit and he said he rushed back and he had

19 to -- I mean ran into all kinds of problems with him.

20 Q    Okay.  Let's back up a little bit.  Who is David

21 Grossie?

22 A    David Grossie was the contractor working for the

23 project for his project at 547 - 23rd Avenue.

24 Q    Whose project?

25 A    Demas Yan's project at 23rd Avenue, and Demas Yan owe

him about $50,000 so he took Demas to court.

Q    To collect that money?

A    To collect that money.

Q    And Mr. Yan, when you talked to him on the phone, did you talk to him on the phone or did you meet him?

A    I believe I met him.

Q    Okay.  To ask him why he hadn't paid the money back to your brother.

A    Yes, I did.

Q    Okay.  And during that conversation, Mr. Yan told you that not to worry about the money but that he was very busy in litigation with Mr. Grossie.

A    That's correct.

Q    What did you do next after that meeting with Mr. Yan?

A    Since he was fighting with Grossie, but time and time I believe I really urged him to pay the money to my brother. Well, you have to do this.  I mean my brother is upset and really feels real bad and he said, don't worry about it.  He keeps asking me, don't worry about it, but in June, my brother calls me and tells me that I cannot wait.  I have to pay back the uncle, otherwise it gets some kind of bad feeling or something.  Then I still urge him but at the time he was in a heated like court battle with David Grossie, so I let that go, but I just still keep asking, couple times. I believe in September, finally he said, I believe I lost to

1  Grossie.  However, I sign you a deed of trust and promissory

2  note and with my house as collateral.  Don't worry about it

3  because I have to pay a lot of money to the attorney, so

4  that's what I got.

5  Q    So was it Mr. Yan's idea to sign a new promissory note?

6  A    Yeah.  He told me that, and also –– but he said well,

7  when I sign that, I'd like to have the original note back.

8  Q    Did you know what he was talking about, the original

9  note back?

10  A    The original Chinese note, they changing hands.  Yeah,

11  my brother told me in about April when he calls me asking

12  about that.

13  Q    So in April of 2002, when your brother calls you to ask

14  you or to tell you he can't find Demas Yan; he hadn't been

15  repaid, he told you about the –– that he had received an

16  original promissory note?

17  A    Yeah.  Yeah.  And the legal details for the

18  transaction.

19  Q    And then when you talked to Mr. Yan about it, in about

20  September or so, Mr. Yan tells you he'll sign a new note,

21  but he wants the old note in exchange.

22  A    Yes, correct.  And then I call my brother and he

23  arranged for somebody to bring the note over and he said,

24  oh, it's really a coincidence.  I mean a family friend

25  called Tsung (Chung Phonetic) will bring the note over by

1 September -- October, I'm sorry.

2 Q    Please speak slowly.  It's a little difficult to follow

3 you.

4 A    I'm sorry.

5 Q    So a family friend brought the note?

6 A    Actually he was my brother's friend -- no, no, I'm

7 sorry, my father's friend.

8 Q    What was his name?

9 A    Tsung.

10 Q    Tsung?

11 A    Tsung, yeah.

12 Q    And he brought a package to you?

13 A    Yes.  My brother did -- yeah, gave him a package to

14 bring it over.

15 Q    And you opened that package?

16 A    Yeah.  It has a toy and boy's clothes, for my boy.

17 Q    And was there a promissory note in there?

18 A    Yes.

19 Q    Okay.  And what did you do with that note?

20 A    Well, that was October, like end of October, beginning

21 of November, so I quickly when I received it, and I call Mr.

22 Yan -- I mean I got the note, let's meet and draw a new note

23 secured with the property.

24 Q    Okay.  And did you meet with him to do that?

25 A    I did meet with him, at Starbuck's on Geary and

negotiated.

Q    So did you bring forms to that meeting?

A    I did bring two forms to that meeting.

Q    And that was a form promissory note and a form deed of trust?

A    Correct.

Q    Okay.  And you met with Mr. Yan at the Starbuck's on Geary to complete those documents.

A    Yes, we did.

Q    And did the two of you discuss the loan terms at that meeting?

A    Yeah, we did.  Actually we have a little argument actually.  I really am telling him when we go down line by line and especially when he cross out the interest and I mean I really telling him that at the time you promised to repay it within one month with a 20 percent rate, now, nothing interest, and then I mean even 450,000 is a little less, but it was a custom.  Even he told me it's a custom. Everybody do the transaction with eight times, like one dollar, eight dollars Hong Kong dollars, and so it's so fair.  I mean I'm in trouble right now.  I'm not trying to not to pay, but I want to pay whatever is on the note, and the note says 450, on the note it says 3.6 million, but there's no interest.  I'm not going to have interest on it, so well, I let it go.

Q    So at your meeting at Starbuck's, did you and Mr. Yan

actually discuss the exchange ratio from Hong Kong dollars

to U.S. dollars for the amount of money he owed to your

brother?

A    Actually we did a little bit.  I mean I -- when we come

down to it, when I see how that come about, okay, he even

told me at the meeting, it was all agreed if I return in

Hong Kong dollars, that will be 3.6.  If I return to them in

U.S. Dollars, that would be 450, and I would repay them at

the time in -- if I was successful.  That's what he said.

If it was successful, I did promise to pay them.  In Hong

Kong dollars, that would be $720,000.  In U.S. Dollars, that

would be $90,000.  But right now, I'm losing all my money.

I'm going to pay whatever is on the note.  That's how that

ended, and we prepared a deed of trust and the note.  We

walked over to the notary so he notarized it.

Q    Why was the note and deed of trust made out to your

sister?

A    Because my brother when he called -- I mean when we

were in conversation, that my brother specifically,

according to his experience, and not to mix up with the --

the personal loan with your business dealings and especially

at the time he talked to me, well, I mean that guy is not

trustworthy.  I mean just left without a word.  That was

terrible, very, very bad, very dishonest.

1   Q    But it was your brother who wanted to keep your

2   dealings with business separate from his own.

3   A    Yes.  Also he told me I really do trust my sister to

4   have the note in her name and to collect it.

5   Q    Did you tell Mr. Yan that?

6   A    I did.

7   Q    That your brother wanted to keep the two separate.

8   A    Yes.

9   Q    And he didn't want to confuse them.

10  A    Oh definitely.

11  Q    So you explained to him why Stella's name had to be --

12  Stella Chen's name had to be on the promissory note and the

13  deed of trust.

14  A    Oh, he said -- he told me when I mentioned it, and he

15  said I don't care because as long as you give me back that

16  old note, I mean the Chinese note, and you give it back and

17  I'm going to give back that sum of money whenever the

18  property gets sold.

19  Q    Okay.  So you mentioned -- and both you and Mr. Yan

20  have handwriting on the note and the deed of trust.

