1          UNITED STATES BANKRUPTCY COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              (SAN FRANCISCO DIVISION)

4

5   In re:

6   DEMAS WAI YAN aka DENNIS YAN,      Case No. 04-33526

7                                      Chapter 11

8                                      San Francisco,California
                                       July 27, 2005
9                                      9:41 a.m.
            Debtor.
10   _____/

11   STELLA CHEN,

12          Plaintiff,

13     v.                              A.P. No. 05-03236

14   DEMAS WAI YAN aka DENNIS YAN,

15          Defendant.
     _____/

16

17                    **VOLUME II**

18          TRANSCRIPT OF TRIAL PROCEEDINGS

19
            BEFORE THE HONORABLE THOMAS CARLSON
20          UNITED STATES BANKRUPTCY JUDGE

21

22   APPEARANCES:

23   For the Debtor:        LAW OFFICES OF MARK J. ROMEO
                            BY: MARK J. ROMEO, ESQ.
24                          130 Sutter Street, 7th Floor
                            San Francisco, California 94104
25

1
APPEARANCES (CONTINUED):
2

3
For Stella Chen:          LAW OFFICES OF WILLIAM WEBB FARRER
4                          BY: WILLIAM WEBB FARRER, ESQ.
                           300 Montgomery Street, Suite 600
5                          San Francisco, California 94104

6

7

8    Court Recorder:        JANE GALVANI
                            UNITED STATES BANKRUPTCY COURT
9                           235 Pine Street
                            San Francisco, California 94104
10

11

12   Transcription Service:  Jo McCall
                             Electronic Court
13                           Recording/Transcribing
                             3946 Pyle Avenue
14                           Santa Rosa, California 95407
                             Telephone: (707) 545-1838
15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3    Plaintiff's Witnesses:    Direct Cross Redirect Recross

4    Fu, Fei Sing

5         By Mr. Farrer            8              60

6         By Mr. Romeo                  21

7

     Seher, Frederick Thomas
8
          By Mr. Farrer           62
9
          By Mr. Romeo                  74
10

11   Brodie, James Scot

12        By Mr. Farrer           79              88

13        By Mr. Romeo                  84

14
     Chen, Stella
15
          By Mr. Farrer           96             136
16
          By Mr. Romeo                 115              139
17

18   Kan, Harold

19        By Mr. Farrer          142

20
     Choy, William
21
          By Mr. Farrer          146
22

23   Leguna, Alina G.

24        By Mr. Farrer          153             166

25        By Mr. Romeo                 162

1          I N D E X (CONINUED):

2

3
Plaintiff's Witnesses:     Direct Cross Redirect Recross

4
Fu, Tony

5
        By Mr. Farrer          170        304
6                                          340

7       By Mr. Chu             197        327

8       By Mr. Romeo                  205          330
                                       231
9

10

11 Defense Witnesses:

12 Wong, Winky

13      By Mr. Romeo           365

14      By Mr. Farrer                 369

15      By Mr. Chu                    380

16

17 Beckman, Richard

18      By Mr. Romeo           391

19      By Mr. Farrer                 400

20

21

22

23

24

25

| | | Ident. | Evid. |
|---|---|---|---|

E X H I B I T S

Plaintiff's Exhibits;                                    Ident.    Evid.

| | | Ident. | Evid. |
|---|---|---|---|
| 1 through 66 (By stipulation) | | | 6 |
| 74   Enlarged Subdivision Map | | 78 | 78 |
| 76   MLS Listing | | 168 | 168 |
| 88   Declaration of Stella Chen | | | 231 |
| 85, 94, 90, 91, 92 and 86 | | | 319 |
| 95 and 96 | | | 326 |
| 97   Parts of Exhibit D | | 329 | 329 |
| 83 and 84 | | | 364 |
| 99   Deed given by Mr. Wong to Mr. Yan | | 383 | 388 |
| 100  Addition Deed by Mr. Wong to Mr. Yan | | 387 | 386 |

Defense Exhibits:

| | | | |
|---|---|---|---|
| A through Q (By stipulation) | | | 6 |

Defense Impeachment Rebuttal Exhibits:

| | | | |
|---|---|---|---|
| R through EE | | 7 | |
| R and S - Declarations of Fei Sing Fu | | | 62 |
| W and X - Two Declarations of Stella Chen | | | 169 |
| T, U, AA, BB, CC, and DD | | | 319 |
| JJ   Certain notes of Mr. Beckman | | 398 | |

1                P R O C E E D I N G S

2    July 27, 2005                        9:41 a.m.

3                    ---oOo—--

4            THE COURT: Okay.  Back to the trial.  And we had

5    Mr. Fu on the stand.

6            MR. FARRER: We have a couple of administrative

7    matters.

8            THE COURT: Yes.

9            MR. FARRER:  One is per our discussion yesterday

10   about Exhibit X not being complete; it's the declaration

11   of -- the second declaration -- I'm sorry, yeah, the second

12   declaration of Stella Chen that she authenticated her

13   signature on.

14           THE COURT: Yes.

15           MR. FARRER:  We have marked and offer Exhibit 88,

16   which is a complete copy of that declaration with the

17   exhibits attached.

18           THE COPY: Very well.

19           MR. FARRER:  I've placed a copy in front of Mr.

20   Hom.  I believe Mr. Romeo stipulates to the admission of

21   that document.

22           MR. ROMEO: Yes, Your Honor.

23           THE COURT: Okay.  And 88 is admitted.

24   ///

25   ///

1                    (Whereupon, Plaintiff's Exhibit

2                    88, Declaration of Stella Chen, is

3                    admitted into evidence.)

4          MR. FARRER: And then Mr. Romeo gave us the page

5     numbers of Mr. Fu's deposition transcript he wanted to read

6     into evidence.  We don't have any objection.

7          THE COURT: So Mr. Fu has had a chance to review

8     those.

9          MR. FARRER: He reviewed those.  He made one

10    change on page 136, line 22.  I've notified Mr. Romeo about

11    that and if he decides to read it in, I assume he'll read

12    it in as corrected.

13         THE COURT: Okay.  Are you ready?

14         MR. ROMEO: Yes, Your Honor.

15         THE COURT: Okay.  Mr. Fu, you're still under

16    oath.  Good morning.

17                    CROSS-EXAMINATION (RESUMED)

18    BY MR. ROMEO:

19    Q    Do you have the deposition transcript there in front

20    of you, Mr. Fu?

21    A    Yes.

22    Q    Yesterday where we left off was I was asking you about

23    how much Demas Yan had told you he needed for this purchase

24    and sale of high tech equipment from Singapore to China.

25    Do you remember where we were?

1  A     Five hundred thousand.

2  Q     He told you five hundred thousand.

3  A     Yes.

4  Q     Okay.  And as I understand your testimony then, you

5  called your brother Fei Sing Fu in Hong Kong while Mr. Yan

6  was still in America to discuss the possibility of this

7  loan, correct?

8  A     I said I called my brother, yes.

9  Q     Okay.  And you said that Mr. Yan when he approached

10  you specifically asked if your brother would be somebody

11  that could help out with the loan in Hong Kong, correct?

12  A     Correct.

13  Q     And then what you learned later in February was that

14  in fact the loan transaction had taken place, correct?

15  A     Yes, correct, because I transfer my brother's word

16  like I talk with him, and he asked, well, have him call me

17  direct from Hong Kong so Mr. Yan could call him from --

18  while he was in Hong Kong.

19  Q     But after the loan had taken place, you heard from

20  both Fei Sing Fu and Mr. Yan --

21  A     That was correct.

22  Q     -- that it took place, correct?

23  A     Yes.

24  Q     Okay.  And in fact I think you testified that Mr. Yan

25  called you two times to thank you for arranging the loan;

1    is that correct?

2    A    It is correct.

3    Q    And one time he called you from Hong Kong, and one

4    time he called you from Sheng Sin, right?

5    A    Correct.

6    Q    And it was also during those conversations -- well,

7    with the conversation with Fei Sing Fu that he told you

8    about, there was a 20 percent premium or profit that was

9    requested by the lender when they made the loan to Mr. Yan,

10   correct?

11   A    No, it was not correct.

12   Q    Why is that not correct?

13   A    Because he did not tell me at that time.

14   Q    When did he tell you?

15   A    He told me, it was like some time in April that he

16   tried to reach Mr. Yan and he was not responding, that he

17   call me.

18   Q    Okay.  And Fei Sing Fu was upset that Mr. Yan had left

19   Hong Kong without calling him, correct?

20   A    Well, he called me and asked me what's going on with

21   that guy because he promised to repay within one month.

22   It's been over a month.  So that's what happened.

23   Q    Okay.  So your brother called you in April you're

24   saying?

25   A    Yes, I believe so.

1  Q    And why do you remember that it was April?

2  A    Well, because I looked back at the event and my best

3  recollection to me is, it's April.  And I did affirm with

4  my brother when I met with him.

5  Q    You mean when he came to the United States this time

6  to testify in trial?

7  A    Yes, we did talk about –- we did briefly talk about

8  that.

9  Q    Okay.  And you did talk about the testimony that you'd

10  given in this case already, correct?  You and your brother?

11  A    No, I don't really.  I did want to –- well, my best

12  recollection is on these few events, is that true?  Yeah,

13  that would be true.  That's what my best recollection is.

14  Q    Okay.  But is it true also though that you discussed

15  with your brother your testimony that you'd given in this

16  case, in deposition?

17  A    I did talk to him, that you went around and –- I mean,

18  went around and around four days with the deposition.  That

19  was correct.

20  Q    And you told him what you'd testified to, correct?

21  A    What's that mean?

22  Q    You told Fei Sing Fu while he was here in the United

23  States what you had already testified to in your deposition

24  that I took for four days.

25  A    Quite frankly, I don't at that time because he don't

1 | know English.

2 | Q    Okay.  Would -- do you know Cantonese?

3 | A    Yeah, we communicate in Cantonese, correct.

4 | Q    Okay.  And so you were able to communicate with him in

5 | Cantonese, correct?

6 | A    Yes.

7 | Q    And you and your brother talked in Cantonese

8 | eventually, correct?

9 | A    Oh yes.

10 | Q    And in Cantonese, you had the discussion with your

11 | brother about your testimony in this case; didn't you?

12 | A    We briefly talked about that, that you -- I mean

13 | particularly I mentioned that you went around and around

14 | with four days and that's all, about it.

15 | Q    Now, when your brother called you, he was upset and

16 | disappointed that Mr. Yan had left Hong Kong and had not

17 | made any arrangement to pay the $450,000, correct?

18 | A    Well, you use the word "upset" -- well, that may be

19 | correct.

20 | Q    Okay.  And after your brother called you and said

21 | Demas hadn't -- Demas Yan had not repaid the loan, you then

22 | attempted to contact Demas Yan; didn't you?

23 | A    I did.

24 | Q    And were you able to contact him?

25 | A    At first he was hard to reach and eventually I did

1 reach him.  I do not like clearly, that he was out –- still

2 out of town or when he was in the USA; he was definitely,

3 when I face-to-face met with him, some time at the end of

4 April or beginning of May.

5 Q    Were you able to talk to him on the phone first?

6 A    I believe so, yes.

7 Q    And when was that?

8 A    End of April or maybe first of May.

9 Q    And that's when you told –- you testified that then

10 Mr. Yan said he had other financial problems and he could

11 not return the money at that time; is that what you're

12 saying?

13        MR. FARRER: Objection.  Mischaracterizes his

14 testimony.

15        MR. ROMEO: Do you understand the question, Mr.

16 Fu?

17        THE WITNESS: No.

18 BY MR. ROMEO:

19 Q    Is it at that point that Mr. Yan told you that he

20 could not repay the money?

21 A    He never said that he is not able to repay the money.

22 He always assure me, don't worry about it.  I'm going to

23 pay it.

24 Q    Now in the white binder there –- let me ask you a

25 couple more questions first.

1          When Demas Yan had made this loan or taken this

2   loan from Mr. Leung, and you wanted to see it repaid, you

3   came up with the idea of preparing the note and deed of

4   trust that we're litigating over in this case, the November

5   note and deed of trust, correct?

6   A    That wasn't correct.

7   Q    Okay.  Why is that not correct?

8   A    Because he keep assuring me that he will repay and

9   repay, and I was urging him to pay my brother's money and

10  at the time, he was real busy fighting with David Grossie

11  in the –- I mean the lawsuit that David Grossie filed

12  against him and trying to recoup his money.  The trial goes

13  on and on, and at that time I think by September, he

14  finally say that because he told me I'm going to secure

15  with the property; don't worry about it, but I –- when I

16  issue that secured with the collateral and you better get

17  the note from your brother back to me.  So that's what I

18  did.  And I told my brother.

19  Q    Okay.  So as I understand it, Mr. Yan wanted the

20  Chinese note, the one that was signed in Hong Kong –-

21  A    Yes.

22  Q    –- back, correct?

23  A    Correct.

24  Q    He wanted the original of the Chinese note back,

25  correct?

1  A     Yeah, that's correct?

2  Q     And in order to replace that, then you prepared, you

3  and Mr. Yan met at Starbuck's and you prepared the note and

4  deed of trust that's now assigned to Stella Chen, correct?

5  A     That's correct.

6  Q     And so before that time, there had been no discussion

7  about securing the note on real property until the issue of

8  the non-payment came up, correct?

9  A     What about the issue that you talk about?  Could you,

10  like one full sentence at one time so that I can answer

11  better.

12  Q     Okay.  Now before, when Fei Sing Fu called you and

13  said Demas Yan had left Hong Kong and not paid the Hong

14  Kong note, then the idea came up to secure it on real

15  property, correct?

16  A     It was I said -- I just testified to you that -- again

17  and again I urged him to pay my brother, but he keep -- I

18  mean using the excuse to fighting, fighting, fighting with

19  Grossie, that my brother tell me that guy is not

20  trustworthy, really totally disappointed that way.  It was

21  really, really bad in our culture and so you better make

22  sure he -- I mean has things as collateral.  That, my

23  brother told me about that, but so then I urge him when we

24  talked, and finally he said -- that was my best

25  recollection was about in September, don't worry about it,

1   and get me the original note so I give your brother the

2   deed of trust, promissory note, whatever we prepare, as

3   soon as we get that.

4   Q    Okay.  Let me ask you, Demas Yan wanted the Chinese

5   note back before he was going to give you a new note; is

6   that correct?

7   A    Yes, that was correct.

8   Q    And in June 2002 or somewhere in the middle of 2002,

9   Fei Sing Fu called you and said that he had to make good on

10  the loan that Demas had taken from him and Mr. Lau, at

11  least Mr. Lau's three million, correct?

12  A    That was correct, like in the mid year, like in June,

13  so he repay Mr. Leung.

14  Q    Okay.  So your brother calls you; he tell you that he

15  had to repay Mr. Leung and tells you that you need to get

16  some collateral and do something about collecting the loan

17  back from Demas Yan, correct?

18       MR. FARRER: Objection, mischaracterizes his

19  testimony.

20       THE COURT: Sustained.

21  BY MR. ROMEO:

22  Q    Did your brother tell you that you should get some

23  collateral for the loan?

24  A    He did mention it, I believe, but the main point he

25  really, really stressed this, this person, wanted to know

 1  why, what his excuse is -- it's no excuse, should not be

 2  excused; is totally untrustworthy.  In Chinese culture,

 3  usually just all agreements will stand, so that guy, I mean

 4  he had no respect to his obligation whatsoever, something

 5  like that.

 6  Q    Okay.  So you went to Mr. Yan and you said you wanted

 7  collateral and a new note for the obligation, correct?

 8          THE COURT: Okay.  Stop.  This isn't working.

 9  He's asking you whose idea it was to put up the real

10  property as collateral.  He just asked you whether your

11  brother asked for that, and you gave an answer that was

12  interesting but didn't answer that question.  I think

13  that's what you're trying to get at, right?

14          MR. ROMEO: Yes, sir.

15          THE WITNESS: Also, Your Honor, the time before

16  and after I'm not sure which to which and maybe when Mr.

17  Yan told me, don't worry about it; I get that as a

18  collateral.  Don't worry about it.  And maybe I like tell

19  my brother like it's a good idea, make sure get that

20  collateral.  And so otherwise I need to get the money, make

21  sure he repay the money.

22  BY MR. ROMEO:

23  Q    Okay.  So going back to the question we were just

24  asking you, was it your brother's idea or your idea to get

25  the collateral for the note when Demas Yan had skipped out

1  of Hong Kong without repaying the loan?

2  A    Again, I said to you, my brother mentioned it to me,

3  but the time before or after, I don't know.  It's like

4  Demas mentioned it to me so that is so definite that Demas

5  want -- Demas Yan want the original Chinese note, so I call

6  my brother and tell him that -- bring that over.

7  Q    Okay.  And that took place in June or mid year 2002

8  that discussion about we need to get collateral for the

9  loan, correct?

10  A    No.  In September -- some time in September.

11  Q    So it happened much later in September.

12  A    Yes, because at the time he was busy fighting with

13  Grossie, as I testified to you.

14  Q    Okay.  Now, open your book, the white book please, to

15  Exhibit T.

16            MR. CHU: Is that "P" counsel?

17            MR. ROMEO: "T" as in Tom.

18            THE WITNESS: T.

19  BY MR. ROMEO:

20  Q    If you go to page 2, first of all, Mr. Fu, is this

21  your declaration filed in the State Court action, Yan

22  versus Fu?

23  A    Yeah, it is.

24  Q    Is that your signature on the last page?

25  A    Yes.

1  Q    Did you sign this in March?

2  A    Yes.

3  Q    Did you read it before you signed it?

4  A    Yes.

5  Q    Did you read it carefully?

6  A    I did.

7  Q    And you signed it under penalty of perjury?

8  A    Yes.

9  Q    And you understood it?

10 A    I did.

11 Q    And you wanted the court to rely upon the truth of

12 this?

13 A    Yes.

14 Q    Okay.  Now on Page 2, at line 25, I want to read from

15 your declaration:

16             "Fei (and that's referring to Fei Sing Fu) has

17             told me, and he will submit a declaration under

18             penalty of perjury to confirm, that he was

19             present when the loan was made and Yan agreed to

20             secure the loan by said promissory note and deed

21             of trust."

22 Is that your testimony in March 2004?

23 A    Yes.

24 Q    And that's not true; is it?

25 A    That's absolutely true.

1    MR. FARRER: Excuse me, counsel. Do you have

2  Exhibit "T" in front of you, in the white binder?

3          THE WITNESS: I do.

4          MR. FARRER: Okay.

5  BY MR. ROMEO:

6  Q   So you're saying that this is true as well as the

7  story that the collateral came up in September of 2002.

8  A   Yes, definitely. Wait a minute. And because I mean

9  if you are talking about the perfect English should be

10 like, Fei had told me and he will submit a declaration

11 under penalty of perjury to confirm that he was present

12 when the loan was made. It should be a period. And Yan

13 agreed to secure the loan by said promissory note and deed

14 of trust, that's the whole thing, what it's all about,

15 because that was the fact, the true fact. It happened in

16 different time, that's all.

17 Q   Okay. But you didn't tell the court that in March

18 2004; did you? You didn't put that period in, even though

19 you just told me you read this declaration carefully.

20 A   I did read it carefully.

21 Q   But you didn't put the period in. You just corrected

22 it yourself.

23          MR. CHU: That's argumentative, Your Honor. The

24 witness has already explained what he said and the

25 declaration speaks for itself.

1          THE COURT: Overruled.

2          MR. ROMEO: Can you answer my question, Mr. Fu?

3          THE WITNESS: I did answer your question.  I

4   believe to the best of my knowledge, my English is a second

5   language, I truly believe this is what happened and it was

6   true.

7   BY MR. ROMEO:

8   Q    Okay.  I understand that English is your second

9   language, but I also understand that you have a real estate

10  broker's license; is that correct?

11  A    That's correct.

12  Q    And you were able to pass the broker's exam to get

13  that license?

14  A    That's correct.

15  Q    And you took a test in English to get that broker's

16  license?

17  A    I don't think they have a English test on that.

18  Q    And you got a degree from Golden Gate University in

19  management in 1990?

20  A    I did, yeah.

21  Q    And you did all your school work in English; is that

22  true?

23  A    Yes.

24  Q    And you got an MBA from Golden Gate University in 1991

25  and you did all of your school work to achieve that

 1  advanced degree, all in English, correct?

 2  A    Yes, correct.

 3  Q    Take a look at Exhibit U, please.  Do you recognize

 4  that document?

 5  A    Yeah.

 6  Q    Now, is that your signature on the last page?

 7  A    Yes.

 8  Q    And you signed this in November -- or excuse me,

 9  October 2004, last year.

10  A    Is that November here?

11  Q    Or, excuse me -- November 4th, 2004.

12  A    November.

13  Q    November 4th, 2004, correct?

14  A    Yes.

15  Q    And you read this one carefully before you submitted

16  it to the court; is that correct?

17  A    That's correct.

18  Q    And you understood it.

19  Q    Yes.

20  Q    On page 2, line 18, I want to read from that

21  declaration:

22          "During February 2002, Yan borrowed the sum of

23          450,000 from my sister-in-law's uncle who then

24          assigned that obligation to my sister, Stella

25          Chen, for payment and collection."

1    Period.  End quote.  Now, according to what you've

2    testified to in this court, that's not true; is it?

3    A    The note was replaced with a new note, and that was

4    understandable, that that loan is from that note.  Yes,

5    that was my understanding.

6    Q    There's no assignment from Mr. Leung to Stella Chen;

7    is there?

8    A    I take it -- I take it the note is originated from Mr.

9    Leung, and eventually assigned to Stella Chen.

10   Q    There's no assignment from Mr. Leung to Stella Chen;

11   is there?

12          MR. FARRER: Objection, to the extent it calls for

13   a legal conclusion.

14          THE COURT: I don't think this is a legal

15   conclusion here.  I mean he's talking about something else.

16          THE WITNESS: I told you that's my understanding

17   is true.

18   BY ROMEO:

19   Q    Okay.  Well, you understand what an assignment is;

20   don't you, Mr. Fu?

21   A    I do.

22   Q    You're a real estate broker and you see them all the

23   time, correct?

24   A    No, not all the time.  Not all the time.

25   Q    But you understand assignments very well because

1  you've used them quite a bit yourself; haven't you?

2  A   How do you refer to that?

3  Q   Well, for example, you've assigned a debt owing or

4  that you claim is owing from Mr. Yan to you to your ex-wife

5  Lei Ming Li; isn't that true?

6  A   Assigned my debt to Lei Ming Li?

7  Q   Yes.

8  A   That was not true.

9  Q   Okay.  Did you assign your partnership interest to Wei

10  Suen?

11  A   That was correct.

12  Q   And you assigned another claim that you have against

13  Mr. Yan to Mr. Charles Li who's filed a Proof of Claim in

14  this case, correct?

15  A   That was correct, yes.

16  Q   In fact, all the claims that you have against Mr. Yan

17  are being enforced by other people than yourself, correct?

18  A   The two you mentioned, yes.

19  Q   Well, and that's all the claims that you have against

20  Mr. Yan, correct?

21  A   I don't have any claim against him right now.

22  Q   Now, at the time that you met Mr. Yan at Starbuck's,

23  you didn't trust him; isn't that correct?

24  A   We did have a little argument on the interest that he

25  intended to delete.

Q    Well, that really wasn't the answer to the question,
but let me stop you there and ask you about that.  You said
that -- you said there was a little argument about the
interest rate?

A    No, because he already promised my brother that he
would pay back 20 percent of the profit of the loan.

Q    Well, you said there was a little argument about the
interest rate, correct?

A    Yes.

Q    And then yesterday you also testified that there was
an argument about the -- there was an argument about
exchange rate.

A    No, I did not say that, because 1.8, one dollar to
eight dollars, if the whole deal is made, I go with that
because even though the official rate if you're using it, I
mean people don't normally go with that, but if you're
really using it, the 3.6 million dollars should be much
more money than the $450,000.

Q    Well, that's not the question I'm asking, Mr. Fu.
Yesterday you testified that there was some kind of a
disagreement over the exchange --

A    A disagreement, that's the interest that he intended
to delete.

Q    And you mentioned for the first time, I might add,
about a discussion about the exchange rate with Mr. Yan at

1  Starbuck's, correct?

2  A    No.

3  Q    You did not -- you did not have a discussion about

4  exchange rates at Starbuck's?

5  A    I did not -- don't misleading me, my friend.

6  Q    Did you discuss exchange rates at Starbuck's?

7  A    No, because he said that your brother said we agree

8  when he loaned me the money -- when he loaned me the money,

9  that's 3.6 million Hong Kong and equivalent to 450,000,

10 that's fine with me.  And he said will repay it with -- in

11 U.S. Dollars, that will be $90,000 and Hong Kong dollars it

12 will be $720,000, that's what I remember.

13 Q    Okay.  But you said there was a disagreement about --

14 A    I did not said that.

15        MR. FARRER: Objection, mischaracterizes his

16 testimony.

17        MR. ROMEO: He just told us that there was an

18 argument, a little argument I guess he calls it, about the

19 interest rate.

20        THE COURT: Yes.  I remember that.

21        THE WITNESS: It is the interest rate, yes.

22        THE COURT: I think the only argument he testified

23 to was about the interest rate.

