1        UNITED STATES BANKRUPTCY COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3          (SAN FRANCISCO DIVISION)

4

5   In re:

6   DEMAS WAI YAN aka DENNIS YAN,        Case No. 04-33526

7                                         Chapter 11

8                                         San Francisco,California
                                          September 15, 2005
9           Debtor.                       4:24 p.m.

10  _____/

11  STELLA CHEN,

12          Plaintiff,

13      v.                                A.P. No. 05-03236

14  DEMAS WAI YAN aka DENNIS YAN,

15          Defendant.
    _____/

16

17                  **VOLUME III**

18        TRANSCRIPT OF TRIAL PROCEEDINGS

19
          BEFORE THE HONORABLE THOMAS CARLSON
20          UNITED STATES BANKRUPTCY JUDGE

21

22  APPEARANCES:

23  For the Debtor:        LAW OFFICES OF MARK J. ROMEO
                           BY: MARK J. ROMEO, ESQ.
24                         130 Sutter Street, 7th Floor
                           San Francisco, California 94104
25

```
 1   APPEARANCES (CONTINUED):

 2

 3   For Stella Chen:          LAW OFFICES OF WILLIAM WEBB FARRER
                               BY: WILLIAM WEBB FARRER, ESQ.
 4                             300 Montgomery Street, Suite 600
                               San Francisco, California 94104
 5

 6

 7
     Court Recorder:           JANE GALVANI
 8                             UNITED STATES BANKRUPTCY COURT
                               235 Pine Street
 9                             San Francisco, California 94104

10

11
     Transcription Service:    Jo McCall
12                             Electronic Court
                               Recording/Transcribing
13                             3946 Pyle Avenue
                               Santa Rosa, California 95407
14                             Telephone: (707) 545-1838

15

16

17

18

19

20

21

22

23

24

25
```

| Plaintiff's Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Fu, Fei Sing | | | | |
| By Mr. Farrer | 8 | | 60 | |
| By Mr. Romeo | | 21 | | |
| | | | | |
| Seher, Frederick Thomas | | | | |
| By Mr. Farrer | 62 | | | |
| By Mr. Romeo | | 74 | | |
| | | | | |
| Brodie, James Scot | | | | |
| By Mr. Farrer | 79 | | 88 | |
| By Mr. Romeo | | 84 | | |
| | | | | |
| Chen, Stella | | | | |
| By Mr. Farrer | 96 | | 136 | |
| By Mr. Romeo | | 115 | | 139 |
| | | | | |
| Kan, Harold | | | | |
| By Mr. Farrer | 142 | | | |
| | | | | |
| Choy, William | | | | |
| By Mr. Farrer | 146 | | | |
| | | | | |
| Leguna, Alina G. | | | | |
| By Mr. Farrer | 153 | | 166 | |
| By Mr. Romeo | | 162 | | |

1                    I N D E X (CONINUED):

2


3
   Plaintiff's Witnesses:     Direct Cross Redirect Recross

4
   Fu, Tony

5
        By Mr. Farrer          170            304

6                                             340

7        By Mr. Chu             197            327

8        By Mr. Romeo                  205           330

9


10


11  Defense Witnesses:

12  Wong, Winky

13       By Mr. Romeo           365

14       By Mr. Farrer                369

15       By Mr. Chu                   380

16


17  Beckman, Richard

18       By Mr. Romeo           391

19       By Mr. Farrer                400

20


21  Closing Argument                              Page

22  By Mr. Farrer                                 428

23  By Mr. Chu                                    440
                                                  462
24
    By Mr. Romeo                                  442
25

|   |   |   | E X H I B I T S |   |   |
|---|---|---|---|---|---|

| | Ident. | Evid. |
|---|---|---|
| Plaintiff's Exhibits; | | |
| 1 through 66 (By stipulation) | | 6 |
| 74   Enlarged Subdivision Map | 78 | 78 |
| 76   MLS Listing | 168 | 168 |
| 88   Declaration of Stella Chen | | 231 |
| 85, 94, 90, 91, 92 and 86 | | 319 |
| 95 and 96 | | 326 |
| 97   Parts of Exhibit D | 329 | 329 |
| 83 and 84 | | 364 |
| 99   Deed given by Mr. Wong to Mr. Yan | 383 | 388 |
| 100  Addition Deed by Mr. Wong to Mr. Yan | 387 | 388 |
| | | |
| | | |
| Defense Exhibits: | | |
| A through Q (By stipulation) | | 6 |
| | | |
| | | |
| Defense Impeachment Rebuttal Exhibits: | | |
| R through EE | 7 | |
| R and S - Declarations of Fei Sing Fu | | 62 |
| W and X - Two Declarations of Stella Chen | | 169 |
| T, U, AA, BB, CC, and DD | | 319 |
| JJ   Certain notes of Mr. Beckman | 398 | |

1        P R O C E E D I N G S

2  September 15, 2005                    4:24 p.m.

3                    --—oOo—

4      (The testimony of Demas Yan, previously transcribed

5  is not included in this transcript.)

6          THE COURT: Do you want to argue today?  All

7  right, I'm ready.

8          MR. ROMEO: I'm ready to go forward with that.

9          THE COURT: Okay.  Do you need a break or are you

10  ready to go?

11         MR. FARRER: Let's get it over with.

12         THE COURT: Okay.

13         MR. FARRER:  If you're ready.

14         THE COURT: Mr. Romeo, is that suitable?

15         MR. ROMEO: Yeah, I'm ready.  I'm only standing up

16  because I'm trying to organize things.

17         THE COURT: That's just fine.

18      (Pause.)

19         Mr. Farrer, you're essentially seeking to enforce

20  this deed of trust.  Is there any reason you shouldn't go

21  first?

22         MR. FARRER: No.  I'd be happy to.

23         THE COURT: By the way, has anyone offered 97?

24         MR. CHU: In evidence?

25         THE COURT: Yes.

1           MR. FARRER: Yes.

2           THE COURT: Has it been admitted?

3           MR. CHU: My recollection is that it was admitted.

4           THE COURT: Is there any question about that?

5           MR. ROMEO: No.  No, Your Honor.

6           THE COURT: Okay.

7           MR. FARRER: Okay, we got it admitted?

8           THE CLERK: Sure.  Now we do.

9           MR. CHU: Well, if it wasn't admitted before, I

10  move for the admission now.

11          THE COURT: Okay.  There's no objection.

12          MR. ROMEO: No objection.

13          THE COURT: So it's admitted.  This is an

14  original.  We need to take care of that.

15                        (Plaintiff's Exhibit 97 had been

16                        previously admitted.)

17          THE COURT:  Okay, Mr. Farrer, go ahead.

18                        CLOSING ARGUMENT

19  BY MR. FARRER:

20          All right, Your Honor.  This is really a

21  straightforward proceeding to enforce a secured claim

22  against property of the estate.  The only twist in this

23  case is that the debtor belatedly -- the debtor who admits

24  executing the underlying loan documents belatedly denies

25  ever receiving the funds represented by the underlying

1 promissory note, even though he admits preparing and

2 executing at least two separate sets of escrow instructions

3 directing the title company to pay off that loan in full.