21  A    That was correct because I was the one doing the

22  writing for the -- I mean I draft the deed of trust and the

23  note but he did make sure that the collateral is only on his

24  one property, on his 663 Chenery because he don't want --

25  during the discussion, he don't want it be on, like I said,

1   well how about 663 and 547 - 23.  He said well no, just 663.

2   That's what I remember.

3   Q    Okay.  And after you and Mr. Yan negotiated --

4             THE COURT: Can I stop you a second?  Does that

5   mean -- that means there's four units though in that 663,

6   right?

7             THE WITNESS: That was correct, Your Honor.

8             THE COURT: So it doesn't mean just one of the

9   units.  It just means that four-unit complex.  Sorry to

10  interrupt.

11            THE WITNESS: It was one whole property.

12  BY MR. FARRER:

13  Q    This is a good point.  Actually the deed of trust was

14  on 663 which was then being subdivided -- it wasn't

15  subdivided until later, right?

16  A    That was correct.

17  Q    Okay.  So the deed of trust, as you understand it, was

18  going to cover the whole property.

19  A    Yeah, because --

20  Q    All four units.

21  A    Yes, because that property is originally called a

22  company called 663 Chenery.

23  Q    Commonly called 663.

24  A    Yeah, it is.

25  Q    Okay.  So you and Mr. -- and I understand it, you and

1  Mr. Yan left Starbuck's and walked over to the notary's

2  office.

3  A    That was correct.

4  Q    And you met with Mr. Brodie.

5  A    Yes, I was -- like I follow him and then he was during

6  the, during the walk, and I was standing behind.

7  Q    And were there -- so the deed of trust -- were the deed

8  of trust and the promissory note given to Mr. Brodie to

9  review?

10 A    Yeah, it was in one stack.

11 Q    Okay.  And did Mr. Yan sign both of those documents in

12 Mr. Brodie's presence?

13 A    I believe he did.

14 Q    Okay.  And did Mr. Brodie then notarize them --

15 notarize the deed of trust?

16 A    Yeah, and asked for his ID.

17 Q    Have you made any changes to that promissory note or

18 deed of trust after Mr. Yan signed them and the deed was

19 notarized?

20 A    No, no way.

21 Q    If you would turn in the black binder to Exhibits 5 and

22 6 and tell me if they are the promissory note and deed of

23 trust that you have been talking about that were negotiated

24 and completed at Starbuck's and then signed over at the

25 notary's office on November 13th, 2002?

1  A    Yeah, that was correct.

2  Q    Did you exert any pressure over Mr. Yan to sign these

3  documents?

4  A    No, except he gained the upper hand by crossing out the

5  interest.

6  Q    Okay.  Did you ever tell Mr. Yan you would not record

7  the deed of trust?

8  A    No, absolutely not.  I recorded it two days later.

9  Q    What happened next?  What did you do with the original

10  note?

11  A    I gave it to my sister for safekeeping purpose because

12  the one after I recorded it, it will be mailed to her.

13  Q    And what happened next after you have your sister the

14  original promissory note?

15  A    In September 2003, I learned that Demas Yan was in

16  contract with a buyer called Santiesteban.  The name is

17  really hard to read, and selling 661 Chenery.

18  Q    So you learned that Mr. Yan was in contract to sell a

19  unit at the Chenery Street address?

20  A    Correct.

21  Q    Do you know what the selling price was?

22  A    It's 418,000.

23  Q    What happened next?

24  A    Like December, in December, he -- one day he came to my

25  house and hand me the plat map, the big one, the big map,

1   and asked me to get Stella to sign and notarize that so that

2   he can get the condo map approved.

3   Q    If you'd look in the back of the black binder, I think

4   it's Exhibit 47.  It's in the pocket part.

5   A    47.  47, no.  Black binder --

6   Q    I think it's 45.  It's in the back.

7   A    45.  45, no.

8   Q    I'm sorry.

9   A    74.

10  Q    Exhibit 74.

11  A    Yeah.

12  Q    Is that the document -- I mean is that a blow-up of the

13  document that Mr. Yan brought to you and asked you to get

14  Stella's signature?

15  A    Yeah.  The paper is different.  They're like a clear

16  plastic.

17  Q    Like a mylar?

18  A    Uh-huh.

19  Q    And did you get Stella's signature?

20  A    Yes, I did.  I called her and she came over and we went

21  down to a notary public and she did, yeah.

22  Q    She signed it and then it was notarized?

23  A    Yes.

24  Q    And after it was notarized, what did you do with it?

25  A    I gave it back to Demas, Mr. Yan.

1  Q    Did Mr. Yan tell you why he needed that signed by
2  Stella?

3  A    So that he can get the condo map approved.

4  Q    When he asked you to sign the -- or have Stella sign
5  that, did he tell you he had any dispute whatsoever with her
6  deed of trust?

7  A    No.  No.

8  Q    What happened after the condominium map was signed and
9  returned to Mr. Yan?

10 A    In January about in January 8, 2004, he faxed over to
11 me an escrow instruction and also right after it, he called
12 me and say, hey, have your sister sign it and it's about to
13 close on the commercial unit.  That's 661 Chenery.

14 Q    Had you asked Mr. Yan to prepare those instructions?

15 A    No, I didn't.

16 Q    Okay.  Would you turn to Exhibit 25.

17 A    Yes.

18 Q    Do you have that?

19 A    Yes.

20 Q    Is this a copy of a fax that you received from Mr. Yan?

21 A    Yes, that's correct.

22 Q    And that was to your fax machine at your house?

23 A    Yes.

24 Q    And did you play any role whatsoever in drafting those
25 escrow instructions?

1  A    No.

2  Q    And again you didn't ask Mr. Yan to prepare these?

3  A    No.

4  Q    And when they arrived at your house, were they already

5  signed by Mr. Yan?

6  A    Yes.

7  Q    Okay.  And you said you spoke to him about the escrow

8  instructions?

9  A    I didn't, because he faxed it over and called me and

10  say have your sister sign it and give it back to me so I can

11  close the deal.

12  Q    So what did you do?

13  A    I called my sister and she came over -- I believe she

14  came over and signed it.

15  Q    Okay.  Did you exert any pressure or control over Mr.

16  Yan to prepare and forward these escrow instructions to you?

17  A    No.

18  Q    And Exhibit 25 is a true and correct copy of the fax

19  that you received from Mr. Yan?

20  A    Yes.  Definitely.

21  Q    What happened next after your sister signed them?

22  A    Yeah, I have her sign it, and that was January 8th, and

23  then I received another phone call from Mr. Yan a few days

24  later, maybe two or three days later, asking me that -- I

25  got an appointment at the title company.  Get your sister

1 over so she can sign all the closing papers that's required.

2 Q    Were you comfortable with the escrow instructions, Mr.

3 Yan had drafted, Exhibit 25?

4 A    I did mention it to him.  I raised up just a small

5 question that I said that I mentioned to him, when I bring

6 it back with my sister's signature to him, for this one I

7 told him, I mentioned it, and it's really too simple.  And

8 he said don't worry about it.  I get a complete one to cover

9 everything.