24        THE WITNESS: The interest rate on -- I'm sorry,

25 Your Honor.  The interest rate on the repay of the loan.

BY MR. ROMEO:

Q    Let's take a look at your deposition, page 109.

A    I'm sorry?

Q    Page 109.

A    Deposition?

A    M-hm.

Q    All right.

A    Yes.

Q    Starting at line 3:

         "Question: You didn't have an argument with

         him ..."

A    Number 9, right?

Q    109.

A    109, on line?

Q    Line 3.

A    Line 3:

         "You didn't have an argument with him that,

         quote, 'you have to do it this way and he said

         no, I want to do it another way.'  There was no

         argument?

         "Answer: No, no.  It was a very pleasant

         meeting."

Is that your testimony?

A    Okay.  That's because I take it and I take it because

overall it was okay.

1   Q    All right.  Let's go back to what I was originally

2   getting to.  At the time of the meeting at Starbuck's, you

3   had some bad feelings about your relationship with Mr. Yan

4   on the Chenery project; didn't you?

5   A    On the Chenery project?

6   Q    Yes, sir.

7   A    No.  I don't think so.

8   Q    All right.  Take a look at --

9   A    Maybe a little bit, but --

10  Q    Let's take a look at your deposition at page 93.  Do

11  you have the page?  I want to start reading on line 2:

12          "Question: Who started the ball rolling, for lack

13          of a better term, in having this note signed?

14          Did you ask Mr. Yan to do it or did he say, we

15          need to do it?

16          "Answer: The deed of trust and the note supposed

17          to be signed a long time because since he came

18          back from Hong Kong without fulfilling his

19          promise, and it's really important to have a

20          solid collateral at that point, particularly when

21          you terminate me at 23rd Avenue.  Is that correct

22          word 'terminate'?

23          "Question: In other words, you were working with

24          him on a project, 547 - 23rd Avenue, and he had

25          terminated you from that.

"Answer: I help him a lot on that.

"Question: You said he had terminated you from that project.

"Answer: That's what he said.

"Question: Okay.  And that happened before the note was signed.

"Answer: That was like September or something.

"Question: Well, my question is whether the termination had to do with your desire to have the note as collateral.  Were you suspicious of his motives or his loyalty at that time?

"Answer: Definitely.

"Question: So you had an uneasy feeling that he might not document this loan because there might be some bad feelings between you and him?

"Answer: That's number one.  And number two, actually it's very bad not to fulfill his promise."

Is that your testimony?

A    Yes.

Q    And so you definitely had some questions about whether you were going to get paid on the Chenery project at that time?

A    On Chenery project.  That's not what you asked me, I had problem with Chenery, no.  That was 23 Avenue, the

1    one -- a different project.

2    Q    Is that your testimony, Mr. Fu?

3    A    Here?

4    Q    Yes.

5    A    Yes.

6    Q    And you definitely didn't trust Mr. Yan at that point

7    or suspected his loyalty and his motives, correct?

8    A    That's correct.

9    Q    Take a look at Exhibit Y in the white binder.  Now, do

10   you have the exhibit in front of you?

11   A    Yes.

12   Q    And when you talked about being terminated from 547 -

13   23rd Avenue, is this -- is this a document that was signed

14   to memorialize that termination in August?

15   A    I believe so.

16   Q    And this was signed on August 28th, 2002?

17   A    Yes.

18   Q    Now, take a look at Exhibit E?

19        THE COURT: T?

20        MR. ROMEO: Excuse me, F.

21   BY MR. ROMEO:

22   Q    Do you see Exhibit F there?

23   A    Exhibit F.

24   Q    Yes.

25   A    Yes.

Q    Okay.  Now, when you and Mr. Yan and Winky Wong were going to do the project together, you had recorded that agreement that I was asking you about yesterday, correct?

A    Would you say that again, please?

Q    When you and Mr. Wong and Mr. Yan had that agreement, you saw that it was recorded down at the County Recorder's Office, correct?

A    Correct.

Q    And as a real estate broker and a mortgage broker, you know that that is a public record and that it clouds or encumbers the title of the property, correct?

A    Would you say it one sentence at a time.

Q    Okay.  You're a real estate broker and you know, because you look at title reports all the time that that agreement recorded against Chenery Street is going to show up on the title, correct?

A    Anything you record, definitely it will show up on the title.

Q    And you wanted it to show up on the title at the time that you recorded that agreement, correct?

A    Which agreement?

Q    The Winky Wong, Demas Yan, and Tony Fu agreement.

A    It was the discussion between the three of us.

Q    Okay.  Then in February it became very urgent as you say here in Exhibit F to get that cancellation recorded,

1  correct?

2  A    I take a real look at it after –- I do not recall if

3  this one I fax it to Demas Yan or because the original, the

4  original document was drafted and signed –- I mean Demas

5  drafted the original and there was no –- I did not recall

6  that –- I mean I had to fax it back to him with that –- in

7  a distance like a 15-minute drive between his house to my

8  house, and I just don't know how you want to get to this.

9  Q    Well, let me clarify this, Mr. Fu.  According to

10 your fax here in February 2002, suddenly it was urgent that

11 the cancellation of the development agreement with Winky

12 Wong be recorded, correct?

13 A    I want to take that back.  It's like because you try

14 to take a couple question –- I mean sentences together.  I

15 just testified to you I take a real closer look into this

16 fax, and it may not be mine.

17 Q    Okay.  So you don't think that this is your fax after

18 all?

19 A    I don't recall because we were –- entered a discussion

20 together, and it was –- I mean Mr. Yan's interest is much

21 bigger than mine because he purchased Winky Wong's 50

22 percent share and that it become –- I mean, it's a real

23 threat to him.  At the time, Winky Wong was in litigation

24 with the other partner.

25 Q    Okay.  But all I'm asking though is that in February

1  you thought it was urgent to have --

2  A    It was the discussion I was testifying.

3  Q    Okay.  But eventually there was a cancellation

4  agreement.

5  A    It was, correct.

6  Q    And you saw that that was recorded, correct?

7  A    It was, correct.

8  Q    Okay.  So that when that cancellation agreement was

9  recorded there was no public record interest showing your

10 name having any interest in Chenery Street, correct?

11 A    That contract is --

12 Q    That was a confusing question.  After that, there was

13 no public record of you having any interest in Chenery

14 Street, correct, once that cancellation agreement was

15 signed?

16 A    The cancellation is signed -- I still -- I mean have

17 contract, in contract with Demas Yan.

18 Q    I understand that.  But once the cancellation

19 agreement got recorded by you, then there was no public

20 record that you had an interest in Chenery Street, correct?

21 A    I think so.

22 Q    Okay.  Now --

23 A    But I'd like to -- I have an explanation to that.

24 Q    I have another question instead.  Let me ask you to

25 look at Exhibit E in the white binder.  Now, go to the last

page of the exhibit first of all.  Can you go to the last

page of the exhibit where there's a promissory note.

THE COURT: Which exhibit?

MR. ROMEO: Exhibit E, Your Honor.

THE COURT: Okay.

THE WITNESS: You mean the last page of Exhibit E?

MR. ROMEO: The last page of Exhibit E, sir.

THE WITNESS: The last page, because there's two

Exhibit E here, it seems -- looks to me -- E, okay.  Yes.

BY MR. ROMEO:

Q     And by the way, this is a form of promissory note that

you had; isn't that correct?

A     No, that's not correct.

Q     And where did you get the form of promissory note?

MR. FARRER: Objection, no foundation.

THE COURT: I'm sorry?

MR. FARRER: Objection, no foundation that he got

the form of promissory note.

THE COURT: I think he already testified he

brought these two forms.

MR. FARRER: No, this is a different payee.

MR. ROMEO: Different note.

THE COURT: Oh, yeah, different note, right,

because --

MR. FARRER: And it's a year and a half

1  beforehand.

2          MR. ROMEO: Okay.  Let me ask you a different

3  question just to save time here.

4  BY MR. ROMEO:

5  Q    You brought the forms for the Stella Chen note and

6  deed of trust, correct?

7  A    Correct.

8  Q    To Starbucks, correct?

9  A    Correct.

10  Q    And the forms that I'm asking you to look at in

11  Exhibit E are the exact same forms but written in with some

12  different terms, correct?

13  A    That's correct.

14  Q    Okay.  And so you had these forms; didn't you?

15  A    Wait a minute.  I mean Mr. Yan also had the same

16  forms.  I mean everybody can have the form like that.

17  Q    Okay.  Well, let's just take a look at the last page

18  of Exhibit E for a minute.  This is supposed to be a note

19  as I understand it between Demas Yan and Lei Ming Li, who

20  is your ex-wife, correct?

21  A    Correct.

22  Q    You were divorced from Lei Ming Li in 2000, correct?

23  A    I need to check with the date -- I mean the year you

24  mentioned on -- yeah, that was correct.

25  Q    Okay.  But by the date of this note, Lei Ming Li was

1    your ex-wife, not your wife, correct?

2    A    I think –- I need to check with the date, the year.

3    Q    Now, the note it says $110,440, correct?

4    A    That's correct.

5    Q    And then next to that is two notations, one says 547,

6    $47,285, and beneath that it says, 663, and then $63,155.

7    Do you see that?

8    A    I see that.

9    Q    And what that refers to is 547 refers to 547 - 23rd

10   Avenue, correct?

11   A    That should be correct.

12   Q    And that's for money that Demas owed you for work on

13   that property; isn't that correct?

14   A    That's not correct.

15   Q    And what's not correct about that, Mr. Fu?

16   A    I told you I testified that this 547, 663, the number

17   I don't recall how that come into it.  Maybe Demas told me

18   I'll write it this way.

19   Q    Well, you did work for Mr. Yan on 547 - 23rd Avenue;

20   didn't you?

21   A    I did work for him.  We were in contract, yes.

22   Q    And he owed you money for that project; didn't he?

23   A    That's correct.

24   Q    And in fact the claim that you assigned to Charles Li

25   which he has filed in Mr. Yan's Chapter 11 case is for

1 money that you claim was originally owed to you for 547 -

2 23rd Avenue, correct?

3 A    I think that's correct.

4 Q    And now the 663 refers to 663 Chenery Street as it was

5 then known, correct?

6 A    663 may refer to Chenery, that's correct.

7 Q    And the 63,000 refers to money that Mr. Yan owes for

8 materials on 663 Chenery Street; isn't that correct?

9 A    That's not correct.

10 Q    And what is not correct about that?

11 A    I told you, I testified I did not recall how these two

12 numbers came into it.

13 Q    Okay.  Whose handwriting are the two numbers in?

14 A    It was me, and I -- it was my handwriting -- I believe

15 it was my handwriting.

16 Q    In fact except for Mr. Yan's signature, this note --

17 the handwritten parts of this note are all in your

18 handwriting; isn't that true, Mr. Fu?

19 A    Yeah, I believe it's my handwriting.  I discussed and

20 negotiated with Mr. Yan, and these two numbers I don't

21 know -- I don't remember how that arrive into it, but at

22 the time, $110,440 it was owed by Mr. Yan and he also

23 evidenced with other promissory note, and this one would be

24 the one supersede the other promissory note.

25 Q    But the 663, just to be clear, that does refer to 663

Chenery Street, correct?

A    I said it would --

Q    You agree with that.

A    I believe so.

Q    Okay.  All right.  And if you look at the second page

of the exhibit, this looks to me like it was signed by Mr.

Yan on February 9th, 2001.

A    Which one?  Did I take the right one?

Q    Second page, the one where the notary is.  You got it.

It was signed by Mr. Yan on February 9th, 2001, correct?

A    That's correct.

Q    And then if you look at the first page of the exhibit,

it was recorded on Tuesday, September 17th, 2002.

A    Recorded on September 17, correct.

Q    And it was you that recorded this, correct?

A    I believe it was Lei Ming Li recorded it.

Q    So you had nothing to do with recording this document?

A    Only maybe I accompany her.

Q    Oh, okay.  So maybe you and Lei Ming Li went to the

Recorder's Office, correct?

A    Maybe.

Q    Okay.  She's not a real estate broker or a real estate

agent; is she?

A    No, she's not.

Q    But you know where the Recorder's Office is very well,

1  correct?

2  A    I did.

3  Q    Okay.  So this was signed in February 2001, but it

4  wasn't recorded until September 2002, correct?

5  A    That's correct.

6  Q    And this was recorded about two weeks after Mr. Yan

7  terminated you from 547 - 23rd Avenue, correct?

8  A    I think so.

9  Q    Okay.  So between February when you wanted to -- well,

10 let me ask you this.  At this point, you also had no record

11 interest in 663 Chenery Street, correct?

12 A    I'm sorry, would you say it again?

13 Q    September 2002, you had no record interest in 663

14 Chenery Street.

15 A    September 2002?

16 Q    Yes, sir.

17 A    September 2002 --

18 Q    Yes, sir.

19 A    -- we were in contract -- I mean the contract was

20 October 18, 2000, and I was --

21 Q    But that contract wasn't recorded though; was it?

22 A    You don't have to record everything.

23 Q    Okay.  But as far as what was recorded against the

24 property at 663 Chenery Street, there was nothing showing

25 your interest on the public record, correct?

1   A    Because at the time --

2   Q    I'm just asking --

3   A    -- I'd like to -- that's why I -- I want to explain if

4   I can, if I may, Your Honor --

5           THE COURT: Was it recorded or not?

6           THE WITNESS: That contract was not recorded.

7           THE COURT: Okay.

8           THE WITNESS: But I'd like to explain if --

9           THE COURT: You can have your counsel explain it.

10  He gets --

11          THE WITNESS: I have explanation, yes.

12          THE COURT: Okay.

13          MR. CHU: Technically, Your Honor, I don't think

14  Mr. Fu has counsel in this case.  He's pro per.

15          THE COURT: Well, he's still -- he's still an

16  adverse witness and he gets to be examined in this way.

17  BY MR. ROMEO:

18  Q    Now, let's go back --

19  A    Give me a second.  I'd like to write that down.  Thank

20  you.

21      (Pause.)

22  Q    I have one more question about Exhibit E before we

23  move on to something else.  On the first page, it says

24  "when recorded mail to," and it gives Lei Ming Li, 4028

25  Coleman Circle, Richmond, California 94806.  Now, that's

1  your sister's address; isn't it?

2  A    That's correct.

3  Q    Lei Ming Li never lived at that address; did she?

4  A    No, but she's still a friend with my sister.

5  Q    That's the same address, by the way, that you used

6  when you prepared the note and deed of trust at Starbuck's,

7  correct?

8  A    Demas and I prepared that.

9  Q    Okay.  Now, let's look at the note that was prepared

10 at Starbuck's.  I think that's Plaintiff's --

11           THE COURT: 5 and 6.

12           MR. ROMEO: Thank you, Your Honor.

13 BY MR. ROMEO:

14 Q    Well, let's first of all look at Exhibit 6.  And as I

15 was just asking you earlier, there's the same address that

16 we see in Exhibit 6 --

17 A    That's correct.

18 Q    -- as on the Lei Ming Li note, correct?

19 A    Yes, that's correct.

20 Q    Okay.  Let's look at Exhibit 5.  Your testimony in

21 Exhibit 5 is that this is all in your handwriting, except

22 that Demas Yan crossed out the provisions on the interest

23 and of course signed the note, correct?

24 A    I think so.

25 Q    Okay.  And you put in there, "the subject property

1    shall keep on market," correct?

2    A    Yeah, it was negotiated.

3    Q    And it says "principal and interest payable in

4    escrow," correct?

5    A    Wait a minute.

6    Q    Right above that, it says "principal and interest

7    payable in escrow."

8    A    "Principal and interest payable in escrow.  Subject

9    property shall keep on market."   Yeah, that's correct,

10   here.

11   Q    Okay.  Because in your agreement with Mr. Yan, the

12   October 18th, 2000 agreement, you had a provision in that

13   agreement that you had the discretion as to whether the

14   property should be marketed or how it should be marketed,

15   correct?

16   A    That was correct, yes.

17   Q    You were here yesterday when Fei Sing Fu testified

18   about a note that was written in Chinese that was signed in

19   Hong Kong, correct?

20   A    I think so.

21   Q    And Mr. Tsung, a friend of your father's, hand carried

22   that note from Hong Kong to deliver to you in San

23   Francisco, correct?

24   A    Correct.

25   Q    And you received it in a package with some clothes and

1 some toys, correct?

2 A    Correct.

3 Q    And when you found the note in the package, you

4 discovered it put in the package in an envelope, correct?

5 A    Correct.

6 Q    You opened the envelope and you pulled out the note

7 and you read it, correct?

8 A    Yeah, I did read it.

9 Q    Okay.  And then you put it someplace safe because it's

10 an important document, correct?

11 A    I put it in my drawer, I testified.

12 Q    Okay.  And it was important because you weren't going

13 to be able to get your brother's money back from Demas Yan

14 unless he signed the new note, and he wasn't going to sign

15 the new note unless he had the old note, correct?

16 A    That's what he asked, to get the old note.

17 Q    Okay.  But it was an important document to you; wasn't

18 it?

19 A    It is a document evidencing the debt, yes.

20 Q    Okay.  It's evidence of the debt; isn't it?

21 A    Well -- yes.

22 Q    And you don't have a copy of that note; do you?

23 A    I may have a copy.

24 Q    Well, when I asked you in deposition you said that you

25 didn't have a copy; isn't that true?

A    I don't have a copy -- I mean with me.  I mean I could

not locate a copy.

Q    But you looked, and you haven't been able to find it,

correct?

A    I think that was correct, yes.

Q    Okay.  So you think that you had a copy at one point;

is that what you're telling me now?

A    Yes.

Q    Okay.  But in your deposition you said you didn't have

a copy.

A    I don't have a copy, yes.

Q    Okay.  So the last time you saw that note, as I

understand it, is when you handed it to Mr. Yan in exchange

for the Stella Chen note and deed of trust, correct?

A    Say that again?

Q    The last time you saw that note, it was in Mr. Yan's

possession, correct?

A    Yeah, and in exchange, correct, yes.

Q    Okay.  And there was an exchange in Mr. Brodie's

office, as I understand your testimony, where Demas Yan

signed the note, signed the deed of trust, and once that

was done, you handed him the Chinese promissory note,

correct?

A    That's correct.  He handed a stack of -- the deed of

trust and the note, yes.

1    Q    Okay.  Let's talk about the time when the property was

2    in escrow in 2003.  Mr. Yan told you that he'd received an

3    offer on 661 Chenery, true?

4    A    True.

5    Q    And he showed you the offer from Mr. Santiesteban.

6    A    He may.

7    Q    Okay.  He may have shown you that offer.

8    A    Yeah, he may have show me the offer, but I disagree.

9    Q    You didn't like the offer because you thought it was

10   too low?

11   A    Yes.

12   Q    And you told Mr. Yan that?

13   A    I did.

14   Q    Okay.  Nonetheless, the escrow went forward to sell

15   that unit, 661 Chenery to Mr. Santiesteban, correct?

16   A    Correct.

17   Q    And during that period of time, you and Mr. Yan had a

18   number of discussions.  Actually, let me clarify the

19   question.  The period of time we're talking about is from

20   September 2003 through January of 2004.  During that period

21   of time, you had numerous discussions with Mr. Yan about

22   that escrow, correct?

23   A    How do you describe "numerous"?  We did have

24   discussions.

25   Q    You did have discussions with Mr. Yan over that period

1   of time about the escrow, correct?

2   A     It is fair to say that, yes.

3   Q     And part of the discussions was that you were

4   disputing with Mr. Yan about who was owed what from your

5   partnership, correct?

6   A     Wait a minute.  Would you say that again?

7   Q     Part of the discussion as over who was -- who was owed

8   what portion of money from the partnership, the 25/75

9   percent split, correct?

10  A     I don't think we really have any disagreement or

11  argument on that.

12  Q     Well, you told me before in deposition that you were

13  upset with Mr. Yan because you said that he was supposed to

14  put in 300,000 but he only put in 235,000 into the joint

15  account that you guys established, correct?

16  A     That's correct, but it's a different -- just a

17  different -- a whole different thing as you just brought it

18  -- mentioned it.

19  Q     Okay.  But you knew at that time that Mr. -- you had

20  told Mr. Yan that you thought he was short on his

21  contributions to the partnership by the fall of 2003,

22  correct?

23          MR. FARRER: Objection, vague as to timing.  Are

24  you talking about these discussions from September to

25  January?

1          MR. ROMEO: Yes.

2          THE COURT: Of 2003 or 4?

3          MR. ROMEO: 3.

4          MR. FARRER: September '03 to January '04.

5          THE COURT: To January '04, that's what I

6    understand.

7          THE WITNESS: We have discussed it, yes.  That's

8    what I already testified.

9    BY MR. ROMEO:

10   Q    Okay.  And some of the discussions were about the

11   instructions that were going to go into the escrow,

12   correct?

13   A    Yes.

14   Q    And some of those discussions were between you and Mr.

15   Yan, and there was some that actually included Mr. Yan,

16   yourself and Lei Ming Li, correct?

17   A    Lei Ming Li have nothing to do with me.

18   Q    I'm asking you, part of the discussions involved you,

19   Mr. Yan and Lei Ming Li on the phone at the same time

20   discussing these instructions, correct?

21   A    Would you try to be specific on what topic and what

22   things.

23   Q    You're having a discussion about the instructions and

24   how to close the escrow on 661 Chenery Street, correct?

25   A    Yes, we may, but --

1  Q    And on at least one occasion, you, Mr. Yan and Lei

2  Ming Li were all on the phone together talking about these

3  instructions and how to release -- or how to reconvey the

4  deeds of trust, correct?

5  A    It may.

6  Q    Okay.  Because at that time there was the Stella Chen

7  note and deed of trust and there was still the Lei Ming Li

8  note and deed of trust, correct?

9  A    That was correct.

10 Q    And in relation to the Lei Ming Li deed of trust, that

11 eventually was reconveyed against the property, correct?

12 A    That was correct.

13 Q    She took it off title of the property, correct?

14 A    When Mr. Yan pay her.

15 Q    Okay.  And Mr. Yan paid her $17,255, correct?

16 A    That was correct.

17 Q    And she reconveyed the deed of trust securing the

18 amount of $110,440; is that correct?

19 A    Because it was paid in full.

20 Q    Okay.  And the reason it was paid in full was because

21 Mr. Yan had made a payment to her in the amount of $30,000

22 prior to that time, correct?

23 A    Demas did make another payment, yes.  That was

24 correct.

25 Q    Okay.  And that payment is reflected in, if you look

1  in the white binder, Exhibit DD, way down at the end there.

2          THE COURT: D?

3          MR. ROMEO: DD.

4          THE COURT: Ah, I see.

5  BY MR. ROMEO:

6  Q    Have you found it?

7  A    Yes.

8  Q    And so that's a $30,000 payment that was made against

9  this Lei Ming Li note, correct?

10 A    That's correct.

11 Q    And this was made in 2001, correct?

12 A    Correct.

13 Q    Off the joint account of Lei Ming Li and Demas Yan,

14 correct?

15 A    That's correct.

16 Q    And the joint account being for a -- a joint account

17 established by all of you for 547 - 23rd Avenue, correct?

18 A    It was established by Demas and Lei Ming Li, that was

19 correct.

20 Q    And it was made payable to Tony Fu or Lei Ming Li,

21 correct?

22 A    That's what it said.

23 Q    Okay.

24          MR. ROMEO: Your Honor, can I use the board here

25 for a minute?

1         THE COURT: Sure.

2         MR. ROMEO: Okay.

3         THE COURT: Pull it out. I think there's a sheet

4 of paper in there. What does it say?

5         MR. ROMEO: It says --

6         THE COURT: You can just take it off or fold it

7 over, whichever you wish.

8         MR. ROMEO: I can just fold it over.

9         THE COURT: That's fine. And if it doesn't fold

10 off, just rip it off. That trial has long since gone.

11         MR. ROMEO: I'm going to slant it a little bit so

12 everybody can see it.

13         MR. FARRER: That's fine.

14         MR. ROMEO: Okay. I forgot a marker, so I'm going

15 to have to write as big as I can in pen.

16         THE COURT: Here's one.

17         MR. ROMEO: Oh, thanks.

18 BY MR. ROMEO:

19 Q    The Lei Ming Li note, Mr. Fu, was in the original

20 amount from 2001 in the amount of 110,440, correct?

21 A    That's correct.

22 Q    And in your discussions with Mr. Yan, during the

23 Santiesteban escrow, it was agreed between Mr. Yan,

24 yourself and Lei Ming Li that she would accept $17,285 in

25 satisfaction of that note, correct?

1  A    That's not correct.

2  Q    Well, she reconveyed it because you just told me that
3  it was paid in full at that point.

4  A    Because what you just said, I was the one that was not
5  correct because it was Mr. Yan and Lei Ming Li discussed
6  it, and negotiated it.

7  Q    So you're saying that there were separate discussions
8  between Lei Ming Li and Mr. Yan that you were not a party
9  to?

10  A    That would be correct, yes.

11  Q    Okay.  Well, let's walk through this anyway.  She paid
12  17,285 -- or she was paid 17,285 by Mr. Yan in January of
13  2004 and reconveyed the deed of trust off the property,
14  correct?