4 From the evidence it's obvious that Mr. Yan is an

5 intelligent but devious soul, who carefully drafts

6 documents so he's protected. Although Mr. Yan belatedly

7 disputes he ever borrowed money from Fei Sing Fu or Mr.

8 Leung, he absolutely had no trouble signing a promissory

9 note and deed of trust representing that loan and

10 confirming the existence and identity of those obligations

11 to Rick Seher and his surveyor, Tony Fu, Stella Chen,

12 Herzog and Berlese, his lawyers, Old Republic Title

13 Company, and Connie Ho.

14 There is ample written documentation entered into

15 evidence that a loan was made. We have a promissory note

16 and recorded deed of trust dated November 13th, 2002. Those

17 are Exhibits 5 and 6 which have been admitted. They both

18 contain attorney's fee clauses.

19 There is a preliminary title report dated

20 September 3rd of 2003; that's Exhibit 21, that identifies

21 the Chen deed of trust. That same report contains Mr.

22 Yan's own handwritten notations identifying which of the

23 four loans he's paid off. There isn't a shred of written

24 documentary evidence that was introduced at this trial or

25 even offered where Mr. Yan disputed the payment to Stella

1  Chen, not a letter, not a fax, not an e-mail, not a

2  handwritten note, nothing.  Instead, what we have is a

3  letter to Yan from Mr. Seher dated October 3rd, '03, that's

4  Exhibit 14, notifying Mr. Yan of something he already knew,

5  and that is, that his lawyers, Herzog and Berlese, had

6  learned there were two more loans on the property that he

7  hadn't disclosed to them.

8       Then there are several e-mails that are exchanged

9  between Mr. Yan and Mr. Seher, and those are Exhibits 18 to

10 22, where Mr. Yan candidly and repeatedly concedes the Chen

11 deed of trust.  Not only does he concede it, he goes so far

12 as to identify her as, and I quote, "his private lender."

13 Then to top it off, on January 8th, of 2004, under no

14 pressure to do so, he, in his own words, crafts a first set

15 of escrow instructions, and those escrow instructions, I

16 believe it's Exhibit 25, specifically instruct Old Republic

17 Title Company to pay off the Stella Chen deed of trust in

18 full for $450,000.

19      Accompanying those escrow instructions is a

20 simple fax cover sheet, it's Exhibit 67, transmitting it to

21 Tony Fu and asking him to get it signed.  Nowhere does Mr.

22 Yan say, wait a second, I'm only doing this because you're

23 threatening me.  I'm only doing this because this is an

24 estimate of what you're owed under the partnership

25 agreement.  No, not a word about any of that.  It's here,

1  let's get Stella paid; I'm willing to pay her.

2       And then he not only drafts them; he signs them.
3  Four days later, he voluntarily walks over to the Old
4  Republic Title Company office and signs a second set of
5  escrow instructions making the same authorization and
6  direction to Old Republic Title Company to pay Stella Chen
7  $450,000 in exchange for her release of her promissory
8  note.  Nothing about Tony Fu or release of his interest in
9  the property or anything, not a peep.

10      Now, what's really curious is what happens
11 between January 13th, 2004 and the letter from Mr. Yan's
12 attorney to Tony Fu and Mr. Yan's e-mail or fax cover sheet
13 of I think it's January 31st of '04 to Mr. Yan saying he'll
14 pay $411,000.  Why has Mr. Yan changed positions from his
15 prior authorization and willingness to pay the full 450,
16 now dropped down to 411 or I'm going to sue you.  He never
17 really told us the answer to that question, and my
18 suspicion is that when he went into the title company and
19 he learned he was going to have to kick in 60 plus thousand
20 dollars to close that sale, he decided it was time to
21 squeeze Tony and Stella and see if he could negotiate a
22 better deal because that's the kind of guy he was.  He was
23 always out negotiating better deals.

24      And it's not surprising.  The man hasn't worked
25 or had any income in five or six years.  He's living at

1  home.  Yet he's able to borrow millions of dollars.  I

2  don't know how that works, but he's got millions of dollars

3  in real estate, but he has no income.  So he was broke.  He

4  needed –- he had to pay debt service on 547 - 23rd Avenue.

5  He had to pay debt service on Chenery to World Savings and

6  Bank of America.  So it was time to start trying to squeeze

7  Tony because, you know, that loan that's memorialized by

8  the Stella Chen note and deed of trust was made in 2002,

9  and the testimony from Fei Sing Fu is that was supposed to

10  be a short-term loan repaid within a matter of months.  And

11  then Mr. Yan disappears, and he never called Mr. Fu like he

12  promised he would, and then Mr. Fu got –- this is Fei Sing

13  Fu –- got concerned; he called Tony; Tony calls Demas.

14  Demas says well, I'll get to it; I'll get to it; I'll get

15  to it, and then finally in November, he agrees to sign –-

16  okay, I'll sign a new note.

17         And the note doesn't have a maturity date.  The

18  note has the interest provisions crossed out.  Now what

19  lender in their right mind would make that kind of

20  modification.  Borrower, yes; lender no.

21         So here is Ms. Chen, who is really just an

22  assignee; it's not her money; it's her brother's money.

23  The loan is now a year and a half old.  It was made in

24  February of '02, and here we are in January of '04, and

25  Demas Yan figures it's a good time to start playing a game.

1  Never before had he taken a position that the loan from Fei

2  Sing Fu and Mr. Leung was the same as the obligation under

3  Exhibit D, the partnership agreement.  There isn't anything

4  in writing where he said hey, these are one and the same or

5  on the promissory note that he took the time to write the

6  trustor's address on or the deed of trust, nothing, not an

7  e-mail, not a fax, not a memo.

8       What does he do?  He says well, I need your

9  signature on this final plat map, so he tells his surveyor,

10  prepare that, get that filed.  Anyway, there's just so much

11  substantial and uncontradicted written evidence admitted in

12  this case that this is a valid, binding, and enforceable

13  loan, secured loan, that the Court should find such.

14       In our trial brief -- and I don't want to belabor

15  it, but I do want to request that the Court reconsider it

16  because I spent a good deal of time on it, and what I did

17  that I think is most helpful to the Court is I took our

18  complaint in this adversary proceeding, which is a

19  declaratory relief complaint, and I compared our

20  allegations with Mr. Yan's answer.  And it's really quite

21  telling how little is disputed, even though you heard Mr.

22  Yan testify here that he wasn't sure he signed things, he

23  admitted he did in his answer.

24       So I went through that on pages 5, 6 and 7 of our

25  brief, stating exactly what paragraphs Yan has admitted in

1   our complaint, and I think we have to start there, because

2   to the extent Yan has admitted those allegations in his

3   answer, they're not contested.  We don't need evidence on

4   them.  He, for example, admits signing both the note and

5   the Chen deed of trust.  Now, he never really waffled on

6   the deed of trust, but he sure did on the note.