10 Q    So Mr. Yan told you he would do some revised escrow

11 instructions?

12 A    That's what I believed.

13 Q    That were more complete?

14 A    Yes.  I mentioned it to him.  He did mention it to me

15 that way.

16 Q    Okay.  And in that phone call, he told you he had an

17 appointment -- made an appointment at Old Republic and he

18 wanted you and Ms. Chen to go down there so that the sale

19 could close.

20 A    Yes.  I did call my sister and brought her down there.

21 Q    Okay.  And who did you meet with?

22 A    I met with Connie Ho.

23 Q    And were you taken into a conference room with your

24 sister?

25 A    Yes.

Q    And did Connie Ho present some papers to your sister to sign?

A    Yes.

Q    And did she sign all of the papers that she was asked to sign?

A    Yes.

Q    And did one of those papers include some revised escrow instructions marked as Exhibit 29?

A    29.  Yeah.  At the time, it was a little funny.  I see my sister look at me.  Did you prepare this?  You get my name wrong.

Q    Did you prepare Exhibit 29?

A    I don't believe so.

Q    Do you know who prepared it?

A    I don't know.  I believe Demas did because I mentioned it to him, that one was too simple, and he came up with -- I don't recall if -- I mean I don't recall but it may -- like there was -- he may draft one like this to me and say is that okay; something like that, but I don't recall clearly on that one.  And I may say okay or something, but that was the time when my sister at the title company, Connie Ho gave it to her and she sign it.

Q    And she signed it.

A    She signed it, yes.

Q    Did your sister give -- did Ms. Ho ask for the original

1  promissory note and deed of trust?

2  A    Yes, she did.

3  Q    And did your sister gives those to her?

4  A    Yes.

5  Q    Did Demas Yan go to Old Republic the next day and sign

6  these revised escrow instructions?

7  A    Yes.

8  Q    How did you learn that?

9  A    I believe at the meeting, Connie Ho even told us, and

10 also I believe Demas did mention it to me too.

11 Q    Is Exhibit 29 a true and correct copy of the revised

12 escrow instructions that were signed by your sister and

13 Demas Yan?

14 A    Yeah, that's correct.

15 Q    Did you exert any pressure or control over Demas Yan to

16 sign those revised instructions?

17 A    No.  For this -- my instruction, I just -- I mention it

18 that when I received the previous one, I did mention it to

19 him, it was too simple.  So at the time when I hand it to

20 him, after my sister signed it, and I mentioned it to him,

21 he said, don't worry about it.  I get you a complete one.

22 Q    Okay.  And when you and your sister left the Old

23 Republic Title Company on January 12th, as far as you knew,

24 the sale was going to close.

25 A    I thought -- I mean, even like Connie Ho in two or

1  three days because she said -- I mean Demas come the next

2  day and sign it and as long as he provides additional funds,

3  she even mentioned -- he owes quite a bit of money, that's

4  what she said.

5  Q    What happened next?

6  A    He -- you know, we also -- a week or two, he calls me

7  and tells me that he wanted a discount.  And otherwise he

8  would help a person called Florence Fong to pursue me.

9  Q    Okay.  What else did he tell you?

10 A    He said -- he told me that you've got to give up --

11 have your sister give up the full amount -- not to take the

12 full amount and take about 410, $410,000 instead of $450,000

13 because otherwise when I -- I cause you trouble -- I mean it

14 will cost you a whole lot more and then I also received his

15 attorney's letter.

16 Q    Okay.  Who is Florence Fong?

17 A    Florence Fong was a person -- we went into a dispute

18 and she got a judgment against me.

19 Q    And after that --

20          THE COURT: What was that?  What was that?

21          THE WITNESS: I am sorry.

22 BY MR. FARRER:

23 Q    He wants to know what your answer was.

24          THE COURT: Who is it?

25          MR. FARRER: Florence Fong, F-o-n-g.

1              THE WITNESS: It was a friend of Demas Yan.

2  BY MR. FARRER:

3  Q    Who had a judgment against you?

4  A    Yeah, that was correct.

5  Q    And Mr. Yan told you that if your sister wouldn't take

6  a discount on the promissory note, he would help Florence

7  Fong pursue you?

8  A    Yeah, that's what he was telling me over the phone and

9  also even faxed to me that I -- even had a fax to me and

10 threaten me like that.

11 Q    Okay.  So he threatened you.

12 A    Yes, he did.

13 Q    Okay.  What happened next after you spoke to Demas and

14 he threatened you?

15 A    I received a letter from his ex-attorney called Richard

16 Beckman.  When I received the letter, I was going over the

17 letter and I remember I did call -- I was so confused, and I

18 was even call Richard Beckman and say, hey, what is going

19 on?  And that's it, and then he said, oh come to me and

20 let's have a settlement talk.  And what kind of settlement?

21 So I call -- I believe I call Demas Yan back and I also

22 mentioned it to my sister, Stella.

23 Q    Did you call Mr. Yan back and ask him what was going

24 on?

25 A    I did, so that's what he said.  I need a discount like

1  that.

2  Q    Did he tell you what he'd do if he didn't get a

3  discount?

4  A    He's going to sue both of us, like my sister and I, so

5  you may end up losing everything.  So I'm going to get you

6  with license stuff and also if you're lucky you're going to

7  get the money in three years, and he also, at that time,

8  brought up the Grossie example.  He said, see, that a

9  perfect example and have me look at it.

10 Q    Why was David Grossie a perfect example?  What do you

11 mean by that?

12 A    Because he was so proud of his action against him, by

13 only -- I mean not paying him about $50,000.

14      MR. ROMEO: I'm going to object to this as

15 speculation.  He's asking almost a double state of mind,

16 like why is Demas proud and what was David Grossie's claim

17 against Demas.

18      THE COURT: What's the relevance of this?

19      MR. FARRER: The relevance is the standard of

20 conduct and motive for Mr. Yan and what he was doing to ace

21 another one of his creditors, and I believe this arose in

22 conversation between Mr. Yan and the witness.  I'd be happy

23 to ask a different question.

24      THE COURT: Well, for what purpose are you offering

25 this?

1    MR. FARRER: That Mr. Yan has a custom, habit and

2 practice of dragging out his creditors till the last

3 possible minute of payment and is very litigious.

4    MR. ROMEO: Well, I think that lacks foundation,

5 Your Honor.

6    MR. FARRER: Well, I'm trying to establish it.

7    THE COURT: Well, I think I need a little more than

8 that to get into this subject.  I mean people get into

9 litigation.  I want you to tie this up a little bit.

10    MR. FARRER: Let me --

11    THE COURT: Make a more specific offer of proof.

12 BY MR. FARRER:

13 Q    Did Mr. Yan mention to you in his conversation, look

14 what I did to Mr. Grossie?