15  A    If that check is that amount, that would be correct.

16  Q    Okay.  But you believe that to be true; don't you?

17  A    I believe your number is true.

18  Q    Okay.  And then in 2001 we know that Mr. Yan had made
19  a check payable to Lei Ming Li or Tony Fu in the amount of
20  $30,000, correct?  It's right there in front of you,
21  Exhibit DD.

22  A    I know.  I know.  I want to get back to the 110,444
23  note.  Which one is it?

24  Q    I think it's Exhibit E.

25  A    Exhibit E.  Yeah, that's Exhibit E.

1   Q    And go to the last page of the exhibit.

2   A    Uh-huh, yes.  Yeah, that's correct.

3   Q    And I was going to ask you to look at that because if

4   you take this minus this, minus this -- excuse me, let me

5   make that clear for the record -- you take 110,440 --

6   A    M-hm.

7   Q    17,285 and 30,000, it adds up -- it leaves $63,155,

8   correct?

9   A    That's correct.

10  Q    By the way, Mr. Fu, during that escrow in

11  Santiesteban's purchase of 661 Chenery Street, you never

12  told the title company that you were a 25 percent owner;

13  did you?

14  A    Officially, it was Mr. Yan contacted the title

15  company; that may be correct.

16  Q    So it is correct that you never told the title company

17  you were a 25 percent owner.

18  A    Because I did not officially in contact with them,

19  yeah, that may be correct.

20  Q    Okay.  And you didn't review -- you didn't review or

21  sign any seller's instructions; did you?

22  A    I did not.

23  Q    I think you told me yesterday that you didn't put any

24  money into the purchase of the property, correct, from Mr.

25  Wong?

1   A    Mr. Wong -- purchased Mr. Wong's property, yes.

2   Q    You didn't put any money into the purchase of the

3   property; did you?

4   A    No, I did not.

5            THE COURT: Which property is this?

6            MR. ROMEO: The Chenery Street property, to

7   clarify.

8            THE COURT: Chenery.

9   BY MR. ROMEO:

10  Q    You understood that to be the Chenery Street property,

11  correct?

12  A    Yes, correct.

13  Q    Let me ask you to look at Exhibit CC.

14  A    Which one?

15  Q    CC, C as in cat.

16  A    The white binder?

17  Q    White binder, sorry.

18           THE COURT: CC.  Okay.

19  BY MR. ROMEO:

20  Q    Mr. Fu, do you recognize these documents?

21  A    I may went through that.

22  Q    Do you remember Mr. Yan serving these requests for

23  admissions on you in the Sate Court action in June 2004?

24  A    He may.

25  Q    Do you recognize on the third page the responses that

1  you prepared to the requests for admissions and signed?

2  A    I may.

3  Q    Do you recognize your response to No. 4?  If you'd

4  read the question, it says, quote:

5          "You did not contribute any purchase money for

6          the project."

7  End quote.  And by "project," according to the first page

8  of the exhibit, is the construction project known as 663

9  Chenery Street.  Do you understand the question there now?

10  A    Which one?

11  Q    It says:

12          "You did not contribute any purchase money for

13          the project."

14  A    That's No. 4, right?

15  Q    Yes, sir.  And your response to that question was

16  "denied."

17  A    That was correct.

18  Q    So what you were saying by denying that request was

19  that you did contribute money towards the purchase of the

20  project.

21  A    That was correct.

22  Q    But that's not true; is it?

23  A    What do you mean?

24  Q    Well, you just told me in testimony today that you

25  didn't purchase -- you didn't contribute any money towards

1   the purchase of the project.

2   A    I did contribute money to the project, and I will

3   prove it.

4   Q    In today's --

5         MR. CHU: Objection, Your Honor, mischaracterizes

6   the witness's testimony.  The question earlier was whether

7   he contributed purchase money for the property.  Now he's

8   asking him whether he contributed purchase money for the

9   project, which I think is --

10        THE COURT: That's what I understood.  But we

11  ought to get -- make sure it's clear.

12        MR. ROMEO: Well, the definition of "project" is

13  663 Chenery Street, the property referred to in the earlier

14  question.

15        MR. CHU: No.

16        THE WITNESS: No, that's for the project.

17        MR. CHU: Misstates the document.  Project is the

18  construction project, not the property.

19        THE COURT: They all have to do, purchase money

20  for the project.  One is purchase money; one is

21  construction.

22  BY MR. ROMEO:

23  Q    If you look at No. 5, Mr. Fu.  There's a different

24  question there.  It says you did not contribute any money

25  towards construction of the project.

1  A    It's actually the same, to my understanding.

2  Q    Oh.  So you're saying it's now the same question.

3           MR. FARRER: Well, objection --

4           MR. ROMEO: Well, he can answer.

5           MR. FARRER:  -- to the extent it's argumentative

6  as to what his answer --

7           THE COURT: I'm all confused at this point.  Would

8  you ask the question over so I can make sure I understand

9  what's going on?

10 BY MR. ROMEO:

11 Q    Earlier today, Mr. Fu, you said that you hadn't

12 contributed any money towards the purchase of 663 Chenery

13 Street, the property.

14 A    The purchase on Winky Wong's part, that's what I

15 understand you asked me, if it was not -- I did not

16 contribute any money.  That was correct.

17          THE COURT: Can I -- let me ask a question.

18          THE WITNESS: Yes, Your Honor.

19          THE COURT: You have the original agreement,

20 three-part agreement, with Winky Wong.

21          THE WITNESS: Yes.

22          THE COURT: And then later it became a two-party

23 agreement.

24          THE WITNESS: Yes.

25          THE COURT: Did Winky Wong own the real property

1   at the time of the first agreement?

2           THE WITNESS: Correct.

3           THE COURT: He had a hundred percent ownership?

4           THE WITNESS: He had hundred percent owner, that's

5   correct, Your Honor.

6           THE COURT: And then Mr. Yan purchased the

7   property from Winky Wong.

8           THE WITNESS: That's correct, Your Honor.

9           THE COURT: And that's why he had a larger share

10  in the second agreement.

11          THE WITNESS: Exactly.  And at the beginning, I'd

12  like to explain, if you allow me.

13          THE COURT: Just -- just --

14          THE WITNESS: Okay.  Thank you.

15  BY MR. ROMEO:

16  Q   I'd like you to take a look at Exhibit Q, Mr. Fu.

17  Have you had a chance to look at it?

18  A   I did.

19  Q   Do you recognize that letter?

20  A   That letter is from Demas Yan's ex-attorney, Richard

21  Beckman.  Is that correct?

22  Q   Correct.  And then when you got the letter, you

23  eventually called Mr. Beckman to discuss his contentions,

24  correct?

25  A   Yes.

Q    And in the course of that discussion, you didn't say anything to Mr. Beckman about a loan made in Hong Kong; did you?

A    The call was real simple.  I said I received your letter.  I do not know what's going on.  And then he asked, come to my office and let's get -- I mean get to a table and settle, get a settlement talk.  And I said, what kind of settlement talk?  Then I get back to Mr. Yan.  That's all about.

Q    Okay.  In this letter, Mr. Beckman suggests that the Chen note and deed of trust be reconveyed for a lesser amount than the full face amount, correct?

A    That's correct.

Q    And he makes some contentions about the accounting on the project and the fact that you didn't have a license and other issues that were in dispute between you and Mr. Yan, correct?

            MR. FARRER: Objection, the letter speaks for itself.

            THE COURT: I assume it's a preparatory question.

            MR. ROMEO: It is.

            THE COURT: You may have the question.

            THE WITNESS: I looked at it, and I read it, and I perceived this is like an extortion letter.

///

BY MR. ROMEO:

Q    Okay.  You see it as an extortion letter.  But in any case, you read the letter.

A    I did read the letter.

Q    You showed it to your sister, Stella Chen.

A    I did.

Q    Stella Chen and you discussed it, correct?

A    It's ridiculous, yes.

Q    And you heard her testify on the stand yesterday that she thought that it was ridiculous that Demas Yan was asking for a discount from 450 to $410,000, correct?

A    It was ridiculous, yes.  That's correct.

Q    And then in the conversation that you and Stella Chen had, you said it was ridiculous because Demas Yan had gotten a loan of $450,000 and he should pay back the loan of $450,000, correct?  You heard your sister testify to that, correct?

A    That's the truth also.

Q    But you didn't tell Mr. Beckman in your phone call to him, we don't want to accept a lesser amount than $450,000 because Demas Yan received $450,000 from our relative in Hong Kong in 2002.

A    I told you all the conversation was just a short conversation.  I did not know what's going on, I said.  He said come negotiate -- I mean settlement talk or something,

1  and I said, well I'll get back to Demas.  That's all I

2  remember in the talk.

3  Q    Okay.  You thought the letter was ridiculous.  You

4  knew that Mr. Yan had borrowed $450,000, but in that

5  conversation with Mr. Beckman, you never told him, this is

6  from a loan from Hong Kong in 2002.

7  A    I have no obligation to get into talk with a stranger

8  that I did not know.

9  Q    My question is --

10           THE COURT: Is it yes or no, did you mention it or

11  not?  He gets to ask yes or no questions.

12           THE WITNESS: All right.  Sorry, Your Honor.

13  BY MR. ROMEO:

14  Q    So is the answer yes or no?  Did you say something

15  about a Hong Kong loan to Mr. Beckman?

16  A    I did not say anything.

17  Q    In fact, you didn't say anything until the

18  declarations in March 2004 in opposition to the preliminary

19  injunction motion; isn't that correct?

20           MR. FARRER: Objection, vague and ambiguous.  To

21  whom, about what?

22  BY MR. ROMEO:

23  Q    Well, if you look at your declaration --

24           THE COURT: I think the question is that at any

25  time before those March 2004 declarations, did he raise

1  this loan?

2       MR. FARRER: To anyone?

3       MR. ROMEO: To Mr. Yan or his attorneys.

4       THE COURT: Or any of his counsel or anything like

5  that I suppose would be the relevant question.

6       MR. FARRER: Do you understand the question?

7       MR. ROMEO: If you need a minute to reflect on it,

8  you can look at your --

9       MR. FARRER: Tell him you don't understand the

10  question.

11       THE WITNESS: I'm sorry.  Would you say the

12  question again?

13  BY MR. ROMEO:

14  Q    Take a look at Exhibits T and U again, please.  Let's

15  look at Exhibit T first.  And isn't Exhibit T the first

16  time that you said -- or you made any communication to Mr.

17  Yan or his attorneys about a loan from Hong Kong?

18       MR. FARRER: Other than what he's already

19  testified to, counsel.  He's testified to several phone

20  calls with Mr. Yan about the note and deed of trust years

21  before this declaration was filed.

22  BY MR. ROMEO:

23  Q    After Mr. Beckman's letter and till March, did you say

24  anything to them -- to Mr. Yan or his counsel about a loan

25  in Hong Kong, up to the point of this declaration.

A    I don't think I have direct communication with Mr. Yan
after the talk, a brief talk and then I remember that I
receive a threat almost at the same time, received a fax to
me from Mr. Yan threaten -- the threat letter, and that's
about it, and I did not get into anything with -- and my
sister did have an attorney called Siu Ma respond with a
letter.

Q    To Mr. Beckman.

A    And then find out the lawsuit, and it was getting into
the injunction and my sister went into the courtroom.  That
all happened and it was trying to cheat us also at that
point.

Q    Okay.  Siu Ma didn't say anything about the Hong Kong
loan in her letter to Mr. Beckman; did she?

A    I believe not, yes.

Q    All right.

        THE COURT: Which letter is that?

        MR. ROMEO: Exhibit Q.  Oh, the Siu Ma letter?

        THE COURT: Yeah.

        MR. ROMEO: He just mentioned it in his testimony.
I don't think it's been marked as an exhibit.

        THE COURT: Not an exhibit.  Okay.

        MR. ROMEO: Okay.

BY MR. ROMEO:

Q    Now, what you did tell Mr. Beckman during the course

1  of your phone call with him was that if Demas didn't pay

2  you the full amount, the $450,000, you were, quote, unquote

3  "going to make trouble for him."  Correct?

4  A    That's a lie.

5  Q    You didn't tell Mr. Beckman during the course of that

6  conversation that you were going to make a report to the

7  Department of Real Estate about the condominium project

8  because there was something wrong with the disclosures?

9  A    That's a lie.

10 Q    You didn't tell Mr. Beckman during the course of that

11 conversation that you were going to call the building

12 department because there was some discrepancy between the

13 as-built project and the plans on file with the building

14 department?

15 A    Did Beckman say that?

16       MR. FARRER: Mr. Fu, please answer yes or no.

17       THE COURT: Just yes or no.

18       THE WITNESS: No, that's a lie.

19       MR. FARRER: Just yes or no.

20       THE WITNESS: No.  I never said that.

21 BY MR. ROMEO:

22 Q    You didn't make any threats against Mr. Yan to Mr.

23 Beckman about public agencies that you were going to

24 contact to create trouble for Mr. Yan in the marketing of

25 this project?

1  A     No.

2  Q     You deny that?

3  A     Yes.

4          MR. FARRER: Your Honor, could we take a break?

5          THE COURT: Yes.

6          MR. ROMEO: It's 11:00 o'clock.  That's fine.  I

7  don't have too much longer.

8          THE COURT: Okay.  Let start again at a quarter

9  after by that clock.  That's seven minutes.

10         THE CLERK: All rise.

11     (Whereupon, a recess is taken at 11:08 a.m., and the

12  court is reconvened at 11:20 a.m.)

13         THE CLERK: All rise.

14         THE COURT: Please be seated.  Go ahead, Mr.

15  Romeo.

16  BY MR. ROMEO:

17  Q    Okay.  Mr. Fu, during 2003, approximately July of

18  2003, the actual construction work on the Chenery project

19  was completed, correct?

20  A    It was completed on August 7 or 8, 2003 with the

21  Certificate of Occupancy.

22  Q    And at that time, you were aware from conversations

23  with Mr. Yan that he was trying to get a subdivision map

24  recorded, correct?

25  A    He did not bring the map to me until December.

Q   Okay.  But you were aware that he was trying to get a

subdivision map recorded, correct?

A   I may not know that.

Q   As a real estate broker, you know that when there's a

condominium, there's usually a subdivision map recorded

before the units can be sold.  You have that understanding;

don't you?

A   I do understand that.

Q   And prior -- prior to December 2003, you were aware

from Mr. Yan that he was trying to get such a map recorded

so that the units could be sold, correct?

A   He did not tell me that.  Yes, he did not tell me.

Q   So it's your testimony that you never discussed the

subdivision map at all with Mr. Yan in 2003?

        MR. FARRER: Objection, mischaracterizes his

testimony.

        THE COURT: Well, he's asking.

        MR. FARRER: Well, actually, he's saying "your

testimony."

        THE COURT: He's saying are you testifying?

That's a fair question.

        THE WITNESS: Would you say it again?

BY MR. ROMEO:

Q   You were here when Stella Chen was testifying

yesterday, correct?

A     Yes, correct.

Q     And part of her testimony was about signing a
subdivision map?

A     That's correct?

Q     And she testified that -- and forgive me if I
mischaracterize it -- but that you assisted in making sure
that the map got signed by her, correct?

A     That's correct.

Q     All right.  So -- and I'm assuming, and you can
correct me, that you talked to Mr. Yan about the necessity
of those maps being signed.

A     That's when he brought it over to me, like in
December.

Q     Okay.  And you knew from Mr. Yan though prior to that,
that he was having trouble with World Savings and Bank of
America approving the conversion of the condominium.

A     I don't think I knew that.  Oh, by the way, I never
done a subdivision map before.  I never.

Q     I understand.

A     It's my first time.

Q     I understand that.  But the answer to my question is,
you deny having any discussions with Mr. Yan in which Mr.
Yan conveyed to you that he was having trouble with World
Savings and Bank of America signing off on the condominium
map.

1  A    I don't think he mentioned that.

2  Q    He never -- he never discussed that with you at all.

3  A    No.

4  Q    All right.  Now, you testified earlier today that Mr.

5  Yan had made a note to Lei Ming Li, your ex-wife, correct?

6  A    Correct.

7  Q    And she had participated in some discussions about the

8  instructions in the Santiesteban escrow about the

9  reconveyance of that note.

10  A    That's correct.

11  Q    And you're in regular contact with her; aren't you?

12  A    Yes.

13  Q    In fact, you guys live together; don't you?

14  A    No.

15  Q    You deny that?

16  A    Yes.

17  Q    Since this case has been filed in Bankruptcy Court,

18  you've been to the deposition -- all of the depositions;

19  haven't you?

20  A    What do you mean "all of the depositions"?

21  Q    Demas Yan's deposition, your deposition, obviously,

22  Stella Chen's deposition.

23  A    Yes.

24  Q    And you're a party to this litigation so you've been

25  served with various papers by my office as well as the

1  other attorneys, correct?

2  A    Correct.  Except some of the things he did not serve

3  me, like joint pre-trial statement, the last day you served

4  the -- and Mr. Chu remind me.

5  Q    Well, as I understand, Mr. Chu said at your deposition

6  that if I needed to get papers to you, I should send them

7  to his office; isn't that true?

8  A    But I supposed to receive a copy.

9  Q    Okay.  Well, but Mr. Chu said to send your copies to

10  his office or to serve you in care of his office; isn't

11  that true?

12  A    Yes, that was true.

13  Q    And so you've gotten all these papers and you know,

14  for example, that we tried to take the deposition of your

15  ex-wife, Lei Ming Li, who you're in regular contact with,

16  correct?

17  A    Yeah, I think so.

18  Q    And you knew that in June of 2005; didn't you?

19  A    I knew that, yes.

20  Q    And you were present at 5813 Geary Boulevard, San

21  Francisco when Lei Ming Li was served a subpoena for her

22  deposition by someone named Man Louie, true?

23  A    Not true.

24  Q    Do you deny that?

25  A    Yes.

Q    And you deny being at 5813 Geary Boulevard when she

was served with the subpoena and you drove her away in a

Jaguar?

A    That statement was not correct.

Q    All right.  Do you have a Jaguar?

A    No.

Q    What kind of car do you have?

A    It's a private matter.

Q    It's a what?

A    It's a private matter.

Q    I don't know --

A    I believe it's not relevant to the case.

        THE COURT: A private matter, he said.  I didn't

know that was a car, but --

        MR. ROMEO: I was not going to say that.

        THE COURT: Okay.

BY MR. ROMEO:

Q    So you don't want the Court to hear the answer to that

question?  Mr. Fu?

A    I answered, I don't --

Q    And you know who Man Louis is; don't you?

A    When I pick up the mail on my mail box I read that

there was a subpoena in my mail box, and I give it to Mr.

Chu and Mr. Chu returned it to you, and I recall he was a

friend of Mr. Yan for many years with a mental disorder.

Q    Okay.  You told me that in deposition; you think Man Louie is a person with a mental disorder.  But you saw him on the sidewalk at 5913 Geary Boulevard on June 2nd serving a subpoena on Lei Ming Li; didn't you?

A    I did not.

Q    You did not.

A    That's not a correct statement.

Q    And during the course of this –- your deposition in this case, I asked you Lei Ming Li's address so that I could serve her with a deposition subpoena, and you refused to tell me; isn't that true?

A    Because I'm not related to her.

Q    But you know her address.

A    She is now living with a friend, that's what I know.

Q    You know her address; don't you?

A    I know her address, yes.

Q    And you refused to tell me her address during your deposition; didn't you?

A    Because it's not my responsibility to.  At that point, I feel –- resent it, I believe.

Q    Okay.  But you didn't want to give me her address because you didn't want me to serve a subpoena on her, correct?

A    That's not what I think of.  What I think of is, it's a private matter and I should not disclose it without her

1 permission.

2 Q    You know that she's a witness in this case though;

3 don't you, because she's talked to Mr. Yan about the

4 instructions in the escrow in the Santiesteban matter,

5 correct?

6 A    I don't believe she talked to Santiesteban anything.

7 Q    She talked to Mr. Yan about those instructions,

8 correct, the ones that --

9 A    The instruction that Mr. Yan offered to pay her.

10 Q    Now part of the dispute between you and Mr. Yan about

11 the Chenery project is whether Mr. Yan put in all the money

12 that he was supposed to put in, correct?

13 A    Correct.

14 Q    And for purposes of keeping track of that, you and Mr.

15 Yan kept a bank account under the name of this corporation

16 you formed, San Francisco Building and Professionals,

17 correct?

18 A    That's correct.

19 Q    And when you formed that corporation, you and Mr. Yan

20 went to the Bank of America and you opened an account under

21 that name.

22 A    That's correct.

23 Q    And after the account was opened, Mr. Yan put money

24 into that account because he was supposed to contribute

25 $300,000 minimum for construction costs, true?

1  A    True.

2  Q    And then from that account, you and Mr. Yan would be

3  able to pay costs of construction.

4  A    That's true.

5  Q    And you had signing authority on that account.

6  A    Yes.

7  Q    And you had the checkbook in your possession during

8  the time that that account was open.

9  A    Yes.

10 Q    And you made a number of payments that Mr. Yan has

11 disputed with you, true?

12 A    Untrue.  He never dispute with me anything on my

13 writing the checks.

14 Q    All right.  So you made -- for example, in your

15 deposition, remember I asked you about a gentleman named

16 Ming Fong?

17 A    Correct.

18 Q    And I asked you why you had written three checks

19 totaling $85,000 to Ming Fong during the course of

20 construction?

21 A    I think it's $80,000, yeah.  Yes.

22 Q    Okay.  And you remember that when I asked you who is

23 Ming Fong, three times you said "I don't recall," when I

24 asked you about the three different checks?

25 A    I felt that it was totally irrelevant with the money

1 he's supposed to put in and fulfill his obligation, and he

2 knew all along and he is okay with all that, and --

3 Q    Do you remember in your deposition I showed you the

4 three checks to Ming Fong, remember that?

5 A    Yes.

6 Q    And each time I showed you the check, I said to you,

7 Mr. Fu, what did Mr. Fong -- who is Ming Fong, correct?

8 A    That's correct.

9 Q    And three times you answered "I don't recall."  We

10 could look at your deposition transcript -- but I'm just

11 saving time here --

12 A    It was explained, and I was frustrated and I already

13 told you it was not relevant to what Mr. Yan is supposed to

14 put in at that point, and I did answer to you just a few

15 minutes later.

16 Q    After you took a break and you talked to your counsel

17 and Stella Chen, you came back and then you remembered all

18 of a sudden who Ming Fong was, correct?

19 A    Not that all of a sudden I remember or not, because

20 Mr. Chu advised me I should fully cooperate, and I did.

21 And I was frustrated, and I mentioned it, and it's all on

22 record.

23 Q    But you did remember who Ming Fong was when I asked

24 the question.

25 A    I did.

1  Q    And you deliberately didn't tell me even though you

2  did recall.

3  A    Right.  I already told you, it's not relevant to it,

4  and I mean at that very moment, it was -- I'm not supposed

5  to really get into that.

6  Q    Okay.  And then when you came back after conferring

7  with all the other attorneys, you were able to come back

8  and remember and tell me that Ming Fong was a construction

9  supervisor on the Chenery project during 2001 and 2002,

10 correct?

11 A    I did apologize to you.

12 Q    But you did remember suddenly that he was the

13 construction supervisor in 2001 for which he received

14 payments of $85,000.

15 A    I told you I apologized that I was not responsive at

16 that minute --

17 Q    But that's your testimony.

18 A    -- and I did give you a full answer.

19 Q    But that's your testimony that he was construction

20 supervisor.

21 A    He was my right-hand man and helped me at the time.

22 Q    And you said he's the guy who's your right-hand man

23 who you really trust.

24 A    I did say that, yes.

25 Q    And he's the guy that was there at the project very

1  frequently working to make sure that the project got done.

2  A    Yeah, he helped me, yes.

3  Q    And Mr. Fong, as I understand it, now lives in Hong

4  Kong, correct?

5  A    That's correct.

6  Q    And he left for Hong Kong in 2002, correct?

7  A    Some time in 2003, as I remember.

8  Q    Okay.  But it's your testimony that he was there full

9  time in 2002 and 2003 to work on the project as your right-

10  hand man.

11  A    I did testify to you he was very frequent and helped

12  me.

13  Q    Out of that construction account, you also wrote a

14  couple of checks to San Francisco Toyota, I believe?

15  A    Yes, there was two checks to Toyota, yes, that's

16  correct.

17  Q    And with those two checks you bought two trucks.

18  A    No, it was one truck.

19  Q    You bought one truck.

20  A    Yes.  That's correct.

21  Q    And that truck is registered in your name.

22  A    I want to mention that.  Can I explain the two checks?

23  Q    Well, I'm just asking you first of all, did you

24  register the truck in your name?

25  A    I don't recall.

Q    Okay.  And you don't recall even what kind of truck it
was; do you?  That's what you told me in your deposition;
you couldn't recall the truck.

A    I did, yes.

Q    And you couldn't recall in your deposition where the
truck was.

A    May I explain?

Q    I'm just asking you a question.

A    I did not, yes.

Q    You couldn't recall where the truck was that you
paid --

A    At the time.

Q    -- what was it, about $40,000 for?

A    No, the truck wasn't 40,000; it was like twenty some
thousand.

Q    Twenty-six, it was more like 26,000.