7           Mr. Yan is not the kind of guy this Court –- I

8   think his credibility is seriously at issue.  He got up

9   here and he tried to bob and weave about this Falley

10  promissory note, and he got up here and although he

11  admitted he was the sole source of funds for that

12  promissory note, he tried to concoct this story that really

13  half of it was Tony Fu and Lei Ming Li, so only half of it

14  was his, but what does he do?  And this is a classic

15  example where actions speak louder than words.  This guy

16  tells Falley not to pay it.  He doesn't tell Falley not to

17  pay half; he tells Falley not to pay any of it, and he

18  clearly admitted that.

19          And then he lied big time on the stand about

20  something he did just a month ago.  I asked him point

21  blank, did you ever make demand on Falley to pay that note?

22  What was his testimony?  No, I never did.  That was a bold

23  faced lie.  Exhibit 116 is a written demand letter that he

24  sent just a month ago to Mr. Falley making demand on that

25  note.

1          Mr. Yan got up here, and he tried to create an

2     illusion, a story about, you know, Tony Fu always was

3     hiding assets and concealing them from his creditors

4     because there was this judgment creditor named Florence

5     Fong chasing him.  Well, it's not really relevant to the

6     case, but what has this man done?  He's transferred 1.5

7     million dollars of real estate to his parents for nothing.

8     I mean, you know, it gets nowhere.  It doesn't really

9     factor into the note; it's just the kind of guy he is.

10          We would be asking the Court for an order

11     determining that the Chen promissory note and deed of

12     trust, Exhibits 5 and 6, are valid, enforceable obligations

13     according to their terms and that the deed of trust

14     constitutes a first priority, secured lien against the

15     proceeds of the property since the debtor has obtained

16     orders selling free and clear with the lien to attach to

17     the proceeds currently being housed by Bank of the West.

18          The total proceeds held by Bank of the West are

19     approximately 2.3 million dollars, so it's more than enough

20     to cover this promissory note.  I am sorry I have forgotten

21     exactly what exhibit that is.

22          THE COURT: Do I have a copy of the motion to sell

23     free and clear in that --

24          MR. FARRER: You have copies of all of the orders

25     and they've all been admitted and the orders authorizing

1  the sale free and clear of the four properties are Exhibits

2  59, 60, 61 and 62.  And they were all stipulated into

3  evidence on July 25th.

4      Exhibit 64 is the then –- or the most recent

5  statement from Bank of the West showing that they were

6  holding 2.3 million dollars from the sale of the Chenery

7  Street proceeds.  This is a segregated interest-bearing

8  account.  The only proceeds deposited into that account are

9  from the sale of the four Chenery Street condos.

10      There's been no argument or dispute that the

11  Stella Chen deed of trust encumbered the entire property

12  and not just a unit.  In fact, the deed of trust was

13  recorded before the subdivision was ever approved.

14      Exhibit 65 contains a calculation of the amount

15  due to Stella Chen under two scenarios.  The first scenario

16  is a default as of March 1st, 2004.  The reason that date

17  was selected is that Mr. Yan has clearly and consistently

18  and unequivocally testified that he took the property off

19  the market.  It's our position that the promissory note and

20  the deed of trust specifically required him to market the

21  property because they didn't otherwise have a maturity

22  date, and the note says exactly that.  He shall keep the

23  property on the market.  So that is the default that

24  triggered our argument that interest became –- started

25  accruing.  And we calculated interest using California

1   Civil Code Section 3287 which says where you have a sum

2   certain, the payee is entitled to collect pre-judgment

3   interest at ten percent.

4           So we calculated interest on the $450,000

5   principal amount in that first scenario from March 1st of

6   '04 till August 1st of '05, which was just after the

7   commencement of the trial.   But it's a simple calculation.

8   We also included our attorney's fees and costs through June

9   30th of '05 because that's all we had that had been billed

10  and paid as of -- through June 30th and then we had some

11  additional trustee's fees, the total being $699,238.35.

12  That does not include interest that has accrued and

13  continuing to accrue on or after August 1st of 2005 or any

14  of the attorney's fees and costs that have incurred in this

15  matter which are substantial during June, July and August

16  and September of this year.

17          The second scenario in this calculation, the only

18  difference is the date that we calculated interest from.

19  And we picked the date of March 1st, '02 on the grounds that

20  that was the day -- or actually Fei Sing Fu had testified

21  the loan was made in February of '02 and it was to be

22  repaid -- it was a short-term loan to be repaid in 30 days.

23  Mr. Yan disappeared.   He never called him back.   He never

24  offered to pay him anything.   He just, you know, left town.

25  So we think because we have a sum certain as of that day,

1  that interest ought to accrue from March 1st of '02 and not

2  the interest rate –- not the default date of March 1st of

3  '04.  The difference is obviously significant, and it's

4  approximately two years of interest at ten percent.  All

5  the other numbers are the same.

6          THE COURT: The note doesn't even seek interest

7  for that period.

8          MR. FARRER: The note postdates that period.  The

9  note is in November of '02, about eights months later.

10          THE COURT: Right.

11          MR. FARRER: And so, you know, I mean, there's

12  arguments.  I'm just trying to get my claim up there.

13  (Laughing.)

14          It's certainly the earliest possible date we

15  could allege interest accruing from will be the date of the

16  loan.  And if you recall the testimony, there was supposed

17  to be a kicker on that loan.  It wasn't to approve

18  interest, but he was supposed to get a piece of the action

19  on the sale of this high-tech equipment, and I became –-

20  I've forgotten exactly what that testimony was, but –-

21          MR. ROMEO: It was 20 percent in one month, Your

22  Honor.

23          MR. FARRER: Okay.  It was a lot.  But it was a

24  loan made in Hong Kong, and it's a California, you know –-

25  laws may not normally apply, but anyway, we would be asking

1   the Court to award one or the other of the scenarios plus

2   the additional interest in attorney's fees that have been

3   accrued.

4           Now, we have already provided Mr. Romeo with

5   redacted copies of all of our legal fees, and they are set

6   forth in Exhibit --

7           THE COURT: 66.

8           MR. FARRER: Thank you.  There they are, yeah,

9   Exhibit 66.

10          THE COURT: The procedures that the -- at least

11  the District Court uses for this are to wait till the trial

12  is over before we --

13          MR. FARRER: Right.

14          THE COURT:  -- require objections as to fees, if

15  you win.

16          MR. FARRER: Right.  So I mean we can address the

17  fee issue I guess after the Court determines the matter.  I

18  have nothing further.  Thank you.

19          THE COURT: Okay.  Mr. Romeo?

20          MR. CHU: Your Honor, perhaps I should --

21          THE COURT: Yes, that's fine.

22          MR. CHU:  -- I should go next.

23          THE COURT: Go ahead.

24  ///

25  ///

1  CLOSING ARGUMENT

2  BY MR. CHU:

3       The evidence I think establishes that Mr. Yan has

4  no problem drafting legal documents.  He undertakes efforts

5  that most laymen probably would not undertake by

6  themselves.  He has some training in that area, I presume.

7  Mr. Yan was competent enough to draft the Exhibit A, the

8  Winky Wong agreement.  Mr. Yan was competent enough to

9  draft a cancellation of that agreement when the

10 cancellation became appropriate.  Exhibit B is the

11 cancellation agreement, and Mr. Yan also drafted Exhibit

12 double F, so I think the evidence is clear that when an

13 agreement is canceled or superseded, Mr. Yan had no problem

14 preparing even a simple document memorializing that fact.