15 A    Yes.

16 Q    And did he tell you or did you know what he meant by

17 that?

18    MR. ROMEO: Objection.  That's ambiguous.  I mean

19 he's going to either answer what he told him or what he

20 knew.

21    MR. FARRER: Okay.  What did Mr. --

22    THE COURT: Okay.  Okay.  Okay.  Pick one.

23 BY MR. FARRER:

24 Q    What did Mr. Yan tell you what he meant by that, look

25 what I did to Mr. Grossie?

1    A    Because --

2            THE COURT: Be specific.

3            MR. FARRER: I asked him if --

4            THE COURT: What he said. All we want to hear is

5    what Mr. Yan said.

6            MR. FARRER: That's right.

7    BY MR. FARRER:

8    Q    What did Mr. Yan tell you he had done to Mr. Grossie?

9    A    Mr. Yan told me that, look, see, he was so proud that I

10   owe -- you know, I did not pay him $50,000, and he may get

11   nothing. And the truth of the matter is even if he get it,

12   and it's really not that amount. So that's what he told me.

13   Q    Were you involved in the Grossie litigation?

14   A    He asked me to help him as a witness.

15   Q    Mr. Yan did.

16   A    He did, yes.

17   Q    And did you help him?

18   A    I did.  I went up to the witness stand to testify what

19   happened and during that trial, David Grossie pull out a

20   paper called "affidavit" that I believe Demas Yan did forge

21   my name on it, that I don't recognize that. I really tell

22   the court, it's not mine. So he was -- I really remember

23   that, when we walked out, he was so mad, and telling me all

24   kinds of bad things and I did not help him up there. I told

25   him I've got to tell the truth. That's what happened.

1    MR. ROMEO: Your Honor, I need to --

2    THE COURT: Let's get off this.  This is just

3  running too far afield.

4    MR. FARRER: Fair enough.

5  BY MR. FARRER:

6  Q    When Mr. Yan told you that he had to have a discount or

7  he would sue you and your sister, what did you tell him?

8  A    I told him no way.  This is no way to do it.

9  Q    So what happened next?

10  A    I got a phone message from Richard Beckman saying that

11  he is having an injunction, something.  Then I informed my

12  sister and she went to the court.

13  Q    Did Mr. Yan ultimately sue you and your sister?

14  A    Yes, he did.

15  Q    Did he sue you twice?

16  A    I believe so.

17  Q    Have any payments been made on that $450,000 note?

18  A    No.

19  Q    Does that promissory note evidence any obligations

20  other than the amount of money that Mr. Yan borrowed from

21  your brother and Leung Hing Lau?

22  A    No.

23  Q    Does that promissory note have anything to do with the

24  money that Demas Yan owes you as a result of your

25  partnership agreement with him regarding the development of

1  Chenery?

2  A    Would you say that again, I'm sorry.

3  Q    Does the $450,000 promissory note have anything to do

4  with your partnership interest in the development of the

5  Chenery property?

6  A    No, no.  None at all.

7  Q    Did you ever agree to accept the sum of $450,000 in

8  full satisfaction of your 25 percent interest in Chenery?

9  A    No way.

10 Q    Did you ever threaten Demas Yan that if he did not pay

11 your sister's promissory note, you would commence

12 foreclosure proceedings on the Chenery property?

13 A    No.

14           MR. FARRER: No further questions.

15           THE COURT: Okay.  Cross-exam?

16           MR. FARRER: Actually --

17           MR. CHU: Your Honor, the scope of the direct

18 appears to now to have touched on the issue as to the

19 partnership interest consideration.  If I may, I would like

20 to ask Mr. Fu some additional direct questions pertaining to

21 that issue because it has come up now.

22           MR. ROMEO: No objection, Your Honor.

23           THE COURT: Whom do you represent?

24           MR. CHU: Wei Suen, Your Honor, the present

25 assignee of Mr. Fu's 25 percent interest in the Chenery

1 project.

2         THE COURT: Assignee for Mr. --

3         MR. CHU: Mr. Fu.  Mr. Fu assigned his interest in

4 the Chenery project to my client.

5         THE COURT: Well, I take it that, Mr. Romeo, that

6 your theory of the case is that this represents the

7 partnership interest.

8         MR. ROMEO: That's true.

9         THE COURT: So it's going to come out anyway.

10         MR. ROMEO: That's true.

11         THE COURT: To some extent.

12         MR. CHU: Yes, Your Honor.

13         THE COURT: We have to identify whether -- what the

14 consideration for this was.

15         MR. CHU: That's correct.  To the extent that the

16 note is the payment for the partnership interest, then my

17 client would be stuck with the note as the consideration, as

18 the return.

19         MR. ROMEO: Time wise, I'd rather --

20         THE COURT: Well, you know, let's go through this a

21 little bit.  If you're allowed to ask questions, you're

22 definitely stuck with the result you get here.

23         MR. CHU: I think I'm stuck with the result anyway,

24 Your Honor.

25         THE COURT: Not if you're not allowed to ask

1   questions.  You can't be bound by something in which you

2   don't participate, and you're not a party, so I'm --

3           MR. CHU: Well, it was a consolidated --

4           THE COURT: But you're in privity I guess.

5           MR. ROMEO: It was a consolidated action, so --

6           MR. CHU: It was consolidated, yeah.

7           THE COURT: Okay.  I think I have to allow you to

8   ask these questions.  Okay.

9                   CROSS-EXAMINATION

10  BY MR. CHU:

11  Q    Mr. Fu, in November of 2002, what was the state of the

12  Chenery project, I mean, was it complete at the time?

13  A    The framing was completed and a lot of things haven't

14  been completed yet.

15  Q    When was the project completed, the construction?

16  A    The project was completed on August 7 or 8, of 2003.

17  Q    Okay.  So at the time you obtained the $450,000 note,

18  was there -- well, let me ask you, how much work was there

19  left to do at the time you got that note?

20  A    Actually, quite a lot.

21  Q    When the project was completed in August of 2003, how

22  much, in your opinion, was the property worth at that time?

23  A    In 2003?

24  Q    Yes.  After it was complete.

25  Q    After it was complete in '03 --

1    MR. ROMEO: Objection, Your Honor, I don't think

2  he's competent to testify.  He's not an appraiser; he's not

3  an owner of the property, and he can't express an opinion --

4    THE COURT: Your assertion is that he's a partner

5  in the property, right?

6    MR. ROMEO: I think the Evidence Code says you have

7  to be a record owner of the property.

8    MR. FARRER: Do you have a section for that?

9    MR. CHU: I'm not soliciting the evidence for

10  purposes of the actual value of the property; I just want to

11  know Mr. Fu's opinion as to what the property was worth as

12  far he was concerned.

13    THE COURT: Okay.  I'll allow the question for that

14  purpose.