A    Twenty something.  The truck, I'd like to mention, it
was Demas brought in to buy that truck, and it was a
company truck, and that's what he paid, and there was two
checks.  I wrote one check, it's ten thousand something.
Supposed he is the one writing another check.  I have
another GMC, it was in my briefcase right now here.  I can
prove to you -- and actually he backed out at the very last
minute and saying that it would be better that the
accounting look straight, and I don't want to confuse that,

1  and I get into that if I -- I lost some money on it.

2  Q    Okay.  And I asked you about some other expenses that

3  you wrote and signed checks for on that account, and for,

4  example, you told me that you were paying your Macy's bill

5  off of the construction account, true?

6  A    That's true.  I also --

7  Q    And you paid MBNA, a credit card that you held, off of

8  that account.

9  A    Yes.

10  Q    And you paid Direct Merchants Bank off that account.

11  A    I believe so, yes.

12  Q    You paid a number of your own personal bills off that

13  account, totaling thousands of dollars, correct?

14  A    That was correct.

15  Q    And that was part of why Mr. Yan was unhappy with you

16  in your partnership in 2003 and 2004.

17  A    I don't think that was the case.

18  Q    Just one more series of questions, Mr. Fu, and I'll be

19  done.  In your testimony yesterday when Mr. Farrer was

20  asking you questions, you mentioned that -- your belief

21  that Mr. Yan has a friend named Florence Fong who is trying

22  to collect a judgment against you.

23  A    That's correct.

24  Q    And you believe that Florence Fong and Mr. Yan have

25  some kind of a conspiracy where he's going to assist her in

1 collecting the judgment against your assets; isn't that

2 true?

3 A    That may be true.

4 Q    And you've been very concerned about Florence Fong

5 collecting that judgment against you, correct?

6 A    Florence Fong, my insurance attorney has been

7 negotiating with her.  It's ongoing matter.

8 Q    Okay.  But as I understand it right now, there's a

9 judgment against you that's been out there for a couple of

10 years, correct?

11 A    Yes.  It's been a couple of years my insurance

12 attorney has contacted her and has been negotiating with

13 her attorney.

14 Q    But in the meantime you believe that Demas Yan is also

15 communicating with Florence Fong to try and help her to

16 collect the judgment against you, correct?

17 A    That's what he's threatening me on.

18 Q    All right.  In fact I think you told me that -- in

19 deposition, that you believed that Florence Fong and Demas

20 Yan were romantically linked.

21 A    That was correct.  That's what he told me.

22 Q    That's what you told me in deposition; isn't it?

23 A    That's what Mr. Yan told me.

24 Q    And because of that Florence Fong judgment, it's been

25 your practice to hold things that are owed to you in other

1  people's names; isn't that true?

2  A    That's not true.

3  Q    Well, is it because of the Florence Fong judgment that

4  the money that Mr. Yan owed you on 547 - 23rd Avenue turned

5  into a note which we saw in Exhibit E which is a note and

6  deed of trust payable to Lei Ming Li, your ex-wife?

7  A    That's untrue.  Not true.

8  Q    Is it because of Florence Fong's judgment against you

9  and your desire to hide assets that you have assigned your

10  claim in the partnership to Wei Suen, Mr. Chu's client?

11  A    That's not true.

12  Q    You deny it?

13  A    I do.  I deny it.

14  Q    It's because of Florence Fong's judgment and your

15  desire to hide assets from her that you assigned your claim

16  against Mr. Yan from 547 - 23rd Avenue for 200,000 to one

17  Charles Li, an engineer on that project.

18  A    That's what Mr. Charles Li paid, I believe.

19  Q    And if you look in the exhibit binder, going to

20  Exhibit AA, that's your assignment to Wei Suen of your

21  alleged 25 percent interest in the Chenery project; isn't

22  it?

23  A    It is.

24  Q    And that assignment is dated February 23rd, 2004.

25  A    That's correct.

1  Q    And that's three days after Mr. Yan filed a lawsuit

2  against you, correct?

3  A    That's correct.

4  Q    And the next in order is Exhibit BB.  That's Mr. Li's

5  Proof of Claim in this case; isn't it?

6  A    I believe so.

7  Q    And attached to the Proof of Claim is an agreement

8  between you and Mr. Yan from December -- excuse me,

9  September 13th, 2000 pertaining to 547 - 23rd Avenue.

10 A    That's correct.

11 Q    And the last -- second to last page of that exhibit is

12 your agreement and assignment dated July 3rd, 2003 assigning

13 that claim to Charles Li.

14 A    Which one is it?

15 Q    Second to last page.

16 A    Second to last page.  Yes.

17 Q    And the Lei Ming Li note, the obligations relate to

18 work that you did for 547 - 23rd Avenue for Mr. Yan and

19 amounts that you had expended on Chenery Street, correct?

20 A    No, that's not correct.

21 Q    You deny that.

22 A    I deny that.

23 Q    And the Stella Chen note, that's your obligation that

24 Mr. Yan -- that you claim Mr. Yan owes you that's just put

25 under the name of Stella Chen in order to hide your assets.

A    That's completely not true.

Q    You deny that?

A    Yes.

        MR. ROMEO: All right.  I have no further
questions.

        THE COURT: Okay.  Any cross-exam?

        MR. FARRER: Yes.

                    REDIRECT-EXAMINATION

BY MR. FARRER:

Q    Mr. Fu, earlier this morning you testified that your
final version of your agreement for your partnership
interest between you and Mr. Yan on Chenery Street had not
been recorded; do you recall that testimony?

A    Yes.

Q    Why wasn't it recorded?

A    Demas Yan told me not to record it because it would
hurt him -- hurt his interest on paying the two loans that
he assumed, Winky Wong's two loans.

Q    So did you understand that Mr. Yan had assumed -- when
he purchased the Chenery Street property from Winky Wong in
connection with that purchase, he assumed some existing
loans that Mr. Wong had on that property?

A    Yes.  There was two loans.

Q    And did either, to your knowledge, Mr. Wong or Mr. Yan
notify the lenders of that assignment of those loans to Mr.

1  Yan?

2  A    I don't believe so.

3  Q    And Mr. Yan was concerned that if you recorded your

4  interest in the property, that it might notify the lenders

5  who in turn might accelerate the loans because they'd been

6  assigned to him.

7  A    That's true because the loan is in Winky Wong's name

8  and Demas will be like a 75 percent ownership and I am 25

9  ownership, it hurt him, and they would get into the

10 property and pick up the loans.

11 Q    Okay.  Now did your ex-wife, Lei Ming Li have any

12 participation or involvement with the negotiation, drafting

13 or execution of the Stella Chen note and deed of trust?

14 A    No.

15 Q    Is there a reason why you don't want Mr. Yan to know

16 where your ex-wife and son live?  Just yes or no.

17 A    Yes, I do not want him to know.

18 Q    Why?

19 A    Because he was tracing -- Mr. Yan was tracing my son

20 and it's a threat -- a security threat to my son's physical

21 or -- he attempted to even maybe hurt my son at the school

22 yard and he was there without any reason and purpose -- I

23 mean the purpose was pretty obvious.

24 Q    So was there a time that you were taking your son to

25 school and found Mr. Yan on the school yard?

1  A    It was in the early afternoon I believe when I went

2  there and I passed by -- I saw Mr. Yan was wandering around

3  the school yard.  I approached him.

4  Q    Does Mr. Yan have any children?

5  A    At the time I don't think he had any children.  I do

6  not know.

7  Q    Okay.  When you saw Mr. Yan, did you talk to him?

8  A    Yes, I did approach him, yes.

9  Q    Did you ask him why he was there?

10 A    I said, yeah, why are -- I did ask him why you are

11 here.  I mean, you are here without -- I mean with no

12 reason.

13 Q    What did he say?

14 A    He said to me, don't try to dispute with me, dispute

15 me, and you are in a lot of trouble as well as maybe your

16 son.

17 Q    And when did this happen?

18 A    It was happen, I need to check the exact time, some

19 time -- it was like I filed a harassment case some time

20 beforehand -- I mean right after, I filed the harassment

21 case against him.

22 Q    Was it before or after he sued you?

23 A    It was right after he sue me, yes.  That was correct,

24 yes.

25 Q    Now you indicated earlier that you think you may have

1  made a copy of the original Chinese note, correct?

2  A    That was correct.

3  Q    And when you were asked to search your records, did

4  you make a comprehensive search and try to find that copy?

5  A    I did, because I move and I try to find, and I did not

6  locate it.

7  Q    But when you met with Mr. Yan, the Starbuck's meeting,

8  and he agreed to sign the note to your sister, did you feel

9  comfortable that because you were getting a new note, that

10  it was okay to give Mr. Yan back the original Chinese note?

11  A    Yes.

12  Q    Now, Mr. Romeo asked you to look at Exhibit CC, that's

13  double CC, which were your answers to some requests for

14  admissions that Mr. Yan has sent to you.

15  A    Yes.

16  Q    Did you have an attorney?

17  A    I did not have an attorney.

18  Q    Have you ever seen any requests for admissions before

19  in any litigation?

20  A    No.

21  Q    Mr. Romeo mentioned this morning or you testified that

22  you had a conversation with Mr. Beckman, remember that?

23  A    I did.

24  Q    And Mr. Beckman was Mr. Yan's lawyer, correct?

25  A    Yes.

1  Q    Why don't you turn to Exhibit Q.  Do you have that

2  handy?

3  A    Yes.

4  Q    Now, this is a true a correct copy of a letter you

5  received from him.

6  A    Yes, correct.

7  Q    And you called him after you received it.

8  A    Yes, just a three-minute or two-minute talk.

9  Q    Answer my questions yes or no.  Okay.  How long was

10  that conversation?

11  A    Two-minute or three-minute, maximum.

12  Q    Did you have any discussion with Mr. Beckman about the

13  merits of your claims or Mr. Yan's defenses?

14  A    I did not get into any.

15  Q    Okay.  Did you then go hire a lawyer?

16  A    My sister did.

17  Q    Stella.

18  A    Yes.

19  Q    And what was the name of that lawyer?

20  A    Siu Ma.

21  Q    Okay.  And then did she hire somebody else to actually

22  handle the litigation once Mr. Yan had sued?

23  A    Yes, that's David Sepp (Phonetic).

24  Q    Now at the time -- shortly after you received the

25  letter from Mr. Beckman, you received a fax or two from Mr.

1  Yan; didn't you?

2  A    It was around that time, yes.

3        MR. FARRER: May I approach the witness, Your

4  Honor.

5        THE COURT: Yes.  This is not yet marked?

6        MR. FARRER: It is marked, but it hasn't been

7  offered and is about to be offered.  I've handed the

8  witness what we've marked as Exhibit 85.

9  BY MR. FARRER:

10  Q    Mr. Fu, can you tell me what Exhibit 85 is.

11  A    It was a fax from Mr. Yan.  I treat that as a letter

12  of -- extortion letter or something.

13  Q    Okay I'm going to pass you a fax cover sheet.  Is that

14  the original of Exhibit 85?

15  A    Yes, that's correct.

16  Q    And so Mr. Yan faxed Exhibit 85 to you on January

17  24th?

18  A    Yes.

19  Q    Okay.  What did you do in response to that fax?

20  A    As a matter of fact, I did not respond I think.  It

21  automatic has been handled by the attorney.

22        MR. FARRER: May I approach the witness, Your

23  Honor.

24        THE COURT: Yes.

25  ///

BY MR. FARRER:

Q    MR. Fu, I've handed you what's been marked as

Plaintiff's Exhibit 94.  Can you tell me what that is.

A    It is another fax that show up in my fax machine that

Mr. Yan offer here, my settlement offer is 411,000.

Q    Now, did you -- and he asked you to contact Old

Republic by February 2nd.

A    Yeah, that's what it say here.

Q    What did you do in response to this fax?

A    I believe I did not respond.  It's all -- the letter

has been all handled by the attorney.

Q    And I've just handed you a half sheet of paper.  Is

that the original exhibit 94?

A    Yeah, that's correct.

Q    So after Mr. Beckman's letter on January 20th -- strike

that.

Did you have any conversations with Mr. Beckman

or Mr. Yan after you received Mr. Beckman's letter of

January 20th of 2004?

A    Just I received the letter -- I mean what's going on

and that's it.

Q    And prior to receiving Mr. Beckman's letter -- Mr.

Beckman's letter dated January 20th of 2004, do you recall

the date that Demas Yan signed escrow instructions agreeing

to pay Stella Chen's deed of trust?

A    It was on January 13.

Q    One week before Mr. Beckman's letter.

A    That's correct.

Q    Okay.  And is there anything to your knowledge that you know what happened between January 13th, 2004 when Mr. Demas went to Old Republic and signed a document by himself to pay off that lien and January 20th of 2004?

A    I remember he came to me once or maybe twice that –– the threat including the threat that will help Florence Fong and all kinds of things, and that he want –– it was either –– and would like to have a discount.

Q    So between January 13th and January 20th of 2004, you had one or more conversations with Mr. Yan where he told you that if Stella Chen didn't agree to a discount, life would not be pleasant for you.

A    It is, and especially he brought up all kinds of things that –– such as I testify earlier that David Grossie is an example and all that.

Q    Did he tell you he'd sue you?

A    Yes, he did.

Q    And that you'd never see the money?

A    Yes, he did.

Q    Okay.  And he told you these things before he hired Mr. Beckman.

A    I believe so, yes.

1  Q   Well, you didn't have any conversations with him after

2  he hired Mr. Beckman; did you?

3  A   I don't think so.  I may said I get back to you, get

4  back to him; in fact, I may not even talking to him, and I

5  remember I discussed it with Stella and then find Siu Ma to

6  respond the letter.

7  Q   And once Stella Chen had hired her own lawyer, was it

8  your assumption that the lawyers would then take care of

9  the communications and trying to resolve the dispute?

10 A   Yes, that's true.

11 Q   Now, at the time Mr. Beckman sends this letter of

12 January 20th, 2004, what's the status of the condos?

13 A   It's all complete long time.

14 Q   They're ready to go; aren't they?

15 A   Yes.

16 Q   All four of them.

17 A   Yes.

18 Q   Okay.  What does Mr. Yan do with them?  He sues you

19 and Stella, won't pay her.  What's he do with the

20 condominiums?

21 A   Take off the market.

22 Q   He takes them off the market; doesn't he?

23 A   And rent them.

24 Q   He rents them; doesn't he?

25 A   Yes, and also threat that he got rent money and he can

1  outlast me if I dispute him.

2  Q    So he rents -- does he rent all four condominiums?

3  A    He did.

4  Q    Did he keep all that money?

5  A    Yes, he did.

6  Q    Okay.  Did he ask your permission to rent them as

7  required by your agreement with him?

8  A    Never.

9  Q    Did he ask your permission to sell the unit to Mr.

10 Santiesteban as required by the unit -- by your agreement?

11 A    Well, he brought that up to me.  I said that was too

12 low, and he simply ignore me.

13 Q    Did anyone besides Demas Yan or his lawyer ever tell

14 you that Mr. Yan was disputing your -- Stella Chen's note

15 and deed of trust?

16 A    I'm sorry.  Would you say it again please?

17 Q    Did anyone besides Mr. Yan and his lawyer, Mr. Beckman

18 ever tell you that they were disputing Stella Chen's deed

19 of trust?

20 A    No.

21 Q    Did anyone ever tell you besides Mr. Yan and Mr.

22 Beckman that Mr. Yan considered Stella Chen's deed of trust

23 to really be memorializing Mr. Yan's obligation to you for

24 your interest in Chenery?

25 A    No.

1  Q    Now, Mr. Romeo came up here and asked you some

2  questions about a promissory note for Lei Ming Li.

3  A    Yes.

4  Q    That Mr. Yan signed?

5  A    Yes.

6  Q    Were you present when he signed it?

7  A    I believe I was present.  I may, but it's been a long

8  time.  Signed what, I'm sorry?

9  Q    The Lei Ming Li promissory note for $110,000?

10 A    Oh yeah, I was the one -- I was the one with him,

11 yeah, and I write it up.

12 Q    Were you present when Mr. Yan signed it?

13 A    I did, yes.

14 Q    And Mr. Yan also gave you a deed of trust to secure

15 repayment of that note at the same time; didn't he?

16 A    Give that to Lei Ming.

17 Q    I know, but you were at the -- you and Mr. Yan were

18 together when the promissory note to Lei Ming Li and the

19 deed of trust were signed; were you not?

20 A    Yes.

21 Q    Okay.  So Mr. Yan gave you both a promissory note to

22 Lei Ming Li and a deed of trust to Lei Ming Li.

23 A    Yes.

24 Q    And Mr. Romeo has mentioned that in the escrow, Lei

25 Ming Li only took $17,285 because she had already gotten a

1  check for 30,000, right?

2  A    They negotiated -- yeah, that was the check issued by

3  the title company.

4  Q    Was there another payment that Mr. -- or other

5  consideration that Mr. Yan gave to Lei Ming Li to account

6  for the remaining balance?

7  A    Yes.

8  Q    And what was that?

9  A    That was the one -- it's the money that lent to

10 another person called Augustine Falley.

11            MR. FARRER: May I approach the witness, Your

12 Honor.

13            THE COURT: Yes.

14 BY MR. FARRER:

15 Q    Now, Mr. Fu, I've handed you what's been marked as

16 Exhibit 91.  Do you know what that is?

17 A    Yeah, that was the promissory note Mr. Falley give it

18 to Demas Yan, but Demas -- Mr. Demas Yan draft this one and

19 I see that my name is on it too.

20 Q    Okay.  Now, did --

21            MR. FARRER: May I approach the witness, Your

22 Honor.

23            THE COURT: Yes.

24 BY MR. FARRER:

25 Q    Mr. Yan, do you have Exhibit 90 in front of you?

1  A    90, yes.

2  Q    And what is Exhibit 90?

3  A    90 is the check that issued to Mr. Augustine Falley by

4  Mr. Demas Yan.

5  Q    And that's the consideration for the Falley promissory

6  note, Exhibit 91?

7  A    That was correct.

8  Q    And then can you tell me what Exhibit 92 is?

9  A    92 is the assignment that Mr. Yan gave it to Crystal

10  Lei.  That's Lei Ming Li.

11  Q    Okay.  So Lei Ming Li also goes by the name Crystal

12  Lei?

13  A    That's correct.

14  Q    And is it your understanding that Mr. Yan in

15  connection with his negotiations with Lei Ming Li to

16  satisfy the remaining balance on her promissory note

17  assigned the $50,000 Falley note to her.

18  A    That's correct.

19  Q    Do you recall when you were married?

20  A    I was married in '90-'91.

21  Q    '90-'91?  Did you invite Mr. Yan to your wedding?

22  A    Yes, I did.

23  Q    And did he attend?

24  A    He did.

25         MR. FARRER: May I approach the witness, Your

Honor.

THE COURT: Yes.

BY MR. FARRER:

Q    Mr. Fu, do you have exhibit 86 in front of you?

A    Yes.

Q    And what is Exhibit 86?

A    It's a picture taken at the reception -- at the banquet.

Q    Is this your wedding reception?

A    Yes.

Q    In 1991?

A    Yes.

Q    And can you identify the people in the picture for me, slowly.

A    The lady in the front is my sister Stella.  The person from the left to the right -- left, the first one is Demas Yan and the second one is another classmate called Philip -- I forgot his last name.  And then the one is me.

Q    So that's you on the right.

A    Yes, correct.

MR. FARRER: Let me take a lunch break, Your Honor.  I think I'm finished with this witness.  I just want to compare my notes and --

THE COURT:  Okay.  Let's -- how long will it take you?

1    MR. FARRER: No more than an hour.  Maybe we
2 should talk to -- you went a lot longer with Mr. Fu than I
3 thought you were going to, and Mr. Yan hasn't even been on
4 the stand yet.
5    MR. ROMEO: I'm sorry.
6    MR. FARRER: Well, I don't want an apology.  I
7 just --
8    THE COURT: How long is it going to take with Mr.
9 Yan?
10    MR. ROMEO: Direct, I would -- excuse me, Your
11 Honor, direct, I would say maybe an hour, hour and a half
12 direct.
13    MR. FARRER: I have a few excerpts to read it
14 before we close.  We're not going to --
15    THE COURT: Okay.  Why don't we try to start at
16 1:00.  Let's just push this up and get going.
17    MR. ROMEO: Thank you, Your Honor.
18    THE COURT: Okay.
19    THE CLERK: All rise.
20    (Whereupon, the luncheon recess is taken at 12:10 p.m.
21 and the court is reconvened at 1:09 p.m.)
22    THE CLERK: All rise.
23    THE COURT: Please be seated.  Okay.
24    MR. FARRER: Your Honor, at this time I'd like to
25 move the admission of Exhibits 85, 94, 90, 91, 92 and 86.

1    MR. ROMEO: No objection to 85, 94, 86, 91, 90 and

2 92.  That's fine.

3    THE COURT: Okay.  Thank you.

4                        (Whereupon, Plaintiff's Exhibits

5                        85, 94, 90, 91, 92 and 86, are

6                        admitted into evidence.)

7    MR. ROMEO: Your Honor, while we're on moving

8 exhibits into evidence, I'd like to move into evidence

9 Exhibits T, U, AA, BB, CC and DD.

10    MR. FARRER: T, no problem; U no problem.

11    MR. ROMEO: AA.

12    MR. FARRER: No problem.

13    MR. ROMEO: BB.

14    MR. FARRER: No problem.

15    MR. ROMEO: CC.

16    MR. FARRER: No problem.

17    MR. ROMEO: And DD.

18    MR. FARRER: No problem.

19    THE COURT: Okay.  Thank you.

20                        (Whereupon, Defense Exhibits T, U,

21                        AA, BB, CC, and DD, are admitted

22                        into evidence.)

23 BY MR. FARRER:

24 Q    Mr. Fu.

25 A    Yes.

1   Q    Before we took the break, actually during Mr. Romeo's

2   cross-examination of you, you testified that Demas Yan had

3   called you on two occasions after meeting in Hong Kong with

4   your older brother Fei Sing Fu.  Do you recall that

5   testimony?

6   A    Yes, that was correct.

7   Q    And you mentioned that one of those phone calls Mr. Yan

8   called you from Hong Kong and on the second phone call, he

9   called you from Shenzhen?

10  A    Shenzhen.

11  Q    Shenzhen.  And how do you know that he was calling you

12  from Hong Kong and Shenzhen?

13  A    During the conversation, usually I would ask where are

14  you right now, and he would say I'm in Hong Kong; I'm in

15  Shenzhen.

16  Q    Did Mr. Yan tell you that he was in Hong Kong and

17  Shenzhen during those two phone calls?

18  A    Yes.

19  Q    And then Mr. Romeo asked you about whose idea it was to

20  get a new promissory note and some collateral.  Do you

21  recall that?

22  A    I did.

23  Q    Okay.  And to the best of your recollection, who was

24  the -- who first suggested getting a new note and some

25  collateral from Mr. Yan to memorialize and secure the

obligation of the loan made in Hong Kong?

A    I remember -- my best recollection was when I urge him to pay the brother, just -- you have to simply just pay it and he finally told me, hey, I have to pay the lawyer; I have to pay this; I mean I don't have the money because that -- I can secure my property with it, then you have total control with it.

Q    Did Mr. Yan tell you that he couldn't afford to pay your brother back at some point in time?

A    Yes, that was at about September, that year.

Q    September of 2002?

A    September of 2002, correct.

Q    And in response to that statement, was there a discussion about executing a new note and getting collateral to secure repayment of that new note?

A    That's how he afford to -- I mean keep pecking on my soda; don't worry about it, and I just use 663 as collateral and don't worry about it.

Q    During any of the discussions you had with Mr. Yan commencing in February of 02, up until mid January of '04, did he ever deny owing your brother money?

A    Never.

Q    And when is the first time that you learned that Mr. Yan was taking a position that the Stella Chen promissory note was in fact to memorialize your partnership interest in

Chenery Street?

A    I was -- that's why the letter came to me and also at
about the same time that he said we have a money dispute or
something like that, came out from the facts and I have to
talk, and I believe that was about the time.

Q    What letter are you referring to?

A    The letter I was referring to is Richard Beckman's
letter.

Q    Of January 20th of 2004?

A    That's correct.

Q    So that's the first time that you learned that Mr. Yan
was taking a position that Stella Chen's promissory note and
your interest in Chenery were one and the same?

A    Yes, that's correct.

        MR. FARRER: May I approach the witness, Your
Honor?

        THE COURT: Yes.

        MR. FARRER: Thank you.

        MR. ROMEO: Your Honor, I haven't seen what he's
just handed the witness.

        MR. FARRER: I'll give it to you.

        MR. ROMEO: Okay, thanks.

BY MR. FARRER:

Q    Mr. Fu, I've handed you what we've marked as
Plaintiff's Exhibits 95 and 96.  Why don't we start with

1  Exhibit 96 because it's earlier in time.  Have you seen

2  Exhibit 96 before?

3  A    Yeah, I may have a copy of it.

4  Q    And where did you get a copy of Exhibit 96?

5  A    I believe either Mr. Yan gave it to me or faxed it to

6  me.

7  Q    Okay.  And who is Jim Hutchinson?

8  A    He is the deputy director at the Building Department.

9  Q    Which county?

10 A    In San Francisco.

11 Q    And have you seen Exhibit 95 before?

12 A    Yes.

13 Q    And where did -- how did you acquire it?

14 A    I believe Mr. Yan gave me a copy.

15 Q    And did Mr. Yan tell you why he was sending this

16 memorandum or this letter of March 26th, 2002 to Mr. Lopez?