15      The note and deed of trust contain no mention at

16 all of his agreement with Mr. Fu.  There's no mention of

17 the October 18th, 2000 agreement.  A short mention would

18 have been easy to effect on the note in exchange for the

19 October 18th agreement.  Just one little phrase, that's all

20 he needed.  It wasn't there.  The fact that the note was

21 made payable to Ms. Chen undercuts Mr. Yan's entire theory

22 about how Mr. Fu came to approach him with the note.  Mr.

23 Yan's testimony is that, oh, Tony was in dire straits.  He

24 needed to have something that he could show to a lender to

25 show he had collateral.

1    If that note and deed of trust says Stella Chen

2  on it, that's not going to help him.  Mr. Fu already had

3  the original October 18th, 2000 agreement that showed his

4  interest in the property.  I mean he could have used that

5  as collateral.  He didn't need anything else if he actually

6  wanted to show someone that he had an interest in property

7  to borrow on.  But having Stella Chen's name appear on the

8  note and deed of trust just kills his story.  It kills his

9  entire concoction, so Mr. Yan goes back and decides well,

10 the only way that story is going to make any sense at all

11 is if the deed of trust was blank when I signed it.  So

12 from the start, he has alleged that the deed of trust was

13 incomplete and that Tony filled in Stella Chen's name after

14 he signed it.

15    Well, that goes directly against the testimony of

16 the notary public, James Brodie.  James Brodie came in and

17 testified that that deed of trust was complete when he

18 notarized it.  And Mr. Brodie has no axe to grind in this

19 matter.  And on top of that, Mr. Brodie testified that he

20 would never notarize an incomplete document and that he had

21 turned away documents presented to him for notarization

22 when they were incomplete.  And Mr. Yan didn't know that

23 it's illegal for a notary to notarize a document that's not

24 complete.  It's a bit of minute knowledge that no one knows

25 except a notary probably.

1    So he didn't know that was going to come in, but

2    it undercuts his testimony entirely.  As far as what we've

3    seen, in addition to Mr. Yan misrepresenting to the Court

4    his failure, and I guess his never having made demand on

5    the Falley note, Ms. Leguna came in and testified that he

6    misrepresented the ownership of the property to her.  I

7    think the evidence shows that Mr. Yan will say whatever he

8    needs to say if it suits his purpose.  There's simply no

9    evidence that the note and the partnership agreement were

10   ever tied together.  That is a story that came in after the

11   fact somewhere in the beginning of 2004 when Mr. Yan and

12   Mr. Fu had their dispute.  Before that, there was not one

13   document that tied the two things together.

14        That's all I have, Your Honor.

15        THE COURT: Okay.  Thank you.  Mr. Romeo.

16        MR. ROMEO: Yes, Your Honor.

17                 CLOSING ARGUMENT

18   BY MR. ROMEO:

19        I think the main point that we've trying over the

20   past three days of trial is that there's not two

21   obligations here, and it's been the Plaintiff, Stella Chen,

22   and her witnesses that have asserted that there was -- that

23   the reason that this note was signed has to do with a loan

24   that was made in Hong Kong.  I'm sorry we couldn't do this

25   trial in three consecutive days so that the testimony in

the previous two trial days was a little more fresh, but I want to revisit a lot of that testimony in my argument and I may go into some detail because it's been almost a month ago, more than a month ago that we heard from Stella Chen and Tony Fu and Fei Sing Fu.

And that's where I think the dispute is, in this case. We're not going to pay twice. You know, if we have to pay, it would have to be paid once with appropriate adjustments for what's going on in this Chenery Street project. They're saying that there was a completely different obligation underlying this note and deed of trust, and I remember when we were at the pre-trial –- or excuse me -- the status conference, and I said to Your Honor, this is a story about a briefcase full of cash. Sure enough Fei Sing Fu comes in here and when he's talking about that loan, at the stand and I said well, how big of a –- he started talking about a valise and then he starts motioning with his hands, well, it was a briefcase and it was full of cash. It was full of one thousand dollar Hong Kong bills. And it's a briefcase full of cash.

What's extremely appealing about the story from their standpoint is that cash is inherently non-traceable. It's fungible; it's hard to prove that, you know, it happened or didn't happen at first blush because it's fungible. It could have been there; it could have not. We

only have someone's say-so that it was. What we do understand is that Mr. Yan insisted –- and this is according to the testimony of Fei Sing Fu and Tony Fu, Mr. Yan insisted on cash. Now Mr. Fu, Tony Fu, says that when he asked for the loan, he wanted $500,000 cash. Mr. Fei Sing Fu says that it was $450,000 cash. So we've got some inherent difficulties right there.

Mr. Yan is said to have told them that the usual form of payment in his business is, that cash is preferred, but Mr. Yan testified in court today, and I think that it's almost a matter of judicial notice, that in international transactions in commerce, letters of credit are in fact what's used. So it's, right off the bat, a story that doesn't sound, you know, it doesn't sound very believable.

Mr. Yan was never in Singapore. There's no testimony that he was in Singapore, that he knew anybody in Singapore. The person who allegedly put up all of this cash, Mr. Leung, is conveniently –- he's been dead since 2003. So he's not -- there's no way he could have been deposed; there's no way he could have been asked about where this money came from.

Another internal inconsistency goes to the exchange rate. The exchange rate in Hong Kong is 7.8 to 1, and according to Mr. Fei Sing Fu, the people involved in this transaction were not, you know, they were not yokels;

they knew what they were doing, and he talked about Mr.
Leung's sophistication, his yachts, his mansions, et
cetera, et cetera. Mr. Fu admitted that he was a director
of a number of companies in Hong Kong. I think I asked him
about at least four or five that he was a director of, so
obviously, a man of sophistication. These guys know how to
count money. 3.6 million dollars Hong Kong is actually at
the exchange rate $462,598 U.S. dollars. Well, people who
know how to count money don't leave $12,000 on the table
right out the gate. It just doesn't make sense.

Fei Sing Fu, in that restaurant meeting at the
Tung Hing Restaurant in Hong Kong said that Mr. Yan
cursorily, his word cursorily, counted this money.
Although this is a briefcase full of cash, this is more
than a thousand individual notes, if he said that they were
in one thousand dollar Hong Kong bills, there had to have
been thirty-six hundred individual bank notes in there.

For someone in this size of a transaction to
cursorily count the money -- maybe he didn't want to insult
them, but it seems to me that for a transaction of this
size, that somebody would have counted the money,
especially if I was the borrower. Conveniently, none of
these witnesses has ever given a specific date that that
transaction took place in the restaurant in Hong Kong. It
was well within their power to do that. Why do we know

that?  Well, number one, they had a note.  I'll talk to you about that later.  Number two, Fei Sing Fu said that before he put up his end of the loan, he had to visit several banks to collect up 600,000 Hong Kong dollars that he was going to put in.