15    THE WITNESS: Even going back at the beginning of

16  2003 and somebody offered two million, and Demas Yan

17  objected because the person making that offer, it was pretty

18  serious and there's still a lot of work to be done, and a

19  lot of changes they anticipated because they want to be --

20  that property want to be (unintelligible) -- I forgot the --

21  like commercial people also living in there so that's -- I'm

22  sorry I don't get that word.  The person was really

23  interested in buying it even at the beginning of '03, it has

24  a lot to do, but two million, it was rejected by Demas Yan

25  and he told me, and it really conservative at that point

1  before even finished is 2.2 million.

2         MR. CHU:  That was at the beginning of 2003?

3         MR. ROMEO: Excuse me, Your Honor, before he asks

4  the next question, I want to strike the last answer because

5  I think that that was hearsay and non-responsive.  He was

6  asked about his belief and then he went off on this long

7  tangent.

8         THE COURT: What is your belief as to the value --

9  just -- you don't need to explain why, just what's your

10 belief.

11        THE WITNESS: My belief is --

12        THE COURT: In August 2003 -- November or August?

13        MR. CHU: August of 2003.

14        THE COURT: August 2003.

15        THE WITNESS: 2.3

16 BY MR. CHU:

17 Q    2.3?

18 A    Yes.

19 Q    Okay.  Now you mentioned that you found out about an

20 offer on the property some time in early 2003.  Yes or no.

21 A    Uh -- yes.

22        MR. ROMEO: Objection.  Calls for hearsay, Your

23 Honor.

24        MR. CHU: I haven't -- that was a yes or no

25 question.  I didn't ask him about who said anything.

1  THE COURT: Okay.  Certainly no hearsay yet.

2  THE WITNESS: Yes.

3  BY MR. CHU:

4  Q    Did Mr. Yan tell you about the offer?

5  A    It's open.  Actually that person came to me and he was

6  a couple houses down in the same street, called Rick, and

7  bring in a person called Mason, and they are pretty serious,

8  even brought in an attorney to discuss the matter, but Demas

9  Yan was firmly reject it.

10  Q    Okay.  Well, you got ahead of me.  Did you talk to Mr.

11  Yan about the offer in early 2003?

12  A    Yes, we did.

13  Q    You talked to him about it?

14  A    Yeah, I did.

15  Q    And you told him -- I mean, was the offer made to you

16  or was it made to Mr. Yan?

17  A    Actually it was made to Mr. Yan.

18  Q    It was made to Mr. Yan.

19  A    Uh-huh.

20  Q    And then you and Mr. Yan talked about it?

21  A    Yeah, we talked about it, and after he rejected it,

22  that offer, he even -- that person even wants to buy my

23  note, but Demas Yan really is certain on it and not

24  cooperate with that guy, so that person really backed out at

25  some point.

1  Q    Okay.  How much did they offer Mr. Yan for the note, I
2  mean for the --
3  A    For the contract.
4  Q    For the project.
5  A    No, for my share of the contract.
6  Q    No, no, no.  I'm asking how much they offered for the
7  whole project, not just your share of it.
8  A    Two million.
9  Q    Two million.  And was that as is?
10 A    As is, correct.
11 Q    And Mr. Yan told you he rejected it?
12 A    Yes.
13 Q    What did Mr. Yan tell you as far as his valuation of
14 the project at that time?
15 A    2.2 at least.
16 Q    2.2.
17 A    Yes.
18 Q    And then you're saying that those people wanted to buy
19 your interest in the project?
20 A    Correct.
21 Q    How much did they offer you?
22 A    They offer me, like $550,000.
23 Q    Did you talk to Mr. Yan about that offer?
24 A    Well, when I brought it up, he was very mad about it,
25 and that's why he threatened he would not cooperate with

1  that guy, blah-blah-blah, and even call him and tell him

2  that if Tony sell his contract to you, I'm not going to

3  cooperate with you, and then you are in trouble, and a lot

4  of paperwork on my hands, and I'm not going to cooperate --

5  something.  So the other party back out.

6  Q    Did Mr. Yan -- when they backed out, did they tell you

7  that or did they tell Mr. Yan?  I mean how did you find out

8  they backed out?

9  A    That person did mention it, he told me.

10 Q    So -- okay.  We're going back to the $450,000 note

11 you obtained in November of 2002.  After you got that note,

12 did you continue to work on the project after that time?

13 A    Oh definitely.  Yes.

14 Q    Did you have to continue putting money into it?

15 A    Yes.

16 Q    Do you know approximately how much you put in from --

17 off the top of your head?

18 A    No, it would be -- I really don't, but I did put -- it

19 still need a lot of money to finalize the project.

20 Q    Now, the -- let me take you back to your meeting at

21 Starbuck's.  Wasn't it Starbuck's where you brought the note

22 and deed of trust to Demas?

23 A    Yes, that was correct.  The forms.

24 Q    The forms.

25 A    Yes.

Q    You -- how many deeds of trust did you bring to the meeting?

A    Just one.

Q    Just one?

A    Yeah, two forms.

Q    Two forms.  One was a promissory note and one was a deed of trust?

A    No, no, no.  They are in one package, like two forms, the promissory note, usually, I mean like attach one -- I mean go with it.  And like I brought two, the reason was, one for him -- like one for him to keep and then one for me, something like that.

Q    Now who decided that Chenery was going to act as the collateral for the loan?

A    It was Demas.

Q    Did he have a choice?

A    Yeah, he did, on 547 - 23rd Avenue, at the time.

Q    So he could have put in either property as collateral.

A    He did, but at the time he did mention it to me.  I mean that 547 - 23 is not that good because I intended to get a loan.  That's the reason he said I really want that on 663.  That's why he take over the pen and write on it.

Q    Did you have a deed of trust there that also had a description for the 23rd Avenue property?  Or did you bring descriptions for both properties with you?

A    I believe I have the two descriptions with me because like this property, it was through my hands and I have those -- I have those with me, yes.  That was correct.

Q    And then it was Mr. Yan who decided on Chenery.

A    Yes, correct.

Q    Before you left Starbuck's, did you fill out the deed of trust completely?

A    Oh, it was all complete.

Q    It was all complete.

A    Yes.  That's why there was even a little argument over the deleted interest.

Q    But that was on the note, but I'm talking about the deed of trust.

A    Everything was complete.

        MR. CHU:  All right.  That's all I have in the way of cross, as far as the scope of the direct, Your Honor.  In our case, I may have additional questions pertaining to the project and the construction itself --

        THE COURT: Yeah, I understand.

        MR. CHU:  -- but as far as the scope of this direct, that's all I have.

        THE COURT: Okay.  Mr. Romeo?

        MR. ROMEO: Thank you, Your Honor.

///

///

CROSS-EXAMINATION

1

BY MR. ROMEO:

2

Q    Good afternoon, Mr. Fu.  We've met before.

3

A    Yes.

4

Q    Now, as I understand it, your current occupation is as

5

a real estate mortgage broker, correct?