17        MR. ROMEO: Objection, Your Honor.  I think it

18 lacks foundation.  There's been no testimony that this was

19 indeed sent.

20 BY MR. FARRER:

21 Q    Did Mr. Yan tell you he had sent this letter?

22        MR. ROMEO: Objection.  Hearsay.

23        MR. FARRER: (unintelligible.)

24        THE COURT: Your client's comments are not hearsay.

25        MR. FARRER: You can answer.

1  BY MR. FARRER:

2  Q    The question was, did Mr. Yan tell you that he had sent

3  Exhibit 95 to Mr. Lopez?

4  A    He tried to resolve a complaint filed --

5            THE COURT: Yes or no.

6  BY MR. FARRER:

7  Q    Yes or no.

8  A    Yes.

9  Q    Did he tell you why he sent the letter to Mr. Lopez?

10 A    Yes, he did.

11 Q    And what did he say?

12 A    He said to take care of the problem caused by Florence

13 Fong.  She apparently filed a complaint with the

14 authorities.

15 Q    Do you know what kind of complaint?  Did Mr. Yan

16 explain to you what kind of complaint Ms. Fong had filed

17 with the authorities?

18 A    Alleged that I am the one walking at the side -- as

19 the contractor without a license.

20 Q    And Mr. Yan gave you a copy of this letter?

21 A    Yes.

22 Q    Okay.  And he also gave you a copy of Exhibit 96?

23 A    That was correct.

24            MR. FARRER: I'd move the admission of 95 and 96.

25            THE COURT: Any objection?

1    MR. ROMEO: Your Honor, I don't think there's any
2 foundation for 96.  It's not signed.  There's no testimony
3 that it has been sent.  Simply giving Mr. Fu a copy if that
4 is indeed what Mr. Fu testified to, I don't think is enough
5 to say that this is a communication that actually took place
6 between Mr. Yan and Jim Hutchinson.  There's no address on
7 it.  There's no signature.

8    THE COURT: Right.

9    MR. FARRER: Mr. Yan -- well, I'll try to lay a
10 further --

11    THE COURT: You can -- I don't know if he knows
12 whether Mr. Yan said anything to him, but you can get Mr.
13 Yan to answer.

14    MR. FARRER: I know I can.

15 BY MR. FARRER:

16 Q    Did Mr. Yan tell you that he had send Exhibit 96 to Mr.
17 Hutchinson?

18 A    He handed it to him personally.

19 Q    Handed it to him personally?  Mr. Yan told you that?

20 A    Yes.

21 Q    Okay.

22 A    And also Mr. Falley told me also --

23    THE COURT: Wait a minute.  Wait a minute.

24    MR. FARRER:  Excuse me.

25    THE COURT: You say he did that.  Did you see him

1  do that?

2          THE WITNESS: Mr. Falley also told me.

3          MR. FARRER: No.  The Court has asked you did you

4  see him hand Exhibit 96 to Mr. Hutchinson?

5          THE WITNESS: He told me.

6          THE COURT: Who told you?

7          THE WITNESS: Mr. Yan told me.

8  BY MR. FARRER:

9  Q    That he handed Exhibit 96 to Mr. Hutchinson.

10 A    That's correct.

11 Q    Were you present?

12 A    I was not present.

13 Q    Okay.

14         MR. FARRER: Again, I'd move the admission of 96.

15         MR. ROMEO: I still object.  There's no foundation

16 or testimony for it.

17         THE COURT: Well, I will let it in provisionally.

18 Mr. Yan can testify about it if he wants, but he's got

19 admissible evidence from Mr. Yan that the letter was sent.

20                         (Whereupon, Plaintiff's Exhibits 95

21                         and 96 are admitted into evidence.)

22         MR. FARRER: No further cross, Your Honor.

23         THE COURT: Okay.  Redirect?

24         MR. CHU: Your Honor, I have a few questions on

25 cross.

1    THE COURT: Okay.

2    MR. FARRER: Oh, I am sorry.  I forgot --

3    THE COURT: Okay,

4    MR. FARRER: Go ahead.  I am finished.

5                    REDIRECT EXAMINATION

6  BY MR. CHU:

7  Q    Mr. Fu, can I direct you to Exhibit A in the white

8  binder.  That was the original agreement between the two of

9  you, Mr. Yan and you and Winky Wong?

10 A    That was correct.

11 Q    Who drafted this?

12 A    I believe Mr. Yan.

13 Q    Can you turn to Exhibit B in the same binder.  That's

14 the cancellation of the agreement with Winky Wong?

15 A    Yes.

16 Q    Who drafted that?

17 A    Mr. Yan.

18 Q    Okay.  Then turn to Exhibit D please.  Is that your

19 contract, the partnership agreement with Mr. Yan on the

20 Chenery project?

21 A    Correct.

22 Q    I'm sorry.  I got a little bit ahead of myself.  On

23 Exhibit C in the white binder.  It's a handwritten draft.

24 A    Yes.

25 Q    Whose handwriting is that?

1  A    It's Demas Yan and I, both of us.

2  Q    It looks like someone had drafted the original draft

3  and then signed; then there were some -- there's handwriting

4  afterwards?

5  A    I believe we were on the table of why I was writing it

6  up and Mr. Yan do some editing or something, it looks to me.

7  Q    And was that the draft that led to the preparation of

8  the final contract which I think is Exhibit D?

9  A    That's correct.

10 Q    Okay.  Now Exhibit D, did you and Mr. Yan sign that

11 together at the same time?

12 A    Yes.

13 Q    And was it notarized?

14 A    It was notarized.

15          MR. CHU:  Your Honor, if I can approach the

16 witness with this?

17          THE COURT: Yes.

18          MR. CHU: I'm going to show the witness what --

19 parts of the original of Exhibit D.

20 BY MR. CHU:

21 Q    Can you take a look at that?

22 A    Yes.

23 Q    Is that the original agreement?

24 A    Yes.

25 Q    And is that the notarization page?

1  A     Yes.

2          MR. CHU:  Your Honor, may I have the Clerk mark

3  this original copy of the Plaintiff's as next in order?

4          MR. FARRER: We actually have a tab, Your Honor.

5          MR. CHU: Oh.

6          THE COURT: Okay.

7          MR. ROMEO: That'll be 97?

8          THE COURT: 97.  Okay.

9                         (Whereupon, parts of Exhibit D, are

10                        marked as Plaintiff's Exhibit 97

11                        for identification.)

12         MR. CHU: Your Honor, before I forget, may I -- in

13 fact, I move for the admission of 97.

14         MR. ROMEO: No objection.

15         THE COURT: 97 is admitted.  Thank you.

16                        (Whereupon, Plaintiff's Exhibit 97,

17                        part of Exhibit D, is admitted into

18                        evidence.)

19 BY MR. CHU:

20 Q     Was that agreement ever canceled?

21 A     No.

22 Q     Earlier I think you testified that --

23         THE COURT: May I see it?  Is that the one?  Is

24 that it?

25         MR. FARRER: Yes.

MR. CHU: Yes, Your Honor. Perhaps the Court would like to just take a look at this version.

THE COURT: Okay. This is the same one as 3.

MR. FARRER: Except it has a notary.

THE COURT: Except it's notarized.

MR. CHU: Same one as D, except it -- yes.

MR. FARRER: D.

THE COURT: D, I'm sorry. D, yes. Okay.

BY MR. CHU:

Q    I think earlier you testified that you did not -- you withheld from recording that document at Mr. Yan's request; was that your earlier testimony?

A    That's true.

Q    Now when Mr. Yan signed the Stella Chen note and deed of trust, he didn't ask you for the return of that document; did he?

A    No.

MR. CHU: That's all I have, Your Honor.

THE COURT: Okay. Mr. Romeo?

MR. ROMEO: Yes. Just a few short questions.

RECROSS-EXAMINATION.

BY MR. ROMEO:

Q    When Mr. Farrer was asking you questions, Mr. Fu, about your relationship with Mr. Yan, he said that -- or he asked you to testify about some threats that were made against

1  you?

2  A    Would you say that again.  Too long, too many sentence.

3  Q    Okay.  Do you remember when Mr. Farrer was asking you

4  about your fear of Demas Yan because you said he followed

5  you to the school yard.

6  A    He was in the school yard.

7  Q    Okay.

8        MR. FARRER: Objection.  Mischaracterizes his

9  testimony.

10       MR. ROMEO: Pardon?

11       MR. FARRER: Mischaracterizes his testimony.  He

12  didn't say "he followed him to the school yard."

13       THE COURT: That's correct.

14       MR. FARRER: He said he was there when Mr. Fu

15  arrived.

16  BY MR. ROMEO:

17  Q    Okay.  I stand corrected.  You testified that Mr. Yan

18  was waiting for you there at the school yard, correct?

19  A    Still, I don't think that's a true statement.

20  Q    How did you happen to see Mr. Yan at the school yard?

21  A    Because I saw him like wandering around in the school

22  yard.

23  Q    And you were there to pick up your son from school?

24  A    I think so, yes.

25  Q    So this would be in the afternoon, some time?

1   A    Yes.

2   Q    Okay.  And then you saw Mr. Yan when you arrived,

3   correct?

4   A    Yes, correct.

5   Q    And you said Mr. Yan made threats against you on that

6   occasion?

7   A    Yes.

8   Q    Yes?  And you say Mr. Yan made other threats to you on

9   other occasions?

10  A    Yes.

11  Q    And you said that those were threats of physical harm

12  to you or your family?

13  A    Verbally, he was mentioning that.  That's -- I mean --

14  Q    In your deposition, you told me there was another time

15  you said that you were afraid of him because he made a

16  threat against you at Chenery Street at the property?

17  A    Yeah, that was correct.

18  Q    And I asked you if that was a threat of some sort of

19  physical harm to you -- to you or your family, correct?

20  A    I don't think so.  You may -- you may ask but I said

21  that he threat on me -- I mean, verbally.  I just said that.

22  Q    But it wasn't a threat to harm you; was it?  Not to

23  harm you physically or to do something --

24  A    It was not to harm me physically, no.  Yes.

25  Q    And it's the same thing at the school yard, at Aragon

1  Elementary School where your son was attending in 2003,

2  there was no threat at the school yard of physical harm

3  against you; was there?

4  A    Yeah, that's correct.

5  Q    Mr. Farrer was asking you about your diligent search

6  for the Chinese promissory note that you made.  Do you

7  remember that testimony?

8  A    Yes, I do.

9  Q    And I gather from that that you thought that you had a

10 copy and that you were going to find it somewhere in your

11 records.

12 A    I thought I had a copy, yes.  I could not find it.

13 Q    Okay.  Can you look in your deposition to page 96

14 please.  It's the big one.

15       MR. FARRER: What page, counsel, again?

16       MR. ROMEO: 96.

17 BY MR. ROMEO:

18 Q    Okay.  I want to start reading on page -- or line 14 of

19 96:

20            "Question: That's the last time you saw the note,

21            the first note?

22            "Answer: Wait a minute.  The last time I saw the

23            note was exchanged with the deed of trust.

24            "Question: And you haven't seen it since?

25            "Answer: Oh, for God's sake.

1         "The Witness: No.

2         "Question:  That was the last time you saw that

3         note?  Did you keep a copy of that note?

4         "Answer: No."

5   Is that your response from your deposition, Mr. Fu?

6     (Pause.)

7   A   Yeah, that was my answer, yes, correct.

8   Q   And so your testimony today is a new story; isn't it?

9   A   Well, I told you, I may have a copy.  I may be wrong.

10  Q   But you understood the question in your deposition and

11  it's a simple question, did you keep a copy of the note?

12  You understood that question.

13  A   Because I don't have it on hand, so I said it was no,

14  so I don't have -- I told you I might have a copy so --

15  Q   Hmm.  But I asked you if you kept a copy of the note.

16  Not whether you had one, but whether you kept one.

17  A   I don't have it.

18  Q   Okay.  Now with regard to -- do you still have the

19  exhibits in front of you?  Do you have the exhibits from Mr.

20  Farrer, Nos. 90, 91, and 92, in front of you?  Okay.  Let's

21  take a look at Exhibit 90, Mr. Fu.

22  A   Yes.

23  Q   No, excuse me.  I'm sorry.  Le me start out the other

24  way.  No, take a look at Exhibit 90.  That's a photocopy of

25  a check, correct?

1  A    That's correct.

2  Q    And the check is written to Mr. Falley on that joint

3  account that we talked about a little bit earlier for 547 -

4  23rd Avenue, correct?

5  A    That's correct.

6  Q    The one where Lei Ming Li, your ex-wife, and Mr. Yan

7  were the signatories on the account, correct?

8  A    Demas Yan's signature on the account, right.

9  Q    And Lei Ming Li, correct?

10  A    That's on the account, yes.

11  Q    Okay.  And beneath your copy of this check, there's

12  some handwriting; do you see that?

13  A    Yes, I see that.

14  Q    And it says 25,000 to apply to down payment on 547 -

15  23rd Avenue, period.  Do you see that?

16  A    Yes.

17  Q    And that's Mr. Yan's handwriting; isn't it?

18  A    I think so, yes.

19  Q    And that was written on this copy of the note when it

20  was given to Lei Ming Li, correct?  A copy of the check.

21  A    I believe so.

22  Q    Take a look at Exhibit 92.  You wrote this agreement;

23  didn't you?

24  A    I believe Lei Ming Li did.  That's Crystal's -- the

25  assignment to Crystal.

1    Q    Okay.

2    A    Or maybe Mr. Yan, they both talking.

3    Q    Well, as far as who drafted this assignment, was that

4    Lei Ming Li; was it you; or was it Mr. Yan; or was it

5    somebody else?

6    A    I don't know.  It's not mine.

7    Q    It's not yours.

8    A    Yes.

9    Q    But you think it might be Crystal Li.

10   A    It might be, or Mr. Yan.

11   Q    Or it might be Mr. Yan, but you don't know who drafted

12   it.

13   A    No.

14   Q    Okay.  But it does say in the first sentence:

15            "For consideration received, Demas Y. Yan assigned

16            his interest under the due on demand promissory

17            note ..."

18   And so on and so forth, correct?

19   A    That's correct.

20   Q    His interest, correct?

21   A    Yes.

22   Q    And that's because in Exhibit 91, the promissory note

23   is payable to who?  Doesn't it say Tony Fu and Demas Y. Yan?

24   A    My name was on it, yes, that was correct.

25   Q    So when Mr. Yan assigned an interest in this note, he

1  only assigned his interest, that is one-half, correct?

2  A    It's the deal between Demas Yan and Crystal, but --

3  Q    I'm sorry, the assignment of the note is the deal

4  between Lei Ming Li and Crystal?

5  A    Yes.

6  Q    I mean, excuse me, between Demas and Lei Ming Li?

7  A    Yes.

8  Q    We're getting a little confused.  So this is Crystal

9  and Demas Yan's deal, correct?

10  A    That's correct.

11  Q    So you have no idea or you have no personal knowledge

12  as to what understanding they may have had; do you?

13  A    I may have some understanding.

14  Q    You have no personal knowledge; you were not there when

15  they discussed it; were you?

16  A    I may not.

17  Q    All right.

18         MR. ROMEO: No further questions, Your Honor.  Oh

19  no, I have one more.

20  BY MR. ROMEO:

21  Q    We just marked Exhibit 97.  Is that it over there?

22  This is the original of Exhibit D in our white binder,

23  correct?

24  A    That's correct.

25  Q    And I just saw that it came out of an envelope in Mr.

1  Chu's possession, correct?

2  A    Correct.

3  Q    How did Mr. Chu get possession of it, if you know?

4  A    Mr. Farrer was asking me if I can borrow it from Mr.

5  Suen, so also it was inquiry from Mr. Chu also.

6  Q    Okay.  So when you assigned your interest in the

7  partnership to Mr. Suen on February 23rd, 2004, you were

8  very careful to give Mr. Suen the original of the agreement,

9  correct?

10  A    That was correct.

11  Q    Just like you were very careful to give Mr. Yan the

12  promissory note from Hong Kong, correct?

13  A    Changing hands, yes, it was changing hands.

14  Q    This is an original document; it's an important

15  document, correct?

16  A    Yes, correct.

17  Q    And before it went to Mr. Suen, it was then in your

18  possession.  You were the one that gave this to Mr. Suen,

19  correct?

20  A    Oh yes.

21  Q    And you kept it because it's an important document and

22  it's the original, correct?

23  A    Correct.

24  Q    So Mr. Yan didn't have this; you had it.

25  A    Wait a minute.  He had one copy and I had one copy.

1  Q    But you have the original; don't you?

2  A    Two originals, I remember.

3  Q    And the original --

4  A    Mr. Yan had one original.  I had one original.  That's

5  my best recollection.

6  Q    Okay.  So it's your testimony that when you and Mr. Yan

7  went in front of Charlie Chow (Phonetic) on 10-18-2000, that

8  you signed and notarized two of these and signed the notary

9  book twice?

10 A    That may be my best recollection, yes.

11 Q    Okay.  So you think that if Charlie Chow's notary book

12 is introduced into evidence, that it will show that you

13 signed two documents on that date, or just one?

14 A    It might well be two.  That's my best recollection.  I

15 have the original, that's the fact.

16 Q    Oh, so you have the original?

17 A    No, I --

18 Q    And you got this from Mr. Yan?

19 A    That's my -- I mean the contract, the original

20 contract, and I believe Demas Yan have the original also.

21 Q    But you're not positive.  You just think that this is

22 the original.

23 A    No, this is my original.

24 Q    Yeah, this is the one that Demas gave you.

25 A    Except that you misstated in your -- in some of your

1  statement that I give this original to Demas when changing

2  hands on the note or something, that you intentionally

3  misled the Court or something. That may be yours. And also

4  I evidence some criminal conduct in the exhibit. That may

5  happen in your client.

6  Q   Okay. What criminal conduct?

7  A   That's intentionally bring out the exhibit if you go

8  take a look at the exhibit.

9  Q   All right. Well, regardless, this document --

10 A   I believe you know it.

11 Q   -- this document has been in your possession.

12 A   It's been in my possession, correct.

13 Q   In your possession in 2002.

14 A   That's correct. Until I give it to Mr. Suen.

15 Q   Until you gave it to Mr. Suen.

16 A   Yes.

17         MR. ROMEO: Okay. No further questions.

18         THE COURT: Okay.

19         MR. FARRER: Just one follow-up, Your Honor?

20         THE COURT: Yes, you may.

21                    RE-REDIRECT EXAMINATION

22 BY MR. FARRER:

23 Q   Mr. Fu, did you ever at any time lend any money to

24 Augustine Falley, the payor on that promissory note?

25 A   No, I did not.

Q    Thank you.

MR. FARRER: No further questions.

THE COURT: Okay.  Any further questions?

MR. FARRER: Mr. Fu is released.

THE COURT: Okay.  Mr. Fu, you may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: Now, who's calling Mr. Yan?  Are you, Mr. Farrer?

MR. FARRER: No, I'm not going to call him. Instead I think what I'm going to do is just read a couple of deposition excerpts from his depositions, and then we'll close our case in chief.

THE COURT: Okay.  I don't have --

MR. FARRER: I've got them.

THE COURT: You're going to have to give them to me, yes.

(Pause.)

MR. FARRER: Your Honor, I've passed to the Clerk the original certified deposition transcripts of Demas Yan taken on September 3rd, November 19th, and June 7th, 2005.

THE COURT: Okay.

MR. FARRER:  I'll be reading from -- on page -- starting with the September 3rd, 2004 transcript.

THE COURT: Okay.  Can you hold on just a second so I can read this.  I'd like to read along, if I can.

1     All right.  What page are you going to start with?

2     MR. FARRER: 19.

3     THE COURT: Page 19.  Thank you.  Go ahead.

4     MR. FARRER: Starting line 2 to 14.

5     "Question: Have you lived in the United States for

6     the last 30 years?

7     "Answer: Yes.

8     "Question: Have you ever returned to Hong Kong?

9     "Answer: Yes.

10    "Question: How many times in the last 30 years and

11    if it's --

12    "Answer: I don't recall.

13    "Question: Once a year, once every couple of

14    years, once every ten years?  Can you give me an

15    average if that's easier?

16    "Answer: I would say maybe two, three times a year

17    for the last ten years."

18 Reading from page 20, line 12:

19    "Question: Okay.  And did you go to Hong Kong last

20    year, 2003?

21    "Answer: Yes.

22    "Question: And did you go to Hong Kong in 2002?

23    "Answer: Yes."

24 Page 24, starting at line 3:

25    "Question: Are you going to law school?

1     "Answer: I'm doing some research on my own.

2     "Question: Are you going to law school?

3     "Answer: Like I said, I'm doing research on my

4     own.

5     "Question: Answer the question yes or no.  Are you

6     attending law school?

7     "Answer: I'm attending law school part time.

8     "Question: Okay.  That was a very simple question.

9     It's a simple question.  Let's not beat around the

10     bush.  The answer is yes.  You are dragging this

11     out.  If the question can be answered yes or no,

12     please do so.  You are going to law school.  How

13     long have you been doing that?  Did you start this

14     year or last year?

15     "Answer: About a year."

16 Page 25, line 6:

17     "Question: What have you been doing since 1998 as

18     being a self-employed individual?  What types of

19     industries are you working in?

20     "Answer: I mostly invest in my own portfolio.

21     "Question: Are we talking -- are we investing in

22     the stock market, real estate, what are we

23     talking?

24     "Answer: I invest in both stocks and real estate.

25     "Question: So you've been an investor and that's

1   how you describe yourself since 1998 to the

2   present.

3   "Answer: Yes.

4   "Question: Have you also been a developer of real

5   property?

6   "Answer: It depends how you define developer.

7   "Question: Have you taken real estate and improved

8   it or built condominiums on it or updated the

9   structure that it was preexisting on?

10  "Answer: Yes."

11  Page 41, line 3:

12  "Question: And what's the proximate time frame

13  when you first met Connie Ho to open this

14  preliminary escrow?

15  "Answer: It should be in 2003.

16  "Question: Third quarter?  Fourth quarter?

17  "Answer: Probably middle of 2003 or maybe earlier,

18  I don't recall.

19  "Question: Okay.

20  "Answer: Probably first half of 2003.

21  "Question: Did you list the condos with a broker?

22  "Answer: No, I didn't.  I was selling it as an

23  owner.

24  "Question: Have any of the condos sold?

25  "Answer: 661 Chenery Street is under contract.

1    "Question: What about the other three?

2    "Answer: They are not.  They haven't been sold.

3    "Question: Are they still listed for sale?

4    "Answer: No.

5    "Question: And when did they come off?  When did

6    they stop being listed for sale?

7    "Answer: Probably in the late 2003."

8  Page 46, starting at line 19:

9    "Question: Tell me exactly what was said between

10   you and Mr. Fu regarding not recording these deeds

11   of trust?

12   "Answer: I don't know.  I can't say exactly.  I

13   recall when Tony Fu gave me the deed of trust to

14   sign, that he told me that he won't record it or

15   maybe I asked him not to record it, and he said

16   yes, something to that nature."

17 Page 47:

18   "Question: Why would you ask him not to record it?

19   "Answer: No particular reason."

20 Page 54, line 6:

21   "Question: And the institutional deeds of trust

22   when you signed them, you understood they were

23   going to be recorded, right?

24   "Answer: Yes.

25   "Question: And you understood the reason that they

1  were going to be recorded is so the institution

2  gets a lien against your property.  If you don't

3  repay the obligation, they can go after your

4  property.  You understand that, right?

5  "Answer: Yes."

6  Page 55, line 22:

7  "Question: Is it your testimony that the very

8  first time you learned that Chen and Li had

9  recorded their deeds of trust is when you got a

10  preliminary title report earlier this year?

11  "Answer: Correct.

12  "Question: And did you complain to anyone the

13  minute you learned that?

14  "Answer: Yes.

15  "Question: Who did you complain to?

16  "Answer: Tony Fu.

17  "Question: Did you complain to anybody else?

18  "Answer: No."

19  Line 15, actually line 18:

20  "Question: Did you have any discussion with Connie

21  Ho about it?

22  "Answer: No.

23  "Question: And you had -- "

24  This is line 21, I'm sorry?

25  "Question: And you had -- so you had no

1  discussions with anyone about those deeds of trust

2  other than Tony Fu.

3  "Answer: Correct.

4  "Question: You didn't bother to call Stella Chen

5  and say, what are you doing with a deed of trust

6  against my property?

7  "Answer: At the time I didn't know who Stella Chen

8  was."

9  "Question: And you didn't call Lei Ming Li?

10  "Answer: No, because I know that she is related to

11  Tony Fu.

12  "Question: Didn't -- isn't it true that you, after

13  you became aware of the deeds of trust, you signed

14  escrow instructions directing and authorizing the

15  title company to pay both of those liens?

16  "Answer: Yes."

17  Page 99, line 3:

18  "Question: And this is what -- this is about nine

19  months after you get a contractor's license; isn't

20  it?

21  "Answer: Yes.

22  "Question: Okay.  And isn't it true that you fired

23  Tony Fu on another project because you got your

24  contractor's license and didn't need him anymore?

25  "Answer: That was one of the reasons why, as you

1        put it, I fired him."

2        MR. ROMEO: Excuse me, Your Honor, I missed the

3 page citation on that.