Well, if I'm going to go to several banks, one of them, somewhere in my several banking relationships has got a bank statement which shows where I withdrew a bunch of money all on the same day to go and take to this restaurant.  There's a jury instruction which says failure to produce stronger available proof, that applies here.  There's -- it was well within their power, knowing that this was disputed to bring forward indisputable third-party documents, routine things from a bank, saying that the money came out of the bank on such and such a date.

Now, on that meeting, there's been a lot of declarations in court about what transpired in the restaurant in that meeting in 2002.  Some of those are admittedly hearsay declarations of Mr. Fu and Ms. Chen.  They're repeating what Fei Sing Fu has told them, but all of those declarations have something key about them.  Number one, is that there's two sets, one that happens in March 2004 on one application for an injunction, and the other set comes in November 2004 on another set of injunction.  So everybody has a lot of time to think about

what they're going to say and how they're going to shoot

down Mr. Yan's application for injunction.

Fei Sing Fu, the eye witness, in Exhibit R says

in his declaration, I was personally present at a meeting

in February 2002 when my wife's uncle agreed to loan Demas

Yan this $450,000, and he says, and -- and in the same

sentence -- and Yan agreed to repay said funds to our

family from the proceeds of his real estate project.

In his November 5th declaration, he makes the

exact same statement. He was personally present when Mr.

Yan agreed to secure the repayment of the funds in that

meeting, not later on, not in November 2002 but in that

meeting, and that same statement is repeated in all the

declarations, and I would just -- for the sake of time, I

won't go through all of them, but Exhibits R, S, T, W and X

are extremely informative on this issue. I find it

significant that months apart with people having time to

think about it, with a written declaration, where you have

time; you don't misspeak in a declaration; you have time to

read it and correct it, read it and correct, and everybody

says that they heard him say that there was a deed of trust

promised on his real estate project in the meeting. That

strikes me as people not getting their story together.

Then Mr. Fei Sing Fu shows up in trial in this

case, and he takes the stand and he gives us an entirely

different story.  He says, well, during that meeting, he

promised to pay it back within a month, and he wanted on

top of that 20 percent, so that this was supposed to be a

quick turnaround.  We further learn, very late in the case,

a question which Mr. Yan has never asked in all of his four

depositions, like, was there a Chinese language note in

this case, we suddenly learn that there's a Chinese

language note in depositions in this case in July of 2005.

And what Mr. Fu, Fei Sing Fu, what Mr. Tony Fu both testify

to was that the note existed, that it was an extremely

important note.  They both agreed that it was important.

In fact, it was so important that when it came time for the

alleged exchange of that Chinese note for the Stella Chen

note, they couldn't send it by DHL; they had to send it --

wait for somebody they knew whom they trusted to hand carry

it to the United States so that it wouldn't get lost.

We find out from them, however, that although

that document which they consider important, which they

consider so important it has to be hand carried to the

United States, Fei Sing Fu doesn't keep a copy.  Tony Fu

goes through this elaborate procedure, he says, at

Starbuck's or the notary's office where he -- Mr. Yan gives

the deed of trust and Tony Fu gives him back the Chinese

note.   He doesn't keep a copy of the Chinese language note

in that meeting, although he claims he had given the

original.

So it's convenient that the one person they're suing is the one person who has the only existing copy so they can blame it on Mr. Yan, you know, if it doesn't -- if it's not found. If you look at the loan document, Exhibit 5, the Stella Chen note, and we've talked about that a little bit today, it has interest running apparently from -- no interest running at any time, but there's no reference to the obligation being incurred in February. It's a huge difference, and again, Mr. Farrer in his closing says, what lender would do that, and I think that's a really fair question.

If in fact sophisticated business people in Hong Kong made a huge loan to somebody in the United States, and they didn't ask for interest, not only did they leave the interest on the table from February to November, but they left the interest on all along. That just doesn't seem consistent with the transaction, with the type of people that he was alleged to have been dealing with in Hong Kong. The nine months of interest alone that they would have given up, at the legal rate, would have been $33,750.

We also hear from Tony Fu, when I crossed Fei Sing Fu about the exchange rate, Tony Fu when he takes the stand suddenly remembers on direct testimony that he and Mr. Yan had an argument about the interest rate and the

1 exchange rate at the meeting at Starbuck's, which is

2 interesting because when I asked him about that and asked

3 him if he recently invented that fact, I confronted him

4 with his deposition testimony and his deposition testimony

5 was that the meeting was, quote, "very pleasant."  There

6 was no argument.

7          Another example of the evolving story, Your

8 Honor, is the question of who gets the money.  Stella

9 Chen's deposition says numerous times that Mr. Leung, the

10 original lender, in fact the only lender that's originally

11 disclosed, gets the money.  She says it multiple times in

12 her deposition.  Tony Fu says Fei Sing Fu gets the money.

13 Fei Sing Fu says I had to pay this –- this Mr. Leung in

14 Hong Kong three million Hong Kong dollars, and I had to

15 absorb the total loss so that this thing could be

16 collected.

17          They are all over the map on who gets the money.

18 And it's funny again, go back to those declarations and

19 look at them.  Fei Sing Fu has signed two declaration in

20 March 2004 and another one in November 2004.  He is, by his

21 own testimony, out a lot of money by this time.  Stella

22 Chen and Tony Fu have also signed declarations in the exact

23 same time frame.  Their brother is out a lot of money.

24 Their brother has been embarrassed in front of a trusted

25 business associate in Hong Kong.  Their brother is getting

blown off by this Mr. Yan for not paying back $450,000.
Don't you think somebody would say something about that in
the declarations instead of saying it's really just Mr.
Leung's money.  Don't you think somebody would say
something in the declarations about the fact that Mr. Yan
had signed a note in Hong Kong.  Notes are great.  Notes
prove that someone owes me money.  Why is it all this time
nobody says, hey, by the way, this guy not only borrowed
this money; it was in cash, but he did sign a note.  We
kept a copy because it was so important.  But it's not
there.

Finally, we get to the purpose of the loan.
Again, this is an interesting story because Mr. Yan is not
in the high tech equipment business.  He was, and when he
was, he lived over in Asia.  Now he's living in the United
States doing real estate development.  Suddenly magically
he comes up with a deal that is so screaming that he has to
have $500,000 right away.  He's going to go ship something
from Singapore and sell it to China and do it all in a
month.  There's nothing in the evidence that would be
consistent with that, and again, it's inconsistent with his
personal knowledge that they use letters of credit.  I mean
I think everybody knows that.  We use letters of credit in
international transactions.

Mr. Farrer says, well, there's nothing in the

documents about Mr. Yan denying owing a loan to Mr. Leung, and that's kind of my point too in a weird way, and that's because there is nothing in the documentation from them that people that are out all this money saying, you stiffed my wife's uncle for a huge amount of money. Where is it? People should have been in a panic. If it was due back in a month, people should have been outraged that this much money had not been paid back. But there's nothing in any of the documents, all the hundreds of exhibits we have in this case, saying you didn't pay Mr. Leung's loan back. There's nothing there. It's completely silent, and it's especially silent in the time when Mr. Fei Sing Fu and Mr. Tony Fu said they were really upset from Mr. Yan skipping town and not paying the money. So yes, there is silence, and on Mr. Yan's side, why is there not something denying owing the Leung loan? Because it's pretty hard to dispute something that you don't know about. That's why there's this silence on his side of it.