6

A    I'm holding a broker's license.

7

Q    Well, in your deposition didn't you tell me that you

8

were currently employed as a real estate broker, a mortgage

9

broker?

10

A    That's one of my employment --

11

         MR. CHU: Your Honor, this is going beyond the

12

scope of the direct.

13

         THE COURT: I don't think it can be.  I think

14

the -- somebody has to get out -- be able to get out in the

15

course of examination who the witness is and if the

16

plaintiff doesn't ask it, if direct doesn't ask it, then it

17

can get out on cross.  This is preliminary stuff.

18

         MR. ROMEO: We ought to clarify because it would be

19

my intention to both cross-examine and --

20

         THE COURT: Is this your -- well then, it's clearly

21

not --

22

         MR. ROMEO:  -- and he's here -- and he's been

23

subpoenaed as an adverse witness for my side.

24

         THE COURT: Fine.  Then it's clearly -- there's no

25

1  scope of direct question -- limitation.  He's now your

2  witness.

3         MR. FARRER: Just so we understand, this is his

4  shot.

5         THE COURT: This is his shot, yes.

6         THE WITNESS: I should say, I'm sorry, I should say

7  I am associated with a brokerage firm.

8  BY MR. ROMEO:

9  Q    And you had a real estate license for over ten years,

10  correct?

11  A    That was correct.

12  Q    And you've been in the United States since 1985?

13  A    Correct.

14  Q    And you earned a bachelor's degree from Golden Gate

15  University in 1990 in management or in business?

16  A    Correct.

17  Q    And then you earned an MBA from Golden Gate University

18  in 1991?

19  A    That should be correct.

20  Q    And as far as your occupation, you worked as a real

21  estate broker and you've been a developer; is that correct?

22  A    That's correct.

23  Q    And you've worked as a general contractor?

24  A    That was a long time ago.

25  Q    Okay.  But you had a contractor's license?

1  A    I did.  A long time ago.

2  Q    Okay.  And you've done some projects with Mr. Yan,

3  correct?

4  A    Correct.

5  Q    And you've done projects with other people, correct?

6  A    Correct.

7  Q    And with Mr. Yan, you've worked on this Chenery Street

8  project, correct?

9  A    Correct.

10  Q    And then you worked on 547 - 23rd Avenue, correct?

11  A    Yeah, I did help him, yes.

12  Q    Okay.  That was another project that you worked on with

13  Mr. Yan, correct?

14  A    That wasn't really a project.  I was helping him.  We

15  have different contract.

16  Q    Okay.  And at some point with the Chenery project, you

17  started out actually with Mr. Yan and another gentleman by

18  the name of Winky Wong, correct?

19  A    Correct.

20  Q    And if you -- you've got the binder -- have you got the

21  white binder there in front of you?  If you take a look at

22  Exhibit A.  Okay.  So, have you had a chance to look at

23  that?

24  A    Yes.

25  Q    Okay.  And that was an agreement that you and Mr. Yan

1  and Mr. Wong entered into originally with -- for development

2  of the Chenery Street property, correct?

3  A    Yes.  Actually, along with another one.

4  Q    And to summarize, though, the idea was that Mr. Wong

5  owned the property at the time, correct?

6  A    Correct.

7  Q    He was the owner.  And you and Mr. Yan were going to be

8  25 percent partners with him in the development of that

9  property, correct?

10  A    Correct.

11  Q    And contribute to capital and the expertise to develop

12  the property, correct?

13  A    Correct.

14  Q    And then after a bit of time, Mr. Wong wanted to drop

15  out of that deal and Mr. Yan purchased Mr. Wong's interest

16  in the property, correct?

17  A    I don't know if he dropped out; however, he purchased

18  Winky Wong's share.

19  Q    He purchased Winky Wong's --

20  A    Demas Yan purchased Winky Wong's share.

21  Q    Well, who was on title?  You understand the difference

22  between title ownership and some other ownership, correct?

23  You're a real estate broker.

24  A    Correct.

25  Q    And you go down to the Hall of Records and you look up

1  and see who's got the title interest on the deed or you get

2  a title report and find out, correct?

3  A    Well -- correct.

4  Q    And in this case, Mr. Yan eventually took title to the

5  property in 2000 from Mr. Wong, correct?

6  A    That's correct.

7  Q    And in October when Mr. Yan took title interest to the

8  property and got a deed from Mr. Wong, you and Mr. Yan

9  entered into a new agreement with regard to development of

10  the property, correct?

11  A    Would you say that again, I'm sorry.

12  Q    When Mr. Yan bought the property from Mr. Wong in 2000,

13  you and Mr. Yan developed a whole new deal for the

14  development of that property, correct?

15  A    Actually at that point we discussed and negotiated to a

16  more specific deal, but my share to the property, it wasn't

17  changed.

18  Q    So your share was always 25 percent.

19  A    Yes, that was correct.  Yes.

20  Q    So whether it was under the Winky Wong deal or it was

21  with the deal with Mr. Yan, it was going to be 25 percent of

22  the property.

23  A    That's correct.

24  Q    And in the Winky Wong deal, that's Exhibit A, correct?

25  A    Correct.

1  Q    And then that was canceled, correct?

2  A    Yes.

3  Q    And then you entered into a contract which you'll see

4  in Exhibit D.  That was your agreement with Mr. Yan?

5  A    That's correct.

6  Q    And part of that contract was that Mr. Yan was going to

7  put up the first $300,000 of the construction costs,

8  correct?

9  A    Correct.

10 Q    And you were going to have the complete right to decide

11 whether to sell or rent the property, correct?

12 A    That's correct.

13 Q    And the reason you wanted that was to make sure that

14 the property didn't just sit there and you got the time and

15 effort and expense that you put into the property out of it

16 in some prompt fashion, right?

17 A    I understand that I have the complete right, the right

18 to sell or rent and I call it control.

19        MR. FARRER: I'm sorry, counsel, what exhibit are

20 you talking about?

21        MR. ROMEO: Exhibit D.  I'm sorry.  I apologize to

22 the Court and counsel.  It's Exhibit D.

23        MR. CHU: D as in dog.

24        MR. ROMEO: M-hm.

25 ///

BY MR. ROMEO:

Q    So you didn't put any money into the purchase of the property from Mr. Wong; did you?

A    No.

Q    And is it fair to say that during the time that -- from 2000 to 2002 there was periods in which there was activity on the property such as construction, and sometimes there was a break because a permit or something of that nature was needed, correct?

A    That's correct.

Q    There was a lot of down time during the development of that property, correct?

A    Yeah, there's some down time, yes, that's correct.

Q    Okay.  And you were doing the construction.  Mr. Yan doesn't do construction; does he?

A    He went around -- I went around.

Q    Okay.  But you were doing the construction.  You were the leader, the project manager, correct?

A    Well, actually I'm doing a lot of work, yes.

Q    Okay.  And you're using your contractor's license.