4        MR. FARRER: 99.

5        THE COURT: 99.

6        MR. FARRER: Lines 3 to 10.

7        MR. FARRER: Page 107, line 15:

8        "Mr. Farrer: Question: Okay, let's mark Exhibit

9        11.

10       (Defendant's Exhibit 11 marked for identification)

11       "Question: All right.  Mr. Yan, I've asked the

12       court reporter to mark Exhibit 11, a declaration

13       of restrictions for 663 Chenery Street.  It has

14       your name down at the bottom as the declarant.  Is

15       that your signature that appears on the second to

16       the last page?

17       "Answer: Yes.

18       "Question: Did you employ or hire an attorney to

19       prepare these?

20       "Answer: Yes.

21       "Question: This is only a portion of the

22       declaration.  It's a lengthy document.  I did the

23       cover page and the index to the contents and then

24       I -- the actual first page of the declaration

25       along with your signature.  And you appear again

1       in front of a notary on June 9th, 2003 to have

2       your signature notarized on this document.

3       "Answer: What date?

4       "Question: June 9th, 2003.

5       "Answer: Okay, yes.

6       "Question: Is that right?

7       "Answer: Appears to be, yeah.

8       "Question: The purpose that you had this document

9       notarized is so it could be recorded.

10      "Answer: Yes."

11  Page 118, line 7.  Actually, let's start with line 4.

12      "Mr. Farrer: Question: Okay, let's mark Exhibit --

13      let's make this No. 16.

14      (Defendant's Exhibit 16 marked for

15      identification.)

16      "Question: Mr. Yan, I've asked the court reporter

17      to mark as Exhibit 16 escrow instructions

18      addressed to Old Republic Title Escrow Officer,

19      Connie Ho.  Is that your signature above the line

20      'Demas Yan'?

21      "Answer: That's a computerized signature that I

22      use when I sign a fax from the computer.  I don't

23      recall I seen this instruction.

24      "Question: There's a notation from the top that

25      it's from you; do you see that, that you sent this

on June 8th, 2004?

"Answer: Well, that's what it says on top.

"Question: That is what it says on top, and it also says that you agree to pay Stella Chen -- agrees to accept $450,000 for the release and reconveyance of a deed of trust.  Do you see that?

"Answer: That's what it says on this.

"Question: And you used your computerized signature in the past?

"Answer: Yes.

"Question: And is that your computerized signature?

"Answer: It appears to be, but I think for a fact that this escrow instruction wasn't given to Connie Ho.  The escrow instruction that she has is completely different from this."

"Question: Why would you prepare, sign and fax this over to Stella if you disputed her deed of trust?

"Answer: Well, I really don't recollect that I sent this, but this fax number on top 668-3903 is Tony Fu's fax number.

"Question: It's to that fax number; that's right?

"Answer: Yes.  So I didn't send this to Stella Chen.

1    "Question: Did you prepare it?

2    "Answer: If I sent this, I sent this to Tony fu.

3    "Question: Did you prepare it?

4    "Answer: I don't recall I prepared this one.

5    "Question: But that's your signature on it.

6    "Answer: It appears to be."

7    "Question: Okay.  Why would you sign such a

8    document if you disputed that the trust --

9    "Answer: Like I said, I don't recall that I

10   prepared this document.

11   "Question: I didn't ask you if you prepared it; I

12   said why would you sign it if you disputed her

13   deed of trust?

14   "Answer: I said I don't recall I signed this

15   document so I can't answer your question.

16   "Question: Are you denying sending this, these

17   escrow instructions to Tony Fu?

18   "Answer: I'm saying that I don't recall that I

19   sent this escrow instruction to Tony Fu, and I

20   know for a fact that this wasn't the escrow

21   instruction that was given to Connie Ho.

22   "Question: Irrespective of whether or not it's the

23   one that was given to Connie Ho, why would you

24   send a document that says it's okay to pay Stella

25   Chen $450,000?

1      "Answer: Do I need to repeat myself? I said I
2      don't recall that I prepared this document.
3      "Question: Who else would possibly have access to
4      your computerized signature?
5      "Answer: I guess anyone who has received my
6      computerized fax would have a copy of it.
7      "Question: Did you send computerized?
8      "Answer: Let's move on.
9      "Question: I'm not going to move on.
10     "Answer: I'm not denying that I didn't prepare
11     this one; I'm saying I don't recall I prepared
12     this one.
13     "Question: You're not denying you prepared it.
14     You just can't recall.
15     "Answer: I'm not trying to argue about the verity
16     of this signature or this fax. I'm saying I don't
17     recall I prepared this fax."
18 Page 22, line 20:
19     "Question: Mr. Farrer: Mark that Exhibit 17.
20     (Defendant's Exhibit 17 marked for
21     identification.)
22     Question: Mr. Yan, I have asked the court reporter
23     to mark as Exhibit 17 another set of escrow
24     instructions directed to Connie Ho at Old Republic
25     Title regarding 661 Chenery Street. Is that your

1  signature that appears above that signature block

2  of Demas Yan?

3  "Answer: Yes.

4  "Question: And you signed this on or about January

5  13th, 2004?

6  "Answer: Yes.

7  "Question: And you understood -- did you read this

8  document before you signed it?

9  "Answer: Yes.

10  "Question: And you understood -- did you read this

11  document before you signed it?

12  "Answer: I probably did.

13  Mr. Farrer: Let's mark this Exhibit No. 19.

14  (Defendant's Exhibit 19 marked for

15  identification.)

16  Mr. Farrer: Question: I asked the court reporter

17  to mark as Exhibit 19 another set of escrow

18  instructions.  Is that your signature as it

19  appears above the typed named 'Demas Yan'?

20  "Answer: Yes.

21  "Question: Did you read this before you signed it?

22  "Answer: I probably did.

23  "Question: And in this document, you are directing

24  Old Republic Title Company to pay Stella Chen the

25  sum of $450,000.

1  "Answer: This escrow instruction wasn't drafted by

2  me.  When I signed this document, I was still

3  under negotiation with Tony Fu to reduce this

4  amount.

5  "Question: This amount or reduce the amount owed

6  to Li?

7  "Answer: On both of them.

8  "Question: Where were you when you signed this?

9  "Answer: I signed it at the escrow office.

10  "Question: Okay.  So you realized it was being

11  given to the title company on the day you signed

12  it, January 13th.

13  "Answer: Yes."

14  "Question: Now when you signed this document, who

15  was present, Exhibit 19?

16  "Answer: Just the employees at the escrow company.

17  "Question: Who would that be?  Was Connie Ho

18  there?

19  "Answer: Yes, I believe she was the one that gave

20  this to me to sign.

21  "Question: Okay.  Was it already signed by Ms.

22  Chen before you signed it?

23  "Answer: I don't recall.  It appears to be.

24  "Question: So you signed it and left it with her.

25  "Answer: Yes.

Page 130, line 19:

    "Question: Okay.  What happened between the date
that you signed the escrow instructions telling
Old Republic to pay Stella Chen's lien of $450,000
and your decision to go file a lawsuit instead and
not to go through with the sale?

    "Answer: I was still hoping that I can close the
escrow in time and come to an agreement with Tony
Fu, and I made a number of different offers and
proposals at the time.  I was also consulting with
my lawyer at the time.  And basically, I started
to learn more about my alternatives -- what my
alternatives are in regards to my position with
the deed of trust.  And after consulting with my
lawyer, we decided that I was -- well, basically
my lawyer's opinion was that I have a good case on
my hand and that decision was to give an offer to
Tony Fu to settle this amount and that basically
it was a final offer to Tony Fu before we filed
suit.

    "Question: What was that offer?

    "Answer: I believe my offer was to ask him to
repay the amount that I offered, spent on the
construction, and basically I think my offer to
him was around 410,000, the amount for him to

1  release this deed of trust.

2  "Question: Oh, to reduce the $450,000 deed of

3  trust, you would pay him 410?

4  "Answer: Yes.

5  "Question: You wanted a $40,000 discount because

6  you think you paid more than you were supposed to

7  under your agreement.

8  "Answer: That's correct.

9  I'm turning now to the -- Mr. Yan's deposition taken on

10 November 19th, 2004, page 196, line 25:

11  "Question: All right.  And then the escrow

12  instructions to Old Republic, Attn: Connie Ho,

13  where did you find this document?

14  "Answer: I have it in my house.

15  "Question: Did you receive a copy of these escrow

16  instructions from Ms. Ho on the day you signed it?

17  "Answer: Hmm, I don't recall exactly, but I think

18  probably either on the day I send it or after.

19  "Question: Shortly after?

20  "Answer: Yes.

21  "Question: And the next document is a second one-

22  page document also entitled 'Escrow Instructions'

23  and this is regarding Stella Chen's deed of trust.

24  "Answer: Yes.

25  "Whereas the one I just mentioned was for Ms. Li,

right?

"Answer: Correct.

"Question: And where did you find this document?

"Answer:  Same place.

"Question: Your house?

"Answer: Yes.

"Question: And did you receive a copy of this document from Ms. Ho either on the day you sent it or shortly thereafter?

"Answer: Yes, I think so.

Page 237, line 1:

"Question: Where are -- "

THE COURT: 237?

MR. FARRER: I'm sorry, 237, yes.

THE COURT: 237.

MR. FARRER: Line 1.

THE COURT: Yes.

"Question: Where are -- strike that.  Are you currently renting any of the condominiums on Chenery Street to anyone?

"Answer: Yes.

"Question: And how many of the units are rented?

"Answer: Three.

"Question: And are the rental agreements memorialized in writing?  Is there a lease?

1    "Answer: Yes.

2    "Question: And are there written leases for all

3    three?

4    "Answer: Yes.

5    "Question: Why didn't you produce the written

6    leases?

7    "Answer: I obviously think it's irrelevant to this

8    case.

9  Page 242, line 15:

10    "Question: You're not holding onto security

11    deposits; you're spending them.

12    "Answer: Yeah.

13    "Question: That was a yes?

14    "Answer: Yes.

15  Page 307, starting at line 14:

16    "Question: Okay.  Back to Exhibit 54, which is

17    this title report, and you received this I think

18    we established before we took our break around

19    September 3rd of 2003, around then.

20    "Answer: What did you say again?

21    "Question: You received this on September 3, 2003?

22    "Answer: Uh, I mean I received it on the day

23    that's effective date.  And they may have send it

24    to me some other time.

25    "Question: Within a day or two or shortly

1     thereafter?

2     "Answer: I cannot recall.

3     "Question: Is this the first preliminary report

4     you received on Chenery?

5     "Answer: Looking back, I think this was the one I

6     first received.

7     "Question: And does this report contain references

8     to the Stella Chen deed of trust?

9     "Answer: Yes.

10     "Question: And the Lei Ming Li deed of trust?

11     "Answer: Yes.

12     "Question: And well as the two institutional

13     lenders that Winky Wong had borrowed from?

14     "Answer: Yes.

15     "Question: And is that your handwriting on the

16     first page of Exhibit 54?

17     "Answer: Yes.

18     "Question: And so you sent a copy of this

19     preliminary report to David Smith on December 4,

20     of 2003.

21     "Answer: I believe so.  I'm not quite sure about

22     exact date.

23     "Question: Well, look at the fax header at the

24     top.

25     "Answer: The fax header, is that -- let's see,

okay, all right.

"Question: And does it say December 4, 2003?
Doesn't it?

"Answer: Okay.

"Question. Okay. Who is David Smith.

"Answer: He is one of the partners, I think one of
the guys working at the surveyor's office.

"Question: Frederick Seher & Associates?

"Answer: Yes. And why were you sending this
preliminary report to David Smith?

"Answer: Because at the time we were in the final
phase of getting the condo papers, condo permits,
and we needed to put down whatever encumbrances
there are on the four units.

"Question: Okay. Is that your handwriting on the
third page of Exhibit 4 which says by item 4,
'Paid off as of December 1, 2003.'

"Answer: Yes.

"Question: And is that your handwriting on page 4
under item 5 that says "Paid off as of December 1,
2003.'

"Answer: Yes.

"Question: And you don't make any comments or
notations about items 7 or 8; do you?

"Answer: I do not."

Page 326, line 7:

    "Question: But you made no disclosure to Mr.

    Santiesteban or his broker before you entered into

    a contract to sell 661 Chenery; did you?

    "Answer: Disclose about what?

    "Question: That you had a dispute with the Chen

    deed of trust.

    "Answer: No, I don't think that's required."

Page 342, line 3:

    THE COURT: I'm sorry, what page?

    MR. FARRER: 342.

    THE COURT: 342.

    MR. FARRER: Line 3.

    THE COURT: Okay.

    "Question: Do you recall when you took the

    property off the market?

    "Answer: After the lawsuit was filed.

    "Question: And it hasn't been on the market since?

    "Answer: No."

Finally, the deposition of Demas Yan taken in this matter on

June 7th, of 2005, page 41, line 3:

    "Question: So to the best of your knowledge,

    Humphrey Wu has no knowledge of the disputes

    between you and your disputes with payment of the

    $450,000 promissory note to Stella Chen?

1  "Answer: No, I don't think -- I don't think I

2  mentioned that to him.

3  "Question: The same with Winky Wong?

4  "Answer: Winky Wong knows I have a dispute with

5  Tony Fu and he knows the dispute was over the deed

6  of trust that Tony Fu had signed to other people.

7  "Question: How does he know that?

8  "Answer: Just in general.  I told him about the

9  dispute.

10  "Question: What did you tell him?

11  "Answer: I don't recall exactly.  Basically that

12  Tony Fu made up a big lie or Stella Chen made up a

13  big lie about the deed of trust or cash loan.

14  "Question: Did you tell him that Stella Chen made

15  up a big lie?

16  "Answer: Yes, yeah, I did.

17  "Question: And did you show Winky Wong any of the

18  documents regarding the deed of trust to Stella

19  Chen?

20  "Answer: No, I don't believe so.

21  "Question: Did you tell him that you had signed

22  escrow instructions directing the title company to

23  pay the Stella Chen deed of trust.

24  "Answer: Did I tell who?

25  "Question: Winky Wong.

1         "Answer: No.

2         "Question: And when did you tell Winky Wong about

3         your dispute with the Stella Chen promissory note

4         and deed of trust?

5         "Answer: Right around the time when he told me

6         that Tony Fu called him.

7         "Question: Would that have been this year?

8         "Answer: I'm not sure, maybe it's this year, last

9         year, I'm not sure, after the litigation began in

10         early 2004."

11      MR. FARRER: Your Honor, I passed to the Court

12 Clerk and handed copies to opposing counsel of what has been

13 marked Exhibits 83 and 84.  They are true and correct copies

14 of the register of actions for the two lawsuits that Demas

15 Yan filed against Stella Chen in the San Francisco Superior

16 Court.  I offer them simply for judicial notice of the

17 activity in those cases and request the Court take judicial

18 notice of it.

19      MR. ROMEO: Your Honor, I think the Court can take

20 judicial notice of what the docket says.  I don't think that

21 it can take judicial notice of anything -- any individual

22 item in that docket without having the content of it.  So --

23      THE COURT: Well, the register of actions, like

24 number two on 84; is that what you're referring to?  Is this

25 all one action?

1    MR. FARRER: There are two separate lawsuits that

2 Mr. Yan filed against my client.  The first one --

3        THE COURT: Yeah, these are all the same lawsuit.

4        MR. FARRER:  -- is Exhibit 83, the lengthier one.

5        THE COURT: Okay.

6        MR. FARRER: Which has a case number at the top of

7 428960.

8        THE COURT: Yes.

9        MR. FARRER: Okay.  And actually, I'm not sure if

10 this is exactly like the Bankruptcy Court or not, but --

11        THE COURT: These go backwards.

12        MR. FARRER: But it's in reverse chron, so if you

13 went to the last page, you would be able to see that Mr. Yan

14 commenced this action on February 20th of '04.

15        THE COURT: Okay.

16        MR. FARRER: Okay.  And on Exhibit 84, same thing,

17 it's a separate -- it's a new case number 436872, and he

18 commenced that action on December 6th of 2004.  And I offer

19 those simply for judicial notice of the activity in those

20 cases.

21        MR. ROMEO: No objection, Your Honor.

22        THE COURT: Okay.

23                        (Whereupon, Plaintiff's Exhibits 83

24                        and 84 are admitted into evidence.)

25        MR. FARRER: Your Honor, at this point, Plaintiff

1   rests.

2           THE COURT: All right.  Thank you.

3           MR. ROMEO: Your Honor, I'd like to -- I have a

4   witness waiting outside who has other commitments.  I'd like

5   to call him.  I was going to call Mr. Yan, straightaway

6   but --

7           THE COURT: The order is up to you.

8           So 83 and 84 are admitted.  Okay.

9       (Pause.)

10              WINKY WONG, DEFENSE WITNESS, SWORN

11          THE CLERK: Raise your right hand, please.  Do you

12  solemnly swear the testimony you are about to give to the

13  Court is the truth, the whole truth, and nothing but the

14  truth?

15          THE WITNESS: Yes.

16          THE CLERK: Please be seated.  Please state your

17  full name and address for the record.

18          THE WITNESS: My name is Winky Wong.  My address is

19  645 Mariposa Street, San Francisco, California 94107.

20                   DIRECT EXAMINATION

21  BY MR. ROMEO:

22  Q    Good afternoon, Mr. Wong.  We've met before.  My name

23  is Mark Romeo.  I'm Demas Yan's attorney.  I want to ask you

24  just a few questions today about a project or a property

25  known as 663 Chenery Street.  Are you familiar with that

1  property?

2  A    Yes.

3  Q    And you at one time owned it?

4  A    I'm sorry?

5  Q    You owned that property at one time?

6  A    Yes.

7  Q    And do you know Demas Yan?

8  A    Yes.

9  Q    And do you know Tony Fu sitting over there in the first

10 row?

11 A    Yes.

12 Q    And you were friends with both of them?

13 A    Yes.

14 Q    And at one point, they entered into an agreement with

15 you regarding Chenery Street?

16 A    Yes.

17 Q    And in the white binder --

18        MR. ROMEO: If I could approach the witness?

19        THE COURT: Yes, help him out.

20 BY MR. ROMEO:

21 Q    I opened up the white binder to Exhibit A, Mr. Wong.

22 Do you see that?

23 A    Yes.

24 Q    And is that the agreement that -- is your name on that

25 agreement?

1   A    Yes.

2   Q    And is this the agreement that I was just asking you

3   about with Mr. Yan and Mr. Fu?

4   A    Yes.

5   Q    In the agreement on the first page in the second

6   numbered item, it talks about some development

7   possibilities.  Do you see that?

8   A    Yes.

9   Q    And it talks about a figure of a market worth of a new

10  structure.

11  A    M-hm, yes.

12  Q    And at the time that this agreement was entered into,

13  do you recall having a discussion with Mr. Yan or Mr. Fu

14  about those values?

15  A    Yes.

16  Q    And were those values supposed to be the value of the

17  structure of when it was finished and ready to sell?

18          MR. FARRER: Objection.  Leading.

19          THE COURT: I can't hear you very well.

20          MR. FARRER: Objection.  Leading.  You can ask him

21  what the value is, but not trying to suggest the answer.

22          MR. ROMEO: I'll rephrase the question, Your Honor.

23          THE COURT: Okay.

24  BY MR. ROMEO:

25  Q    It talks about a 1.5 to 1.8 million dollar value,

1 correct?

2 A    Yes.

3 Q    And is there a time frame for the value, the 1.5 to 1.8

4 million?

5 A    Yes.

6 Q    And what time frame did the parties to this contract

7 discuss at the time that those were put in the contract?

8 A    Around 1999 to 2000.

9 Q    Okay.  And then when did you anticipate being able to

10 complete the project?

11 A    Around 2001.

12 Q    Okay.  So do the figures relate to the project as

13 completed?

14 A    I'm sorry?

15 Q    Does the market values or projected values relate to

16 the project when it's completed?

17 A    Yes.

18 Q    If you go to the second page of the agreement.  Item

19 13.

20 A    Yes.

21 Q    Are those -- those are the same projections of value

22 that were in the second item of the contract on the first

23 page?

24 A    Yes.

25 Q    Okay.

1    MR. ROMEO: I have no further questions, Your
2    Honor.
3    THE COURT: Okay.  Any cross-exam?
4    MR. FARRER: Just a little bit, Your Honor.
5    THE COURT: It's pretty narrow here.
6                    CROSS-EXAMINATION
7    BY MR. FARRER:
8    Q    Mr. Wong, my name is Bill Farrer.  I represent Stella
9    Chen.
10   A    Okay.
11   Q    You've never met Ms. Chen before; have you?
12   A    No.
13   Q    Mr. Romeo asked you at one point in time you owned 661
14   Chenery Street.
15   A    663 Chenery Street
16   Q    663 Chenery Street, excuse me.  And that was the
17   address before it became subdivided and condominiums built?
18   A    Yes.
19   Q    And at some point in time, you entered into this
20   Exhibit A with Mr. Demas Yan and Tony Fu, correct?
21   A    Yes.
22   Q    And at some time later, you decided to sell your
23   interest to Demas Yan.
24        MR. ROMEO: Objection.  It's outside the scope of
25   direct.  He's not a party witness, and --

1    MR. FARRER: I can call him back.

2    THE COURT: Let's see where this goes.  This has

3 got to be pretty short, but --

4    MR. FARRER: It will be.

5    THE COURT: -- let's see where it goes.

6 BY MR. FARRER:

7 Q    Did you sell your interest in --

8    THE COURT:  The scope of the direct I think is

9 this contract.

10    MR. FARRER: I understand.

11 BY MR. FARRER:

12 Q    -- 663 Chenery Street to Mr. Yan?

13 A    Your question?

14 Q    Did you sell 663 Chenery Street to Mr. Yan.

15 A    Yeah, my interest.

16 Q    Yes.  And how much did you sell that for?

17 A    I forgot.  You know, around 700,000, the whole project,

18 including my share, including the property.

19 Q    And how much cash did he pay you?

20 A    I forgot.

21 Q    And in connection with that sale, did Mr. Yan agree

22 with you to assume the existing mortgages on the property?

23 A    He assume -- yeah.

24 Q    Okay.  Did you notify the lenders that you had sold

25 your interest in that property to Mr. Yan?

1  A    The lenders?

2  Q    Did you notify your lenders, World Savings and Bank of

3  America that you'd sold your interest in Chenery Street to

4  Mr. Yan?

5  A    No.

6  Q    Okay.  Why not?

7  A    He have agreement for me assume the loans, so that's

8  why I didn't do that here.  I forgot to do it.

9  Q    You forgot to do that.

10 A    Yes.

11 Q    Okay.  And after you sold your interest, who paid those

12 loans?

13 A    He paid all the loans.

14 Q    Okay.  And in connection with your agreement to sell

15 Chenery Street to Mr. Yan, did you give him a grant deed?

16 A    Yes, I gave him a grant deed.

17 Q    And was that grant deed recorded shortly after you sold

18 your interest in the property to Mr. Yan?

19 A    Yes.

20 Q    There wasn't an agreement between the two of you to

21 delay recording your grant deed?

22 A    You mean the grant deed is recorded, yeah.

23 Q    No, but did you have an agreement with Mr. Yan to delay

24 recording that grant deed so that it wouldn't apprise the

25 lenders that you no longer had any interest in that

property?

A    Sorry, I don't understand.

Q    Do you know what a grant deed is?

A    Yeah, I know a grant deed, yeah.

Q    Did you give him Mr. Yan a grant deed?

A    Yes.

Q    Did you ask Mr. Yan or did you have an agreement with Mr. Yan not to record that grant deed because if he did, the lenders would call the loans and the principal balance would come due?

A    I forgot.

Q    Do you know the approximate amount of the balances owing to the lenders at the time -- lenders with liens on Chenery Street at the time you sold it to Mr. Yan?

A    I forgot.

Q    Now, Mr. Romeo asked you about Exhibit 1. Do you have that in front of you?

A    Yes.

Q    And he asked you specifically about paragraphs 2 and 13.

A    M-hm, yes.

Q    And there apparently was some attempt by the parties to estimate the value --

        THE COURT: It's Exhibit A, right?

        MR. FARRER: Exhibit A, I'm sorry, if I didn't say

1 that.

2 BY MR. FARRER:

3 Q    There was some attempt -- paragraphs 2 and 13, I think

4 it was, some attempt by the parties -- let's back up.

5        When was Exhibit A signed by you and Mr. Fu and

6 Mr. Yan?

7 A    It's around 1999.

8 Q    Okay.  So you can remember signing the document five

9 years ago, but you can't remember how much in cash you got

10 for the sale of this property to Mr. Yan.

11        MR. ROMEO: Objection, Your Honor, I think this is

12 argumentative.

13        THE COURT: That's argumentative.

14 BY MR. FARRER:

15 Q    Mr. Wong, back in 1999 when you signed this document,

16 you and Mr. Yan and Mr. Fu got together and kind of guess-

17 estimated how much that property would be worth if the

18 single family dwelling that was there was torn down and

19 condominiums built, right?

20 A    Yes.

21 Q    And it was a guess; wasn't it?

22 A    Yes, it was a guess, yeah.

23 Q    It was a guess.  And at the time you guessed the value

24 of that property, it just had a single family residence on

25 it, right?