Now, let's look at the Chen note. Mr. Chu says that the Stella Chen note doesn't say anything; it doesn't reference anything about this deal. But I disagree. If you look at the language of Exhibit 5, I think that it echoes Exhibit D in the following respect. Exhibit D has a provision that says that Mr. Fu shall have the decision as to whether to sell or rent the property. And in Exhibit 5,

1  in Mr. Fu's own handwriting, it says -- it echoes that

2  language.  It says the subject property shall keep on

3  market, and that the principal and interest will be paid in

4  escrow.

5       To me, that sounds like a connection, a strong

6  connection between the two in that phrase.  Mr. Chu says

7  there's not a phrase.  But there is a phrase, and it's a

8  very important one.  It says the property shall keep on

9  market.  How important is it?  It's in the notice of

10 default.  That's why Mr. Farrer sent a letter on August 5th,

11 2004 demanding that the property be put on the market.

12 That's why a notice of default was then recorded against

13 the property and foreclosure proceedings started.

14      There's been a bit of discussion about why the

15 note was recorded or if Mr. Yan had signed it before a

16 notary; he would have had that expectation to record it.

17 But look what happened with the Lei Ming Li note.  It was

18 signed in February 2001.  It was not recorded until

19 September 17th, 2002.  What happened between those two

20 events?  On August 28th, there's the memorandum of

21 termination from Mr Yan to Tony Fu saying you terminated

22 from 547 - 23rd Avenue.  Two weeks later, he's recorded the

23 Lei Ming Li note which has otherwise laid in his files

24 apparently at home not doing anybody any harm for more than

25 a year and a half.

1   What else happens?  Well, at the time that Mr. Fu

2   is meeting with Mr. Yan, he is having some problems.  They

3   are already having some problems, and he says in his

4   deposition testimony, which I confronted him with on cross-

5   examination, and that's at page 93.  He says that he

6   definitely was suspicious and unhappy with Mr. Yan and

7   their relationship.  He was not confident of the

8   relationship at the time that the Stella Chen note was

9   signed.  So that seems to me to be exactly why Mr. Fu is

10  now concerned about securing his interest, securing all of

11  his claims against Mr. Yan, which is another way of saying

12  that it's not really Mr. Leung's loan to Mr. Yan, but Mr.

13  Tony Fu trying to make sure that he comes out of everything

14  with something to show for it.

15      The deposition is pretty clear that at that

16  point, he thought that things were going sideways in their

17  relationship, and that he was being protective.

18      THE COURT: Why didn't he just record the --

19  Exhibit D?

20      MR. ROMEO: Because according to Mr. Yan's

21  testimony, Mr. Fu was obsessed -- and in fact there's

22  documentation showing that he mentions this repeatedly, and

23  he did talk about it in cross.  He was obsessed with his

24  legal dispute with Florence Fong.  He's obsessed with not

25  putting things in his own name.  To record this agreement

would be to tell the whole wide world I'm a 25 percent owner of this property on Chenery Street, which is why the Lei Ming Li note is under his ex-wife's name, not Tony's name even though Lei Ming Li didn't work on 547 - 23rd. Lei Ming Li didn't work on Chenery Street. Lei Ming Li didn't loan this gentleman any money. Lei Ming Li didn't even live at the property address where it says on the Lei Ming Li note, "when recorded, return to." It's Stella Chen, his sister's address, and it's the same thing with the Stella Chen note. It's the same thing with the Wei Luen claim.

It's the same thing -- when I asked him about all the claims, there's a bunch of claims against Mr. Yan in this case. Charles Li from 547 - 23rd Avenue, Wei Suen from the Chenery Street property, Tony Fu from the Chenery Street property -- there are none of them under Tony Fu's name. They all start with Tony, but they all end up in other people's names. He's like this puppeteer over here, assigning his claims out and they're all marching towards Mr. Yen.

So that answers your question. He would have never recorded Exhibit D because he's never recorded anything under his name since he's had this dispute with Florence Fong. It's remarkable that Mr. Fu has so many significant claims that start with him, it's just not something you see every day where he has so many claims

1   that start with him and they all end up in, you know, Mr.

2   Suen is an electrical subcontractor.  You know, he sends it

3   to his sister.  He sends it to his ex-wife.  Why doesn't

4   the guy just prosecute his own claims in his own name.

5   He's an artist at staying off the public record.  So I

6   think that that's –- I would be flabbergasted if he would

7   have recorded Exhibit D.

8           There's been a number of –- there was a question

9   about did Mr. Yan know whether these deeds of trust were

10  recorded.  Well, I think it's pretty clear that he didn't

11  until he got that title report, and that's because if you

12  look at Exhibit D, among the things that Mr. Yan has to pay

13  out of his own pocket that's not a shared expense of the

14  partnership between him and Tony Fu are costs of

15  professionals to do CC&R's and subdivision maps and things

16  like that.  That's all on his dime.  It's not a credit

17  against the 300,000 he's supposed to put in, so every extra

18  dollar that he has to come up with for those expenses is

19  something that he's watching for.

20          So he has mass prepared first with the

21  institutional lenders and so he goes through Berlese's

22  office; he goes through Seher's office; he has all of this

23  prepared as if Bank of America and World Savings are going

24  to be the lenders on those maps.  Those maps then get

25  changed and you can see his own reluctance to incur that

1 expense because David Smith says, hey, guess what, you've

2 got two new lenders on it, here's our service agreement;

3 we've got to change everything. And the first thing Mr.

4 Yan does he sends back an e-mail, take no action at this

5 time. Let me work on it. Because he's obviously reluctant

6 to just spend money over and over and over again having all

7 of these maps prepared.

8 And in fact, there's a note in Berlese's file,

9 and it's in one of the exhibits that when this happens, one

10 of the associates in Berlese's office says hourly, so it's

11 going to cost him a lot of money to keep changing these

12 maps and playing around with the maps and the CC&R's.

13 And he not only has to do it once, but he has to

14 do it twice because then we take the institutional lenders

15 off; then we put these other people on. But it seems

16 pretty –- it seems to me that he would not have gone to

17 that expense to prepare those maps. He was obviously

18 reluctant to spend that money, had he known all along that

19 there were four lenders on the property. It's pretty clear

20 how he got the money to take the lenders off. He

21 refinanced. This is the Washington Mutual loans. They're

22 disclosed in his schedules. They're right there. They're

23 on 547 - 23rd Avenue.

24 And I want to refer again to what happens in the

25 escrow. In the escrow, number one, Tony Fu is never

acting, negotiating, driving papers around or doing anything as a seller. Why is that? It's because the note is already his piece of -- his participation in this. He's not reviewing seller's documents. He's not reviewing seller's instructions. He is dealing with the Stella Chen note.

In the trial, before we went through these figures, they make perfect sense. They add up to the penny, how the Lei Ming Li note gets released. It's $110,440. He's made a payment in escrow of 17,285. He's made a previous payment of 30,000. That leaves 63,155. Why is that number important? Because that number is exactly what's on the Lei Ming Li note for Chenery Street. Why is that not paid under the -- why didn't they just pay another 63,000 to Lei Ming Li in that escrow? The reason is, is they know that's being picked up in Tony Fu's piece of Chenery Street.