A    Never.

Q    You deny using your contractor's license on Chenery Street.

A    No, never.  Yes.

Q    Okay.  So in any case, during -- from 2000 to 2003,

1 when this property was to be sold, there was periods of

2 activity and periods of inactivity, correct?

3 A    Yes.

4 Q    Okay.  Now, when there was periods of inactivity, do

5 you know if Mr. Yan was in San Francisco or did he travel

6 more?

7 A    It's better you ask him.

8 Q    Well, were you in pretty frequent contact with Mr. Yan

9 because of this project?

10 A    I did have frequent contact with him, correct.

11 Q    And when there was a period of inactivity, did he not

12 leave the country at times to travel or to visit with his

13 fiancee over in China?

14 A    I don't know if he had a fiancee or what, and I don't

15 know what you're trying to get me to.

16 Q    Okay.  Well, let's talk about one of those trips.

17 You've been present during all of the depositions of

18 yourself and Ms. Chen and Mr. Yan in this case, correct?

19 A    Correct.

20 Q    And you were also here when Fei Sing Fu was testifying

21 this morning.

22 A    Correct.

23 Q    And when I took your deposition, I asked you a lot of

24 questions about what Fei Sing Fu had told you, correct?

25 A    Correct.

Q   And so let's ask about Mr. Yan's trip to China in
February 2002.  It's your testimony that he called you
before he left for Hong Kong and wanted to get some
financing for an equipment deal, correct?

A   Yes.  I even remember we talked about it in Koi Palace.

Q   That would be the Koi Palace Restaurant on Geary?

A   Correct.  That was correct, yeah.

Q   Okay.  So you and Mr. Yan had this meeting at the Koi
Palace Restaurant and he explained to you that he wanted to
do a deal whereby he was going to buy some equipment or
components in Singapore and sell them in mainland China,
correct?

A   The person who help him is a single man, that's one I
know.

Q   Okay.  Well, you told me before in your deposition that
the person that he was buying from was from Singapore,
correct?

A   Wait a minute.  Say that again?

Q   In your deposition, you told me that the person or
company that -- the people that he was buying the products
from, the components or whatever, the high tech equipment I
think you called it -- that those people were in Singapore,
correct?

A   The contact.  His contact, the man, the business
contact to sell him the equipment is a single man called

1   Jimmy.  That's what he told me.

2   Q    Okay.  And so he was going to buy equipment, either by

3   or through Jimmy -- this is according to what Demas told

4   you, correct?

5   A    That was correct.

6   Q    And then he was going to resell that equipment over in

7   mainland China, correct?

8   A    Yes.

9   Q    And he told you that he was very excited about that

10  deal because he was going to get double or triple profits

11  from that transaction, correct?

12  A    Yes.

13  Q    And in order to do that particular deal, Demas told you

14  at the Koi Palace Restaurant that he needed $500,000 U.S.,

15  correct?

16  A    He said that deal was -- the person -- I mean the

17  person making the deal with him, the Singapore person, that

18  the deal to buy that computer network system or whatever, it

19  was -- the deal was $500,000.

20  Q    Okay.  But Demas told you he needed $500,000 to do that

21  deal.

22  A    No, he told me the deal was $500,000.

23       MR. ROMEO: Your Honor, I need to give you Mr. Fu's

24  depositions.

25       (Pause.)

1    MR. FARRER: Mr. Romeo, are you going to be reading

2  from depositions?

3    MR. ROMEO: Yes, I am.

4    MR. FARRER: On June 16th and 17th of '05?

5    MR. ROMEO: I want to read from the deposition

6  transcript June 16th, 2005, page 60.

7    MR. FARRER: All right.  Your Honor, I'm going to

8  object to that.  The reason is, if you look at the back of

9  that transcript, you'll see it was only typed up and sent to

10  the witness on July 8th, meaning the witness hasn't had a

11  full 30 days to read or consider the deposition as mandated

12  by Federal Rule of Bankruptcy Procedure 7032, and -- I'm

13  sorry 7000 -- yeah, 7032.  Hold on a second -- I'm mis-

14  citing it -- 7030(e) which says:

15    "The deponent shall have 30 days after being

16    notified by the office that the transcript is

17    available to review the transcript and to make

18    changes."

19    I believe there's a case too, it's not a Ninth

20  Circuit case, that precludes the use of a deposition

21  transcript if the witness hasn't had a minimum of 30 days to

22  review that transcript.  We were never requested nor do we

23  agree to waive signing and reading -- this case has been

24  pending since January, so there's really no excuse it took

25  so long to take the depositions.  But the point is Mr. Yan

1  hasn't been given his statutory time period to review this

2  transcript of his deposition and make any corrections he

3  deemed appropriate.

4        THE COURT: Let me read the rule here and the

5  comments.

6     (Pause.)

7        Mr. Romeo, do you have any comments?

8        MR. ROMEO: Your Honor, I would have to brief it

9  overnight and tell you in the morning because I just am not

10 prepared to deal with the rule at this point.

11       THE COURT: I have no idea what the remedy is here.

12 So we'll just -- you can go on with other questions, and

13 we'll deal with it tomorrow.

14       MR. ROMEO: I will say this is that --

15       THE COURT: If you want to -- Mr. Farrer, you've

16 got to give us a case.

17       MR. FARRER: The case is In re Koran Enterprises,

18 Inc. 61 BR 321.

19       THE COURT: Okay.  Hold on.  Slow down.  Koran --

20       MR. FARRER: Yeah, K-o-r-a-n, Enterprises, Inc., 61

21 BR 321.

22       THE COURT: 61 BR --

23       MR. FARRER: 321.

24       THE COURT: 321?

25       MR. FARRER: Yes.

1    THE COURT: Okay.  Why don't you go on with the
2 rest -- just go on and you can come back to this tomorrow if
3 you wish or do you want to stop now?

4    MR. ROMEO: No, I'd like to go on.  I don't know
5 whether we can have me go on with the -- I have to use the
6 deposition transcript.  I will say this, is that we
7 consolidated these cases on May 19th.  I had noticed Mr.
8 Fu's and Stella Chen's depositions for far earlier than they
9 were actually taken, and they were postponed due to the
10 joint requests and vacation schedules of Mr. Chu and Mr.
11 Farrer.

12    THE COURT: Well, there's all sort of ways we can
13 deal with this.  One is to continue the trial.

14    MR. ROMEO: I'm happy to do that too if he needs to
15 stand on his objection, then I move to continue the trial
16 now.  But I'd rather brief it -- I'd rather -- if -- what we
17 could is we could proceed.  I'd like to use the transcript
18 because I'd like to get through my cross-examination and he
19 can have a conditional motion to strike if you should rule
20 that somehow or another the transcript isn't --

21    THE COURT: What do you want to do, Mr. Farrer?

22    MR. FARRER: I would prefer that Mr. Romeo do
23 whatever additional cross-examination he has of the witness
24 without the need for the deposition transcripts unless
25 that's all he has is to confront him with deposition

1  testimony to try to impeach him or -- if he has other direct

2  questions, if he has other exhibits he --

3          THE COURT: Let me go look at the case right now.

4  Okay?

5          MR. FARRER: Sure.

6          THE COURT: Let me look and see what the case says.

7          MR. CHU: Actually, Your Honor, there's only 25

8  more minutes left of 5:00 o'clock and --

9          THE COURT: Well, let me just -- let me go read the

10 case first and I'll be right back.  It will only take me a

11 couple of minutes.