1   A    Yes.

2   Q    Okay.  And the three of you estimated that the market

3   value of that property if completed -- by the way, back up.

4   At the time you estimated the value of the Chenery Street

5   property, were there plans drawn?

6   A    No, not yet.

7   Q    Okay.  And there had been no demolition and no starting

8   of construction?

9   A    No.

10  Q    Okay.  If this -- if you -- I'm sorry.  The three of

11  you estimated the fair market value of this property

12  somewhere between 1.5 and 1.8 million dollars, right?

13  A    Yes.

14  Q    And as I understand this agreement, once the property

15  was sold, you would get to keep 50 percent of the net

16  proceeds.  Mr. Yan would get 25 percent and Mr. Fu would get

17  25 percent.

18  A    Yes, the first time.

19  Q    That's right?  And if the property sold for more than

20  1.85, would that distribution change?

21  A    I forgot.

22  Q    Okay.  So there wasn't an agreement among the three of

23  you that if the fair market value of the property actually

24  turned out to be more than 1.8 million, that one of you was

25  going to get the entire excess?  It was still going to be

1  split according to the percentages, right?

2  A    Yes.

3  Q    Okay.  Did you and Mr. Yan and Mr. Fu ever get together

4  after signing this agreement and making new guesses as to

5  what the fair market value of that property would be worth?

6  A    Yes.

7  Q    And when did you do that?

8  A    I don't know when, but we always get together at that

9  time, even the side and before and after.

10  Q    When you say "at that time," I need to know approximate

11  time.  What year?

12  A    In-between 1999, that year.  Always get together

13  because we have a problem at that time.

14  Q    I understand that, and do you recall the approximate

15  time you sold out to Mr. Yan?

16  A    After I sold the whole project?

17  Q    Yes.  When was that?

18  A    Around 2000.

19  Q    Around 2000.  Did you make any estimates of the value

20  of the property, the Chenery Street property, after 2000?

21  A    You mean sold my share?

22  Q    Well, no, he actually bought you out.

23  A    Yeah.

24  Q    My question is, did you make any further estimates of

25  the value of the property after you had been bought out?

1    A    Yes.

2    Q    You did.

3         MR. ROMEO: Objection, Your Honor, I think it goes

4    to competence and relevance.  He's no longer an owner of the

5    property.  His opinion doesn't count.

6         MR. FARRER: I'll move on.

7    BY MR. FARRER:

8    Q    Mr. Wong, do you know what the property -- you know the

9    condos were built.

10   A    Yeah, I know.

11   Q    And do you know how much the sale proceeds were for the

12   four condos?

13   A    You mean right now?

14   Q    Yeah.

15   A    I don't know.

16   Q    You don't know.

17   A    I didn't check.

18   Q    Would it surprise you to learn that after paying all

19   taxes, interest and commissions, there's 2.3 million dollars

20   sitting in an account?

21        MR. ROMEO: Objection.  I think that that lacks

22   foundation.  It's not relevant whether he's surprised by the

23   amount.  It's argumentative.

24        THE COURT: Sustained.  This is -- I don't see how

25   this is within the scope of -- why is it in the scope of

1  direct.

2         MR. FARRER: He's offered this witness for the

3  value of the property --

4         THE COURT: Yeah, right.

5         MR. FARRER:  -- and I'm just trying to say, well,

6  okay, do you know what it sold for and you estimated --

7         THE COURT: You're right.

8         MR. FARRER: So is the objection overruled?

9         THE COURT: Yes.

10         MR. FARRER: Thank you.

11         MR. ROMEO: Excuse me, Your Honor, I'd like to

12  respond to that.  I think that my point was that the

13  projected value was a contractual term or understanding

14  between them and I think that he has gone beyond the scope.

15  I mean I think that his present-day opinion of the value is

16  still irrelevant.  He's done no foundation that he has a

17  basis for such opinion or is competent to render such an

18  opinion, such as a real estate license or --

19         THE COURT: I think the question was whether it

20  would be a surprise to know that.

21         MR. FARRER: That's all I asked him.

22         THE COURT: Yeah.  Now what we're asking about his

23  knowledge of the value at the time he owned it, and whether

24  the current proceeds are so out of line with what he thought

25  when he owned it that he is surprised.

1    MR. ROMEO: But he's an owner.  We're all surprised

2 at the current value of San Francisco real estate.

3    THE COURT: I'm not surprised by much of anything.

4    (Laughter.)

5    You can have your question.  I want you to keep

6 moving though.  This is of limited worth here.

7    MR. FARRER: Let me withdraw it.

8 BY MR. FARRER:

9 Q    Mr. Wong, when -- after Exhibit A was executed by you,

10 you later decided to sell your interest to Mr. Yan, right?

11 A    Yes.

12 Q    So Exhibit A was canceled; wasn't it?  It was

13 terminated by the parties.

14    MR. ROMEO: Objection.  It calls for a legal

15 conclusion.  Or I'll object to it to the extent that it

16 calls for a legal conclusion from a witness.

17    THE COURT: Ask him -- did you ever sign anything

18 indicating that this was canceled?

19    THE WITNESS: Yes.

20    THE COURT: You did.

21    THE WITNESS: I did.

22    THE COURT: You signed an instrument that

23 superseded this and said basically this is canceled.  Do we

24 have that here?

25    MR. FARRER: I don't.

1      MR. CHU: Exhibit B, Your Honor.

2      THE COURT: Exhibit B.  Yeah.

3      MR. FARRER: Yeah, I'm sorry.  Thank you, Mr. Chu.

4  BY MR. FARRER:

5  Q    Mr. Wong, would you look at Exhibit B?

6  A    Yes.

7  Q    Is that an agreement canceling Exhibit A?

8  A    Yes.

9  Q    And that was your understanding?  That once you made a

10 decision to sell your interest to Mr. Yan, your prior

11 agreement with Mr. Yan and Mr. Fu was no longer effective,

12 right?

13 A    I'm sorry?

14 Q    Once you made a decision to sell Chenery Street to Mr.

15 Yan, your earlier agreement with Mr. Yan and Mr. Fu was no

16 longer effective.

17 A    Yeah.

18 Q    Thank you.

19      THE COURT: Anything more?

20      MR. CHU: I have a few, Your Honor.

21      THE COURT: Okay.

22      MR. CHU:  All within the scope, I assure the

23 Court.

24 ///

25 ///

CROSS-EXAMINATION

1

BY MR. CHU:

2

Q    Hello, Mr. Wong, my name is John Chu.  I represent a

3

gentleman named Wei Suen whom you probably don't know.

4

         The agreement that you signed with Mr. Fu and Mr.

5

Yan, under that agreement, who was supposed to put up the

6

costs for construction?  Who was going to pay that?  Were

7

you going to pay that or were they going to pay that?

8

A    They paid that.

9

Q    They pay it.

10

A    Yeah.

11

Q    So essentially you deeded over half the property to

12

them for their promise to do the construction; is that

13

pretty much the agreement?

14

A    Yes.

15

Q    Okay.  What were you supposed to do during this

16

construction period?

17

A    I'm just an investor.

18

Q    You're just the owner and you can sit back and do

19

nothing.  Who was supposed to pay the Bank of America and

20

Washington Mutual during the construction period?  Is that

21

you or them?

22

         MR. ROMEO: Excuse me, Your Honor, I'm going to

23

object to the question.  The witness's testimony was just

24

that it was World Savings --

25

1        MR. CHU: Oh, pardon me.  Pardon me.

2  BY MR. CHU:

3  Q    World Savings and Bank of America.

4  A    At that time, we share, yeah.

5  Q    You share 50-50?

6  A    Yeah.

7  Q    So you pay half, and they pay half.

8  A    You're talking about the first contract, right?

9  Q    Yeah, first contract.

10 A    Yes.

11 Q    okay.  And then that first contract was in September of

12 1999.  You canceled the agreement it looks like about two

13 years later in October of 2000 or is that one year later --

14 one year later.

15 A    One year later.

16 Q    At that time when you canceled the contract, the

17 property was still intact, right?  It had not been

18 demolished, still standing?

19 A    Yes.

20 Q    During that period, was it being rented out?

21 A    No.

22 Q    No, it was just vacant, empty?

23 A    Uh-huh.

24 Q    Okay.  You said yes?

25 A    Yes.

1  Q    Now when you canceled the contract with Mr. Yan and Mr.

2  Fu, at that time, this is October of 2000, did you already

3  agree to sell your 50 percent to Mr. Yan?

4  A    Yes.

5  Q    And after your sale of the 50 percent to Mr. Yan, you

6  had no further interest in the property?

7  A    Yes.

8  Q    And you gave him a deed for that 50 percent.

9  A    Yes.

10 Q    Do you recall approximately when you gave that deed to

11 him?

12 A    In 2000.

13 Q    Okay.  Would it have been about two months later in

14 December of 2000?

15 A    End of the year 2000.

16 Q    Let me show you a document.  Maybe it will help you

17 refresh your recollection.  Mr. Wong, this is the document

18 that purports to be a grant deed from you dated December 14,

19 2000 --

20 A    M-hm.

21 Q    -- recorded in the San Francisco's Recorder's Office on

22 December 15th, 2000.  Does that refresh your recollection?

23 A    Yes.

24 Q    Is this the deed that you gave to Mr. Yan in exchange

25 for the purchase of the 50 percent interest?

1  A    Yes.

2  Q    Okay.  Is there an -- and this is a copy of that deed?

3  A    Yes.

4         MR. CHU: Your Honor, I'm going to have this marked

5  as an exhibit.

6         THE COURT: Okay.

7         MR. CHU: This will be Plaintiff's 98, I believe.

8         THE COURT: Okay.

9         MR. FARRER: Actually, make it 99.

10        MR. CHU: 99.

11        MR. FARRER: Because we have two 97's.

12     (Counsel discuss at counsel table.)

13        MR. CHU: I apologize, Your Honor, this is sort of

14 an impeachment, an impeachment document, so I don't have

15 extra copies.

16        THE COURT: Okay.

17                         (Whereupon, a deed given by Mr.

18                         Wong to Mr. Yan, is marked as

19                         Plaintiff's Exhibit 99 for

20                         identification.)

21 BY MR. CHU:

22 Q    Mr. Wong, you notice on the grantee portion of that

23 deed, you're still on title.  It was deeded from you to Mr.

24 Yan and to you as 50 percent owners.  Why is it that you

25 stayed on title even though you had no further interest in

1   the property?

2   A   You mean I'm still on title at that time?

3   Q   Yes.

4   A   After the second contract?

5   Q   Yes, after that date.  Well, let me back up a little

6   bit, and ask you a different question.  Who prepared that

7   deed?

8   A   Demas Yan.

9   Q   It was Mr. Yan.  So as you sit there today, did you

10  know that you still owned the property after you deeded it

11  to him?  I'm sorry, do you want me to move that -- you're

12  looking over at Mr. Yan.  Is this thing blocking your way?

13  A   No, that's okay.

14          THE COURT: We don't need that.  We want everybody

15  to be able to see the witnesses.

16  BY MR. CHU:

17  Q   Did you know that you were still a 50 percent owner on

18  the property after that?

19  A   After the second contract?

20  Q   Yes.

21  A   No, I'm -- Demas Yan to buy out and I have no

22  interest -- I no longer --

23  Q   You had no interest in the property at that time?

24  A   Yeah.

25          THE COURT: Let me ask you a question.  At the time

1 you are in this first agreement with Mr. Fu and Mr. Yan, did

2 you own the whole property?

3         THE WITNESS: Before, I owned the whole property.

4 Yes.

5         THE COURT: You owned the whole property before --

6 when you were in this agreement, before the agreement was

7 canceled, you owned the whole property.

8         THE WITNESS: Yes.

9         THE COURT: And after the agreement was canceled,

10 you thought you owned nothing.

11         THE WITNESS: After the second agreement.

12         THE COURT: The second agreement --

13         THE WITNESS: After Mr. Yan buy out my interest, I

14 think I'm, you know, I'm no longer with the building.

15         THE COURT: Okay.

16 BY MR. CHU:

17 Q   And there was a second agreement around the time that

18 you canceled the first agreement where Mr. Yan bought you

19 out.

20 A   Yes.

21 Q   And then you gave him the deed after he bought you out.

22 A   Yes.

23 Q   And that's the deed.

24 A   Yes.

25 Q   Okay.  All right.

1    THE COURT: Now, there's a title report on this

2 property that has to do with the time of the --

3    MR. CHU: There's an additional deed coming up,

4 Your Honor.

5    THE COURT: Okay.  All right.  There has to be.

6    MR. FARRER: I think you're talking about Exhibit

7 21, the title report.

8 BY MR. CHU:

9 Q    Do you recall that in 2001 Mr. Yan asked you to sign

10 another deed on the property, even though you'd already sold

11 it to him?

12 A    Can I see the deed?

13 Q    Yeah.  Let me show it to you.

14    MR. CHU:  I'm showing the witness what appears to

15 be a grant deed dated August 14, 2001 recorded in the San

16 Francisco Recorder's Office on August 15th, 2001.

17 BY MR. CHU:

18 Q    Does that refresh your recollection of an additional

19 deed you may have been asked to sign?

20 A    Yes.

21    MR. ROMEO: Your Honor, before he proceeds further,

22 we ought to mark this or the record is not going to be very

23 clear.

24    THE COURT: Yes.  So this should be 100?

25    MR. FARRER: Yes, sir.

1    MR. ROMEO: It's 100.

2    THE COURT: Okay.

3                        (Whereupon, an additional deed by

4                        Mr. Wong to Mr. Yan, is marked as

5                        Plaintiff's Exhibit 100 for

6                        identification.)

7    MR. CHU:  And the record should also reflect that

8    this particular document was produced by Mr. Yan in the

9    course of the document productions during the case, and the

10   production number is YAN000095.

11   BY MR. CHU:

12   Q    Is that your signature on this document?

13   A    Yes.

14   Q    Do you recall why you needed to sign -- the

15   circumstances in which Mr. Yan asked you to sign this again?

16   A    I think it's I sold the whole -- my interest to Mr. Yan

17   already so that's why he wanted a grant deed.

18   Q    Okay.  And who prepared this document, to your

19   understanding?

20   A    Mr. Yan.

21        MR. CHU: I'll show this one to the Court.  Again,

22   I apologize I only have one copy.

23        Your Honor, may I move 99 and 100 into evidence?

24        THE COURT: Any objection?

25        MR. ROMEO: No objection, Your Honor.

1    THE COURT: Okay.

2                          (Whereupon, Plaintiff's Exhibits 99

3                          and 100, grant deeds given by Mr.

4                          Wong to Mr. Yan, are admitted into

5                          evidence.)

6    THE COURT: What's the relevance of this anyway?

7    Now that we finally got it to Mr. Yan?

8    MR. CHU: Oh, just clearing up the title and

9    establishing that Mr. Wong -- I guess Mr. Yan intentionally

10   kept Mr. Wong on title during -- even after Mr. Wong sold

11   out for the, I guess the arguable purpose of making sure

12   that the two existing loans on the property were not called.

13   THE COURT: Didn't get called.

14   MR. CHU: Yeah.

15   BY MR. CHU:

16   Q    Mr. Wong, over the past few months, have you had any

17   contact with Mr. Yan?

18   A    Yes.

19   Q    You guys call each other and talk to each other on

20   occasion?

21   A    You mean after the second contract?

22   Q    No, over the past few months, let's say from May

23   through now.

24   A    Yes.

25   Q    Did Mr. Yan tell you that Mr. Farrer was attempting to

1   serve you with a deposition subpoena during that period?

2   A     You mean within this three months?

3   Q     Yes.

4   A     He told me, but I don't have the time, you know,

5   because this three months I'm so busy.

6   Q     Did Mr. Yan tell you to make yourself unavailable so

7   that you couldn't be served with the deposition subpoena?

8   A     You mean within this three months?

9   Q     Yes.

10  A     I told him that I don't have the time to do that

11  deposition, because I've got a new business, just working on

12  this year, so I'm so busy, and sometimes I need to go to

13  Vancouver and go to Hong Kong, so that's why I'm so busy.

14  Q     I see.  Were you served with a subpoena to appear here

15  today?

16  A     Mr. Yan give me the paperwork like a couple of weeks

17  ago.

18  Q     What kind of paperwork?

19  A     To come here today.

20  Q     Was it a subpoena?

21  A     Yes.

22  Q     Did he pay you a witness fee to appear?

23  A     No.

24  Q     How much was the property worth when you sold out to

25  Mr. Yan?

1  A    When, are you talking about?

2  Q    Yeah.

3  A    You're talking about 1999?

4  Q    No, 2000 when you sold.

5  A    I think -- I guess around -- the whole thing is around

6  700,000.

7  Q    700,000.

8  A    Around 700,000 including the property and the project.

9  Q    So at this point, you have no further interest in the

10  project, and if there was money to be made, you're out?

11  A    Yes.

12       MR. CHU: Nothing further here, Your Honor.

13       THE COURT: Okay.  Cross-exam?

14       MR. FARRER: Redirect.

15       MR. ROMEO: Redirect.

16       THE COURT: Redirect, sorry.

17       MR. ROMEO: None, Your Honor.  Thank you.

18       THE COURT: Okay.  All right.  Thank you.  Anymore?

19  Okay.  Thank you, Mr. Wong, you're excused.

20       THE WITNESS: Thank you.

21     (Pause.)

22       RICHARD BECKMAN, DEFENSE ATTORNEY, SWORN

23       THE CLERK: Raise your right hand, please.  Do you

24  solemnly swear the testimony you are about to give in this

25  Court will be the truth, the whole truth, and nothing but

1 the truth?

2          THE WITNESS: Yes, I do.

3          THE CLERK: Please state your full name and address

4 for the record.

5          THE WITNESS: My name is Richard Beckman.  My

6 business address is 703 Market Street, Suite 1610, San

7 Francisco, 94103.

8          THE COURT: Please go ahead, Mr. Romeo.

9          MR. ROMEO: Thank you.

10                    DIRECT EXAMINATION

11 BY MR. ROMEO:

12 Q    Good afternoon, Mr. Beckman.

13 A    Good afternoon.

14 Q    You're an attorney here in San Francisco, correct?

15 A    That's correct.

16 Q    And at one time, you represented Mr. Demas Yan in a

17 lawsuit in San Francisco Superior Court entitled <u>Yan versus</u>

18 <u>Fu et al.</u>

19 A    That's correct.

20 Q    And you began that representation when?

21 A    I didn't go back and check but I believe it was early

22 2004, maybe January 2004.

23 Q    And in connection with that representation, you were

24 asked to contact a gentleman by the name of Tony Fu,

25 correct?

1  A    Yes.

2  Q    And who did you understand Tony Fu to be?

3  A    I understand Tony Fu to be the contractor on the

4  project on Chenery Street who had built the -- or

5  remodeled -- I wasn't quite sure or don't remember now --

6  the building that Mr. Yan owned.

7  Q    Have you ever met Mr. Fu in person?

8  A    I don't believe so.

9  Q    Did you ever write Mr. Fu a letter in connection with

10 that project?

11 A    I'm sure I did.  And I see it in front of me, a letter

12 dated January 20, 2004 on my letterhead to Dong Fu with my

13 signature, so that would refresh my recollection that I did

14 write to him, at least once.

15 Q    And at the time that you wrote to Mr. Fu, what was your

16 understanding of the dispute between Mr. Fu and Mr. Yan?

17 A    Well, as I recall --

18       MR. FARRER: Objection, calls for hearsay.

19       THE COURT: I think --

20       MR. ROMEO: It's a foundational question.

21       THE COURT: Are you --

22       MR. FARRER: I mean I assume he's just going to

23 testify exactly what Mr. Yan told him, which is all hearsay.

24       THE COURT: Obviously you're getting into the

25 privilege here.

1    MR. FARRER: And you're also --

2    MR. ROMEO: Well, I'm not asking necessarily for

3  the privileged information; I'm asking for his understanding

4  as to why he wrote this letter.

5    MR. FARRER: But, Your Honor, the sole source of

6  that understanding would be what the client told him, I

7  assume, unless he's got sources from -- information from

8  other sources.

9    THE COURT: Well --

10   MR. ROMEO: I was asking it as a foundational

11  question while it was -- the answer, you know, that it's

12  a --

13   THE COURT: Okay.  You go ahead with this.  At some

14  point, you're going to run into something or other but I'll

15  let you go a little farther.

16  BY MR. ROMEO:

17  Q    All right.  Let me ask you a different question.

18  You've seen Exhibit Q before?

19  A    Exhibit Q is the January 20th, 2004 letter, yes.

20  Q    And you sent that to Tony Fu, correct?

21  A    Yes, I would have dictated this and I see by the

22  initials YVN, my then secretary would have prepared it, gave

23  it to me; I sign it and give it back to her for mailing.

24  Q    Okay.  And on the second page it says that -- in the

25  last paragraph that you would look forward to hearing from

1  Mr. Fu about the dispute between him and Mr. Yan.

2  A    M-hm.

3  Q    Is that true?

4  A    Certainly.

5  Q    And did you in fact get a call from Tony Fu at any time

6  or any kind of communication from him?

7  A    I spoke with Mr. Fu, and I don't recall if he called me

8  or I called him.

9  Q    Did you have a conversation with Mr. Fu then about the

10 disputes between him and Mr. Yan?

11 A    Yes.

12 Q    And during the course of that conversation, did Mr. Fu

13 tell you what the source of the obligation was about the

14 $450,000 deed of trust?

15         MR. FARRER: Objection.  Leading.

16         THE COURT: Overruled.

17         THE WITNESS: I don't recall specifically if Mr.

18 Fu –- I don't remember exactly what he said.  My

19 recollection though is that the focus was on his claim to

20 ownership or a part ownership interest in the property.

21 That's my recollection of the general tenor of our

22 conversation.

23 BY MR. ROMEO:

24 Q    In the course of the conversation, did Mr. Fu tell you

25 that Demas Yan had taken a loan from a relative in Hong Kong

1  in cash?

2          MR. FARRER: Objection.  Leading.

3          MR. ROMEO: No, I'm just asking if such a statement

4  was made.

5          MR. FARRER: No foundation.  I mean --

6          THE COURT: Overruled.

7          THE WITNESS: I don't recall any discussion between

8  us or any communication from Mr. Fu about a loan or anyone

9  in Hong Kong.

10  BY MR. ROMEO:

11  Q    Did you ever hear from either Mr. Fu, Stella Chen or

12  any of their attorneys, their representatives, about a loan

13  in Hong Kong.

14  A    The first information that I recall and was quite

15  astounded by it that I received regarding a loan from a Hong

16  Kong source to Mr. Yan was in the objection or the

17  opposition that I believe an attorney, Siu Ma filed to our

18  request for a preliminary injunction seeking to halt what I

19  recall then was foreclosure proceedings.

20  Q    Let me ask you to flip over just one exhibit to Exhibit

21  R.  You were referring to some papers on an injunction

22  motion.

23  A    This looks like the opposition, part of the opposition.

24  My partner Jak Marquez I think was primarily handling the

25  injunction motion, but I definitely reviewed the papers.

1  Q    Was it in connection with these papers that you first
2  learned about a Hong Kong loan from either Chen or Fu's
3  representatives?
4  A    It was in these opposition papers that in my
5  recollection was the first information I got about any loan
6  involved in any of the dispute between Mr. Yan and Dong Fu
7  or Stella Chen.
8  Q    Okay.
9  A    Again, I was quite astounded by it.
10 Q    Let me ask you this.  Going back to the conversation
11 you had with Tony Fu, did Tony Fu suggest what actions he
12 might take with respect to his dispute with Mr. Yan?
13 A    He did not indicate any interest in trying to resolve
14 the matter.  As I recall, I had offered I think $410,000 to
15 settle his claim.  He said that he did not -- would not
16 accept that and if Mr. Yan would not pay him the full amount
17 that he would take some punitive measures, and I recall he
18 actually said something to the effect that he would make
19 trouble for Mr. Yan.  He would report him to the Department
20 of Real Estate alleging that he had violated his real estate
21 license duties in some respect, that he would testify
22 adversely to him in some appellate proceeding or some other
23 proceeding that was then going on, but nothing about a loan
24 or any other way to resolve this.
25 Q    Did you make any notes of that conversation?

1  A    Yes, I did.  I routinely keep track of telephone

2  conversations on a software system that's called Abacus, and

3  it tracks the matter that is related to the conversation,

4  and if it's, you know, accurately being operated.  It notes

5  the day and time of the conversation.

6  Q    Would seeing those notes refresh your recollection

7  about the specific things that Tony Fu told you in the

8  course of that conversation?

9  A    Probably.

10  Q    Would it refresh your recollection of the date and time

11  that the conversation took place?

12  A    Certainly.

13        MR. ROMEO: Your Honor, I'd like to -- and I have

14  to apologize because I just brought this one copy, but I

15  would like to mark this as --

16        THE COURT: Well, show it to opposing counsel

17  first.

18     (Pause.)

19        MR. ROMEO: Mr. Chu, did you want to see it?

20        MR. CHU: No.

21        MR. ROMEO: Would you like to see it, Your Honor.

22     (Pause.)

23        MR. ROMEO: Your Honor, I'd like to mark this as

24  Exhibit JJ.  I know it may be a little bit out of order, but

25  I don't see the exhibits that are marked already.

1          THE COURT: JJ?

2          MR. ROMEO: Yes.

3                         (Whereupon, certain notes of Mr.