Now, they've tried to make the Falley note look like that is some kind of a payment, but there was no testimony from any witness that substantiates that theory, that somehow or another the assignment in '03 is a satisfaction of that 63,155. And regardless of how close it comes, I don't think the figure fits. When he takes these calculations and says, well, this plus the interest is 61 and that's pretty close, but the thing was, is what

he did assign was one-half interest in that note, and that
would have been 25,000.  Twenty-five thousand with interest
is 30,000, but it's not 63,000.  I think before people
started disputing about the Falley note and about the
Stella Chen note, that this is pretty good evidence of why
the 63,155 wasn't picked up in the Lei Ming Li; it's
because he was getting paid over here under this other
note, under the $450,000.

THE COURT: Hold on a second.  Never mind.  Thank
you.

MR. ROMEO: Okay.

(Pause.)

I just think it's really significant.  Mr. Fu is
not acting as a seller in the escrow.  He was certainly in
the Santiesteban escrow consumed with the deeds of trust,
but if I'm a 25 percent owner, why am I not looking out for
what I'm getting?  Why am I not acting as a seller?  He's
not acting as a seller because he's got this Chen deed of
trust.

As far as the plaintiff's contentions -- I'll
wrap up here really quickly -- I want to say this about the
instructions.  The instructions are the instructions.  He
admitted signing them, but I don't think that they carry,
you know, the power that they ascribe to them.  For one
thing, the instructions are signed in a period in which,

1    you know, they are still negotiating.  They're still

2    disputing between him and Tony Fu.  He's already said that

3    he was under a threat of foreclosure.  He's under a threat

4    from Arthur Rugama (Phonetic), the buyer's attorney about,

5    you have to perform.

6          So in this sort of maelstrom of problems that,

7    you know, maybe he should not -- you know, he may have some

8    responsibility for creating by selling maybe too soon

9    before some of these problems were straightened out, I

10   think there's a very real threat when someone says that

11   they're holding a note and they're going to foreclose, that

12   that is a threat.  That is duress.  And in fact, it

13   continues to be duress clear up through 2004 right through

14   the bankruptcy filing, because if you look at the NOD, I

15   don't think that's a valid NOD.  The NOD says that the

16   default is that you haven't put the property on the market.

17   By the way, pay the attorney's fees.  But if you go and you

18   look at the attorney's fees, which by the time of Mr.

19   Farrer's letter and if you look at these exhibits 52, 53

20   and 54, they're asking for a total demand of 615,000.

21         So in addition to the 450,000, in addition to the

22   interest, there's over a hundred thousand in legal fees

23   even though the attorney's fee provisions in these

24   documents say that they're only entitled to attorney's fees

25   that are incurred -- reasonable attorney's fees that are

incurred in some action.  So they put a gun to this guy and they say you've got to pay every penny, every dollar of attorney's fees that we say they are in the context of an NOD.  This is not the usual -- this is not usually how it works with a judicial foreclosure.

So I question whether that was even a valid Notice of Default.  Had it been -- I question when they should get their interest because he did put it back on the market.  Since he's filed the case, the foreclosure has been stayed.  He then in January puts it back on the market.  He's in effect cured the non-monetary default.  Look what happens, everything gets sold.  It's in a blocked account.  Mr. Farrer and I both have signing authority on that account.  Everything is safe and satisfied.

If interest should run, interest should run from the time that each of these properties was sold because there was never enough without them being sold for them to be paid.  So I totally disagree that interest should run from February '02.  That's outrageous because they didn't ask it.  It shouldn't even run from November '02, and I don't think it should run from '04.  I think it should run from the time the property is sold, assuming that the Court is going to even award interest.

Your Honor, I think I've covered most of the points.  I've probably gone on a lot longer than I should

have, but I just -- as I said, I think that they came
forward with a story about a loan in Hong Kong which I hope
you will look at the evidence in detail and see how many
internal inconsistencies there are with that story.  When a
story is that late coming and it keeps evolving and it
keeps coming up with things that don't make sense or are
internally inconsistent, you have to wonder, you know,
about the genuineness of that story.

So I think it's actually more likely as a matter
of preponderance of the evidence that if there is an
obligation under this note, that obligation originated with
Tony Fu, not Mr. Leung in Hong Kong, and that the
plaintiff -- or the debtor in this case should not have to
pay two claims.  If there's one claim, he should have to
pay one claim, but not two.

I think that's all I have to say.  Thank you.

THE COURT: Okay.  I will get back to you.

MR. ROMEO: Yes, thank you.

MR. CHU: I have two minutes, Your Honor, if I
may?

THE COURT: Okay.

FURTHER CLOSING ARGUMENT

BY MR. CHU:

The Court inquired as to why Mr. Fu couldn't
simply record the notarized October 18th agreement himself,

1  if he was concerned about security.  Well, he could have,

2  Your Honor, but there was no reason for him to because

3  having the original agreement was his security.  His

4  concern in November of 2002 was the unsecured loan that the

5  family had made to Mr. Yan.

6          THE COURT: Okay.  Slow down a second.

7          MR. CHU: I think the argument was that in

8  November of 2002, Mr. Fu was concerned about his own

9  interest in the Chenery property because of the

10 deteriorating relations with Mr. Yan and Mr. Yan's failure

11 to pay.  The question then became, well, why would Mr. Fu

12 need a deed of trust to secure his interest when he already

13 had the original agreement that he could have recorded, and

14 the counter argument was, well, Mr. Fu was afraid to put

15 things on record in his own name because he was afraid of

16 these judgment creditors coming after him.

17          Well, if that were the case, Mr. Fu could have

18 recorded the agreement and then assigned it to one of his

19 friends.  He could have assigned an interest to one of his

20 friends, but he wasn't concerned about himself at the time.

21 He was concerned about his family.  His family was putting

22 pressure on him to get this loan collected.  His family

23 made the loan on his voucher.  Mr. Fu vouched for Mr. Yan

24 as a trustworthy person to whom the family could lend cash.

25 That turned out not to be the case.

1    So Mr. Fu wanted the deed of trust from Mr. Yan

2 to secure his family's loan, not to secure his own

3 interest.  His own interest was fine.  He had the original

4 agreement.  If he wanted to, he could have recorded it.  If

5 he was afraid that his creditors would come after his 25

6 percent interest in the property, he could have just

7 assigned his 25 percent interest in the property to someone

8 else.  And in fact, that happened.  He assigned his 25

9 percent interest to Mr. Suen for consideration.

10    The argument that Mr. Fu was concerned about his

11 own personal well-being and his own stake in the property

12 just doesn't wash.

13    That's all I have, Your Honor.

14    THE COURT: Do you have any comments about the --

15 Mr. Romeo's argument with respect to the lack of any

16 corroborating evidence that this cash was amassed or the

17 lack of any discussions, e-mails, letters, whatsoever,

18 prior to the execution of this note and deed of trust about

19 a loan and the failure to repay the loan?