12         MR. FARRER: That's fine.

13         THE COURT: We're probably going to adjourn for the

14 day anyway, but let's get some idea of what we're doing.

15 Stay seated.  I will be right back.

16         MR. ROMEO: Okay.  Thank you, Your Honor.

17         MR. FARRER: Thank you, Your Honor.

18         THE COURT: Okay.

19     (Whereupon, a recess is taken at 4:34 p.m. and the

20 court is reconvened at 4:43 p.m.)

21         THE COURT: We should stop for the day.  And

22 there's a couple things that can happen here.  You know,

23 I'll just throw out a couple suggestions, couple thoughts on

24 the subject.  And that is, are there particular pages you're

25 interested in or is it the whole thing?

1          MR. ROMEO: It's --

2          THE COURT: Do you have a list of pages?

3          MR. ROMEO: Yeah, it's particular pages and

4 passages, and I'm --

5          THE COURT: Well, there's a couple things we can

6 do.  This deposition isn't real short; it's fairly long.

7 The most important interest here is in having the witness --

8 let me just see one more thing by the way.

9          MR. ROMEO: Your Honor, the --

10         THE COURT: Just hold on, please.  Hold on.

11    (Pause.)

12         It might be possible to see whether there's any

13 corrections that, you know, we can deal with.  If there's

14 some objection to what was said, then I think you have to

15 have some sort of a hearing and the rule contemplates a

16 hearing to figure this out.  You know, if this can't be

17 worked out in some way, either by way of determining that

18 the deposition is correct or by -- in one way or another.

19 I'm more inclined to continue the trial than to preclude

20 them from using the deposition.

21         MR. FARRER: Well --

22         THE COURT: I'm willing to listen to you tomorrow,

23 but that's my inclination and you should all know that.

24         MR. FARRER: Maybe --

25         THE COURT: And obviously if it's the matter of

1   just determining at this point whether the deposition is

2   correct or not, then knowing the pages would help.

3            MR. FARRER: Well, if he maybe would -- exactly.

4   We could have the witness --

5            THE COURT: That's why I asked about the pages.  If

6   there is 110 pages, it's harder than if there are 20.

7            MR. FARRER: That's exactly right.

8            MR. ROMEO: Okay.

9            MR. FARRER: So if he would give those pages to us,

10  we could have the witness read those and let us know in the

11  morning.

12           MR. ROMEO: I can make a handwritten list right

13  now.  I assure everybody that of at least for phase one,

14  everything that's relevant to phase one is between pages 1

15  and 163.

16           THE COURT: That's a lot -- that's a lot though.

17           MR. FARRER: Yeah.

18           MR. ROMEO: Well --

19           THE COURT: You may still want to do that, if

20  that's all you can do, but --

21           MR. ROMEO: Well, I mean it's sort of scattered,

22  but I could still tell you that -- but as far as what I

23  would want to use in cross-examination or that I'm going to

24  refer to, I probably can give you a list of pages and it's

25  probably not a Herculean task to read them and for Mr. Fu to

1  review them and make sure --

2         THE COURT: Well, if it turns out that the amount

3  is a third of that, I think that's probably workable.

4         MR. FARRER: Yeah.  No problem.  Or less.

5         THE COURT: You know, just generally designating 1

6  through 163 is a lot unless you're really going to use all

7  those.

8         MR. ROMEO: No, I had no intention of --

9         MR. CHU: Did he mean 63 or 163?

10         THE COURT: What?

11         MR. CHU: Did you say 163 or just 63?

12         MR. ROMEO: No, 163.

13         MR. CHU: 163.

14         MR. ROMEO: This is everything I found that I

15  thought would be useful towards phase one, and that's not to

16  say that every page between then and 1 was relevant.  But if

17  I were to sit --

18         THE COURT: Yeah.  Right.  Well, you have some

19  notes there, so --

20         MR. FARRER: He must know what he's going to read.

21         THE COURT: If you give him the pages, I think

22  that, you know, that we can deal with that.  Or, you know, I

23  don't know what else to do here.  This is pretty long.

24         MR. ROMEO: I'll give you a list of pages that

25  might be referred to in cross-examination.

1    THE COURT: Okay.  Why don't we -- why don't I just
2 adjourn for a couple of minutes and let you try to do that.
3 I have to talk to Mr. Hom about something else.  I'm not
4 going to abandon you right how, but I'm going to leave you
5 for a few minutes --
6    MR. ROMEO: Okay.
7    THE COURT:  -- to try to come up with that list,
8 and as I say, I think the best thing to do would be to try
9 and resolve this in the morning, by the morning.
10    MR. FARRER: Your Honor, if I could make a
11 suggestion.
12    THE COURT: Yeah.
13    MR. FARRER: Why don't we agree that Mr. Romeo will
14 give me those pages now --
15    THE COURT: Yes.
16    MR. FARRER:  -- and adjourn for the day.
17    THE COURT: Oh, that's what we're going to do.
18    MR. FARRER: We're going to come back at 9:30.  So
19 you don't have to come back on the bench.  I mean, we can
20 just --
21    THE COURT: Well, I'm going to stay here a few
22 minutes.
23    MR. FARRER: Okay.
24    THE COURT: Try to do this soon and I'm going to
25 stay here a few minutes just because something might come

1    up.  You know, we should do this in the next ten minutes or

2    so.

3              MR. FARRER: Okay.

4              MR. ROMEO: Thank you, Your Honor.

5              THE COURT: And then we'll come back at 9:30

6    tomorrow.  And as I say if this doesn't work out, I'm more

7    likely to continue the trial than to make them go ahead

8    without the deposition that they took.  Okay?

9              MR. FARRER: Okay.

10             THE COURT: You have ten minutes or so.  We'll

11   check in on you.

12             THE CLERK: All rise.

13        (Whereupon, the proceedings are recessed until July 27,

14   2005 at 9:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6                    CERTIFICATE OF TRANSCRIBER

7

8

9            I certify that the foregoing is a correct

10   transcript from the digital sound recording of the

11   proceedings in the above-entitled matter.

12

13

14   DATED: May 9, 2006

15

16                        By: /S/ Jo McCall_____

17

18

19

20

21

22

23

24

25

Case: 05-03236   Doc# 110   Filed: 05/23/06   Entered: 05/23/06 09:50:24   Page 224 of 224