4                         Beckman, are marked as Defense

5                         Exhibit JJ for identification.)

6    BY MR. ROMEO:

7    Q    Does that refresh your recollection about the topics

8    that Mr. Fu raised with you during that conversation?

9    A    Yes.  That is the date, the time and what we discussed

10   in more detail.

11   Q    Let me look at it for a moment.

12          So in the course of this conversation, you have a

13   note here that says that he will -- Mr. Fu will testify

14   against Yan in a concrete law suit appeal?  Do you recall

15   what his specific statements were in that regard?

16          MR. FARRER: Objection, no foundation.

17          MR. ROMEO: I'm asking if he --

18          MR. FARRER: I said -- I'm sorry, objection, no

19   foundation.  He's already testified he can't recall the

20   specifics of anything Mr. Yan said.

21          MR. ROMEO: But I just refreshed the witness's

22   recollection with the exhibit.  So I'm asking if he --

23   having his recollection refreshed, if he can recall --

24          THE COURT: This is what Mr. Fu said.

25          MR. ROMEO: Correct.

1      THE COURT: You can use anything to refresh his

2  recollection.  If he remembers, he can testify about it.

3  BY MR. ROMEO:

4  Q    Well, let me ask you this.  Does seeing the notes

5  refresh your recollection about any remarks that Mr. Fu said

6  about testifying against Yan in the concrete lawsuit appeal?

7  A    Only a little more elaboration beyond what I put down,

8  and it wasn't really clear to me if he was a party to that

9  lawsuit, if he was a witness, if he was going to volunteer

10 his testimony.  He just said that he would -- he would

11 testify adversely to Mr. Yan in that lawsuit if Mr. Yan

12 refused to pay his demand.

13 Q    Now in regard to item -- there's an item number 2.  It

14 says Mr. Fu will notify the Department of Real Estate

15 License that Yan misrepresented that 547 - 23rd Avenue was a

16 new rather than a rebuilt building.  Having looked at your

17 notes, can you recall any further details of what Mr. Fu

18 made -- or what statements Mr. Fu made?

19 A    No, I didn't really understand that.  I was really just

20 listening at that point.

21 Q    And in regard to item number 3 of your notes, having

22 reviewed item number 3, which says:

23           "... notify the Department of Real Estate License

24           that Yan misrepresented that the master bedroom in

25           547 - 23rd Avenue was actually a closet."

1  Does that refresh your recollection of any other statements

2  Mr. Fu made to you in the course of that conversation?

3  A    Not on that topic.  Again, I was just listening to his

4  position and making notes as he spoke.

5  Q    Let me ask you the same question with regard to item

6  number 4.  You made a note that Yan closed up a fire escape

7  on the Chenery property.  Having reviewed that note, does it

8  refresh your recollection of any other statements that Mr.

9  Fu made during the course of that conversation?

10  A    Again, particularly with regard to that particular

11  topic, that's I believe, as I recall, that's all he said on

12  that topic.  It's just a list of things that he was going to

13  do or complaints that he going to bring.

14        MR. ROMEO: All right.  I have no further

15  questions.  Thank you, Mr. Beckman.

16        THE COURT: Cross-exam.

17        MR. ROMEO: I'd like to move Exhibit JJ into

18  evidence.

19        MR. FARRER: I'm going to object to that.  I'd like

20  to do some voir dire on it.

21        THE COURT: Okay.

22                    CROSS-EXAMINATION

23  BY MR. FARRER:

24  Q    Good afternoon, Mr. Beckman.

25  A    Good afternoon.

1   Q    My name is William Farrer.  I'm the attorney for Stella

2   Chen.  I appreciate your coming down.

3   A    Okay.

4   Q    Did you do any preparation with Mr. Yan or Mr. Romeo in

5   connection with your testimony here today?

6   A    I didn't have any communications with Mr. Yan.  I spoke

7   with Mr. Romeo yesterday about whether I had any

8   recollection of these events.

9   Q    When did you give him a copy of this note, JJ?

10  A    I don't think I did it until just now.

11  Q    Oh, so you brought it today?

12  A    Yes.

13  Q    And you read it before you got here?

14  A    Yes.

15  Q    And you have no -- even though you'd read it before you

16  got here, you had no independent recollection of your

17  communication -- the specifics of what Mr. Fu told you

18  except as set forth in that Exhibit JJ.

19  A    You know, I recall speaking with Mr. Fu.  In terms of

20  the details and every bit of the conversation, you know,

21  this certainly was helpful to remind me of some of the

22  topics we discussed.

23  Q    I notice at the very bottom of Exhibit JJ, it says "e-

24  mail to client."

25  A    M-hm.

1  Q    What does that mean?

2  A    It probably means I sent a communication to my client

3  via e-mail and presumably --

4  Q    And the client would be Demas Yan?

5  A    Yes.

6  Q    Did Demas Yan ever contact you to see if you had any

7  documents responsive to document requests that had been

8  propounded to him in connection with this litigation?

9        MR. ROMEO: Your Honor, I have to object.  I think

10 that Demas Yan's communications with Mr. Beckman are subject

11 to privilege.

12        MR. FARRER: I'm not asking if he gave him legal

13 advice; I'm just saying did he make -- was he ever contacted

14 for the purpose of responding to a document request we did

15 in this case.

16        THE WITNESS: Your Honor, I don't know if it's

17 proper or not, but I would assert my own attorney-client

18 objection.

19        THE COURT: Was he contacted --

20        MR. FARRER: By Demas Yan --

21        THE COURT:  -- with respect to a --

22        MR. FARRER: A document request propounded by

23 Stella Chen in this litigation.

24        MR. ROMEO: I think that invades the privilege.

25        THE COURT: Why wouldn't that be -- why wouldn't

1  anything other than just yes or no be privilege?

2          MR. FARRER: Okay.  Let me ask it --

3  BY MR. FARRER:

4  Q    Did you produce any of your files to Mr. Yan after he

5  got -- well, strike that.  Let me back up.

6          You filed a substitution of attorney in this case,

7  correct, in the State Court litigation?

8  A    Substituting in?

9  Q    Out.

10 A    I don't know.  I don't recall.

11 Q    Well, you still don't represent Mr. Yan in that State

12 Court litigation; do you?

13 A    The State Court litigation as I recall was -- oh no,

14 no, that's true; that's right.  Mr. Yan substituted in place

15 himself as I recall --

16 Q    In pro per.

17 A    -- shortly --

18 Q    That's right.

19 A    I actually thought we had substituted back in at some

20 point.

21 Q    Did you give him the files back?

22 A    Well, I would certainly have done so had I been

23 requested.

24 Q    Okay.  And your files would have had that e-mail?

25 A    Possibly.

1  Q    Where did you find the e-mail?

2  A    I don't --

3  Q    I'm sorry, the Abacus notes.

4  A    In my software program, called Abacus.

5  Q    Okay.  So you didn't have a hard copy file you found it

6  in?

7  A    Right.

8  Q    And as you sit here today, you don't know if you gave

9  your files to Mr. Yan when he replaced you and represented

10 himself pro per.

11 A    Again, I would assume, certainly as a practice, but I

12 don't specifically recall handing him the files, although --

13 Q    Now, is the sole source of your information regarding

14 your opinions and analysis of the -- before you wrote the

15 letter to Tony Fu, based -- yeah, Exhibit Q -- solely based

16 upon information provided to you by Mr. Yan?

17       MR. ROMEO: Your Honor, I'm going to object that

18 the question is a little bit overbroad because he's asking I

19 think about both facts and legal conclusions and to the --

20 I'm not sure if he's asking -- limiting just to factual

21 matters or if he's talking about work product or he's

22 talking about --

23       THE COURT: It's a tricky area.

24       MR. FARRER: All right.

25 ///

BY MR. FARRER:

Q    Did you conduct any investigation or -- well, Mr. Yan retained you.

A    Yes.

Q    Okay.  And he retained you in connection with a dispute he was having with Tony Fu, right?

A    I believe so.

Q    Okay.  Did you speak to anybody other than Mr. Yan about the underlying facts regarding that dispute?

          MR. ROMEO: Your Honor, I think that that's going into work product privilege that Mr. Beckman may have and that my client holds also with regard to whom he may have spoken.

          THE COURT: Mr. Farrer, I think what you're getting at is he got his theory of the case from the client?

          MR. FARRER: Is the sole source of his information Mr. Yan.

          THE COURT: And he talked to Mr. Yan once, and they didn't talk about -- much about the substance of the action, so I mean it's just natural that -- and then he heard only -- he said he heard for the first time in seeing those declarations that Mr. Fu had another angle on the case.

          MR. FARRER: That's exactly what he said.

          THE COURT: So I think it's already there, and I think mucking around in this area is getting into work

1  product and privilege and stuff like that, and --

2      MR. FARRER: Well, the question can be answered

3  without divulging the identity of who he talked to or even

4  what they told him, whether or not he did any investigation

5  outside of what his client told him.  And what --

6      THE COURT: What difference does it make?

7      MR. FARRER: Because then his sole source of

8  information is all self-serving, and its weight and its

9  merit is questionable.  Now if he had gone out and done some

10 independent --

11     THE COURT: Well, if he didn't -- if he didn't ask

12 Mr. Fu about his side of the story, then it's just natural

13 that what he's going to put in his papers is what his client

14 tells him.  So I'm not taking the fact that he wrote this

15 letter and didn't mention the Hong Kong loan theory as

16 meaning much of anything other than this letter was sent

17 representing Mr. Yan's side of the case.

18     MR. FARRER: Okay.

19     THE COURT:  We're in a tricky area here, and I

20 don't want to -- I don't want to get into information that

21 really -- you're getting into work -- the very area of work

22 product.

23     MR. FARRER: Well, I understand, but that's a

24 qualified privilege and if I can show I can't get the

25 information from any other source, and he happens to be the

1  sole source, I should be entitled to probe it.  I'm not

2  trying to get into his mental processes; all I'm saying

3  is --

4       THE COURT: But it seems to me that the argument --

5  all you're trying to get at is whether this letter was based

6  on, you know, a dispassionate independent view, like an

7  independent fact finder would make not representing one

8  party or another.

9       MR. FARRER: I'm not even going that far.  I'm

10 trying to ask the witness, Your Honor, if he did anything

11 other than listen to his client's story.

12      THE COURT: And what's the relevance of that?

13      MR. FARRER: Because I think it would go to the

14 weight of the letter and what happened, the allegations that

15 are made.

16      THE COURT: What is the weight of this letter?

17 This letter is not a document that proves -- can be used to

18 prove the truth of the matter as asserted.

19      MR. FARRER: Well, I agree with that.

20      THE COURT: It's a position taken by counsel.

21      MR. FARRER: Okay.  Let me move on.

22      THE COURT: It's not evidence.  It's evidence of a

23 position he took, but we already know the position that Mr.

24 Yan has taken.

25 ///

BY MR. FARRER:

Q    Mr. Beckman, if you would open the black binder.  These are Plaintiff's trial exhibits here.

A    Okay.

Q    If you turn to Tab 5, please.

A    Okay.

Q    That's a promissory note to Stella Chen dated November 13, 2002.  When's the first time you saw that?

A    I don't recall if I had seen a copy of this before the opposition or not.

Q    Do you recall being aware of it before you sent the letter to Tony Fu on January 20th, 2004?

A    I don't know.

Q    Okay.  What about -- turn to Tab 6.  It's a deed of trust to Stella Chen.  Do you recall if you saw this document before you sent the letter to Tony Fu on January 20th, 2004?

A    I don't know.

Q    Okay.  Do you know that -- do you recall seeing it at all?

A    Exhibit 6?

Q    Yes, sir.

A    Yeah, I think so.

Q    And you note on the third to last page, Mr. Yan's signature notarized on that deed of trust?

1  A    On the third to the last page?

2  Q    Yeah.

3  A    I see an acknowledgment on page 2.

4  Q    I'm sorry, page 2, that's easier.

5        I would like to turn your attention to Tab 14, a

6  letter to your client from Frederick Seher & Associates.  Do

7  you know what role Frederick Seher & Associates played in

8  connection with the Chenery property?

9  A    I don't believe I had any familiarity with this -- with

10 either this letter or that individual.

11 Q    Okay.  Do you know if you saw this letter before you

12 sent your letter to Tony Fu on January 20th, 2004?

13 A    I don't think so, but I couldn't tell you for

14 absolutely positive.

15 Q    Okay.  Why don't you turn then to Tab 19.  Do you have

16 that in front of you?

17 A    Yes.

18 Q    That's an e-mail dated November 26, 2003?

19 A    M-hm.

20 Q    And that's before you were retained by Tony -- Demas

21 Yan, right?

22 A    I would have to go back and look, but like I say, I

23 think it was either early 2004 or it could have been very

24 late 2003, so it was November 26 -- yeah, I don't know if

25 this was before he retained me or not.

Q    And do you see who that e-mail is from?

A    I see it's from Dennis Yan.

Q    And does he identify Stella Chen as one of his private lenders?

        MR. ROMEO: Objection, Your Honor.  There's no foundation for the question, for his examining of the witness on the document because he hasn't seen it and he can't authenticate it.

        THE COURT: I don't know what you're doing with this witness.

        MR. ROMEO:  This is just -- this is just asking him to tell what's in the document.

        MR. FARRER: Well, I mean he's --

        THE COURT: I mean you can't really examine him about -- as a witness about the validity of the case.

        MR. FARRER: Well, he initiated the litigation. Well, he's not a percipient witness.

        THE COURT: What's the relevance?  He's not a percipient witness.  This is not an action for sanctions against him in the San Francisco case.  It would only -- we'd let it be heard in San Francisco if that were asserted. I don't know why you have this witness here.

        MR. FARRER: I didn't call him.

        THE COURT: I understand that.  He was called because there was some evidence offered of threats made,

1  this document.  But I think that's the only reason for which

2  he was called.

3      MR. FARRER: Well, he's also testified that he

4  didn't -- the first time he heard about the promissory note

5  and deed of trust that there was another loan was when my

6  clients filed opposition to his TRO.  And what I'm trying to

7  establish is that his own client had a series of documents

8  in his own file that he didn't share with counsel, and

9  that's really about all I'm trying to do with this.

10      MR. ROMEO: I think that's really speculative, Your

11  Honor, and it's a waste of time.

12      THE WITNESS: Your Honor, if I may also -- I think

13  that any communications between Mr. Yan and I when I was his

14  counsel would be privileged.  That would include documents

15  that he showed me as part of the educational process of the

16  case.

17      MR. FARRER: I'm not talking about a communication.

18  I want to know what you were aware of when you were taking

19  positions against my client.

20      THE COURT: You were called and asked whether the

21  first time you heard of this theory was in -- you asked him

22  that.

23      MR. ROMEO: Yes, I did, Your Honor.

24      THE COURT: So the question can be, well, why is

25  that so?  And at least that inquiry is, you know, why were

1 you surprised if you saw the note? So I think that question

2 is in line. It suggests that, didn't you see the note.

3 Isn't that a follow-up question --

4 　　　　MR. FARRER: Of course.

5 　　　　THE COURT: -- that's a question that's related to

6 the I first heard question. So that question is

7 appropriate. We don't have to find out how he saw the note.

8 　　　　MR. ROMEO: But, Your Honor, the question was, did

9 he know about a Hong Kong loan. Anybody looking at this

10 note would not derive from the face of it that Demas Yan got

11 a briefcase full of cash in Hong Kong in February of 2002.

12 That's the only new information that I asked him to testify

13 to new information in March '04, not anything to do with the

14 Stella Chen note.

15 　　　　THE COURT: Okay. I don't think this witness has

16 much to offer about the truth of what really happened at

17 all.

18 　　　　MR. FARRER: Okay.

19 　　　　THE COURT: I think we ought to -- we ought to move

20 on to better fields for inquiry. What have you got now?

21 　　　　MR. FARRER: Exhibit 68, Your Honor. I'm passing

22 it to the witness.

23 BY MR. FARRER:

24 Q    Mr. Beckman, do you have Exhibit 68?

25 A    I do.

1  Q    That's a letter to you from a lawyer named Siu Ma dated

2  February 20th, 2004; is that right?

3  A    I believe that correctly describes it.

4  Q    Did you receive this letter?

5  A    I believe I did.

6  Q    Okay.  So -- and in this letter, Ms. Ma told you about

7  the deed of trust and the loan to her client as well as the

8  escrow instructions.  Do you see that?

9           MR. ROMEO: Objection, Your Honor, mischaracterizes

10  his --

11          THE COURT: Well, let him read the letter.

12          THE WITNESS: I recall receiving this letter.

13  BY MR. FARRER:

14  Q    Okay.  And earlier you testified that the first time

15  you heard about a note and a deed of trust and Stella Chen,

16  was in her opposition to a motion for injunction filed on

17  March 14th of 2004, about 24 days later.

18          MR. ROMEO: Objection, Your Honor.

19  Mischaracterizes his tesimony.  He was asked if he ever

20  heard about a Hong Kong loan made to Demas Yan, not a note

21  and deed of trust to Stella Chen.

22          THE COURT: Okay.  Let me just stop you right here.

23  The fact that they asserted this letter that goes off on a

24  different theory means nothing.  That's the position they

25  were taking.  Okay?  It has nothing to do with the merits of

1  this action.  So I want to get off to witnesses who are --

2  have knowledge of the underlying facts.

3          MR. FARRER: I appreciate that.

4          THE COURT: The positions taken in these different

5  lawsuits doesn't prove in my mind anything.

6          MR. FARRER: I wanted to impeach his prior

7  statement that the first time he heard about a loan, Stella

8  Chen, was in the opposition to a motion --

9          THE COURT: Well, I'm telling you, the impeachment

10 is not worth anything because his testimony -- I consider to

11 have to no weight as to what really happened.

12         MR. FARRER: All right.

13         THE COURT: It was just a position he took at the

14 time before there was, you know, complete discovery in the

15 action before it went to trial.  It's a position he took on

16 behalf of his client.

17 BY MR. FARRER:

18 Q    Mr. Beckman, after -- you filed a lawsuit against Demas

19 Yan and Stella Chen on February 20th of 2004.  Do you recall

20 that?

21 A    Well, for Demas Yan.

22 Q    For Demas Yan.  Yeah.  And shortly thereafter, you

23 applied for a temporary restraining order and preliminary

24 injunction.

25 A    I presume those dates are correct.  I mean, it would

1  have been pretty quickly.

2  Q    And that objection -- your request for an injunction

3  was denied; wasn't it?

4  A    As I recall.

5  Q    Okay.  And didn't you try to settle the case right

6  after that?

7           MR. ROMEO: Objection, relevance.

8           THE WITNESS: I couldn't tell you without looking

9  at some refreshing document.

10          MR. ROMEO: Objection, Your Honor.

11          THE COURT: What's the relevance of this?

12          MR. FARRER: Well, I think that the relevance is --

13          MR. ROMEO: And -- I haven't even finished my

14  objection, Mr. Farrer.  If you would.

15          And also if he made a settlement overture in the

16  litigation at that point, it would not -- it would be

17  inadmissible under Federal Rule of Evidence 408.

18          THE COURT: I want to finish this trial.

19          MR. FARRER: Me too.

20          THE COURT:  If you want to finish this trial

21  before September, we better move on because I'm going on

22  vacation.  This is the last day before I go on vacation.

23  Okay?  And I'm not going to stretch it to hear what an

24  attorney pleaded in the matter previously that it just

25  represents this party -- consistent with this party's

1  position in this case.

2           MR. FARRER: All right, Your Honor.

3           I have one more exhibit; it's Exhibit 93.

4  BY MR. FARRER:

5  Q    Mr. Beckman, you have Exhibit 93 in front of you?

6  A    Yes, I do.

7  Q    Why don't you take a moment to look at it.

8  A    I'm sorry, 93?

9  Q    Yes, sir.

10 A    Yes.  Okay.

11 Q    Do you recall receiving that letter?

12 A    Yeah, I think so.

13 Q    From Mr. Zeif?  (Phonetic)

14 A    M-hm.

15 Q    Okay.  And finally, Mr. Beckman, I asked -- I've marked

16 As Exhibit 75 a substitution of attorney and is this a

17 substitution that you and Mr. Yan signed on or about June

18 11th of 2004 where he subbed you out and he takes over in

19 pro per?

20 A    I believe that's what this is.

21 Q    Is there any reason why you were substituted out?

22          MR. ROMEO: Objection, Your Honor.  That calls for

23 privilege.

24          MR. FARRER: Well not if it doesn't involve a

25 communication.

1    MR. ROMEO: I think that if the client and attorney

2  agree to substitute out, there's no way they can ask the

3  reason without --

4    THE COURT: What's the relevance?

5    THE WITNESS: And, Your Honor, I would assert my

6  own attorney-client privilege.

7    MR. FARRER: I'll withdraw the question.  I'll move

8  the admission of Exhibits 68, 75, and -- what was the other

9  one?

10    THE COURT: 93.

11    MR. FARRER: 93.

12    THE COURT: Any objection?

13    MR. ROMEO: Your Honor, 68 is not relevant because

14  it doesn't go to the issue of impeachment.  It doesn't talk

15  about a Hong Kong loan, and it was shown to him to impeach

16  the witness.  But because it doesn't talk about the Hong

17  Kong loan, it's not impeaching evidence and therefore it's

18  not relevant.

19    93 is excluded under Federal Rule of Evidence 408.

20  It's an offer to settle or compromise.  He's offering it in

21  connection with the timing of some hearing in order to prove

22  or disprove liability or show some issue in the case on the

23  merits of the case, and that's clearly what Mr. Farrer's

24  intent is and it's admissible, squarely within the meaning

25  of Evidence Rule 408.

1    MR. FARRER: Your Honor, Mr. Romeo opened the door

2    when he admitted an offer of Exhibit Q, which is a

3    settlement communication from Mr. Yan for his own self-

4    serving purposes.  Exhibit 68 is a direct response to that

5    letter, and it says so in the first sentence.  It also

6    contradicts his testimony.

7         Exhibit 75 is just the withdrawal.  I don't think

8    you need any comments about that.

9         THE COURT: What is Q being offered for?  What's

10   the purpose of Q?

11        MR. ROMEO: Q is being offered solely for the

12   purpose of showing that there was notice of an issue to the

13   Chen side of this litigation and communication was invited.

14   They had the opportunity to communicate the source of their

15   claim.  They did not run to Mr. Beckman and say, you know,

16   Demas Yan borrowed $450,000 from our uncle in Hong Kong, and

17   he's trying to beat us out of it.  Instead they get threats

18   of going to the Department of Real Estate and blah-blah-

19   blah.  But nothing like, why are you trying to ding us on

20   our $450,000 on the partnership issues.  This is just a

21   loan.  It was the natural response to the letter.  It

22   obviously, according to Mr. Beckman, not even Mr. Fu's

23   testimony had a discussion on the merits of the case that

24   went into some substantive issues and they never said

25   anything about Leung Hing Lau's loan to Mr. Yan in Hong

Kong.  And that's why it's offered.

THE COURT: Okay.  Thank you very much.  I'm going
to admit 68 because you're saying that they never raised the
issue.  They did raise the issue in 68.  If you're asserting
Q for the that purpose, then 68 is relevant just to show
that they -- you're basically saying this is a newly
fabricated position and this is showing a prior consistent
statement is basically it, because you're saying it's
recently created.  The other two I don't think have any
relevance so I'm going to exclude them.  This witness's --
none of this matters to me.

MR. FARRER: Okay.  Well, in that case --

THE COURT: I want to -- with all due respect, I
mean what I want to do is see the documents and I want to
see what happened.  The fact that counsel aggressively
represented his client in this is proper, and not surprising
and doesn't tell me what really happened.  Okay?

MR. FARRER: Okay.  No further questions.

THE COURT: Mr. Romeo?

MR. ROMEO: No further questions, Your Honor.

THE COURT: Mr. Beckman, sorry to waste your time.
You're excused.

MR. BECKMAN: Always a pleasure to come before Your
Honor.  It's a rare opportunity to get in the witness box.

THE COURT: Opportunity, I'm not sure that's --

1   that's a euphemism.

2           Okay.  Did we take a break at all this afternoon.

3           MR. FARRER: No.

4           MR. ROMEO: We haven't taken a break his afternoon.

5           THE COURT: Let's take a really quick break.  I

6   want to finish this.

7           MR. FARRER: Okay.  How many other witnesses do you

8   have besides Demas?

9           MR. ROMEO: I think I'll call Dennis next and --

10          MR. FARRER: Well, that's not answering the

11  question.  How many more witnesses do you have?

12          THE COURT: Who else do you have?

13          MR. ROMEO: Dennis and Man Louie?

14          THE COURT: Okay.

15          MR. ROMEO: He's a third-party witness, real short.

16          THE COURT: Okay.  Let's start in five minutes

17  again.  I'm sorry to press you, but --

18          MR. FARRER: That's all right.

19      (Whereupon, a recess is taken at 3:36 p.m. and the

20  court is reconvened at 3:45 p.m.)

21      (The testimony of Demas Yan has been previously

22  transcribed and will not appear on this transcript.)

23

24

25

CERTIFICATE OF TRANSCRIBER

I certify that the foregoing is a correct transcript from the digital sound recording of the proceedings in the above-entitled matter.

DATED:   May 16, 2006

By: /S/ Jo McCall