20    MR. FARRER: Well, Your Honor, there's only three

21 people present when the loan was made, Mr. Leung, who

22 died --

23    THE COURT: I understand that.  The comment was

24 that there was no evidence that anybody went -- people go

25 into a bank to get this cash.  The loan wasn't paid for a

1  long time.

2          MR. FARRER: Well, there were phone calls.  Mr.

3  Fu, Fei Sing Fu --

4          THE COURT: It was all in phone calls, but there's

5  no -- there's nothing you can put your hands on was his

6  comment to show that the -- any mention of this loan but

7  for this meeting in -- I think it was November.

8          MR. ROMEO: February of 2002 -- or November of

9  2002.

10          THE COURT: It was November when the deed of trust

11  was signed.  So there's about --

12          MR. ROMEO: Correct.

13          MR. FARRER: Besides the phone calls?  I mean

14  because --

15          THE COURT: -- eight or nine months there.

16          MR. FARRER: -- Mr. Yan -- or Mr. Tony Fu

17  testified Mr. Yan called him on at least two occasions to

18  thank him for setting the thing up.

19          MR. ROMEO: Your Honor, I can address that a

20  little bit also.

21          THE COURT: I'm talking about corroboration in

22  some indisputable form.

23          MR. FARRER: Well, we did have --

24          THE COURT: Like a letter.

25          MR. FARRER:  -- we did have a Chinese note, but

1  he asked for it back as a condition of signing the new one,

2  so we don't have that.

3        THE COURT: Right.  But there's no copy --

4        MR. FARRER: And no copy, and that is unfortunate.

5  It's also unfortunate it's a cash loan, but I think that

6  testimony was that is not uncommon in Hong Kong for those

7  things to happen.

8        MR. CHU: That's -- that's what I was going to

9  emphasize, Your Honor.  This is a cultural sort of thing.

10  The Chinese happen to make a lot of loans to each other in

11  cash.  Mr. Fu testified to that.  They don't document it.

12  It's a handshake sort of thing.  The Chinese have a habit

13  of --

14        MR. ROMEO: Your Honor --

15        THE COURT: Well, there are risks in doing

16  business that way.

17        MR. CHU:  -- they keep a lot of money --

18        MR. ROMEO: Your Honor, I have a comment about

19  this.

20        MR. CHU:  -- they keep a lot of cash in the

21  house.

22        THE COURT: All right.  Let him finish, please.

23        MR. ROMEO: I'm sorry.

24        THE COURT: Sit down.  Let him finish.

25        MR. CHU: They keep a lot of cash in the house,

and I think there was testimony to the effect that Mr. Fu had quite a bit of cash in the house, but he had to go out and get the rest from the bank. And maybe Mr. Fu kept all the cash in the house. I mean that's not something you want to make public, but the Chinese do have a habit –- the Asians in particular have a cultural habit of keeping a lot of cash in the house, jewelry --

THE COURT: I understand that this is a loan which is not impossible.

MR. CHU: No.

THE COURT: The question is, is it more likely than not. Anything more? Mr. Romeo, you wanted to say something more, I just didn't want you to interrupt him.

MR. ROMEO: I'm sorry. I just –- before we left the cultural point, I mean I think that that was Mr. Fei Sing Fu's testimony. It might have been Tony Fu's, but Tony Fu has never lived in Hong Kong, so he doesn't know how things are done there. But I find that as sort of a –- I think it's –- how do you explain it. Hong Kong is a very sophisticated place. It's one of the financial capitals of the world. And I don't think that this is a bunch of dirt farmers writing a note –- a piece of notebook paper on someone's front porch for, you know, a loan. This is a lot of –- they emphasized that these are very sophisticated people. I don't think that they would do a loan in cash or

1  that their story that he would do a transaction purely in

2  cash in international commerce, I just don't think any of

3  that makes sense.

4       You know, I think that that's just kind of a

5  window dressing sort of argument to explain it, but I don't

6  think -- I don't think that's necessarily what goes on in

7  Hong Kong, at least with this type of dollars.

8       MR. FARRER: Of course, you didn't live there

9  either.

10       THE COURT: Nor did I.

11       MR. FARRER: Nor did I.

12       THE COURT: I will do the best I can.  I want to

13  listen to -- you know, we have this recorded digitally, and

14  I'm going to listen to some of the witnesses again.  I'm no

15  going to rule on this now because it has been a while, and

16  there's at least two witnesses that are very important, and

17  I want to go through their testimony, and I'll do that

18  tomorrow and I'll get back to you next week.

19       MR. ROMEO: Your Honor, my client reminds me that

20  I was already reminded about one of Mr. Chu's points, and

21  that was that when you asked about whether there was any

22  communications and the one thing I did want to remind the

23  Court is that Fei Sing Fu and Tony Fu who both said they

24  couldn't get a hold of Demas Yan until some time in May,

25  that he was unreachable, we did introduce today that he was

1 able to fax things back and forth from Thailand in the same

2 month that this note was supposedly -- or this loan was

3 supposedly made and due.

4      So I just want to remind the Court of that

5 testimony.

6      THE COURT: Okay.

7      MR. ROMEO: Okay.

8      THE COURT: I will get back to you next week.

9 Thank you.

10      MR. FARRER: A couple of things --

11      THE COURT: Now, we need to have a status

12 conference, but I need to figure this out first.

13      MR. FARRER: That's fine.  I think the Court may

14 have two copies of Exhibit 74, and if you do, I'd like to

15 get one of them because I don't have one.  And then I'd

16 like to get that official transcript from the deposition

17 that was so tortured and abbreviated because I want to talk

18 to my --

19      THE COURT: You want to go yell at him.

20      MR. FARRER: I want to get -- my court reporter

21 charged me for that.

22      THE COURT: I don't need to review 74 anymore.

23 That is not central to my deliberations at all.

24      MR. ROMEO: I'd give the transcript back and get

25 my money back.

1        THE COURT: Did I give you that, that transcript.

2        MR. FARRER: It was the September 3rd --

3        THE COURT: It was September 3rd which goes at one

4 point from page 68 to page 110. No, 101, and then 110.

5 You may have a beef with somebody. Okay.

6        MR. FARRER: All right. Thank you, your Honor.

7        THE COURT: So what I'm going to do is I will get

8 you on the phone. I'm probably going to give you a

9 decision orally, and at the conclusion of that -- I don't

10 know what it is yet -- but we'll have to figure out what

11 else needs to be done. Okay?

12        MR. ROMEO: Okay.

13        MR. FARRER: Thank you, Your Honor.

14        MR. ROMEO: Thank you, Your Honor. Appreciate

15 your patience today.

16        THE COURT: Okay.

17     (Whereupon, the proceedings are concluded at 5:35

18 p.m.)

19

20

21

22

23

24

25

1

2

3                    CERTIFICATE OF TRANSCRIBER

4

5

6            I certify that the foregoing is a correct

7    transcript from the digital sound recording of the

8    proceedings in the above-entitled matter.

9

10

11   DATED:  May 20, 2006

12

13                    By: /S/ Jo McCall

14

15

16

17

18

19

20

21

22

23

24

25